**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

***Counsel for Plaintiffs and the Putative Class***

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBBIE KROMMENHOCK and STEPHEN HADLEY, on behalf of themselves, all others similarly situated, and the general public,<br><br>        Plaintiffs,<br><br>              v.<br><br>POST FOODS LLC,<br><br>        Defendant. | Case No. 3:16-cv-04958-WHO (JSC)<br><br>**DECLARATION OF JACK FITZGFERALD IN OPPOSITION TO POST'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Judge:   Hon. William H. Orrick<br>Date:    January 10, 2018<br>Time:    2:00 p.m.<br>Dept:    4 |

I, Jack Fitzgerald, declare as follows:

1.      I am a member in good standing of the State Bars of California and New York; and of the United States District Courts for the Northern, Eastern, Central, and Southern Districts of California, the Southern and Eastern Districts of New York, and the Western District of Wisconsin; and of the United States Court of Appeals for the Ninth Circuit. I make this Declaration based on my own personal knowledge in opposition to Post's motion to dismiss the Second Amended Complaint.

2.      Attached hereto as <u>Exhibit 1</u> is a true and correct copy of a *New York Times* article titled "How the Sugar Industry Shifted Blame to Fat," written by Anahad O'Connor, and dated September 12, 2016 ("*New York Times* article"). My office obtained this article on December 20, 2016 from the following URL: http://mobile.nytimes.com/2016/09/13/well/eat/how-the-sugar-industry-shifted-blame-to-fat.html.

3.      The *New York Times* article states, on page 1, that "historical documents show" that "[t]he sugar industry paid scientists in the 1960s to play down the link between sugar and heart disease and promote saturated fat as the culprit instead . . . ."

4.      The *New York Times* article further states, on page 1, that "internal sugar industry documents . . . suggest that five decades of research into the role of nutrition and heart disease, including many of today's dietary recommendations, may have been largely shaped by the sugar industry," citing to Kearns, et al., "Sugar Industry and Coronary Heart Disease Research: A Historical Analysis of Internal; Industry Documents," *Journal of the American Medical Association Internal Medicine*, Vol. 176, No. 11, 1680-1685 (2016), a true and correct copy of which is attached hereto as <u>Exhibit 2</u>, and available at http://mobile.nytimes.com/2016/09/13/well/eat/how-the-sugar-industry-shifted-blame-to-fat.htmlshifted-blame-to-fat.html.

5.      The *New York Times* article also states, on page 2, that "[t]he documents show that a trade group called the Sugar Research Foundation, known today as the Sugar

1

Association, paid three Harvard scientists the equivalent of about $50,000 in today's dollars to publish a 1967 review of research on sugar, fat and heart disease."

6. Attached as <u>Exhibit 3</u> is a true and correct copy of a *Mother Jones* article titled, "Big Sugar's Sweet Little Lies, How the industry kept scientists from asking: Does sugar kill?" published in the November/December 2012 Issue, and authored by Gary Taubes and Cristen Kearns Couzens ("*Mother Jones* article"). My office obtained this article on November 23, 2016 from the following URL: http://www.motherjones.com/environment/2012/10/sugar-industry-lies-campaign.

7. According to the *Mother Jones* article, on page 9, "[t]he point man on the [sugar] industry's food and nutrition panel was Frederick Stare . . . ." The article further states that Frederick Stare "had a long history of ties to Big Sugar," including "raking in funding from sugar producers and food and beverage giants . . . ."

8. The *Mother Jones* article further states, on page 9, that "Sugar in the Diet of Man" "neglected to mention that it was funded by the sugar industry, but internal [Sugar Association] documents confirm that it was," citing a Confidential Memorandum from The Sugar Association to the Public Communications Committee, dated July 17, 1975, a true and correct copy of which is attached hereto as <u>Exhibit 4</u>, and is available at http://www.motherjones.com/documents/472453-confidential-memo-to-the-public-communications.

9. The *Mother Jones* articles also states, on page 9, that "The first act of the [Sugar Research Foundation's ] Food & Nutrition Advisory Council was to compile 'Sugar in the Diet of Man,' an 88-page white paper edited by Stare and published in 1975 to 'organize existing scientific facts concerning sugar.'" It further states that "Sugar in the Diet of Man" was "sent to reporters—the sugar Association circulated 25,000 copies—along with a press release . . . ." A true and correct copy of that press release, titled "Scientists Dispel Sugar Fears," is attached hereto as <u>Exhibit 5</u>, and available at http://www.motherjones.com/documents/472416-scientists-dispel-sugar-fears.

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
DECLARATION OF JACK FITZGERALD

10.     According to the *Mother Jones* article, on page 10, "[w]hile Stare and his colleagues had been drafting 'Sugar in the Diet of Man,' the FDA was launching its first review of whether sugar was . . . generally recognized as safe (GRAS) . . . ." The *Mother Jones* article further states that "[t]he FDA subcontracted the task to the Federation of American Societies of Experimental Biology, which created an 11-member committee . . . . led by biochemist George W. Irving Jr., who had previously served two years as chairman of the scientific advisory board of the International Sugar Research Foundation," and "another [Federation of American Societies of Experimental Biology] committee member, Samuel Fomon, had received sugar-industry funding for three of the five years prior to the sugar review."

11.     The *Mother Jones* article also states, on pages 10-11, that "the GRAS committee's review . . . depend[ed] heavily on 'Sugar in the Diet of Man' and other work by its authors" and concluded that "while sugar probably contributed to tooth decay, it was not a 'hazard to the public.'"

12.     On page 12, the *Mother Jones* article goes on to state that "[i]n 1980, when the USDA first published its own set of dietary guidelines, it relied heavily on a review for the American Society of Clinical Nutrition," which "used the GRAS committee's findings to bolster [its] own."

13.     According to the *Mother Jones* article, on page 12, when the USDA later updated its dietary guidelines in 1985, Frederick Stare was on the Dietary Advisory Committee, which promulgated guidelines maintaining that "too much sugar in your diet does not cause diabetes," despite that "the USDA's own Carbohydrate Nutrition Laboratory was still generating evidence to the contrary and supporting the notion that 'even low sucrose intake' might be contributing to heart disease in 10 percent of Americans."  The article further states that "[b]y the early 1990s, the USDA's research into sugar's health effects had ceased, and the FDA's take on sugar had become conventional wisdom, influencing a generation's worth of key publications on diet and health."

14.     Attached hereto as <u>Exhibit 6</u> is a true and correct copy of an article published in the journal *PLOS Biology*, Vol. 15 No. 11 (Nov. 21, 2017), titled "Sugar industry sponsorship of germ-free rodent studies linking sucrose to hyperlipidemia and cancer: An historical analysis of internal documents," authored by Cristin E. Kearns, Dori Apollonio, and Stanton A. Glantz, and available at http://journals.plos.org/plosbiology/article?id=10.1371/journal.pbio.2003460.

15.     Attached hereto as <u>Exhibit 7</u> is a true and correct copy of an article published in the *Annals of Internal Medicine*, Vol. 165 No. 12 (Dec. 20, 2016), titled "Do Sugar-Sweetened Beverages Cause Obesity and Diabetes? Industry and the Manufacture of Scientific Controversy," authored by Dean Schillinger, Jessica Tran, Christina Mangurian, and Cristin Kearns, available at http://annals.org/aim/article-abstract/2635017/do-sugar-sweetened-beverages-cause-obesity-diabetes.

16.     Attached hereto as <u>Exhibit 8</u> are true and correct copies of excerpts from a document produce by Post bearing production numbers Krommenhock_POST2558-666. Because this document was designated by Post as ""HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," plaintiffs are moving to file Exhibit 8 under seal.[1]

17.     Attached hereto as <u>Exhibit 9</u> are true and correct copies of excerpts from a document produced by Post bearing production numbers Krommenhock_POST5528-5633. Because this document was designated by Post as ""HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," plaintiffs are moving to file Exhibit 9 under seal.

18.     Attached hereto as <u>Exhibit 10</u> are true and correct copies of excerpts from a document produced by Post bearing production numbers Krommenhock_POST2866-925.

---

[1] This and other documents Post produced bear a stamp that states, in part, "SUBJECT TO RULE 408 – FOR SETTLEMENT PURPOSES ONLY." Post designated the documents in this manner because they were produced in anticipation of mediation. The parties mediated on October 9, but the matter did not settle. Post subsequently withdrew this "FOR SETTLEMENT PURPOSES ONLY" designation on all documents in had produced with the designation, since those documents will now be part of the discovery record in this case.

Because this document was designated by Post as ""HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," plaintiffs are moving to file Exhibit 9 under seal.

19.     Attached hereto as <u>Exhibit 11</u> are true and correct copies of excerpts from a document produced by Post bearing production numbers Krommenhock_POST1392-1434. Because this document was designated by Post as ""HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," plaintiffs are moving to file Exhibit 9 under seal.

20.     Attached hereto as <u>Exhibit 12</u> are true and correct copies excerpts from a document produced by Post bearing production numbers Krommenhock_POST3517-39. Because this document was designated by Post as ""HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," plaintiffs are moving to file Exhibit 9 under seal.

21.     The claim "Start the Day in a HEALTHY Way" on *Post Honeycomb*, inadvertently was left in the Second Amended Complaint (SAC ¶ 231c), despite that the Court previously dismissed that claim, *see Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 956-57 (N.D. Cal. 2017).  After noticing this, on October 10, 2017, plaintiffs' counsel advised Post's counsel of the error in writing, and withdrew the allegation.


I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 1st day of December, 2017, in San Diego, California

By:     <u>/s/ Jack Fitzgerald</u>
Jack Fitzgerald

# Exhibit 1

                                                                    

**Well**                                                    SUBSCRIBE | LOG IN

# How the Sugar Industry Shifted Blame to Fat

⊙                                                                       1702



ISTOCK

**By ANAHAD O'CONNOR**
**SEPTEMBER 12, 2016**

The sugar industry paid scientists in the 1960s to play down the link between sugar and heart disease and promote saturated fat as the culprit instead, newly released historical documents show.

The internal sugar industry documents, recently discovered by a researcher at the University of California, San Francisco, and published Monday in JAMA Internal Medicine, suggest that five decades of research into the role of nutrition and heart disease, including many of today's dietary recommendations, may have been largely shaped by the sugar industry.

"They were able to derail the discussion about sugar for decades," said Stanton Glantz, a professor of medicine at U.C.S.F. and an author of the JAMA Internal Medicine paper.

The documents show that a trade group called the Sugar Research Foundation, known today as the Sugar Association, paid three Harvard scientists the equivalent of about $50,000 in today's dollars to publish a 1967 review of research on sugar, fat and heart disease. The studies used in the review were handpicked by the sugar group, and the article, which was published in the prestigious New England Journal of Medicine, minimized the link between sugar and heart health and cast aspersions on the role of saturated fat.

Even though the influence-peddling revealed in the documents dates back nearly 50 years, more recent reports show that the food industry has continued to influence nutrition science.

ADVERTISEMENT

Last year, an article in The New York Times revealed that Coca-Cola, the world's largest producer of sugary beverages, had provided millions of dollars in funding to researchers who sought to play down the link between sugary drinks and obesity. In June, The Associated Press reported that candy makers were funding studies that claimed that children who eat candy tend to weigh less than those who do not.

The Harvard scientists and the sugar executives with whom they collaborated are no longer alive. One of the scientists who was paid by the sugar industry was D. Mark Hegsted, who went on to become the head of nutrition at the United States Department of Agriculture, where in 1977 he helped draft the forerunner to the federal government's dietary guidelines. Another was Dr. Fredrick J. Stare, the chairman of Harvard's nutrition department.

In a statement responding to the JAMA journal report, the Sugar Association said that the 1967 review was published at a time when medical journals did not typically require researchers to disclose funding sources. The New England Journal of Medicine did not begin to require financial disclosures until 1984.

The industry "should have exercised greater transparency in all of its research activities," the Sugar Association statement said. Even so, it defended industry-funded research as playing an important and informative role in scientific debate. It said that several decades of research had concluded that sugar "does not have a unique role in heart disease."

The revelations are important because the debate about the relative harms of sugar and saturated fat continues today, Dr. Glantz said. For many decades, health

officials encouraged Americans to reduce their fat intake, which led many people to consume low-fat, high-sugar foods that some experts now blame for fueling the obesity crisis.

"It was a very smart thing the sugar industry did, because review papers, especially if you get them published in a very prominent journal, tend to shape the overall scientific discussion," he said.

Dr. Hegsted used his research to influence the government's dietary recommendations, which emphasized saturated fat as a driver of heart disease while largely characterizing sugar as empty calories linked to tooth decay. Today, the saturated fat warnings remain a cornerstone of the government's dietary guidelines, though in recent years the American Heart Association, the World Health Organization and other health authorities have also begun to warn that too much added sugar may increase cardiovascular disease risk.

Marion Nestle, a professor of nutrition, food studies and public health at New York University, wrote an editorial accompanying the new paper in which she said the documents provided "compelling evidence" that the sugar industry had initiated research "expressly to exonerate sugar as a major risk factor for coronary heart disease."

"I think it's appalling," she said. "You just never see examples that are this blatant."

Dr. Walter Willett, chairman of the nutrition department at the Harvard T. H. Chan School of Public Health, said that academic conflict-of-interest rules had changed significantly since the 1960s, but that the industry papers were a reminder of "why research should be supported by public funding rather than depending on industry funding."

Dr. Willett said the researchers had limited data to assess the relative risks of sugar and fat. "Given the data that we have today, we have shown the refined carbohydrates and especially sugar-sweetened beverages are risk factors for cardiovascular disease, but that the type of dietary fat is also very important," he said.

The JAMA Internal Medicine paper relied on thousands of pages of correspondence and other documents that Cristin E. Kearns, a postdoctoral fellow at U.C.S.F., discovered in archives at Harvard, the University of Illinois and other libraries.

The documents show that in 1964, John Hickson, a top sugar industry executive, discussed a plan with others in the industry to shift public opinion "through our research and information and legislative programs."

ADVERTISEMENT

At the time, studies had begun pointing to a relationship between high-sugar diets and the country's high rates of heart disease. At the same time, other scientists, including the prominent Minnesota physiologist Ancel Keys, were investigating a competing theory that it was saturated fat and dietary cholesterol that posed the biggest risk for heart disease.

Mr. Hickson proposed countering the alarming findings on sugar with industry-funded research. "Then we can publish the data and refute our detractors," he wrote.

In 1965, Mr. Hickson enlisted the Harvard researchers to write a review that would debunk the anti-sugar studies. He paid them a total of $6,500, the equivalent of $49,000 today. Mr. Hickson selected the papers for them to review and made it clear he wanted the result to favor sugar.

Harvard's Dr. Hegsted reassured the sugar executives. "We are well aware of your particular interest," he wrote, "and will cover this as well as we can."

As they worked on their review, the Harvard researchers shared and discussed early drafts with Mr. Hickson, who responded that he was pleased with what they were writing. The Harvard scientists had dismissed the data on sugar as weak and given far more credence to the data implicating saturated fat.

"Let me assure you this is quite what we had in mind, and we look forward to its appearance in print," Mr. Hickson wrote.

After the review was published, the debate about sugar and heart disease died down, while low-fat diets gained the endorsement of many health authorities, Dr. Glantz said.

"By today's standards, they behaved very badly," he said.

 1702 COMMENTS »

**More in Well on NYTimes.com**

WELL
# Is Hot Yoga Good for You?



WELL
# Do Men and Women Need Separate

## Multivitamins?



WELL

## Can You Regain Muscle Mass After Age 60?

WELL

## Why Do I Gain Weight When I Exercise?

WELL

## Are Frozen Fruits and Vegetables as Nutritious as Fresh?

WELL

## Which Milk Is Most Nutritious: Soy, Cashew, Almond or Coconut?

WELL

## Does the Flu Provide Better Immunity Than a Flu Shot?

WELL

## Can a Child Drink Too Much Milk?

WELL

## Since Milk Is White, Why Is Butter Yellow?

**Back to top**

| | |
|---|---|
| **Home** | **Opinion** |
| **World** | **Science** |
| **U.S.** | **Health** |
| **Politics** | **Arts** |
| **The Upshot** | **Photos** |
| **New York** | **Style** |
| **Business Day** | **Video** |

**Technology**                    **Most Emailed**

**Sports**

**More Sections**

**Settings**

**Download the NYTimes app**

Help    Subscribe    Feedback    Terms of Service    Privacy

© 2016 The New York Times Company

# Exhibit 2

**JAMA Internal Medicine | Special Communication**

# Sugar Industry and Coronary Heart Disease Research
## A Historical Analysis of Internal Industry Documents

Cristin E. Kearns, DDS, MBA; Laura A. Schmidt, PhD, MSW, MPH; Stanton A. Glantz, PhD

Early warning signals of the coronary heart disease (CHD) risk of sugar (sucrose) emerged in the 1950s. We examined Sugar Research Foundation (SRF) internal documents, historical reports, and statements relevant to early debates about the dietary causes of CHD and assembled findings chronologically into a narrative case study. The SRF sponsored its first CHD research project in 1965, a literature review published in the *New England Journal of Medicine,* which singled out fat and cholesterol as the dietary causes of CHD and downplayed evidence that sucrose consumption was also a risk factor. The SRF set the review's objective, contributed articles for inclusion, and received drafts. The SRF's funding and role was not disclosed. Together with other recent analyses of sugar industry documents, our findings suggest the industry sponsored a research program in the 1960s and 1970s that successfully cast doubt about the hazards of sucrose while promoting fat as the dietary culprit in CHD. Policymaking committees should consider giving less weight to food industry–funded studies and include mechanistic and animal studies as well as studies appraising the effect of added sugars on multiple CHD biomarkers and disease development.

*JAMA Intern Med.* doi:10.1001/jamainternmed.2016.5394
Published online September 12, 2016.

← Invited Commentary

+ Author Audio Interview

+ Supplemental content

**Author Affiliations:** Author affiliations are listed at the end of this article.

**Corresponding Author**: Stanton A. Glantz, PhD, UCSF Center for Tobacco Control Research and Education, 530 Parnassus Ave, Ste 366, San Francisco, CA 94143-1390 (glantz@medicine.ucsf.edu).

In the 1950s, disproportionately high rates of coronary heart disease (CHD) mortality in American men led to studies of the role of dietary factors, including cholesterol, phytosterols, excessive calories, amino acids, fats, carbohydrates, vitamins, and minerals in influencing CHD risk.[1] By the 1960s, 2 prominent physiologists were championing divergent causal hypotheses of CHD[2,3]: John Yudkin identified added sugars as the primary agent, while Ancel Keys identified total fat, saturated fat, and dietary cholesterol. However, by the 1980s, few scientists believed that added sugars played a significant role in CHD, and the first *1980 Dietary Guidelines for Americans*[4] focused on reducing total fat, saturated fat, and dietary cholesterol for CHD prevention.

Although the contribution of dietary sugars to CHD is still debated, what is clear is that the sugar industry, led by the Sugar Association, the sucrose industry's Washington, DC–based trade association,[5] steadfastly denies that there is a relationship between added sugar consumption and CVD risk.[6,7] This Special Communication uses internal sugar industry documents to describe how the industry sought to influence the scientific debate over the dietary causes of CHD in the 1950s and 1960s, a debate still reverberating in 2016.

## Methods

The Sugar Association evolved from the Sugar Research Foundation (SRF), founded in 1943.[8] We located correspondence between the SRF and Roger Adams, a professor who served on the SRF's scientific advisory board (SAB) between 1959 and 1971, in the University of Illinois Archives[9] (319 documents totaling 1551 pages).

We located correspondence between the SRF and D. Mark Hegsted, professor of nutrition at the Harvard School of Public Health and codirector of the SRF's first CHD research project from 1965 to 1966,[10] in the Harvard Medical Library[11] (27 documents totaling 31 pages).

We collected additional SRF materials through a WorldCat search including annual reports, symposium proceedings, and interviews of research. We reviewed historical reports and statements contextualizing scientific debates in the 1950s and 1960s on dietary factors causally related to CHD published by the National Academy of Sciences–National Research Council (NAS-NRC), US Public Health Service, the American Heart Association (AHA), and American Medical Association (AMA). Findings were assembled chronologically into a narrative case study.

## Results

### SRF's Interest in Promoting a Low-Fat Diet to Prevent CHD

Sugar Research Foundation president Henry Hass's 1954 speech, "What's New in Sugar Research,"[12] to the American Society of Sugar Beet Technologists identified a strategic opportunity for the sugar industry: increase sugar's market share by getting Americans to eat a lower-fat diet: "Leading nutritionists are pointing out the chemical connection between [American's] high-fat diet and the formation of cholesterol which partly plugs our arteries and capillaries, restricts the flow of blood, and causes high blood pressure and heart trouble… if you put [the middle-aged man] on a low-fat diet, it takes just five days for the blood cholesterol to get down to where it should be… If the carbohydrate industries were to recapture this 20

percent of the calories in the US diet (the difference between the 40 percent which fat has and the 20 percent which it ought to have) and if sugar maintained its present share of the carbohydrate market, this change would mean an increase in the per capita consumption of sugar more than a third with a tremendous improvement in general health."[12]

The industry would subsequently spend $600 000 ($5.3 million in 2016 dollars) to teach "people who had never had a course in biochemistry… that sugar is what keeps every human being alive and with energy to face our daily problems."[12]

## Growing Evidence That Sucrose Elevates Serum Cholesterol Level

In 1962, the SRF became concerned with evidence showing that a low-fat diet high in sugar could elevate serum cholesterol level. At its November 1962 SAB meeting,[13] the SRF considered an AMA Council on Foods and Nutrition report, *The Regulation of Dietary Fat,*[14] that, according to the SRF, "indicate[d] that, in low fat diets, the kind of carbohydrate ingested may have an influence on the formation of serum cholesterol."[13] The SAB concluded, "that research developments in the [CHD] field should be watched carefully."[13] The SRF's vice president and director of research, John Hickson, started closely monitoring the field.[15]

In December 1964, Hickson reported to an SRF subcommittee[15] that new CHD research was a cause for concern: "From a number of laboratories of greater or lesser repute, there are flowing reports that sugar is a less desirable dietary source of calories than other carbohydrates, eg,—Yudkin."[15] Since 1957, British physiologist John Yudkin[16] had challenged population studies singling out saturated fat as the primary dietary cause of CHD and argued that other factors, including sucrose, were at least equally important.[17,18]

Hickson proposed that the SRF "could embark on a major program" to counter Yudkin and other "negative attitudes toward sugar."[15] He recommended an opinion poll "to learn what public concepts we should reinforce and what ones we need to combat through our research and information and legislative programs" and a symposium to "bring detractors before a board of their peers where their fallacies could be unveiled."[15] Finally, he recommended that SRF fund CHD research: "There seems to be a question as to whether the [atherogenic] effects are due to the carbohydrate or to other nutrient imbalance. We should carefully review the reports, probably with a committee of nutrition specialists; see what weak points there are in the experimentation, and replicate the studies with appropriate corrections. Then we can publish the data and refute our detractors."[15]

In 1965, the SRF asked Fredrick Stare, chair of the Harvard University School of Public Health Nutrition Department[19] to join its SAB as an ad hoc member.[20] Stare was an expert in dietary causes of CHD and had been consulted by the NAS,[1] National Heart Institute,[21] and AHA,[22] as well as by food companies and trade groups.[19] Stare's industry-favorable positions and financial ties would not be widely questioned until the 1970s.[23]

## Link Between Sucrose and Elevated Serum Triglyceride Level

On July 1, 1965, the SRF's Hickson visited D. Mark Hegsted, a faculty member of Stare's department,[24,25] after publication of articles in *Annals of Internal Medicine* in June 1965[26-29] linking sucrose to CHD.

The first 2 articles[26,27] reported results from an epidemiological study suggesting that blood glucose levels were a better predictor of atherosclerosis than serum cholesterol level or hypertension. The third[28(p210)] demonstrated that sucrose, more than starches, aggravated carbohydrate-induced hypertriglyceridemia and hypothesized that "perhaps fructose, a constituent of sucrose but not of starch, [was] the agent mainly responsible." An accompanying editorial[29(p1330)] argued that these findings corroborated Yudkin's research and that if elevated serum triglyceride levels were a CHD risk factor, then "sucrose must be atherogenic."

On July 11, 1965, the *New York Herald Tribune* ran a full-page article on the *Annals* articles stating that new research "threatened to tie the whole business [of diet and heart disease] in a knot."[30] It explained that, while sugar's association with atherosclerosis was once thought to be theoretical and supported by limited studies, the new research strengthened the case that sugar increased the risk of heart attacks.

## SRF Funds Project 226: A Literature Review on Sugars, Fats, and CHD

On July 13, 1965, 2 days after the *Tribune* article, the SRF's executive committee approved Project 226,[31] a literature review on "Carbohydrates and Cholesterol Metabolism" by Hegsted and Robert McGandy, overseen by Stare.[10] The SRF initially offered $500 ($3800 in 2016 dollars) to Hegsted and $1000 ($7500 in 2016 dollars) to McGandy, "half to be paid when you start work on the project, and the remainder when you inform me that the article has been accepted for publication."[31] Eventually, the SRF would pay them $6500[32] ($48 900 in 2016 dollars) for "a review article of the several papers which find some special metabolic peril in sucrose and, in particular, fructose."[31]

On July 23, 1965, Hegsted asked Hickson to provide articles relevant to the review.[33] Most of the articles Hickson sent[34-40] contained findings that could threaten sugar sales, which suggests that the industry expected the review authors to critique them. Hickson also sent the *Tribune* article[30] and a letter to the editor that criticized findings questioning the therapeutic value of corn oil.[41,42]

On July 30, 1965, Hickson emphasized the SRF's objective for funding the literature review to Hegsted: "Our particular interest had to do with that part of nutrition in which there are claims that carbohydrates in the form of sucrose make an inordinate contribution to the metabolic condition, hitherto ascribed to aberrations called fat metabolism. I will be disappointed if this aspect is drowned out in a cascade of review and general interpretation."[34]

In response, Hegsted assured Hickson that "We are well aware of your particular interest in carbohydrate and will cover this as well as we can."[43]

Nine months into the project, in April 1966, Hegsted told the SRF that the review had been delayed because of new evidence linking sugar to CHD: "Every time the Iowa group publishes a paper *we have to rework a section in rebuttal* [emphasis added]."[44] The "Iowa group" included Alfredo Lopez, Robert Hodges, and Willard Krehl, who had reported a positive association between sugar consumption and elevated serum cholesterol level.[45]

It is not clear whether the SRF commented on or edited drafts of the review. However, on September 6, 1966, Hickson asked

Hegsted, "Am I going to get another copy of the draft shortly?"[40] suggesting Hickson had been involved. Hegsted responded on September 29, "I expect to get it down to you within a week or two."[46] Hickson received the final draft on October 25, 1966, a few days before Hegsted intended to submit it for publication.[47] On November 2, Hickson told Hegsted, "Let me assure you this is quite what we had in mind and we look forward to its appearance in print."[47]

## Publication of Project 226

Project 226 resulted in a 2-part literature review by McGandy, Hegsted, and Stare "Dietary Fats, Carbohydrates and Atherosclerotic Disease," in the *New England Journal of Medicine* (*NEJM*) in 1967.[48,49] Industry and nonindustry funding of the review authors' experimental research was disclosed, but the SRF's funding and participation in the review was not. Evidence reported in the review was relevant to 2 questions: (1) Does the high sucrose content of the American diet cause CHD? and (2) What is the comparative effectiveness of interventions modifying the sucrose or saturated fat content of the diet for the prevention of CHD? The review concluded there was "no doubt" that the only dietary intervention required to prevent CHD was to reduce dietary cholesterol and substitute polyunsaturated fat for saturated fat in the American diet.[49(p246)]

## High Sucrose Content of the American Diet and CHD

The review summarized findings from epidemiologic, experimental, and mechanistic studies examining the role of sucrose in CHD (see eTable 1 in the Supplement). It reported that epidemiologic studies showed a positive association between high sucrose consumption and CHD outcomes[48(pp187-189)] and that experimental studies showed that sucrose caused serum cholesterol and serum triglyceride levels to rise in healthy individuals,[48(pp190-192)] and serum triglyceride levels to rise in those with hypertriglyceridemia.[49(pp242-243)] Finally, it reported that mechanistic studies demonstrated the biological plausibility of (1) sucrose affecting serum cholesterol level mediated through changes to the intestinal microbiome,[49(p243)] and (2) fructose, a component of sucrose, affecting serum triglyceride levels mediated through endogenous lipogenesis in the liver, adipose tissues, and other organs.[49(pp244-246)]

The review evaluated the quality of individual studies, including the work of Yudkin and the Iowa Group[48(pp187-188)] (see eTables 1 and 2 in the Supplement), investigators whom the SRF had identified as threatening before initiating the review[15] and in correspondence while it was being prepared.[34,44] The review discounted these studies on the grounds that they contained questionable data or incorrect interpretation.[48(pp187-189)49(pp242-243)] It questioned whether entire classes of evidence were relevant (see eTables 1 and 3 in the Supplement). It discounted epidemiologic evidence for identifying dietary causes of CHD because of multifactorial confounding[48(p188)] and experimental evidence from short-term studies using large doses of sucrose because they were not comparable with amounts typically consumed in the American diet.[48(pp191-192)] It discounted mechanistic studies conducted with fructose or glucose, not sucrose,[49(pp244)] and animal evidence because of species differences and because people rarely consumed low-fat diets typically fed to rats.[49(pp243-244)] Overall, the review focused on possible bias in individual studies

and types of evidence rather than on consistency across studies and the coherence of epidemiologic, experimental and mechanistic evidence.

## Comparative Effectiveness of Dietary Interventions for the Prevention of CHD

The *NEJM* review summarized findings from human randomized clinical trials (RCTs) evaluating the effect of sucrose interventions on serum cholesterol and triglyceride levels in healthy and hypertriglyceridemic individuals, and the effect of fat interventions on serum cholesterol levels in healthy persons (see eTable 4 in the Supplement). Regarding sucrose interventions, it argued that substituting fat for sucrose caused a large improvement in serum triglyceride levels in healthy individuals,[48(p190)] substituting starch for sucrose caused a large improvement in serum triglyceride levels in patients with hypertriglyceridemia,[49(pp242-243)] and that substituting leguminous vegetables for sucrose caused a large improvement in serum cholesterol levels in healthy individuals.[48(pp190-191)] Finally, it reported that substituting starch for sucrose caused a small improvement in serum cholesterol levels in healthy individuals.[48(pp190-191)] Regarding fat interventions, the review reported that reducing dietary cholesterol and substituting polyunsaturated fat for saturated fat caused a large improvement in serum cholesterol level in healthy persons.[48(pp189-190)]

The review discounted RCTs that had shown that substituting starch for sucrose had a large effect on improving serum triglyceride levels and implied that only studies that had used serum cholesterol level as a biomarker of CHD risk should be used to compare the efficacy of sucrose interventions to fat interventions (see eTable 4 in the Supplement). The review then discounted RCTs that had shown that substituting fat or vegetables for sucrose had a large effect on improving serum cholesterol level, by arguing this intervention was infeasible[48(p191)] (see eTables 4 and 5 in the Supplement). Substituting refined starches (sweetened with artificial sweeteners) for sucrose, despite being feasible, was dismissed because the magnitude of effect on serum cholesterol level was minimal compared with reducing dietary cholesterol level and substituting polyunsaturated fat for saturated fat.[48(pp190-191)]

Unlike its summary of sucrose intervention RCTs, the review reported few study characteristics and no quantitative results in its summary of fat intervention RCTs.[48(pp189-190)] Consulting the original fat intervention RCTs reveals that the review overstated the consistency of studies (see eTable 6 in the Supplement). Only 1 RCT, conducted by Hegsted et al,[50] concluded that reducing dietary cholesterol and substituting polyunsaturated fat for saturated fat substantially improved serum cholesterol levels. Consulting the original clinical studies cited to substantiate reducing dietary cholesterol and substituting polyunsaturated fat for saturated fat reveals that they were not well controlled. Despite arguing earlier in the review that epidemiologic evidence was irrelevant to determining dietary causes of CHD,[48(pp187-189)] the review implied that the epidemiologic evidence pointed to dietary cholesterol and saturated fat as the primary dietary causes of CHD.[49(p246)] The review argued that the lack of mechanistic evidence confirming the biological plausibility that dietary cholesterol and saturated fat raised serum cholesterol levels was unimportant.[49(p246)] Finally, the review emphasized that polyunsaturated fats were readily available and would be well accepted as substitute for saturated fats in the American diet.[49(p246)]

## Discussion

These internal documents show that the SRF initiated CHD research in 1965 to protect market share and that its first project, a literature review, was published in *NEJM* in 1967 without disclosure of the sugar industry's funding or role. The *NEJM* review served the sugar industry's interests by arguing that epidemiologic, animal, and mechanistic studies associating sucrose with CHD were limited, implying they should not be included in an evidentiary assessment of the CHD risks of sucrose. Instead, the review argued that the only evidence modality needed to yield a definitive answer to the question of how to modify the American diet to prevent CHD was RCTs that exclusively used serum cholesterol level as a CHD biomarker. Randomized clinical trials using serum cholesterol level as the CHD biomarker made the high sucrose content of the American diet seem less hazardous than if the entire body of evidence had been considered.

Following the *NEJM* review, the sugar industry continued to fund research on CHD and other chronic diseases "as a main prop of the industry's defense."[51] For example, in 1971, it influenced the National Institute of Dental Research's National Caries Program to shift its emphasis on dental caries interventions other than restricting sucrose.[8] The industry commissioned a review, "Sugar in the Diet of Man," which it credited with, among other industry tactics, favorably influencing the 1976 US Food and Drug Administration evaluation of the safety of sugar.[51] These findings, our analysis, and current Sugar Association criticisms of evidence linking sucrose to cardiovascular disease[6,7] suggest the industry may have a long history of influencing federal policy.

This historical account of industry efforts demonstrates the importance of having reviews written by people without conflicts of interest and the need for financial disclosure. Scientific reviews shape policy debates, subsequent investigations, and the funding priorities of federal agencies.[52] The *NEJM* has required authors to disclose all conflicts of interest since 1984,[53] and conflict of interest disclosure policies have been widely implemented since the sugar industry launched its CHD research program. Whether current conflict of interest policies are adequate to withstand the economic interests of industry remains unclear.[54]

Many industries sponsor research to influence assessments of the risks and benefits of their products.[55-57] The influence of industry sponsorship on nutrition research is receiving increased scrutiny.[58] Access to documents not meant for public consumption has provided the public health community unprecedented insight into industry motives, strategies, tactics, and data designed to protect companies from litigation and regulation.[59] This insight has been a major factor behind successful global tobacco control policies.[60] Our analysis suggests that research using sugar industry documents has the potential to inform the health community about how to counter this industry's strategies and tactics to control information on the adverse health effects of sucrose.

### Study Limitations

The Roger Adams papers and other documents used in this research provide a narrow window into the activities of 1 sugar industry trade association; therefore, it is difficult to validate that the documents gathered are representative of the entirety of SRF internal materials related to Project 226 from the 1950s and 1960s or that the proper weight was given to each data source. There is no direct evidence that the sugar industry wrote or changed the *NEJM* review manuscript; the evidence that the industry shaped the review's conclusions is circumstantial. We did not analyze the role of other organizations, nutrition leaders, or food industries that advocated that saturated fat and dietary cholesterol were the main dietary cause of CHD. We could not interview key actors involved in this historical episode because they have died.

## Conclusions

This study suggests that the sugar industry sponsored its first CHD research project in 1965 to downplay early warning signals that sucrose consumption was a risk factor in CHD. As of 2016, sugar control policies are being promulgated in international,[61] federal,[62,63] state, and local venues.[64] Yet CHD risk is inconsistently cited as a health consequence of added sugars consumption. Because CHD is the leading cause of death globally, the health community should ensure that CHD risk is evaluated in future risk assessments of added sugars. Policymaking committees should consider giving less weight to food industry–funded studies, and include mechanistic and animal studies as well as studies appraising the effect of added sugars on multiple CHD biomarkers and disease development.[65]

**ARTICLE INFORMATION**

**Accepted for Publication:** July 2, 2016.

**Published Online:** September 12, 2016.
doi:10.1001/jamainternmed.2016.5394.

**Author Affiliations:** Philip R. Lee Institute for Health Policy Studies, San Francisco, California (Kearns, Schmidt, Glantz); Department of Orofacial Sciences, University of California, San Francisco (Kearns); Clinical and Translational Science Institute, San Francisco, California (Schmidt); Department of Anthropology, History, and Social Medicine, University of California, San Francisco (Schmidt); Department of Medicine, University of California, San Francisco (Glantz); Center for Tobacco Control Research and Education, San Francisco, California (Glantz); Cardiovascular Research Institute, San Francisco, California (Glantz); Helen Diller Family Comprehensive Cancer Center, San Francisco, California (Glantz).

**Author Contributions:** Drs Kearns and Glantz had full access to all the data in the study and take responsibility for the integrity of the data and the accuracy of data analysis.
*Study concept and design:* All authors.
*Acquisition, analysis, or interpretation of data:* All authors.
*Drafting of the manuscript:* Kearns.
*Critical revision of the manuscript for important intellectual content:* All authors.
*Statistical analysis:* Glantz.
*Obtained funding:* Glantz.
*Administrative, technical, or material support:* Kearns, Glantz.
*Study supervision:* Schmidt, Glantz.

**Conflict of Interest Disclosures:** None reported.

**Funding/Support:** This work was supported by the UCSF Philip R. Lee Institute for Health Policy Studies, a donation by the Hellmann Family Fund to the UCSF Center for Tobacco Control Research and Education, the UCSF School of Dentistry Department of Orofacial Sciences and Global Oral Health Program, National Institute of Dental and Craniofacial Research grant DE-OO7306 and National Cancer Institute Grant CA-087472.

**Role of the Funder/Sponsor:** The funders had no role in design and conduct of the study; collection, management, analysis, and interpretation of the data; and preparation, review, or approval of the manuscript.

**Additional Contributions:** We thank Kimber Stanhope, PhD, RD, for advice on the analysis of the

SRF-funded *NEJM* review and the original studies it cited. No compensation was received for her contribution.

## REFERENCES

**1.** National Academy of Sciences-National Research Council. Symposium on atherosclerosis held under the auspices of the Division of Medical Sciences National Academy of Sciences–National Research Council at the request of the Human Factors Division Air Force Directorate of Research and Development. March 22-23, 1954. 1954; https://catalog.hathitrust.org/Record/001566340. Accessed August 31, 2015.

**2.** Taubes G. *Good Calories, Bad Calories: Challenging the Conventional Wisdom on Diet, Weight Control, and Disease.* New York, NY: Knopf; 2007.

**3.** Teicholz N. *The Big Fat Surprise: Why Butter, Meat, and Cheese Belong in a Healthy Diet.* New York, NY: Simon and Schuster; 2014.

**4.** US Department of Health and Human Services and Department of Agriculture. *Nutrition and Your Health: Dietary Guidelines for Americans.* Washington, DC: US Government Printing Office; 1980.

**5.** Sugar Association. Return of organization exempt from income tax form 990. 2014. https://projects.propublica.org/nonprofits/organizations/132614920. Accessed September 23, 2015.

**6.** Sugar Association. Sugar and heart health: what are the facts? 2015. https://www.sugar.org/sugar-heart-health-facts/. Accessed August 11, 2015.

**7.** Sugar Association. Comment ID No. 22978, submitted May 7, 2015. Office of Disease Prevention and Health Promotion website. https://health.gov/dietaryguidelines/dga2015/comments/readCommentDetails.aspx?CID=22978. Accessed January 20, 2016.

**8.** Kearns CE, Glantz SA, Schmidt LA. Sugar industry influence on the scientific agenda of the National Institute of Dental Research's 1971 National Caries Program: a historical analysis of internal documents. *PLoS Med.* 2015;12(3):e1001798.

**9.** Roger Adams: an inventory of the papers of Roger Adams at the University of Illinois Archives, 1889-1971. Papers of Roger Adams. Urbana: University of Illinois. Record Series No. 15/5/23.

**10.** Cheek DW. *Sugar Research, 1943-1972.* Bethesda, MD: International Sugar Research Foundation; 1974.

**11.** Finding aid Hegsted, D. Mark (David Mark), 1914-2009. Papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**12.** Hass HB. What's new in sugar research. Proceedings of the American Society of Sugar Beet Technologists. 1954. http://digitalcollections.qut.edu.au/1407/5/American_Society_of_Sugar_Beet_Technologists_1954_Part_1.pdf. Accessed October 10, 2015.

**13.** Sugar Research Foundation Inc. Minutes of a meeting of the Scientific Advisory Board (November 9, 1962). Papers of Roger Adams at the University of Illinois Archives, 1889-1971. Urbana: University of Illinois. Record Series No. 15/5/23.

**14.** Council on Foods and Nutrition (American Medical Association). The regulation of dietary fat: a report of the council. *JAMA.* 1962;181(5):411-429.

**15.** Hickson JL. Memoranda to Neil Kelly regarding possible activities of the Sugar Association Inc (December 14, 1964). Papers of Roger Adams at the University of Illinois Archives, 1889-1971. Urbana: University of Illinois. Record Series No. 15/5/23.

**16.** Yudkin J. *Pure, White and Deadly: The Problem of Sugar.* London, England: Davis-Poynter Ltd; 1972.

**17.** Yudkin J. Diet and coronary thrombosis hypothesis and fact. *Lancet.* 1957;273(6987):155-162.

**18.** Yudkin J. Dietary fat and dietary sugar in relation to ischaemic heart-disease and diabetes. *Lancet.* 1964;2(7349):4-5.

**19.** Hegsted DM. Fredrick John Stare (1910-2002). *J Nutr.* 2004;134(5):1007-1009.

**20.** Hickson JL. Letter to Scientific Advisory Board of Sugar Research Foundation (January 14, 1965). Papers of Roger Adams at the University of Illinois Archives, 1889-1971. Urbana: University of Illinois. Record Series No. 15/5/23.

**21.** Technical Group of Committee on Lipoproteins and Atherosclerosis and Committee on Lipoproteins and Atherosclerosis of National Advisory Heart Council. Evaluation of serum lipoprotein and cholesterol measurements as predictors of clinical complications of atherosclerosis: report of a cooperative study of lipoproteins and atherosclerosis. *Circulation.* 1956;14(4, pt 2):691-742.

**22.** Page IH, Allen EV, Chamberlain FL, Keys A, Stamler J, Stare FJ. Dietary fat and its relation to heart attacks and strokes. *Circulation.* 1961;23(1):133-136.

**23.** Hess J. Harvard's sugar-pushing nutritionist. *Saturday Rev.* 1978;(August):10-14.

**24.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (June 16, 1965). D. Mark Hegsted Papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**25.** Hegsted DM. Letter to Charles O'Boyle (July 2, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**26.** Ostrander LD Jr, Francis T Jr, Hayner NS, Kjelsberg MO, Epstein FH. The relationship of cardiovascular disease to hyperglycemia. *Ann Intern Med.* 1965;62(6):1188-1198.

**27.** Epstein FH, Ostrander LD Jr, Johnson BC, et al. Epidemiological studies of cardiovascular disease in a total community—Tecumseh, Michigan. *Ann Intern Med.* 1965;62(6):1170-1187.

**28.** Kuo PT, Bassett DR. Dietary sugar in the production of hyperglyceridemia. *Ann Intern Med.* 1965;62(6):1199-1212.

**29.** Albrink MJ. Carbohydrate metabolism in cardiovascular disease. *Ann Intern Med.* 1965;62(6):1330-1333.

**30.** Ubell E. Sugar: moot factor in heart disease from New York Herald Tribune. 1965; D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medial Library, Francis A. Countway Library of Medicine. H MS c54.

**31.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (July 15, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**32.** International Sugar Research Foundation. ISRF quadrennial report of research for the years 1965-1969. 1969. Papers of Roger Adams at the University of Illinois Archives, 1889-1971. Urbana: University of Illinois. Record Series No. 15/5/23.

**33.** Hegsted DM. Letter to John L. Hickson, Sugar Research Foundation (July 23, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**34.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (July 30, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**35.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (October 18, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**36.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (December 10, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**37.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (March 22, 1966). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**38.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (March 8, 1966). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**39.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (September 19, 1966). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**40.** Hickson JL. Letter to Professor Mark Hegsted, Harvard University (September 6, 1966). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**41.** Kinsell LW. Correspondence: diet and ischemic heart disease in *British Medical Journal* (1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**42.** Dietary fats and intestinal thiamine synthesis in rats. *Nutr Rev.* 1965;23(11):334-336.

**43.** Hegsted DM. Letter to John L. Hickson, Sugar Research Foundation (August 10, 1965). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**44.** Hegsted DM. Letter to John L. Hickson, Sugar Research Foundation (April 26, 1966). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**45.** Lopez A, Hodges RE, Krehl WA. Some interesting relationships between dietary carbohydrates and serum cholesterol. *Am J Clin Nutr.* 1966;18(2):149-153.

**46.** Hegsted DM. Letter to John L. Hickson, Sugar Research Foundation (September 29, 1966). D.

Copyright 2016 American Medical Association. All rights reserved.

Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medial Library, Francis A. Countway Library of Medicine. H MS c54.

**47**. Hickson JL. Letter to Professor Mark Hegsted, Harvard University (April 29, 1966). D. Mark Hegsted papers, 1952-1999 (inclusive), 1960-1978 (bulk). Boston, MA: Harvard Medical Library, Francis A. Countway Library of Medicine. H MS c54.

**48**. McGandy RB, Hegsted DM, Stare FJ. Dietary fats, carbohydrates and atherosclerotic vascular disease. *N Engl J Med*. 1967;277(4):186-192.

**49**. McGandy RB, Hegsted DM, Stare FJ. Dietary fats, carbohydrates and atherosclerotic vascular disease. *N Engl J Med*. 1967;277(5):245-247.

**50**. Hegsted DM, McGandy RB, Myers ML, Stare FJ. Quantitative effects of dietary fat on serum cholesterol in man. *Am J Clin Nutr*. 1965;17(5):281-295.

**51**. Taubes G, Couzens CK. Big sugar's sweet little lies: how the industry kept scientists from asking, does sugar kill? 2012. http://www.motherjones.com /environment/2012/10/sugar-industry-lies -campaign Accessed October 17, 2014.

**52**. Eden J, Levit L, Berg A, Morton S. *Finding What Works in Health Care: Standards for Systematic Reviews*. Washington, DC: National Academies Press; 2011.

**53**. *New England Journal of Medicine*. Integrity safeguards. 2016; http://www.nejm.org/page

/media-center/integrity-safeguards. Accessed January 30, 2016.

**54**. Aveyard P, Yach D, Gilmore AB, Capewell S. Should we welcome food industry funding of public health research? *BMJ*. 2016;353(i2161):i2161.

**55**. Jørgensen AW, Hilden J, Gøtzsche PC. Cochrane reviews compared with industry supported meta-analyses and other meta-analyses of the same drugs: systematic review. *BMJ*. 2006; 333(7572):782-782.

**56**. Oreskes N, Conway EM. *Merchants of Doubt*. New York, NY: Bloomsbury Press; 2010.

**57**. Glantz SA, Slade J, Bero LA, Hanauer P, Barnes DE. *The Cigarette Papers*. Berkeley: University of California Press; 1996.

**58**. Nestle M. Corporate funding of food and nutrition research: science or marketing? *JAMA Intern Med*. 2016;176(1):13-14.

**59**. Bero L. Implications of the tobacco industry documents for public health and policy. *Annu Rev Public Health*. 2003;24:267-288.

**60**. World Health Organization. WHO Framework Convention on Tobacco Control. 2003. http://apps.who.int/iris/bitstream/10665/42811/1 /9241591013.pdf. Accessed October 20, 2014.

**61**. World Health Organization. *Guidelines: Sugar Intake for Adults and Children*. Geneva, Switzerland: World Health Organization; 2015.

**62**. US Department of Health and Human Services and US Department of Agriculture. *2015-2020 Dietary Guidelines for Americans*. 8th ed. Washington, DC: U.S. Government Printing Office; 2016.

**63**. US Food and Drug Administration. Changes to the nutrition facts label. 2016. http://www.fda .gov/Food/GuidanceRegulation /GuidanceDocumentsRegulatoryInformation /LabelingNutrition/ucm385663.htm. Accessed June 7, 2016.

**64**. California Center for Public Health Advocacy. Kick the can, giving the boot to sugary drinks: legislative campaigns. 2016. http://www.kickthecan .info/legislative-campaigns. Accessed January 19, 2016.

**65**. Miller M, Stone NJ, Ballantyne C, et al; American Heart Association Clinical Lipidology, Thrombosis, and Prevention Committee of the Council on Nutrition, Physical Activity, and Metabolism; Council on Arteriosclerosis, Thrombosis and Vascular Biology; Council on Cardiovascular Nursing; Council on the Kidney in Cardiovascular Disease. Triglycerides and cardiovascular disease: a scientific statement from the American Heart Association. *Circulation*. 2011; 123(20):2292-2333.

# Exhibit 3



"THE MOST EMPOWERING MOVIE YOU'LL SEE THIS YEAR."
—Bustle.com
THE EAGLE HUNTRESS

NOW PLAYING SELECT CITIES NATIONWIDE ON FRIDAY

GET TICKETS

# MotherJones

SUBSCRIBE    DONATE

POLITICS    ENVIRONMENT    FOOD    MEDIA    CRIME & JUSTICE    PHOTOS    INVESTIGATIONS    MAGAZINE

**Fight like hell: Read our thoughts** on the election—and what we, together, can do next.

# Big Sugar's Sweet Little Lies

How the industry kept scientists from asking: Does sugar kill?

**GARY TAUBES** AND **CRISTIN KEARNS COUZENS**    **NOVEMBER/DECEMBER 2012 ISSUE**





*Chris Buzelli*

**On a brisk spring** Tuesday in 1976, a pair of executives from the Sugar Association stepped up to the podium of a Chicago ballroom to accept (http://select.nytimes.com/gst/abstract.html?res=F50D16FE3D5B167493CBA8178ED85F428785F9) the

Oscar of the public relations world, the Silver Anvil (http://www.prsa.org/awards/search?
pg=1&saYear=All&sakeyword=sugar+association&saCategory=Crisis+Management&saIndustry=&saOutc
ome=) award for excellence in "the forging of public opinion.
(http://www.prsa.org/Awards/SilverAnvil/)" The trade group had recently pulled off one of the
greatest turnarounds in PR history. For nearly a decade, the sugar industry had been
buffeted by crisis after crisis as the media and the public soured on sugar and scientists
began to view it as a likely cause of obesity, diabetes, and heart disease. Industry ads
claiming that eating sugar helped you lose weight had been called out
(http://www.ftc.gov/opa/1997/03/dietcase.shtm) by the Federal Trade Commission, and the Food
and Drug Administration had launched a review
(http://www.fda.gov/Food/FoodIngredientsPackaging/GenerallyRecognizedasSafeGRAS/GRASSubstancesS
COGSDatabase/ucm084142.htm) of whether sugar was even safe to eat. Consumption had
declined 12 percent in just two years, and producers could see where that trend might
lead. As John "JW" Tatem Jr. and Jack O'Connell Jr., the Sugar Association's president
and director of public relations, posed that day with their trophies, their smiles only
hinted at the coup they'd just pulled off.

Their winning campaign, crafted with the help of the prestigious public relations firm
Carl Byoir & Associates, had been prompted by a poll
(http://www.motherjones.com/documents/486416-executive-summary-attitudes-toward-sugar-poll)
showing that consumers had come to see sugar as fattening, and that most doctors
suspected it might exacerbate, if not cause, heart disease and diabetes. With an initial
annual budget of nearly $800,000 ($3.4 million today) collected from the makers of
Dixie Crystals, Domino, C&H, Great Western, and other sugar brands, the association
recruited a stable of medical and nutritional professionals to allay the public's fears,
brought snack and beverage companies into the fold, and bankrolled scientific papers
that contributed to a "highly supportive" FDA ruling, which, the Silver Anvil
application boasted, made it "unlikely that sugar will be subject to legislative
restriction in coming years."



The story of sugar, as Tatem told it, was one of a
harmless product under attack by "opportunists
dedicated to exploiting the consuming public.
(http://www.motherjones.com/documents/472384-remarks-by-john-
tatem-at-the-chicago-nutrition#document/p6/a79252)" Over the
subsequent decades, it would be transformed from
what the *New York Times* in 1977 had deemed "a
villain in disguise (http://select.nytimes.com/gst/abstract.html?
res=F70F17F83D5F127A93C7AB178ED85F438785F9)" into a

A Timeline of Sugar Spin
(/politics/2012/10/sugar-industry-marketing-timeline)

How a Former Dentist Drilled Big Sugar
(/environment/2012/10/former-dentist-sugar-industry-
lies)

WATCH: Q&A With Author Gary Taubes
(/blue-marble/2012/10/watch-video-gary-taubes-
sugar-regulation)

Secret Sugar Documents Revealed
(/environment/2012/10/sugar-industry-internal-
documents-revealed)

nutrient so seemingly innocuous that even the
American Heart Association and the American
Diabetes Association approved it as part of a healthy
diet. Research on the suspected links between sugar
and chronic disease largely ground to a halt by the late 1980s, and scientists came to
view such pursuits as a career dead end. So effective were the Sugar Association's
efforts that, to this day, no consensus exists about sugar's potential dangers.

The industry's PR campaign corresponded roughly with a significant rise in Americans' consumption of "caloric sweeteners, (http://www.google.com/url? sa=t&rct=j&q=&esrc=s&source=web&cd=3&ved=0CDAOFiAC&url=http%3A%2F% 2Fwww.ers.usda.gov%2Fdatafiles%2FFood_Availabily_Per_Capita_Data_System% 2FLossAdjusted_Food_Availability%2Fsugar.xls&ei=uq-FUOGmNcm2vAGG54COCg&usg=AFOjCNFPiUswOP2lu5_GdYgFAKwhGvt3Ig&sig2=avi88Tv5bbGkX Cl9X4RXHQ&cad=ria) " including table sugar (sucrose) and high-fructose corn syrup (HFCS). This increase was accompanied, in turn, by a surge in the chronic diseases increasingly linked to sugar. Since 1970, obesity rates (http://www.cdc.gov/nchs/data/hestat/obesity_adult_07_08/obesity_adult_07_08.htm) in the United States have more than doubled, while the incidence of diabetes (http://www.motherjones.com/documents/459554-long-term-trends-in-diagnosed-diabetes-october) has more than tripled. (The chart below uses sugar "availability" numbers rather than the USDA's speculative new consumption figures (http://www.nytimes.com/2012/10/27/business/us-cuts-estimate-of-sugar-intake-of-typical-american.html?pagewanted=all) .)



Precisely how did the sugar industry engineer its turnaround? The answer is found in more than 1,500 pages of internal memos, letters, and company board reports we discovered buried in the archives (http://www.motherjones.com/environment/2012/10/how-unemployed-dentist-drilled-sugar-industry) of now-defunct sugar companies as well as in the recently released papers of deceased researchers and consultants who played key roles in the industry's strategy. They show how Big Sugar used Big Tobacco-style tactics to ensure that government agencies would dismiss troubling health claims against their products.

Compared to the tobacco companies, which knew for a fact that their wares were deadly and spent billions of dollars trying to cover up that reality, the sugar industry had a relatively easy task. With the jury still out on sugar's health effects, producers simply needed to make sure that the uncertainty lingered. But the goal was the same: to safeguard sales by creating a body of evidence companies could deploy to counter any unfavorable research.

This decades-long effort to stack the scientific deck is why, today, the USDA's dietary guidelines (http://www.cnpp.usda.gov/DGAs2010-PolicyDocument.htm) only speak of sugar in vague generalities. ("Reduce the intake of calories from solid fats and added sugars.") It's why the FDA insists that sugar is "generally recognized as safe (http://www.fda.gov/Food/FoodIngredientsPackaging/GenerallyRecognizedasSafeGRAS/GRASSubstancesSCOGSDatabase/ucm260083.htm) " despite considerable evidence suggesting otherwise. It's why some scientists' urgent calls for regulation of sugary products have been dead on arrival, and it's why—absent any federal leadership—New York City Mayor Michael Bloomberg felt compelled to propose a ban on oversized sugary drinks (http://www.nytimes.com/2012/09/14/nyregion/health-board-approves-bloombergs-soda-ban.html) that passed in September.

**For 40 years, the sugar industry's priority has been to shed doubt on studies suggesting that its product makes people sick.**

In fact, a growing body of research suggests that sugar and its nearly chemically identical cousin, HFCS, may very well cause diseases that kill hundreds of thousands of Americans every year, and that these chronic conditions would be far less prevalent if we significantly dialed back our consumption of added sugars. Robert Lustig, a leading authority on pediatric obesity at the University of California-San Francisco (whose arguments Gary explored in a 2011 *New York Times Magazine* cover story (http://www.nytimes.com/2011/04/17/magazine/mag-17Sugar-t.html?pagewanted=print) ), made this case last February in the prestigious journal *Nature*. In an article titled "The Toxic Truth About Sugar, (http://www.nature.com/nature/journal/v482/n7383/full/482027a.html?WT.mc_id=TWT_NatureRevEndo) " Lustig and two colleagues observed that sucrose and HFCS are addictive in much the same way as cigarettes and alcohol, and that overconsumption of them is driving worldwide epidemics of obesity and type 2 diabetes (the type associated with obesity). Sugar-related diseases are costing America around $150 billion a year, the authors estimated, so federal health officials need to step up and consider regulating the stuff.

**The fact that confirmed scientific evidence links sugar to the death-dealing diseases...is the lifeblood" of the sugar association.**

The Sugar Association dusted off (http://www.sugar.org/press-releases/sugar-association-finds-opinion-piece-published-in-nature-non-scientific-and-irresponsible.html) what has become its stock response: The Lustig paper, it said, "lacks the scientific evidence or consensus" to support its claims, and its authors were irresponsible not to point out that the full body of science "is inconclusive at best." This inconclusiveness, of course, is precisely what the Sugar Association has worked so assiduously to maintain. "In confronting our critics," Tatem explained (http://www.motherjones.com/documents/493719-excerpt-of-the-presidents-report-board-of#document/p9/a79770) to his board of directors back in 1976, "we try never to lose sight of the fact that no confirmed scientific evidence links sugar to the death-dealing diseases. This crucial point is the lifeblood of the association."

**The Sugar Association's** earliest incarnation (http://www.sugar.org/about-us/history.html) dates back to 1943, when growers and refiners created the Sugar Research Foundation to counter World War II sugar-rationing propaganda (http://www.motherjones.com/documents/480900-a-suggested-program-for-the-cane-and-beet-sugar#document/p1/a79021) —"How Much Sugar Do You Need? None!" declared one government pamphlet. In 1947, producers rechristened their group the Sugar Association and launched a new PR division, Sugar Information Inc., which before long was touting sugar (http://books.google.com/books?id=P1OEAAAAMBAJ&pg=PA9&dq=sugar+information+inc.&hl=en&sa=X&ei=9Y-dT8XPGOW22gXahvXfDg&ved=0CFcO6AEwBA#v=onepage&q=sugar%20information%20inc.&f=false) as a "sensible new approach to weight control." In 1968, in the hope of enlisting foreign sugar companies to help defray costs, the Sugar Association spun off its research division as the International Sugar Research Foundation. "Misconceptions concerning the causes of tooth decay, diabetes, and heart problems exist on a worldwide basis," explained a 1969 ISRF recruiting brochure (http://www.motherjones.com/documents/493727-isrf-brochure#annotation/a79784) .

As early as 1962, internal Sugar Association memos had acknowledged the potential links between sugar and chronic diseases, but at the time sugar executives had a more pressing problem: Weight-conscious Americans were switching in droves to diet sodas—particularly Diet Rite and Tab—sweetened with cyclamate and saccharin. From 1963 through 1968, diet soda's share of the soft-drink market shot from 4 percent to 15 percent. "A dollar's worth of sugar," ISRF vice president and research director John Hickson warned in an internal review, "could be replaced with a dime's worth" of sugar alternatives. "If anyone can undersell you nine cents out of 10," Hickson told the *New York Times* (http://select.nytimes.com/gst/abstract.html?res=F40E16F63D5C137A93C3A9178DD85F4D8685F9) in 1969, "you'd better find some brickbat you can throw at him."

By then, the sugar industry had doled out more than $600,000 (about $4 million today) to study every conceivable harmful effect of cyclamate sweeteners, which are still sold around the world under names like Sugar Twin and Sucaryl. In 1969, the FDA banned cyclamates in the United States based on a study suggesting they could cause bladder cancer in rats. Not long after, Hickson left the ISRF to work for the Cigar Research Council. He was described in a confidential tobacco industry memo (http://www.motherjones.com/documents/486467-iohn-hickson-tobacco-memo) as a "supreme scientific politician who had been successful in condemning cyclamates, on behalf of the [sugar industry], on somewhat shaky evidence." It later emerged that the evidence suggesting that cyclamates caused cancer in rodents was not relevant to humans (http://www.cancer.gov/cancertopics/factsheet/Risk/artificial-sweeteners) , but by then the case was officially closed. In 1977, saccharin, too, was nearly banned on the basis of animal results that would turn out to be meaningless in people.

Meanwhile, researchers had been reporting that blood lipids—cholesterol and triglycerides in particular—were a risk factor for heart disease. Some people had high cholesterol but normal triglycerides, prompting health experts to recommend that they avoid animal fats. Other people were deemed "carbohydrate sensitive," with normal cholesterol but markedly increased triglyceride levels. In these individuals, even moderate sugar consumption could cause a spike in triglycerides. John Yudkin, the

United Kingdom's leading nutritionist, was making headlines
(http://www.motherjones.com/documents/459557-sugar-may-be-cardiac-cuprit-medical-world-news) with
claims that sugar, not fat, was the primary cause of heart disease.

In 1967, the Sugar Association's research division began considering "the rising tide of
implications of sucrose in atherosclerosis." Before long, according to a confidential
1970 review of industry-funded studies, the newly formed ISRF was spending 10
percent of its research budget on the link between diet and heart disease. Hickson, the
ISRF's vice president, urged his member corporations to keep the results of the review
under wraps. Of particular concern was the work of a University of Pennsylvania
researcher on "sucrose sensitivity," which sugar executives feared was "likely to reveal
evidence of harmful effects. (http://www.motherjones.com/documents/486422-excerpt-of-minutes-of-
the-isrf-scientific#document/p3/a79259) " One ISRF consultant recommended
(http://www.motherjones.com/documents/486422-excerpt-of-minutes-of-the-isrf-
scientific#document/p4/a79260) that sugar companies get to the truth of the matter by
sponsoring a full-on study. In what would become a pattern, the ISRF opted not to
follow his advice. Another ISRF-sponsored study, by biochemist Walter Pover of the
University of Birmingham, in England, had uncovered a possible mechanism to
explain how sugar raises triglyceride levels. Pover believed he was on the verge of
demonstrating this mechanism "conclusively" and that 18 more weeks of work would
nail it down. But instead of providing the funds, the ISRF nixed the project, assessing
its value as "nil."

*...e diabetes ...pert testified ...t anything ...re than 70 ...unds per ...rson per ...ar—about ...lf of what is ...ld in America ...day—might ...ark ...idemics.*

The industry followed a similar strategy when it came to
diabetes. By 1973, links between sugar, diabetes, and
heart disease were sufficiently troubling that Sen.
George McGovern of South Dakota convened a hearing
of his Select Committee on Nutrition and Human Needs
to address the issue. An international panel of
experts—including Yudkin and Walter Mertz, head of
the Human Nutrition Institute at the Department of
Agriculture—testified that variations in sugar
consumption were the best explanation for the
differences in diabetes rates between populations, and
that research by the USDA and others supported the
notion that eating too much sugar promotes dramatic
population-wide increases in the disease. One panelist,
South African diabetes specialist George Campbell,
suggested that anything more than 70 pounds per person per year—about half of what
is sold in America today—would spark epidemics.

In the face of such hostile news from independent scientists, the ISRF hosted its own
conference the following March, focusing exclusively on the work of researchers who
were skeptical of a sugar/diabetes connection. "All those present agreed that a large
amount of research is still necessary before a firm conclusion can be arrived at,"
according to a conference review (http://www.motherjones.com/documents/472408-developments-
in-brief-isrf-support-of-health#document/p3/a79768) published in a prominent diabetes journal.
In 1975, the foundation reconvened in Montreal to discuss research priorities with its
consulting scientists. Sales were sinking, Tatem reminded the gathered sugar execs,

and a major factor was "the impact of consumer advocates who link sugar consumption with certain diseases."

Following the Montreal conference, the ISRF disseminated a memo (http://www.motherjones.com/documents/472408-developments-in-brief-isrf-support-of-health) quoting Errol Marliss, a University of Toronto diabetes specialist, recommending that the industry pursue "well-designed research programs" to establish sugar's role in the course of diabetes and other diseases. "Such research programs *might* produce an answer that sucrose is bad in certain individuals," he warned. But the studies "should be undertaken in a sufficiently comprehensive way as to produce results. A gesture rather than full support is unlikely to produce the sought-after answers."

A gesture, however, is what the industry would offer. Rather than approve a serious investigation of the purported links between sucrose and disease, American sugar companies quit supporting (http://www.motherjones.com/documents/472411-sugar-association-meeting-of-the-board-of) the ISRF's research projects. Instead, via the Sugar Association proper, they would spend roughly $655,000 between 1975 and 1980 on 17 studies (http://www.motherjones.com/documents/472497-research-program-funding-schedule-may-1978) designed, as internal documents put it, "to maintain research as a main prop of the industry's defense. (http://www.motherjones.com/documents/484689-schedule-of-expenses-board-of-directors-meeting#document/p3/a79141)" Each proposal was vetted by a panel (http://www.motherjones.com/documents/441454-the-sugar-association-brochure-january-1977#document/p15/a79262) of industry-friendly scientists and a second committee (http://www.motherjones.com/documents/441454-the-sugar-association-brochure-january-1977#document/p16/a78619) staffed by representatives from sugar companies and "contributing research members (http://www.motherjones.com/documents/441454-the-sugar-association-brochure-january-1977#document/p4/a78616)" such as Coca-Cola, Hershey's, General Mills, and Nabisco. Most of the cash was awarded to researchers whose studies seemed explicitly designed to exonerate sugar. One even proposed to explore whether sugar could be shown to boost serotonin levels in rats' brains, and thus "prove of therapeutic value, as in the relief of depression," an internal document noted (http://www.motherjones.com/documents/486444-sucrose-brain-neurotransmitters-and-behavior#document/p2/a14) .

> *Industry-funded science projects were vetted by a panel with reps from Hershey's, Coca-Cola, General Mills, and Nabisco.*

At best, the studies seemed a token effort. Harvard Medical School professor Ron Arky, for example, received money from the Sugar Association to determine whether sucrose has a different effect on blood sugar and other diabetes indicators if eaten alongside complex carbohydrates like pectin and psyllium. The project went nowhere, Arky told us recently. But the Sugar Association "didn't care."



In short, rather than do definitive research to learn the truth about its product, good or bad, the association stuck to a PR scheme designed to "establish with the broadest possible audience—virtually everyone is a consumer—the safety of sugar as a food." One of its first acts was to establish a Food & Nutrition Advisory Council (http://www.motherjones.com/documents/441454-the-sugar-association-brochure-january-1977#document/p15/a78618) consisting of a half-dozen physicians and two dentists willing to defend sugar's place in a healthy diet, and set aside roughly $60,000 per year (more than $220,000 today) to cover its cost (http://www.motherjones.com/documents/484689-schedule-of-expenses-board-of-directors-meeting#document/p2/a79140) .

Working to the industry's recruiting advantage was the rising notion that cholesterol and dietary fat—especially saturated fat—were the likely causes of heart disease. (Tatem even suggested, in a letter to the *Times Magazine* (http://www.motherjones.com/documents/472389-letter-from-john-tatem-to-the-new-york-times#document/p3/a79265) , that some "sugar critics" were motivated merely by wanting "to keep the heat off saturated fats.") This was the brainchild of nutritionist Ancel Keys, whose University of Minnesota laboratory had received financial support from the sugar industry as early as 1944. From the 1950s through the 1980s, Keys remained the most outspoken proponent of the fat hypothesis, often clashing publicly with Yudkin, the most vocal supporter of the sugar hypothesis—the two men "shared a good deal of loathing," recalled one of Yudkin's colleagues.

*federal nels, lustry-ded entists cited lustry-ded studies dismiss gar as a lprit.*

So when the Sugar Association needed a heart disease expert for its Food & Nutrition Advisory Council, it approached Francisco Grande, one of Keys' closest colleagues. Another panelist was University of Oregon nutritionist William Connor, the leading purveyor of the notion that it is dietary cholesterol that causes heart disease. As its top diabetes expert, the industry recruited Edwin Bierman (http://www.google.com/url?sa=t&rct=i&q=&esrc=s&source=web&cd=7&ved=0CEoQFiAG&url=http%3A%2F%2Fwww.ajcn.org%2Fcontent%2F62%2F5%2F895.full.pdf%2Bhtml&ei=m7eJUL_ECoHo2AW_84CIAw&usg=AFQjCNFVwKi3OOsRLHfaDZ26A-g9JXrO9A&sig2=VsXxr5281078F1BAWZwEBw&cad=ria) of the University of Washington, who believed that diabetics need not pay strict attention to their sugar intake so long as they maintained a healthy weight by burning off the calories they consumed. Bierman also

professed an apparently unconditional faith that it was dietary fat (and *being* fat) that
caused heart disease, with sugar having no meaningful effect.

It is hard to overestimate Bierman's role in shifting the diabetes conversation away
from sugar. It was primarily Bierman who convinced the American Diabetes
Association to liberalize the amount of carbohydrates (including sugar) it
recommended in the diets of diabetics, and focus more on urging diabetics to lower
their fat intake, since diabetics are particularly likely to die from heart disease.
Bierman also presented industry-funded studies when he coauthored a section on
potential causes for a National Commission on Diabetes report in 1976; the document
influences the federal diabetes research agenda to this day. Some researchers, he
acknowledged, had "argued eloquently" that consumption of refined carbohydrates
(such as sugar) is a precipitating factor in diabetes. But then Bierman cited five
studies—two of them bankrolled by the ISRF—that were "inconsistent" with that
hypothesis. "A review of all available laboratory and epidemiologic evidence," he
concluded, "suggests that the most important dietary factor in increasing the risk of
diabetes is total calorie intake, irrespective of source."

The point man on the industry's food and nutrition panel
was Frederick Stare (http://www.economist.com/node/1086689),
founder and chairman of the department of nutrition at
the Harvard School of Public Health. Stare and his
department had a long history of ties to Big Sugar. An
ISRF internal research review credited the sugar
industry with funding some 30 papers in his department
from 1952 through 1956 alone. In 1960, the department
broke ground on a new $5 million building funded
largely by private donations, including a $1 million gift
from General Foods, the maker of Kool-Aid and Tang.

> **Big Sugar
> found a reliable
> advocate in
> Frederick
> Stare, whose
> department at
> Harvard was
> bankrolled by
> the likes of
> Kellogg, Kraft,
> and Coca-Cola.**

By the early 1970s, Stare ranked among the industry's
most reliable advocates, testifying in Congress about the
wholesomeness of sugar even as his department kept raking in funding from sugar
producers and food and beverage giants such as Carnation, Coca-Cola, Gerber,
Kellogg, and Oscar Mayer. His name also appears in tobacco documents, which show
that he procured (http://legacy.library.ucsf.edu/tid/eam96b00) industry funding for a study
(http://legacy.library.ucsf.edu/tid/qhn96b00) aimed at exonerating cigarettes as a cause of heart
disease.

The first act of the Food & Nutrition Advisory Council was to compile "Sugar in the
Diet of Man," an 88-page white paper edited by Stare and published in 1975 to
"organize existing scientific facts concerning sugar." It was a compilation of historical
evidence and arguments that sugar companies could use to counter the claims of
Yudkin, Stare's Harvard colleague Jean Mayer, and other researchers whom Tatem
called "enemies of sugar. (http://www.motherjones.com/documents/493719-excerpt-of-the-presidents-
report-board-off/document/p5/a79775)" The document was sent to reporters—the Sugar
Association circulated 25,000 copies—along with a press release
(http://www.motherjones.com/documents/472416-scientists-disnel-sugar-fears) headlined "Scientists
dispel sugar fears." The report neglected to mention that it was funded by the sugar
industry, but internal documents confirm that it was
(http://www.motherjones.com/documents/472453-confidential-memo-to-the-public-communications).

*Leading the panel that evaluated sugar for the FDA: George Irving, a former chair of the scientific advisory board for the International Sugar Research Foundation, an industry group.*

The Sugar Association also relied on Stare to take its message to the people: "Place Dr. Stare on the AM America Show" and "Do a 3 ½ minute interview with Dr. Stare for 200 radio stations," note the association's meeting minutes. Using Stare as a proxy, internal documents explained (http://www.motherjones.com/documents/486093-comms-committee), would help the association "make friends with the networks" and "keep the sugar industry in the background." By the time Stare's copious conflicts of interest were finally revealed—in "Professors on the Take. (http://search.opinionarchives.com/Summary/TP/V40I11P42-1.htm)" a 1976 exposé by the Center for Science in the Public Interest—Big Sugar no longer needed his assistance. The industry could turn to an FDA document to continue where he'd left off.

While Stare and his colleagues had been drafting "Sugar in the Diet of Man," the FDA was launching its first review of whether sugar was, in the official jargon, generally recognized as safe (GRAS), part of a series of food-additive reviews (http://www.fda.gov/Food/FoodIngredientsPackaging/GenerallyRecognizedasSafeGRAS/ucm083022.htm) the Nixon administration had requested of the agency. The FDA subcontracted the task to the Federation of American Societies of Experimental Biology, which created an 11-member committee to vet hundreds of food additives from acacia to zinc sulfate. While the mission of the GRAS committee was to conduct unbiased reviews of the existing science for each additive, it was led by biochemist George W. Irving Jr., who had previously served two years as chairman of the scientific advisory board of the International Sugar Research Foundation. Industry documents show that another committee member, Samuel Fomon, had received sugar-industry funding for three of the five years prior to the sugar review.

The FDA's instructions were clear: To label a substance as a potential health hazard, there had to be "credible evidence of, or reasonable grounds to suspect, adverse biological effects"—which certainly existed for sugar at the time. But the GRAS committee's review would depend heavily on "Sugar in the Diet of Man" and other work by its authors. In the section on heart disease, committee members cited 14 studies whose results were "conflicting," but 6 of those bore industry fingerprints, including Francisco Grande's chapter from "Sugar in the Diet of Man" and 5 others that came from Grande's lab or were otherwise funded by the sugar industry.

The diabetes chapter of the review acknowledged studies suggesting that "long term consumption of sucrose can result in a functional change in the capacity to metabolize carbohydrates and thus lead to diabetes mellitus," but it went on to cite five reports contradicting that notion. All had industry ties, and three were authored by Ed Bierman, including his chapter in "Sugar in the Diet of Man."

*The sugar review panel cited five reports to contradict the notion that sugar*

In January 1976, the GRAS committee published its preliminary conclusions, noting that while sugar probably contributed to tooth decay, it was not a "hazard to the public." The draft review dismissed the diabetes link as "circumstantial" and called the connection to cardiovascular disease "less than clear," with fat playing a greater role. The only cautionary note, besides *consumption leads to diabetes—all had industry ties.*

cavities, was that all bets were off if sugar consumption were to increase significantly. The committee then thanked the Sugar Association for contributing "information and data." (Tatem would later remark (http://www.motherjones.com/documents/493720-excerpt-of-the-presidents-report-board-of#document/n2/a79772) that while he was "proud of the credit line...we would probably be better off without it.")

The committee's perspective was shared by many researchers, but certainly not all. For a public hearing on the draft review, scientists from the USDA's Carbohydrate Nutrition Laboratory submitted what they considered "abundant evidence that sucrose is one of the dietary factors responsible for obesity, diabetes, and heart disease." As they later explained (http://www.motherjones.com/documents/472489-letter-to-the-editor-scogs-report-on-the-health) in the *American Journal of Clinical Nutrition*, some portion of the public—perhaps 15 million Americans at that time—clearly could not tolerate a diet rich in sugar and other carbohydrates. Sugar consumption, they said, should come down by "a minimum of 60 percent," and the government should launch a national campaign "to inform the populace of the hazards of excessive sugar consumption." But the committee stood by its conclusions in the final version (http://babel.hathitrust.org/cgi/pt?id=coo.31924094695743#page/n2/mode/1up) of its report presented to the FDA in October 1976.

*he next time u hear a omoter acking gar, beware e ripoff," rned a gar industry . "Remember can't bstantiate s charges."*

For the sugar industry, the report was gospel. The findings "should be memorized" by the staff of every company associated with the sugar industry, Tatem told his membership (http://www.motherjones.com/documents/493720-excerpt-of-the-presidents-report-board-of#document/n2/a79772). "In the long run," he said (http://www.motherjones.com/documents/493720-excerpt-of-the-presidents-report-board-of#document/n2/a79773), the document "cannot be sidetracked, and you may be sure we will push its exposure to all corners of the country."

The association promptly produced an ad for newspapers and magazines exclaiming "Sugar is Safe!" It "does not cause death-dealing diseases," the ad declared, and "there is no substantiated scientific evidence indicating that sugar causes diabetes, heart disease or any other malady...The next time you hear a promoter attacking sugar, beware the ripoff. Remember he can't substantiate his charges. Ask yourself what he's promoting or what he is seeking to cover up. If you get a chance, ask him about the GRAS Review Report. Odds are you won't get an answer. Nothing stings a nutritional liar like scientific facts."

**The Sugar Association would soon** get its chance to put the committee's sugar review to the test. In 1977, McGovern's select committee—the one that had held

the 1973 hearings on sugar and diabetes—blindsided the industry with a report titled "Dietary Goals for the United States," recommending that Americans lower their sugar intake by 40 percent (PDF) (http://www.google.com/url?
sa=t&rct=i&q=&esrc=s&source=web&cd=1&cad=ria&ved=0CCIOFjAA&url=http%3A%2F%
2Fzerodisease.com%2Farchive%
2FDietary_Goals_For_The_United_States.pdf&ei=tI6AUKiKG4ervOGv04GgAg&usg=AFOiCNGGmZckih
XuoRUS9KGxbTZ_lt6NPA&sig2=xl7zYdT60-ddoO3ixgd4oA) . The association "hammered away" at the McGovern report using the GRAS review "as our scientific Bible," Tatem told sugar executives (http://www.motherjones.com/documents/493720-excerpt-of-the-presidents-
report-board-of#document/p1/a79774) .

McGovern held fast, but Big Sugar would prevail in the end. ==In 1980, when the USDA first published== (http://www.cnpp.usda.gov/DGAs1980Guidelines.htm)==its own set of dietary guidelines, it relied heavily== (http://www.motherjones.com/documents/472481-history-of-the-dietary-
guidelines-for-americans)==on a review written for the American Society of Clinical Nutrition by none other than Bierman== (http://ajcn.nutrition.org/content/32/12/2712.full.pdf+html) ==, who used the GRAS committee's findings to bolster his own.== "Contrary to widespread opinion, too much sugar does not seem to cause diabetes," the USDA guidelines concluded. They went on to counsel that people should "avoid too much sugar," without bothering to explain what that meant.

In 1982, the FDA once again took up the GRAS committee's conclusion that sugar was safe, proposing to make it official. The announcement resulted in a swarm of public criticism, prompting the agency to reopen its case. Four years later, an agency task force concluded (http://jn.nutrition.org/content/116/11_Suppl.toc) , again leaning on industry-sponsored studies, that "there is no conclusive evidence...that demonstrates a hazard to the general public when sugars are consumed at the levels that are now current." (Walter Glinsmann, the task force's lead administrator, would later become a consultant (http://www.sweetsurprise.com/cra-scientific-advisory-panel) to the Corn Refiners Association, which represents producers of high-fructose corn syrup.)

==The USDA, meanwhile, had updated its own dietary guidelines. With Fred Stare now on the advisory committee, the 1985 guidelines== (http://www.cnpp.usda.gov/DGAs1985Guidelines.htm)==retained the previous edition's vague recommendation to "avoid too much" sugar but stated unambiguously that "too much sugar in your diet does not cause diabetes." At the time, the USDA's own Carbohydrate Nutrition Laboratory was still generating evidence== (http://www.military-
nutrition.com/Document.ashx?Document=1)==to the contrary and supporting the notion that "even low sucrose intake" might be contributing to heart disease in 10 percent of Americans.==

*By 1999, the average American would be eating more than double the amount of sugar the FDA had deemed safe in 1986.*

==By the early 1990s, the USDA's research into sugar's health effects had ceased, and the FDA's take on sugar had become conventional wisdom, influencing a generation's worth of key publications on diet and health.== Reports from the surgeon general (http://profiles.nlm.nih.gov/NN/B/C/Q/G/) and the National Academy of Sciences (http://www.nap.edu/openbook.php?record_id=10490&page=4) repeated the mantra that the

evidence linking sugar to chronic disease was inconclusive, and then went on to equate "inconclusive" with "nonexistent." They also ignored a crucial caveat: The FDA reviewers had deemed added sugars—those in excess of what occurs naturally in our diets—safe at "current" 1986 consumption levels. But the FDA's consumption estimate was 43 percent lower than that of its sister agency, the USDA. By 1999, the average American would be eating more than double the amount (http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=3&ved=0CDAQFjAC&url=http%3A%2F%2Fwww.ers.usda.gov%2Fdatafiles%2FFood_Availabiliy_Per_Capita_Data_System%2FLossAdjusted_Food_Availability%2Fsugar.xls&ei=uq-FUOGmNcm2vAGG54COCg&usg=AFOiCNFPiUswOP2lu5_GdYgFAKwhGvt3Ig&sig2=avi88Tv5bbGkXCl9X4RXHQ&cad=ria) the FDA had deemed safe—although we have cut back by 13 percent since then.

**Asked to comment on some** of the documents described in this article, a Sugar Association spokeswoman responded that they are "at this point historical in nature and do not necessarily reflect the current mission or function" of the association. But it is clear enough that the industry still operates behind the scenes to make sure regulators never officially set a limit on the amount of sugar Americans can safely consume. The authors of the 2010 USDA dietary guidelines, for instance, cited two scientific reviews (http://www.nel.gov/evidence.cfm?evidence_summary_id=250302) as evidence that sugary drinks don't make adults fat. The first was written by Sigrid Gibson (http://www.sig-nurture.com/client-portfolio.html) , a nutrition consultant whose clients included the Sugar Bureau (England's version of the Sugar Association) and the World Sugar Research Organization (formerly the ISRF). The second review was authored by Carrie Ruxton (http://www.teaadvisorypanel.com/members/profile/19) , who served as research manager of the Sugar Bureau from 1995 to 2000.

The Sugar Association has also worked its connections to assure that the government panels making dietary recommendations—the USDA's Dietary Guidelines Advisory Committee, for instance—include researchers sympathetic to its position. One internal newsletter (http://www.motherjones.com/documents/458192-sugar-e-news-june-2003#document/p2/a79222) boasted in 2003 that for the USDA panel, the association had "worked diligently to achieve the nomination of another expert wholly through third-party endorsements."

*hen world alth experts red to commend t people eat s sugar, the lustry asked leral officials intervene.*

In the few instances when governmental authorities have sought to reduce people's sugar consumption, the industry has attacked openly. In 2003, after an expert panel convened by the World Health Organization recommended that no more than 10 percent of all calories in people's diets should come from added sugars—nearly 40 percent less than the USDA's estimate (http://www.cnpp.usda.gov/dietaryguidelines.htm) for the average American—current Sugar Association president Andrew Briscoe wrote (http://www.motherjones.com/documents/458188-sugar-association-letter-to-who-april-2003#document/p1/a79120) the WHO's director general warning that the association would "exercise every avenue available to expose the dubious nature" of the report and urge "congressional appropriators to challenge future funding" for the WHO. Larry Craig (R-Idaho, sugar beets) and John

Breaux (D-La., sugarcane), then co-chairs of the Senate Sweetener Caucus, wrote a letter (http://www.motherjones.com/documents/458188-sugar-association-letter-to-who-april-2003#document/p3/a79269) to Secretary of Health and Human Services Tommy Thompson, urging his "prompt and favorable attention" to prevent the report from becoming official WHO policy. (Craig had received more than $36,000 (http://www.spokesmanreview.com/news-story.asp?date=042303&ID=s1340300) in sugar industry contributions in the previous election cycle.) Thompson's people responded with a 28-page letter (http://www.motherjones.com/documents/486456-hhs-letter-to-who-director-general-january-2004#document/p1/a79270) detailing "where the US Government's policy recommendations and interpretation of the science differ" with the WHO report. Not surprisingly, the organization left its experts' recommendation on sugar intake out of its official dietary strategy (http://www.who.int/dietphysicalactivity/strategy/eb11344/en/index.html) .

In recent years the scientific tide has begun to turn against sugar. Despite the industry's best efforts, researchers and public health authorities have come to accept that the primary risk factor for both heart disease and type 2 diabetes is a condition called metabolic syndrome, which now affects more than 75 million Americans (http://www.motherjones.com/documents/459565-prevalence-of-metabolic-syndrome-among-adults-201) , according to the Centers for Disease Control and Prevention. Metabolic syndrome (http://www.nhlbi.nih.gov/health/health-topics/topics/ms/) is characterized by a cluster of abnormalities—some of which Yudkin and others associated with sugar almost 50 years ago—including weight gain, increased insulin levels, and elevated triglycerides. It also has been linked to cancer (http://www.nytimes.com/2011/04/17/magazine/mag-17Sugar-t.html?pagewanted=all&_r=0) and Alzheimer's disease (http://www.motherjones.com/tom-philpott/2012/09/sugar-alzheimers) . "Scientists have now established causation," Lustig said recently. "Sugar causes metabolic syndrome."

Newer studies (http://jcem.endojournals.org/content/early/2011/08/11/jc.2011-1251.abstract) from the University of California-Davis have even reported that LDL cholesterol, the classic risk factor for heart disease, can be raised significantly in just *two weeks* by drinking sugary beverages at a rate well within the upper range of what Americans consume—four 12-ounce glasses a day of beverages like soda, Snapple, or Red Bull. The result is a new wave of researchers coming out publicly against Big Sugar.

During the battle over the 2005 USDA guidelines, an internal Sugar Association newsletter (http://www.motherjones.com/documents/458191-sugar-e-news-august-2003) described its strategy toward anyone who had the temerity to link sugar consumption with chronic disease and premature death: "Any disparagement of sugar," it read, "will be met with forceful, strategic public comments and the supporting science." But since the latest science is anything but supportive of the industry, what happens next?

> *"The science is in," Lustig says. But the industry is going to fight tooth and nail to prevent that science from translating into public policy."*

"At present," Lustig ventures, "they have absolutely no reason to alter any of their practices. The science is in—the medical and economic problems with excessive sugar

consumption are clear. But the industry is going to fight tooth and nail to prevent that science from translating into public policy."

Like the tobacco industry before it, the sugar industry may be facing the inexorable exposure of its product as a killer—science will ultimately settle the matter one way or the other—but as Big Tobacco learned a long time ago, even the inexorable can be held up for a very long time.

**GET THE SCOOP, STRAIGHT FROM MOTHER JONES.**

| ENTER YOUR EMAIL | **Submit** |

 Share on Facebook                Share on Twitter (http://twitter.com/home?

---

**GARY TAUBES** (/AUTHORS/GARY-TAUBES)

Gary Taubes, author of the 2011 best-seller Why We Get Fat (http://www.powells.com/biblio/1-9780307474254-0), has written for Discover, Science, and the New York Times Magazine. He is currently writing a book about sugar.

---

**CRISTIN KEARNS COUZENS** (/AUTHORS/CRISTIN-KEARNS-COUZENS)

Cristin Kearns Couzens took a two-year break from her career in dental health administration to pursue independent research on the sugar industry.

---

*Mother Jones is a nonprofit, and stories like this are made possible by readers like you.* Donate (https://secure.motherjones.com/hip/?action=SUBSCRIPTION&list_source=7HEGP004&extra_don=1&abver=A) or subscribe (https://secure.motherjones.com/fnx/?action=SUBSCRIPTION&pub_code=MJM&term_pub=MJM&list_source=SEGYN4&base_country=US) *to help fund independent journalism.*

## RELATED



(/politics/2012/10/sugar-industry-marketing-timeline)
A Timeline of Sugar Spin (/politics/2012/10/sugar-industry-marketing-timeline)

**MADDIE OATMAN** (/AUTHORS/MADDIE-OATMAN)



(/environment/2012/10/sugar-industry-internal-documents-revealed)
Document Dive: What's Inside the Sugar Industry's Filing Cabinets?
(/environment/2012/10/sugar-industry-internal-documents-revealed)

**MAYA DUSENBERY** (/AUTHORS/MAYA-DUSENBERY)

---

**➕ VIEW COMMENTS**

---

# Exhibit 4

# The Sugar Association, Inc.

*1511 K Street, N. W. Washington, D. C. 20005*

- - C O N F I D E N T I A L - -

July 17, 1975

TO:     THE PUBLIC COMMUNICATIONS COMMITTEE

Gentlemen:

Shortly we will be mailing a packet to the press across the country containing: "Sugar in the Diet of Man," the Deutsch summary, a short news release and a cover letter signed by Bill Tatem.

We can anticipate some questions. Please be aware of the following answers, should they be put to you:

1. Who inspired the writing of the six papers?

    Ans.  Dr. Fredrick Stare of Harvard suggested the need for this research and offered to organize their preparation.

2. Is Dr. Stare on your payroll?

    Ans.  No.

3. Do you contribute to Harvard's School of Public Health?

    Ans.  Yes, with an unrestricted grant.  We also contribute to other organizations in the same manner.

4. Did you pay for the preparation of the papers?

    Ans.  Yes.  At the same time Dr. Stare asked us if we would be interested in the project, he asked us if we would be willing to fund it.  We paid for research time, as we would with any research project, and purchased reprints.

5. Does the fact of your funding compromise the papers?

    Ans.  No.  We did not consider distribution of them until they had been accepted for publication by the journal, World Review of Nutrition and Dietetics.  We feel the reputations of the doctors and their organizations and the prominence of the organ of publication attest to their accuracy and integrity.

Please hold and use for inquiries only.

Regards,

J. R. O'Connell
Director Public Relations

JRO:drb

*Telephone:  Area Code (202) 628-0189*

# Exhibit 5

From:   THE SUGAR ASSOCIATION, INC.
        1511 K Street, N.W.
        Washington, D.C.  20005
        Jack O'Connell/(202) 628-0189
                    or
        Marian Rahl/(212) 986-6100

                                    For Immediate Release


                    SCIENTISTS DISPEL SUGAR FEARS

        WASHINGTON, D.C., August 4--A team of nine leading scientists

in the United States has reassured the consuming public that

sugar, a pure carbohydrate, like any other widely used food, is

harmless when eaten in reasonable amounts.

        In 1974 these physicians and dentists, aware of sugar's

mounting importance as a food, began to study what was actually

known about sugar's effects on health.  Working at medical

centers and universities across the nation, they report their

findings in "Sugar in the Diet of Man," a group of papers

recently published in World Review of Nutrition and Dietetics

and available as a reprint.


                    SUGAR IS AN 'ENERGY' FOOD

        Harvard's Dr. Fredrick J. Stare reports that of the 100

pounds of sugar consumed each year by the average American, only

about 80 pounds actually is eaten.  This amount has scarcely

changed in 50 years, contrary to claims that sugar consumption

is rising in the United States.  Dr. Stare points out that 15 to


                                            -more-

- 2 -

20 per cent of the average American's calories come from sugar--
about 12 per cent for adults and 20 per cent or more for teen-
agers. Sugar is seen by the scientists as a compact source of
energy, a primary nutrition need.

## SUGAR DOES NOT PROMOTE HEART DISEASE

Sugar is not recognized as a causative factor in cardio-
vascular disease, according to the scientists. Dr. Francisco
Grande, of the School of Public Health at the University of
Minnesota and the Jay Phillips Research Laboratory at Mount Sinai
Hospital in Minneapolis, shows how unreliable, incomplete and
out-of-date are Dr. John Yudkin's arguments that sugar consumption
per capita and the death rate ascribed to coronary heart disease
are related. "The extensive work dealing with the production of
experimental atherosclerosis in animals currently available does
not provide any proof of the atherogenic effect of sugar,"
Dr. Grande said.

## OBESITY IS CAUSED BY 'EXCESS CALORIES'

Newer techniques applied to the study of obesity indicate
that the number of fat cells or cells capable of storing fat in
the newborn is, or soon becomes, fixed for life. With an increase
of calories, fat cells increase in size, and this increase is
recognized as obesity. Calorie restriction without obvious
dieting is the only way to permanent weight control. It can be
achieved by a judicious selection of foods, including sugar and

-more-

- 3 -

starch, according to three University of Pittsburgh teachers of
medicine--Drs. Thaddeus Danowski, Sean Nolan and Thorsten Stephan.

### DIABETICS NOW ENJOY NORMAL AMOUNT OF CARBOHYDRATES

"There no longer appears to be any need to restrict dispro-
portionately the intake of carbohydrates in the diet of most
diabetic patients," says a statement issued by the American
Diabetes Association.  Dr. Edwin L. Bierman, professor of medi-
cine at the University of Washington School of Medicine (who
chaired the committee that wrote it), and Dr. Ralph Nelson,
chief clinical nutrition and nutrition therapy, Mayo Clinic,
say, "Treatment of the diabetic today is concerned with total
calorie intake to attain desirable body weight."

### SUGAR DOESN'T CAUSE LOW BLOOD SUGAR SYNDROMES

Low blood sugar syndromes, or hypoglycemia, represent a
spectrum of three stages.  First, healthy persons can develop a
slight decrease in blood sugar level without associated symptoms.
There's an intermediate zone of sugar levels when variants from
normal or accompaniments of a disease may or may not produce
symptoms or signs.  At the other end, extremely low blood sugar
levels can occur in a variety of illnesses.  Hypoglycemia in
diabetes under treatment may be corrected by adjustments in diet
that may include increasing carbohydrate, as well as medications
and control of variables such as emotions and exercise.

-more-

- 4 -

## SUGAR IS BUT ONE FACTOR IN DENTAL CARIES

The results of the sugar and dental review suggest there should be an extension of efforts by the dental profession to promote better dental hygiene, plaque control and more extensive use of fluorides and fluoride mouthwashes.  Reduction of the frequency of intake and consideration of the form in which sugar-containing products are consumed can in turn reduce caries incidence.  This applies particularly to the between-meal con-sumption of sticky snacks.

-0-

8475

# Exhibit 6



PLOS | BIOLOGY

PERSPECTIVE

# Sugar industry sponsorship of germ-free rodent studies linking sucrose to hyperlipidemia and cancer: An historical analysis of internal documents

Cristin E. Kearns[1,2], Dorie Apollonio[1,3,4,5], Stanton A. Glantz[1,3,5,6,7] *

1 Philip R. Lee Institute for Health Policy Studies, University of California San Francisco, San Francisco, California, United States of America, 2 Department of Preventive and Restorative Dental Sciences, School of Dentistry, University of California San Francisco, San Francisco, California, United States of America, 3 Center for Tobacco Control Research and Education, University of California San Francisco, San Francisco, California, United States of America, 4 Department of Clinical Pharmacy, School of Pharmacy, University of California San Francisco, San Francisco, California, United States of America, 5 Helen Diller Family Comprehensive Cancer Center, University of California San Francisco, San Francisco, California, United States of America, 6 Cardiovascular Research Institute, University of California San Francisco, San Francisco, California, United States of America, 7 Department of Medicine; University of California San Francisco, San Francisco, California, United States of America

* Stanton.Glantz@ucsf.edu



Check for updates

🔓 OPEN ACCESS

Citation: Kearns CE, Apollonio D, Glantz SA (2017) Sugar industry sponsorship of germ-free rodent studies linking sucrose to hyperlipidemia and cancer: An historical analysis of internal documents. PLoS Biol 15(11): e2003460. https://doi.org/10.1371/journal.pbio.2003460

Published: November 21, 2017

Copyright: © 2017 Kearns et al. This is an open access article distributed under the terms of the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original author and source are credited.

Funding: The Laura and John Arnold Foundation http://www.arnoldfoundation.org/. (CEK, SAG). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript. National Institute of Dental and Craniofacial Research (grant number DE-007306). (CEK). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript. Samuel Lawrence Foundation https://www.samuellawrencefoundation.org/. (Provided funding for document acquisition). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript. National Cancer Institute (grant number CA-140236). (DA). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the

## Abstract

In 1965, the Sugar Research Foundation (SRF) secretly funded a review in the *New England Journal of Medicine* that discounted evidence linking sucrose consumption to blood lipid levels and hence coronary heart disease (CHD). SRF subsequently funded animal research to evaluate sucrose's CHD risks. The objective of this study was to examine the planning, funding, and internal evaluation of an SRF-funded research project titled "Project 259: Dietary Carbohydrate and Blood Lipids in Germ-Free Rats," led by Dr. W.F.R. Pover at the University of Birmingham, Birmingham, United Kingdom, between 1967 and 1971. A narrative case study method was used to assess SRF Project 259 from 1967 to 1971 based on sugar industry internal documents. Project 259 found a statistically significant decrease in serum triglycerides in germ-free rats fed a high sugar diet compared to conventional rats fed a basic PRM diet (a pelleted diet containing cereal meals, soybean meals, whitefish meal, and dried yeast, fortified with a balanced vitamin supplement and trace element mixture). The results suggested to SRF that gut microbiota have a causal role in carbohydrate-induced hypertriglyceridemia. A study comparing conventional rats fed a high sugar diet to those fed a high-starch diet suggested that sucrose consumption might be associated with elevated levels of beta-glucuronidase, an enzyme previously associated with bladder cancer in humans. SRF terminated Project 259 without publishing the results. The sugar industry did not disclose evidence of harm from animal studies that would have (1) strengthened the case that the CHD risk of sucrose is greater than starch and (2) caused sucrose to be scrutinized as a potential carcinogen. The influence of the gut microbiota in the differential effects of sucrose and starch on blood lipids, as well as the influence of carbohydrate quality on beta-glucuronidase and cancer activity, deserve further scrutiny.

**PLOS** | BIOLOGY

manuscript. UCSF Philip R. Lee Institute for Health Policy Studies. (CEK). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript. UCSF School of Dentistry Department of Orofacial Sciences and Global Oral Health Program. (CEK). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript. Gary Taubes, MS, co-founder of Nutrition Science Initiative http://nusi.org/. (Provided funding for CEK to travel to the Harvard Medical Library). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript. National Cancer Institute (grant number CA-087472). (SAG). The funder had no role in study design, data collection and analysis, decision to publish, or preparation of the manuscript.

**Competing interests:** The authors have declared that no competing interests exist.

**Abbreviations:** CHD, coronary heart disease; GRAS, generally recognized as safe; ISRF, International Sugar Research Foundation; NEJM, New England Journal of Medicine; SRF, Sugar Research Foundation.

**Provenance:** Not commissioned; externally peer reviewed.

## Introduction

In 2017, whether fructose-containing sugars (e.g., sucrose) and starch have differential effects on blood lipids continues to be debated in the scientific literature [1–3]. Studies funded by the food and beverage industry or conducted by authors with food and beverage industry conflicts of interest have been critical of evidence indicating that fructose has unique metabolic effects, while those without such conflicts reach an opposite conclusion [4–6]. The seemingly intractable nature of this controversy may be rooted in more than 60 years of food and beverage industry manipulation of science. We previously reported, based on internal sugar industry documents, that the Sugar Research Foundation (SRF) secretly funded a 1967 review in the New England Journal of Medicine (NEJM) that discounted evidence linking sucrose consumption to coronary heart disease (CHD) [7]. Using the same methodology and internal document sources (see S1 Appendix), this paper presents data that suggest that in 1970, SRF withheld information from the public that the microbiome may be an important contributing factor to sucrose-induced hypertriglyceridemia and that sucrose consumption, compared to starch, might be associated with bladder cancer.

The Sugar Association, a United States sucrose industry trade association [8] (which has organizational ties to SRF, the International Sugar Research Foundation [ISRF], and ISRF's successor, the World Sugar Research Organisation, based in London, UK [9]), has consistently denied [10–12] that sucrose has any metabolic effects related to chronic disease beyond its caloric effects. On January 5, 2016, the Sugar Association issued a press release [13] criticizing findings from a study published in Cancer Research [14] using multiple mouse models that suggested that dietary sugar induces increased tumor growth and metastasis when compared to a nonsugar starch diet. The Sugar Association stated that "no credible link between ingested sugars and cancer has been established." In contrast, this paper provides empirical data suggesting that the sugar industry terminated funding of an animal study that was finding unfavorable results with respect to the association between dietary sugars and cancer, with possible translational importance to humans.

Our study contributes to a wider body of literature documenting industry manipulation of science. Industries seeking to influence regulation have a history of funding research resulting in industry-favorable interpretations of controversial evidence related to health effects of smoking [15,16], therapeutic effects of pharmaceutical drugs [17,18], the relationship between sugar-sweetened beverage consumption and weight gain or obesity [5], and the causes of climate change, [19] among other issues. The tobacco industry also has a long history of conducting research on the health effects of its products that is often decades ahead of the general scientific community and not publishing results that do not support its agenda [20–23]. This paper provides empirical data suggesting that the sugar industry has a similar history of conducting, but not publishing studies with results that are counter to its commercial interests.

## SRF launches Project 259

Based on its sponsorship of the 1967 NEJM review [24,25], SRF was aware of peer-reviewed published animal evidence suggesting a role of intestinal microbiota in the differential effects of sucrose and starch on blood lipids. The NEJM review [25] reported that starch-fed rats had significantly higher biliary excretion of bile acids [26] and lower serum cholesterol levels [27] than sucrose-fed rats. When the antibiotic sulfasuxidene was added to similar diets, the serum cholesterol level of the starch-fed rats rose, while in sucrose-fed rats, it did not [27], leading the NEJM review to report, "dietary influence on the intestinal [microbiota] was therefore suggested" [25].

In correspondence with *NEJM* review author D. Mark Hegsted in 1965, SRF Vice President of Research John Hickson posited that the differential effects of sucrose and starch on serum cholesterol might be explained by differences in the bacterial synthesis of thiamine in the intestine [28]. Hickson [28] referred to a 1964 paper, "Dietary Fats and Intestinal Thiamine Synthesis in Rats" [29], which summarized experimental evidence from animals indicating that the dietary requirement for thiamine was dependent on the type of carbohydrate consumed. The paper reported that rats fed a thiamine-deficient diet develop symptoms of a thiamine deficiency more rapidly when fed glucose or sucrose compared to potato starch and that thiamine deficiency was delayed with the administration of antibiotics. These results, according to the article, suggested that both starches and certain antibiotics encouraged the growth of thiamine-synthesizing gut bacteria, while sucrose did not. Hickson referred to the role of intestinal thiamine synthesis in the differential effects of sucrose and starch on blood lipids as:

> Representative of a fact that has disturbed me for some time. The change from [sucrose] an essentially soluble [carbohydrate] to [raw starch] an essentially insoluble carbohydrate does provide a change in the [bacterial] synthesis [of thiamine in the intestine] and I have not been convinced that this factor has been eliminated [28].

In his correspondence with Hegsted, Hickson inquired about the possible role of intestinal thiamine synthesis in a then-recent clinical trial comparing the effect of carbohydrate quality on serum cholesterol levels conducted by Hegsted and colleagues [28]. In contrast to previous trials by other investigators, which had found differential effects of high-sucrose and high-starch diets on serum cholesterol, Hegsted and colleagues had found none. Hickson asked Hegsted whether these conflicting results might be related to differences in the thiamine status of experimental groups. It is not clear whether SRF communicated with Hegsted further about the role of gut microbiota and thiamine synthesis in the differential effects of sucrose and starch on blood lipids, but the industry continued to explore the topic. SRF launched Project 259 in 1968 [30] in an "attemp[t] to measure the nutritional effects of the [bacterial] organisms in the intestinal tract" when sucrose was consumed, compared to starch [31]. SRF explained Project 259's rationale in an internal report:

> It has been postulated that there might be a dietary significance in the indigestible residues of starch in the intestinal contents, which might account for the observed differences in the lipid carbohydrate-interactions between the simple sugars versus complex sugars [32].

SRF consulted with Professor Alastair Frazer, head of the Department of Clinical Biochemistry at the University of Birmingham, Birmingham, UK, to select the experimental model [33]. Despite the conclusion of the SRF-sponsored *NEJM* review that animal models had little value in evaluating sucrose's CHD risks, SRF selected the germ-free rat for Project 259 (germ-free isolators to create and maintain germ-free laboratory animals had been developed in the 1940s [34]). In the 1960s, parallel studies with germ-free and conventional rats were considered a good model to examine the relationship between dietary factors, the gut microbiota, and blood lipids [29]. SRF chose W.F.R. Pover, a colleague of Frazer's at the University of Birmingham, to lead the project. He was provided US$29,304 (US$187,583 in 2016 dollars) between June 1968 and September 1970 to conduct the study [31].

## Project 259 links sucrose consumption to cancer

SRF, which became ISRF in July 1968, initially authorized 15 months of funding for Project 259 between June 1968 and September 1969 [35]. By ISRF's June 1969 site visit to Pover's lab,



because of delays in receiving the equipment needed for the main experiment, Pover had conducted only initial studies with various rat strains and germ-free guinea pigs [32]. Pover's initial experiments produced results that ISRF representatives found to be "of particular interest" (Fig 1B) [32]. According to its September 1969 Quadrennial Report of Research,

> Among [Project 259's] observations was . . . that the urine from rats on the basic diet contained an inhibitor of beta-glucurinidase activity in a quantity greater than that from sucrose-fed animals. *This is one of the first demonstrations of a biological difference between sucrose and starch fed rats* [emphasis added] [32].

The ISRF report did not include data from Project 259 and did not elaborate further on the experimental design of the studies or the significance of the finding that starch inhibited urinary beta-glucuronidase compared to sucrose.

Contemporaneous scientific publications, however, provide the context: elevated urinary beta-glucuronidase had been found to be positively associated with bladder cancer [36,37]. There was also some evidence that beta-glucuronidase activity was associated with atherosclerosis [38]. This incidental finding of Project 259 demonstrated to SRF that sucrose versus starch consumption caused different metabolic effects and suggested that sucrose, by stimulating urinary beta-glucuronidase, may have a role in the pathogenesis of bladder cancer.



**Fig 1. Experimental design for Project 259 and results reported to ISRF.** (A) Project 259 was conducted using "germ-free" rats that were raised in isolators to limit their exposure to bacteria. The main study found rats fed a high-sugar diet showed a highly significant sharp decrease in triglycerides in the blood, compared to controls. (B) Project 259's lead investigator, W.F.R. Pover, told ISRF that if the same rats showed an elevated triglyceride level after they were exposed to bacteria and fed the same high-sugar diet, "the role of bacteria in determining triglyceride levels will be proven conclusively [in rats]" [33]. ISRF terminated funding for the experiments before they could be completed. An initial preliminary study conducted before the main experiment found that rats fed a high-sugar diet had less of a beta-glucuronidase inhibitor in their urine than rats fed a basic PRM diet high in starch. Beta-glucuronidase is an enzyme, and high levels in the urine were known to be associated with bladder cancer in the 1960s. *Image of rat vector icon credit: Rvector/Shutterstock.com.* ISRF, International Sugar Research Foundation.

https://doi.org/10.1371/journal.pbio.2003460.g001



## Project 259 links the microbiome to sucrose-induced hypertriglyceridemia

In August 1970, Pover reported to ISRF that the main germ-free experiment had achieved promising results (Fig 1):

> There has been a sharp decrease in serum triglyceride of germfree rats fed a high sugar diet; there is no overlap with the serum triglyceride figures from rats fed the basic P.R.M. diet (a pelleted diet containing cereal meals, soybean meals, whitefish meal, and dried yeast, fortified with a balanced vitamin supplement and trace element mixture [39]) so this result is highly significant. We have yet to feed the starch diet. Both serum cholesterol and serum cholesterol ester values for germfree rats on sugar diet seem elevated; this result is not as clearcut as the triglyceride result and must await statistical evaluation before we can be sure.

> The role of bacteria in determining serum triglyceride levels will be proven conclusively if we can demonstrate that these same rats, when conven[t]ionalised, show elevated serum T. G.s [triglycerides] when fed a sugar diet. This will take about 18 weeks [33].

ISRF had previously authorized an extension of Project 259's funding to September 1970, which was 3 months short of the time Pover needed to conclude the experiment [33]. The language in Pover's report suggests he was confident that Project 259, taken to completion, would confirm the causal role of gut microbiota in the differential effects of sucrose and starch on serum triglycerides in rats.

## ISRF terminates Project 259 funding

On September 10, 1970, as part of a strategic assessment of industry research conducted during the transition from SRF to ISRF, Hickson reported to industry executives on the contribution of SRF's research projects to "elicit useful and significant information" to the sugar industry [33]. Hickson described the value of Project 259 as "nil" [33]. After supporting the project for 27 months, ISRF did not approve the additional 12 weeks of funding needed to complete the study. Knowing that additional funding was not forthcoming from ISRF, according to ISRF's 1969–1970 Annual Report of Research, "Dr Pover ha[d] expressed hopes [to ISRF] of obtaining continuing support from other sources" [33]. No published papers were listed for Project 259 in the ISRF publication, *Sugar Research 1943–1972* [30]. We could not identify any published results.

A March 1974 ISRF report includes its internal interpretation of Project 259's results:

> Observations showed significant increase in serum triglyceride level with rats having conventional [microbiota] on sucrose diets, whereas a decreasing effect was noted with germfree rats, suggesting the triglycerides were formed from fatty acids produced in the small intestine by the fermentation of sucrose [30].

ISRF's summary of Project 259 confirms that the sugar industry interpreted the results as indicating that intestinal bacteria had a role in sucrose-induced hypertriglyceridemia in rats.

## Implications

Despite limited available detail about Project 259's study design, it appears that ISRF did not terminate funding because of concerns about the quality of the study. ISRF's June 1969 site visit to Pover's laboratory suggests that ISRF was informed of and perhaps had input into the

PLOS | BIOLOGY

study design. Indeed, ISRF's internal reports show how ISRF interpreted the results: biological differences between sucrose- and starch-fed rats were demonstrated [32] and a mechanism by which sucrose caused triglyceride formation was suggested [30].

Based on ISRF's interpretation of preliminary results, extending Project 259's funding would have been unfavorable to the sugar industry's commercial interests. In the 1960s, scientists disagreed about whether sucrose was hypertriglyceridemic relative to starch [40]. Project 259's preliminary results, if confirmed upon project completion and subsequently published, would have supported the argument that sucrose was hypertriglyceridemic. ISRF's decision to terminate Project 259's funding was also consistent with SRF's earlier efforts to cast doubt on the CHD risks of sucrose [41].

In addition, publication of results suggesting an association between sucrose consumption and bladder cancer would likely have had further adverse regulatory implications to the sugar industry. As of 1958, the US Food Additives Amendment stated that any food found to cause cancer when ingested by animals was grounds for removal from the Food and Drug Administration's list of foods generally recognized as safe (GRAS) [42]. Project 259's September 1969 finding indicated that the urine of rats fed a high-sucrose versus a high-starch diet contained higher levels of beta-glucuronidase, an enzyme that had been previously associated with bladder cancer in rats [36,37]. Had ISRF disclosed Project 259's findings, it is likely that sucrose would have received scrutiny as a potential carcinogen. This possibility seems particularly likely because in October 1969, the FDA removed cyclamates—artificial sweeteners that had captured significant market share from sucrose—from the GRAS list based on evidence that rats fed high levels of cyclamates developed bladder tumors [43].

It is not clear why the results of Project 259 were never published. One possibility is that Pover was unable to locate timely funding from other sources to allow the experiments to be completed. Another possibility is that the project was completed, but the results were unpublishable. Regardless of what actually happened, these events would have occurred after ISRF's decision to terminate funding and would, therefore, not have informed ISRF's decision to terminate funding shortly before the data collection phase of the project was complete. Because ISRF knew that Pover did not have a new funder lined up [33], it is plausible to believe that ISRF thought that terminating Project 259's funding would prevent completion of the project and publication of results that were potentially damaging to the sugar industry.

Our analysis also identifies several lines of inquiry active in the 1960s about the health effects of added sugars, which may warrant further investigation today. One is the role of thiamine deficiency in differential effects of sucrose versus starch on blood lipids. Thiamin is a water-soluble vitamin that acts as a coenzyme in reactions critical to normal carbohydrate metabolism obtained either from dietary sources or from microbial synthesis in the large intestine [44]. Although investigators were aware in the 1960s that carbohydrate quality influences intestinal thiamine synthesis and subsequent blood lipid levels, the contribution of bacterially synthesized thiamin to health remains unclear [45].

Another line of inquiry active in the 1960s that may deserve attention is the relationship between carbohydrate quality, urinary beta-glucuronidase, and bladder cancer. Since the 1960s, urinary beta-glucuronidase activity has also been associated with renal disorders [46], urinary tract infections [47,48], and renal transplant rejection [49]. Beta-glucuronidase is an enzyme produced in most human tissues that cleaves glucuronic acid from substrates, making them less water soluble and inhibiting excretion [50]. Substrates include drugs, dietary factors, toxins, and steroid hormones, among others. While it has been hypothesized that factors inhibiting serum beta-glucuronidase lower cancer risk [50], little is currently known about dietary correlates of beta-glucuronidase activity. The results from Project 259 suggest that carbohydrate quality may modulate urinary beta-glucuronidase.

## Supporting information

**S1 Appendix. Methods.**
(PDF)

## Acknowledgments

We thank Jack Youngren, PhD, Peter Turnbaugh, PhD, and Susan Lynch, PhD, for their helpful comments in revising the paper.

## References

1. Lustig RH, Mulligan K, Noworolski SM, Tai VW, Wen MJ, Erkin-Cakmak A, et al. Isocaloric fructose restriction and metabolic improvement in children with obesity and metabolic syndrome. Obesity. 2016; 24(2):453–60. https://doi.org/10.1002/oby.21371 PMID: 26499447

2. Khan TA, Sievenpiper JL. Metabolic improvement with fructose restriction: Is it the fructose or the weight loss? Obesity. 2016; 24(3):549-. https://doi.org/10.1002/oby.21431 PMID: 26857209

3. Lustig RH. Response to "Metabolic improvement with fructose restriction: Is it the fructose or the weight loss?". Obesity. 2016; 24(3):550-. https://doi.org/10.1002/oby.21438 PMID: 26853905

4. Schillinger D, Tran J, Mangurian C, Kearns C. Do sugar-sweetened beverages cause obesity and diabetes? Industry and the manufacture of scientific controversy. Ann Intern Med. 2016; 165(12):895–7. https://doi.org/10.7326/L16-0534 PMID: 27802504

5. Bes-Rastrollo M, Schulze MB, Ruiz-Canela M, Martinez-Gonzalez MA. Financial conflicts of interest and reporting bias regarding the association between sugar-sweetened beverages and weight gain: A systematic review of systematic reviews. PLoS Med. 2013; 10(12):e1001578. https://doi.org/10.1371/journal.pmed.1001578 PMID: 24391479

6. Stanhope KL. Sugar consumption, metabolic disease and obesity: The state of the controversy. Crit Rev Clin Lab Sci. 2016; 53(1):52–67. https://doi.org/10.3109/10408363.2015.1084990 PMID: 26376619

7. Kearns CE, Schmidt LA, Glantz SA. Sugar industry and coronary heart disease research: A historical analysis of internal industry documents. JAMA Internal Medicine. 2016; 176(11):1680–5. https://doi.org/10.1001/jamainternmed.2016.5394 PMID: 27617709

8. The Sugar Association. Return of organization exempt from income tax form 990. 2014. Available from: https://projects.propublica.org/nonprofits/organizations/132614920. Cited 23 September 2015.

9. Kearns CE, Glantz SA, Schmidt LA. Sugar industry influence on the scientific agenda of the National Institute of Dental Research's 1971 National Caries Program: A historical analysis of internal documents. PLoS Med. 2015; 12(3):e1001798. https://doi.org/10.1371/journal.pmed.1001798 PMID: 25756179

10. Berg E. The sugar industry turns up its sales pitch. The New York Times; 17 November 1985. Available from: http://www.nytimes.com/1985/11/17/weekinreview/the-sugar-indsutry-turns-up-its-sales-pitch.html. Cited 16 July 2016.

11. Ramirez A. Sugar group's effort draws health organization's fire. 1991; January 8, 1991. Available from: http://www.nytimes.com/1991/01/08/business/media-business-advertising-sugar-group-s-effort-draws-health-organization-s-fire.html.

12. The Sugar Association. Sugar can play an important supporting role in good nutrition. 2016. Available from: https://www.sugar.org/sugar-can-play-an-important-supporting-role-in-good-nutrition/. Cited 11 July 2016.

13. The Sugar Association. The Sugar Association response to University of Texas MD animal study linking sugar to cancer (January 5, 2016). 2016. Available from: https://www.sugar.org/the-sugar-association-response-university-of-texas-md-animal-study-linking-sugar-to-cancer/. Cited 4 August 2016.

14. Jiang Y, Pan Y, Rhea PR, Tan L, Gagea M, Cohen L, et al. A sucrose-enriched diet promotes tumorigenesis in mammary fland in part through the 12-lipoxygenase pathway. Cancer Res. 2016; 76(1):24–9. https://doi.org/10.1158/0008-5472.CAN-14-3432 PMID: 26729790

15. Barnes DE, Bero LA. Why review articles on the health effects of passive smoking reach different conclusions. JAMA. 1998; 279(19):1566–70. PMID: 9605902

16. Tong E, England L, Glantz S. Changing conclusions on secondhand smoke in a sudden infant death syndrome review funded by the tobacco industry. Pediatrics. 2005; 115:356–66.

PLOS | BIOLOGY

17. Jørgensen AW, Hilden J, Gøtzsche PC. Cochrane reviews compared with industry supported meta-analyses and other meta-analyses of the same drugs: Systematic review. BMJ: British Medical Journal. 2006; 333(7572):782-. https://doi.org/10.1136/bmj.38973.444699.0B PMID: 17028106

18. Yank V, Rennie D, Bero LA. Financial ties and concordance between results and conclusions in meta-analyses: Retrospective cohort study. BMJ: British Medical Journal. 2007; 335(7631):1202–5. https://doi.org/10.1136/bmj.39376.447211.BE PMID: 18024482

19. Oreskes N, Conway EM. Merchants of doubt. New York: Bloomsbury Press; 2010.

20. Glantz SA, Bero LA, Slade J, Barnes DE. The cigarette papers. Berkeley: Univ of California Press; 1998.

21. Wayne G, Connolly G, Henningfield J. Assessing internal tobacco industry knowledge of the neurobiology of tobacco dependence. Nicotine Tobacco Res. 2004; 6:927–40.

22. Diethelm P, Rielle JC, McKee M. The whole truth and nothing but the truth? The research that Philip Morris did not want you to see. Lancet. 2005; 366:86–92. https://doi.org/10.1016/S0140-6736(05)66474-4 PMID: 15993237

23. Schick SF, Glantz S. Concentrations of the carcinogen 4-(methylnitrosamino)-1-(3-pyridyl)-1-butanone in sidestream cigarette smoke increase after release into indoor air: Results from unpublished tobacco industry research. Cancer Epidemiol Biomarkers Prev. 2007; 16(8):1547–53. https://doi.org/10.1158/1055-9965.EPI-07-0210 PMID: 17684127

24. McGandy RB, Hegsted DM, Stare FJ. Dietary fats, carbohydrates and atherosclerotic vascular disease. New Engl J Med. 1967; 277(4):186. https://doi.org/10.1056/NEJM196707272770405 PMID: 5339697

25. McGandy RB, Hegsted DM, Stare FJ. Dietary fats, carbohydrates and atherosclerotic vascular disease. New Engl J Med. 1967; 277(5):242–7.

26. Portman OW, Mann GV, Wysocki AP. Bile acid excretion by the rat: Nutritional effects. Arch Biochem Biophys. 1955; 59(1):224–32. PMID: 13269173

27. Portman OW, Lawry EY, Bruno D. Effect of dietary carbohydrate on experimentally induced hypercholesteremia and hyperbetalipoproteinemia in rats. Exp Biol Med. 1956; 91(2):321–3.

28. Hickson JL. Letter to Professor Mark Hegsted, Harvard University (December 10). D Mark Hegsted Papers, 1952–1999 (inclusive), 1960–1978 (bulk). H MS c54. Boston, MA: Harvard Medial Library, Francis A. Countway Library of Medicine; 1965.

29. Dietary fats and intestinal thiamine synthesis in rats. Nutr Rev. 1965; 23(11):334–6. PMID: 5321070

30. Cheek DW. Sugar research, 1943–1972. Bethesda: International Sugar Research Foundation; 1974.

31. International Sugar Research Foundation. Annual report: 1968–1969, The International Sugar Research Foundation, Inc. Papers of Roger Adams. Record Series Number 15/5/23. Urbana, Illinois: University of Illinois Archives; 1969.

32. International Sugar Research Foundation. ISRF quadrennial report of research for the years 1965–1969. Papers of Roger Adams. Record Series Number 15/5/23. Urbana, Illinois: University of Illinois Archives; 1969.

33. International Sugar Research Foundation. The International Sugar Research Foundation, Inc. annual report of research for the year 1969–1970. Papers of Roger Adams. Record Series Number 15/5/23. Urbana, Illinois: University of Illinois Archives; 1970.

34. Kirk RGW. "Life in a germ-free world": Isolating life from the laboratory animal to the bubble boy. Bull Hist Med. 2012:237–75. https://doi.org/10.1353/bhm.2012.0028 PMID: 23000838

35. International Sugar Research Foundation. Meeting of scientific advisory board ISRF offices, Bethesda, Md., Friday, November 13, 1970. Papers of Roger Adams. Record Series Number 15/5/23. Urbana, Illinois: University of Illinois Archives; 1970.

36. Boyland E, Wallace DM, Williams DC. Urinary enzymes in bladder cancer. Br J Urol. 1955; 27(1):11–4. PMID: 14363712

37. Bartalos M, Gyorkey F. Beta-glucuronidases: their significance and relation to cancer. J Am Geriatr Soc. 1963; 11(1):21–34.

38. Miller BF, Aiba T, Keyes FP, Curreri PW, Branwood AW. Beta-glucuronidase activity and its variation with pH in human atherosclerotic arteries. J Atheroscler Res. 1966; 6(4):352–8. PMID: 5341160

39. National Academy of Sciences. International Symposium on Laboratory Animals and Institute of Laboratory Animal Resources (U.S.): Defining the laboratory animal; IV Symposium, International Committee on Laboratory Animals organized by the International Committee on Laboratory Animals and the Institute of Laboratory Animal Resources, National Research Council. 1971.

40. Grande F. Sugar and cardiovascular disease. World Rev Nutr Diet. 22: Karger Publishers; 1975. p. 248–69. PMID: 1103484

PLOS | BIOLOGY

41. Kearns CE, Schmidt LA, Glantz SA. Sugar industry and coronary heart disease research: A historical analysis of internal industry documents. JAMA Intern Med. 2016; 176(11):1680–5. https://doi.org/10.1001/jamainternmed.2016.5394 PMID: 27617709

42. Merrill RA. Food safety regulation: Reforming the Delaney Clause. Annu Rev Public Health. 1997; 18:313. https://doi.org/10.1146/annurev.publhealth.18.1.313 PMID: 9143722

43. Institute of Medicine Food and Nutrition Board. Enhancing the regulatory decision-making approval process for direct food ingredient technologies workshop Summary. Washington, D.C.; 1999.

44. Wrong OM, Edmonds C, Chadwick V. The large intestine: Its role in mammalian nutrition and homeostasis.  Lancaster, England:  MTP Press; 1981.

45. Said HM. Intestinal absorption of water-soluble vitamins in health and disease. The Biochemical journal. 2011; 437(3):357–72. https://doi.org/10.1042/BJ20110326 PMID: 21749321

46. Gonick HC, Kramer HJ, Schapiro AE. Urinary ß-glucuronidase activity in renal disease. Arch Intern Med. 1973; 132(1):63–9. PMID: 4577391

47. Dibb WL, Bottolfsen KL. Evaluation of Rosco Diagnostic β-glucuronidase tablets in the identification of urinary isolates of escheria coli. Acta Pathol Microbiol Scand B. 1984; 92(1-6):261–4.

48. Pearez J, Berrocal CI, Berrocal L. Evaluation of a commercial β-glucuronidase test for the rapid and economical identification of Escherichia coli. J Appl Bacteriol. 1986; 61(6):541–5. PMID: 3549665

49. Dyck RF, Cardella CJ, Sacks MA. Urinary lysosomal enzyme excretion after renal allotransplantation. Clin Chim Acta. 1979; 91(1):111–7. PMID: 104810

50. Maruti SS, Li L, Chang J-L, Prunty J, Schwarz Y, Li SS, et al. Dietary and demographic correlates of serum β-glucuronidase activity. Nutr Cancer. 2010; 62(2):208–19. https://doi.org/10.1080/01635580903305375 PMID: 20099195

# Exhibit 7

# Annals of Internal Medicine

LETTERS

## COMMENTS AND RESPONSES

---

### Let's Not SPRINT to Judgment About New Blood Pressure Goals

**TO THE EDITOR:** Ortiz and James (1) state that the absolute risk reduction for the primary outcome of SPRINT (Systolic Blood Pressure Intervention Trial) with an intensive compared with a standard systolic blood pressure treatment goal (16 events per 1000 persons treated) was outweighed by the absolute risk for harm (22 events per 1000 persons) over 3.2 years. More accurately, the absolute risk reduction (benefit) with intensive treatment was 18 events per 1000 persons and the absolute risk for harm was 23 events per 1000 persons over a median follow-up of 3.26 years.

Their comparison overemphasizes harms by focusing on the small fraction of serious adverse events deemed potentially related to the intervention rather than the number of participants experiencing any serious adverse event, which did not differ between groups. They placed the risk for decompensated heart failure, cardiovascular death, and other primary outcomes benefited by intensive treatment on equal footing with risk for syncope, electrolyte abnormality, hypotension, and acute kidney injury (2), which were less common during SPRINT than knee arthroplasty.

Furthermore, the authors minimize benefits by ignoring the 27% reduction in total mortality (2), which is also important to patients and more consequential than syncope and other adverse events. In clinical practice, treatment adjustment would probably handle these adverse events, mostly without long-term sequelae. On the other hand, benefits would reasonably be expected to further accumulate over time in patients tolerant to intensive therapy.

Some intervention-related serious adverse events may have been overreported in the intensive treatment group. These conditions were prospectively identified; participants were not masked to treatment assignment and were warned of adverse events in consent forms. The intensive treatment group had approximately 30% more study visits and thus a greater opportunity to report adverse events. This opportunity may have led to ascertainment bias, which did not exist for the study outcomes equally ascertained in both groups.

Guidelines current at trial inception recommended a systolic blood pressure goal less than 140 mm Hg, the same as for the SPRINT comparison group (3). Yet, Ortiz and James state that both SPRINT groups were overtreated compared with the goal of less than 150 mm Hg that they advocated in 2014 (4), a controversial recommendation (5) that came years after SPRINT started.

Finally, they argue against pursuing the intensive systolic blood pressure goal in a hypothetical patient aged 79 years already receiving antihypertensive medication. However, all age groups benefited equally in SPRINT and this patient would have higher absolute cardiovascular risk and thus greater potential benefit than a hypothetical patient aged 55 years whom they recommend treating more intensively.

The SPRINT Research Group will continue to produce publications that include data on in-depth safety and benefits in participants aged 75 years or older, as well as quality-of-life and kidney outcomes, to inform future guidelines.

*Cora E. Lewis, MD, MSPH*
University of Alabama at Birmingham
Birmingham, Alabama

*Karen C. Johnson, MD, MPH*
University of Tennessee Health Sciences Center
Memphis, Tennessee

*Mahboob Rahman, MD*
Case Western Reserve University
Cleveland, Ohio

*Kaycee M. Sink, MD, MAS*
*Walter T. Ambrosius, PhD*
Wake Forest School of Medicine
Winston-Salem, North Carolina

**Disclaimer:** All authors are investigators and receive support from the National Institutes of Health for SPRINT.

**Disclosures:** Disclosures can be viewed at www.acponline.org /authors/icmje/ConflictOfInterestForms.do?msNum=L16-0441.

doi:10.7326/L16-0441

**References**
1. Ortiz E, James PA. Let's not SPRINT to judgment about new blood pressure goals. Ann Intern Med. 2016;164:692-3. [PMID: 26902415] doi:10.7326/M15-3123
2. Wright JT Jr, Williamson JD, Whelton PK, Snyder JK, Sink KM, Rocco MV, et al; SPRINT Research Group. A randomized trial of intensive versus standard blood-pressure control. N Engl J Med. 2015;373:2103-16. [PMID: 26551272] doi:10.1056/NEJMoa1511939
3. Chobanian AV, Bakris GL, Black HR, Cushman WC, Green LA, Izzo JL Jr, et al; Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure. National Heart, Lung, and Blood Institute. Seventh report of the Joint National Committee on Prevention, Detection, Evaluation, and Treatment of High Blood Pressure. Hypertension. 2003;42: 1206-52. [PMID: 14656957]
4. James PA, Oparil S, Carter BL, Cushman WC, Dennison-Himmelfarb C, Handler J, et al. 2014 evidence-based guideline for the management of high blood pressure in adults: report from the panel members appointed to the Eighth Joint National Committee (JNC 8). JAMA. 2014;311:507-20. [PMID: 24352797] doi:10.1001/jama.2013.284427
5. Chazal RA, Creager MA. New quality measure core sets provide continuity for measuring quality improvement: concerns raised about conflicting blood pressure measures [Editorial]. Hypertension. 2016;67:1053-4. [PMID: 26883270] doi:10.1161/HYP.0000000000000043

**IN RESPONSE:** We thank Dr. Lewis and colleagues and appreciate their perspective. They suggest that we understated the benefits and exaggerated the harms from SPRINT (1). We agree that relative risk reduction is an important measure of clinical effect. However, it is incomplete and should be interpreted in the context of absolute risk reduction (2), which does not confound the effect size of the intervention with the baseline risk for an event. We stand by our assertion that the

This article has been corrected. The specific correction appears on the last page of this document. The original version (PDF) is available at www.annals.org.

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

LETTERS

interpretation of clinical trial results should be more balanced and use established principles of evidence-based medicine to assess clinical effectiveness.

SPRINT showed that only 1.6% (absolute risk reduction) of participants benefited from more aggressive treatment to a lower blood pressure goal, whereas 98% of participants treated aggressively had no benefit at 3.2 years. Those 98% were subjected to more treatment; more visits; more costs; more disease labeling; and, in some cases, more harm without any benefit.

We agree with the SPRINT investigators that the outcomes studied are generally (although not always) more serious to individual patients than the harms caused by the treatment but do not agree that this comparison is appropriate. Harms may be justifiable to a person if the offending treatment is likely to benefit him or her over time, which is not the case for 98% of SPRINT participants. The investigators discount the intensity of their intervention on a largely asymptomatic population, and most patients do not view more medications, more physician visits, and higher out-of-pocket costs favorably—especially when the likelihood of benefit is less than 2%.

The SPRINT investigators assume that, when harms occur, they will be detected and corrected with minimal or no sequelae. This assumption seems logical in a clinical trial, where patients are seen regularly and monitored closely; however, that is not what happens in practice, where follow-up is less reliable and management can vary considerably. In tightly controlled clinical trials, benefits are often exaggerated and harms minimized (3) because such trials are conducted under ideal conditions with protocols, expert clinicians, selected patients, and close follow-up and monitoring.

In summary, we believe that SPRINT is an important study whose results should be applied judiciously in selected patients by incorporating principles of evidence-based medicine; patient preferences; and individualized, informed, shared decision making to ensure that patients treated more aggressively truly have a high likelihood of benefit from the intervention without being harmed.

*Eduardo Ortiz, MD, MPH*
Washington, DC

*Paul A. James, MD*
University of Iowa
Iowa City, Iowa

**Disclosures:** Authors have disclosed no conflicts of interest. Forms can be viewed at www.acponline.org/authors/icmje/ConflictOfInterestForms.do?msNum=M15-3123.

doi:10.7326/L16-0442

**References**
1. Wright JT Jr, Williamson JD, Whelton PK, Snyder JK, Sink KM, Rocco MV, et al; SPRINT Research Group. A randomized trial of intensive versus standard blood-pressure control. N Engl J Med. 2015;373:2103-16. [PMID: 26551272] doi:10.1056/NEJMoa1511939
2. Carrasco-Labra A, Montori VM, Ioannidis JA, Jaeschke R, Devereaux P, Walsh M, et al. Misleading presentations of clinical trial results. In: Guyatt G,

Rennie D, Meade MO, Cook DJ, eds. Users' Guides to the Medical Literature: A Manual for Evidence-Based Clinical Practice. 3rd ed. New York: McGraw-Hill; 2015:259-70.
3. Olsen LA, McGinnis JM. Roundtable on Value and Science-Driven Health Care. Redesigning the Clinical Effectiveness Research Paradigm: Innovation and Practice-Based Approaches: Workshop Summary. Washington, DC: National Academies Pr; 2010.

## Economic Outcomes With Anatomical Versus Functional Diagnostic Testing for Coronary Artery Disease

**TO THE EDITOR:** Mark and colleagues' (1) cost analysis of data from PROMISE (PROspective Multicenter Imaging Study for Evaluation of Chest Pain) suggests little or no difference in cost or outcomes with cardiac computed tomography angiography (CTA) versus functional stress testing for assessment of chest pain or other symptoms of coronary artery disease in relatively low-risk patients evaluated in emergency departments. However, this trial and its conclusions have several important caveats.

First, whether pharmacologic stress testing legitimately can be termed "functional" is debatable. Truly functional and relevant clinical information, such as exercise capacity; recovery heart rate; and exercise-induced symptoms, dysrhythmias, heart rate, blood pressure, and ischemic ST segment changes, were not obtainable in the 29% of patients in this cohort who had this type of testing. Exercise information is well known to be a robust predictor of cardiovascular and all-cause mortality (2, 3).

Second, an alternative trial design could have compared exercise electrocardiographic (ECG) testing alone (which made up only 10% of the functional testing group in this trial) with cardiac CTA. The data in Figure 4 of the article show that treadmill ECG testing costs $1731 less than cardiac CTA from baseline to 3 years of follow-up with no apparent difference in outcome, which PROMISE investigators stated in their response to my letter to the editor of *The New England Journal of Medicine* (4). Thus, value (the ratio of outcome per unit cost) is likely to be greater for exercise ECG testing than for cardiac CTA evaluation of low-risk patients with symptoms of coronary artery disease.

Third, exercise ECG testing alone rather than nuclear imaging or CTA is likely to confer substantial additional benefits for patients that the results of PROMISE do not entirely capture. These include avoidance of radiation exposure and potential nephrotoxicity and fewer downstream diagnostic and therapeutic procedures, such as invasive coronary arteriography and coronary revascularization, for which mortality reduction or prevention of myocardial infarction is unlikely and risks for mortality and other adverse outcomes are nontrivial.

In the United States, technology that confers no apparent longevity advantage (5) is often blamed for the high cost of health care. The main evaluation strategies used in PROMISE provide an excellent example of technology run amok in the U.S. health care system with no obvious clinical benefit.

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

Wade H. Martin III, MD
Washington University School of Medicine and the St. Louis
 Veterans Affairs Health Care System
St. Louis, Missouri

Disclosures: Authors have disclosed no conflicts of interest. Forms
can be viewed at www.acponline.org/authors/icmje/ConflictOfInterest
Forms.do?msNum=L16-0481.

doi:10.7326/L16-0481

References
1. Mark DB, Federspiel JJ, Cowper PA, Anstrom KJ, Hoffmann U, Patel MR,
et al; PROMISE Investigators. Economic outcomes with anatomical versus func-
tional diagnostic testing for coronary artery disease. Ann Intern Med. 2016;
165:94-102. [PMID: 27214597] doi:10.7326/M15-2639
2. Mark DB, Shaw L, Harrell FE Jr, Hlatky MA, Lee KL, Bengtson JR, et al.
Prognostic value of a treadmill exercise score in outpatients with sus-
pected coronary artery disease. N Engl J Med. 1991;325:849-53. [PMID:
1875969]
3. Cole CR, Blackstone EH, Pashkow FJ, Snader CE, Lauer MS. Heart-rate re-
covery immediately after exercise as a predictor of mortality. Circulation.
1999;341:1351-7. [PMID: 10536127]
4. Douglas PS, Hoffmann U. Anatomical versus functional testing for coronary
artery disease [Letter]. N Engl J Med. 2015;373:91. [PMID: 26132947] doi:10
.1056/NEJMc1505594
5. Squires D, Anderson C. U.S. health care from a global perspective:
spending, use of services, prices, and health in 13 countries. The Common-
wealth Fund. 8 October 2015. Accessed at www.commonwealthfund.org/
publications/issue-briefs/2015/oct/us-health-care-from-a-global-perspective
on 6 June 2016.

IN RESPONSE: Dr. Martin makes several interesting points.
PROMISE was a pragmatic randomized trial designed to as-
sess the outcomes of 2 diagnostic strategies in symptomatic
patients: initial use of CTA or of functional testing (a compos-
ite of exercise ECG testing, stress nuclear testing, or stress
echocardiography, with the choice of test left up to the man-
aging physician) (1, 2). It was not designed or powered to
compare each functional testing option individually against
CTA. Exercise ECG testing without imaging is clearly less ex-
pensive than CTA, but PROMISE was not designed to prove
that it was clinically equivalent or better. The lack of evidence
of a difference in this case is not evidence of a lack of a dif-
ference. The recent SCOT-HEART (Scottish Computed To-
mography of the Heart) trial reported that, after 1.7 years, CTA
was associated with 38% fewer fatal and nonfatal myocardial
infarctions than a usual care strategy based primarily on exer-
cise ECG testing (3). Thus, we are not in a position to con-
clude that, had treadmill testing been used in all patients in
PROMISE, the clinical outcomes would be unchanged or
would favor treadmill testing alone.

Squires and Anderson's analysis (4) provides a very low-
powered view of country-level health care spending and out-
comes that does not permit any conclusions about cause and
effect. We do agree with Dr. Martin that the value of medical
technology cannot be assumed and must be shown, which is
why we conducted PROMISE.

Daniel B. Mark, MD, MPH
Pamela S. Douglas, MD
Melanie R. Daniels, BA
Duke University Medical Center
Durham, North Carolina

Disclosures: Disclosures can be viewed at www.acponline.org
/authors/icmje/ConflictOfInterestForms.do?msNum=M15-2639.

doi:10.7326/L16-0482

References
1. Douglas PS, Hoffmann U, Lee KL, Mark DB, Al-Khalidi HR, Anstrom K, et al;
PROMISE investigators. PROspective Multicenter Imaging Study for Evaluation
of chest pain: rationale and design of the PROMISE trial. Am Heart J. 2014;
167:796-803. [PMID: 24890527] doi:10.1016/j.ahj.2014.03.003
2. Douglas PS, Hoffmann U, Patel MR, Mark DB, Al-Khalidi HR, Cavanaugh B,
et al; PROMISE Investigators. Outcomes of anatomical versus functional testing
for coronary artery disease. N Engl J Med. 2015;372:1291-300. [PMID:
25773919] doi:10.1056/NEJMoa1415516
3. SCOT-HEART investigators. CT coronary angiography in patients with sus-
pected angina due to coronary heart disease (SCOT-HEART): an open-label,
parallel-group, multicentre trial. Lancet. 2015;385:2383-91. [PMID: 25788230]
doi:10.1016/S0140-6736(15)60291-4
4. Squires D, Anderson C. U.S. health care from a global perspective:
spending, use of services, prices, and health in 13 countries. The Common-
wealth Fund. 8 October 2015. Accessed at www.commonwealthfund.org/
publications/issue-briefs/2015/oct/us-health-care-from-a-global-perspective
on 14 November 2016.

## Management of Chronic Insomnia Disorder in Adults

TO THE EDITOR: In their guideline, Qaseem and colleagues
(1) define insomnia as "dissatisfaction with sleep quantity or
quality" and note that $30 to $107 billion is spent annually on
this dissatisfaction. However, dissatisfaction and sleep distur-
bance are not closely related. A 1976 study of 122 patients
with chronic insomnia compared findings from a sleep labo-
ratory with self-reports the following morning (2). The authors
concluded, "Most subjects consistently underestimated the
amount of time they slept and overestimated the time it
took them to get to sleep in comparison with laboratory
data . . . fewer than 1 patient in 5 with a complaint of very
short sleep or very long sleep latency will have the complaint
confirmed in a laboratory sleep recording" (2). They also ex-
pressed alarm about the amount spent on prescription hyp-
notics, an estimated $170 million in 1970.

Because we have precious little understanding of what
sleep is or how it works, a true measure of drug benefit is to
ask whether the patient performs better or is more awake the
day after a drug-induced sleep. Glass and associates (3)
showed that elderly persons had precisely the opposite effect.
Adverse cognitive and psychomotor events and reports of
daytime fatigue were significantly more common "in people
using any sedative compared with placebo" (3). Wilt and co-
workers' evidence report cites concerns about "increased risk
for dementia, fractures, major injury, [and] cognitive and be-
havioral changes, including driving impairment" with the use
of hypnotics for insomnia (4).

Insomnia has recently been vigorously promoted—largely
by the pharmaceutical industry—as a serious disease treatable

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

by drugs. According to Qaseem and colleagues, the main goal of drug treatment for this disorder is to render patients unconscious for a subjective interval that satisfies them (thus relieving the insomnia). For some reason, sleep study measures are used as intermediate end points even though they are very weakly related to the disorder. (Why not just ask the patient if he or she is satisfied?) Spending billions of dollars and engendering harms to relieve this particular dissatisfaction do not seem to be Choosing Wisely.

*Thomas E. Finucane, MD*
Johns Hopkins Bayview Medical Center
Baltimore, Maryland

**Disclosures:** Disclosures can be viewed at www.acponline.org /authors/icmje/ConflictOfInterestForms.do?msNum=L16-0543.

doi:10.7326/L16-0543

**References**
1. Qaseem A, Kansagara D, Forciea MA, Cooke M, Denberg TD; Clinical Guidelines Committee of the American College of Physicians. Management of chronic insomnia disorder in adults: a clinical practice guideline from the American College of Physicians. Ann Intern Med. 2016;165:125-33. [PMID: 27136449] doi:10.7326/M15-2175
2. Carskadon MA, Dement WC, Mitler MM, Guilleminault C, Zarcone VP, Spiegel N. Self-reports versus sleep laboratory findings in 122 drug-free subjects with complaints of chronic insomnia. Am J Psychiatry. 1976;133:1382-8. [PMID: 185919]
3. Glass J, Lanctôt KL, Herrmann N, Sproule BA, Busto UE. Sedative hypnotics in older people with insomnia: meta-analysis of risks and benefits. BMJ. 2005; 331:1169. [PMID: 16284208]
4. Wilt TJ, MacDonald R, Brasure M, Olson CM, Carlyle M, Fuchs E, et al. Pharmacologic treatment of insomnia disorder: an evidence report for a clinical practice guideline by the American College of Physicians. Ann Intern Med. 2016;165:103-12. [PMID: 27136278] doi:10.7326/M15-1781

**IN RESPONSE:** We share Dr. Finucane's concern about the overuse of pharmacologic therapy, and this concern applies to many diseases beyond insomnia. Therefore, comparing the benefits of pharmacologic therapy for insomnia with the harms and costs before initiating it is incredibly important. We recommended cognitive behavioral therapy for insomnia as first-line treatment rather than pharmacologic therapy. We also advocated for a shared approach to decision making with the patient and caution when considering pharmacologic options. In addition, our guideline contains a high-value care section promoting cognitive behavioral therapy for insomnia over medications.

We agree that focusing on patient-centered outcomes is important. We did not consider evidence on laboratory-measured sleep outcomes; instead, the evidence review collected data on global outcomes when available, which included questionnaires that addressed problems and worry about sleep and accompanying distress or dysfunction. We also acknowledged the limitations of these studies and the evidence. However, the sleep outcomes reported in the evidence review and guideline were collected from patient diaries. Although patients may incorrectly estimate numbers, such as total sleep time or wake after sleep onset, they are still patient-centered.

*Devan Kansagara, MD, MCR*
Portland Evidence-based Synthesis Program and Portland Veterans Affairs Medical Center
Portland, Oregon

*Timothy J. Wilt, MD, MPH*
Minneapolis VA Center for Chronic Disease Outcomes Research and University of Minnesota School of Medicine
Minneapolis, Minnesota

*Melissa Starkey, PhD*
*Amir Qaseem, MD, PhD*
American College of Physicians
Philadelphia, Pennsylvania

**Disclosures:** Disclosures can be viewed at www.acponline.org /authors/icmje/ConflictOfInterestForms.do?msNum=M15-2175.

doi:10.7326/L16-0542

## Physicians, Patients, and Firearms

**TO THE EDITOR:** Inasmuch as litigation on gun control pends before the Supreme Court of the United States, the focus is properly trained on slippery-slope rhetoric subtly embedded in (and omitted from) discussion of what is portrayed as inherent in the patient–physician relationship. Wintemute and colleagues suggest that an initial physician query "might simply be, 'Are there any firearms kept in or around your home?'" (1). No. The topic should be gently introduced the same as other concerns, such as tobacco use, namely by asking, "Would you like to discuss . . . ?" Nonpejorative phrasing is welcoming without being intrusive; the more aggressive approach "simply" may trigger communication cessation and thus preclude invoking the presumed motivations for such questioning, education, and counseling.

In addition, profiling demographic groups allegedly at increased risk for violence includes citation of a generic Centers for Disease Control and Prevention Web site to support the authors' claim that "middle-aged and older white men are at high risk for firearm-related suicide (up to 5 times higher than black men of the same age)." Yet, the referenced article addressing this topic includes a figure that depicts only a 3-fold increase in this type of suicide among this population compared with their black counterparts (2). A press release on a report covering the same period (1999 to 2008) reported a datum that was ignored: "Among racial/ethnic groups, the greatest increases in suicide rates were among white non-Hispanics (40 percent) and American Indian and Alaska Natives (65 percent)" (3). Targeting millions of white men is unjustified.

An article by Weinberger and associates (4) published last year that conveyed opinions consistent with those being promulgated was not surprisingly cited uncritically and failed to refute the referenced claim in an accompanying online comment that the "onslaught of 'scientific' support for gun-control laws is flawed" (5). In their abstract, Wintemute and colleagues even admit that specific recommendations were generated by "proceeding from the limited available evi-

Downloaded From: http://annals.org/ by a Univ of California San Francisco User on 09/20/2017

dence." Such abuse of academic discretion—having bipartisan roots—is more ideological than definitive; it poisons what should be disinterested inquiry devoid of subliminal messaging.

Finally, Wintemute and colleagues' title ("Yes, You Can: Physicians, Patients, and Firearms") was overtly reminiscent of the political campaign of the incumbent president, seemingly at one with the big-government themes that have been emblematic since 2009. Polemics have no place in the composition of scholarly articles; paradoxically, their suasive capacity is diminished as a result.

Robert B. Sklaroff, MD
Nazareth Hospital
Philadelphia, Pennsylvania

**Disclosures:** Authors have disclosed no conflicts of interest. Forms can be viewed at www.acponline.org/authors/icmje/ConflictOfInterestForms.do?msNum=L16-0545.

doi:10.7326/L16-0545

**References**
1. Wintemute GJ, Betz ME, Ranney ML. Yes, you can: physicians, patients, and firearms. Ann Intern Med. 2016;165:205-13. [PMID: 27183181] doi:10.7326 /M15-2905
2. Centers for Disease Control and Prevention. QuickStats: death rates from suicide* for persons aged 45-64 years, by black or white race and sex—United States, 1999-2008. Morbidity and Mortality Weekly Report. 13 January 2012. Accessed at www.cdc.gov/mmwr/preview/mmwrhtml/mm6101a6.htm on 5 August 2016.
3. CDC finds suicide rates among middle-aged adults increased from 1999-2010 [press release]. Atlanta: Centers for Disease Control and Prevention; 2014. Accessed at www.cdc.gov/media/releases/2013/p0502-suicide-rates.html on 5 August 2016.
4. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, et al. Firearm-related injury and death in the United States: a call to action from 8 health professional organizations and the American Bar Association. Ann Intern Med. 2015;162:513-6. [PMID: 25706470] doi:10.7326/M15-0337
5. Sklaroff RB. Onslaught of "scientific" support for gun-control laws is flawed [online comment]. 14 April 2015. Accessed at http://annals.org/article.aspx?articleid=2151828 on 5 August 2016.

**IN RESPONSE:** Dr. Sklaroff suggests that we advocate asking about firearms without any prior effort to establish either the need for such questions from the physician's perspective or their reasonableness from the patient's point of view. He is incorrect. We discuss these preliminaries in our article and elsewhere (1) and use that approach in our clinical work. We wholeheartedly agree with the importance of nonpejorative phrasing—again, a point we have made repeatedly. Perhaps he sees something pejorative in, "Are there any firearms kept in or around your home?" We do not.

We take issue with his use of the loaded term "profiling" to describe making an initial and tentative assessment of a patient's risk for an adverse health event based partly on characteristics that the patient shares with others. Physicians—of necessity—adopt this approach all the time, are aware of its limitations, and ask questions precisely to refine and individualize those initial assessments. Our mention of middle-aged and older white non-Hispanic men is a prime example. Risk for firearm-related suicide in this large group is high and in-

creasing; to a surprising extent, firearm violence is now an old white guy problem (2). Does that high risk apply to every member of the group? Of course not. Does it provide sufficient basis for further inquiry, particularly when other risk factors are involved? We believe it does.

Our choice of a title came from the circumstances that led to the writing of the article itself. In recent years, we have given presentations on firearm violence at national meetings of medical professional societies and have repeatedly been asked whether it was even permissible under the law for physicians to ask patients about firearms. The first draft of the article focused primarily on a discussion of state and federal laws on this matter, and the title was chosen to summarize our answer to that repeated question. As both our article and this response to Dr. Sklaroff should make clear, we agree entirely with him that physician–patient relationships should be, as he suggests in his comment below, "untethered from mandates". This includes those that would restrict the free exchange of ideas and information about firearms.

Garen J. Wintemute, MD, MPH
University of California Davis School of Medicine
Sacramento, California

Marian E. Betz, MD, MPH
University of Colorado School of Medicine
Denver, Colorado

Megan L. Ranney, MD, MPH
Rhode Island Hospital, The Warren Alpert Medical School of
  Brown University
Providence, Rhode Island

**Disclosures:** Disclosures can be viewed at www.acponline.org /authors/icmje/ConflictOfInterestForms.do?msNum=M15-2905.

doi:10.7326/L16-0544

**References**
1. Betz ME, Wintemute GJ. Physician counseling on firearm safety: a new kind of cultural competence. JAMA. 2015;314:449-50. [PMID: 26241594] doi:10.1001/jama.2015.7055
2. Wintemute GJ. The epidemiology of firearm violence in the twenty-first century United States. Annu Rev Public Health. 2015;36:5-19. [PMID: 25533263] doi:10.1146/annurev-publhealth-031914-122535

## Curbing Firearm Violence

**TO THE EDITOR:** I read Weinberger's editorial (1) with interest. As was the case 2 years ago (2), "because public health research predictably guides a generation of public policy, it is necessary to scrutinize the political science underlying the paired [article] and editorial on gun control." Inasmuch as the term "gun control" carries divergent meanings to liberals (restricting firearm access) and conservatives (aiming firearms properly), it is necessary to recognize that editorialization—particularly in a scientific journal—is most effective when devoid of proselytizing.

Weinberger claims that physicians "have a broader societal obligation to improve population health" and, thus, "to

Downloaded From: http://annals.org/ by a Univ of California San Francisco User on 09/20/2017

## LETTERS

inform and educate their patients and the public at large to effect changes in behavior and adoption of important preventive measures." A broad-brush assertion is invoked to justify deputizing physicians—like it or not—to accumulate behavioral information subject to transfer to a third party (that is, government). Such is the nuanced segue from recognition of the noble duty to promote public health to the elitism inherent in forcing both ends of the patient–physician relationship to submit to mandated questioning and answering.

In addition, Weinberger claims that physicians "should not shirk their responsibility to seek information about gun ownership when appropriate" on the basis of Wintemute and colleagues' accompanying article (3) that, according to Weinberger, supposedly identifies "only rare occasions when physicians cannot ask a patient about firearms." To the contrary, careful scrutiny of Wintemute and colleagues' article fails to identify any putative exceptions; instead, it seeks to justify such querying globally. False citation of an allegedly corroborative article has yielded excessive opining.

Not surprisingly, Weinberger also claims (incompletely) that "the authors focus on the particular importance of addressing firearms with patients when there is information, behavior, or individual factors suggesting a risk for violence to self or others." Actually, Wintemute and colleagues use demographic characterizations (also known as profiling)—misquoting the literature in the process—to trigger justifying such probes.

Finally, Weinberger tasks physicians to band with, inter alia, the legal community to "mitigate the risk for firearm-related injury and death," ignoring the societal and political forces at play that dwarf allegedly medical considerations. In fact, regardless of ethical concerns, some would expand National Security Agency files (4) by having physicians become founts of data that would be made available for background checks (5). This is akin to enlisting educators to supply information on their students' home environments accrued by questioning students pursuant to "educational" grants ostensibly intended to satisfy Common Core Standards.

Clinical interactions must uphold patient–physician privacy rights and be untethered from mandates on both history-taking and how that history is recorded.

*Robert B. Sklaroff, MD*
Nazareth Hospital
Philadelphia, Pennsylvania

**Disclosures:** Authors have disclosed no conflicts of interest. Forms can be viewed at www.acponline.org/authors/icmje/ConflictOfInterestForms.do?msNum=L16-0541.

doi:10.7326/L16-0541

**References**
1. Weinberger SE. Curbing firearm violence: identifying a specific target for physician action. Ann Intern Med. 2016;165:221-2. [PMID: 27183475] doi:10.7326/M16-0968
2. Sklaroff RB. Guns, suicide, and homicide [Letter]. Ann Intern Med. 2014;160:876-7. [PMID: 24935495] doi:10.7326/L14-5012-2
3. Wintemute GJ, Betz ME, Ranney ML. Yes, you can: physicians, patients, and firearms. Ann Intern Med. 2016;165:205-13. [PMID: 27183181] doi:10.7326/M15-2905

4. Electronic Frontier Foundation. National security and medical information. 2016. Accessed at www.eff.org/issues/national-security-and-medical-information on 5 August 2016.
5. Anonymous. The role of HIPAA in gun control. Scripted Blog. 2016. Accessed at www.scripted.com/writing-samples/the-role-of-hipaa-in-gun-control on 5 August 2016.

**IN RESPONSE:** Dr. Sklaroff politicizes the view expressed in my editorial, framing it as a "gun control" position rather than a recognition of the medical profession's responsibility to address issues that affect public health and the potential for injury or death to each clinician's patients and family members. There is absolutely no intent for physicians to be deputized to report gun ownership to local, state, or federal governments, and it is unfortunate that gun rights advocates, such as Dr. Sklaroff, take this unfounded position. There is also no proposal to impose "mandated questioning" on physicians but rather a recognition that such questioning is permitted when a patient or others in the household may be at risk for injury or death.

The joint statement by major medical organizations, the American Public Health Association, and the American Bar Association emphasizes the importance of physicians counseling patients about firearms and is a recognition of the commitment of these major professional communities to curb firearm violence (1). Doing so is a professional responsibility that goes above and beyond the polarized political positions that have unfortunately become the societal norm in the United States.

*Steven Weinberger, MD*
American College of Physicians
Philadelphia, Pennsylvania

**Disclosures:** Disclosures can be viewed at www.acponline.org/authors/icmje/ConflictOfInterestForms.do?msNum=M16-0968.

doi:10.7326/L16-0540

**Reference**
1. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, et al. Firearm-related injury and death in the United States: a call to action from 8 health professional organizations and the American Bar Association. Ann Intern Med. 2015;162:513-6. [PMID: 25706470] doi:10.7326/M15-0337

## OBSERVATIONS

### Nivolumab-Induced Recurrence of Rheumatoid Arthritis in a Patient With Advanced Non–Small Cell Lung Cancer: A Case Report

*Background:* Nivolumab (Opdivo, Bristol-Myers Squibb) is a human IgG4 monoclonal antibody with high affinity for the programmed death-1 receptor and is the first programmed death-1 immune checkpoint inhibitor approved by the U.S.

Downloaded From: http://annals.org/ by a Univ of California San Francisco User on 09/20/2017

Food and Drug Administration for second-line treatment of patients with advanced squamous and nonsquamous non–small cell lung cancer (1). Because of its "unbalancing" effect on the immune system, nivolumab may trigger immune-related adverse events (IRAEs), especially among patients with an autoimmune predisposition (2).

*Objective:* To present a case of nivolumab-induced recurrence of rheumatoid arthritis successfully treated with concurrent administration of prednisolone in a patient with advanced non–small cell lung cancer.

*Case Report:* A 76-year-old man with previously untreated stage IV lung adenocarcinoma and a history of rheumatoid arthritis that had been in clinical and laboratory remission for 25 years was referred to the oncology clinic of "Sotiria" Athens General Hospital for oncologic evaluation and treatment. The patient was treated with first-line carboplatin–pemetrexed plus bevacizumab, maintenance pemetrexed plus bevacizumab, second-line carboplatin–paclitaxel, and third-line gemcitabine–bevacizumab. Following disease progression after third-line therapy was begun, intravenous nivolumab treatment at 3 mg/kg of body weight every 2 weeks was initiated. Fifteen days after the first nivolumab infusion, a rheumatoid arthritis crisis occurred, with symmetrical polyarthritis of the upper extremities (particularly in the interphalangeal and metacarpophalangeal joints) and lower-extremity weakness accompanied by marked elevation of rheumatoid factor levels (251 IU/mL [reference range, <30 IU/mL]) and citrullinated peptide antibodies (104.3 U/mL [reference range, <5.0 U/mL]). Oral prednisolone therapy was begun at 20 mg/d and gradually tapered over 10 weeks; symptoms remitted within 5 days after treatment. Nivolumab therapy was continued during prednisolone treatment and after its completion without any modification of the initial protocol. Follow-up chest computed tomography 3 months after initiation of nivolumab therapy showed a partial response.

*Discussion:* Patients with a history of autoimmunity are at increased theoretical risk for IRAEs (2, 3). In support of this hypothesis, serologic aggravation of autoimmune thyroiditis and induction of autoimmune hemolytic anemia in patients receiving nivolumab have been reported (4, 5). However, adequate clinical evidence to substantiate this concern is lacking, mainly because clinical trials of immune checkpoint inhibitors typically exclude patients with autoimmune disorders (2, 3).

Therapeutic management of immune checkpoint blockade–induced IRAEs generally includes interruption of the offending agent and suppression of lymphocyte activation with moderate to high doses of corticosteroids or other immunomodulatory drugs, such as azathioprine or tumor necrosis factor-$\alpha$ antagonists, in the presence of steroid-refractory symptoms (2). Cautious use of immunosuppressive agents has nevertheless been advised in this setting because of concerns over a potential compromise of antitumor immunity (2).

To our knowledge, this is the first reported case of a patient with cancer who had a nivolumab-induced clinical recurrence of a previously diagnosed autoimmune disorder that was successfully treated with corticosteroids without discontinuation of the culprit drug. It provides much-needed, real-world clinical evidence that nivolumab may induce clinical exacerbation of an underlying autoimmune condition even decades after its last manifestation. Furthermore, prednisolone successfully controlled the arthritis recurrence without the need to discontinue nivolumab therapy and, most important, without affecting antitumor response. Further studies are warranted to provide additional data on the efficacy and toxicity of nivolumab in patients with a history of autoimmune conditions, as well as to confirm the feasibility of its concurrent administration with corticosteroids in the presence of nivolumab-induced IRAEs.

*Konstantinos Syrigos, PhD*
*Sofia Tsagouli, MD*
*Dimitra Grapsa, PhD*
"Sotiria" Athens General Hospital, University of Athens School of Medicine
Athens, Greece

**Disclosures:** Authors have disclosed no conflicts of interest. Forms can be viewed at www.acponline.org/authors/icmje/ConflictOfInterestForms.do?msNum=L16-0137.

doi:10.7326/L16-0137

**References**
1. Guibert N, Mazières J. Nivolumab for treating non–small cell lung cancer. Expert Opin Biol Ther. 2015;15:1789-97. [PMID: 26574148] doi:10.1517/14712598.2015.1114097
2. Michot JM, Bigenwald C, Champiat S, Collins M, Carbonnel F, Postel-Vinay S, et al. Immune-related adverse events with immune checkpoint blockade: a comprehensive review. Eur J Cancer. 2016;54:139-48. [PMID: 26765102] doi:10.1016/j.ejca.2015.11.016
3. Teply BA, Lipson EJ. Identification and management of toxicities from immune checkpoint-blocking drugs. Oncology (Williston Park). 2014;28 Suppl 3:30-8. [PMID: 25384885]
4. Narita T, Oiso N, Taketomo Y, Okahashi K, Yamauchi K, Sato M, et al. Serological aggravation of autoimmune thyroid disease in two cases receiving nivolumab. J Dermatol. 2016;43:210-4. [PMID: 26198822] doi:10.1111/1346-8138.13028
5. Kong BY, Micklethwaite KP, Swaminathan S, Kefford RF, Carlino MS. Autoimmune hemolytic anemia induced by anti-PD-1 therapy in metastatic melanoma. Melanoma Res. 2016;26:202-4. [PMID: 26795275] doi:10.1097/CMR.0000000000000232

## Do Sugar-Sweetened Beverages Cause Obesity and Diabetes? Industry and the Manufacture of Scientific Controversy

*Background:* The outcomes of recent regulatory initiatives, tax measures, and federal nutritional guidance designed to curb consumption of sugar-sweetened beverages (SSBs) have hinged on whether these beverages are a proven cause of obesity and diabetes. The SSB industry has opposed such initiatives, claiming that causation is scientifically controversial (1). We comprehensively surveyed the literature to determine whether experimental studies that found no association between SSBs and obesity- and diabetes-related outcomes (negative studies) are more likely than positive studies to have received financial support from this industry.

*Methods:* We searched PubMed from January 2001 to July 2016 for English-language experimental studies on the effects of SSB consumption on obesity- and diabetes-related outcomes, augmented by hand-searching recent reviews (Supplement, available at www.annals.org). Our strategy in-

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

*Figure.* Study flow diagram.



Trials are presented on the left; SRs and meta-analyses are presented on the right. SR = systematic review; SSB = sugar-sweetened beverage.

cluded (sugar* or "sugar-sweetened" or sweet* or fructose) and (beverage* or soda or soft drink) and (obesity or body mass index [BMI] or weight and/or diabetes or metabolism). To focus on causation, we included articles with experimental designs and systematic reviews or meta-analyses of experimental research. We excluded observational studies and studies supported by SSB competitors (bottled water and dairy industries). We classified articles as having positive or negative associations versus no associations. We identified whether articles were independently funded or were funded by, or had authors with financial conflicts with, the SSB industry.

*Results:* We identified 60 studies (28 trials and 32 systematic reviews/meta-analyses of trials) that examined the effects of SSB consumption on obesity- and diabetes-related outcomes (Figure). Twenty-six articles (8 trials and 18 systematic reviews/meta-analyses) described no associations, and 34 articles (20 trials and 14 systematic reviews/meta-analyses) described positive associations. Studies funded by the SSB industry were significantly more likely to be negative independently funded ones: 25 of 26 studies (96.2%) had funding ties to this industry, whereas only 1 of 34 positive studies (2.9%) had such ties (relative risk, 32.70 [95% CI, 4.70 to 225.8]; $P < 0.001$).

*Conclusion:* We established that experimental studies that have financial conflicts with the SSB industry are much more likely than independently funded ones to find no relationship between SSB consumption and metabolic outcomes.

Although a systematic review done a decade ago found that nutrition-related studies favor the sponsors' products (2), to our knowledge ours is the first systematic review of experimental studies that was designed to evaluate causal associations between SSBs and metabolic outcomes. The strength of the association between industry and null findings is more robust than that of the previous analysis (2), a convenience sample of studies of nutrition-related products (3), and a study of systematic reviews of artificially sweetened beverages and body weight (4).

Although some argue that research quality ratings for SSB studies do not differ greatly on the basis of the funding source, others contend that such studies with conflicts of interest have deficiencies that bias results toward the null hypothesis (5), many of which may not be detected in standard ratings. These deficiencies include choice of comparators, bias in defining confounders (versus mediators), biased coding of outcomes, bias in data analysis, selective outcome reporting, and designs that lack external validity. Current methods to assess risk of bias, such as those used by entities influential to health policy (for example, the U.S. Department of Agriculture Dietary Guidelines Advisory Committee Bias Assessment Tool), are probably insufficient because they do not include funding source as a risk of bias.

In conclusion, clinical trials and systematic reviews of trials in which the conduct of research or investigators were supported by the SSB industry were much more likely to find no association between their products and metabolic outcomes

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

than those that were independently funded. This industry seems to be manipulating contemporary scientific processes to create controversy and advance their business interests at the expense of the public's health.

*Dean Schillinger, MD*
*Jessica Tran, BA*
*Christina Mangurian, MD, MS*
University of California, San Francisco, and Center for
   Vulnerable Populations at Zuckerberg San Francisco
   General Hospital
San Francisco, California

*Cristin Kearns, DDS, MBA*
University of California, San Francisco, Philip R. Lee Institute
   for Health Policy Studies and School of Dentistry
San Francisco, California

**Grant Support:** Dr. Schillinger was supported by grant 2P30 DK092924-06. Ms. Tran was supported by grant 5T32DK007418-35. Dr. Mangurian was supported by grant K23MH093689. Dr. Kearns was supported by National Institute of Dental and Craniofacial Research grant DE-007306.

**Disclosures:** Disclosures can be viewed at www.acponline.org /authors/icmje/ConflictOfInterestForms.do?msNum=L16-0534.

This article was published at www.annals.org on 1 November 2016.

doi:10.7326/L16-0534

**References**
1. Schillinger D, Jacobson MF. Science and public health on trial: warning notices on advertisements for sugary drinks. JAMA. 2016;316:1545-6. [PMID: 27479332] doi:10.1001/jama.2016.10516
2. Lesser LI, Ebbeling CB, Goozner M, Wypij D, Ludwig DS. Relationship between funding source and conclusion among nutrition-related scientific articles. PLoS Med. 2007;4:e5. [PMID: 17214504]
3. Nestle M. Corporate funding of food and nutrition research: science or marketing? JAMA Intern Med. 2016;176:13-4. [PMID: 26595855] doi:10 .1001/jamainternmed.2015.6667
4. Mandrioli D, Kearns CE, Bero LA. Relationship between research outcomes and risk of bias, study sponsorship, and author financial conflicts of interest in reviews of the effects of artificially sweetened beverages on weight outcomes: a systematic review of reviews. PLoS One. 2016;11:e0162198. [PMID: 27606602] doi:10.1371/journal.pone.0162198
5. Stanhope KL. Sugar consumption, metabolic disease and obesity: the state of the controversy. Crit Rev Clin Lab Sci. 2016;53:52-67. [PMID: 26376619] doi:10.3109/10408363.2015.1084990

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

## CORRECTION: DO SUGAR-SWEETENED BEVERAGES CAUSE OBESITY AND DIABETES?

In a recent Letter to the Editor (1), one of the included studies (2) was incorrectly categorized as having funding ties to industry. This resulted in changes to the Results section and the supplement, which have been corrected both in print and online. We apologize for this error.

doi:10.7326/L16-0534

**Reference**

1. Schillinger D, Tran J, Mangurian C, Kearns C. Do sugar-sweetened beverages cause obesity and diabetes? Industry and the manufacture of scientific controversy [Letter]. Ann Intern Med. 2016;165:895-6. doi: 10.7326/L16-0534
2. Trumbo PR, Rivers CR. Systematic review of the evidence for an association between sugar-sweetened beverage consumption and risk of obesity. Nutr Rev. 2014;72:566-74. [PMID: 25091794] doi:10.1111/nure.12128

Downloaded From: http://annals.org/ by a Univ of California San Francisco User  on 09/20/2017

# Exhibit 8

## Filed Under Seal

# Exhibit 9

## Filed Under Seal

# Exhibit 10

## Filed Under Seal

# Exhibit 11

## Filed Under Seal

# Exhibit 12

## Filed Under Seal