**FAEGRE BAKER DANIELS LLP**
TARIFA B. LADDON (SBN 240419)
*tarifa.laddon@faegrebd.com*
HOWARD D. RUDDELL (SBN 281510)
*howard.ruddell@faegrebd.com*
11766 Wilshire Boulevard, Suite 750
Los Angeles, CA  90025
Telephone:     +1.310.500.2090
Facsimile:     +1.310.500.2091

SARAH L. BREW (admitted pro hac vice)
*sarah.brew@faegrebd.com*
AARON D. VAN OORT (admitted pro hac vice)
*aaron.vanoort@faegrebd.com*
COURTNEY A. LAWRENCE (admitted pro hac vice)
*courtney.lawrence@faegrebd.com*
NICHOLAS J. NELSON (admitted pro hac vice)
*nicholas.nelson@faegrebd.com*
90 South Seventh Street, Suite 2200
Minneapolis, MN 55402-3901
Telephone:     +1.612.766.7000
Facsimile:     +1.612.766.1600

Attorneys for Defendant Post Foods, LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEBBIE KROMMENHOCK and STEPHEN HADLEY, on behalf of themselves, all others similarly situated, and the general public,<br><br>Plaintiffs,<br><br>v.<br><br>POST FOODS, LLC,<br><br>Defendant. | Case No. 3:16-CV-04958-WHO<br><br>Hon. William H. Orrick<br><br><br>**DEFENDANT POST FOODS, LLC's ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT** |

Defendant Post Foods, LLC ("Post") hereby answers Plaintiffs Debbie Krommenhock and Stephen Hadley's Second Amended Complaint ("SAC") and states its defenses thereto as follows:

## INTRODUCTION

1.      The scientific evidence is compelling: Excessive consumption of added sugar is toxic to the human body. Experimentally sound, peer-reviewed studies and meta-analyses convincingly show that consuming excessive added sugar—any amount above approximately 5% of daily caloric intake—greatly increases the risk of heart disease, diabetes, liver disease, and a wide variety of other chronic morbidity.

**Answer**: Post denies the allegations in Paragraph 1 of the SAC.

2.      Despite the compelling evidence that the fructose in sugar acts as a chronic liver toxin, detrimentally affecting health, to increase their price and sales, Post leverages a policy and practice of marketing high-sugar cereals with health and wellness claims. These claims, however, are deceptive because they are incompatible with the significant dangers of the excessive added sugar consumption to which these foods contribute.

**Answer**: Post denies the allegations in Paragraph 2 of the SAC.

3.      Plaintiffs bring this action against Post on behalf of themselves, other Post cereal consumers, and the general public, primarily to enjoin Post from continuing to engage in its practice of using deceptive health and wellness claims to market high-sugar cereals.

**Answer**: Post admits that Plaintiffs seek to represent some Post cereal consumers and that they seek injunctive relief. Post denies the remaining allegations in Paragraph 3 of the SAC.

## THE PARTIES

4.      Plaintiff Debbie Krommenhock is a resident of Dublin, California.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 4 of the SAC and therefore denies them.

5.      Plaintiff Stephen Hadley is a resident of Monterey, California.

**Answer**: Post lacks sufficient knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the SAC and therefore denies them.

6.      Defendant Post Foods, LLC is a Delaware limited liability corporation with its

1  principal place of business at 2503 S. Hanley Road, St. Louis, Missouri 63144.

2      **Answer**: Post admits that it is a Delaware limited liability company. Post denies the

3  remaining allegations in Paragraph 6 of the SAC.

4                          **JURISDICTION AND VENUE**

5      7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A),

6  the Class Action Fairness Act, because the matter in controversy exceeds the sum or value of

7  $5,000,000 exclusive of interest and costs, and at least one member of the class of plaintiffs is a

8  citizen of a state different from Post. In addition, more than two-thirds of the members of the class

9  reside in states other than the state in which Post is a citizen and in which this case is filed, and

10  therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

11      **Answer**: Paragraph 7 consists of a legal conclusion to which no response is required. To

12  the extent a response is required, Post agrees that this Court has subject matter jurisdiction under

13  28 U.S.C. § 1332(d).

14      8.      The Court has personal jurisdiction over Post pursuant to Cal. Code Civ. P. §

15  410.10, as a result of Post's substantial, continuous and systematic contacts with the state, and

16  because Post has purposely availed itself of the benefits and privileges of conducting business

17  activities within the state.

18      **Answer**: Paragraph 8 consists of a legal conclusion to which no response is required. To

19  the extent a response is required, Post admits that this Court has personal jurisdiction over Post for

20  the claims brought in this case by California residents arising out of purchases they made in

21  California.

22      9.      Venue is proper in the Northern District of California pursuant to 28 U.S.C. §

23  1391(b) and (c), because Post resides (i.e., is subject to personal jurisdiction) in this district, and a

24  substantial part of the events or omissions giving rise to the claims occurred in this district.

25      **Answer**: Paragraph 9 consists of a legal conclusion to which no response is required. To

26  the extent a response is required, Post admits that venue is proper in this District.

27

28

**FACTS**

**A.      There Has Been a Recent Rise in Human Sugar Consumption**

10.      Sugars are sweet, short-chain, soluble carbohydrates. Simple sugars are called monosaccharides, while disaccharides are formed when two monosaccharides undergo a condensation reaction. The three most common sugars in our diets are fructose, glucose, and sucrose. Other sugars, like lactose, found in milk, and maltose, formed during the germination of grains like barley, are not generally consumed in large amounts. Glucose is a monosaccharide that occurs naturally in fruits and plant juices and is the primary product of photosynthesis. Most ingested carbohydrates (like bread and pasta) are converted into glucose during digestion, and glucose is the form of sugar transported around the body in the bloodstream, and used by the cells for energy. Fructose is a monosaccharide that occurs naturally in fruits and honey. It is the sweetest of the sugars. Sucrose is a disaccharide comprised of one molecule of glucose chemically linked to one molecule of fructose. It is found in sugar cane and beets. Common table sugar is sucrose. During digestion and prior to blood absorption, enzymes called sucrases cleave a sucrose molecule into its constituent parts, glucose and fructose.

**Answer**: Post admits that fructose, glucose, sucrose, and lactose are forms of sugars, which are a form of carbohydrates. Post lacks sufficient knowledge and information to form a belief as to the truth of the remaining allegations in Paragraph 10 of the SAC and therefore denies them.

11.      Humans' consumption of sugar has shifted dramatically over time. Cro-Magnon men during the Paleolithic age were hunters and gatherers, with a diet mainly comprised of meat, high in protein, moderate in fat, and low in carbohydrates. Fruits and berries were the major source of carbohydrates, and starch consumption was low.[1] In 1200 B.C., a process was developed in India for extracting sugar in the form of cane juice called khanda, which is where the word "candy" comes from. For nearly 3,000 years, sugar was rare, reserved for nobility. The invention of the pot still in 1700 A.D., however, allowed mass production of refined sugar. But it was still

---

[1] Tappy, L., et al., "Metabolic Effects of Fructose in the Worldwide Increase in Obesity," *Physiology Review*, Vol. 90, 23-46, at 24 (2010) [hereinafter "Tappy, Metabolic Effects of Fructose"].

1  extraordinarily expensive until the middle of the 18th century, when there was a worldwide

2  growth in sugar production, including in America. Thus, humans have been consuming sugar in

3  substantial amounts for less than 300 years.

4      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

5  the allegations in Paragraph 11 of the SAC and therefore denies them. Post asserts that the article

6  cited in footnote 1 to Paragraph 11 of the SAC speaks for itself and should be read as a whole and

7  in light of the entire body of available scientific evidence. Post denies that the conclusions or

8  inferences Plaintiffs attempt to draw from the cited article are valid or establish their claims.

9      12.    For most of that time, Americans' sugar consumption was almost exclusively table

10 sugar, with only small amounts of glucose and fructose ingested from fruit.[2] And sugar was a

11 condiment, added to coffee or tea, with control over the amount eaten.

12     **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

13 the allegations in Paragraph 12 of the SAC and therefore denies them. Post asserts that the article

14 cited in footnote 2 to Paragraph 12 of the SAC speaks for itself and should be read as a whole and

15 in light of the entire body of available scientific evidence. Post denies that the conclusions or

16 inferences Plaintiffs attempt to draw from the cited article are valid or establish their claims.

17     13.    In the 1960s, the food industry developed technologies to extract starch from corn,

18 then convert it to glucose, some of which could then be converted to fructose, leading to the

19 development of corn-derived sweeteners, most notably high-fructose corn syrup (HFCS).[3]

20 Although HFCS is comprised of both fructose and glucose, unlike with sucrose, the fructose is not

21 chemically bound to the glucose in a new molecule. Thus the fructose in HFCS is referred to as

22 "free" fructose. HFCS can be produced with different fructose-to-glucose ratios. The most

23 common are HFCS-42 and HFCS-55, containing 42% and 55% fructose. Some HFCS, however,

24 can be as much as 90% fructose, i.e., HFCS-90. Food manufacturers have recently begun referring

25 to HFCS-90 on food label ingredients statements as simply "fructose."

26     **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

27 [2] *Id.*

28 [3] *Id.* (citation omitted).

1   the allegations in Paragraph 13 of the SAC and therefore denies them. Post asserts that the article

2   cited in footnote 3 to Paragraph 13 of the SAC speaks for itself and should be read as a whole and

3   in light of the entire body of available scientific evidence. Post denies that the conclusions or

4   inferences Plaintiffs attempt to draw from the cited article are valid or establish their claims.

5       14.     Fructose is sweeter than either glucose or sucrose. In fruit, it serves as a marker for

6   foods that are nutritionally rich. Before the development of the worldwide sugar industry, fructose

7   in the human diet was limited to items like honey, dates, raisins, molasses, figs, grapes, raw

8   apples, apple juice, persimmons, and blueberries (which contain approximately 10-15% fructose).

9   Food staples like milk, vegetables, and meat have essentially no fructose. Thus, until relatively

10  recently, human beings have had little dietary exposure to fructose.[4]

11      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

12  the allegations in Paragraph 14 of the SAC and therefore denies them. Post asserts that the article

13  cited in footnote 4 to Paragraph 14 of the SAC speaks for itself and should be read as a whole and

14  in light of the entire body of available scientific evidence. Post denies that the conclusions or

15  inferences Plaintiffs attempt to draw from the cited article are valid or establish their claims.

16      15.     But the low cost and long shelf-life of HFCS has contributed to a rapid increase in

17  its consumption over the last 45 years, and thus the consumption of fructose. Between 1970 and

18  2000, the United States' yearly per capita HFCS consumption went from 0.292 kg per person, to

19  33.4 kg per person, a greater than 100-fold increase.[5]

20      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

21  the allegations in Paragraph 15 of the SAC and therefore denies them. Post asserts that the article

22  cited in footnote 5 to Paragraph 15 of the SAC speaks for itself and should be read as a whole and

23  in light of the entire body of available scientific evidence. Post denies that the conclusions or

24  inferences Plaintiffs attempt to draw from the cited article are valid or establish their claims.

25  _____

26  [4] Bray, G., "How bad is fructose?," *American Journal of Clinical Nutrition*, Vol. 86, 895-96
    (2007) [hereinafter, "Bray, How Bad is Fructose?"].

27  [5] Bray, G.A., et al., "Consumption of high-fructose corn syrup in beverages may play a role in the
    epidemic of obesity*," American Journal of Clinical Nutrition*, Vol. 79, 537-43, at 537, 540 (2004)

28  [hereinafter "Bray, HFCS Role in Obesity Epidemic"].

16.     Today, the majority of sugars in typical American diets are added to foods during processing, preparation, or at the table.[6] The two primary sources of added sugar in processed food are HFCS and sucrose (i.e., granulated sugar used, for example, in baked goods). Added sugar is in more than 74% of processed foods,[7] under more than 60 different names.[8] Although the tendency is to associate sugar with sweets, added sugar is found in many savory processed foods, like bread, soup, and pasta sauce.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 16 of the SAC and therefore denies them. Post asserts that the sources cited in footnotes 6-7 to Paragraph 16 of the SAC speak for themselves and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from the cited sources are valid or establish their claims.

17.     There has been a rise over the past 45 years in Americans' consumption of added sugars. From 1970 to 2000, there was a 25% increase in available added sugars in the U.S.[9] The American Heart Association found that between 1970 and 2005, sugars available for consumption increased by an average of 76 calories per day, from 25 teaspoons (400 calories) to 29.8 teaspoons

---

[6] U.S. Dep't of Agric. & U.S. Dep't of Health & Human Servs., "Dietary Guidelines for Americans, 2010," at 27 (2010) *available at* http://www.health.gov/dietaryguidelines/dga2010/DietaryGuidelines2010.pdf.

[7] Ng, S.W., et al., "Use of caloric and non-caloric sweeteners in US consumer packaged foods, 2005-9, *Journal of the Academy of Nutrition and Dietetics*, Vol. 112, No. 11, 1828-34 (2012).

[8] Some examples: Agave nectar, Barbados sugar, Barley malt, Barley malt syrup, Beet sugar, Brown sugar, Buttered syrup, Cane juice, Cane juice crystals, Cane sugar, Caramel, Carob syrup, Castor sugar, coconut palm sugar, Coconut sugar, Confectioner's sugar, Corn sweetener, Corn syrup, Corn syrup solids, Date sugar, Dehydrated case juice, Demerara sugar, Dextrin, Dextrose, Evaporated cane juice, Free-flowing brown sugars, Fructose, Fruit juice, Fruit juice concentrate, Glucose, Glucose solids, Golden sugar, Golden syrup, Grape sugar, High-Fructose Corn Syrup (HFCS), Honey, Icing sugar, Invert sugar, Malt syrup, Maltodextrin, Maltol, Maltose, Mannose, Maple syrup, Molasses, Muscovado, Palm sugar, Panocha, Powdered sugar, Raw sugar, Refiner's syrup, Rice syrup, Saccharose, Sorghum Syrup, Sucrose, Sugar (granulated), Sweet Sorghum, Syrup, Treacle, Turbinado sugar, and Yellow sugar.

[9] Bray, How Bad is Fructose?, *supra* n.4, at 895 (citing Havel, P.J., "Dietary fructose: implications for dysregulation of energy homeostasis and lipid/carbohydrate metabolism, *Nutrition Reviews*, Vol. 63, 133-57 (2005) [hereinafter, "Havel, Dietary Fructose"]).

1  (476 calories), a 19% increase.[10] The Continuing Survey of Food Intake by Individuals from 1994

2  to 1996 showed that the average person had a daily added sugars intake of 79 grams, equal to 316

3  calories and about 15% of energy intake. Those in the top one-third of fructose consumption

4  ingested 137 grams of added sugars per day (548 calories, about 26% of energy per day), and

5  those in the top 10% of fructose consumption ingested 178 grams of fructose per day (712

6  calories, about 34% of energy).[11]

7          **Answer**: Post admits that the American Heart Association issued an "AHA Scientific

8  Statement" in 2009 and that Paragraph 17 of the SAC contains some language from that

9  Statement. Post lacks sufficient knowledge or information to form a belief as to the truth of the

10  remaining allegations in Paragraph 17 of the SAC and therefore denies them. Post asserts that the

11  AHA Scientific Statement and the additional sources cited in footnotes 10-11 to Paragraph 17 of

12  the SAC speak for themselves and should be read as a whole and in light of the entire body of

13  available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to

14  draw from these sources are valid or establish their claims.

15          18.     In 2014, researchers analyzing data obtained from National Health and Nutrition

16  Examination Survey (NHANES) showed that during the most recent period of 2005-2010, the

17  mean percent of calories from added sugar in the American diet was 14.9%. Most adults, 71.4%,

18  consumed 10% or more of their calories from added sugar, while about 10% of adults consumed

19  25% or more of their calories from added sugar.[12]

20

21  [10] Johnson, R.K., et al., on behalf of the American Heart Association Nutrition Committee of the
    Council on Nutrition, Physical Activity, and Metabolism and Council on Epidemiology and

22  Prevention, "Dietary Sugars Intake and Cardiovascular Health: A Scientific Statement From the
    American Heart Association," *Circulation*, Vol. 120, 1011-20, at 1016-17 (2009) [hereinafter

23  "AHA Scientific Statement"]. *See also* World Health Organization, Sugars intake for adult and
    children: Guideline" (March 4, 2014) *available at*

24  http://www.who.int/nutrition/publications/guidelines/sugars_intake/en (Based on scientific
    evidence, recommending adults and children reduce daily intake of free sugars to less than 10% of

25  total energy intake and noting that "[a] further reduction to below 5% or roughly 25 grams (6
    teaspoons) per say would provide additional health benefits.").

26  [11] Bray, How Bad is Fructose?, *supra* n.4, at 895.

27  [12] Yang, Quanhe, et al., "Added Sugar Intake and Cardiovascular Diseases Mortality Among US
    Adults," *Journal of the American Medical Association*, at E4-5 (published online Feb. 3, 2014)

28  [hereinafter, "Yang, NHANES Analysis"].

1    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

2    the allegations in Paragraph 18 of the SAC and therefore denies them. Post asserts that the article

3    cited in footnote 12 to Paragraph 18 of the SAC speaks for itself and should be read as a whole

4    and in light of the entire body of available scientific evidence. Post denies that the conclusions or

5    inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

6          19.     Today, "the vast majority of the U.S. population exceeds recommended intakes of .

7    . . added sugars."[13] Despite some reduction in added sugar intake recently, "intakes of added

8    sugars are still very high . . . and are well above recommended limits . . . ."[14] Approximately 90%

9    of the population exceeds recommended daily limits.[15]

10   **Answer**: Post admits that footnote 13 to Paragraph 19 of the SAC refers to the U.S.

11   Department of Agriculture and U.S. Department of Health & Human Servs.' Scientific Report

12   of the 2015 Dietary Guidelines Advisory Committee, and that Paragraph 19 of the SAC contains

13   some language from that Report. The Report speaks for itself and should be read as a whole in

14   light of the entire body of available scientific evidence. Post denies that the conclusions or

15   inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

16   **B.**     **The Body's Physiological Response to Excess Sugar Consumption**

17        **1.**     **The Body's Response to Glucose**

18        20.     The body needs some glucose, largely to meet the brain's metabolic demands, but

19   also because all living cells use glucose for energy. Blood glucose levels below 25mg/dL may

20   result in coma, seizure, or death, while levels consistently exceeding 180 mg/dL can cause long-

21   term damage, including renal failure and atherosclerosis.

22        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

23   the allegations in Paragraph 20 of the SAC, and therefore denies them.

24   
25   [13] U.S. Dep't of Agric. & U.S. Dep't of Health & Human Servs., "Scientific Report of the 2015 Dietary Guidelines Advisory Committee: Advisory Report to the Secretary of Health and Human Services and the Secretary of Agriculture," at 26 (February 2015), *available at*
26   http://www.health.gov/dietaryguidelines/2015-scientific-report/PDFs/Scientific-Report-of-the-2015-Dietary-Guidelines-Advisory-Committee.pdf.

27   [14] *Id.* at 38.

28   [15] *Id.* at 35.

21.     For these reasons, blood glucose concentration is tightly-regulated by homeostatic regulatory systems. When blood glucose rises after a meal, beta cells in the pancreas secrete insulin into the blood, which helps muscle, fat, and liver cells absorb the glucose for energy, lowering the blood sugar. Too little blood sugar stimulates the secretion of hormones that counteract the insulin and thus restore normal blood sugar.[16]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 21 of the SAC, and therefore denies them. Post asserts that the article cited in footnote 16 to Paragraph 21 of the SAC speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

22.     During certain steps in processing glucose, the body forms fructose. However, unlike with glucose, there is no biological need for dietary fructose, i.e., fructose consumed from food, whether fruit, honey, HFCS, or some other form. Moreover, unlike glucose, fructose does not directly stimulate insulin secretion.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 22 of the SAC, and therefore denies them.

23.     The body processes glucose and fructose differently. With little processing, fructose passes through the small intestine, into blood bound for the liver, so that it is taken up nearly 100% for processing in the liver (a characteristic shared by substances commonly referred to as poisons). By contrast, glucose is both "burned up" by cells directly, and processed elsewhere outside the liver, so that the liver must process only 20% of glucose consumed.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 23 of the SAC, and therefore denies them.

24.     So much glucose is burned up prior to liver processing, because all the body's cells contain a transporter that, when stimulated by insulin, takes in glucose from the blood. By

---

[16] Ludwig, David S., "The Glycemic Index: Physiological Mechanisms Relating to Obesity, Diabetes, and Cardiovascular Disease," *Journal of the American Medical Association*, Vol. 287, No. 18, 2414-23, at 2415 (May 8, 2002) (citation omitted).

1  contrast, fructose can only be absorbed by cells that contain a different transporter, which most

2  cells lack.

3      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

4  the allegations in Paragraph 24 of the SAC, and therefore denies them.

5      25.     The liver is capable of processing relatively small amounts of sugar, meted out

6  slowly. This is one of the reasons that eating the fructose in fruit is not problematic: the sugar in

7  fruit is encased in the fruit's fiber, which slows the sugar's uptake, and some sugar encased in fruit

8  fiber may not even be released. Thus fruit consumption does not overwhelm the liver. Notably,

9  adding fiber to foods that are high in sugar does not replicate this effect, because the sugar and

10 fiber remain separate, and the sugar is not encased in the fiber like it is in fruit. Fruit also comes

11 packaged with nutrients, like vitamins, that are beneficial for health, and sends satiation signals to

12 the brain, telling it that the body is full.

13     **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

14 the allegations in Paragraph 25 of the SAC, and therefore denies them.

15     26.     Because the liver has some capacity to process sugar, there does appear to be a

16 "safe" threshold of daily added sugar consumption, small enough not to overload the liver:

17 approximately 5% of calories, or about 38 grams (9 teaspoons, 150 calories) per day for men, 25

18 grams (6 teaspoons, 100 calories) per day for women,[17] and 12-15 grams (3-6 teaspoons, 50-60

19 calories) for children depending on age and caloric needs.[18]

20     **Answer**: Post denies that 5% of calories represents a generally applicable "safe" threshold

21 for added daily sugar consumption. Post lacks sufficient knowledge or information to form a belief

22 as to the truth of the remaining allegations in Paragraph 26 of the SAC, and therefore denies them.

23 Post asserts that the sources cited in footnotes 17-18 to Paragraph 26 of the SAC speak for

24 themselves and should be read as a whole and in light of the entire body of available scientific

25 ───────────────

26 [17] AHA Scientific Statement, *supra* n.10. Similarly, the World Health Organization recommends
that no more than 10% of an adult's calories—and ideally less than 5%—should come from added

27 sugar or from natural sugars in honey, syrups, and fruit juice.

28 [18] *See* "How Much Is Too Much?," *at* http://www.sugarscience.org/the-growing-concern-of-overconsumption.

1  evidence.

2      27.     But the long-term consumption of excess sugar can have dire physiological

3  consequences, acting as a chronic, dose-dependent liver toxin, overloading the liver and causing

4  chronic metabolic disease, also sometimes called metabolic syndrome, a cluster of symptoms that,

5  when present together, increase a person's risk of chronic disease like cardiovascular disease and

6  type 2 diabetes.

7      **Answer**: Post denies the allegations in Paragraph 27 of the SAC.

8      28.     When excess sugar consumption overloads the liver, the glucose increases insulin

9  secretion, while the fructose gets turned into liver fat, causing insulin resistance. The combination

10 over time results in rapid and dramatic increases in blood glucose and insulin concentrations.[19]

11 Over time, individuals with frequent insulin secretion may develop insulin resistance, where the

12 body produces insulin but does not use it effectively, so that glucose builds up in the blood instead

13 of being absorbed by the cells. Because the muscle, fat, and liver cells do not respond properly to

14 insulin and thus cannot easily absorb glucose from the bloodstream, the body needs higher levels

15 of insulin. Eventually the pancreas' beta cells cannot keep up with this increasing demand, and

16 over time can no longer produce enough insulin to overcome insulin resistance, so blood glucose

17 levels remain high.

18     **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

19 the allegations in Paragraph 28 of the SAC, and therefore denies them. Post asserts that the article

20 cited in footnote 19 to Paragraph 28 of the SAC speaks for itself and should be read as a whole

21 and in light of the entire body of available scientific evidence. Post denies that the conclusions or

22 inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

23     29.     Currently, about two-thirds of the American population is overweight, about one-

24 quarter to one-third is diabetic or pre-diabetic, and another one-quarter is hypertensive. Many

25

26 [19] Janssens, J.P., et al., "Effects of soft drink and table beer consumption on insulin response in
normal teenagers and carbohydrate drink in youngsters," *European Journal of Cancer Prevention*,
27 Vol. 8, 289-95 (1999) ("In contrast to table beer, consumption of regular soft drinks induced a fast
and dramatic increase in both glucose and insulin concentration within a maximum 1 hour after
28 consumption.").

1    Americans also have high serum triglycerides. Insulin resistance is a component of all of these

2    health issues.

3         **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

4    allegations in Paragraph 29 of the SAC, and therefore denies them.

5         30.    Energy deposition into fat cells by insulin stimulate them to secrete a hormone

6    called leptin, which is a natural appetite suppressant that tells the brain the body is full and can

7    stop eating. Generally, glucose suppresses the hunger hormone, ghrelin, and stimulates leptin. But

8    high insulin levels brought on by excess sugar consumption have been linked to leptin resistance,

9    where the brain is desensitized to the hormone and so no longer "hears" the message to stop

10   eating.[20] Because increased insulin makes the body feel hungry, excess sugar consumption can

11   create a vicious cycle in which the more sugar one eats, the hungrier one feels.

12        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

13   allegations in Paragraph 29 of the SAC, and therefore denies them. Post asserts that the article

14   cited in footnote 20 to Paragraph 30 speaks for itself and should be read as a whole and in light of

15   the entire body of available scientific evidence. Post denies that the conclusions or inferences

16   Plaintiffs attempt to draw from this source are valid or establish their claims.

17        **2.    The Body's Response to Fructose**

18        31.    But it is the fructose, found in most processed foods, that appears to cause the

19   greatest harm in the shortest amount of time. Nearly all added sugars contain significant amounts

20   of fructose. For example, HFCS typically contains nearly 42% or 55% fructose, while table sugar

21   and other sweeteners, like cane sugar, contain 50% fructose.

22        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

23   the allegations in Paragraph 31 of the SAC, and therefore denies them.

24        32.    Fructose is the most lipophilic carbohydrate, meaning it easily converts to a form,

25   glycerol, that supports conversion to fats, including free fatty acids, a damaging form of

26

27   _____
     [20] Shapiro, A., et al., "Fructose-induced leptin resistance exacerbates weight gain in response to
     subsequent high-fat feeding," *American Journal of Physiology, Regulatory, Integrative and*
28   *Comparative Physiology*, Vol. 295, No. 5, R1370-75 (2008).

1    cholesterol called very low-density lipoprotein (VLDL), and triglycerides, which get stored as fat.

2    Studies in humans and animals have shown that fructose is preferentially metabolized to lipid (fat)

3    in the liver, leading to increased triglyceride levels, which are associated with insulin resistance

4    and cardiovascular disease.[21] Fatty acids created during fructose metabolism accumulate as fat

5    droplets in the liver, also causing insulin resistance, as well as non-alcoholic fatty liver disease. In

6    addition, when the liver turns excess sugar into liver fat and becomes insulin resistant, that

7    generates hyperinsulinemia, which drives energy storage into body fat.

8         **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

9    allegations in Paragraph 32 of the SAC, and therefore denies them. Post asserts that the articles

10    cited in footnotes 21 to Paragraph 32 speak for themselves and should be read as a whole and in

11    light of the entire body of available scientific evidence. Post denies that the conclusions or

12    inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

13         33.      Glucose does not do this. Following consumption of 120 calories of glucose,  less

14    than 1 calorie should be stored as fat, while 120 calories of fructose should result in 40 calories

15    being stored as fat.

16         **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

17    the allegations in Paragraph 33 of the SAC, and therefore denies them.

18         34.      The metabolism of fructose also creates several waste products and toxins,

19    including uric acid, which drives up blood pressure, causes gout, and is a risk factor for

20    cardiovascular disease because the production of uric acid utilizes nitric oxide, a key modulator of

21    vascular function, and causes inflammation. Experimental human studies confirm that fructose

22    feeding raises serum uric acid levels.[22]

---

23    [21] Elliot, S.S., et al., "Fructose, weight gain, and the insulin resistance syndrome," *American

24    Journal of Clinical Nutrition*, Vol. 76, 911-22 (2002) [hereinafter, "Elliot, Fructose & Insulin Resistance"]; Bray, How Bad is Fructose?, *supra* n.4; Havel, Dietary Fructose, *supra* n.9.

25    [22] Nguyen, S., et al., "Sugar Sweetened Beverages, Serum Uric Acid, and Blood Pressure in Adolescents," *Journal of Pediatrics*, Vol. 154, No. 6, 807-13 (June 2009) (citations omitted)

26    [hereinafter, "Nguyen, Serum Uric Acid"]; Johnson, R.J., "Potential role of sugar (fructose) in the epidemic of hypertension, obesity and the metabolic syndrome, diabetes, kidney disease, and

27    cardiovascular disease," *American Journal of Clinical Nutrition*, Vol. 86, 899-906 (2007); Nakagawa, T., et al., "A causal role for uric acid in fructose-induced metabolic syndrome,"

28    *American Journal of Physiology*, Vol. 290, F625-31 (2006).

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of allegations in Paragraph 34 of the SAC, and therefore denies them. Post asserts that the articles cited in footnote 22 to Paragraph 34 speaks for themselves and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

35.     Moreover, fructose interferes with the brain's communication with leptin, which may result in overeating. And while glucose suppresses ghrelin, thus reducing hunger, fructose has no effect on ghrelin.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 35 of the SAC, and therefore denies them.

**3.       The Addiction Response**

36.     Research shows that, for some people, eating sugar produces characteristics of craving and withdrawal, along with chemical changes in the brain's reward center, the limbic region, which can be similar to those of people addicted to drugs like cocaine and alcohol.[23] These changes are linked to a heightened craving for more sugar.[24] This can create a vicious cycle leading to chronic illness.

**Answer**: Post denies the allegations in Paragraph 36 of the SAC. Post asserts that the sources cited in footnotes 23 and 24 of Paragraph 36 speak for themselves and should be read as a whole and in light of the entire body of available scientific evidence.

**C.     There Has Been a Dramatic Rise in Obesity & Chronic Disease That Parallels the Rise in Human Sugar Consumption**

37.     As noted above, there was a dramatic rise in Americans' use of sugar, first in the mid-18th century, then again starting in the United States in about 1970, with the introduction into the market of HFCS. Concurrently with these changes in the diet have been alarming rises in

---

[23] Volkow, N.D., et al., "Drug addiction: the neurobiology of behavior gone awry," *Nature Reviews Neuroscience*, Vol. 5, No. 12, 963-70 (2004); Brownell, K.D., et al., "Food and addiction: A comprehensive handbook," *Oxford University Press* (2012).

[24] Avena, N., "Evidence for sugar addiction: behavioral and neurochemical effects of intermittent, excessive sugar intake," *Neuroscience Behavior Review*, Vol. 52, No. 1, 20-39 (2008).

1  obesity and chronic disease.

2      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

3  the remaining allegations in Paragraph 37 of the SAC, and therefore denies them.

4      38.    In 1924, New York City health commissioner Haven Emerson noted a sevenfold

5  increase in diabetes rate in the city. In 1931, Dr. Paul Dudley White, a cardiologist at

6  Massachusetts General Hospital, warned of an epidemic of heart disease. And in 1988, scientists

7  learned about the advent of adolescent type 2 diabetes.

8      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

9  the remaining allegations in Paragraph 38 of the SAC, and therefore denies them.

10      39.    In 2004, researchers reported their analysis of food consumption patterns from

11  1967 to 2000. Noting that HFCS consumption increased more than 1,000% from 1970 to 1990,

12  "far exceeding the changes in intake of any other food or food group," researchers found this

13  "mirrors the rapid increase in obesity" seen during the same period, as demonstrated in the below

14  graphic.[25]



FIGURE 1. Estimated intakes of total fructose (●), free fructose (▲), and high-fructose corn syrup (HFCS, ◆) in relation to trends in the prevalence of overweight (■) and obesity (x) in the United States. Data from references 7 and 35.

[25] Bray, HFCS Role in Obesity Epidemic, *supra* n.5, at 537, 540-41 & Table 2; *see also* Flegal, K.M., et al., "Prevalence and trends in obesity among US adults, 1999-2000," *Journal of the American Medical Association*, Vol. 288, 1723-27 (2002); Putnam, J.J., et al., "Food consumption, prices and expenditures, 1970-97," *U.S. Department of Agriculture Economic Research Service statistical bulletin no. 695* (April 1999).

1    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

2    the allegations in Paragraph 37 of the SAC, including in the graphic, and therefore denies them.

3    Post asserts that the sources cited in footnote 25 to Paragraph 39 of the SAC speak for themselves

4    and should be read as a whole and in light of the entire body of available scientific evidence. Post

5    denies that the conclusions or inferences Plaintiffs attempt to draw from these sources are valid or

6    establish their claims.

7    40.    Besides the compelling circumstantial evidence that increased sugar consumption

8    has led to chronic disease, there is substantial research showing the causal mechanisms of disease

9    and demonstrating substantial increased risk of chronic disease with excess sugar consumption.

10   **Answer**: Post admits that there is research that purports to show a correlation between

11   increased sugar consumption and chronic disease, but denies that such research constitutes

12   "compelling circumstantial evidence" or is "substantial." Post denies the remaining allegations in

13   Paragraph 40 of the SAC.

14   **D.    There is Substantial Scientific Evidence That Excess Sugar Consumption Causes**

15   **Metabolic Syndrome, Cardiovascular Disease, Type 2 Diabetes, and Other Morbidity**

16   41.    Research shows that overloading the mitochondria—the energy-burning factories

17   within the cells—in any given organ will manifest various forms of chronic metabolic disease.

18   Whatever organ becomes insulin resistant manifests its own chronic metabolic disease. For

19   example, insulin resistance of the liver leads to type 2 diabetes. Insulin resistance of the brain

20   causes Alzheimer's disease. Insulin resistance of the kidney leads to chronic renal disease.

21   **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

22   the allegations in Paragraph 41 of the SAC, and therefore denies them.

23   42.    After artificial trans fat, the chemical that most overloads mitochondria is sugar.

24   **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

25   the allegations in Paragraph 42 of the SAC, and therefore denies them.

26   **1.    Excess Sugar Consumption Causes Metabolic Syndrome**

27   43.    Excess consumption of added sugar leads to metabolic syndrome by stressing and

28   damaging crucial organs, including the pancreas and liver. When the pancreas, which produces

1   insulin, becomes overworked, it can fail to regulate blood sugar properly. Large doses of fructose

2   can overwhelm the liver, which metabolizes fructose. In the process, the liver will convert excess

3   fructose to fat, which is stored in the liver and released into the bloodstream. This process

4   contributes to key elements of metabolic syndrome, including high blood fats and triglycerides,

5   high cholesterol, high blood pressure, and extra body fat, especially in the belly.[26]

6          **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

7   the allegations in Paragraph 43 of the SAC, and therefore denies them. Post asserts that the article

8   cited in footnote 26 to Paragraph 43 speaks for itself and should be read as a whole and in light of

9   the entire body of available scientific evidence. Post denies that the conclusions or inferences

10   Plaintiffs attempt to draw from this source are valid or establish their claims.

11          44.     Metabolic disease has been linked to type 2 diabetes, cardiovascular disease,

12   obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease,

13   and is defined as the presence of any three of the following:

14                  a.      Large Waist Size (35" or more for women, 40" or more for men);

15                  b.      High triglycerides (150mg/dL or higher, or use of cholesterol medication);

16                  c.      High total cholesterol, or HDL levels under 50mg/dL for women, and 40

17                          mg for men;

18                  d.      High blood pressure (135/85 mm or higher); or

19                  e.      High blood sugar (100mg/dL or higher).

20          **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

21   the allegations in Paragraph 44 of the SAC, and therefore denies them.

22          45.     More generally, "metabolic abnormalities that are typical of the so-called metabolic

23   syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of

24   circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense

25

26

27   [26] Te Morenga, L., et al., "Dietary sugars and body weight: systematic review and metaanalyses of
     randomized controlled trials and cohort studies," *BJM* (January 2013) [hereinafter, "Te Morenga,
28   Dietary Sugars & Body Weight"].

1   LDLs."[27]

2       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

3   the allegations in Paragraph 45 of the SAC, and therefore denies them. Post asserts that the article

4   cited in footnote 27 to Paragraph 45 speaks for itself and should be read as a whole and in light of

5   the entire body of available scientific evidence. Post denies that the conclusions or inferences

6   Plaintiffs attempt to draw from this source are valid or establish their claims.

7       46.     56 million Americans have metabolic syndrome, or about 22.9% over the age of

8   20, placing them at higher risk for chronic disease.

9       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

10  the allegations in Paragraph 46 of the SAC, and therefore denies them.

11      47.     In 2010, Harvard researchers published a meta-analysis of three studies, involving

12  19,431 participants, concerning the effect of consuming sugar-sweetened beverages on risk for

13  metabolic syndrome. They found participants in the highest quantile of 1-2 servings per day[28] had

14  an average 20% greater risk of developing metabolic syndrome than did those in the lowest

15  quantile of less than 1 serving per day, showing "a clear link between SSB consumption and risk

16  of metabolic syndrome . . . ."[29]

17      **Answer**: Post admits that footnote 29 to Paragraph 47 refers to an article published in

18  2010, and that Paragraph 29 contains some language from that article. Post lacks sufficient

19  knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph

20  47 of the SAC or footnote 28 thereto, and therefore denies them. Post asserts that the article cited

21  in footnote 29 to Paragraph 47 speaks for itself and should be read as a whole and in light of the

22  entire body of available scientific evidence. Post denies that the conclusions or inferences

23

24  [27] Fried, S.K., "Sugars, hypertriglyceridemia, and cardiovascular disease," *American Journal of Clinical Nutrition*, Vol. 78 (suppl.), 873S-80S, at 873S (2003) [hereinafter, "Fried, Hypertriglyceridemia"].

25
26  [28] Because 1 sugar-sweetened beverage typically has 140-150 calories and 35-37.5 grams of sugar per 12-ounce serving, this is equivalent to between 140 and 300 calories per day, and 35 to 75 grams of sugar per day.

27  [29] Malik, Vasanti S., et al., "Sugar-Sweetened Beverages and Risk of Metabolic Syndrome and Type 2 Diabetes," Diabetes Care, Vol. 33, No. 11, 2477-83, at 2477, 2480-81 (November2010)
28  [hereinafter "Malik, 2010 Meta-Analysis"].

1  Plaintiffs attempt to draw from this source are valid or establish their claims.

2      48.     Researchers who studied the incidence of metabolic syndrome and its components

3  in relation to soft drink consumption in more than 6,000 participants in the Framingham Heart

4  Study found that individuals who consumed 1 or more soft drinks per day (i.e., 140-150 calories

5  and 35-37.5 grams of sugar or more) had a 48% higher prevalence of metabolic syndrome than

6  infrequent consumers, those who drank less than 1 soft drink per day. In addition, the frequent-

7  consumer group had a 44% higher risk of developing metabolic syndrome.[30]

8      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

9  the allegations in Paragraph 48 of the SAC, and therefore denies them. Post asserts that the article

10  cited in footnote 30 to Paragraph 48 speaks for itself and should be read as a whole and in light of

11  the entire body of available scientific evidence. Post denies that the conclusions or inferences

12  Plaintiffs attempt to draw from this source are valid or establish their claims.

13      49.     Recently, researchers concluded a study to determine whether the detrimental

14  effects of dietary sugar were due to extremely high dosing, excess calories, or because of its

15  effects on weight gain, rather than caused by sugar consumption directly.[31] In other words, the

16  researchers dissociated the metabolic effects of dietary sugar from its calories and effects on

17  weight gain.

18      **Answer**: Post admits that the study cited in footnote 31 to Paragraph 49 of the SAC

19  purported to "assess[] the effects of dietary sugar restriction with isocaloric substitution of starch

20  (complex carbohydrate) on metabolic parameters in children." Post asserts that this study speaks

21  for itself and should be read as a whole and in light of the entire body of available scientific

22  evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this study

23  are valid or establish their claims.

24      50.     Because the researchers did not want to give subjects sugar to see if they got sick,

25  ---

26  [30] Dhingra, R., et al., "Soft Drink Consumption and Risk of Developing Cardiometabolic Risk Factors and the Metabolic Syndrome in Middle-Aged Adults in the Community," *Circulation*, Vol. 116, 480-88 (2007) [hereinafter "Dhingra, Cardiometabolic Risk"].

27  [31] Robert H. Lustig, et al., "Isocaloric Fructose Restriction and Metabolic Improvement in

28  Children with Obesity and Metabolic Syndrome," *Pediatric Obesity*, Vol. 24, No. 2, 453-60 (Feb. 2016).

1   they instead took sugar away from people who were already sick to see if they got well. But if

2   subjects lost weight, critics would argue that the drop in calories or weight loss was the reason for

3   the clinical improvement. Therefore, the researchers designed the study to by isocaloric, by giving

4   back to subjects the same number of calories in starch that were taken away in sugar. The study

5   involved 43 children, ages 8 to 19, each obese with at least one other co-morbidity demonstrating

6   metabolic problems. All were high consumers of added sugar in their diets.[32]

7        **Answer**: Post asserts that the study cited in footnote 32 to Paragraph 50 of the SAC speaks

8   for itself and should be read as a whole and in light of the entire body of available scientific

9   evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this study

10  are valid or establish their claims.

11       51.    To perform the study, researchers assessed subjects' home diets by two

12  questionnaires to determine how many calories, and how much fat, protein, and carbohydrate they

13  were eating. Subjects were then tested at a hospital based on their home diets. Then, for the next 9

14  days, researchers catered the subjects' meals. The macronutrient percentages of fat, protein, and

15  carbohydrate were not changed. Subjects were fed them the same calories and percent of each

16  macronutrient as their home diet; but within the carbohydrate fraction, researchers took the added

17  sugar out, and substituted starch. For example, researchers took pastries out, and put bagels in;

18  took yogurt out, and put baked potato chips in; took chicken teriyaki out, and put turkey hot dogs

19  in (although subjects were still given whole fruit). Researchers reduced subjects' dietary sugar

20  consumption from 28% to 10% of calories. Researchers also gave subjects a scale to take home,

21  and each day they would weigh themselves. If they were losing weight, they were instructed to eat

22  more. The goal was for subjects to remain weight-stable over the 10 days of study. On the final

23  day, subjects came back to the hospital for testing on their experimental low-added sugar diet. The

24  study team analyzed the pre- and post-data in a blinded fashion so as not to introduce bias.[33]

25       **Answer**: Post asserts that the study cited in footnote 33 to Paragraph 51 of the SAC speaks

26  for itself and should be read as a whole and in light of the entire body of available scientific

27  ---

[32] *See id.* at 453-54.

28  [33] *See id.* at 454-55.

evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this study are valid or establish their claims.

52.     Researchers analyzed three types of data. First, diastolic blood pressure decreased by 5 points. Second, baseline blood levels of analytes associated with metabolic disease, such as lipids, liver function tests, and lactate (a measure of metabolic performance) all improved significantly. Third, fasting glucose decreased by 5 points. Glucose tolerance improved markedly, and fasting insulin levels fell by 50%. Each of these results was highly-statistically-significant.[34]

**Answer**: Post asserts that the study cited in footnote 34 to Paragraph 52 of the SAC speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this study are valid or establish their claims.

53.     In sum, the study indicated that subjects improved their metabolic status in just 10 days, even while eating processed food, by just removing added sugar and substituting starch. The metabolic improvement, moreover, was unrelated to changes in weight or body fat.

**Answer**: Post asserts that the study referred to in Paragraph 53 of the SAC speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this study are valid or establish their claims.

**2.     Excess Sugar Consumption Causes Type 2 Diabetes**

54.     Diabetes affects 25.8 million Americans, and can cause kidney failure, lowerlimb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[35]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

---

[34] *See id.* at 455-56.

[35] Aranceta Bartrina, J. et al., "Association between sucrose intake and cancer: a review of the evidence," *Nutrición Hospitalaria*, Vol. 28 (Suppl. 4), 95-105 (2013); Garcia-Jimenez, C., "A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose," *Journal of Molecular Endocrinology*, Vol. 52, No. 1 (2014); Linden, G.J., "Allcause mortality and periodontitis in 60-70-year-old men: a prospective cohort study," *Journal of Clinical Periodontal*, Vol. 39, No. 1, 940-46 (October 2012).

the allegations in Paragraph 54 of the SAC, and therefore denies them. Post asserts that the articles cited in footnote 35 to Paragraph 54 speak for themselves and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

55.     In 2010, Harvard researchers also performed a meta-analysis of 8 studies concerning sugar-sweetened beverage consumption and risk of type 2 diabetes, involving a total of 310,819 participants. They concluded that individuals in the highest quantile of SSB intake had an average 26% greater risk of developing type 2 diabetes than those in the lowest quantile.[36] Moreover, "larger studies with longer durations of follow-up tended to show stronger associations."[37] Thus, the meta-analysis showed "a clear link between SSB consumption and risk of . . . type 2 diabetes."[38]

**Answer**: Post admits that footnote 36 to Paragraph 55 of the SAC refers to an article published in 2010, and that Paragraph 55 contains some language from that article. Post lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 55 of the SAC, and therefore denies them. Post asserts that the article cited in footnotes 36-38 to Paragraph 55 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

56.     An analysis of data for more than 50,000 women from the Nurses' Health Study,[39] during two 4-year periods (1991-1995, and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day (i.e., 140-150 calories and 35-37.5 grams of sugar), had an 83% greater relative risk of type 2 diabetes compared

---

[36] Malik, 2010 Meta-Analysis, *supra* n.29 at 2477, 2480.

[37] *Id.* at 2481.

[38] *Id.*

[39] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 women registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *at* http://www.channing.harvard.edu/nhs.

with those who consumed less than 1 such beverage per month, and women who consumed 1 or more fruit punch drinks per day had a 100% greater relative risk of type 2 diabetes.[40]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 56 of the SAC and footnote 39 thereto, and therefore denies them. Post asserts that the article cited in footnote 40 to Paragraph 56 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

57.    The result of this analysis shows a statistically significant linear trend with increasing sugar consumption.[41]



**Fig. 4.** Multivariate relative risks (RRs) of type 2 diabetes according to sugar-sweetened soft drink consumption in the Nurses' Health Study II 1991–1999 (Multivariate RRs were adjusted for age, alcohol (0, 0.1–4.9, 5.0–9.9, 10+ g/d), physical activity (quintiles), family history of diabetes, smoking (never, past, current), postmenopausal hormone use (never, ever), oral contraceptive use (never, past, current), intake (quintiles) of cereal fiber, magnesium, trans fat, polyunsaturated:saturated fat, and consumption of sugar-sweetened soft drinks, diet soft drinks, fruit juice, and fruit punch (other than the main exposure, depending on model). The data were based on Ref. [50]).

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 57 of the SAC, including the graphic, and therefore denies them. Post asserts that the article cited in footnote 41 to Paragraph 57 speaks for itself and should be read as a

---

[40] Schulze, M.B., et al., "Sugar-Sweetened Beverages, Weight Gain, and Incidence of Type 2 Diabetes in Young and Middle-Aged Women," *Journal of the American Medical Association*, Vol. 292, No. 8, 927-34 (Aug. 25, 2004) [hereinafter "Schulze, Diabetes in Young & Middle-Aged Women"].

[41] Hu, F.B., et al., "Sugar-sweetened beverages and risk of obesity and type 2 diabetes: Epidemiologic evidence," *Physiology & Behavior*, Vol. 100, 47-54 (2010).

1   whole and in light of the entire body of available scientific evidence. Post denies that the

2   conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their

3   claims.

4       58.     A prospective cohort study of more than 43,000 African American women between

5   1995 and 2001 showed that the incidence of type 2 diabetes was higher with higher intake of both

6   sugar-sweetened soft drinks and fruit drinks. After adjusting for confounding variables, those who

7   drank 2 or more soft drinks per day (i.e., 140-300 calories and 35-75 grams of sugar) showed a

8   24% greater risk of type 2 diabetes, and those who drank 2 or more fruit drinks per day showed a

9   31% greater risk of type 2 diabetes, than those who drank 1 or less such drinks per month.[42]

10      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

11  the allegations in Paragraph 58 of the SAC, and therefore denies them. Post asserts that the article

12  cited in footnote 42 to Paragraph 58 speaks for itself and should be read as a whole and in light of

13  the entire body of available scientific evidence. Post denies that the conclusions or inferences

14  Plaintiffs attempt to draw from this source are valid or establish their claims.

15      59.     A large cohort study of more than 70,000 women from the Nurses' Health Study

16  followed for 18 years showed that those who consumed 2 to 3 apple, grapefruit, and orange juices

17  per day (280-450 calories and 75-112.5 grams of sugar) had an 18% greater risk of type 2 diabetes

18  than women who consumed less than 1 sugar-sweetened beverage per month. The data also

19  showed a linear trend with increased consumption, as demonstrated below.[43]

20

21

22

23

24

25

---

26  [42] Palmer, J.R., et al., "Sugar-Sweetened Beverages and Incidence of Type 2 Diabetes Mellitus in African American Women," *Archive of internal Medicine*, Vol. 168, No. 14, 1487-82 (July 28, 2008) [hereinafter "Palmer, Diabetes in African American Women"].

27

28  [43] Bazzano, L.A., et al., "Intake of fruit, vegetables, and fruit juices and risk of diabetes in women," *Diabetes Care*, Vol. 31, 1311-17 (2008).

1
2
3
4
5
6
7
8
9
10
11
12
13



**Figure 1**—*Multivariate-adjusted relative hazard of diabetes by category of cumulatively updated fruit juice intake. Values were adjusted for cumulatively updated BMI, physical activity, family history of diabetes, postmenopausal hormone use, alcohol use, smoking, and total energy intake. For an increase of 1 serving/day of fruit juice, the multivariate-adjusted relative risk was 1.18 (95% CI 1.10–1.26; P < 0.0001).*

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 59 of the SAC, including the graphic, and therefore denies them. Post asserts that the article cited in footnote 43 to Paragraph 59 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

60.     An analysis of more than 40,000 men from the Health Professionals Follow-Up Study, a prospective cohort study conducted over a 20-year period, found that, after adjusting for age and a wide variety of other confounders, those in the top quartile of sugar-sweetened beverage intake had a 24% greater risk of type 2 diabetes than those in the bottom quartile, while consumption of artificially-sweetened beverages, after adjustment, showed no association.[44]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 60 of the SAC, and therefore denies them. Post asserts that the article

---

[44] de Konig, L., et al., "Sugar-sweetened and artificially sweetened beverage consumption and risk of type 2 diabetes in men," *American Journal of Clinical Nutrition*, Vol. 93, 1321- 27 (2011).

1    cited in footnote 44 to Paragraph 60 speaks for itself and should be read as a whole and in light of

2    the entire body of available scientific evidence. Post denies that the conclusions or inferences

3    Plaintiffs attempt to draw from this source are valid or establish their claims.

4            61.     Most convincingly, an econometric analysis of repeated cross-sectional data

5    published in 2013 established a causal relationship between sugar availability and type 2 diabetes.

6    After adjusting for a wide range of confounding factors, researchers found that an increase of 150

7    calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an

8    increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a

9    statically-significant 11-fold difference.[45]

10           **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

11   the allegations in Paragraph 61 of the SAC, and therefore denies them. Post asserts that the article

12   cited in footnote 45 to Paragraph 61 speaks for itself and should be read as a whole and in light of

13   the entire body of available scientific evidence. Post denies that the conclusions or inferences

14   Plaintiffs attempt to draw from this source are valid or establish their claims.

15           **3.     Excess Sugar Consumption Causes Cardiovascular Disease**

16           62.     Sixteen million Americans have heart disease, which is the number one killer in the

17   United States.[46]

18           **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

19   the allegations in Paragraph 62 of the SAC, and therefore denies them. Post asserts that the article

20   cited in footnote 46 to Paragraph 62 speaks for itself and should be read as a whole and in light of

21   the entire body of available scientific evidence. Post denies that the conclusions or inferences

22   Plaintiffs attempt to draw from this source are valid or establish their claims.

23           63.     Data obtained from NHANES surveys during the periods of 1988-1994, 1999-

24   2004, and 2005-2010, after adjusting for a wide variety of other factors, demonstrate that those

25

26   [45] Basu, S., et al., "The Relationship of Sugar to Population-Level Diabetes Prevelance: An
     Econometric Analysis of Repeated Cross-Sectional Data," *PLOS Online*, Vol. 8, Issue 2 (February
27   27, 2013).

     [46] Gaddam, K.K., et al., "Metabolic syndrome and heart failure—the risk, paradox, and treatment,"
28   *Current Hypertension Reports*, Vol. 13, No. 2, 142-48 (2011).

1    who consumed between 10% - 24.9% of their calories from added sugars had a 30% greater risk of

2    cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories

3    from added sugar. In addition, those who consumed 25% or more of their calories from added

4    sugars had an average 275% greater risk of CVD mortality than those who consumed less than 5%

5    of calories from added sugar.[47]

6         **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

7    the allegations in Paragraph 63 of the SAC, and therefore denies them. Post asserts that the article

8    cited in footnote 47 to Paragraph 63 speaks for itself and should be read as a whole and in light of

9    the entire body of available scientific evidence. Post denies that the conclusions or inferences

10   Plaintiffs attempt to draw from this source are valid or establish their claims.

11        64.    Similarly, when compared to those who consumed approximately 8% of calories

12   from added sugar, participants who consumed approximately 17% - 21% (the 4th quintile) of

13   calories from added sugar had a 38% higher risk of CVD mortality, while the relative risk was

14   more than double for those who consumed 21% or more of calories from added sugar (the 5th

15   quintile). Thus, "[t]he risk of CVD mortality increased exponentially with increasing usual

16   percentage of calories from added sugar,"[48] as demonstrated in the chart below.

17

18

19

20

21

22

23

24

25

26

27   _____
     [47] Yang, NHANES Analysis, *supra* n.12 at E4-5.

28   [48] *Id.*



Figure 1. Adjusted Hazard Ratio (HR) of the Usual Percentage of Calories From Added Sugar for Cardiovascular Disease Mortality Among US Adults 20 Years or Older: National Health and Nutrition Examination Survey Linked Mortality Files, 1988-2006

Histogram of the distribution of usual percentage of calories from added sugar in the population. Lines show the adjusted HRs from Cox models. Midvalue of quintile 1 (7.4%) was the reference standard. The model was adjusted for age, sex, race/ethnicity, educational attainment, smoking status, alcohol consumption, physical activity level, family history of cardiovascular disease, antihypertensive medication use, Healthy Eating Index score, body mass index, systolic blood pressure, total serum cholesterol, and total calories. Solid line indicates point estimates; dashed lines indicate 95% CIs.

**<u>Answer</u>**: Post admits that footnote 48 to Paragraph 64 refers to a 2014 study analyzing NHANES data, and that Paragraph 64 of the SAC contains some language from that study. Post lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 64 of the SAC, and therefore denies them. Post asserts that the article cited in footnote 48 to Paragraph 64 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

65.     The NHANES analysis also found "a significant association between sugar-sweetened beverage consumption and risk of CVD mortality," with an average 29% greater risk of CVD mortality "when comparing participants who consumed 7 or more servings/wk (360 mL per serving) with those who consumed 1 serving/wk or less . . . ."[49] The study concluded that "most US adults consume more added sugar than is recommended for a healthy diet. A higher percentage of calories from added sugar is associated with significantly increased risk of CVD mortality. In addition, regular consumption of sugar-sweetened beverages is associated with elevated CVD mortality."[50]

---

[49] *Id.* at E6.

[50] *Id.* at E8.

1    **Answer**: Post admits that footnotes 49-50 to Paragraph 65 refers to a 2014 study analyzing

2    NHANES data, and that Paragraph 65 of the SAC contains some language from that study. Post

3    lacks sufficient knowledge or information to form a belief as to the truth of the remaining

4    allegations in Paragraph 65 of the SAC, and therefore denies them. Post asserts that the study cited

5    in footnotes 49-50 to Paragraph 64 speaks for itself and should be read as a whole and in light of

6    the entire body of available scientific evidence. Post denies that the conclusions or inferences

7    Plaintiffs attempt to draw from this source are valid or establish their claims.

8         66.    The Nurses' Health Study found that, after adjusting for other unhealthy lifestyle

9    factors, those who consumed two or more sugar-sweetened beverages per day (280 calories and 70

10   grams of sugar or more) had a 35% greater risk of coronary heart disease compared with

11   infrequent consumers.[51]

12       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

13   the allegations in Paragraph 66 of the SAC, and therefore denies them. Post asserts that the article

14   cited in footnote 51 to Paragraph 66 speaks for itself and should be read as a whole and in light of

15   the entire body of available scientific evidence. Post denies that the conclusions or inferences

16   Plaintiffs attempt to draw from this source are valid or establish their claims.

17       **4.    Excess Sugar Consumption Causes Liver Disease**

18       67.    Fructose consumption causes serious liver disease, including non-alcoholic fatty

19   liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these

20   cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its

21   injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH patients

22   progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[52]

23       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

24   the allegations in Paragraph 67 of the SAC, and therefore denies them. Post asserts that the articles

---

[51] Fung T.T., et al., "Sweetened beverage consumption and risk of coronary heart disease in women," *American Journal of Clinical Nutrition*, Vol. 89 at 1037-42 (February 2009).

[52] Farrell, G.C., et al., "Nonalcoholic fatty liver disease: from steatosis to cirrhosis," *Hepatology*, Vol. 433, No. 2 (Suppl. 1), S99-S112 (February 2006); Powell, E.E., et al., "The Natural History of Nonalcoholic Steatohepatitis: A Follow-up Study of Forty-two Patients for Up to 21 Years," *Hepatology*, Vol. 11, No. 1 (1990).

1  cited in footnote 52 to Paragraph 67 speak for themselves and should be read as a whole and in

2  light of the entire body of available scientific evidence. Post denies that the conclusions or

3  inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

4      68.     Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise

5  of fructose consumption, with approximately 6 million Americans estimated to have progressed to

6  NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes.

7  NASH is now the third-leading reason for liver transplant in America.[53]

8      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

9  the allegations in Paragraph 68 of the SAC, and therefore denies them. Post asserts that the article

10 cited in footnote 53 to Paragraph 68 speaks for itself and should be read as a whole and in light of

11 the entire body of available scientific evidence. Post denies that the conclusions or inferences

12 Plaintiffs attempt to draw from this source are valid or establish their claims.

13     69.     Moreover, because the liver metabolizes sugar virtually identically to alcohol, the

14 U.S. is now seeing for the first time alcohol-related diseases in children. Conservative estimates

15 are that 31% of American adults, and 13% of American children suffer from NAFLD.[54]

16     **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

17 the allegations in Paragraph 69 of the SAC, and therefore denies them. Post asserts that the articles

18 cited in footnote 54 to Paragraph 69 speak for themselves and should be read as a whole and in

19 light of the entire body of available scientific evidence. Post denies that the conclusions or

20 inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

21     **5.    Excess Sugar Consumption Causes Obesity**

22     70.     Excess sugar consumption also leads to weight gain and obesity because insulin

23

24  [53] Charlton, M.R., et al., "Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States," *Gastroenterology*, Vol. 141, No. 4, 1249-53 (October 2011).

25  [54] Lindback, S.M., et al., "Pediatric Nonalcoholic Fatty Liver Disease: A Comprehensive Review," *Advances in Pediatrics*, Vol. 57, No. 1, 85-140 (2010); Lazo, M. et al., "The Epidemiology of

26  Nonalcoholic Fatty Liver Disease: A Global Perspective," *Seminars in Liver Disease*, Vol. 28, No. 4, 339-50 (2008); Schwimmer, J.B., et al., "Prevalence of Fatty Liver in Children and

27  Adolescents," *Pediatrics*, Vol. 118, No. 4, 1388-93 (2006); Browning, J.D., et al., "Prevalence of hepatic steatosis in an urban population in the United States: Impact of ethnicity," *Hepatology*,

28  Vol. 40, No. 6, 1387-95 (2004).

1   secreted in response to sugar intake instructs the cells to store excess energy as fat. This excess

2   weight can then exacerbate the problems of excess sugar consumption, because excess fat,

3   particularly around the waist, is in itself a primary cause of insulin resistance, another vicious

4   cycle. Studies have shown that belly fat produces hormones and other substances that can cause

5   insulin resistance, high blood pressure, abnormal cholesterol levels, and cardiovascular disease.

6   And belly fat plays a part in the development of chronic inflammation in the body, which can

7   cause damage over time without any signs or symptoms. Complex interactions in fat tissue draw

8   immune cells to the area, which triggers low-level chronic inflammation. This in turn contributes

9   even more to insulin resistance, type 2 diabetes, and cardiovascular disease.

10      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

11   the allegations in Paragraph 70 of the SAC, and therefore denies them.

12      71.      Based on a meta-analysis of 30 studies between 1966 and 2005, Harvard

13   researchers found "strong evidence for the independent role of the intake of sugar-sweetened

14   beverages, particularly soda, in the promotion of weight gain and obesity in children and

15   adolescents. Findings from prospective cohort studies conducted in adults, taken in conjunction

16   with results from short-term feeding trials, also support a positive association between soda

17   consumption and weight gain, obesity, or both."[55]

18      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

19   the allegations in Paragraph 71 of the SAC, and therefore denies them. Post asserts that the article

20   cited in footnote 55 to Paragraph 71 speaks for itself and should be read as a whole and in light of

21   the entire body of available scientific evidence. Post denies that the conclusions or inferences

22   Plaintiffs attempt to draw from this source are valid or establish their claims.

23      72.      A recent meta-analysis by Harvard researchers evaluating change in Body Mass

24   Index per increase in 1 serving of sugar-sweetened beverages per day found a significant positive

25   association between beverage intake and weight gain.[56]

26   _____

[55] Malik, V.S., et al., "Intake of sugar-sweetened beverages and weight gain: a systematic review,"
27   *American Journal of Clinical Nutrition*, Vol. 84, 274-88 (2006).

[56] Malik, V.S., et al., "Sugar-sweetened beverages and BMI in children and adolescents:
28   reanalyses of a meta-analysis," *American Journal of Clinical Nutrition*, Vol. 29, 438-39 (2009).

1    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

2    the allegations in Paragraph 72 of the SAC, and therefore denies them. Post asserts that the article

3    cited in footnote 56 to Paragraph 72 speaks for itself and should be read as a whole and in light of

4    the entire body of available scientific evidence. Post denies that the conclusions or inferences

5    Plaintiffs attempt to draw from this source are valid or establish their claims.

6    73.    One study of more than 2,000 2.5-year-old children followed for 3 years found that

7    those who regularly consumed sugar-sweetened beverages between meals had a 240% better

8    chance of being overweight than non-consumers.[57]

9    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

10   the allegations in Paragraph 73 of the SAC, and therefore denies them. Post asserts that the article

11   cited in footnote 57 to Paragraph 73 speaks for itself and should be read as a whole and in light of

12   the entire body of available scientific evidence. Post denies that the conclusions or inferences

13   Plaintiffs attempt to draw from this source are valid or establish their claims.

14   74.    An analysis of data for more than 50,000 women from the Nurses' Health Study

15   during two 4-year periods showed that weight gain over a 4-year period was highest among

16   women who increased their sugar-sweetened beverage consumption from 1 or fewer drinks per

17   week, to 1 or more drinks per day (8.0 kg gain during the 2 periods), and smallest among women

18   who decreased their consumption or maintained a low intake level (2.8 kg gain).[58]

19   **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

20   the allegations in Paragraph 74 of the SAC, and therefore denies them. Post asserts that the article

21   cited in footnote 58 to Paragraph 74 speaks for itself and should be read as a whole and in light of

22   the entire body of available scientific evidence. Post denies that the conclusions or inferences

23   Plaintiffs attempt to draw from this source are valid or establish their claims.

24   75.    A study of more than 40,000 African American women over 10 years had similar

25   results. After adjusting for confounding factors, those who increased sugar-sweetened beverage

26   [57] Dubois, L., et al., "Regular sugar-sweetened beverage consumption between meals increases
27   risk of overweight among preschool-aged children," *Journal of the American Dietetic Association*,
     Vol. 107, Issue 6, 924-34 (2007).

28   [58] Schulze, Diabetes in Young & Middle-Aged Women, *supra* n.40.

1    intake from less than 1 serving per week, to more than 1 serving per day, gained the most weight

2    (6.8 kg), while women who decreased their intake gained the least (4.1 kg).[59]

3          **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

4    the allegations in Paragraph 75 of the SAC, and therefore denies them. Post asserts that the article

5    cited in footnote 59 to Paragraph 75 speaks for itself and should be read as a whole and in light of

6    the entire body of available scientific evidence. Post denies that the conclusions or inferences

7    Plaintiffs attempt to draw from this source are valid or establish their claims.

8          76.     A study of more than 6,000 participants in the Framingham Heart Study found

9    those who consumed more than 1 soft drink per day had a 31% greater risk of obesity than those

10   who consumed less than 1 soft drink per day.[60]

11         **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

12   the allegations in Paragraph 76 of the SAC, and therefore denies them. Post asserts that the article

13   cited in footnote 60 to Paragraph 76 speaks for itself and should be read as a whole and in light of

14   the entire body of available scientific evidence. Post denies that the conclusions or inferences

15   Plaintiffs attempt to draw from this source are valid or establish their claims.

16         77.     The link between sugar intake and weight gain was also demonstrated in a

17   randomized, controlled intervention study, where "[a] simple 12 month school based intervention

18   focused on reducing consumption of carbonated drinks resulted in significant differences in the

19   proportion of overweight children in the control and intervention groups," as demonstrated in the

20   chart below.

21

22

23

24

25

26

27   [59] Palmer, Diabetes in African American Women, *supra* n.42.

28   [60] Dhingra, Cardiometabolic Risk, *supra* n.30.



**Fig 2** Mean change in prevalence of overweight and obese children from baseline to follow up at 12 months according to clusters

At a three-year follow-up, however, the significant difference seen between the groups after a year of focused education was no longer evident, with overweight more prevalent in both groups, providing further support for the link between sugar and weight gain.[61]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 77 of the SAC, including the graphic, and therefore denies them. Post asserts that the article cited in footnote 61 to Paragraph 77 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

78.    Similarly, experimental short-term feeding studies comparing sugar-sweetened beverages to artificially-sweetened beverages have illustrated that consumption of the former leads to greater weight gain. As demonstrated in the chart below, one 10-week trial involving more than 40 men and women demonstrated that the group that consumed daily supplements of sucrose (for 28% of total energy) increased body weight and fat mass, by 1.6 kg for men and 1.3 kg for women, while the group that was supplemented with artificial sweeteners lost weight—1.0 kg for

---

[61] James, J. et al., "Preventing childhood obesity: two year follow-up results from the Christchurch obesity prevention programme in schools (CHOPPS)," *BJM*, Vol. 335, 762 (2007) (discussing James, J., et al., "Preventing childhood obesity by reducing consumption of carbonated drinks: cluster randomized controlled trial," *BJM*, Vol. 328, 1237 (April 27, 2004)).

men and 0.3 kg for women.[62]



**FIGURE 2.** Mean (± SEM) changes in body weight, fat mass, and fat-free mass during an intervention in which overweight subjects consumed supplements containing either sucrose (●; $n = 21$) or artificial sweeteners (△; $n = 20$) daily for 10 wk. The diet × time interactions were significant for changes in body weight ($P < 0.0001$) and fat mass ($P < 0.05$) by analysis of variance with Tukey's post hoc tests. At specific time points for changes in body weight and fat mass, there were significant differences between the sucrose and sweetener groups: $^{*}P < 0.05$, $^{**}P < 0.001$, and $^{***}P < 0.0001$ (general linear model with least squares means and adjustment for multiple comparisons).

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 78 of the SAC, including the graphic, and therefore denies them. Post asserts that the article cited in footnote 62 to Paragraph 78 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

79.    In another, 3-week study, researchers gave normal-weight subjects 1150 grams of soda per day, sweetened with either aspartame or HFCS. The experiment found that drinking

---

[62] Raben, A., et al., "Sucrose compared with artificial sweeteners: different effects on ad libitum food intake and body weight after 10 wk of supplementation in overweight subjects," *American Journal of Clinical Nutrition*, Vol. 76, 721-29 (2002) [hereinafter, "Raben, Sucrose vs. Artificial Sweeteners"].

artificially-sweetened soda reduced calorie intake and body weight of men, while drinking HFCS-sweetened soda significantly increased calorie intake and body weight of both sexes, as demonstrated in the chart below.[63]



FIG 1. Changes in body weight during 3-wk periods when subjects drank 1150 g/d of soda sweetened with aspartame (APM), an equal weight of soda sweetened with high-fructose corn syrup (HFCS), or had no experimental manipulation (no soda). *$p < 0.05$ relative to weight gain in no-soda period.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 79 of the SAC, including its graphic, and therefore denies them. Post asserts that the article cited in footnote 63 to Paragraph 79 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

---

[63] Tordoff, M.G., et al., "Effect of drinking soda sweetened with aspartame or high-fructose corn syrup on food intake and body weight," *American Journal of Clinical Nutrition*, Vol.51, 963-69 (1990).

1

6.      **Excess Sugar Consumption Causes Inflammation**

2      80.      Inflammation has been associated with type 2 diabetes, myocardial infarction, and

3  stroke, as well as weight gain and obesity.[64]

4      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

5  the allegations in Paragraph 80 of the SAC, and therefore denies them. Post asserts that the articles

6  cited in footnote 64 to Paragraph 79 speak for themselves and should be read as a whole and in

7  light of the entire body of available scientific evidence. Post denies that the conclusions or

8  inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

9      81.      A 10-week study comparing a group whose sucrose intake was increased by 151%

10  to a group whose intake was decreased by 42% showed the former's blood concentration of the

11  biological markers for inflammation, haptoglobin, transferrin, and Creactive protein, increased by

12  13%, 5%, and 6%, respectively, while the later group's concentrations decreased by 16%, 2%, and

13  26% respectively.[65]

14      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

15  the allegations in Paragraph 81 of the SAC, and therefore denies them. Post asserts that the article

16  cited in footnote 65 to Paragraph 81 speaks for itself and should be read as a whole and in light of

17  the entire body of available scientific evidence. Post denies that the conclusions or inferences

18  Plaintiffs attempt to draw from this source are valid or establish their claims.

19      82.      In a prospective, randomized, controlled crossover trial, 29 subjects were studied

20  over six 3-week interventions in which they either consumed various amounts of fructose, glucose,

21  or sucrose, or received dietary advice to consume low amounts of fructose. The study showed

22  LDL particle size reducing (associated with atherosclerosis) by 0.51 nm after high-fructose intake

23  (80 grams per day), and by 0.43 nm after high-sucrose intake (also 80 grams per day). It also

24

25  [64] Sorensen, L.B., et al., "Effect of sucrose on inflammatory markers in overweight humans,"
    *American Journal of Clinical Nutrition*, Vol. 82, 421-27 (2005) (citations omitted) [hereinafter,
26  "Sorensen, Inflammatory Markers"]; *see also* Pearson, T.A., et al., "Markers of Inflammation and
    Cardiovascular Disease: Application to Clinical and Public Health Practice, A Statement for
27  Healthcare Professionals From the Centers for Disease Control and Prevention and the American
    Heart Association," *Circulation*, Vol. 107, 499-511 (2003).

28  [65] Sorensen, Inflammatory Markers, *supra* n.64.

1  found significant increases in fasting glucose and C-reactive protein, leading the authors to

2  conclude that the "data show potentially harmful effects of low to moderate consumption of SSBs

3  on markers of cardiovascular risk such as LDL particles, fasting glucose, and [C-reactive protein]

4  within just 3 wk in healthy young men, which is of particular significance for young consumers."[66]

5       **<u>Answer</u>**: Post lacks sufficient knowledge or information to form a belief as to the truth of

6  the allegations in Paragraph 82 of the SAC, and therefore denies them. Post asserts that the article

7  cited in footnote 66 to Paragraph 82 speaks for itself and should be read as a whole and in light of

8  the entire body of available scientific evidence. Post denies that the conclusions or inferences

9  Plaintiffs attempt to draw from this source are valid or establish their claims.

10      83.     In a nested case-control study of 656 cases of type 2 diabetes and 694 controls from

11 the Nurses Study, researchers identified a dietary pattern strongly related to inflammatory markers,

12 which was high in sugar-sweetened soft drinks, showing linear trends across quintiles of dietary

13 pattern for six inflammation markers.

14

15

16

17

18

19

20

21

22

23

24

25

26

---

27 [66] Aeberli, I., et al., "Low to moderate sugar-sweetened beverage consumption impairs glucose
and lipid metabolism and promotes inflammation in healthy young men: a randomized controlled
28 trial," *American Journal of Clinical Nutrition*, Vol. 94, 479-85 (2011).




**FIGURE 1.** Geometric mean concentrations and 95% CIs of interleukin 6 (IL-6), soluble tumor necrosis factor α receptor 2 (sTNFR2), C-reactive protein (CRP), E-selectin, soluble intracellular cell adhesion molecule 1 (sICAM-1), and soluble vascular cell adhesion molecule 1 (sVCAM-1) by quintiles of diet pattern score adjusted for age, BMI (9 categories), physical activity (quintiles), family history of diabetes, smoking (never, past, current, or missing), postmenopausal hormone use (never, ever, or missing), energy intake (quintiles), and fasting status. The comparison between quintile 5 and quintile 1 was significant for all biomarkers, $P < 0.05$. Quintile cutoffs were based on distributions in controls.

    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 83 of the SAC, including its graphic, and therefore denies them.

    **7.    Excess Sugar Consumption Causes High Blood Triglycerides and Abnormal Cholesterol Levels**

    84.    Fructose facilitates the biochemical formation of triacylglycerols more efficiently than does glucose.[67] This is because fructose metabolism in the liver converts the fructose to

---

[67] Elliot, Fructose & Insulin Resistance, *supra* n.21.

fructose-1-phosphate, which readily becomes a substrate for the backbone of the triglyceride molecule.[68] As compared to starches, sugars—particularly sucrose and fructose—tend to increase serum triacylglycerol concentrations by about 60%.[69]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 84 of the SAC, and therefore denies them. Post asserts that the articles cited in footnotes 67-69 to Paragraph 84 speak for themselves and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

85.     Cholesterol is a waxy, fat-like substance found in the body's cells, used to make hormones, bile acids, vitamin D, and other substances. The human body manufactures all the cholesterol it requires, which circulates in the bloodstream in packages called lipoproteins. Excess cholesterol in the bloodstream can become trapped in artery walls, building into plaque and narrowing blood vessels, making them less flexible, a condition called atherosclerosis. When this happens in the coronary arteries, it restricts oxygen and nutrients to the heart, causing chest pain or angina. When cholesterol-rich plaques in these arteries burst, a clot can form, blocking blood flow and causing a heart attack.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 85 of the SAC, and therefore denies them.

86.     Most blood cholesterol is low-density lipoprotein, or LDL cholesterol, which is sometimes called "bad" cholesterol because it carries cholesterol *to* the body's tissues and arteries, increasing the risk of heart disease. High-density lipoprotein, or HDL cholesterol, is sometimes called "good" cholesterol because it removes excess cholesterol from the cardiovascular system, bringing it to the liver for removal. Thus, a *low* level of HDL cholesterol increases the risk of heart disease.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

---

[68] Bray, G.A., "Soft Drinks and Obesity: The Evidence," *CMR e-Journal*, Vol. 2, Issue, 2, 10-14, at 13 (Oct. 2009).

[69] Fried, Hypertriglyceridemia, *supra* n.27, at 873S.

1  the allegations in Paragraph 86 of the SAC, and therefore denies them.

2         87.     Diet affects blood cholesterol. For example, the body reacts to saturated fat by

3  producing LDL cholesterol.

4         **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

5  the allegations in Paragraph 87 of the SAC, and therefore denies them.

6         88.     When the liver is overwhelmed by large doses of fructose, it will convert excess to

7  fat, which is stored in the liver and then released into the bloodstream, contributing to key

8  elements of metabolic syndrome, like high blood fat and triglycerides, high total cholesterol, and

9  low HDL "good" cholesterol.[70]

10        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

11  the allegations in Paragraph 88 of the SAC, and therefore denies them. Post asserts that the article

12  cited in footnote 70 to Paragraph 88 speaks for itself and should be read as a whole and in light of

13  the entire body of available scientific evidence. Post denies that the conclusions or inferences

14  Plaintiffs attempt to draw from this source are valid or establish their claims.

15        89.     A study of more than 6,000 participants in the Framingham Heart Study found

16  those who consumed more than 1 soft drink per day had a 25% greater risk of

17  hypertriglyceridemia, and 32% greater risk of low HDL cholesterol than those who consumed less

18  than 1 soft drink per day.[71]

19        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

20  the allegations in Paragraph 89 of the SAC, and therefore denies them. Post asserts that the article

21  cited in footnote 71 to Paragraph 89 speaks for itself and should be read as a whole and in light of

22  the entire body of available scientific evidence. Post denies that the conclusions or inferences

23  Plaintiffs attempt to draw from this source are valid or establish their claims.

24        90.     A systematic review and meta-analysis of 37 randomized controlled trials

25  concerning the link between sugar intake and blood pressure and lipids found that higher sugar

26  intakes, compared to lower sugar intakes, significantly raised triglyceride concentrations, total

---

[70] Te Morenga, Dietary Sugars & Body Weight, *supra* n.26.

[71] Dhingra, Cardiometabolic Risk, *supra* n.30.

1  cholesterol, and low density lipoprotein cholesterol.[72]

2  **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

3  the allegations in Paragraph 90 of the SAC, and therefore denies them. Post asserts that the article

4  cited in footnote 72 to Paragraph 90 speaks for itself and should be read as a whole and in light of

5  the entire body of available scientific evidence. Post denies that the conclusions or inferences

6  Plaintiffs attempt to draw from this source are valid or establish their claims.

7  91.    A cross-sectional study among more than 6,100 U.S. adults from the NHANES

8  1999-2006 data were grouped into quintiles for sugar intake as follows: (1) less than 5% of

9  calories consumed from sugar, (2) 5% to less than 10%, (3) 10% to less than 17.5%, (4) 17.5% to

10  less than 25%, and (5) 25% or more. These groups had the following adjusted mean HDL levels

11  (because HDL is the "good" cholesterol, higher levels are better): 58.7 mg/dL, 57.5, 53.7, 51.0,

12  and 47.7. Mean triglyceride levels were 105 mg/dL, 102, 111, 113, and 114.  Mean LDL levels

13  were 116 mg/dL, 115, 118, 121, and 123 among women, with no significant trend among men.

14  Consumers whose sugar intake accounted for more than 10% of calories had a 50% - 300% higher

15  risk of low HDL levels compared to those who consumed less than 5% of calories from sugar.

16  Likewise, high-sugar consumers had greater risk of high triglycerides. All relationships were

17  linear as demonstrated in the charts below.[73]

18

19

20

21

22

23

24

25

---

26  [72] Te Morenga, L., et al., "Dietary sugars and cardiometabolic risk: systematic review and meta-analyses of randomized controlled trials on the effects on blood pressure and lipids," *American Journal of Clinical Nutrition*, Vol. 100, No. 1, 65-79 (May 7, 2014).

27  [73] Welsh, J.A., et al., "Caloric Sweetener Consumption and Dyslipidemia Among US Adults," *Journal of the American Medical Association*, Vol. 303, No. 15, 1490-97 (April 21, 2010).

28





Figure 1. Multivariable-Adjusted Mean HDL-C Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006

Figure 2. Multivariable-Adjusted Geometric Mean Triglyceride Levels by Level of Added Sugar Intake Among US Adults, NHANES 1999-2006

Figure 3. Multivariable-Adjusted Mean LDL-C Levels by Level of Added Sugar Intake Among US Men and Women, NHANES 1999-2006

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 91 of the SAC, including its graphic, and therefore denies them. Post asserts that the article cited in footnote 73 to Paragraph 91 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

92.     One experimental study showed that, when a 17% fructose diet was provided to healthy men, they showed an increase in plasma triacylglycerol concentrations of 32%.[74]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 92 of the SAC, and therefore denies them. Post asserts that the article cited in footnote 74 to Paragraph 92 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

93.     Another 10-week experimental feeding study showed that those who were fed 25% of their energy requirements as fructose experienced increases in LDL cholesterol, small dense LDL cholesterol, and oxidized LDL cholesterol, as well as increased concentrations of

---

[74] Bantle, J.P., et al., "Effects of dietary fructose on plasma lipids in healthy subjects," *American Journal of Clinical Nutrition*, Vol. 72, 1128-34 (2000).

triglycerides and total cholesterol, while those fed a 25% diet of glucose did not experience the same adverse effects.[75]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 93 of the SAC, and therefore denies them. Post asserts that the article cited in footnote 75 to Paragraph 93 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

94.     In a cross-sectional study of normal weight and overweight children aged 6-14, researchers found that "the only dietary factor that was a significant predictor of LDL particle size was total fructose intake."[76]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 94 of the SAC, 4 and therefore denies them. Post asserts that the article cited in footnote 76 to Paragraph 94 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

**8.      Excess Sugar Consumption is Associated with Hypertension**

95.     A study of more than 6,000 participants in the Framingham Heart Study found those who consumed more than 1 soft drink per day had a 22% greater incidence, and an 18% greater risk of high blood pressure than those who consumed less than 1 soft drink per day.[77]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 95 of the SAC, and therefore denies them. Post asserts that the article cited in footnote 77 to Paragraph 95 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences

---

[75] Stanhope, K.L., et al., "Consuming fructose-sweetened, not glucose-sweetened, beverages increases visceral adiposity and lipids and decreases insulin sensitivity in overweight/obese humans," *The Journal of Clinical Investigation*, Vol. 119, No. 5, 1322-34 (May 2009).

[76] Aeberli, I., et al., "Fructose intake is a predictor of LDL particle size in overweight schoolchildren," *American Journal of Clinical Nutrition*, Vol. 86, 1174-78 (2007).

[77] Dhingra, Cardiometabolic Risk, *supra* n.30.

1  Plaintiffs attempt to draw from this source are valid or establish their claims.

2         96.    An analysis of the NHANES data for more than 4,800 adolescents also showed a

3  positive, linear association between sugar-sweetened beverages and higher systolic blood pressure,

4  as well as corresponding increases in serum uric acid levels.[78]



Figure 1.
Sample mean of serum uric acid with 95% confidence intervals by categories of sugar
sweetened beverage consumption adjusted for age, race/ethnicity, sex, total calories, BMI z-
score, alcohol, smoking, dietary fiber intake, diet beverage consumption, and milk
consumption. *P* for trend = 0.01

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 96 of the SAC, including its graphic, and therefore denies them. Post asserts that the article cited in footnote 78 to Paragraph 96 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

        97.    In one study, 15 healthy men drank 500 ml water containing either no sugar, 60 grams of fructose, or 60 grams of glucose. Blood pressure, metabolic rate, and autonomic nervous

[78] Nguyen, Serum Uric Acid, *supra* n.22.

system activity were measured for 2 hours. While the administration of fructose was associated with an increase in both systolic and diastolic blood pressure, blood pressure did not rise in response to either water or glucose ingestion, as demonstrated in the chart below.[79]



Fig. 1. Time course of the systolic blood pressure (SBP; *A*), diastolic blood pressure (DBP; *B*), and heart rate (HR; *C*) changes (*left*) and mean responses (*right*) to drinking water (○), glucose (▲), and fructose (■). *$P < 0.05$ and **$P < 0.01$, statistically significant differences over time from baseline values (*left*) and differences between responses to the drinks (*right*).

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 97 of the SAC, including its graphic, and therefore denies them. Post asserts that the article cited in footnote 79 to Paragraph 97 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the

---

[79] Brown, C.M., et al., "Fructose ingestion acutely elevates blood pressure in healthy young humans," *Am. J. Physiol. Regul. Integr. Compl. Physiol.*, Vol. 294, R730-37 (2008).

1  conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their

2  claims.

3       98.     In another study, more than 40 overweight men and women were supplemented for

4  10 weeks with either sucrose or artificial sweeteners. The sucrose group saw an increase in

5  systolic and diastolic blood pressure, of 3.8 and 4.1 mm Hg, respectively, while the artificial

6  sweetener group saw a decrease in systolic and diastolic blood pressure, of 3.1 and 1.2 mm Hg,

7  respectively.[80]

8       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

9  the allegations in Paragraph 98 of the SAC, and therefore denies them. Post asserts that the article

10  cited in footnote 80 to Paragraph 98 speaks for itself and should be read as a whole and in light of

11  the entire body of available scientific evidence. Post denies that the conclusions or inferences

12  Plaintiffs attempt to draw from this source are valid or establish their claims.

13       99.     Another study took a variety of approaches to measuring the association between

14  sugar intake and blood pressure, concluding that an increase of 1 serving of sugar-sweetened

15  beverages per day (i.e., 140-150 calories, and 35-37.5 grams of sugar) was associated with

16  systolic/diastolic blood pressure differences of +1.6 and +0.8 mm Hg (and +1.1/+0.4 mm Hg with

17  adjustment for height and weight), while an increase of 2 servings results in systolic/diastolic

18  blood pressure differences of +3.4/+2.2, demonstrating that the  relationship is direct and linear.[81]

19       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

20  the allegations in Paragraph 99 of the SAC, and therefore denies them. Post asserts that the article

21  cited in footnote 81 to Paragraph 99 speaks for itself and should be read as a whole and in light of

22  the entire body of available scientific evidence. Post denies that the conclusions or inferences

23  Plaintiffs attempt to draw from this source are valid or establish their claims.

24

25

26  [80] Raben, Sucrose vs. Artificial Sweeteners, *supra* n.62.

27  [81] Brown, I.J., et al., "Sugar-Sweetened Beverage, Sugar Intake of Individuals, and Their Blood
   Pressure: International Study of Macro/Micronutrients and Blood Pressure," *Hypertension*, Vol.
28  57, 695-701 (2011).

1    **9.    Excess Sugar Consumption is Associated with Alzheimer's Disease, Dementia,**

2    **and Cognitive Decline**

3    100.    In a study of over 2,000 participants over 6.8 years, researchers found that higher

4    average glucose levels within the preceding 5 years (115 mg/dL compared to 100 mg/dL) were

5    related to an 18% increased risk of dementia among those without diabetes. For those with

6    diabetes, higher average glucose levels (190 mg/dL compared to 160 mg/dL) were related to a

7    40% increased risk of dementia.[82]

8    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

9    the allegations in Paragraph 100 of the SAC, and therefore denies them. Post asserts that the

10   article cited in footnote 82 to Paragraph 100 speaks for itself and should be read as a whole and in

11   light of the entire body of available scientific evidence. Post denies that the conclusions or

12   inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

13   101.    "To evaluate a possible association between fructose mediated metabolic changes

14   and cognitive behaviour," researchers "assessed the correlation of serum triglyceride and insulin

15   resistance levels with memory," and "found a positive correlation between serum triglyceride

16   levels and insulin resistance index . . . , which indicates that increased serum triglyceride levels

17   may contribute to increase[d] insulin resistance . . . ." And researchers "found that the latency time

18   varied in proportion to the insulin resistance . . . , which suggests that memory performance may

19   rely on levels of insulin resistance . . . ."[83]

20   **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

21   the allegations in Paragraph 101 of the SAC, and therefore denies them. Post asserts that the

22   article cited in footnote 83 to Paragraph 101 speaks for itself and should be read as a whole and in

23   light of the entire body of available scientific evidence. Post denies that the conclusions or

24   inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

25

26   [82] Crane, P.K, et al., "Glucose Levels and Risk of Dementia," *New England Journal of Medicine*, Vol. 369, No. 6, 540-48 (2013).

27   [83] Agrawal, R., et al., "'Metabolic syndrome' in the brain: deficiency in omega-3 fatty acid

28   exacerbates dysfunctions in insulin receptor signaling and cognition," *Journal of Physiology*, Vol. 590, No. 10, 2485-99, at 2489 (2012).

1

**10.     Excess Sugar Consumption is Linked to Some Cancers.**

102.     In a population-based case-control study involving 424 cases and 398 controls, women in the highest quartile of added sugar intake had an 84% greater risk of endometrial cancer.[84] Similarly, in a study of patients with stage 3 colon cancer, those in the highest quintile of glycemic load experienced worsening in disease-free survival of approximately 80% compared to those in the lowest quintile.[85]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 102 of the SAC, and therefore denies them. Post asserts that the articles cited in footnotes 84-85 to Paragraph 102 speak for themselves and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from these sources are valid or establish their claims.

103.     A population based case-control study on Malaysian women found a significant, two-fold increased risk of breast cancer among premenopausal and postmenopausal women in the highest quartile of sugar intake.[86]

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 103 of the SAC, and therefore denies them. Post asserts that the article cited in footnote 86 to Paragraph 103 speaks for itself and should be read as a whole and in light of the entire body of available scientific evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

104.     A prospective epidemiological study of nearly 45,000 cancer cases among 436,000 participants aged 50-71, found added sugars were positively associated with risk of esophageal

---

[84] King, M.G., et al., "Consumption of Sugary Foods and Drinks and Risk of Endometrial Cancer," *Cancer Causes Control*, Vol. 24, No. 7, 1427-36 (July 2013).

[85] Meyerhardt, J.A., et al. "Association of dietary patterns with cancer recurrence and survival in patients with stage III colon cancer," *Journal of the American Medical Association*, Vol. 298, 754-64 (2007).

[86] Sulaiman, S., et al., "Dietary carbohydrate, fiber and sugar and risk of breast cancer according to menopausal status in Malaysia," *Asian Pacific Journal of Cancer Prevention*, Vol. 15, 5959 (2014).

1  adenocarcinoma; added fructose was associated with risk of small intestine cancer; and all

2  investigated sugars were associated with increased risk of pleural cancer.[87]

3      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

4  the allegations in Paragraph 104 of the SAC, and therefore denies them. Post asserts that the

5  article cited in footnote 87 to Paragraph 104 speaks for itself and should be read as a whole and in

6  light of the entire body of available scientific evidence. Post denies that the conclusions or

7  inferences Plaintiffs attempt to draw from this source are valid or establish their claims.

8  **E.    There is Substantial Evidence That Consuming Artificial Trans Fat—Found in Some**

9  **Post Cereals—is Detrimental to Health**

10     105.    Artificial trans fat is created through the industrial process of hydrogenation, in

11 which hydrogen atoms are added to normal vegetable oil by heating it in the presence of an ion

12 donor catalyst metal, like nickel. The process was invented in 1901 by German scientist Wilhelm

13 Normann. The resulting partially hydrogenated vegetable oil (or PHVO) is useful in

14 manufacturing packaged foods because, unlike natural fat which needs refrigeration for rigidity or

15 else liquefies, trans fat remains solid at room temperature.

16     **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

17 the allegations in Paragraph 105 of the SAC, and therefore denies them.

18     106.    Human beings, however, have not evolved to digest this artificial fat. Instead, it is

19 readily incorporated into organ and blood cells in place of natural fats with devastating

20 consequences, causing and exacerbating cardiovascular disease, type-2 diabetes and cancer. When

21 trans fat invades blood cell walls, for example, their ability to recognize and use insulin is

22 retarded, leading to excessive blood sugar and insulin swings, and eventually to diabetes. And for

23 existing diabetics, trans fat exacerbates symptoms and causes cognitive decline. By disfiguring the

24 body's cells, trans fat also interferes with the immune system's ability to distinguish the body's

25 cells from foreign infections, causing it to become persistently overactive, a condition known as

26 chronic systemic inflammation, damaging nearly every human organ.

27

28 [87] Tasevska, N., et al., "Sugars in diet and risk of cancer in the NIH-AARP Diet and Health Study," *International Journal of Cancer*, Vol. 130, No. 1, 159-69 (Jan. 1, 2012).

1        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

2  the allegations in Paragraph 106 of the SAC, and therefore denies them.

3        107.    But it is the deleterious effects of trans fat on the cardiovascular system that

4  presents the gravest public health danger. Analysis of the Nurses' Health Study data shows risk of

5  coronary heart disease doubles for each 2% increase in trans fat calories consumed.[88] And a wide

6  variety of experimentally sound, peer-reviewed studies convincingly demonstrate that consuming

7  even small quantities of artificial trans fat greatly increases incidences of death from cancer,

8  diabetes, and heart disease.[89]

9        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

10  the allegations in Paragraph 107 of the SAC, and therefore denies them. Post asserts that the

11  articles cited in footnotes 88-89 to Paragraph 107 speak for themselves and should be read as a

12  whole and in light of the entire body of available scientific evidence. Post denies that the

13  conclusions or inferences Plaintiffs attempt to draw from these sources are valid or establish their

---

14  [88] Hu, F.B., et al., "Dietary Fat Intake and the Risk of Coronary Heart Disease in Women," *New*

15  *England Journal of Medicine*, Vol. 337, No. 2, at 1491-99 (Nov. 20, 1997).

16  [89] Koppe, S. et al., "Trans fat feeding results in higher serum alanine aminotransferase and increased insulin resistance compared with a standard murine high-fat diet," *American Journal of Physiology, Gastrointestinal and Liver Physiology*, Vol. 297 at G378 (2009); Wang, Y. et al.,

17  "Trans-11 Vaccenic Acid Dietary Supplementation Induces Hypolipidemic Effects on JCR:LA-cp Rats," *Journal of Nutrition*, Vol. 138, at 2117 (Nov. 2008); Chajès, V., et al., "Association

18  between Serum Trans-Monounsaturated Fatty Acids and Breast Cancer Risk in the E3N-EPIC Study," *American Journal of Epidemiology*, Vol. 167 at 1312 (2008); Vinikoor, L.C. , et al.,

19  "Consumption of Trans-Fatty Acid and its Association with Colorectal Adenomas," *American Journal of Epidemiology*, Vol. 168, at 181 (2007); Liu, X., et al., "Trans-Fatty Acid Intake and

20  Increased Risk of Advanced Prostate Cancer: Modification by RNASEL R462Q Variant," *Carcinogenesis*, Vol. 28, at 1232 (2007); Mozaffairan, D., et al., "Trans Fatty Acids and

21  Cardiovascular Disease," *New England Journal of Medicine*, Vol. 354, at 1601 (2006); Chavarro, J., et al., "A Prospective Study of Blood Trans Fatty Acid Levels and Risk of Prostate Cancer,"

22  *Proceedings of the American Association of Cancer Research*, Vol. 47, at 95 (2006); Clifton, P.M., et al., "Trans Fatty Acids In Adipose Tissue And The Food Supply Are Associated With

23  Myocardial Infarction," *Journal of Nutrition*, Vol. 134, at 874 (2004); Lemaitre, R.N., et al., "Cell Membrane Trans-Fatty Acids and the Risk of Primary Cardiac Arrest," *Circulation*, Vol. 105, at

24  697 (2002); Salmeron, J., et al., "Dietary Fat Intake and Risk of Type 2 Diabetes in Women," *American Journal of Clinical Nutrition*, Vol. 73, at 1019 (2001); De Roos, N.M., et al.,

25  "Replacement of Dietary Saturated Fatty Acids by Trans Fatty Acids Lowers Serum HDL Cholesterol and Impairs Endothelial Function in Healthy Men and Women," *Arteriosclerosis,*

26  *Thrombosis, and Vascular Biology*, Vol. 21, at 1233 (2001); Ascherio, A., et al., "Trans Fatty Acids & Coronary Heart Disease," *New England Journal of Medicine*, Vol. 340, at 94 (1999)

27  [hereinafter "Ascherio, Replacement of Dietary Saturated Fat with Trans Fat"]; Willet, W.C., et al., "Trans Fatty Acids: Are the Effects only Marginal?," *American Journal of Public Health*, Vol.

28  84, at 722 (1994).

1  claims.

2      108.   Epidemiologists estimate that artificial trans fat consumption contributes to as

3  many as 100,000 otherwise preventable American deaths each year.[90]

4      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

5  the allegations in Paragraph 108 of the SAC or the footnote thereto, and therefore denies them.

6  Post asserts that the article cited in footnote 90 to Paragraph 108 speaks for itself and should be

7  read as a whole and in light of the entire body of available scientific evidence. Post denies that the

8  conclusions or inferences Plaintiffs attempt to draw from this source are valid or establish their

9  claims.

10      109.   In November 2013, the FDA issued a Tentative Determination Regarding Partially

11  Hydrogenated Oils, in which it stated:

12  Based on new scientific evidence and the findings of expert scientific panels, the
13  Food and Drug Administration (FDA) has tentatively determined that partially
    hydrogenated oils (PHOs), which are the primary dietary source of industrially-
    produced *trans* fatty acids, or *trans* fat, are not generally recognized as safe
14  (GRAS) for any use in food based on current scientific evidence establishing the
15  health risks associated with the consumption of *trans* fat . . . .

16  [ . . . ]

17  The current scientific evidence . . . identifies significant health risks caused by the
    consumption of *trans* fat. This evidence includes the opinions of expert panels and
18  the 2005 recommendation of the Institute of Medicine (IOM) to limit trans fat
    consumption as much as possible while consuming a nutritionally adequate diet . . .
19  . In addition, according to the Centers for Disease Control and Prevention (CDC),
    elimination of PHOs from the food supply could prevent 10,000 to 20,000 coronary
20  events and 3,000 to 7,000 coronary deaths annually . . . . Given this evidence, we
    have tentatively determined that there is no longer a consensus among qualified
21  scientific experts that PHOs, the primary dietary source of industrially-produced
    *trans* fatty acids, are safe for human consumption, either directly or as ingredients
22  in other food products.

23  75 Fed. Reg. 67169, 67169 (Nov. 8, 2013).

24      **Answer**: Post admits that on November 8, 2013, the FDA issued a "Tentative

25  Determination Regarding Partially Hydrogenated Oils; Request for Comments and for Scientific

26  _____

[90] Ascherio, Replacement of Dietary Saturated Fat with Trans Fat, *supra* n.89 (Removing 2% of
27  daily calories from trans fat from the American diet "would prevent approximately 30,000
    premature coronary deaths per year, and epidemiologic evidence suggests this number is closer to
28  100,000 premature deaths annually.").

1  Data and Information," 78 Fed. Reg. 67169, and that Paragraph 109 contains some language from
2  that Tentative Determination. Post asserts that the FDA's Tentative Determination speaks for itself
3  and should be read as a whole and in light of the entire body of available scientific evidence. Post
4  denies that the conclusions or inferences Plaintiffs attempt to draw from the FDA's Tentative
5  Determination are valid or establish their claims. Post denies any remaining allegations in
6  Paragraph 109 of the SAC.

7  <u>**POST'S MARKETING & SALE OF HIGH-SUGAR CEREALS**</u>

8      110.     Post was founded in 1895, in Battle Creek, Michigan. Post is a multi-billion dollar
9  food company that manufactures, markets and sells a wide variety of breakfast cereals. It is the
10  United States' third-largest cereal manufacturer behind Kellogg and General Mills.

11      <u>**Answer**</u>: Post admits that it manufactures, markets, and sells certain cereals, among other
12  foods. Post lacks sufficient knowledge or information to form a belief as to the truth of the
13  allegation that it is the United States' third-largest cereal manufacturer, and therefore denies this
14  allegation. Post denies all remaining allegations in Paragraph 110 of the SAC.

15      111.     Post's largest brand, Honey Bunches of Oats, was the third-best selling cereal in
16  2015, behind just General Mills' Honey Nut Cheerios and Kellogg's Frosted Flakes, enjoying
17  sales of $411 million, a 4% share of the country's $8.9 billion market.

18      <u>**Answer**</u>: Post admits the allegations in Paragraph 111 of the SAC.

19      112.     In 2014, the cereal industry used 816 million pounds of sugar, or about 2.5 lbs. for
20  each of the 318.9 million people in the U.S. in 2014. That is 1,134 grams per person, or 3 grams
21  per person, per day, for every man, woman, and child in the U.S. That totals more than 361 billion
22  grams of sugar in one year.

23      <u>**Answer**</u>: Post lacks sufficient knowledge or information to form a belief as to the truth of
24  the allegations in Paragraph 112 of the SAC, and therefore denies them.

25      113.     During the last decade, as consumer interest in healthy eating has grown, and based
26  on sophisticated consumer research, Post has intentionally positioned itself in the market as a
27  purportedly "healthy" brand of processed food, by using various labeling statements to suggest its
28  cereals are healthy food choices.

**Answer**: Post denies the allegations in Paragraph 113 of the SAC.

114.    Many of Post's cereals, however, contain high amounts of sugar, such that their regular consumption is likely to contribute to excess added sugar consumption and, hereby, increased risk for and contraction of chronic disease.

**Answer**: Post denies the allegations in Paragraph 114 of the SAC.

115.    As with any company the size of Post, and with as many products, Post makes occasional changes in product offerings (for example, discontinuing or introducing new products or varieties), product formulations, and product labeling and packaging.

**Answer**: Post admits the allegations in Paragraph 115 of the SAC as they relate to Post. Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 115 of the SAC as to other companies, and therefore denies them.

116.    Regardless of such changes, however, during the previous four years and dating back even further into at least the mid-2000s, Post has maintained, and to this day actively maintains a policy and practice of labeling high-sugar cereals—those that contribute significantly more than 5% of calories from added sugar, and thus whose regular consumption is likely to contribute to increased risk of illness—with various health and wellness claims that suggest the cereals are healthy, when they are not.

**Answer**: Post denies the allegations in Paragraph 116 of the SAC.

117.    Post bolsters this practice with websites dedicated to the products that repeat and in some instances state even more aggressive health and wellness claims.

**Answer**: Post denies the allegations in Paragraph 117 of the SAC.

118.    This policy and practice is apparent in Post's consistent use of certain words and phrases across many cereals, flavors, varieties, and packaging. For example, this Complaint details misleading statements made in the labeling of 34 different Post cereals. Among those statements:

    a.    The word "nutrition" or "nutritious" appears more than 35 times, the word "wholesome" appears more than 30 times, and the word "healthy" appears approximately 20 times;

    b.    The phrase "no high fructose corn syrup" appears more than 20 times;

     c.     The phrase "less processed" appears more than 15 times;

     d.     The phrases "good for you," "good for your health," or "good for your family" appear approximately 15 times.

**Answer**: Post admits that the words and phrases quoted in Paragraph 118 of the SAC appear on some of the product labels depicted in the SAC. Post denies all remaining allegations in Paragraph 118 of the SAC.

119.     Although plaintiffs were victims of Post's longtime and general policy and practice with respect to the cereals they purchased and labels they saw, this Complaint and their claims are not so limited; rather, plaintiffs seek through this lawsuit to enjoin Post's *policy and practice generally*, including but not necessarily limited to the products, labels, and label claims challenged herein.

**Answer**: Post admits that Plaintiffs seek injunctive relief that is not limited to the cereals they purchased and labels they saw, but denies that Plaintiffs are entitled to such relief. Post denies the remaining allegations in Paragraph 119 of the SAC.

120.     In fact, plaintiffs have enjoyed Post's products in the past. If they could be assured through prospective injunctive relief that Post's cereals are properly labeled (i.e., that they do not contain excess added sugar if they bear health and wellness labeling), they would consider purchasing Post cereals bearing such claims in the future.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 120 of the SAC, and therefore denies them.

121.     The cereals that are the subject of this Complaint and examples of Post's policy and practice of marketing high-sugar cereals with misleading health and wellness claims, are the following:

     a.     <u>Post Great Grains Cereals</u>
         (i.) Blueberry Morning
         (ii.) Cranberry Almond Crunch
         (iii.) Banana Nut Crunch
         (iv.) Raisins, Dates & Pecans
         (v.) Crunchy Pecans
         (vi.) Blueberry Pomegranate
         (vii.) Protein Blend: Honey, Oats & Seeds
         (viii.) Protein Blend: Cinnamon Hazelnut

b. Post Honey Bunches of Oats Cereals
    (i.) Honey Roasted
    (ii.) With Almonds
    (iii.) Raisin Medley
    (iv.) With Pecan Bunches
    (v.) With Cinnamon Bunches
    (vi.) With Vanilla Bunches
    (vii.) With Apples & Cinnamon Bunches
    (viii.) With Real Strawberries
    (ix.) Fruit Blends – Banana Blueberry
    (x.) Fruit Blends – Peach Raspberry
    (xi.) Tropical Blends – Mango Coconut
    (xii.) Whole Grain Honey Crunch
    (xiii.) Whole Grain with Vanilla Bunches
    (xiv.) Greek Honey Crunch
    (xv.) Greek Mixed Berry
    (xvi.) Honey Roasted Granola
    (xvii.)Raspberry Granola
    (xviii.) Cinnamon Granola
    (xix.) Protein Granola with Dark Chocolate

c. Post Shredded Wheat
    (i.) Honey Nut
    (ii.) Crunch!

d. Single-Variety Post Cereals
    (i.) Raisin Bran
    (ii.) Bran Flakes
    (iii.) Alpha-Bits
    (iv.) Honeycomb
    (v.) Waffle Crisp

**Answer**: Post admits that the products listed in Paragraph 121 of the SAC are the subject of Plaintiffs' SAC. Post denies all remaining allegations in Paragraph 121 of the SAC.

122.   The amount of total sugar and added sugar in each challenged product is set forth in the table below (noted in italics where the amounts differ).

| Product | Total Sugar | Added Sugar |
|---|---|---|
| *Great Grains Blueberry Morning* | *16g* | *14g* |
| *Great Grains Cranberry Almond Crunch* | *12g* | *11g* |
| *Great Grains Banana Nut Crunch* | *10g* | *9g* |
| *Great Grains Raisins, Dates & Pecans* | *13g* | *7g* |
| Great Grains Crunchy Pecans | 8g | 8g |
| *Great Grains Blueberry Pomegranate* | *13g* | *12g* |
| Great Grains Protein Blend: Honey, Oats & Seeds | 9g | 9g |
| Great Grains Protein Blend: Cinnamon Hazelnut | 9g | 9g |
| Honey Bunches of Oats Cereal – Honey Roasted | 6g | 6g |
| Honey Bunches of Oats Cereal – With Almonds | 6g | 6g |

    ANSWER TO SECOND AMENDED COMPLAINT
Case No.:  3:16-CV-04958-WHO

| | | |
|---|---|---|
| *Honey Bunches of Oats Cereal – Raisin Medley* | *14g* | *10g* |
| Honey Bunches of Oats Cereal – With Pecan Bunches | 6g | 6g |
| Honey Bunches of Oats Cereal – With Cinnamon Bunches | 6g | 6g |
| Honey Bunches of Oats Cereal – With Vanilla Bunches | 12g | 12g |
| *Honey Bunches of Oats Cereal – With Apples & Cinnamon Bunches* | *8g* | *6g* |
| *Honey Bunches of Oats Cereal – With Real Strawberries* | *8g* | *7g* |
| Honey Bunches of Oats Cereal – Fruit Blends – Banana Blueberry | 6g | 6g |
| Honey Bunches of Oats Cereal – Fruit Blends – Peach Raspberry | 6g | 6g |
| Honey Bunches of Oats Cereal – Tropical Blends – Mango Coconut | 6g | 6g |
| Honey Bunches of Oats Cereal – Whole Grain Honey Crunch | 12g | 12g |
| Honey Bunches of Oats Cereal – Whole Grain with Vanilla Bunches | 12g | 12g |
| Honey Bunches of Oats Cereal – Greek Honey Crunch | 13g | 13g |
| Honey Bunches of Oats Cereal – Greek Mixed Berry | 13g | 13g |
| Honey Bunches of Oats Granola – Honey Roasted | 12g | 12g |
| Honey Bunches of Oats Granola – Raspberry | 12g | 12g |
| Honey Bunches of Oats Granola – Cinnamon | 12g | 12g |
| Honey Bunches of Oats Protein Granola with Dark Chocolate | 13g | 13g |
| Shredded Wheat Honey Nut | 12g | 12g |
| Shredded Wheat Crunch! | 12g | 12g |
| *Raisin Bran* | *19g* | *9g* |
| Bran Flakes | 5g | 5g |
| Alpha-Bits | 6g | 6g |
| Honey-Comb | 10g | 10g |
| Waffle Crisp | 12g | 12g |
| **Average =** | | **9.6g** |

**Answer**: Post admits that the table in Paragraph 122 purports to set forth the amount of total sugar and added sugar present in the challenged products, but notes that the product labels and nutritional information it has produced to Plaintiffs constitute the best and most accurate evidence of the products' sugar content.

123.    Although discussed more specifically below, annexed to this Complaint as Appendix 1 is a table setting forth for each challenged cereal:

a.    The health and wellness labeling claims plaintiffs challenge as misleading;

b.    The forms of added sugars used;

c.    The amount of added sugar in each serving;

d.    The proportion of added sugar by weight in each serving;

e.    The proportion of the product's calories from added sugar; and

f.      The contribution of the product's added sugar to the AHA's maximum recommended daily added sugar intake of 38 grams for men (M), 25 grams for women (W) and 12-15 grams for children (C).

**Answer**: Post admits that Plaintiffs annexed to their SAC an appendix entitled "Appendix 1" that purports to set forth the information described in Paragraph 123 of the SAC, but notes that the product labels and nutritional information for the challenged products constitute the best and most accurate evidence of the products' nutritional content. Post also asserts that many of the "challenged health and wellness claims" listed in "Appendix 1" to the SAC have been dismissed with prejudice or abandoned by Plaintiffs in response to Post's Motion to Dismiss.

**A.     Post Great Grains Cereals**

124.    Post sells a line of cereals under a "Great Grains" brand.

**Answer**: Post admits the allegations in Paragraph 124 of the SAC.

### *1.     Blueberry Morning*

125.    Post introduced *Post Great Grains Blueberry Morning* cereal in around May to August 2016 (having rebranded a cereal previously referred to as Post Selects Blueberry Morning). The packaging of *Post Great Grains Blueberry Morning cereal* is pictured below.

1



16   **Answer**: Post admits the allegations in Paragraph 125 of the SAC.

17   126.   The packaging of *Post Great Grains Blueberry Morning* has made the following

18   labeling claims suggesting, both individually and especially in the context of the label as a whole,

19   that the product is healthy:

20   a.   "Less processed nutrition you can see"

21   b.   "nutritious Blueberries"

22   c.   "Why less processed? Quite simply, because it's good for you!"

23   d.   "We gently crack the whole wheat berry and add a mix of grains to our

24   flakes, while some of the competition add artificial sweeteners and flavors along with

25   isolated fiber to their flakes. We then add in nutritious fruits and nuts and balance them

26   with our grains for a great taste that's irresistible."

27   e.   Whole Grains Council Stamp

28   **Answer**: Post admits that the phrases quoted in Paragraph 126 of the SAC appeared on

certain versions of the packaging of Great Grains Blueberry Morning at various points in time. Post denies the remaining allegations in Paragraph 126 of the SAC.

**2.   *Cranberry Almond Crunch***

127.   The initial version of the packaging of *Post Great Grains Cranberry Almond Crunch* is pictured below.



**Answer**: Post admits the allegations in Paragraph 127 of the SAC.

128.   In around June 2014, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 128 of the SAC.

129.    In around March 2017, Post introduced the packaging picture below.



**Answer**: Post admits the allegations in Paragraph 129 of the SAC.

130.    The packaging of *Post Great Grains Cranberry Almond Crunch* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

        a.    "Less processed nutrition you can see"

        b.    "wholesome Almonds"

        c.    "nutritious Cranberries"

        d.    "Why less processed? Quite simply, because it's good for you!"

        e.    "We gently crack the whole wheat berry and add a mix of grains to our flakes, while some of the competition add artificial sweeteners and flavors along with isolated fiber to their flakes. We then add in nutritious fruits and nuts and balance them with our grains for a great taste that's irresistible."

        f.    "It's whole foods from the field to your bowl, with whole grains, fiber, and nutritious ingredients in every bite!"

        g.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 130 of the SAC appeared on certain versions of the packaging of Great Grains Cranberry Almond Crunch at various points in time. Post denies the remaining allegations in Paragraph 130 of the SAC.

**3.  *Banana Nut Crunch***

131.    The initial packaging of *Post Great Grains Banana Nut Crunch* is pictured below.



**Answer**: Post denies the allegations in Paragraph 131 of the SAC.

132.    In or around March 2015, Post introduced the packaging pictured below.



1    **Answer**: Post admits the allegations in Paragraph 132 of the SAC.

2    133.   In or around March 2017, Post introduced the packaging pictured below.



15   **Answer**: Post admits the allegations in Paragraph 133 of the SAC.

16   134.   The packaging of *Post Great Grains Banana Nut Crunch* has made the following

17   labeling claims suggesting, both individually and especially in the context of the label as a whole,

18   that the product is healthy:

19         a.   "Less processed nutrition you can see"

20         b.   "wholesome Walnuts"

21         c.   "wholesome Almonds"

22         d.   "Why less processed? Quite simply, because it's good for you!"

23         e.   "We gently crack the whole wheat berry and add a mix of grains to our

24   flakes, while some of the competition add artificial sweeteners and flavors along with

25   isolated fiber to their flakes. We then add in nutritious fruits and nuts and balance them

26   with our grains for a great taste that's irresistible."

27         f.   "wholesome walnuts and almonds"

28         g.   "It's whole foods from the field to your bowl, with whole grains, fiber, and

1    nutritious ingredients in every bite!"

2         h.    Whole Grains Council Stamp

3    **Answer**: Post admits that the phrases quoted in Paragraph 134 of the SAC appeared on

4    certain versions of the packaging of Great Grains Banana Nut Crunch at various points in time.

5    Post denies the remaining allegations in Paragraph 134 of the SAC.

6    ***4.  Raisins, Dates & Pecans***

7         135.    The initial packaging of *Post Great Grains Raisins, Dates & Pecans* is pictured

8    below.



22   **Answer**: Post admits the allegations in Paragraph 135 of the SAC.

23        136.    In around February 2015, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 133 of the SAC.

137.     The packaging of *Post Great Grains Raisins, Dates & Pecans* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

           a.     "Less processed nutrition you can see"

           b.     "wholesome Pecans"

           c.     "naturally nutritious Raisins & Dates"

           d.     "Why less processed? Quite simply, because it's good for you!"

           e.     "We gently steam, roll and bake our whole grains to help maintain the full flavor and nutrition of our flakes, while some of the competition add artificial sweeteners and flavors along with isolated fiber to their flakes. We then add in nutritious fruits and nuts and balance them with our grains for a great taste that's irresistible."

           f.     "It's whole foods from the field to your bowl, with whole grains, fiber and nutritious ingredients in every bite!"

           g.     Whole Grains Council Stamp

1    **Answer**: Post admits that the phrases quoted in Paragraph 137 of the SAC appeared on

2    certain versions of the packaging of Post Great Grains Raisins, Dates & Pecans at various points in

3    time. Post denies the remaining allegations in Paragraph 137 of the SAC.

4    **5.  Crunchy Pecans**

5    138.    The initial packaging of *Post Great Grains Crunchy Pecans* is pictured below.



18   **Answer**: Post admits the allegations in Paragraph 138 of the SAC.

19   139.    In around October 2013, Post introduced the packaging pictured below.

- 67 -



**Answer**: Post admits the allegations in Paragraph 139 of the SAC.

140.   In around December 2014, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 140 of the SAC.

141.   The packaging of *Post Great Grains Crunchy Pecans* has made the following

labeling claims suggesting, both individually and especially in the context of the label as a whole,

that the product is healthy:

1            a.     "Less processed nutrition you can see"

2            b.     "wholesome Pecans"

3            c.     "Why less processed? Quite simply, because it's good for you!"

4            d.     "We gently steam, roll and bake our whole grains to help maintain the full

5  flavor and nutrition of our flakes, while some of the competition add artificial sweeteners

6  and flavors along with isolated fiber to their flakes. We then add in nutritious fruits and

7  nuts and balance them with our grains for a great taste that's irresistible."

8            e.     "It's whole foods from the field to your bowl, with whole grains, fiber and

9  nutritious ingredients in every bite!"

10            f.     Whole Grains Council Stamp

11  **Answer**: Post admits that the phrases quoted in Paragraph 141 of the SAC appeared on

12  certain versions of the packaging of Post Great Grains Crunchy Pecans at various points in time.

13  Post denies the remaining allegations in Paragraph 141 of the SAC.

14      *6. Blueberry Pomegranate*

15     142.    The Post introduced *Post Great Grains Blueberry Pomegranate* cereal in around

16  April 2012. The product's initial packaging is pictured below.

1    **Answer**: Post admits the allegations in Paragraph 142 of the SAC.

2    143.    In around February 2014, Post introduced the packaging pictured below.



15    **Answer**: Post admits the allegations in Paragraph 143 of the SAC.

16    144.    The packaging of *Post Great Grains Blueberry Pomegranate* has made the

17 following labeling claims suggesting, both individually and especially in the context of the label as

18 a whole, that the product is healthy:

19          a.    "Less processed nutrition you can see"

20          b.    "nutritious Blueberries"

21          c.    "Why less processed? Quite simply, because it's good for you!"

22          d.    "We gently steam, roll and bake our whole grains to help maintain the full

23    flavor and nutrition of our flakes, while some of the competition add artificial sweeteners

24    and flavors along with isolated fiber to their flakes. We then add in nutritious fruits and

25    nuts and balance them with our grains for a great taste that's irresistible."

26          e.    "It's whole foods from the field to your bowl, with whole grains, fiber and

27    nutritious ingredients in every bite!"

28          f.    Whole Grains Council Stamp

1

**Answer**: Post admits that the phrases quoted in Paragraph 144 of the SAC appeared on

2 certain versions of the packaging of Post Great Grains Blueberry Pomegranate at various points in

3 time. Post denies the remaining allegations in Paragraph 144 of the SAC.

4      **7.  *Protein Blend: Honey, Oats & Seeds***

5      145.    The initial packaging of *Post Great Grains Protein Blend: Honey, Oats & Seeds* is

6 depicted below.



20      **Answer**: Post denies the allegations in Paragraph 145 of the SAC.

21      146.    In around August 2013, Post introduced the packaging pictured below.

1
2
3
4
5
6
7
8
9
10
11



12   **Answer**: Post admits the allegations in Paragraph 146 of the SAC.

13   147.   In around September 2014 Post introduced the packaging pictured below.

14
15
16
17
18
19
20
21
22
23
24



25   **Answer**: Post admits the allegations in Paragraph 147 of the SAC.

26   148.   The packaging of *Post Great Grains Protein Blend: Honey, Oats & Seeds* has

27   made the following labeling claims suggesting, both individually and especially in the context of

28   the label as a whole, that the product is healthy:

1         a.      "HELPS SUPPORT A HEALTHY METABOLISM"

2         b.      "wholesome Almonds"

3         c.      "nutritious Pumpkin Seeds"

4         d.      "sweetened with a kiss of honey"

5         e.      "Why less processed? Quite simply, because it's good for you!"

6         f.      "We gently crack the whole wheat berry and add a mix of grains to our flakes, while some of the competition add artificial sweeteners, flavors, or isolated fibers to their flakes. We then add in nutritious nuts and seeds and balance them with our grains for a great taste that's irresistible."

10         g.      "It's whole foods from the field to your bowl, with nutritious ingredients in every bite!"

12         h.      "Support a Healthy Metabolism"

13         i.      "The process of metabolism establishes the rate at which we burn our calories and, ultimately, how quickly we gain weight or how easily we lose it. Although some factors affecting metabolic rate, like age and genetics can't be changed, there are ways to maximize your metabolism." **Breakfast:** Eat breakfast. One important part of metabolism is how many calories you burn while at rest; did you know that eating breakfast to 'break the fast' can increase your metabolism by as much as 10%? Start your day with the less processed whole grain nutrition of Great Grains Protein Blend to help jumpstart your metabolism." **Protein:** Eat protein. Did you know that protein generally requires about 25% more energy to digest? Because protein takes longer to breakdown than fat and carbohydrate, the body uses more energy to digest protein and this helps you burn more calories. . . . Great Grains Blend can actually help enhance your metabolism!" [ . . . ] **Fiber:** Consume fiber. Diets rich in fiber help keep you fuller longer which is important for weight management. Great Grains Protein Blend can help keep you satisfied with the staying power of . . . fiber."

27         j.      Whole Grains Council Stamp

28    **Answer**: Post admits that the phrases quoted in Paragraph 148 of the SAC appeared on

1    certain versions of the packaging of Post Great Grains Protein Blend: Honey, Oats & Seeds at

2    various points in time. Post denies the remaining allegations in Paragraph 148. Post further asserts

3    that the Court has held the following statement to be non-actionable: "Fiber: Consume fiber. Diets

4    rich in fiber help keep you fuller longer which is important for weight management. Great Grains

5    Protein Blend can help keep you satisfied with the staying power of an excellent source of fiber.".

6        **8. Protein Blend: Cinnamon Hazelnut**

7        149.    The initial packaging of *Post Great Grains Protein Blend: Cinnamon Hazelnut*,

8    introduced in around September 2012, is pictured below.



21   **Answer**: Post admits the allegations in Paragraph 149 of the SAC.

22       150.    In around August 2013, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 150 of the SAC.

151.    In around September 2014, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 151 of the SAC.

152.    The packaging of *Post Great Grains Protein Blend: Cinnamon Hazelnut* has made

1    the following labeling claims suggesting, both individually and especially in the context of the

2    label as a whole, that the product is healthy:

3              a.        "HELPS SUPPORT A HEALTHY METABOLISM"

4              b.        "wholesome Almonds"

5              c.        "nutritious Hazelnuts"

6              d.        "less processed whole grain cereal"

7              e.        "Why Less Processed? Quite simply because it's good for you!"

8              f.        "We gently crack the whole wheat berry and add a mix of grains to our

9    flakes, while some of the competition add artificial sweeteners, flavors or isolated fibers to

10   their flakes. We then add in nutritious nuts and balance them with our grains for a great

11   taste that's irresistible."

12             g.        "wholesome hazelnuts, almonds, and multi grain clusters with real

13   cinnamon"

14             h.        "It's whole foods from the field to your bowl, with nutritious ingredients in

15   every bite!"

16             i.        "Support a Healthy Metabolism"

17             j.        "The process of metabolism establishes the rate at which we burn our

18   calories and, ultimately, how quickly we gain weight or how easily we lose it. Although

19   some factors affecting metabolic rate, like age and genetics can't be changed, there are

20   ways to maximize your metabolism." **Breakfast:** Eat breakfast. One important part of

21   metabolism is how many calories you burn while at rest; did you know that eating

22   breakfast to 'break the fast' can increase your metabolism by as much as 10%? Start your

23   day with the less processed whole grain nutrition of Great Grains Protein Blend to help

24   jumpstart your metabolism." **Protein:** Eat protein. Did you know that protein generally

25   requires about 25% more energy to digest? Because protein takes longer to breakdown

26   than fat and carbohydrate, the body uses more energy to digest protein and this helps you

27   burn more calories. . . . Great Grains Blend can actually help enhance your metabolism!" [

28   . . . ] **Fiber:** Consume fiber. Diets rich in fiber help keep you fuller longer which is

important for weight management. Great Grains Protein Blend can help keep you satisfied with the staying power of . . . fiber."

k.      Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 152 of the SAC appeared on certain versions of the packaging of Post Great Grains Protein Blend: Cinnamon Hazelnut at various points in time. Post denies the remaining allegations in Paragraph 152 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "Fiber: Consume fiber. Diets rich in fiber help keep you fuller longer which is important for weight management. Great Grains Protein Blend can help keep you satisfied with the staying power of . . . fiber."

153.     These health and wellness claims, individually and especially in the context of the packaging as a whole, affirmatively suggest the *Great Grains Protein Blend: Cinnamon Hazelnut* is healthy, and particularly that it is formulated to increase metabolism and promote weight loss.

**Answer:**  Post denies the allegations in Paragraph 153 of the SAC.

**B.**      **Post Honey Bunches of Oats Cereal and Granola**

   ***1.  Honey Roasted***

154.     The packaging of *Post Honey Bunches of Oats Cereal – Honey Roasted* that was in use when the class period began is pictured below:



**Answer**: Post admits the allegations in Paragraph 154 of the SAC.

155.    In around November 2012, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 155 of the SAC.

156.    In around October 2014, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 156 of the SAC.

157.    In around August 2015, Post introduced the "Dedicated to Delicious" packaging pictured below.



1

2

3

4

5

6

7

8

9

10

11

12



13 **Answer**: Post admits the allegations in Paragraph 157 of the SAC.

14 158.   In around October 2015, Post introduced the packaging pictured below.

15

16

17

18

19

20

21

22

23

24

25

26

27 **Answer:**   Post denies the allegations in Paragraph 158 of the SAC.

28 159.   The packaging of *Post Honey Bunches of Oats Cereal – Honey Roasted* has made

the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

       a.      "Our Post Promise | No High Fructose Corn Syrup"

       b.      "Heart Healthy"

       c.      Depictions of heart in circle

       d.      "a Touch of Honey!"

       e.      "A delicious, wholesome start to your day!"

       f.      "4 Wholesome Grains"

       g.      Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 159 of the SAC appeared on certain versions of the packaging of Honey Bunches of Oats – Honey Roasted at various points in time. Post denies the remaining allegations in Paragraph 159 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

**2. With Almonds**

160.    The packaging of *Post Honey Bunches of Oats Cereal – With Almonds* that was in use when the class period began is pictured below.



**Answer**: Post admits the allegations in Paragraph 160 of the SAC.

161.   In around November 2012, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 161 of the SAC.

162.   In around October 2014, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 162 of the SAC.

163.   In around August 2015, Post introduced the "Dedicated to Delicious" packaging pictured below.



- 84 -

ANSWER TO SECOND AMENDED COMPLAINT
Case No.:  3:16-CV-04958-WHO





**Answer**: Post admits the allegations in Paragraph 163 of the SAC.

164.    In around October 2015, Post introduced the packaging pictured below.



**Answer**: Post denies the allegations in Paragraph 164 of the SAC.

165.    The packaging of *Post Honey Bunches of Oats Cereal – With Almonds* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

        a.     "Our Post Promise | No High Fructose Corn Syrup"

        b.     "Heart Healthy"

        c.     Depictions of heart in circle

        d.     "a Touch of Honey!"

        e.     "A delicious, wholesome start to your day!"

        f.     "4 Wholesome Grains"

        g.     Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 165 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – With Almonds at various points in time. Post denies the remaining allegations in Paragraph 165 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

### 3. *Raisin Medley*

166.    The packaging of *Post Honey Bunches of Oats Cereal – Raisin Medley* that was in use when the class period began is pictured below.



**Answer**: Post lacks sufficient knowledge or information to form a belief as to the allegations in Paragraph 166 of the SAC, and therefore denies them.

167.    In around December 2012, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 167 of the SAC.

168.     The packaging of *Post Honey Bunches of Oats Cereal – Raisin Medley* has made at least the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

    a.      "Our Post Promise | No High Fructose Corn Syrup"

    b.      "Heart Healthy"

    c.      Depictions of heart in circle

    d.      "a Touch of Honey!"

    e.      "A delicious, wholesome start to your day!"

    f.      "4 Wholesome Grains"

    g.      Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 168 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – Raisin Medley at various points in time. Post denies the remaining allegations in Paragraph 168 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

1    *4. With Pecan Bunches*

2       169.    The packaging of *Post Honey Bunches of Oats Cereal – With Pecan Bunches* that

3    was in use when the class period began is pictured below.



18      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the

19   allegations in Paragraph 169 of the SAC, and therefore denies them.

20       170.    In around August 2013, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 170 of the SAC.

171.    The packaging of *Post Honey Bunches of Oats Cereal – With Pecan Bunches* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

        a.    "Our Post Promise | No High Fructose Corn Syrup"

        b.    "Heart Healthy"

        c.    Depictions of heart in circle

        d.    "a Touch of Honey!"

        e.    "A delicious, wholesome start to your day!"

        f.    "4 Wholesome Grains"

        g.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 171 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – With Pecan Bunches at various points in time. Post denies the remaining allegations in Paragraph 171 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

### 5. *With Cinnamon Bunches*

172.    The packaging of *Post Honey Bunches of Oats Cereal – With Cinnamon Bunches* that was in use when the class period began is pictured below.



**<u>Answer</u>**: Post lacks sufficient knowledge or information to form a belief as to the allegations in Paragraph 172 of the SAC, and therefore denies them.

173.    In around November 2012, Post introduced the packaging pictured below.



**<u>Answer</u>**: Post admits the allegations in Paragraph 173 of the SAC.

174.   In around January 2015, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 174 of the SAC.

175.   In around October 2015, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 175 of the SAC.

176.   The packaging of *Post Honey Bunches of Oats Cereal – With Cinnamon Bunches* has made the following labeling claims suggesting, both individually and especially in the context

of the label as a whole, that the product is healthy:

      a.    "Our Post Promise | No High Fructose Corn Syrup"

      b.    "Heart Healthy"

      c.    Depictions of heart in circle

      d.    "a Touch of Honey!"

      e.    "A delicious, wholesome start to your day!"

      f.    "4 Wholesome Grains"

      g.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 176 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – With Cinnamon Bunches at various points in time. Post denies the remaining allegations in Paragraph 176 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

### 6. With Vanilla Bunches

177.    The packaging of *Post Honey Bunches of Oats Cereal – With Vanilla Bunches* that was in use when the class period began is pictured below.



**Answer**: Post lacks sufficient knowledge or information to form a belief as to the allegations in Paragraph 177 of the SAC, and therefore denies them.

178.    In around December 2012, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 178 of the SAC.

179.    In around October 2015, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 180 of the SAC.

180.    The packaging of *Post Honey Bunches of Oats Cereal – With Vanilla Bunches* has

made the following labeling claims suggesting, both individually and especially in the context of

the label as a whole, that the product is healthy:

      a.    "Our Post Promise | No High Fructose Corn Syrup"

      b.    "Heart Healthy"

      c.    Depictions of heart in circle

      d.    "a Touch of Honey!"

      e.    "A delicious wholesome start to your day!"

      f.    "4 Wholesome Grains"

      g.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 180 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – With Vanilla Bunches at various points in time. Post denies the remaining allegations in Paragraph 180 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

### 7. *With Apples & Cinnamon Bunches*

181.    Post introduced *Post Honey Bunches of Oats Cereal – With Apples & Cinnamon Bunches* in around September 2014. Its initial packaging is pictured below.



**Answer**: Post denies the allegations in Paragraph 181 of the SAC.

182.  In around October 2015, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 182 of the SAC.

183.  The packaging of *Post Honey Bunches of Oats Cereal – With Apples & Cinnamon Bunches* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

a.  "Our Post Promise | No High Fructose Corn Syrup"

b.  Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 183 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – With Apples & Cinnamon Bunches at various points in time. Post denies the remaining allegations in Paragraph 183 of the SAC.

**8. With Real Strawberries**

184.  The packaging of *Post Honey Bunches of Oats Cereal – With Real Strawberries* that was in use when the class period began is pictured below.



**Answer**: Post lacks sufficient knowledge or information to form a belief as to the allegations in Paragraph 184 of the SAC, and therefore denies them.

185.    In around November 2012, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 185 of the SAC.

186.    In around December 2014, Post introduced the packaging pictured below.



**Answer**: Post denies the allegations in Paragraph 186 of the SAC.

187.    In around October 2015, Post introduced the packaging pictured below.

**Answer**: Post admits the allegations in Paragraph 187 of the SAC.

188.    The packaging of *Post Honey Bunches of Oats Cereal – With Real Strawberries* has made the following labeling claims suggesting, both individually and especially in the context

of the label as a whole, that the product is healthy:

    a.    "Our Post Promise | No High Fructose Corn Syrup"

    b.    "Heart Healthy"

    c.    Depictions of heart in circle

    d.    "a Touch of Honey!"

    e.    "A delicious wholesome start to your day!"

    f.    "4 Wholesome Grains"

    g.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 188 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – With Real Strawberries at various points in time. Post denies the remaining allegations in Paragraph 188 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

### 9.  Fruit Blends – Banana Blueberry

189.    The packaging of *Post Honey Bunches of Oats Cereal – Fruit Blends – Banana Blueberry* that was in use when the class period began is pictured below.



**Answer**: Post admits the allegations in Paragraph 189 of the SAC.

190.    In around March 2013, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 190 of the SAC.

191.    The packaging of *Post Honey Bunches of Oats Cereal – Fruit Blends – Banana Blueberry* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

        a.     "Our Post Promise | No High Fructose Corn Syrup"

        b.     "Heart Healthy"

        c.     Depictions of heart in circle

        d.     "a Touch of Honey!"

        e.     "A delicious wholesome start to your day!"

        f.     "4 Wholesome Grains"

        g.     Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 191 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – Fruit Blends – Banana Blueberry at various points in time. Post denies the remaining allegations in Paragraph 191 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a

1  Touch of Honey!"

2  **_10. Fruit Blends – Peach Raspberry_**

3  192.  The packaging of _Post Honey Bunches of Oats Cereal – Fruit Blends – Peach_

4  _Raspberry_ that was in use when the class period began is pictured below.



16  **Answer**: Post admits the allegations in Paragraph 192 of the SAC.

17  193.  In around March 2013, Post introduced the packaging pictured below.



1    **Answer**: Post admits the allegations in Paragraph 193 of the SAC.

2    194.    The packaging of *Post Honey Bunches of Oats Cereal – Fruit Blends – Peach*

3    *Raspberry* has made the following labeling claims suggesting, both individually and especially in

4    the context of the label as a whole, that the product is healthy:

5         a.    "Our Post Promise | No High Fructose Corn Syrup"

6         b.    "Heart Healthy"

7         c.    Depictions of heart in circle

8         d.    "a Touch of Honey!"

9         e.    "A delicious wholesome start to your day!"

10        f.    "4 Wholesome Grains"

11        g.    Whole Grains Council Stamp

12    **Answer**: Post admits that the phrases quoted in Paragraph 194 of the SAC appeared on

13   certain versions of the packaging of Post Honey Bunches of Oats Cereal – Fruit Blends – Peach

14   Raspberry at various points in time. Post denies the remaining allegations in Paragraph 194 of the

15   SAC. Post further asserts that the Court has held the following statements non-actionable: "a

16   Touch of Honey!"

17   ***11. Tropical Blends – Mango Coconut***

18   195.    Post introduced *Post Honey Bunches of Oats Cereal – Tropical Blends – Mango*

19   *Coconut* in around September 2012.  The product's initial packaging is pictured below.

20

21

22

23

24

25

26

27

28



**Answer**: Post admits the allegations in Paragraph 195 of the SAC.

196.    In around March 2013, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 196 of the SAC.

197.    The packaging of *Post Honey Bunches of Oats Cereal – Tropical Blends –Mango Coconut* has made the following labeling claims suggesting, both individually and especially in

the context of the label as a whole, that the product is healthy:

     a.     "Our Post Promise | No High Fructose Corn Syrup"

     b.     "a Touch of Honey!"

     c.     "4 Wholesome Grains"

     d.     Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 197 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – Tropical Blends – Mango Coconut at various points in time. Post denies the remaining allegations in Paragraph 197 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a Touch of Honey!"

### *12. Whole Grain Honey Crunch*

198.     Post introduced *Post Honey Bunches of Oats Cereal – Whole Grain Honey Crunch* in around September 2014. The product's packaging is pictured below.



**Answer**: Post admits the allegations in Paragraph 198 of the SAC.

199.     The packaging of *Post Honey Bunches of Oats Cereal – Whole Grain Honey Crunch* has made the following labeling claims suggesting, both individually and especially in the

context of the label as a whole, that the product is healthy:

      a.    "Our Post Promise | No High Fructose Corn Syrup"

      b.    Heart design in "I" in "Whole Grain" name.

      c.    "**WHOLE GRAINS** – good for your **family**, good for your **health**, good for **you**."

      d.    "Honey Bunches of Oats Whole Grain Cereal has it all. . . . . Fiber fills you up, helps keep you satisfied and is important to help maintain digestive health. **Rich in nutrients**: Honey Bunches of Oats Whole Grain Cereal is rich in nutrients . . . important for moms-to-be and growing children. . . . Whole grains are an important part of a balanced diet, but on average, Americans eat less than 1 serving of whole grains per day."

      e.    "Staring your day with a bowl of Honey Bunches of Oats Whole Grain Cereal is a smart step toward eating a balanced diet."

      f.    Whole Grains Council Stamp

    <u>**Answer**</u>: Post admits that the phrases quoted in Paragraph 199 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – Whole Grain Honey Crunch at various points in time. Post denies the remaining allegations in Paragraph 199 of the SAC. Post further asserts that the Court has held the following statements non-actionable: " . . . good for your health . . ." and "Honey Bunches of Oats Whole Grain Cereal has it all. . . . . Fiber fills you up, helps keep you satisfied and is important to help maintain digestive health. Rich in nutrients: Honey Bunches of Oats Whole Grain Cereal is rich in nutrients . . . important for moms-to-be and growing children. . . . Whole grains are an important part of a balanced diet, but on average, Americans eat less than 1 serving of whole grains per day."

    ***13.  Whole Grain with Vanilla Bunches***

    200.    Post introduced *Post Honey Bunches of Oats Cereal – Whole Grain with Vanilla Bunches* in around September 2014. The product's packaging is pictured below.

1
2
3
4
5
6
7
8
9
10
11



12    **Answer**: Post admits the allegations in Paragraph 200 of the SAC.

13    201.    The packaging of *Post Honey Bunches of Oats Cereal – Whole Grain With Vanilla*

14  *Bunches* has made the following labeling claims suggesting, both individually and especially in

15  the context of the label as a whole, that the product is healthy:

16           a.    "Our Post Promise | No High Fructose Corn Syrup"

17           b.    Heart design in "I" in "Whole Grain" name.

18           c.    "**WHOLE GRAINS** – good for your **family**, good for your **health**, good

19  for **you**."

20           d.    "Honey Bunches of Oats Whole Grain Cereal has it all. . . . . Fiber fills you

21  up, helps keep you satisfied and is important to help maintain digestive health. **Rich in**

22  **nutrients**: Honey Bunches of Oats Whole Grain Cereal is rich in nutrients . . . important

23  for moms-to-be and growing children. . . . Whole grains are an important part of a balanced

24  diet, but on average, Americans eat less than 1 serving of whole grains per day."

25           e.    "Staring your day with a bowl of Honey Bunches of Oats Whole Grain

26  Cereal is a smart step toward eating a balanced diet."

27           f.    Whole Grains Council Stamp

28    **Answer**: Post admits that the phrases quoted in Paragraph 201 of the SAC appeared on

1    certain versions of the packaging of Post Honey Bunches of Oats Cereal – Whole Grain With

2    Vanilla Bunches at various points in time. Post denies the remaining allegations in Paragraph 201

3    of the SAC. Post further asserts that the Court has held the following statements non-actionable: "

4    . . . good for your health . . ." and "Honey Bunches of Oats Whole Grain Cereal has it all. . . . .

5    Fiber fills you up, helps keep you satisfied and is important to help maintain digestive health. Rich

6    in nutrients: Honey Bunches of Oats Whole Grain Cereal is rich in nutrients . . . important for

7    moms-to-be and growing children. . . . Whole grains are an important part of a balanced diet, but

8    on average, Americans eat less than 1 serving of whole grains per day."

9        ***14.   Greek Honey Crunch***

10       202.    Post introduced *Post Honey Bunches of Oats Cereal – Greek Honey Crunch* in

11   around March 2013. The product's packaging is pictured below.



25       **Answer**: Post denies the allegations in Paragraph 202 of the SAC.

26       203.    The packaging of *Post Honey Bunches of Oats Cereal – Greek Honey Crunch* has

27   made the following labeling claims suggesting, both individually and especially in the context of

28   the label as a whole, that the product is healthy:

1       a.     "Our Post Promise | No High Fructose Corn Syrup"

2       b.     "a touch of wildflower honey"

3       c.     "WHOLESOME NUTRITION"

4       d.     "GOODNESS AND TASTE IN EVERY BOWL"

5       e.     Whole Grains Council Stamp

6   **Answer**: Post admits that the phrases quoted in Paragraph 203 of the SAC appeared on

7   certain versions of the packaging of Post Honey Bunches of Oats Cereal – Greek Honey Crunch at

8   various points in time. Post denies the remaining allegations in Paragraph 203 of the SAC. Post

9   further asserts that the Court has held the following statements non-actionable: "a touch of

10   wildflower honey" and "GOODNESS AND TASTE IN EVERY BOWL."

11   ***15. Greek Mixed Berry***

12   204.    Post introduced *Post Honey Bunches of Oats Cereal – Whole Grain Honey Crunch*

13   (sic) in around March 2013. The product's packaging is pictured below.



26   **Answer**: Post admits the allegations in Paragraph 205 of the SAC.

27   205.    The packaging of *Post Honey Bunches of Oats Cereal – Greek Mixed Berry* has

28   made the following labeling claims suggesting, both individually and especially in the context of

the label as a whole, that the product is healthy:

        a.    "Our Post Promise | No High Fructose Corn Syrup"

        b.    "a touch of wildflower honey"

        c.    "WHOLESOME NUTRITION"

        d.    "GOODNESS AND TASTE IN EVERY BOWL"

        e.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 205 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Cereal – Greek Mixed Berry at various points in time. Post denies the remaining allegations in Paragraph 205 of the SAC. Post further asserts that the Court has held the following statements non-actionable: "a touch of wildflower honey" and "GOODNESS AND TASTE IN EVERY BOWL."

### 16. *Granola – Honey Roasted*

206.    Post introduced *Post Honey Bunches of Oats Granola – Honey Roasted* in around March 2013. The product's packaging is pictured below.




**Answer**: Post admits the allegations in Paragraph 206 of the SAC.

207.    The packaging of *Post Honey Bunches of Oats Granola – Honey Roasted* has made at least the following labeling claims suggesting, both individually and especially in the context of

the label as a whole, that the product is healthy:

a.      "[I]t's the perfect combination of wholesome goodness and honey-sweet crunch that everyone in your entire family will love."

b.      Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 207 of the SAC appeared on certain versions of the packaging of Post Honey Bunches of Oats Granola – Honey Roasted at various points in time. Post denies the remaining allegations in Paragraph 207 of the SAC.

**17.  *Granola – Raspberry & Cinnamon***

208.    The packaging of *Post Honey Bunches of Oats Granola – Raspberry and Cinnamon* are pictured below.




**Answer**: Post admits the allegations in Paragraph 209 of the SAC.

209.    The packaging of *Post Honey Bunches of Oats Granola – Raspberry and Cinnamon* have made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the products are healthy:

    a.    "[I]t's the perfect combination of wholesome goodness and honey-sweet crunch that everyone in your entire family will love."

1        b.     Whole Grains Council Stamp

2       <u>**Answer**</u>: Post admits that the phrases quoted in Paragraph 209 of the SAC appeared on

3    certain versions of the packaging of Post Honey Bunches of Oats Granola – Raspberry and

4    Cinnamon at various points in time. Post denies the remaining allegations in Paragraph 209 of the

5    SAC.

6         ***18.  Protein Granola with Dark Chocolate***

7        210.    The packaging of *Post Honey Bunches of Oats Protein Granola with Dark*

8    *Chocolate* is depicted below.



16       <u>**Answer**</u>: Post admits the allegations in Paragraph 210 of the SAC.

17        211.    The packaging of *Post Honey Bunches of Oats Protein Granola with Dark*

18    *Chocolate* and *Cinnamon* has made at least the following labeling claims suggesting, both

19    individually and especially in the context of the label as a whole, that the product is healthy:

20          a.    "HELPS FUEL YOUR BODY WITH SUSTAINED ENERGY"

21          b.    "just a touch of wildflower honey"

22          c.    Whole Grains Council Stamp

23       <u>**Answer**</u>: Post admits that the phrases quoted in Paragraph 211 of the SAC appeared on

24    certain versions of the packaging of Post Honey Bunches of Oats Protein Granola with Dark

25    Chocolate and Cinnamon at various points in time. Post denies the remaining allegations in

26    Paragraph 211 of the SAC. Post further asserts that the Court has held the following statements

27    non-actionable: "just a touch of wildflower honey."

28

1  **C.      Post Shredded Wheat Cereal**

2      *1. Honey Nut*

3      212.    The packaging of *Post Shredded Wheat Honey Nut* that was in use when the class

4  period began is pictured below.



17      <u>**Answer**</u>: Post admits the allegations in Paragraph 212 of the SAC.

18      213.    In around November 2012, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 213 of the SAC.

214.   In around March 2017, Post introduced the packaging pictured below.



**Answer**: Post denies the allegations in Paragraph 214 of the SAC.

215.   The packaging of *Post Shredded Wheat Honey Nut* has made at least the following labeling claims suggesting, both individually and especially in the context of the label as a whole,

that the product is healthy:

      a.     "May Help Reduce the Risk of Heart Disease" and depiction of heart.

      b.     "AN INGREDIENT LIST THAT IS SO GOOD, WE HAVE NOTHING TO HIDE."

      c.     "Wouldn't it be great if it were easy to understand what is in your food?With Post Shredded Wheat, it's easy to be confident with your breakfast choice. It is made with nothing but goodness, so go ahead and enjoy a bowl."

      d.     "We make it easy to understand what is in your food—we start with the goodness of whole grain wheat."

      e.     "We make it easy to understand what is in your food—it's just the wholesome goodness of whole grain wheat."

      f.     "Our flavor comes from 100% whole grain wheat, honey, almonds, molasses and real sugar. That means vitamin and mineral fortified Post Shredded Wheat Honey Nut contains no High fructose corn syrup or artificial ingredients."

      g.     "No Sugar* [ ] Added: Our flavor comes from 100% whole grain wheat, nothing else. That means Post Shredded Wheat . . . has 0 grams of sugars per serving."

      h.     "Natural source of fiber."

      i.     "Bite-sized health tip."

      j.     "Post Shredded Wheat is one of the simple things you can do to feel good each day."

      k.     "THE BISCUIT OF BENEFITS / Post Shredded Wheat Honey Nut is made with 100% whole grain wheat, for a natural source of fiber. . . . So what does this mean in terms of health benefits for you? They are so plentiful, the cereal could be renamed Biscuit of Benefits!"

      l.     "**Heart Health**"

      m.     "**Digestive Health**: Diets rich in fiber have many benefits and are important for maintaining digestive health."

      n.     "**Reduced Cancer Risk**"

1          o.          Whole Grains Council Stamp

2     **Answer**: Post admits that the phrases quoted in Paragraph 215 of the SAC appeared on

3   certain versions of the packaging of Post Shredded Wheat Honey Nut at various points in time.

4   Post denies the remaining allegations in Paragraph 215 of the SAC. Post further asserts that the

5   Court has held the following statements non-actionable: "No Sugar* [ ] Added: Our flavor comes

6   from 100% whole grain wheat, nothing else. That means Post Shredded Wheat . . . has 0 grams of

7   sugars per serving," "Natural source of fiber," and **Reduced Cancer Risk.**"

8     ***2.  Crunch!***

9     216.    Post introduced *Post Shredded Wheat Crunch!* in around September 2014. The

10   product's packaging is pictured below.



23     **Answer**: Post admits the allegations in Paragraph 216 of the SAC.

24     217.    The packaging of *Post Shredded Wheat Crunch!* has made the following labeling

25   claims suggesting, both individually and especially in the context of the label as a whole, that the

26   product is healthy:

27          a.          "POST SHREDDED WHEAT CRUNCH MAY HELP REDUCE THE

28          RISK OF HEART DISEASE"

1           b.    "Post Shredded Wheat CRUNCH combines bite sized 100% natural whole

2 grain wheat with granola cluster crunch for delicious heart healthy satisfaction.

3 <u>GOODNESS YOU CAN TASTE</u>!"

4           c.      Whole Grains Council Stamp

5 **<u>Answer</u>**: Post admits that the phrases quoted in Paragraph 217 of the SAC appeared on

6 certain versions of the packaging of Post Shredded Wheat Crunch! at various points in time. Post

7 denies the remaining allegations in Paragraph 217 of the SAC. Post further asserts that the Court

8 has held the following statements non-actionable: "Post Shredded Wheat CRUNCH combines bite

9 sized 100% natural whole grain wheat with granola cluster crunch for delicious heart healthy

10 satisfaction. GOODNESS YOU CAN TASTE!"

11 **D.**    **Post Single Cereals**

12     *1. Raisin Bran*

13     218.    The packaging of *Post Raisin Bran* that was in use when the class period began is

14 pictured below.



27     **<u>Answer:</u>**  Post lacks sufficient knowledge or information to form a belief as to the

28 allegations in Paragraph 218 of the SAC, and therefore denies them.

219.    In around January 2013, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 219 of the SAC.

220.    In around March 2015, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 220 of the SAC.

1    221.    In around January 2017, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 221 of the SAC.

222.    The packaging of *Post Raisin Bran* has made at least the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

a.    "contains NO HIGH FRUCTOSE Corn Syrup"

b.    "No High Fructose Corn Syrup"

c.    "Healthy"

d.    "Nutritious"

e.    "Where nutritious and delicious live in harmony"

f.    "NATURAL ADVANTAGE"

g.    "Fiber is good for digestive health"

h.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 222 of the SAC appeared on certain versions of the packaging of Post Raisin Bran at various points in time. Post denies the remaining allegations in Paragraph 222 of the SAC. Post further asserts that the Court has held the

1  following statements non-actionable: "NATURAL ADVANTAGE."

2  **2. Bran Flakes**

3  223.    The packaging of *Post Bran Flakes* is depicted below.



16  **Answer**: Post admits the allegations in Paragraph 223 of the SAC.

17  224.    The packaging of *Post Bran Flakes* has made the following labeling claims

18  suggesting, both individually and especially in the context of the label as a whole, that the product

19  is healthy:

20          a.      "DIETARY FIBER TO HELP MAINTAIN DIGESTIVE HEALTH"

21          b.      "Contains no high fructose corn syrup"

22          c.      "THE IMPORTANCE OF WHOLE GRAIN AND FIBER"

23          d.      "WHOLE GRAINS FOR YOUR HEALTHY LIFESTYLE"

24          e.      "Whole grains provide fiber and other important nutrients to help keep you

25  healthy."

26          f.      "Getting enough fiber in your diet helps naturally regulate your digestive

27  system. Choose a diet rich in a variety of fiber containing foods such as whole grain

28  cereals, breads, and pastas and fruits and vegetables."

1     g.     "FIBER TO HELP WITH WEIGHT MANAGEMENT"

2     h.     "Experts recommend diets rich in fiber to help keep you satisfied while you

3     exercise and cut calories to lose weight. Diets rich in fiber are usually lower in calories and

4     larger in volume than low fiber diets, and require more chewing which helps promote a

5     feeling of fullness and satisfaction after eating."

6     i.     Whole Grains Council Stamp

7     **Answer**: Post admits that the phrases quoted in Paragraph 224 of the SAC appeared on

8     certain versions of the packaging of Post Bran Flakes at various points in time. Post denies the

9     remaining allegations in Paragraph 224 of the SAC.

10    **3.  Alpha-Bits**

11    225.    Post first introduced Alpha-Bits—cereal shaped like letters—in 1958.

12    **Answer**: Post admits the allegations in Paragraph 225 of the SAC.

13    226.    In around July 2012, Post entered into a deal to use characters from a PBS Kids

14    show, "*Super Why*," on the product's packaging. The packaging of *Post Alpha-Bits* that was in use

15    when the class period started is pictured below.



**Answer**: Post denies the allegations in Paragraph 226 of the SAC.

227.    In around December 2016, Post introduced the packaging pictured below.



**Answer**: Post admits the allegations in Paragraph 227 of the SAC.

228.    The packaging of *Post Alpha-Bits* has made at least the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

   a.    "NO HIGH FRUCTOSE CORN SYRUP"

   b.    "ALPHA-BITS IS A GOOD SOURCE OF NUTRIENTS THAT ARE BUILDING BLOCKS FOR YOUR CHILD'S DEVELOPING BRAIN"

   c.    "Makes a Smart Snack!"

   d.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 228 of the SAC appeared on certain versions of the packaging of Post Alpha-Bits at various points in time. Post denies the remaining allegations in Paragraph 228 of the SAC.

**4. *Honeycomb***

229.    The packaging of *Post Honeycomb* that was in use when the class period began is pictured below.



**<u>Answer</u>**: Post admits the allegations in Paragraph 229 of the SAC.

230.    In around December 2012, Post introduced the packaging pictured below.



**<u>Answer</u>**: Post admits the allegations in Paragraph 230 of the SAC.

231.    The packaging of *Post Honey-Comb* has made the following labeling claims, through at least around January of 2017, suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

a.    "Nutritious" (in "Nutritious Sweetened Corn & Oat Cereal")

b.    "Why Vitamin D? – Many kids are not getting enough Vitamin D; - Important for a growing child's health needs; - Promotes healthy bones and teeth by helping the body absorb calcium"

c.    "Each Serving Helps Start the Day in a HEALTHY Way"

d.    Whole Grains Council Stamp

**Answer**: Post admits that the phrases quoted in Paragraph 231 of the SAC appeared on certain versions of the packaging of Post Honey-Comb at various points in time. Post denies the remaining allegations in Paragraph 231 of the SAC.

### 5. *Waffle Crisp*

232.    The packaging of *Post Waffle Crisp* is pictured below.



**Answer**: Post admits the allegations in Paragraph 232 of the SAC.

233. The packaging of *Post Waffle Crisp* has made the following labeling claims suggesting, both individually and especially in the context of the label as a whole, that the product is healthy:

        a.       "NO HIGH FRUCTOSE CORN SYRUP!"

        b.       "Iron & Zinc for Growth"

**Answer**: Post admits that the phrases quoted in Paragraph 233 of the SAC appeared on certain versions of the packaging of Post Waffle Crisp at various points in time. Post denies the remaining allegations in Paragraph 233 of the SAC.

## POST'S UNLAWFUL ACTS AND PRACTICES

A.    **Post Marketed and Continues to Market its Cereals with Health and Wellness Claims that are Deceptive in Light of the Cereals' High Sugar Content**

    1.    **Post Affirmatively Misrepresents that Some High-Sugar Cereals are "Healthy," "Nutritious," or "Wholesome"**

234.    Consumers interpret the words "nutritious" and "wholesome" to mean the same thing as, or to be euphemisms for, "healthy."

**Answer**: Post denies the allegations in Paragraph 234 of the SAC.

235.    In using these words in the manner described herein, Post also intends consumers to interpret "nutritious" and "wholesome" to mean healthy.

**Answer**: Post denies the allegations in Paragraph 235 of the SAC.

236.    Although in some cases, Post's labeling claims for its cereals are suggestive that they are healthy, in other cases, Post directly represents this is true by calling at least the following cereals "healthy," "nutritious," or "wholesome":

        a.      *Post Great Grains Blueberry Morning* ("Less processed nutrition you can see," "nutritious Blueberries," and "nutritious fruits and nuts")

        b.      *Post Great Grains Cranberry Almond Crunch* ("Less processed nutrition you can see," "nutritious Cranberries," "wholesome Almonds," "nutritious fruits and nuts," and "nutritious ingredients in every bite!")

        c.      *Post Great Grains Banana Nut Crunch* ("Less processed nutrition you can

see," "wholesome Walnuts," "wholesome Almonds," "nutritious fruits and nuts,"

"wholesome walnuts and almonds," and "nutritious ingredients in every bite!")

        d.     *Post Great Grains Raisins, Dates & Pecans* ("Less processed nutrition you

can see," "wholesome Pecans," "naturally nutritious Raisins & Dates," "We gently steam,

roll and bake our whole grains to help maintain the full flavor and nutrition of our flakes,"

"nutritious fruits and nuts," and "nutritious ingredients in every bite!")

        e.     *Post Great Grains Crunchy Pecans* ("Less processed nutrition you can see,"

wholesome Pecans," "We gently steam, roll and bake our whole grains to help maintain

the full flavor and nutrition of our flakes," "nutritious fruits and nuts," and "nutritious

ingredients in every bite!"

        f.     *Post Great Grains Blueberry Pomegranate* ("Less processed nutrition you

can see," "nutritious Blueberries," "We gently steam, roll and bake our whole grains to

help maintain the full flavor and nutrition of our flakes," "nutritious fruits and nuts," and

"nutritious ingredients in every bite!")

        g.     *Post Great Grains Protein Blend: Honey, Oats & Seeds* ("HELPS

SUPPORT A HEALTHY METABOLISM," "wholesome Almonds," "nutritious Pumpkin

Seeds," "nutritious nuts and seeds," "nutritious ingredients in every bite!," and "the less

processed whole grain nutrition of Great Grains Protein Blend")

        h.     *Post Great Grains Protein Blend: Cinnamon Hazelnut* ("HELPS SUPPORT

A HEALTHY METABOLISM," "wholesome Almonds," "nutritious Hazelnuts,"

"nutritious nuts," "wholesome hazelnuts, almonds, and multi grain clusters," "nutritious

ingredients in every bite!," and "the less processed whole grain nutrition of Great Grains

Protein Blend")

        i.     *Post Honey Bunches of Oats – Honey Roasted, With Almonds, Raisin*

*Medley, With Pecan Bunches, With Cinnamon Bunches, With Vanilla Bunches, With Real*

*Strawberries, Fruit Blends – Banana Blueberry, Fruit Blends – Peach Raspberry* ("Heart

Healthy," heart depictions, "4 Wholesome Grains," and "A delicious, wholesome start to

your day!")

1        j.       *Post Honey Bunches of Oats – Tropical Blends – Mango Coconut* ("4

2    Wholesome Grains")

3        k.       *Post Honey Bunches of Oats – Whole Grain Honey Crunch and Whole

4    Grain with Vanilla Bunches* (Heart design in "I" in "Whole Grain" name, "good for your

5    family, good for your health, good for you," "important to help maintain digestive health,"

6    and "rich in nutrients.")

7        l.       *Post Honey Bunches of Oats – Greek Honey Crunch and Greek Mixed

8    Berry* ("WHOLESOME NUTRITION")

9        m.      *Post Honey Bunches of Oats Granola – Honey Roasted, Raspberry, and

10   Cinnamon* ("wholesome goodness")

11       n.       *Post Shredded Wheat Honey Nut* ("Bite-sized health tip," "Heart Health,"

12   "May Help Reduce the Risk of Heart Disease," "Digestive Health," "important for

13   maintaining digestive health," "what does that mean in terms of health benefits for you?

14   They are so plentiful, the cereal could be renamed Biscuit of Benefits!")

15       o.       *Post Shredded Wheat Crunch!* ("heart healthy")

16       p.       *Post Raisin Bran* ("Healthy," "Nutritious," "Where nutritious and delicious

17   live in harmony," and "good for digestive health")

18       q.       *Post Bran Flakes* ("HELP MAINTAIN DIGESTIVE HEALTH," "FOR

19   YOUR HEALHTY LIFESTYLE," and "important nutrients to help keep you healthy")

20       r.       *Honey-Comb* ("Promotes healthy bones and teeth" and "Helps Start the Day

21   in a HEALTHY Way")

22   **Answer**: Post admits that, at various points in time, the statements quoted in Paragraph

23   236 of the SAC appeared on certain of its products. Post denies the remaining allegations in

24   Paragraph 236 of the SAC. Post further asserts that the Court has held that the following

25   statements referenced in Paragraph 236 of the SAC are non-actionable: "important to maintain

26   digestive health" and "rich in nutrients" on *Honey Bunches of Oats –Whole Grain Honey Crunch*

27   and *Honey Bunches of Oats – Whole Grain with Vanilla Bunches*, and "Helps Start the Day in a

28   HEALTHY Way" on *Honey-Comb*. Post further asserts that Plaintiffs have abandoned any claims

based on the statement "good for your health" on *Honey Bunches of Oats –Whole Grain Honey Crunch* and *Honey Bunches of Oats – Whole Grain with Vanilla Bunches* in their response to Post's motion to dismiss the SAC.

237.    Statements that these cereals are "healthy," "nutritious," and "wholesome" are false, or at least highly misleading, because, due to their high added sugar content, consumption of these cereals is decidedly unhealthy, and the consequences of consuming the products—increased risk for, and in some cases contraction of chronic disease—are incompatible with Post's representations that the cereals are "healthy," "nutritious," and "wholesome."

**Answer**: Post denies the allegations in Paragraph 237 of the SAC.

**2.    Post Affirmatively Misrepresents that Consuming Some of its High-Sugar Cereals Will Promote Bodily Health, Prevention of Disease, or Weight Loss**

238.    In some cases, Post falsely represents that its high-sugar cereals are effective in promoting bodily health and preventing disease.

**Answer**: Post denies the allegations in Paragraph 238 of the SAC.

239.    Post employs such a misleading tactic with respect to its *Post Great Grains Protein Blend: Honey, Oats & Seeds* and *Cinnamon Hazelnut* cereals, expressly and affirmatively representing that consumption of the cereals will promote weight loss.

Specifically, Post states:

> "The process of metabolism establishes the rate at which we burn our calories and, ultimately, how quickly we gain weight or how easily we lose it. Although some factors affecting metabolic rate, like age and genetics can't be changed, there are ways to maximize your metabolism." **Breakfast:** Eat breakfast. . . . Start your day with the less processed whole grain nutrition of Great Grains Protein Blend to help jumpstart your metabolism. **Protein:** Eat protein. Did you know that protein generally requires about 25% more energy to digest? Because protein takes longer to breakdown than fat and carbohydrate, the body uses more energy to digest protein and this helps you burn more calories. . . . Great Grains Blend can actually help enhance your metabolism! [ . . . ] **Fiber:** Consume fiber. Diets rich in fiber help keep you fuller longer which is important for weight management. Great Grains Protein Blend can help keep you satisfied with the staying power of an excellent source of fiber."

**Answer**: Post admits the language quoted in Paragraph 239 of the SAC appeared on its *Great Grains Protein Blend: Honey, Oats & Seeds* and *Great Grains Protein Blend: Cinnamon Hazelnut* cereals. Post denies the remaining allegations in Paragraph 239. Post further asserts that

the Court has held the following statements referenced in Paragraph 239 of the SAC to be non-actionable: "As a good source of protein, Great Grains Blend can actually help enhance your metabolism!" and "Fiber: Consume fiber. Diets rich in fiber help keep you fuller longer which is important for weight management. Great Grains Protein Blend can help keep you satisfied with the staying power of an excellent source of fiber."

240.    Post's representation that consumption of *Post Great Grains Protein Blend: Honey, Oats & Seeds* and *Cinnamon Hazelnut* cereals will promote weight loss is false, or at least highly misleading because the cereals contain 9g of added sugar per serving, accounting for approximately 16% of the products' calories—which is more than 300% the AHA's recommended maximum of 5% of calories from added sugar. Moreover, a single serving of *Post Great Grains Protein Blend: Honey, Oats & Seeds* or *Cinnamon Hazelnut* cereal accounts for more than 23% of men's, and 36% of women's maximum AHA-recommended daily added sugar intake.

**Answer**: Post admits that *Great Grains Protein Blend: Honey, Oats & Seeds* and *Great Grains Protein Blend: Cinnamon Hazelnut* contained 9 grams of added sugar per serving and approximately 16% of each cereal's calories per serving derive from added sugar, but notes that the product labels and nutritional information Post produced to Plaintiffs constitutes the best and most accurate evidence of the products' added sugar content. Post denies the remaining allegations in Paragraph 240 of the SAC. Furthermore, Post asserts that Paragraph 240 of the SAC erroneously assumes that the AHA has recommended a 5% threshold of calories from added sugar in any one serving of food and that AHA has recommended an across-the-board 5% threshold for added sugar intake.

241.    For these reasons, regular consumption of *Post Great Grains Protein Blend: Honey, Oats & Seeds* or *Cinnamon Hazelnut* cereals is highly likely to contribute to excess added sugar consumption, and thereby increased risk for, and actual contraction of, chronic disease, substantially harming both the human digestive system and overall human health.

**Answer**: Post denies the allegations in Paragraph 241 of the SAC.

242.    Moreover, because of the products' high added sugar content, their consumption is likely to promote weight *gain*, not weight loss.

1        **Answer**: Post denies the allegations in Paragraph 242 of the SAC.

2        243.     Post makes a similar misrepresentation with respect to its *Bran Flakes* cereal,

3   stating "FIBER TO HELP WITH WEIGHT MANAGEMENT," and explaining that "Experts

4   recommend diets rich in fiber to help keep you satisfied while you exercise and cut calories to lose

5   weight." Similar to Post's *Great Grain Protein Blend* cereals, however, 20% of *Bran Flakes'*

6   calories come from its added sugar, such that it is likely to contribute to weight *gain*, not weight

7   loss.

8        **Answer**: Post admits that the language quoted in Paragraph 243 of the SAC appeared on

9   its Bran Flakes cereal and that approximately 20% of its calories per serving derive from added

10  sugar, but notes that the product labels and nutritional information Post produced to Plaintiffs

11  constitutes the best and most accurate evidence of the products' added sugar content. Post denies

12  the remaining allegations in Paragraph 243 of the SAC.

13       244.     In several cases, Post misrepresents that certain cereals are heart healthy, including

14  various *Honey Bunches of Oats* and *Shredded Wheat* varieties.

15       **Answer**: Post denies the allegations in Paragraph 244 of the SAC.

16       **3.       Even When Not Stating So Expressly, Post Strongly Suggests Its High-Sugar**

17                  **Cereals are Healthy**

18       245.     Besides direct, express claims that some of its cereals are "healthy," "nutritious,"

19  and "wholesome," Post also conveys this same idea through suggestion.

20       **Answer**: Post denies the allegations in Paragraph 245 of the SAC.

21                  **a.       Post Touts Its High-Sugar Cereals' Whole Grain, Fiber, and "Real"**

22                             **Ingredient Content to Distract From Their High Added Sugar Content**

23       246.     A major strategy Post employs is "calling out" the supposedly beneficial aspects of

24  its cereals, and particularly their whole (or multi) grain, fiber, or "real" ingredient content.

25       **Answer**: Post admits that, at certain times, its labeling on certain products and its

26  marketing materials truthfully highlight the inclusion of whole grain, fiber, and real fruit or nuts in

27  certain products. Post denies the remaining allegations in Paragraph 246 of the SAC.

28       247.     In emphasizing the supposedly beneficial nutrients or other aspects of its cereals,

- 130 -

Post necessarily and intentionally also de-emphasizes, hides, obscures, and otherwise omits material information regarding the products' detrimental nutrient content, and specifically their high added sugar content.

**Answer**: Post denies the allegations in Paragraph 247 of the SAC.

        **b.**        **Post Leverages a Deceptive Industry "Certification" Program—the Whole Grains Council Stamp—to Make its High-Sugar Cereals Seem Healthy**

248.    Many of Post's cereals bear a stamp of the Whole Grains Council like that pictured below.



**Answer**: Post admits that certain of its products, at various times, feature a Whole Grain Stamp stating the number of grams of whole grains per serving and the website for the Whole Grains Council, similar to but not necessarily identical with the picture in Paragraph 248 of the SAC. Post denies all remaining allegations in Paragraph 248 of the SAC.

249.    The Whole Grains Council was formed in 2003 and holds itself out as a purported "nonprofit *consumer advocacy* group."[91]

**Answer**: Post admits that the website cited in footnote 91 to Paragraph 249 of the SAC states that the Whole Grains Council is a nonprofit consumer advocacy group formed in April 2002 by a group of millers, manufacturers, scientists, and chefs. Post lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 249 of the SAC and therefore denies them.

---

[91] *See* http://wholegrainscouncil.org/about-us.

1        250.    Its membership, however, is comprised not of consumers or their advocates, but

2 primarily of hundreds of food manufacturers, like Cargill, ConAgra, Domino's Pizza, Frito-Lay,

3 General Mills, Heinz, Hostess, Kellogg, Kraft, McDonald's, Nestle, Quaker, Smucker, and of

4 course, Post.

5        **Answer**: Post admits that several food manufacturers, including Post's parent Post

6 Consumer Brands, LLC ("PCB"), are members of the Whole Grains Council. Post lacks sufficient

7 knowledge or information to form a belief as to the truth of the allegations regarding the other

8 specified food manufacturers' membership in the Whole Grains Council, and therefore denies

9 these allegations. Post denies all remaining allegations in Paragraph 250 of the SAC.

10        251.    The Whole Grain's Council stamp is frequently misused by food manufacturer-

11 members—including by Post in this case—to bolster claims that foods are supposedly healthy, by

12 suggesting that an independent, perhaps governmental authority has determined a food is healthy

13 or otherwise sanctioned its health and wellness claims.

14        **Answer**: Post denies the allegations in Paragraph 251 of the SAC as they relate to Post.

15 Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations

16 regarding other food manufacturers, and therefore denies these allegations.

17        252.    In order to use a Whole Grains Council Stamp, though, a food need only contain a

18 minimum of 8g whole grain, and there are no disqualifying criteria. Accordingly, high-sugar foods

19 can, and frequently do display the Whole Grains Council Stamp.

20        **Answer**: Post admits that the only requirement to bear the Basic Whole Grains Stamp is

21 that the food contains at least 8 grams of whole grain per serving, and thus foods with sugar can

22 display the Whole Grains Stamp as long as they contain at least 8 grams of whole grain per

23 serving. Post denies all remaining allegations in Paragraph 252 of the SAC.

24        253.    This is true of many of Post's cereals, and the use of the stamp is deceptive because

25 it implies independent verification that the cereals are healthy, despite that the Whole Grains

26 Council is an industry group, and that Post's cereals contain such high amounts of added sugar

27 that they remain unhealthy choices notwithstanding their whole grain content.

28        **Answer**: Post denies the allegations in Paragraph 253 of the SAC.

c.      **In Representing that Many of Its High-Sugar Cereals Contain "No High Fructose Corn Syrup," Post Leverages Consumer Confusion to Obscure the Dangers of the Added Sugar in its Cereals**

254.    Post has capitalized on consumer aversion toward high fructose corn syrup by touting the absence of that ingredient, deceptively suggesting that its cereals are healthier because HFCS is absent.

**Answer**: Post denies the allegations in Paragraph 254 of the SAC.

255.    This strategy leverages consumer confusion over the relative dangers of different forms of sugar, inasmuch as many consumers incorrectly believe that HFCS is a substantially more dangerous form of added sugar than other forms.

**Answer**: Post denies the allegations in Paragraph 255 of the SAC.

256.    Some consumers also incorrectly believe there are "healthy" forms of added sugar, for example honey, "cane sugar," or "natural" sugars. Conversely, many consumers are not even aware that some more obscure ingredients are added sugars, such as Evaporated Cane Juice (the use of which the FDA has said is deceptive), Glycerin, and fruit and fruit juice "concentrates." Many consumers also have no idea what invert sugar is, or that it is sucrose that has been broken into free glucose and free fructose, and thus is extremely similar to HFCS, despite that it is used in several Post cereals.

**Answer**: Post admits that invert sugar is an ingredient in some of its cereals. Post lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in Paragraph 256 of the SAC, and therefore denies them.

257.    In reality, added sugar in virtually any form contains toxic fructose, and thus has essentially the same detrimental health effects, with typically only minor differences in the ratio of fructose to glucose in a given form of added sugar. Thus, even if literally true, Post's "no high fructose corn syrup" representations are highly misleading.

**Answer**: Post denies the allegations in Paragraph 257 of the SAC.

d.      **Post Falsely Markets Some of Its High-Sugar Cereals as "Simple," "Whole Foods" that Are "Less Processed"**

258.    To capitalize on increasing consumer preference for fresh, unprocessed, "whole" foods, Post affirmatively misrepresents that several of its cereals have this characteristic.

**Answer**: Post denies the allegations in Paragraph 258 of the SAC.

259.    Specifically, Post represents that its *Great Grains Blueberry Morning*, *Cranberry Almond Crunch*, *Banana Nut Crunch*, *Raisins, Dates & Pecans*, *Crunchy Pecans*, and *Blueberry Pomegranate* cereals are "Less processed nutrition you can see," explaining, "Why less processed? Quite simply, because it's good for you!"

**Answer**: Post admits that, at various points in time, the statements quoted in Paragraph 259 of the SAC appeared on labels for *Great Grains Blueberry Morning*, *Great Grains Cranberry Almond Crunch*, *Great Grains Banana Nut Crunch*, *Great Grains Raisins Dates & Pecans*, *Great Grains Crunchy Pecans*, and *Great Grains Blueberry Pomegranate*. Post denies any remaining allegations in in Paragraph 259 of the SAC.

260.    Post similarly represents its *Great Grains Protein Blend: Honey, Oats & Seeds* cereal is "less processed whole grain nutrition," while its *Great Grains Protein Blend:Cinnamon Hazelnut* is both "less processed whole grain nutrition," and "less processed whole grain cereal," with Post stating, "Why less processed? Quite simply because it's good for you!"

**Answer**: Post admits that the phrases "less processed whole grain nutrition" and "Why less processed? Quite simply because it's good for you!" appeared on its *Great Grains Protein Blend: Honey, Oats & Seeds* and *Great Grains Protein Blend: Cinnamon Hazelnut* cereals, and admits that the phrase "less processed whole grain cereal" appeared on its *Great Grains Protein Blend: Cinnamon Hazelnut* cereal. Post denies any remaining allegations in in Paragraph 260 of the SAC.

261.    Most of these *Great Grains* cereals' packaging also states, "It's whole foods from the field to your bowl."

**Answer**: Post admits that, at various points in time, the statement quoted in Paragraph 261 of the SAC appeared on some of its *Great Grains* cereals. Post denies all remaining allegations in Paragraph 261 of the SAC.

262.    These statements are false or at least highly misleading. First, *Post Great Grains* cereals containing blueberries are sweetened with invert sugar and glycerin, two highly-processed

1  forms of added sugar, while all Great Grains cereals are sweetened with sugar and brown sugar,

2  and sometimes glycerin or juice concentrates, which are also highly-processed sweeteners.

3      **Answer**: Post admits that its *Great Grains* cereals contain sugar and brown sugar as

4  ingredients, and admits that *Great Grains Blueberry Morning* and *Great Grains Blueberry*

5  *Pomegranate* contain invert sugar and glycerin, but notes that the product labels and nutritional

6  information Post produced to Plaintiffs constitutes the best and most accurate evidence of the

7  products' ingredients. Post denies all remaining allegations in Paragraph 262 of the SAC.

8      263.   Second, because these statements suggest *Great Grains* cereals are healthy food

9  options, the statements are false, or at least highly misleading, due to the cereals' high added sugar

10 content.

11     **Answer**: Post denies the allegations in Paragraph 263 of the SAC.

12         **e.   Post Deceptively Omits, Intentionally Distracts From, and Otherwise**

13             **Downplays the Cereals' High Added Sugar Content**

14     264.   In marketing its cereals with health and wellness claims, Post regularly and

15 intentionally omits material information regarding the amount and dangers of the added sugars in

16 its products. Post is under a duty to disclose this information to consumers because (a) Post is

17 revealing *some* information about its products—enough to suggest they are healthy—without

18 revealing additional material information, (b) Post's deceptive omissions concern human health,

19 and specifically the detrimental health consequences of consuming its products, (c) Post was, and

20 is, in a superior position to know of the dangers presented by the sugars in its cereals, as it is a

21 global food company whose business depends upon food science and policy, and (d) Post actively

22 concealed material facts not known to plaintiff and the class.

23     **Answer**: Post denies the allegations in Paragraph 264 of the SAC.

24     265.   Moreover, in marketing its cereals, Post regularly affirmatively uses certain words

25 and phrases to falsely suggest their sugar content is low.

26     **Answer**: Post denies the allegations in Paragraph 265 of the SAC.

27     266.   For example, Post's representation that many varieties of *Honey Bunches of Oats*

28 *Cereal* contain just "a Touch of Honey!" are false and misleading, where the products contain as

1   much as 12g of sugar per serving (*Post Honey Bunches of Oats Cereal – With Vanilla Bunches*),

2   and the added sugar generally accounts for 20% or more of the products' calories, since reasonable

3   consumers would expect a cereal supposedly sweetened with just a "touch" of honey to be

4   relatively low in sugar.

5       **Answer**: Post denies the allegations in Paragraph 266 of the SAC. Post further asserts that

6   the Court has held that the phrase "a Touch of Honey!" is non-actionable puffery.

7       267.    These claims are false and misleading because the products' added sugar content is

8   high, not low. Such statements are likely to confuse even consumers aware of health issues

9   regarding sugar, because they suggest any such health issues, in any event, do not pertain to these

10   cereals sweetened with only a "touch" or "kiss" of honey.

11       **Answer**: Post denies the allegations in Paragraph 267 of the SAC. Post further asserts that

12   the Court has held that the phrase "a touch of honey" and similar statements are non-actionable

13   puffery.

14       **4.    Post Immorally Markets Some High-Sugar Cereals to Children, Who Are the**

15              **Most Vulnerable to the Dangers of Excess Added Sugar Consumption**

16       268.    Post markets some of its cereals either directly to children, or to parents, as *for* their

17   children. In some cases, these cereals are among the highest in sugar that Post offers.

18       **Answer**: Post admits that it markets some of its cereals primarily for children. Post denies

19   the remaining allegations in Paragraph 268 of the SAC. Post further asserts that Plaintiffs have

20   conceded that statements directed to children are not independently actionable. (Dkt. 88 at 38

21   n.37).

22       269.    For example, Post markets *Honey-Comb* cereal by stating that "Many kids are not

23   getting enough Vitamin D," and representing that the cereal's Vitamin D content is "Important for

24   a grown child's health needs," and "Promotes healthy bones and teeth by helping the body absorb

25   calcium."

26       **Answer**: Post admits that, at various times, the statements quoted in Paragraph 269

27   appeared on its *Honey-Comb* cereal. Post denies any remaining allegations in Paragraph 269 of the

28   SAC.

1    270.    Similarly, Post markets *Waffle Crisp* using a cartoon waffle mascot, and by

2  representing that it contains "Iron & Zinc for Growth."

3    **Answer**: Post admits that its *Waffle Crisp* cereal features a cartoon waffle mascot and that

4  the side panel of its packaging at one time stated "Iron & Zinc for Growth." Post denies any

5  remaining allegations in Paragraph 270 of the SAC.

6    271.    Post markets *Alpha-Bits* using characters from a popular PBS Kids cartoon show,

7  and by representing that it contains "NUTRIENTS THAT ARE BUILDING BLOCKS FOR

8  YOUR CHILD'S DEVELOPING BRAIN."

9    **Answer**: Post admits that, at various times, its *Alpha-Bits* cereal packaging featured

10 characters from the show "Super Why" and, at various other times, stated "NUTRIENTS THAT

11 ARE BUILDING BLOCKS FOR YOUR CHILD'S DEVELOPING BRAIN." Post denies any

12 remaining allegations in Paragraph 271 of the SAC.

13    272.    At 6g per serving, the added sugar in *Alpha-Bits* cereal accounts for 20% of the

14 product's weight and calories, 400% of the AHA's recommended maximum of 5% of calories

15 from sugar, and 40-50% of children's AHA-recommended maximum daily added sugar intake of

16 12-15g per day.

17    **Answer**: Post admits that approximately 20% of *Alpha-Bits'* calories per serving derive

18 from added sugar, but notes that the product labels and nutritional information Post produced to

19 Plaintiffs constitutes the best and most accurate evidence of the products' added sugar content.

20 Post denies the remaining allegations in Paragraph 272 of the SAC. Furthermore, Post asserts that

21 Paragraph 272 of the SAC erroneously assumes that the AHA has recommended a 5% threshold of

22 calories from added sugar in any one serving of food and that AHA has recommended a maximum

23 daily added sugar intake of 12-15g per day for all children.

24    273.    At 10g per serving, the added sugar in *Honey-Comb* cereal accounts for more than

25 31% of the product by weight, more than 30% of its calories, and up to 83% of children's AHA-

26 recommended maximum daily added sugar intake.

27    **Answer**: Post admits that *Honey-Comb* contains 10g of added sugar per serving and that

28 added sugar makes up approximately 31% of a serving's weight and 30% of a serving's calories,

but notes that the product labels and nutritional information Post produced to Plaintiffs constitutes the best and most accurate evidence of the products' added sugar content. Post denies the remaining allegations in Paragraph 273 of the SAC. Furthermore, Post asserts that Paragraph 273 of the SAC erroneously assumes that the AHA has recommended a 5% threshold of calories from added sugar in any one serving of food and that AHA has recommended a maximum daily added sugar intake of 12-15g per day for all children.

274.     At 12g per serving, the added sugar in *Waffle Crisp* accounts for 40% of the product's eight and calories, and up to 100% of children's AHA-recommended maximum daily added sugar intake.

**Answer**: Post admits that *Waffle Crisp* contains 12g of added sugar per serving and that added sugar makes up approximately 40% of a serving's weight and 40% of a serving's calories, but notes that the product labels and nutritional information Post produced to Plaintiffs constitutes the best and most accurate evidence of the products' added sugar content. Post denies the remaining allegations in Paragraph 274 of the SAC. Furthermore, Post asserts that Paragraph 274 of the SAC erroneously assumes that the AHA has recommended a maximum daily added sugar intake of 12-15g per day for all children.

275.     These statements were malicious, immoral, and oppressive because there are currently obesity and type 2 diabetes epidemics among American children, who are thus among the most vulnerable to misleading health and wellness marketing that results in substantially increased added sugar consumption.

**Answer**: Post denies the allegations in Paragraph 275 of the SAC.

276.     Marketing high-sugar cereals to children, or for children's consumption, is itself an unfair and immoral business practice, but it is especially harmful when the marketing suggests the high-sugar cereals are healthy options for children.

**Answer**: Post denies the allegations in Paragraph 276 of the SAC.

277.     Thus, marketing *Honey-Comb* cereal as a healthy option for children to promote bone and teeth health—even if true, which is dubious—while obscuring the detrimental effect of the cereal's consumption in promoting obesity, metabolic disease, cardiovascular disease, and

1  other morbidity, is immoral, malicious, and oppressive.

2      **Answer**: Post denies the allegations in Paragraph 277 of the SAC.

3      278.   Likewise, marketing other high-sugar children's cereals, like *Waffle Crisp*, with

4  false and misleading health and wellness claims, is immoral, malicious, and oppressive.

5      **Answer**: Post denies the allegations in Paragraph 278 of the SAC.

6      **5.    Post Egregiously Markets Some High-Sugar Cereals to Children Even Though

7            They Contain Artificial Trans Fat**

8      279.   In one case, Post even markets a high-sugar cereal to children despite that it also

9  contains artificial trans fat, a substance so deadly that the FDA has banned it with a phaseout

10  deadline of 2018. These claims are false and misleading because, in addition to the health dangers

11  of consuming the products' high sugar content, artificial trans fat is the single worst nutrient (the

12  only nutrient worse than sugar) in terms of its effect on bodily health, and particularly heart health.

13      **Answer**: Post admits that the FDA determined in 2015 that there is no longer a consensus

14  that Partially Hydrogenated Oils (PHOs), the primary source of industrially-produced trans fat, are

15  generally recognized as safe for use in human food, and established a compliance date of June 18,

16  2018 for removing PHOs from food products. Post admits that Waffle Crisp at one time contained

17  partially hydrogenated soybean oil as an ingredient and that Waffle Crisp is marketed to children,

18  among other consumers. Post denies all remaining allegations in Paragraph 279 of the SAC.

19      280.   Specifically, Post markets its *Waffle Crisp* cereal with a cartoon waffle mascot,

20  representing that it contains "Iron & Zinc for Growth." But *Waffle Crisp* also contains 12g of

21  sugar, accounting for 40% of the cereal by weight, and 40% of its calories, and contributing

22  between 80% and 100% of children's AHA-recommended daily maximum added sugar intake. In

23  addition, *Waffle Crisp* is made with partially hydrogenated vegetable oil containing toxic artificial

24  trans fat.

25      **Answer**: Post admits that its *Waffle Crisp* cereal features a cartoon waffle mascot and that

26  the side panel of its packaging at one time stated "Iron & Zinc for Growth." Post admits that

27  *Waffle Crisp* at one time contained 12g of sugar and included partially hydrogenated soybean oil

28  as an ingredient, but asserts that the product labels and nutritional information it has produced to

1   Plaintiffs constitute the best and most accurate evidence of the products' ingredient content. Post

2   denies all remaining allegations in Paragraph 280 of the SAC. Furthermore, Post asserts that

3   Paragraph 280 of the SAC erroneously assumes that the AHA has recommended a maximum daily

4   added sugar intake of 12-15g per day for all children.

5       281.    As noted above, there are obesity and type 2 diabetes epidemics among American

6   children currently, rendering them most vulnerable to false advertising that has the effect of

7   promoting sugar and artificial trans fat consumption.

8       **Answer**: Post denies the allegations in Paragraph 281 of the SAC.

9       282.    Marketing such an unhealthy food to children or for their consumption, and

10  especially through the use of claims that suggest the cereal is a healthy choice, is immoral,

11  malicious, oppressive, and egregious.

12      **Answer**: Post denies the allegations in Paragraph 282 of the SAC.

13      **6.      Post Knows or Reasonably Should Know of the Strong Scientific Evidence**

14      **Demonstrating Its High-Sugar Cereals are Unhealthy to Consume But Fails to**

15      **Warn Consumers of the Known Dangers of Consuming Its High-Sugar**

16      **Cereals**

17      283.    As a longtime and major national food manufacturer, Post is well-positioned to

18  know the most current food science. Moreover, the issue of added sugar has gained increasing

19  prominence over the past decade.

20      **Answer**: Post denies the allegations in the first sentence of Paragraph 283 of the SAC. Post

21  lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the

22  second sentence of Paragraph 283 of the SAC, and therefore denies them.

23      284.    Post maintains on its website a page titled "Post Nutrition Pledge," in which it

24  demonstrates it is aware of concerns regarding sugar, for example stating that it has "been steadily

25  decreasing the sugar in all our varieties of sweetened cereals for years now."[92] Even if literally

26  true, however, any such reduction has been miniscule.

27

28  _____
    [92] *See* http://postfoods.com/about-us/post-nutrition-pledge.

1    **Answer**: Post admits that the Post website previously included the language quoted in

2    Paragraph 284 for a certain period of time. Post denies all remaining allegations in Paragraph 284

3    of the SAC.

4    285.    For example, scientific evidence of the dangers of sugar was available to Post as a

5    result of its membership in the Whole Grains Council. For example, the Whole Grains Counsel

6    website notes Harvard research finding that replacing sugar with whole grains lowers heart disease

7    risk.[93]

8    **Answer**: Post admits that it is a member of the Whole Grains Council. Post lacks sufficient

9    knowledge or information to form a belief as to the truth of the allegations in the second sentence

10   of Paragraph 285, and therefore denies them. Post denies all remaining allegations in Paragraph

11   285 of the SAC.

12   286.    Despite knowing of the dangers of the added sugar in its cereals, Post failed to

13   adequately warn consumers, but instead induced them to consume the Post cereals through

14   affirmative health and wellness misrepresentations that also distracted consumers from the dangers

15   presented by the Post cereals.

16   **Answer**: Post denies the allegations in Paragraph 286 of the SAC.

17   **7.    Post Violates FDA and State Food Labeling Regulations**

18   287.    Several of Post's cereals contain statements that violate FDA food labeling

19   regulations, which have been adopted as California's labeling regulations pursuant to the

20   California Sherman Food, Drug, and Cosmetic Law Cal. Health & Safety Code §§ 109875 *et seq*.

21   (the "Sherman Law"). *See id.* § 110665 ("Any food is misbranded if its labeling does not conform

22   with the requirements for nutrition labeling as set forth in Section 403(q) (21 U.S.C. Sec. 343(q))

23   of the federal act and the regulations adopted pursuant thereto.").

24   **Answer**: Paragraph 287 of the SAC states a legal conclusion to which no response is

25   required. To the extent a response is required, Post denies that its cereals contain statements that

26   violate any FDA food labeling regulations or any parallel requirement of the Sherman Law.

27   ───────────────────

28   [93] *See* http://wholegrainscouncil.org/replacing-butter-sugar-or-refined-grains-with-wholegrains-cuts-heart-disease-risk.

1          **a.**      **In Violation of State and Federal Regulations, Post's Health and**

2                    **Wellness Statements are False, Misleading, and Incomplete**

3        288.     Post's health and wellness statements challenged herein were false and misleading

4 for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any

5 food whose "label is false or misleading in any particular." Post accordingly also violated

6 California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110660.

7       <u>**Answer**</u>: Paragraph 288 constitutes a legal conclusion to which no response is required. To

8 the extent a response is required, Post denies the allegations in Paragraph 288 of the SAC.

9        289.     Post's health and wellness statements challenged herein also "fail[ed] to reveal

10 facts that are material in light of other representations made or suggested by the statement[s],

11 word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1).

12 Such facts include the detrimental health consequences of consuming added sugars in amounts

13 present in the challenged products.

14       <u>**Answer**</u>: Post denies the allegations in Paragraph 289 of the SAC.

15        290.     Post similarly failed to reveal facts that were "[m]aterial with respect to the

16 consequences which may result from use of the article under" both "[t]he conditions prescribed in

17 such labeling," and "such conditions of use as are customary or usual," in violation of §

18 1.21(a)(2). Namely, Post failed to disclose the increased risk of serious chronic disease likely to

19 result from the usual consumption of its cereals in the customary manner.

20       <u>**Answer**</u>: Post denies the allegations in Paragraph 290 of the SAC.

21        291.     Post's implied and express health claims challenged herein also violate 21 C.F.R.

22 §§ 101.14(d)(2)(ii), (iii) & (e) because, for the reasons discussed herein, the claims are not

23 "complete, truthful, and not misleading," and many of the claims—like "heart healthy"—are not

24 "limited to describing the value that ingestion (or reduced ingestion) of the substance, as part of a

25 total dietary pattern, may have on a particular disease or health-related condition."

26       <u>**Answer**</u>: Post denies the allegations in Paragraph 291 of the SAC.

27        292.     On packaging of *Shredded Wheat Honey Nut* that was in use for some time, Post

28 also falsely stated that the product contained "No Added [ ] Sugar," and "0 grams of sugars per

1  serving," in violation of 21 C.F.R. § 101.13.

2      **Answer**: No answer is required to Paragraph 292 of the SAC because the Court held that

3  Plaintiffs have no standing to sue for this alleged error. (Dkt. 116 at 20-21).

4          **b.      Post Violates Additional Regulations Governing Health Claims**

5      293.    A health claim "expressly or by implication . . . characterizes the relationship of

6  any substance to a disease or health-related condition." 21 C.F.R. § 101.14(a)(1). Foods may not

7  contain such claims "unless: (1) The claim is specifically provided for in subpart E of this part;

8  and (2) The claim conforms to all general provisions of this section as well as to all specific

9  provisions in the appropriate section of subpart E of this part," *id.* § 101.14I.

10     **Answer**: Paragraph 293 of the SAC consists of a legal conclusion to which no response is

11 required. To the extent a response is required, Post admits that Paragraph 293 of the SAC

12 accurately quotes portions of the governing regulations.

13     294.    Post's cereals contain health claims in violation of § 101.14(e), as follows:

14          a.      *Honey Bunches of Oats – Honey Roasted*, *With Almonds*, *Raisin Medley*,

15 *With Pecan Bunches*, *With Vanilla Bunches*, *Fruit Blends – Banana Blueberry*, *Fruit*

16 *Blends – Peach Raspberry* ("Heart Healthy" with depiction of heart in circle);

17          b.      *Shredded Wheat – Honey Nut* ("**Heart Health**," "May Help Reduce the

18 Risk of Heart Disease" along with depiction of heart, "**Reduced Cancer Risk**," and

19 "**Digestive Health**: Diets rich in fiber . . . are important for maintaining digestive health.");

20          c.      *Shredded Wheat – Crunch!* ("POST SHREDDED WHEAT CRUNCH

21 MAY HELP REDUCE THE RISK OF HEART DISEASE," and "heart healthy");

22          d.      *Great Grains Protein Blend: Honey, Oats & Seeds* & *Cinnamon Hazelnut*

23 ("Diets rich in fiber help keep you fuller longer which is important for weight

24 management.");

25          e.      *Honey Bunches of Oats – Whole Grain Honey Crunch* and *Whole Grain*

26 *with Vanilla Bunches* (Heart design in "I" in "Whole Grain" name, and "Fiber . . . is

27 important to help maintain digestive health.");

28          f.      *Raisin Bran* ("Fiber is good for digestive health.");

g.     *Bran Flakes* ("DIETARY FIBER TO HELP MAINTAIN DIGESTIVE

HEALTH," "FIBER TO HELP WITH WEIGHT MANAGEMENT," and "Experts

recommend diets rich in fiber to help keep you satisfied while you exercise and cut calories

to lose weight.").

**Answer**: Post denies the allegations in Paragraph 294 of the SAC. Post further asserts that

the Court dismissed claims against the following statements with prejudice: "Diets rich in fiber

help keep you fuller longer which is important for weight management" on the *Great Grains*

*Protein Blend* cereals, "Fiber … is important to maintain digestive health" on the *Honey Bunches*

*of Oats Whole Grain* cereals, and "heart healthy" on *Shredded Wheat – Crunch!*.  Post also asserts

that the Court held the following statements are not health claims: "Digestive Health: Diets rich in

fiber … are important for maintaining digestive health," "Fiber is good for digestive health,"

"DIETARY FIBER TO HELP MAINTAIN DIGESTIVE HEALTH," "FIBER TO HELP WITH

WEIGHT MANAGEMENT," and "Experts recommend diets rich in fiber to help keep you

satisfied while you exercise and cut calories to lose weight." Post also asserts that Plaintiffs

abandoned their claims against the statements "Reduced Cancer Risk" on *Shredded Wheat –*

*Honey Nut*.

295.     Furthermore, Post's statements that *Post Great Grains Protein Blend: Honey, Oats*

*& Seeds* and *Cinnamon Hazelnut* will "help you burn more calories" and "enhance your

metabolism," because "protein generally requires about 25% more energy to digest" (as well as

related statements suggesting eating the product will "increase your metabolism by 10%," or

otherwise representing the product will promote weight loss) are also unlawful, in violation of

FDA and corresponding California food labeling regulations. Because metabolism and weight are

"disease or health-related conditions," and there is no protein-based health claim connected to

weight loss or metabolism prescribed under Subpart E of title 21 of the Code of Federal

Regulations, Post's labeling of *Post Great Grains Protein Blend: Honey, Oats & Seeds and*

*Cinnamon Hazelnut* violates 21 C.F.R. § 101.14, and corresponding California law, rendering the

product misbranded.

**Answer**: Post denies the allegations in Paragraph 295 of the SAC. Post further asserts that

1    the Court has held that statements about metabolism, digestive health, or weight management do

2    not qualify as health claims.

3        296.    The statements set forth above associating fiber with weight loss or digestive health

4    on *Great Grains Protein Blend: Honey, Oats & Seeds* & *Cinnamon Hazelnut*, *Honey Bunches of*

5    *Oats – Whole Grain Honey Crunch* and *Whole Grain with Vanilla Bunches*, and *Bran Flakes* are

6    unlawful for similar reasons.

7        **Answer**: Post denies the allegations in Paragraph 296 of the SAC. Post further asserts that

8    the Court has held that statements about metabolism, digestive health, or weight management do

9    not qualify as health claims, and that the Court dismissed with prejudice many of the statements

10   associating fiber with weight management or digestive health on the *Great Grains Protein Blend*

11   and *Honey Bunches of Oats Whole Grain* cereals.

12       297.    The use of the term "Heart Healthy," with depiction of heart in circle, on various

13   *Honey Bunches of Oats* products violates § 101.14(e) because the statements are not permitted

14   under Subpart E. And because the statements are made in connection with health claims permitted

15   under the FDAMA, § 101.14(d)(2) does not allow Post to make claims, other than the health claim

16   permitted under the FDAMA, even if such other claims are "related" and would be allowed for a

17   health claim authorized under Subpart E instead of under the FDAMA.

18       **Answer**: Paragraph 297 consists of a legal conclusion to which no response is required. To

19   the extent a response is required, Post denies the allegations in Paragraph 297 of the SAC.

20       298.    The same is true for "heart healthy" statements and depictions of hearts on *Honey*

21   *Bunches of Oats – Whole Grain* and *Shredded Wheat* cereals.

22       **Answer**: Paragraph 298 consists of a legal conclusion to which no response is required. To

23   the extent a response is required, Post denies the allegations in Paragraph 298 of the SAC.

24   **B.    Post Used its Website, as Referenced on Some Labels, and Other Online Fora, to**

25   **Spread Misinformation about the Dangers of Consuming the Added Sugar in its**

26   **Cereals**

27       299.    The side panel of Post's cereals invites consumers to "visit [Post] at:

28   postfoods.com" (the "Post Website").

1    **Answer**: Post admits that some of its cereals at various times listed the Post website on the

2    side panel. Except as expressly admitted, Post denies all remaining allegations in Paragraph 299 of

3    the SAC.

4    300.    Post uses the Post Website to further its deceptive marketing of high-sugar cereals

5    as healthy.

6    **Answer**: Post denies the allegations in Paragraph 300 of the SAC.

7    301.    For example, the Post Website states that one of Post's "VALUE[S]" IS

8    "Nourishing Goodness," which according to Post means, "[w]e craft our products with careful

9    attention to goodness. Start your day with us and nourish your body with whole, grains, protein,

10   vitamins and minerals." This statement appears adjacent to a photograph of a woman eating a

11   bowl of *Post Great Grains Crunchy Pecans*.



24   **Answer**: Post admits that the Post website previously included the image and the language

25   quoted in Paragraph 301 for a certain period of time. Post denies all remaining allegations in

26   Paragraph 301 of the SAC.

27   302.    Other "VALUE[S]" Post represents it has include:

28          a.    VALUE #2 – "Goodness on Purpose" with Post stating, "We take great care

1    to use wholesome ingredients to help you take great care of your whole family."

2            b.      VALUE #4 – "No HFCS, Ever"

3            c.      VALUE #6 – "Something for Everyone," with Post stating, "there's a Post

4    cereal for every taste and nutritional need to keep everyone in your family happy and

5    healthy."

6            d.      VALUE #7 - "The Best Nature has to Offer," with Post stating, "We are

7    committed to understanding and utilizing the highest quality of ingredients in order to

8    nourish you and your family."

9        **Answer**: Post admits that the Post website previously included the language quoted in

10   Paragraph 302 for a certain period of time. Post denies all remaining allegations in Paragraph 302

11   of the SAC.

12       303.    The Post Webpage includes a purported "Nutrition Pledge," wherein Post states,

13   "We Pledge to Help you Start Each Day Right," because "Post Foods was established on the

14   principle that good nutrition can change the way we feel, look, and perform."

15       **Answer**: Post admits that the Post website previously included the language quoted in

16   Paragraph 303 for a certain period of time. Post denies all remaining allegations in Paragraph 303

17   of the SAC.

18       304. Post further claims that:

19       Helping you be healthy each day is rewarding for us and it's in our roots. Post
         Foods was literally created to enhance health…. Over the years, we've learned even
20       more about the health benefits of a diet rich in grains. Eating grains – particularly
         whole grains – can help you meet your daily nutrient needs and provides broad-
21       reaching health benefits. **Whole grains are an important source of many
         nutrients, including dietary fiber, several B vitamins, minerals, and natural
22       antioxidants.** Peer-reviewed scientific studies show major health problems, from
         heart disease and obesity to diabetes and cancer, occur less frequently with a diet
23       rich in whole grains. So, today, we know the benefits of what C.W. Post created
         reach far beyond digestive health.
24

25       **Answer**: Post admits that the Post website previously included the language quoted in

26   Paragraph 304 for a certain period of time. Post denies all remaining allegations in Paragraph 304

27   of the SAC.

28       305.    Post further claims it "believe[s] whole grains are an essential component of a

healthy lifestyle," but also "believe[s] that sugar in moderation brings fun to breakfast."

**Answer**: Post admits that the Post website previously included the language quoted in Paragraph 305 for a certain period of time. Post denies all remaining allegations in Paragraph 305 of the SAC.

306. These statements, both alone, and in combination with Post's other advertising, mislead consumers into believe that Post's cereals are healthy and the supposed "moderate" amount of sugar in them is not concerning.

**Answer**: Post denies the allegations in Paragraph 306 of the SAC.

307. The Post Website also includes a link to a page titled "**Our Brands**," which includes pictures of "Post's Family of cereals," and allows a browser to click on each cereal for more information about it.

**Answer**: Post admits that the Post website previously included a link to page entitled "Our Brands," which includes pictures of Post cereals with the banner "Post's Family of Cereals" and allowed the viewer to click on each cereal for more information about it. Post denies all remaining allegations in Paragraph 307 of the SAC.

308. Post uses each cereal's dedicated webpage to further its false and misleading health and wellness messaging, as follows:

    a. **Post Alpha-Bits**: Underneath the heading "Enriching from A to Z," Post claims "Alpha-Bits is a trusted source of essential vitamins and minerals that your child needs, including vitamin A, iron and zinc!" Lower on the same page, Post claims, "It's an excellent source of vitamin, and has added nutrients like iron and zinc that help support healthy brain development. Alpha-Bits also provides 20g of whole grain (per 30g serving), and 12 essential vitamins and minerals that growing kids need!"

1
2
3
4
5
6
7
8
9
10
11



12      (i.)     After clicking the "VIEW NUTRITION INFO" link, Post makes the

13 following additional health and wellness claims:

14          (A)      "Alpha-Bits is fortified with nutrients that growing kids

15 need"

16          (B)      "Did You Know? Alpha-Bits has: ● Iron and zinc help to

17 support healthy brain development ● 20g whole grain per 30g serving* ●

18 Excellent source of vitamin D and iron ● 12 essential vitamins and minerals

19 ● No artificial flavors ● Contains nutrients that support healthy brain

20 development"

21          (C)      "Post® Alpha-Bits® cereal is fortified with nutrients that

22 help support healthy brain development in children. Iron helps deliver

23 oxygen to the brain & body. Zinc helps brain & body cells grow and

24 develop. Choline helps the brain send messages."

25
26
27
28



        (ii.)      After clicking the "Our Story" link for *Post Alpha-Bits*, Post continues its deceptive marketing strategy under the heading "The Alpha-Bit Story: Wholesome From A to Z," by claiming that "For decades, Post Alpha- Bits has remained a trusted brand with its great-tasting, whole grain oat and corn cereal pieces, nutrients to support healthy brain development and the alphabet fun that kids and mom L-O-V-E." "In fact, the Alpha-Bits on shelves today has a more nutritious formula that the original cereal that launched more than 50 years ago. The cereal has 20 grams of whole grain, only 6 grams of sugar and 22 essential vitamins and minerals. Alpha Bits cereal is a great way for growing children to start their day."



1

2

3

4

5

        **b.**     ***Post Golden Crisp***: After clicking the "VIEW NUTRITION INFO" link on the *Post Golden Crisp* webpage, Post claims "Golden Crisp isn't just sweet to eat. It also has good stuff, like essential vitamins and minerals," and asks "Did You Know? Golden Crisp Has: ● 10 essential vitamins and minerals ● Excellent source of six B vitamins ● Excellent source of vitamin D ● Good source of iron and zinc ● Fat- and cholesterol-free."

6

7

8

9

10

11

12

13

14



15

16

17

18

19

20

21

22

23

24

25

26

27

28

        **c.**     ***Post Great Grains***: Prominently featured on the *Post Great Grains* webpage is a large banner depicting a bowl of the cereal, next to the claim, "Nutrition You Can See," underneath which Post claims, "You can't argue with nutrition you can see. Great Grains starts whole and stays whole, so you know you're eating better nutrition," with a clickable button inviting consumers to "See the Difference." Clicking "See the Difference" sends the browser a page which furthers Post's health and wellness messaging by touting *Post Great Grains* as "Less-Processed Nutrition," "Quite simply because it's good for you!," and contains "nutritious fruit, nuts and/or seeds" "balance[d] . . . with . . . grains," for a "less processed whole grain cereal that's high in natural fiber." At the bottom of this page is a variety of *Post Great Grains* nutrition information. These "Nutrition" pages for each variety including further claims; for example, on the "Nutrition" page for Post Great Grains Cranberry Almond Crunch, Post asks "Did You Know? Great Grains Cranberry Almond Crunch has: ● 35g of whole grain per serving** ●24% of your Daily Value for fiber (6g of fiber per serving) ● 0g saturated fat, 0g trans fat and 0mg cholesterol

per serving ● 14 vitamins and minerals ● Excellent source of antioxidant vitamins C and E . . . ● 9g Protein with milk"



d.   ***Post Honey Bunches of Oats***: The *Post Honey Bunches of Oats* webpage similarly continues Post's deceptive health and wellness messaging. Prominently displayed on the page is a large banner stating that "Honey Bunches of Oats Whole Grain Varieties" contain "2/3 of your day's whole grain."



1

(i.)    Clicking on the "Our Story" link brings a browser to a video that

2    touts Post Honey Bunches of Oats as "WHOLESOME," overlaid on a field of

3    grain.



14    (ii.)    The "Nutrition" links for each variety continue this messaging with,

15    claims such as " Heart Healthy (0g trans fat, 0g saturated fat, 0mg cholesterol per

16    serving) ● 2/3 of your  day's whole grain (32g per serving); whole grains are an

17    important part of a balanced diet, but on average, Americans eat less than 1 serving

18    of whole grains per day. ● Good source of fiber (5g per serving); fiber fills you up,

19    helps keep you satisfied and is important to help maintain digestive health. ● 12

20    essential vitamins and minerals; including iron and folic acid which are important

21    for moms-to-be and growing children."

22

23

24

25

26

27

28



e.      **Post Honeycomb**: The "Nutrition" link on the *Post Honeycomb* webpage asks, "Did You Know? Honeycomb cereal has: 8g of whole grain per serving ●Excellent source of vitamin D ● Low in fat and cholesterol-free ● 10 essential vitamins and minerals."

f.      **Post Bran Flakes**: Prominently displayed on the *Post Bran Flakes* page is a banner claiming the product will "Improve Your Digestive Health," because "Post Bran Flakes is an excellent source of fiber, which aids digestion. When you feel good inside, you feel better all over." Post further describes *Post Bran Flakes* as "a wholesome breakfast choice for the whole family, made with whole grain wheat and wheat bran. Each serving provides 16g of whole grain, 5g of fiber and 13 essential vitamin and minerals." The "Nutrition" link on the *Post Bran Flakes* webpage continues this health messaging by claiming that "Post Bran Flakes is an excellent source of fiber, which is good for your digestive health," and asking "Did You Know Post Bran Flakes has: 16g of whole grin per serving* ● 20% of your Daily Value for fiber (5f of fiber per serving) ● Low in fat and cholesterol-free ● 13 vitamins and minerals."

g.      *Post Raisin Bran*: Prominently displayed on the *Post Raisin Bran* webpage is a banner with the large claim, "No High-Fructose Corn Syrup" underneath which is the further claim, that "As part of Post's commitment to goodness, we don't use high-fructose corn syrup in Post Raisin Bran – or any of our products." Below that Post asks "Have you ever wondered: How is Raisin Bran Naturally Delicious?," answering, "Post Raisin Bran has hundreds of 100% Sun-Maid® California Raisins in every box, and is made with whole grain wheat and wheat bran for delicious nutrition. It provides 23g of whole grain (per serving), provides 13 essential vitamins and minerals, and 32% of your Daily Value for fiber (8g per serving)."



h.    *Post Shredded Wheat*: Upon arriving at the *Post Shredded Wheat* webpage, consumers are greeted by a large banner depicting a bowl of Post Shredded Wheat next to the claim "Zero In On Your Health," underneath which Post claims, "The 100% whole grain goodness of Post Shredded Wheat has zero sodium, 0g sugar and zero cholesterol per serving." This is especially deceptive because Post does not distinguish between Post Shredded Wheat and sweetened varieties, such as Post Shredded Wheat Honey Nut, which contains 12g of sugar per serving. Each variety, including those sweetened varieties containing high amounts of added sugar, are pictured below the banner, and the "Nutrition" link on the same page takes a browser to information about all these varieties of shredded wheat.

1
2
3
4
5
6
7
8
9
10



11        (i.)      Clicking on the "Learn More" link on the "Zero In On Your Health"

12   banner takes users to a page dedicated entirely to Post's deceptive health and

13   wellness marketing strategy. Post claims "Making 100% whole grain Post

14   Shredded Wheat part of your regular diet, at breakfast or any other meal, is just one

15   way to choose a healthier lifestyle. Get even more expert nutrition and health

16   information by browsing the topics below," which include "Fiber & Whole

17   Grains," "Diet & Exercise" and "Heart Health," and include the following 5

18   articles: "Whole Grains Shown to be Naturally Protective for Your Heart,"

19   "Inflammation, The Second Half of the Cardiovascular Heart Disease Puzzle,"

20   "Studies Show Eating Whole Grains Reduces Chronic Inflammation in Diabetics,"

21   "Whole Grains—A Natural Way to Fight Diabetes," and "Antioxidants in Whole

22   Grains May Boost Immunity and Slow Aging." Each of these supposed "articles" is

23   actually just a summary of information found elsewhere, without identifying the

24   author of any of the "articles." Each "article" concludes "With all this great news,

25   why wait? Fill your bowl at least once a day with whole-grain Post cereal and be

26   good to your heart! Our whole grains contain natural fiber and antioxidants —

27   that's the Post Natural Advantage." All but one of these articles touts the health

28   benefits of whole grains while omitting the negative health consequences of

1    consuming the sugar in Post's products. The one article that mentions sugar,

2    "Inflammation, the Second Half of the Coronary Heart Disease Puzzle," declares

3    that "a diet rich in high calorie, processed, easily digestible, nutrient poor foods is

4    an underlying cause of inflammation . . . . These types of meals lead to spikes in

5    blood sugar and fat, including oxidative stress which among other things leads to

6    inflammation," demonstrating Post was and is well aware of the deleterious effects

7    of the processed sugar in its products, yet leverages its whole grain messaging to

8    convince consumers that its cereals are nonetheless healthy.

9


20   (ii.)   The "Zero In On Your Health" banner also scrolls to reveal other

21   health and wellness banners, such as "9 of 10 Doctors Agree! 94% of physicians

22   surveyed with over 15 years experience would recommend adding Post Shredded

23   Wheat to your diet to improve and maintain heart health." The "Learn More" link

24   on the banner takes consumers to a page titled "The Right Choice for Your Heart"

25   which makes further health and wellness claims.

26

27

28





        i.    ***Post Waffle Crisp***: Post furthers its health and wellness messaging about

*Post Waffle Crisp* online, as well. For example, the webpage for *Post Waffle Crisp* states

that "Waffle Crist also provides 10 essential vitamins and minerals in every serving." The

"Nutrition" link leads to a claim that "Each serving provides essential nutrients that make

eating waffle crisp just a little bit sweeter," and asks "Did You Know? Waffle Crisp has:

Low in saturated fat and cholesterol-free ● 10 essential vitamins and minerals ● Excellent

source of six B vitamins ● Good source of iron and zinc."

**Answer**: Post admits that the Post website previously included some of the language

quoted in Paragraph 308 and some of the images in Paragraph 308 relating to various products for various periods of time. Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations about the statements regarding *Golden Crisp* in Paragraph 308(b) and regarding *Honey Bunches of Oats* in Paragraph 308(d)(1), and therefore denies them.  Post further asserts that Plaintiffs have admitted the statements made on Post's website are not independently actionable (Dkt. 88 at 38, n. 37), and that the SAC does not contain any challenges to *Golden Crisp*, *Honey Bunches of Oats Whole Grain Almond*, or *Post Shredded Wheat Original*. Post denies all remaining allegations in Paragraph 308 of the SAC.



## C.   Post Made Misleading Public Statements Concerning High-Sugar Cereals

309.     Post has also periodically issued press releases furthering its misleading health and wellness messaging of its cereals.

**Answer**: Post denies the allegations in Paragraph 309 of the SAC. Post further asserts that Plaintiffs have admitted the statements made in Post's press releases are not independently actionable. (Dkt. 88 at 38, n. 37.)

310.     For example, Post issued a press release on January 17, 2013 titled "New Post Great Grains Protein Blend Cereal Aims to Boost Americans' Metabolisms in 2013," claiming that the "*Combination Of Protein, Whole Grain And Fiber Helps Increase Metabolic Rate*." Post further claims that "Americans' top resolution for 2013 is to lose weight. Post Foods, LLC, is

doing their part to help these goals come to fruition with the introduction of the new Great Grains Protein Blend cereal, which helps support a healthy metabolism." The press release continues to mislead consumers into thinking this high-sugar cereal is "nutritious" and "wholesome" and "heart healthy."

**Answer**: Post admits that it issued a January 17, 2013 press release entitled "New Post Great Grains Protein Blend Cereal Aims to Boost Americans' Metabolisms in 2013" and that this press release contains the language quoted in the first and second sentences of Paragraph 310. Post asserts that the press release speaks for itself and should be read as whole. Post denies all remaining allegations in Paragraph 310 of the SAC.

311.    On February 5, 2014, Post issued another press release in which it claimed that, "All Great Grains cereals are made with less processed grains for more wholesome nutrition in every bowl. Every recipe has at least 30g of whole grains per serving and is a heart healthy way to start the day."

**Answer**: Post admits that it issued a February 5, 2014 press release that contained the language quoted in Paragraph 311. Post asserts that the press release speaks for itself and should be read as whole. Post denies all remaining allegations in Paragraph 310 of the SAC.

**D.     The Foregoing Behaviors are Part of Post's Longstanding Policy, Practice, and Strategy of Marketing its High-Sugar Cereals as Healthy in Order to Increase Sales and Profit**

312.    The practices complained of herein, while specific to certain cereal lines, cereal flavors or varieties, and certain packaging claims, are exemplary of, and consistent with, Post's longtime practice of intentionally and strategically marketing high-sugar cereals with health and wellness claims that both deceptively suggest the products are healthy, and deceptively omit the dangers of consuming the products.

**Answer**: Post denies the allegations in Paragraph 312 of the SAC.

313.    These practices have been consistent notwithstanding Post's occasional discontinuation or introduction of new products or lines of cereal, reformulation of products, or labeling or packaging changes.

1      **Answer**: Post denies the allegations in Paragraph 313 of the SAC.

2      314.    This strategy is based on sophisticated consumer marketing research, and has been

3  undertaken by Post with the purpose of increasing the prices, sales, and market share of its cereals.

4      **Answer**: Post denies the allegations in Paragraph 314 of the SAC.

5      315.    Unless enjoined from using in the marketing of high-sugar cereals the health and

6  wellness marketing statements, representations, strategies, and tactics complained of herein, Post

7  will continue to employ this strategy, as the consumer preference for healthier-seeming foods is

8  strong.

9      **Answer**: Post denies the allegations in Paragraph 312 of the SAC.

10      316.    In fact, Neilsen's 2015 Global Health & Wellness Survey found "88% of those

11  polled are willing to pay more for healthier foods."[94]

12      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the

13  allegations in Paragraph 316 of the SAC, and therefore denies them. Post asserts that the Nielsen

14  survey referred to in Paragraph 316 speaks for itself and should be read as a whole. Post denies

15  that the conclusions or inferences Plaintiffs attempt to draw from the referred-to Nielsen survey

16  are valid or establish their claims.

17  **E.     Post's Policy and Practice of Marketing High-Sugar Cereals as Healthy is Especially**

18  **Harmful Because Consumers Generally Eat More than One Serving of Cereal at a**

19  **Time, Which Post Knows or Reasonably Should Know**

20      317.    The serving size for Post's cereals is generally either 1 cup or, less frequently, 3/4

21  cup. Depending on the type of cereal, this generally means either around 30g or 50g per serving.

22      **Answer**: Post admits that the serving size for the challenged cereals is either 1 cup or ¾

23  cups, which amounts to between 29g – 59g per serving. Post denies all remaining allegations in

24  Paragraph 317 the SAC.

25      318.    In 2014, the FDA analyzed food consumption data between 2003 and 2008, from

26

27  ------------------------------
[94] Nancy Gagliardi, Forbes, *Consumers Want Healthy Foods--And Will Pay More For Them*, (Feb.

28  18, 2015) (citing Neilson, *We are what we eat, Healthy eating trends around the world*, at 11 (Jan. 2015)).

the National Health and Nutrition Examination Survey (NHANES, discussed previously above),

finding that at least 10% of Americans eat at one sitting, 2 to 2.6 times the amount of cereal as the

labeled serving size. Federal regulations thus provide that the reference amount customarily

consumed (RACC) for cereal is 110 grams. 21 C.F.R. § 101.12(b).

**Answer**: Post admits that federal regulations provide that the RACC for ready-to-serve

prepared cereals is 110 grams. Post lacks sufficient knowledge or information to form a belief as

to the truth of the remaining allegations in Paragraph 318 of the SAC, and therefore denies them.

Post asserts that the findings of the National Health and Nutrition Examination Survey speak for

themselves and should be read as a whole and in light of the full body of scientific evidence. Post

denies that the conclusions or inferences Plaintiffs attempt to draw from the National Health and

Nutrition Examination Survey are valid or establish their claims.

319.    A study conducted by cereal giant General Mills found that children and

adolescents 6 to 18 years old typically eat about twice as much cereal in a single meal compared to

the suggested serving size.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

the allegations in Paragraph 319 of the SAC, and therefore denies them. Post asserts that the

General Mills study referred to Paragraph 319 speaks for itself and should be read as a whole and

in light of the full body of scientific evidence. Post denies that the conclusions or inferences

Plaintiffs attempt to draw from the referred-to General Mills study are valid or establish their

claims.

320.    Another study, by Yale University's Rudd Center for Food Policy and Obesity,

found that children 5 to 12 years old ate an average of 35 grams of low-sugar cereals, but an

average of 61 grams of high-sugar cereals.[95]

**Answer**: Post asserts that the study referred to and cited in footnote 95 to Paragraph 320 of

the SAC speaks for itself and should be read as a whole and in light of the entire body of scientific

evidence. Post denies that the conclusions or inferences Plaintiffs attempt to draw from this source

---

[95] Jennifer L. Harris, et al., "Effects of Serving High-Sugar Cereals on Children's Breakfast-Eating Behavior," *Pediatrics*, Vol. 127, Issue 1 (Jan. 2011).

1   are valid or establish their claims.

2        321.    As a result of consumers' actual eating habits, Post's high-sugar cereals in reality

3   contribute significantly more sugar to their consumers' diets than even the high amount in a single

4   serving suggests.

5        **Answer**: Post denies the allegations in Paragraph 321 of the SAC.

6        322.    For example, doubling a serving of most Post cereals would cause men, women,

7   and children all to exceed their AHA-recommended maximum daily sugar intake in just the single

8   breakfast serving—in some cases providing more than three times the daily maximum.

9        **Answer**: Post denies the allegations in Paragraph 322 of the SAC.

10        323.    For this reason, the Post high-sugar cereals are especially dangerous to the health of

11   those who regularly consume them.

12        **Answer**: Post denies the allegations in Paragraph 323 of the SAC.

13          **PLAINTIFFS' PURCHASES, RELIANCE, AND INJURY**

14   **A.**     **Plaintiff Debbie Krommenhock**

15        324.    Over the past approximately two years, plaintiff Debbie Krommenhock purchased

16   the following Post cereals and granolas.

17            a.    *Post Honey Bunches of Oats Cereal – With Almonds*

18            b.    *Post Honey Bunches of Oats Granola – Honey Roasted*

19            c.    *Post Shredded Wheat – Honey Nut*

20            d.    *Post Raisin Bran*

21      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

22   the allegations in Paragraph 324 of the SAC, and therefore denies them.

23        325.    Ms. Krommenhock purchased the foregoing Post cereals and granolas at either the

24   Lucky's located at 21001 San Ramon Valley Boulevard, in San Ramon, California 94583, or the

25   Wal-Mart located at 9100 Alcosta Boulevard, in San Ramon, California 94583.

26      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

27   the allegations in Paragraph 325 of the SAC, and therefore denies them.

28        326.    As best she can recall, Ms. Krommenhock purchased *Post Honey Bunches of Oats*

– *With Almonds* multiple times, beginning approximately two years ago, with her most recent purchase in approximately July 2016, purchasing the product approximately a few times per year.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 326 of the SAC, and therefore denies them.

327.    As best she can recall, Ms. Krommenhock purchased *Post Honey Bunches of Oats Granola – Honey Roasted* one time during the past two years.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 327 of the SAC, and therefore denies them.

328.    As best she can recall, Ms. Krommenhock purchased *Post Shredded Wheat Honey Nut* approximately six times over the past several years, with her last purchase in around June 2016.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 328 of the SAC, and therefore denies them.

329.    As best she can recall, Ms. Krommenhock purchased *Post Raisin Bran* on a few occasions, with the last time in or about summer 2015.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 329 of the SAC, and therefore denies them.

330.    For each Post cereal and granola purchased, Ms. Krommenhock read and decided to purchase the product in substantial part based upon Post's health and wellness labeling statements discussed herein and set forth above with respect to each cereal or granola variety, which statements—individually, and especially in the context of the packaging as a whole—made the products seem like healthy food choices to Ms. Krommenhock.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 330 of the SAC, and therefore denies them.

* * *

331.    When purchasing the Post cereals and granola, Ms. Krommenhock was seeking products that were healthy to consume, that is, of which consumption would not increase her risk of CHD, stroke, and other morbidity.

1    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

2    the allegations in Paragraph 331 of the SAC, and therefore denies them.

3    332.    The health and wellness representations on the Post cereals' and granola's labeling,

4    however, was misleading, and had the capacity, tendency, and likelihood to confuse or confound

5    Ms. Krommenhock and other consumers acting reasonably (including the putative Class) because,

6    as described in detail herein, the products are not healthy but instead their consumption increases

7    the risk of CHD, stroke, and other morbidity.

8    **Answer**: Post denies the allegations in Paragraph 332 of the SAC.

9    333.    Ms. Krommenhock is not a nutritionist or food scientist, but rather a lay consumer

10   who did not have the specialized knowledge that Post had regarding the nutrients present in the

11   Post cereals and granolas. At the time of purchase, plaintiff was unaware of the extent to which

12   consuming high amounts of added sugar in any form adversely affects blood cholesterol levels and

13   increases risk of CHD, stroke, and other morbidity, or what amount of sugar might have such an

14   effect.

15   **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

16   the allegations in Paragraph 333 of the SAC, and therefore denies them.

17   334.    Ms. Krommenhock acted reasonably in relying on Post's health and wellness

18   marketing, which Post intentionally placed on the products' labels with the intent to induce

19   average consumers into purchasing the products.

20   **Answer**: Post denies the allegations in Paragraph 334 of the SAC.

21   335.    Ms. Krommenhock would not have purchased Post cereals and granola if she knew

22   that their labeling claims were false and misleading in that the products were not as healthy as

23   represented.

24   **Answer**: Post denies the allegations in Paragraph 335 of the SAC.

25   336.    The Post cereals and granolas cost more than similar products without misleading

26   labeling, and would have cost less absent the misleading health and wellness claims. If Post were

27   enjoined from making the misleading claims, the market demand and price for its cereals and

28   granola would drop, as it has been artificially and fraudulently inflated due to Post's use of

deceptive health and wellness labeling.

      **Answer**: Post denies the allegations in Paragraph 336 of the SAC.

      337.    Ms. Krommenhock paid more for the Post cereals and granola, and would only have been willing to pay less, or unwilling to purchase them at all, absent the misleading labeling statements complained of herein.

      **Answer**: Post denies the allegations in Paragraph 337 of the SAC.

      338.    For these reasons, the Post cereals and granola were worth less than what Ms. Krommenhock paid for them, and may have been worth nothing at all.

      **Answer**: Post denies the allegations in Paragraph 338 of the SAC.

      339.    Instead of receiving products that had actual healthful qualities, the products Ms. Krommenhock received were not healthy, but rather their consumption causes increased risk of CHD, stroke, and other morbidity.

      **Answer**: Post denies the allegations in Paragraph 339 of the SAC.

      340.    Ms. Krommenhock lost money as a result of Post's deceptive claims and practices in that she did not receive what she paid for when purchasing the Post cereals and granola.

      **Answer**: Post denies the allegations in Paragraph 340 of the SAC.

      341.    Ms. Krommenhock detrimentally altered her position and suffered damage in an amount equal to the amount she paid for the products.

      **Answer**: Post denies the allegations in Paragraph 341 of the SAC.

      342.    As a result of Post's practices, Ms. Krommenhock has suffered bodily injury in the form of increased risk of CHD, stroke, and other morbidity.

      **Answer**: Post denies the allegations in Paragraph 342 of the SAC.

**B.**    **Plaintiff Stephen Hadley**

      343.    Plaintiff Stephen Hadley has been a frequent cereal eater for many years. Mr. Hadley is relatively health-conscious. During the past several years and prior, in seeking out cereals to eat, Mr. Hadley has generally tried to choose healthy options, and has been willing to pay more for cereals he believes are healthy.

      **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

1    the allegations in Paragraph 343, and therefore denies them.

2        344.    Over the past several years, Mr. Hadley has purchased Post cereals on multiple

3    occasions, including Post Great Grains cereals, Post Honey Bunches of Oats cereals and granolas,

4    Post Shredded Wheat cereals, and various Post single cereals.

5        **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

6    the allegations in Paragraph 344, and therefore denies them.

7        345.    ***Post Great Grains Cereals***. Over the past several years, Mr. Hadley has purchased

8    the following varieties of Post Select/Great Grains cereals:

9            a.      *Post Great Grains Blueberry Morning*

10           b.      *Post Great Grains Cranberry Almond Crunch*

11           c.      *Post Great Grains Banana Nut Crunch*

12           d.      *Post Great Grains Raisins, Dates & Pecans*

13           e.      *Post Great Grains Crunchy Pecans*

14       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

15   the allegations in Paragraph 345, and therefore denies them.

16       346.    Mr. Hadley believes he may also have purchased *Post Great Grains Blueberry*

17   *Pomegranate*, and *Post Great Grains Protein Blend: Cinnamon Hazelnut* cereals.

18       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

19   the allegations in Paragraph 346, and therefore denies them.

20       347.    To the best of his recollection, Mr. Hadley has been purchasing *Post Great Grains*

21   cereals since early 2012 (including in their earlier incarnation as *Post Selects* or *Post Selects/Great*

22   *Grains*). Given plaintiff's habits, he believes he purchased one variety or another with a frequency

23   of approximately once every couple of months. Plaintiff believes he purchased Post Great Grains

24   cereals from locations including: (a) the Nob Hill Foods located at 900 Lighthouse Avenue, in

25   Monterey, California 93940, (b) the Trader Joe's located at 570 Munras Avenue, in Monterey,

26   California (c) the Safeway located at 815 Canyon Del Rey Boulevard, in Del Rey Oaks, California

27   93940, (d) the Grocery Outlet located at 1523 Freemont Boulevard, in Seaside, California 93955, I

28   the Wal-Mart located at 150 Beach Road, in Marina, California 93933, and (f) the Target located

at 2040 California Avenue, in Sand City, California 93955. Mr. Hadley believes he last purchased a *Post Great Grains* cereal in approximately April or May 2016.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 347, and therefore denies them. Post notes that the SAC makes no claims as to Post Selects or Post Selects/Great Grains cereals.

348.    For each *Post Great Grains* cereal purchased, Mr. Hadley read and decided to purchase the product in substantial part based upon Post's health and wellness labeling statements discussed herein and set forth above with respect to each variety, which statements—individually, and especially in the context of the packaging as a whole—made the products seem like healthy food choices to Mr. Hadley.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 348, and therefore denies them.

349.    ***Post Honey Bunches of Oats Cereals & Granolas.*** Over the past several years, Mr. Hadley has purchased the following varieties of *Post Honey Bunches of Oats* cereals and granolas:

          a.    *Post Honey Bunches of Oats Cereal – Honey Roasted*

          b.    *Post Honey Bunches of Oats Cereal – With Almonds*

          c.    *Post Honey Bunches of Oats Cereal – Raisin Medley*

          d.    *Post Honey Bunches of Oats Cereal – With Pecan Bunches*

          e.    *Post Honey Bunches of Oats Cereal – With Vanilla Bunches*

          f.    *Post Honey Bunches of Oats Cereal – With Real Strawberries*

          g.    *Post Honey Bunches of Oats Cereal – Whole Grain Honey Crunch*

          h.    *Post Honey Bunches of Oats Cereal – Greek Honey Crunch*

          i.    *Post Honey Bunches of Oats Granola – Honey Roasted*

          j.    *Post Honey Bunches of Oats Protein Granola – with Dark Chocolate*

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 349, and therefore denies them.

350.    Mr. Hadley believes he may also have purchased the *Apples & Cinnamon Bunches* variety of Honey Bunches of Oats cereal, and *Cinnamon* granola.

1    **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

2    the allegations in Paragraph 350, and therefore denies them.

3        351.    To the best of his recollection, Mr. Hadley has been purchasing *Post Honey*

4    *Bunches of Oats* cereals since early 2012. Given plaintiff's habits, he believes he purchased one

5    variety or another with a frequency of approximately once every two weeks. Plaintiff believes he

6    purchased *Post Honey Bunches of Oats* cereals from locations including: (a) the Safeway located

7    at 815 Canyon Del Rey Boulevard, in Del Rey Oaks, California 93940, (b) the Wal-Mart located

8    at 150 Beach Road, in Marina, California 93933, and (c) the Target located at 2040 California

9    Avenue, in Sand City, California 93955. Plaintiff believes he last purchased a *Post Honey Bunches*

10   *of Oats* cereal in July 2016.

11       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

12   the allegations in Paragraph 351, and therefore denies them.

13       352.    To the best of his recollection, Mr. Hadley purchased *Post Honey Bunches of Oats*

14   granolas likely one time, in the spring of 2013, from the Nob Hill Foods located at 900 Lighthouse

15   Avenue, in Monterey, California 93940.

16       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

17   the allegations in Paragraph 352, and therefore denies them.

18       353.    For each *Post Honey Bunches of Oats* cereal purchased, Mr. Hadley read and

19   decided to purchase the product in substantial part based upon Post's health and wellness labeling

20   statements discussed herein and set forth above with respect to each variety, which statements—

21   individually, and especially in the context of the packaging as a whole—made the products seem

22   like healthy food choices to Mr. Hadley.

23       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

24   the allegations in Paragraph 353, and therefore denies them.

25       354.    ***Post Shredded Wheat.*** Over the past several years, Mr. Hadley has purchased *Post*

26   *Shredded Wheat Honey Nut* cereal.

27       **Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of

28   the allegations in Paragraph 354, and therefore denies them.

355.     To the best of his recollection, Mr. Hadley has been purchasing *Post Shredded Wheat Honey Nut* cereals since fall (approximately August or September) of 2014. Given plaintiff's habits, he believes he purchased one variety or another with a frequency of approximately once every four months. Plaintiff believes he purchased *Post Shredded Wheat Honey Nut* cereal from the Grocery Outlet located at 1523 Freemont Boulevard, in Seaside, California 93955. Plaintiff believes he last purchased *Post Shredded Wheat Honey Nut* cereal in summer 2015.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 355, and therefore denies them.

356.     For each *Post Shredded Wheat Honey Nut* cereal purchased, Mr. Hadley read and decided to purchase the product in substantial part based upon Post's health and wellness labeling statements discussed herein and set forth above, which statements—individually, and especially in the context of the packaging as a whole—made the products seem like healthy food choices to Mr. Hadley.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 356, and therefore denies them.

357.     ***Post Singles Cereals.*** Over the past several years, Mr. Hadley has purchased the following "single" varieties of Post cereals:

        a.    *Raisin Bran*

        b.    *Bran Flakes*

        c.    *Alpha Bits*

        d.    *Honey-Comb*

        e.    *Waffle Crisp*

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 357, and therefore denies them.

358.     To the best of his recollection, Mr. Hadley purchased *Post Raisin Bran* in or around the summer of 2014, from the Nob Hill Foods located at 900 Lighthouse Avenue, in Monterey, California 93940.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 358, and therefore denies them.

359.   For each of the foregoing Post cereals purchased, Mr. Hadley read and decided to purchase the product in substantial part based upon Post's health and wellness labeling statements discussed herein and set forth above with respect to each variety, which statements—individually, and especially in the context of the packaging as a whole—made the products seem like healthy food choices to Mr. Hadley.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 359, and therefore denies them.

* * *

360.   When purchasing the Post cereals and granola, Mr. Hadley was seeking products that were healthy to consume, that is, whose consumption would not increase his risk of CHD, stroke, and other morbidity.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 360, and therefore denies them.

361.   The health and wellness representations on the Post cereals' and granolas' labeling, however, was misleading, and had the capacity, tendency, and likelihood to confuse or confound Mr. Hadley and other consumers acting reasonably (including the putative Class) because, as described in detail herein, the products are not healthy but instead their consumption increases the risk of CHD, stroke, and other morbidity.

**Answer**: Post denies the allegations in Paragraph 361 of the SAC.

362.   Mr. Hadley is not a nutritionist or food scientist, but rather a lay consumer who did not have the specialized knowledge that Post had regarding the nutrients present in the Post cereals and granolas. At the time of purchase, plaintiff was unaware of the extent to which consuming high amounts of added sugar in any form adversely affects blood cholesterol levels and increases risk of CHD, stroke, and other morbidity, or what amount of sugar might have such an effect.

**Answer**: Post lacks sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 362, and therefore denies them.

363.     Mr. Hadley acted reasonably in relying on Post's health and wellness marketing, which Post intentionally placed on the products' labels with the intent to induce average consumers into purchasing the products.

**Answer**: Post denies the allegations in Paragraph 363 of the SAC.

364.     Mr. Hadley would not have purchased Post cereals and granolas if he knew that their labeling claims were false and misleading in that the products were not as healthy as represented.

**Answer**: Post denies the allegations in Paragraph 364 of the SAC.

365.     The Post cereals and granolas cost more than similar products without misleading labeling, and would have cost less absent the misleading health and wellness claims. If Post were enjoined from making the misleading claims, the market demand and price for its cereals and granolas would drop, as it has been artificially and fraudulently inflated due to Post's use of deceptive health and wellness labeling.

**Answer**: Post denies the allegations in Paragraph 365 of the SAC.

366.     Mr. Hadley paid more for the Post cereals and granolas, and would only have been willing to pay less, or unwilling to purchase them at all, absent the misleading labeling statements complained of herein.

**Answer**: Post denies the allegations in Paragraph 366 of the SAC.

367.     For these reasons, the Post cereals and granolas were worth less than what Mr. Hadley paid for them, and may have been worth nothing at all.

**Answer**: Post denies the allegations in Paragraph 367 of the SAC.

368.     Instead of receiving products that had actual healthful qualities, the products Mr. Hadley received were not healthy, but rather their consumption causes increased risk of CHD, stroke, and other morbidity.

**Answer**: Post denies the allegations in Paragraph 368 of the SAC.

369.     Mr. Hadley lost money as a result of Post's deceptive claims and practices in that he did not receive what he paid for when purchasing the Post cereals and granolas.

**Answer**: Post denies the allegations in Paragraph 369 of the SAC.

1    370.    Mr. Hadley detrimentally altered his position and suffered damages in an amount

2    equal to the amount he paid for the products.

3    **Answer**: Post denies the allegations in Paragraph 370 of the SAC.

4    371.    As a result of Post's practices, Mr. Hadley has suffered bodily injury in the form of

5    increased risk of CHD, stroke, and other morbidity.

6    **Answer**: Post denies the allegations in Paragraph 371 of the SAC.

7    **CLASS ACTION ALLEGATIONS**

8    372.    Pursuant to Fed. R. Civ. P. 23, plaintiffs seek to represent a class of all persons in

9    California who, at any time from August 29, 2012 to the time a class is notified, purchased high-

10   sugar Post cereals bearing health and wellness claims for their own personal, family, or household

11   use and not for resale.

12   **Answer**: Post admits that Plaintiffs purport to bring a class action on behalf of the putative

13   class defined in Paragraph 372 of the SAC, but denies that there is any factual or legal basis to

14   certify a class.

15   373.    Plaintiffs nevertheless reserve the right to divide into subclasses, expand, narrow,

16   more precisely define, or otherwise modify the class definition prior to (or as part of) filing a

17   motion for class certification.

18   **Answer**: Post admits that Plaintiffs purport to reserve such rights, but denies that there is

19   any factual or legal basis to certify a class.

20   374.    The members in the proposed class and subclass are so numerous that individual

21   joinder of all members is impracticable, and the disposition of the claims of all class members in a

22   single action will provide substantial benefits to the parties and Court. Fed. R. Civ. P. 23(a)(1).

23   **Answer**: Paragraph 374 consists of a legal conclusion to which no response is required. To

24   the extent a response is required, Post denies the allegations in Paragraph 374 of the SAC.

25   375.    Questions of law and fact common to plaintiffs and the class (Fed. R. Civ. P.

26   23(a)(2) include, without limitation:

27   a.    Whether certain Post cereals contain sufficient added sugar to contribute

28   substantially to the excessive consumption of added sugar;

b.      Whether the excessive consumption of added sugar presents significant health risks;

c.      Whether, if the former questions of fact are answered in the affirmative, this renders misleading to the reasonable consumer Post's use of health and wellness claims on the packaging of high-sugar Post cereals;

d.      Whether the challenged Post health and wellness claims were material;

e.      Whether Post made any statement it knew or should have known was false or misleading;

f.      Whether Post maintained a longstanding marketing policy, practice, and strategy of selling high-sugar cereals with health and wellness claims;

g.      Whether Post's practices were immoral, unethical, unscrupulous, or substantially injurious to consumers;

h.      Whether the utility of any of Post's practices, if any, outweighed the gravity of the harm to its victims;

i.      Whether Post's conduct violated public policy, including as declared by specific constitutional, statutory or regulatory provisions;

j.      Whether the consumer injury caused by Post's conduct was substantial, not outweighed by benefits to consumers or competition, and not one     consumers themselves could reasonably have avoided;

k.      Whether Post's conduct or any of its acts or practices violated the California False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*, the California Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*, the Federal Food, Drug, and Cosmetic Act, 28 U.S.C. §§ 301 *et seq.*, and its implementing regulations, 21 C.F.R. §§ 101 *et seq.*, the California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq.*, or any other regulation, statute, or law;

l.      Whether Post's policies, acts, and practices with respect to the Post high-sugar cereals were designed to, and did result in the purchase and use of the products by the class members primarily for personal, family, or household purposes;

1    m.    Whether Post represented that Post high-sugar cereals have characteristics,

2    uses, or benefits which they do not have, within the meaning of Cal. Civ. Code

3    § 1770(a)(5);

4    n.    Whether Post represented Post high-sugar cereals are of a particular

5    standard, quality, or grade, when they were really of another, within the meaning of Cal.

6    Civ. Code § 1770(a)(7);

7    o.    Whether Post advertised Post high-sugar cereals with the intent not to sell

8    them as advertised, within the meaning of Cal. Civ. Code § 1770(a)(9);

9    p.    Whether Post represented that Post high-sugar cereals have been supplied in

10   accordance with previous representations when they have not, within the meaning of Cal.

11   Civ. Code § 1770(a)(16);

12   q.    Whether through the challenged labels and advertising, Post made

13   affirmations of fact or promises, or descriptions of the goods;

14   r.    Whether Post's affirmations of fact or promises, or descriptions of the

15   goods became part of the basis of the bargain for the Class's purchases;

16   s.    Whether Post failed to provide the goods in conformation with its

17   affirmations of fact, promises, and descriptions of the goods;

18   t.    The proper equitable and injunctive relief;

19   u.    The proper amount of restitution or disgorgement; and

20   v.    The proper amount of reasonable litigation expenses and attorneys' fees.

21   **Answer**: Paragraph 375 consists of a legal conclusion to which no response is required. To

22   the extent a response is required, Post denies the allegations in Paragraph 375 of the SAC.

23   376.   Plaintiffs' claims are typical of class members' claims in that they are based on the

24   same underlying facts, events, and circumstances relating to Post's conduct. Fed. R. Civ. P.

25   23(a)(3).

26   **Answer**: Paragraph 376 consists of a legal conclusion to which no response is required. To

27   the extent a response is required, Post denies the allegations in Paragraph 376 of the SAC.

28

377.     Plaintiffs will fairly and adequately represent and protect the interests of the class, have no interests incompatible with the interests of the class, and have retained counsel competent and experienced in class action, consumer protection, and false advertising litigation, including within the food industry.

**Answer**: Paragraph 377 consists of a legal conclusion to which no response is required. To the extent a response is required, Post denies the allegations in Paragraph 377 of the SAC.

378.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each class member is small such that, absent representative litigation, it would be infeasible for class members to redress the wrongs done to them.

**Answer**: Paragraph 378 consists of a legal conclusion to which no response is required. To the extent a response is required, Post denies the allegations in Paragraph 378 of the SAC.

379.     Questions of law and fact common to the class predominate over any questions affecting only individual class members.

**Answer**: Paragraph 379 consists of a legal conclusion to which no response is required. To the extent a response is required, Post denies the allegations in Paragraph 379 of the SAC.

380.     As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), and may be appropriate for certification "with respect to particular issues" under Rule 23(b)(4).

**Answer**: Paragraph 380 consists of a legal conclusion to which no response is required. To the extent a response is required, Post denies the allegations in Paragraph 380 of the SAC.

<u>**CAUSES OF ACTION**</u>

**FIRST CAUSE OF ACTION**

**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW,**

**CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.***

381.     Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

**Answer**: Post incorporates by reference and repleads all of the admissions, denials, and allegations contained in the paragraphs above.

382.   The FAL prohibits any statement in connection with the sale of goods "which is untrue or misleading," Cal. Bus. & Prof. Code § 17500.

**Answer**: Paragraph 382 consists of a legal conclusion to which no response is required. To the extent a response is required, Post admits that Paragraph 382 accurately quotes a portion of § 17500 of the California Business & Professions Code.

383.   Post's use of health and wellness advertising for Post Cereal products that contain substantial amounts of added sugar is deceptive in light of the strong evidence that excessive sugar consumption greatly increases risk of chronic disease.

**Answer**: Post denies the allegations in Paragraph 383 of the SAC.

384.   Post knew, or reasonably should have known, that the challenged health and wellness claims were untrue or misleading.

**Answer**: Post denies the allegations in Paragraph 384 of the SAC.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT,**

**CAL. CIV. CODE §§ 1750 *ET SEQ.***

385.   Plaintiffs reallege and incorporate the allegations elsewhere in this Complaint as if fully set forth herein.

**Answer**: Post incorporates by reference and repleads all of the admissions, denials, and allegations contained in the paragraphs above.

386.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

**Answer**: Paragraph 386 consists of a legal conclusion to which no response is required. To the extent a response is required, Post admits the allegations in Paragraph 386 of the SAC.

387.   Post's policies, acts, and practices were designed to, and did, result in the purchase and use of the products primarily for personal, family, or household purposes, and violated and continue to violate the following sections of the CLRA:

a.   § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.   § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.   § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

**Answer**: Post denies the allegations in Paragraph 387 of the SAC.

388.   In compliance with Cal. Civ. Code § 1782, plaintiffs sent written notice to Post of their claims, but Post has failed, after 30 days, to satisfy plaintiffs' demand or to rectify the behavior. Accordingly, plaintiffs, on behalf of themselves and the class, seek injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and reasonable attorneys' fees and costs.

**Answer**: Post admits that Plaintiffs sent Post a notice purporting to comply with § 1782 of the California Civil Code and that Plaintiffs purport to seek injunctive relief, restitution, statutory damages, compensatory damages, punitive damages, and reasonable attorneys' fees and costs on behalf of themselves and the putative class. Post denies the remaining allegations in Paragraph 388 of the SAC, and denies that Plaintiffs or any member of the putative class are entitled to relief from Post.

389.   In compliance with Cal. Civ. Code § 1782(d), an affidavit of venue was filed concurrently with the original Complaint.

**Answer**: Post admits the allegations in Paragraph 389 of the SAC.

### THIRD CAUSE OF ACTION

### VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW,

### CAL. BUS. & PROF. CODE § § 17200 *ET SEQ.*

390.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

1    **Answer**: Post incorporates by reference and repleads all of the admissions, denials, and

2    allegations contained in the paragraphs above.

3    391.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice,"

4    Cal. Bus. & Prof. Code § 17200.

5    **Answer**: Paragraph 391 of the SAC consists of a legal conclusion to which no response is

6    required. To the extent a response is required, Post admits that Paragraph 391 accurately quotes a

7    portion of § 17200 of the California Business & Professions Code.

8                                              **Fraudulent**

9    392.    Post's use of the challenged health and wellness claims on products containing high

10   amounts of added sugar are likely to deceive reasonable consumers.

11   **Answer**: Post denies the allegations in Paragraph 392 of the SAC.

12                                               **Unfair**

13   393.    Post's conduct with respect to the labeling, advertising, and sale of Post high-sugar

14   cereals was and is unfair because Post's conduct was and is immoral, unethical, unscrupulous, or

15   substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the

16   gravity of the harm to its victims.

17   **Answer**: Post denies the allegations of Paragraph 393 of the SAC.

18   394.    Post's conduct with respect to the labeling, advertising, and sale of Post high-sugar

19   cereals was also unfair because it violated public policy as declared by specific constitutional,

20   statutory or regulatory provisions, including the False Advertising Law, the Federal Food, Drug,

21   and Cosmetic Act, and the California Sherman Food, Drug, and Cosmetic Law.

22   **Answer**: Post denies the allegations of Paragraph 394 of the SAC.

23   395.    Post's conduct with respect to the labeling, advertising, and sale of Post high-sugar

24   cereals was also unfair because the consumer injury was substantial, not outweighed by benefits to

25   consumers or competition, and not one consumers themselves could reasonably have avoided.

26   **Answer**: Post denies the allegations of Paragraph 395 of the SAC.

27

28

**Unlawful**

396.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

        a.    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

        b.    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*; and

        c.    The Federal Food, Drug, and Cosmetic Act, 28 U.S.C. §§ 301 *et seq.*, and its implementing regulations, 21 C.F.R. §§ 101 *et seq.*; and The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 109875, *et seq.*

**Answer**: Post denies the allegations in Paragraph 396 of the SAC.

**FOURTH CAUSE OF ACTION**

**BREACH OF EXPRESS WARRANTY, CAL. COM. CODE § 2313(1)**

397.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

**Answer**: Post incorporates by reference and repleads all of the admissions, denials, and allegations contained in the paragraphs above.

398.    Through the labels of high-sugar Post products bearing health and wellness claims, Post made affirmations of fact or promises, and made descriptions of goods, that formed part of the basis of the bargain, in that plaintiffs and the class purchased the products in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

**Answer**: Post denies the allegations in Paragraph 398 of the SAC.

399.    These affirmations and descriptions include, for example:

        *a.*    *Great Grains Blueberry Morning*

- "Less processed nutrition you can see"
- "it's good for you!"
- "less processed whole grain cereal"

        *b.*    *Great Grains Cranberry Almond Crunch*

- "Less processed nutrition you can see"
- "it's good for you!"

1            •  "nutritious ingredients in every bite!"

2            •  "less processed whole grain cereal"

3      *c.*      *Great Grains Banana Nut Crunch*

4            •  "Less processed nutrition you can see"

5            •  "it's good for you!"

6            •  "nutritious ingredients in every bite!"

7            •  "less processed whole grain cereal"

8      *d.*      *Great Grains Raisins, Dates & Pecans*

9            •  "Less processed nutrition you can see"

10            •  "it's good for you!"

11            •  "nutritious ingredients in every bite!"

12      *e.*      *Great Grains Crunchy Pecans*

13            • "Less processed nutrition you can see"

14            • "it's good for you!"

15            • "nutritious ingredients in every bite!"

16      *f.*      *Great Grains Blueberry Pomegranate*

17            • "Less processed nutrition you can see"

18            • "it's good for you!"

19            • "nutritious ingredients in every bite!"

20      *g.*      *Great Grains Protein Blend: Honey, Oats & Seeds*

21            • "HELPS SUPPORT A HEALTHY METABOLISM"

22            • "it's good for you!"

23            • "nutritious ingredients in every bite!"

24            • "Support a Healthy Metabolism"

25            • "less processed whole grain cereal"

26      *h.*      *Great Grains Protein Blend: Cinnamon Hazelnut*

27            • "HELPS SUPPORT A HEALTHY METABOLISM"

28            • "nutritious ingredients in every bite!"

1      • "it's good for you!"

2      • "less processed whole grain cereal"

3      • "Support a Healthy Metabolism"

4          i.      *Honey Bunches of Oats Cereal – Honey Roasted, With Almonds, Raisin*

5      *Medley, With Pecan Bunches, With Cinnamon Bunches, With Vanilla Bunches, With Real*

6      *Strawberries, Fruit Blends – Banana Blueberry, and Fruit Blends – Peach Raspberry*

7      • "Heart Healthy"

8      • heart depictions

9      • "wholesome"

10         j.      *Honey Bunches of Oats Cereal – Tropical Blends – Mango Coconut*

11     • "wholesome"

12         k.      *Honey Bunches of Oats Cereal – Whole Grain Honey Crunch* and *Whole*

13     *Grain With Vanilla Bunches*

14     • "a smart step toward eating a balanced diet"

15     • "Honey Bunches of Oats Whole Grain Cereal has it all. . . Fiber fills you

16     up, helps keep you satisfied and is important to help maintain digestive

17     health. Rich in nutrients: Honey Bunches of Oats Whole Grain Cereal is

18     rich in nutrients . . . important for moms-to-be and growing children. . . .

19     Whole grains are an important part of a balanced diet, but on average,

20     Americans eat less than 1 serving of whole grains per day."

21     • "good for your family, good for your health, good for you"

22     • Heart design in "I" in "Whole Grain" name

23         l.      *Honey Bunches of Oats Cereal – Greek Honey Crunch & Greek Mixed*

24     *Berry*

25     • "WHOLESOME NUTRITION"

26         m.      *Honey Bunches of Oats Granola – Honey Roasted*, *Raspberry*, and

27     *Cinnamon*

28     • "wholesome"

n.    *Honey Bunches of Oats Protein Granola with Dark Chocolate*

• "HELPS FUEL YOUR BODY WITH SUSTAINED ENERGY"

o.    *Shredded Wheat Honey Nut*

- "An ingredient list that is so good, we have nothing to hide. Wouldn't it be great if it were easy to understand what is in your food? With Post Shredded Wheat, it's easy to be confident with your breakfast choice. It is made with nothing but goodness, so go ahead and enjoy a bowl."

- "We make it easy to understand what is in your food—we start with the goodness of whole grain wheat. No artificial flavors or colors added: Our flavor comes from whole grain wheat, honey, almonds, molasses and real sugar. That means vitamin and mineral fortified Post Shredded Wheat Honey Nut contains no High fructose corn syrup or artificial ingredients."

- "We make it easy to understand what is in your food—it's just the wholesome goodness of whole grain wheat."

- "No Sugar* [ ] Added: Our flavor comes from 100% whole grain wheat, nothing else. That means Post Shredded Wheat . . . has 0 grams of sugars per serving."

- "THE BISCUIT OF BENEFITS / Post Shredded Wheat Honey Nut is made with 100% whole grain wheat, for a natural source of fiber. . . . So what does this mean in terms of health benefits for you? They are so plentiful, the cereal could be renamed Biscuit of Benefits!"

- "**Heart Health**"

- "**Digestive Health:** Diets rich in fiber have many benefits and are important for maintaining digestive health."

p.    *Shredded Wheat Crunch!*

1          • "POST SHREDDED WHEAT CRUNCH MAY HELP REDUCE

2            THE RISK OF HEART DISEASE"

3          • "heart healthy"

4     q.     *Raisin Bran*

5          • "Healthy"

6          • "Nutritious"

7          • "Where nutritious and delicious live in harmony"

8          • "good for digestive health"

9     r.     *Bran Flakes*

10         • "TO HELP MAINTAIN DIGESTIVE HEALTH"

11         • "YOUR HEALTHY LIFESTYLE"

12         • "nutrients to help keep you healthy"

13         • "TO HELP WITH WEIGHT MANAGEMENT"

14    s.   *Alpha-Bits*

15         • "ALPHA-BITS IS A GOOD SOURCE OF NUTRIENTS THAT

16           ARE BUILDING BLOCKS FOR YOUR CHILD'S

17           DEVELOPING BRAIN"

18    t.   *Honey-Comb*

19         • "Nutritious"

20    **Answer**: Post admits that the statements cited in Paragraph 399 of the SAC appeared on

21  certain versions of its packaging for certain products at certain points in time, but denies that those

22  statements constitute express warranties. Post further asserts that the Court has dismissed with

23  prejudice Plaintiff's breach of express warranty claim with respect to the following statements

24  referred to in Paragraph 399: "Fiber fills you up, helps keep you satisfied and is important to help

25  maintain digestive health. Rich in nutrients: Honey Bunches of Oats Whole Grain Cereal is rich in

26  nutrients . . . important for moms-to-be and growing children. . . . Whole grains are an important

27  part of a balanced diet, but on average, Americans eat less than 1 serving of whole grains per day"

28  on Honey Bunches of Oats – Whole Grain Honey Crunch and Whole Grain with Vanilla Bunches,

and "No Sugar* [ ] Added: Our flavor comes from 100% whole grain wheat, nothing else. That means Post Shredded Wheat . . . has 0 grams of sugars per serving" on Shredded Wheat – Honey Nut, and "heart healthy" on Shredded Wheat Crunch!. Post further asserts that Plaintiffs have abandoned their breach of express warranty claim as to the phrase "good for your health" on Honey Bunches of Oats – Whole Grain Honey Crunch and Whole Grain with Vanilla Bunches.

400.    Post breached its express warranties by selling products that do not meet the above affirmations and product descriptions because they are not healthy, and not heart healthy, but in fact detrimentally affect health, increasing risk of CHD, stroke, and other morbidity.

**Answer**: Post denies the allegations in Paragraph 400 of the SAC.

401.    That breach actually and proximately caused injury in the form of the lost purchase price that plaintiffs and Class members paid for the high-sugar Post products bearing health and wellness claims.

**Answer**: Post denies the allegations in Paragraph 401 of the SAC.

402. Plaintiffs gave Post notice of the breach before filing or asserting the claims, but Post failed to remedy the breach.

**Answer**: Post admits that Plaintiffs notified Post of an alleged breach of express warranty prior to filing this lawsuit, but denies that it breached any express warranty or that it failed to remedy any such breach.

403.    As a result, plaintiffs seek, on behalf of themselves and other class members, actual damages arising as a result of Post's breaches of express warranty.

**Answer**: Post admits that Plaintiffs seek actual damages in connection with their claims for breach of express warranty, but denies that Plaintiffs or any class member suffered any "damages as a result of Post's breaches of express warranty" and denies that Plaintiff or any class member is entitled to any relief from Post.

**FIFTH CAUSE OF ACTION**

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY,**

**CAL. COM. CODE § 2314**

1    404.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if

2    set forth in full herein.

3        **Answer**: Post incorporates by reference and repleads all of the admissions, denials, and

4    allegations contained in the paragraphs above.

5        405.    Post, through its acts and omissions set forth herein, in the sale, marketing and

6    promotion of high-sugar Post products bearing health and wellness claims, made representations

7    to plaintiffs and the Class that, among other things, the products are healthy. This specifically

8    includes those statements set forth in paragraph 399(a)-(t) above. Plaintiffs and the Class bought

9    high-sugar products bearing health and wellness claims manufactured, advertised, and sold by

10   Post as described herein.

11       **Answer**: Post lacks sufficient knowledge or information as to whether Plaintiffs or any

12   putative class member purchased any Post product challenged in the SAC, and therefore denies

13   this allegation. Post denies all remaining allegations in Paragraph 405 of the SAC.

14       406.    Post is a merchant with respect to the goods of this kind which were sold to

15   plaintiffs and the class, and there was, in the sale to plaintiffs and other consumers, an implied

16   warranty that those goods were merchantable.

17       **Answer**: Post lacks sufficient knowledge or information as to whether Plaintiffs or any

18   putative class member purchased any Post product challenged in the SAC, and therefore denies

19   this allegation. Post admits that implied warranties may operate as a matter of law, and avers that

20   any such warranties were met. Post denies all remaining allegations in Paragraph 406 of the SAC.

21       407.    However, Post breached that implied warranty in that Post high-sugar products

22   bearing health and wellness claims are not healthy, as set forth in detail herein.

23       **Answer**: Post denies the allegations in Paragraph 407 of the SAC.

24       408.    As an actual and proximate result of Post's conduct, plaintiffs and the class did not

25   receive goods as impliedly warranted by Post to be merchantable in that they did not conform to

26   promises and affirmations made on the container or label of the goods.

27       **Answer**: Post denies the allegations in Paragraph 408 of the SAC.

28

1    409. Plaintiffs gave Post notice of the breach before filing or asserting the claims, but Post

2    failed to remedy the breach.

3    **Answer**: Post admits that Plaintiffs notified Post of an alleged breach of implied warranty

4    prior to filing this lawsuit, but denies that it breached any implied warranty or that it failed to

5    remedy any such breach.

6    410. As a result, plaintiffs seek, on behalf of themselves and other class members, actual

7    damages arising as a result of Post's breaches of implied warranty.

8    **Answer**: Post admits that Plaintiffs seek actual damages in connection with their claims for

9    breach of implied warranty, but denies that Plaintiffs or any class member suffered any "damages

10   as a result of Post's breaches of implied warranty" and denies that Plaintiff or any class member is

11   entitled to any relief from Post.

12                                   **PRAYER FOR RELIEF**

13   411. Wherefore, plaintiffs, on behalf of themselves, all others similarly situated, and the

14   general public, pray for judgment against Post as to each and every cause of action, and the

15   following remedies:

16        a.   An Order certifying this as a class action, appointing plaintiffs and their
               counsel to represent the class, and requiring Post to pay the cost of class
17             notice;

18        b.    An Order enjoining Post from labeling, advertising, or packaging the Post
               high-sugar cereals identified herein with the challenged health and wellness
19             statements identified herein;

20        c.   An Order compelling Post to conduct a corrective advertising campaign to
               inform the public that Post high-sugar cereals were deceptively marketed;
21

22        d.   An Order enjoining Post's longstanding policy, practice, and strategy of
               marketing high-sugar cereals with misleading health and wellness claims;

23        e.   An Order requiring Post to pay restitution to restore funds that may have
               been acquired by means of any act or practice declared by this Court to be
24             an unlawful, unfair, or fraudulent business act or practice, untrue or
               misleading advertising, or a violation of the UCL, FAL, or CLRA;
25

26        f.   An Order requiring Post to pay all statutory, compensatory, and punitive
               damages permitted under the causes of action alleged herein;

27        g.   An Order requiring Post to disgorge or return all monies, revenues, and
               profits obtained by means of any wrongful or unlawful act or practice;
28

h.      Pre- and post-judgment interest;

i.      Costs, expenses, and reasonable attorneys' fees; and

j.      Any other and further relief the Court deems necessary, just, or proper.

**Answer**: Post denies that Plaintiffs or any putative class member is entitled to the relief requested in Paragraph 411 of the SAC.

### JURY DEMAND

412.    Plaintiffs hereby demand a trial by jury on all issues so triable.

**Answer**: Post admits that Plaintiffs are entitled to a trial by jury on all issues so triable, and it likewise demands a trial by jury on all issues so triable.

### DEFENSES AND AFFIRMATIVE DEFENSES

412.    Without suggesting or conceding that it has the burden of proof on any such defenses, Post alleges the following defenses and/or affirmative defenses to the SAC:

### FIRST DEFENSE
#### (Failure to State a Claim)

The SAC fails to state a claim on which relief can be granted because the representations on Post's labels were accurate and not false or misleading. Further, the SAC fails to allege any facts supporting Plaintiffs' allegations that they suffered any damages as a result of any act or omission on the part of Post.

### SECOND DEFENSE
#### (Commercial Speech Protection)

Plaintiffs' claims, and those of other Post cereal purchasers, are barred, in whole or in part, because Post's commercial speech was not misleading and is protected under the First Amendment of the United States Constitution and the California Constitution.

### THIRD DEFENSE
#### (Preemption)

Plaintiffs' claims, and those of other Post cereal purchasers, are barred, in whole or part, because Post adhered to and complied with all applicable federal laws, regulations, and rules, including but not limited to the Federal Food, Drug, and Cosmetic Act and FDA regulations.

1   Accordingly, each and every claim asserted or raised in the SAC is or may be preempted by

2   federal Nutrition Labeling and Education Act, 21 U.S.C. § 341 *et seq.* under the Supremacy

3   Clause of the United States Constitution.

4   **FOURTH DEFENSE**

5   (Puffery)

6       Plaintiffs' claims, and those of other Post cereal purchasers, are barred to the extent that

7   any alleged deceptive statements constitute puffery, and no reasonable consumer would have

8   reasonably relied on or misunderstood the representations on Post's labels.

9   **FIFTH DEFENSE**

10   (No Reliance)

11       Plaintiffs' claims, and those of other Post cereal purchasers, are barred, in whole or in part,

12   because Plaintiffs and/or members of the purported class did not rely or reasonably rely on the

13   alleged statements or conduct of Post.

14   **SIXTH DEFENSE**

15   (No Warranties)

16       Post made no express warranties that were relied upon by Plaintiffs or other Post cereal

17   purchasers.

18   **SEVENTH DEFENSE**

19   (Implied Warranty Claim Barred by Opportunity to Examine)

20       Plaintiffs' claim for breach of implied warranty, and that of other Post cereal purchasers, is

21   barred because Plaintiffs and other Post cereal purchasers had an opportunity to examine the goods

22   and an examination would have revealed the alleged defects of which Plaintiffs complain.

23   **EIGHTH DEFENSE**

24   (No Standing – No Injury in Fact)

25       Post alleges on information and belief that Plaintiffs and other Post cereal purchasers have

26   not sustained the required injury in fact and/or lost the requisite money or property necessary to

27   confer standing under California Business & Professions Code §§ 17200, *et seq.*, §§ 17500 *et seq.*,

28   California Civil Code §§ 1750 *et seq.*, or Article III of the United States Constitution.

**NINTH DEFENSE**

(No Causation)

To the extent that Plaintiffs or other Post cereal purchasers suffered injury, ascertainable loss, or damage, which Post denies, such injury, ascertainable loss, or damage was not proximately caused by any conduct or inaction of Post.

**TENTH DEFENSE**

(Failure to Make Reasonable Efforts to Minimize Loss or Mitigate Damages)

Plaintiffs' claims, and those other Post cereal purchasers, are barred, in whole or in part, because Plaintiffs other Post cereal purchasers failed to act reasonably to minimize any loss, damages or harm that they suffered, and could have avoided such harm by making reasonable efforts or expenditures

**ELEVENTH DEFENSE**

(Damages Unavailable)

The damages sought by Plaintiffs and other Post cereal purchasers under California Business & Professions Code §§ 17200, *et seq.*, §§ 17500 *et seq.*, and California Civil Code §§ 1750 *et seq.* are not available as a matter of law.

**TWELFTH DEFENSE**

(Conduct Not Knowingly Untrue or Misleading)

The matters challenged by the SAC were neither known to Post to be, nor in the exercise of reasonable care should have been known to Post to be, untrue or misleading.

**THIRTEENTH DEFENSE**

(Full Performance of Any Duties)

Plaintiffs' claims, and those of and other Post cereal purchasers, are barred, in whole or in part, because Post fully performed any and all obligations pursuant to any contract, warranty, or statutory duty existing between the parties herein.

**FOURTEENTH DEFENSE**

(Equitable Relief – Remedies)

Plaintiffs and other Post cereal purchasers are barred from asserting the claims for

equitable relief alleged in the SAC because they have not suffered any irreparable injury, have

adequate remedies at law and/or the equitable relief is neither necessary nor proper under

applicable law.

## FIFTEENTH DEFENSE

### (Statutes of Limitations)

Plaintiffs' claims, and those of other Post cereal purchasers, are barred, in whole or in part, by the applicable statutes of limitations, including, but not limited to, Code of Civil Procedure §§ 337, 338, 339, Business and Professions Code § 17208, Cal. Civil Code § 1783.

## SEVENTEENTH DEFENSE

### (Waiver)

The claims of some Post cereal purchasers, are barred, in whole or in part, by the doctrine of waiver.

## EIGHTEENTH DEFENSE

### (Primary Jurisdiction)

Each of Plaintiffs' claims, and those of other Post cereal purchasers, should be stayed or dismissed in accordance with the doctrine of primary jurisdiction.

## NINETEENTH DEFENSE

### (Reservation of Further Defenses)

Post reserves the right to allege further affirmative defenses as they may become known through the course of discovery.

Dated:  April 12, 2018                    **FAEGRE BAKER DANIELS LLP**

By:  */s/ Sarah L. Brew*
Tarifa B. Laddon (SBN 240419)
Howard D. Ruddell (SBN 281510)
Sarah L. Brew  (pro hac vice)
Aaron Van Oort (pro hac vice)
Courtney A. Lawrence (pro hac vice)
Nicholas J. Nelson (pro hac vice)

Attorneys for Defendant POST FOODS, LLC