**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEBBIE KROMMENHOCK and STEPHEN HADLEY, on behalf of themselves, all others similarly situated, and the general public,<br><br>    Plaintiffs,<br><br>           v.<br><br>POST FOODS, LLC,<br><br>    Defendant. | Case No. 3:16-cv-04958-WHO<br><br>**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>**REDACTED FOR PUBLIC FILING**<br><br>Judge:         Hon. William H. Orrick<br>Hearing Date:  October 9, 2019, 2:00 p.m.<br>Location:      Courtroom 2 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

NOTICE OF MOTION ......................................................................................................... 1

ISSUE TO BE DECIDED ..................................................................................................... 1

MEMORANDUM OF POINTS & AUTHORITIES ............................................................ 2

I.      FACTS AND COMMON EVIDENCE SUPPORTING THE CLASS'S CLAIMS .............. 2

     A.     Cereal Consumption is Ubiquitous ................................................. 2

     B.     Consumer Interest in Healthy Eating Greatly Affects the Cold Cereal Market ........................................................................................................ 3

     C.     Post Carefully Studied the Market to Understand Cereal Consumers ..................... 4

     D.     Post Used the Challenged Health and Wellness Claims to Drive Sales and Market Share ........................................................................................... 5

          1.     Great Grains ................................................................................. 5

          2.     Honey Bunches of Oats ............................................................... 6

          3.     Honey Bunches of Oats Granola ................................................. 7

          4.     Raisin Bran .................................................................................. 8

          5.     Bran Flakes ................................................................................. 8

          6.     Honeycomb ................................................................................. 9

          7.     Alpha-Bits ................................................................................... 9

          8.     Waffle Crisp .............................................................................. 10

     E.     Plaintiffs Relied on Post's Misrepresentations and Deceptive Omissions .............. 10

     F.     Post's Health and Wellness Claims and Omissions Were Misleading .................... 10

          1.     The Accused Cereals Are Not Healthy ...................................... 10

          2.     Great Grains is Not "Less Processed" or "Gently Steamed, Rolled, and Baked" ............................................................................ 11

     G.     The Class was Injured by Post's Misrepresentations and Deceptive Omissions .................................................................................................. 12

i

|  |  | 1. | The Class Paid Premiums for the Products | ...................................... | 12 |

2. Post Realized a Significant Advantage at the Class's Expense by Advertising the Products as Healthy While Withholding Material Information ........................................................... 13

H. Post Acted with Fraud and Oppression, Subjecting it to Punitive Damages ............ 13

II. ARGUMENT ................................................................................................ 17

A. The Requirements of Rule 23(a) Are Satisfied ........................................ 18

1. Numerosity ............................................................................. 18

2. Commonality ........................................................................... 18

3. Typicality ............................................................................... 18

4. Adequacy ............................................................................... 19

B. The Requirements of Rule 23(b)(3) Are Satisfied ..................................... 20

1. Predominance ......................................................................... 20

   a. The Class's Claims will be Resolved through Objective Standards and Common Evidence that Apply Classwide ................ 20

      i. Consumer Fraud: Affirmative Misrepresentation ................ 20

      ii. Consumer Fraud: Deceptive Omission ............................. 21

      iii. Breach of Warranty ................................................... 22

   b. The Class's Damages Models are Consistent with its Theories of Liability, and Capable of Measuring Classwide Damages ........................................................................ 22

      i. The Consumer Impact Model ....................................... 23

      ii. The Advantage Realized Model ..................................... 24

2. Superiority ............................................................................. 25

III. CONCLUSION ............................................................................................. 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Similasan Corp.*,
    306 F.R.D. 635 (S.D. Cal. 2015) ...............................................................22

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)...................................................................................22

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
    133 S. Ct. 1184 (2013)..............................................................................22

*Baranco v. Ford Motor Co.*,
    294 F. Supp. 3d 950 (N.D. Cal. Mar. 12, 2018) .......................................24

*Bautista v. Valero Mktg. & Supply Co.*,
    2018 WL 7142094 (N.D. Cal. Dec. 4, 2018) ............................................14

*Bromfield v. Craft Brew Alliance, Inc.*,
    2018 WL 4952519 (N.D. Cal. Sept. 25, 2018) ..........................................27

*Butler v. Porsche Cars N. Am., Inc.*,
    2017 WL 1398316 (N.D. Cal. Apr. 19, 2017) ......................................23, 24

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013).....................................................................................25

*Cortina v. Goya Foods, Inc.*,
    94 F. Supp. 3d 1174 (S.D. Cal. 2015)........................................................23

*Culley v. Lincare Inc.*,
    2016 WL 4208567 (E.D. Cal. Aug. 10, 2016)............................................29

*Dachauer v. NBTY, Inc.*,
    913 F.3d 844 (9th Cir. 2019) .....................................................................23

*Daniel v. Ford Motor Co.*,
    806 F.3d 1217 (9th Cir. 2015) ...................................................................23

*De La Fuente v. Stokely–Van Camp, Inc.*,
    713 F.2d 225 (7th Cir. 1983) .....................................................................20

*Falk v. Gen. Motors Corp.*,
    496 F. Supp. 2d 1088 (N.D. Cal. 2007) .....................................................22

*Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*,
    326 F.R.D. 592 (N.D. Cal. June 26, 2018) ................................................28

*Guido v. L'Oreal, USA, Inc.*,
  284 F.R.D. 468 (C.D. Cal. 2012) ...................................................................................21

*Hadley v. Kellogg Sales Co.*,
  273 F. Supp. 3d 1052 (N.D. Cal. 2017) .........................................................................23

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) .............................................................18, 19, 21, 27

*Hale v. State Farm Mut. Auto. Ins. Co.*,
  2016 WL 4992504 (S.D. Ill. Sept. 16, 2016) .................................................................19

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) ........................................................................................19

*In re Arris Cable Modem Consumer Litig.*,
  327 F.R.D. 334 (N.D. Cal. 2018) ..................................................................................27

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) .............................................................................24

*In re Ferrero Litig.*,
  278 F.R.D. 552 (S.D. Cal. 2011) ...................................................................................22

*In re Lenovo Adware Litig.*,
  2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ...............................................................28

*In re MyFord Touch Consumer Litig.*,
  291 F. Supp. 3d 936 (N.D. Cal. 2018) ...........................................................................27

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. Aug. 14, 2015) ..........................................................24

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (S.D.N.Y. 2015) ..................................................................................24

*In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prods. Liab. Litig.*,
  2019 WL 693224 (N.D. Cal. Feb. 19, 2019) .................................................................14

*In re Yahoo! Inc. Consumer Data Sec. Breach Litig.*,
  313 F. Supp. 3d 1113 (N.D. Cal. 2018) .........................................................................14

*Johns v. Bayer Corp.*,
  280 F.R.D. 551 (S.D. Cal. 2012) ...................................................................................22

*Jones v. Goord*,
  435 F. Supp. 2d 221 (S.D.N.Y. 2006) ...........................................................................18

iv

*Karim v. Hewlett-Packard Co.*,
   311 F.R.D. 568 (N.D. Cal. 2015) .................................................................................. 24

*Kurtz v. Kimberly-Clark Corp.*,
   312 F.R.D. 482 (E.D.N.Y. Mar. 27, 2017) ................................................................... 27

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) .................................................................................................. 25

*Lambert v. Nutraceutical Corp.*,
   870 F.3d 1170 (9th Cir. 2017) ...................................................................................... 25

*Lanovaz v. Twinings N. Am., Inc.*,
   2014 WL 1652338 (N.D. Cal. Apr. 24, 2014) ............................................................. 22

*Lavie v. Procter & Gamble Co.*,
   105 Cal. App. 4th 496 (2003) ....................................................................................... 21

*Local Joint Exec. Bd. Of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
   244 F.3d 1152 (9th Cir. 2001) ...................................................................................... 20

*Marino v. Coach, Inc.*,
   264 F. Supp. 3d 558 (S.D.N.Y. Aug. 28, 2017) ........................................................... 26

*Martinelli v. Johnson & Johnson*,
   2019 WL 1429653 (E.D. Cal. Mar. 29, 2019) ............................................................. 27

*Odyssey Wireless, Inc. v. Apple Inc.*,
   2016 WL 7644790 (S.D. Cal. Sept. 14, 2017) ............................................................. 27

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ........................................................................................ 26

*Salvagne v. Fairfield Ford Inc.*,
   254 F.R.D. 321 (S.D. Ohio 2009) ................................................................................. 20

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
   559 U.S. 393 (2010) ...................................................................................................... 18

*Simpson v. Fireman's Fund Ins. Co.*,
   231 F.R.D. 391 (N.D. Cal. 2005) .................................................................................. 19

*Spann v. J.C. Penney Corp.*,
   2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) ............................................................. 26

*Stathakos v. Columbia Sportswear Co.*,
   2017 WL 1957063 (N.D. Cal. May 11, 2017) .............................................................. 26

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. 2012) ................................................................22, 29

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ...........................................................................29

*Werdebaugh v. Blue Diamond Growers*,
    2014 WL 2191901 (N.D. Cal. May 23, 2014) ...........................................26, 27

*Williams v. Gerber Prods. Co.*,
    552 F.3d 934 (9th Cir. 2008) ...........................................................................21

**Statutes**

Cal. Bus. & Prof. Code § 17203 ...............................................................................23

Cal. Bus. & Prof. Code § 17535 ...............................................................................23

Cal. Civ. Code § 1780(a)(3) .....................................................................................23

Cal. Civ. Code § 1780(a)(4) .....................................................................................14

Cal. Civ. Code § 3294(a) ..........................................................................................14

Cal. Com. Code § 2313(1)(a) ...................................................................................22

Cal. Com. Code § 2313(1)(b) ...................................................................................22

**Rules**

Fed. R. Civ. P. 23(a)(1) .............................................................................................18

Fed. R. Civ. P. 23(a)(4) .............................................................................................19

Fed. R. Civ. P. 23(c)(5) .............................................................................................17

**Regulations**

21 C.F.R. § 1.21 ........................................................................................................21

21 C.F.R. § 1.21(a)(2) ...............................................................................................21

## NOTICE OF MOTION

PLEASE TAKE NOTICE, that on October 9, 2019, at 2:00 p.m., Plaintiffs will move the Court to certify a Class comprised of the following Subclasses: All persons who, on or after August 29, 2012 (the "Class Period"), purchased in California, for household use and not for resale or distribution, one or more of the following Post cereal varieties:

**Great Grains Subclass:** Raisins, Dates, and Pecans (16 or 40.5 oz. package); Crunchy Pecan (16 oz.); Cranberry Almond Crunch (14 oz.); Blueberry Pomegranate (15.9 oz.); Banana Nut Crunch (15.5 oz.); Protein Blend: Honey, Oats, and Seeds (14.75 or 13.5 oz.); and Protein Blend: Cinnamon Hazelnut (14.75 or 13.5 oz.).

**Honey Bunches of Oats Subclass:** Honey Roasted (14.5, 18, 23, 24.5, 27, 28, 36, or 48 oz.); Almonds (14.5, 18, 23, 24.5, 27, 28, 36, or 48 oz.); Raisin Medley (17 oz.); Pecan Bunches (14.5 oz.); Cinnamon Bunches (14.5 or 18 oz.); Vanilla Bunches (18 oz.) Apple & Cinnamon Bunches (14.5 or 18 oz.); Real Strawberries (13, 16.5, or 20 oz.); Fruit Blends: Banana Blueberry (14.5 or 18 oz.); Fruit Blends: Peach Raspberry (14.5 or 18 oz.); Tropical Blends: Mango Coconut (14.5 or 18 oz.); Greek Honey Crunch (12.5 or 15.5 oz.); and Greek Mixed Berry (12.5 or 15.5 oz.).

**Honey Bunches of Oats Whole Grain Subclass:** Vanilla Bunches (18 oz.); Honey Crunch (18 oz).

**Honey Bunches of Oats Granola Subclass:** Honey Roasted (11 or 20 oz.); Cinnamon (11 oz.); Raspberry (11 oz.).

**Raisin Bran Subclass:** Raisin Bran (20 or 25 oz.).

**Bran Flakes Subclass:** Bran Flakes (16 oz.).

**Alpha-Bits Subclass:** Alpha-Bits (11.5 or 12 oz.).

**Honeycomb Subclass:** Honeycomb (12.5, 16, 33, or 35 oz.).

**Waffle Crisp Subclass:** Waffle Crisp (11.5 oz.).

The Motion is based on the within Memorandum; the concurrently-filed Declarations of Jack Fitzgerald ("Fitzgerald Decl."), Bruce Silverman ("Silverman Decl."), Dr. Robert Lustig, M.D., MSL ("Lustig Decl."), Dr. Michael Greger, M.D., FACLM ("Greger Decl."), Steven P. Gaskin ("Gaskin Decl."), Coin B. Weir ("Weir Decl."), Debbie Krommenhock ("Krommenhock Decl."), and Stephen Hadley ("Hadley Decl."), and all exhibits thereto; and all relevant pleadings, evidence, and argument offered in support of the Motion.

Plaintiffs ask that the Court certify the Class pursuant to Rules 23(a) and 23(b)(3), appoint them Class Representatives, and appoint their counsel Class Counsel.

## ISSUE TO BE DECIDED

Whether the requirements of Federal Rules of Civil Procedure 23(a) and 23(b)(3) are satisfied.

1

## MEMORANDUM OF POINTS & AUTHORITIES

This case is readily amenable to certification of a Rule 23(b)(3) damages class. *First*, Rule 23(a)'s criteria are satisfied. For numerosity, Plaintiffs show hundreds of thousands of units sold for each Subclass. For commonality, Plaintiffs show Post's offending conduct was substantially the same within each Subclass. For typicality, Plaintiffs show their claims are based on the same facts and legal theories as other Class Members' claims, and that all were injured in the same manner. And for adequacy, Plaintiffs show they are *bona fide* purchasers with standing and without conflict, who will continue, together with counsel, to prosecute the case vigorously. *Second*, Rule 23(b)(3)'s criteria are satisfied. Post's liability to all depends on whether its conduct was objectively deceptive or breached warranties, questions that can be resolved with common evidence, so that common liability issues predominate; and if Post is liable, what it owes can be calculated classwide consistent with the Class's theories of liability. The Class alleges Post's affirmative misrepresentations inflated the products' prices relative to their true value, and that Class Members were injured by paying these premia. Plaintiffs have used conjoint analysis, a widely-accepted method for isolating price premia associated with challenged labeling claims. The Class also alleges Post omitted material information, distorting the market demand for its products and causing the Class to purchase more than it otherwise would have. To test the advantage Post realized by remaining silent, Plaintiffs employed a study to model the change in consumer demand attendant to a disclosure of the sort the Class alleges Post was required to make. Finally, class treatment is the superior means of adjudicating the Class's claims because adjudicating them individually is economically infeasible.

## I.   FACTS AND COMMON EVIDENCE SUPPORTING THE CLASS'S CLAIMS

### A.   Cereal Consumption is Ubiquitous

More than ▮% of US households ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. *See* Ex. 24 at KP13760, 13850.[1] It is "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ ▬▬▬." Ex. 25 at KP9998; *see also* Ex. 26 at KP11072 ("▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬"). ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬," Ex. 27 at KP16412, and "▬▬▬▬▬▬▬▬ ▬▬▬▬▬," Ex. 24 at KP13763. "▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬," Ex. 28 at KP15489; *see also* Ex. 24 at

---

[1] All exhibit references, "Ex. __," are to the Fitzgerald Declaration. Post documents are referred to by shortening its chosen production number prefix, "Krom_POST," to "KP," and dropping leading zeroes.

1   KP13821, and "███████████████████████████," Ex. 24 at KP13763. "████████

2   ██████████████," with "██████████████," *id.* at KP13758, while "████

3   ████████████████████," *id.* at KP13823.  ████████████████████████

4   ████," and "████████████████████████████████," *Id.* at KP13821.

5   Reflecting its broad appeal, annual sales have long hovered around $█████. Ex. 28 at KP15443. Post has

6   had a consistent ███% share, good for yearly sales of about $█████, making it the third-largest manufacturer.

7   *See* Ex. 24 at KP13759-60, 13790; Ex. 28 at KP15422, 15451; Ex. 29 at KP16787-88; Ex. 30 at KP15881.

8           **B.    Consumer Interest in Healthy Eating Greatly Affects the Cold Cereal Market**

9           "████████████████████████████████████████████

10  ████████████████████████." Ex. 24 at KP13771. "████████████████

11  █████████████████." Ex. 31 at KP26204. And "████████████████

12  ████████████████," Ex. 32 at KP1194. *See also* Silverman Decl. ¶¶

13  35-66 (discussing consumer interest in healthy eating). Thus, "████████████████

14  ████████████████████." Ex. 24 at KP13751; *see also* Silverman Decl. ¶¶ 67-86

15  (discussing consumer attitudes and behavior regarding cereal).

16          The cold cereal market has "████████████████████████████████."

17  Ex. 33 at KP10458; *see also* Ex. 3, Bernstein Tr. 348:7-9. The products here are Adult (Great Grains, Raisin

18  Bran, Bran Flakes), All-Family (Honey Bunches of Oats), or Kids (Alpha-Bits, Honeycomb, Waffle Crisp)

19  cereals. Ex. 34.[2] "████████████████████████████████████," "

20  with "████████████████████████████████████████████

21  ████████████████████." Ex. 24 at KP13835. "████████████████

22  ████████████████," Ex. 28 at KP15498. In addition, "████████████

23  ████████████████████████." Ex. 36 at KP25608.

24          Yet, "████████████████████████████████████████████

25  ████████████████████████." Ex. 30 at KP15872. Cereal sales

26

27  ───────────────
    [2] When the Class Period began in 2012, Post used a "████████████████████████████" in which those

28  brands were internally arranged into either "████████" (████████████████████), "████████"
    (████████), or "████████████" (████████████████████████) cereals. *See* Ex. 35 at KP16807.

1    have thus "█████████████████" due to "████████████████████

2    ████," Ex. 28 at KP15419. The category "███████████████████████

3    █," with "████████████████████████████████████████████████

4    ███████." *Id.* at KP15416; *see also* Ex. 37 at KP20418 (███████████████

5    ███████████████ Silverman Decl. ¶¶ 87-97 (discussing declining sales in the cereal market).

6    Thus, "████████████████████████████████████████████████

7    ██████████████," Ex. 30 at KP15884, and "██████████████████████

8    ████████," Ex. 26 at KP11079. Such "marketing messages conveying the supposed health benefits of

9    breakfast cereals are material to consumers and influence their purchase decisions," Silverman Decl. ¶ 102.

**C.    Post Carefully Studied the Market to Understand Cereal Consumers**

11    With █████████████" and "███████████████████" sold annually, "█████" is a "██

12    ███████████," Ex. 38 at KP2599. It is the "██████████████████," with "████████

13    █████████████" each year. *Id.* As a result, consumers "█████████████████████████" spread

14    across "██████████████" containing "███████████," *id.*; *see also* Ex. 39 at KP1387 (noting, in

15    ██, ██████████████████," "██████████████," "██████████████," and "█

16    █████████████████"). In this highly-competitive environment, "████████████████," Post

17    knows it needs "█████████████████████████████████████," Ex. 38 at

18    KP2599. Thus, Post is "███████████████████████████████," Bernstein Tr. 35:13-

19    16. It does this by ██████████████████████████████████████. *Id.* 35:20-36:13, 37:1-

20    4; *see also* Silverman Decl. ¶¶ 98-100 (discussing Post's use of ████████████████████).

21    Research showed that, "████████████████████████████████████

22    █████████████████████," Ex. 24 at KP13773. Moreover, "██████████████████

23    ████████████████████████," Ex. 28 at KP15489; *see also* Ex. 24 at KP13792 ("█████

24    █████████████████████████."). Of particular interest to cereal consumers are whole

25    grain, fiber, protein, and (the lack of) high fructose corn syrup. *See* Silverman Decl. ¶¶ 55-65, 72-78, 80-82,

26    88-89, 92, 94, 100-101, 115-31, 268. But while "██████████████████████████████

27    █████████████," Ex. 36 at KP25617. This is challenging because, for many consumers, "█████████

28    ██████████████████████," Ex. 40 at KP14726; *see also* Bernstein Tr. 82:9-24.

4

**D.     Post Used the Challenged Health and Wellness Claims to Drive Sales and Market Share**

"███████████████████████████," thus "███████████████████████████████

███████████████," Ex. 41 at KP17630; *see also* Silverman Decl. ¶¶ 103-111 (discussing role of

packaging). "[I]t is not unusual for a cereal box to remain on the kitchen table throughout breakfast, and

sometimes later in the day as well if the consumer opts to snack on the contents," Silverman Decl. ¶ 111.

Because "███████████████████████████████████," Ex. 41 at KP17630,

"Post load[s] every face . . . with product information," since "the package 'sells' at home as well as in the

store," and even "a packaging claim that a consumer might not notice in the store upon a first purchase might

very well influence subsequent purchases." Silverman Decl. ¶ 111.

**1.     Great Grains**

With little exception, from the start of the Class Period until late 2016, each "core" variety of Great

Grains cereal—Raisins, Dates & Pecans, Crunchy Pecans, Cranberry Almond Crunch, Banana Nut Crunch,

and Blueberry Pomegranate—bore a prominent, front-of-label claim, "Less processed nutrition you can see."

*See* Exs. 7-8. Below, centered on the front panel, were enlarged depictions of ingredients often characterized

as "wholesome" or "nutritious" (*i.e.*, "wholesome Almonds" or "nutritious Cranberries"). *See id.*

This messaging was bolstered by additional statements on the back panel, where a header read, "Why

less processed? Quite simply, because it's good for you!" Then, depending on the flavor, it stated either:

• "We gently steam, role and bake our whole grains to help maintain the full flavor and
nutrition of our flakes, while some of the competition add artificial sweeteners and flavors
along with isolated fiber to their flakes. We then add in nutritious fruits and nuts and
balance them with our grains for a great taste that's irresistible."

*or*

• "We gently crack the whole wheat berry and add a mix of grains to our flakes, while some
of the competition add artificial sweeteners and flavors along with isolated fiber to their
flakes. We then add in nutritious fruits and nuts and balance them with our grains for a
great taste that's irresistible."

*Id.* After reiterating the "wholesome" and "nutritious" ingredients, it concluded, "It's whole foods from the

field to your bowl, with whole grains, fiber and nutritious ingredients in every bite!" *Id.* And it featured a

Whole Grains Council (WCG) Stamp, occasionally rotated to the side or top. *See* Ex. 7 at KP8, 13, 109.

These statements appeared on an earthy brown box depicting healthy-looking ingredients, especially

seamed flakes, and call-outs to whole grain and fiber, like a stylized "I" in "Grains," and a fiber nutrient

content claim. *See id.*; Silverman Decl. ¶¶ 146, 150, 154, 160-61, 169, 171, 199-201 (discussing packaging and its elements). The messaging was also supported by commercials starring celebrity chef Curtis Stone, and other consistent, non-label advertising. *See* Silverman Decl. ¶¶ 153, 156-58, 166, 173-82, 324-30.

In early 2013, Post introduced a Great Grains "Protein Blend" line extension, in two varieties. Ex. 7 at 7-11, 44-57; *see also* Silverman Decl. ¶¶ 162-68 (discussing Great Grains innovation and line extensions). The packaging replaced the "Less processed for nutrition you can see" claim with the "Protein Blend" sub-brand, but the front panel still featured "wholesome" and "nutritious" ingredient call-outs, while adding a prominent claim, "HELPS SUPPORT A HEALTHY METABOLISM." The back and side panels maintained Great Grains' other "less processed" messaging, while adding information on how to "Support a Healthy Metabolism" on the back. *See* Ex. 7 at KP14, 19, 82, 83, 102, 105, 138, 139, 181, 184.

The claims and box design were the result of highly-sophisticated research intended to determine the most compelling messages and visual cues possible for Great Grains' health-conscious target audience. *See* Silverman Decl. ¶¶ 141-56; *see also id.* ¶¶ 132-38 (discussing materiality of WGC Stamp). As a result, Great Grains was a standout in an otherwise declining market, obtaining increasing market share each year. *See id.* ¶¶ 168, 172, 183-93. Thus, there can be little doubt the messaging was material. *See id.* ¶¶ 140, 199-201.

In late 2016, Post redesigned the packaging. *See* Ex. 7 at KP318, 319, 329, 330; Silverman Decl. ¶¶ 194-97. Although it removed some challenged claims, the box still features "wholesome" and "nutritious" ingredient claims, and a WGC Stamp. Post also added a new claim to the front panel, "NO HIGH FRUCTOSE CORN SYRUP." *See* Ex. 7 at KP318, 319, 329, 330; Silverman Decl. ¶¶ 196-97. And ███████████████ ██████████████████████████████████████████, as well. Bernstein Tr. 257:16-259:15.

### 2.      Honey Bunches of Oats

In August 2012, "HBO" was being sold in packaging with numerous health and wellness claims. *See*, *e.g.*, Ex. 9 at KP11; *compare* Ex. 42 at KP2998 (lineup as of November 16, 2012). "Our Post Promise | No High Fructose Corn Syrup" appeared in a green banner across the top of the front panel. Next to that was a statement of the amount of whole grain, and images of a wheat frond and a heart. A side panel read, "A delicious, wholesome start to your day!" Underneath was a graphic with headers for "Heart Healthy," "Whole Grain," and "Vitamins & Minerals," with more information in text underneath. At the bottom was a WGC Stamp, whose yellow color stood out on the dark blue background. *See id.* Contemporaneous television

commercials messaged "███████" or "██████████████████████." *See* Silverman Decl. ¶ 219.

By early 2013, Post had redesigned HBO's packaging. *See* Ex. 9 at KP39; Ex. 43 at KP17045. It contained a WGC Stamp on the top flap, which is where "Our Post Promise | No High Fructose Corn Syrup" was relocated. The front panel's top banner now read, "4 Wholesome ☺ Grains," in large print, with "9 essential vitamins and minerals" below. *See*, *e.g.*, Ex. 9 at KP33. The challenged claims remained consistent, except when some short-run promotion occasionally took over the front panel's top banner. *See* Exs. 9-10.

Post introduced two HBO Greek Yogurt varieties in early 2013. *See* Ex. 9 at pp. 21-22, 190-201; Ex. 43 at KP17041. They had a WGC Stamp on the top flap, and "WHOLESOME NUTRITION" on the back panel above the statement, "5g of protein and 33g whole grain per serving, that's over 2/3 of your day's whole grain," which appeared above "GOODNESS AND TASTE IN EVERY BOWL." "██████" is "██████████████████████████." Ex. 44 at KP1750; *accord* Bernstein Tr. 126:23-24.

In 2014, Post ████████████████████████, because "████████████████████████" Ex. 45 at KP20117; *see also* Silverman Decl. ¶ 231. The concept ██████████, *see* Silverman Decl. ¶¶ 231-33, and Post introduced the line extension in around September 2014, with two varieties, modified from existing products already made with whole grain. *See* Ex. 9 at 23-24, 202-207. They ended up being "████████████████████," Ex. 46 at KP9390.

In 2017, Post refreshed HBO's packaging. *See* Silverman Decl. ¶¶ 236-45. Although the design changed, "4 WHOLESOME GRAINS" remained at the top of the front panel, and the WGC Stamp and "Our Post Promise | No High Fructose Corn Syrup" statement, on the top flap. *See*, *e.g.*, Ex. 9 at KP58662.

HBO's labeling was driven by what research told Post about consumer interest in healthy eating. *See* Silverman Decl. ¶¶ 205-30, 236-45. And Post's health and wellness messaging for HBO was reiterated in non-label advertising. *Id.* ¶¶ 213, 219, 239, 331. This messaging was material to HBO's consumers, *see id.* ¶¶ 204, 247-52, and has helped Post to maintain HBO as one of its most important brands, *see id.* ¶ 246.

### 3. Honey Bunches of Oats Granola

Post introduced Honey Bunches of Oats Granola in around February 2013, "████████████████ ████████████████." Ex. 47 at KP19282. Health and wellness claims on the packaging included a WGC Stamp and the statement, "it's the perfect combination of wholesome goodness and honey-sweet crunch that everyone in your entire family will love," which appeared in a sentence touting

its fiber and whole grain. *See* Ex. 11 at KP125, 296, 336; Ex. 12; Silverman Decl. ¶¶ 255-56. Research

suggested ▮▮▮▮▮▮▮▮▮▮, showing it was material. *See* Silverman Decl. ¶¶ 254, 257, 260-61.

### 4.    Raisin Bran

Post has long positioned Raisin Bran as a healthy cereal. *See id.* ¶¶ 263-64, 269-70, 274. In August

2012, its front panel bore a prominent "Contains NO HIGH FRUCTOSE Corn Syrup" claim, while its side

displayed a large WGC Stamp, and stated, "Where nutritious and delicious live in harmony." *See* Ex. 13 at

KP302; Ex. 14. Other packaging elements supported the health message. *See* Silverman Decl. ¶ 266.

In early 2013, Post redesigned the label. *See* Ex. 13 at KP61-62. The new packaging still included a

prominent "No High Fructose Corn Syrup" claim, this time in a green banner at the top of the front panel,

and a WGC Stamp, moved to the top flap. The back panel claimed "Fiber is good for digestive health," and

included a Word Search, with words all apparently relating to Raisin Bran, such as "Raisins," "Bran,"

"Breakfast," and "Morning." Among the list were "Healthy" and "Nutritious." *See id.* Perhaps this is because

Post knows "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮," and "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮," Ex. 41 at KP17630.

In around March 2015, Post removed the "No HFCS" claim, replacing it with a "Chef's Best" seal,

but other claims remained. *See* Ex. 13 at KP199; Ex. 48 at KP8624. Given Raisin Bran's target audience and

its interest in healthy eating, these claims were material. *See* Silverman Decl. ¶¶ 262, 275-78. Nevertheless,

in 2016, Post refreshed the design, removing most the challenged claims, but leaving the WGC Stamp in

place. *See id.* ¶ 272.

### 5.    Bran Flakes

Throughout the Class Period, Post advertised Bran Flakes as good for digestive health. At first, its

packaging included a prominent, green "digestive health" banner. The back panel repeated this messaging,

with a header reading, "Bran Flakes / with dietary fiber to help maintain / digestive health." *See* Ex. 15 at 3

(Silverman Dep. Ex. 2). Following a 2013 refresh, the messaging remained similar. "DIETARY FIBER TO

HELP MAINTAIN DIGESTIVE HEALTH" appeared in a green banner, this time at the bottom of the box.

Centered on the front was, "Contains no high fructose corn syrup." The side featured a prominent WGC

Stamp. And the back panel was full of health and wellness claims, like "THE IMPORTANCE OF WHOLE

GRAIN AND FIBER," "FIBER TO HELP WITH WEIGHT MANAGEMENT," and "Whole grains provide

fiber and other important nutrients to help keep you healthy." *See id.* at 4. In around August 2014, Post redesigned the packaging again, but the changes were insignificant. Primarily, the green banner moved to the top of the front panel, and the WGC Stamp moved to the top flap, but the messaging remained the same. *See id.* at pp 6-7; Ex. 16. The messaging was material to consumers. *See* Silverman Decl. ¶¶ 280-83, 285-88.

### 6.  Honeycomb

Until early 2017, Honeycomb's packaging had a WGC Stamp on the top flap and described the cereal as "Nutritious Sweetened Corn & Oat Cereal." *See* Ex. 17 at KP15, 50, 52, 107, 150, 161, 234, 235, and 272; Ex. 18. Research in 2016 showed Honeycomb was ███████████ demonstrating the effect of these health cues. Ex. 49 at KP1092; *see also* Silverman Decl. ¶¶ 291, 294-97. But while the health messaging was material to consumers, *id.* ¶¶ 290, 299-302, internally, ██████████████████, *id.* ¶ 292-93. In 2017, Post redesigned the packaging, dropping "Nutritious," and removing the WGC Stamp, though Post brought the WGC Stamp back in 2018. *See* Ex. 17 at KP327; Silverman Decl. ¶ 298.

### 7.  Alpha-Bits

When the Class Period began in August 2012, Post had just entered into a deal with the PBS Kids show, *Super Why*, to feature its characters on the packaging. *See* Silverman Decl. ¶ 305. From August 2012 to December 2016, the *Super Why* Alpha-Bits packaging stated in the upper-right-hand corner of the front panel, "NO HIGH FRUCTOSE CORN SYRUP," between two other nutritional callouts. *See* Ex. 19 at KP53, 86, 87, 120, 163. On one side panel was the phrase, "ALPHA-BITS IS A GOOD SOURCE OF NUTRIENTS THAT ARE BUILDING BLOCKS FOR YOUR CHILD'S DEVELOPING BRAIN," followed by explanations of the purported benefits of iron, zinc, and B vitamins. *See id.* And the top flap contained a WGC Stamp, whose yellow color rendered it prominent on the dark blue background. *See id.*; Ex. 20.

In around December 2016, Post redesigned the packaging to a pirate theme. *See* Ex 19 at KP326; Ex. 50 at KP1098; Bernstein Tr. 398:14-399:6. The WGC Stamp remained on the top flap, and the "BUILDING BLOCKS" claim on the side, but the "NO HFCS" claim was moved to a bullet-point list on the side, included under a new header, "Makes a Smart Snack!" *See* Ex. 19 at KP326. In around the beginning of 2018, Post introduced a white "notebook paper" packaging that removed all challenged claims other than the WGC Stamp. *See id.* at KP58129; Bernstein Tr. 399:7-400:1. The challenged claims, however, were material, especially to parents concerned with their children's health. *See* Silverman Decl. ¶¶ 304, 307-311.

### 8.      Waffle Crisp

Until Waffle Crisp was discontinued in August 2018, its front panel displayed in a green banner, prominent on the packaging's yellow background, the phrase, "NO HIGH FRUCTOSE CORN SYRUP." *See* Exs. 21-22. Until around November 2012, the message was repeated on the top flap. For a large portion of the Class Period, the side panel also included, above the Nutrition Facts box, also in a prominent green banner, the phrase, "Iron & Zinc for Growth." In around October 2016, Post removed "Iron & Zinc for Growth." *See* Silverman Decl. ¶ 315. These claims were material, particularly to parents. *See id.* ¶¶ 313-14, 316-18.

### E.      Plaintiffs Relied on Post's Misrepresentations and Deceptive Omissions

Plaintiffs purchased the challenged products relying on their health and wellness claims. Krommenhock Decl. ¶¶ 2-5; Krommenhock Tr. 47:10-48:10, 172:3-7, 180:25-181:16, 189:7-190:7; Hadley Decl. ¶¶ 2-15; Hadley Tr. 143:19-23, 156:4-15, 158:13-25, 161:7-163:4, 176:25-177:5, 199:8-199:13. Had Post disclosed material information about the health implications of the products' added sugar, they believe they would have curbed or ceased their consumption, reducing the number of their purchases. Krommenhock Decl. ¶ 6; Krommenhock Tr. 224:18-225:10, 249:24-250:16; Hadley Decl. ¶ 16; Hadley Tr. 342:15-343:25.

### F.      Post's Health and Wellness Claims and Omissions Were Misleading

#### 1.      The Accused Cereals Are Not Healthy

"Added sugars are sweeteners that contain the molecules glucose and fructose." Lustig Decl. ¶ 15. While the body requires glucose, *id.* ¶ 17, "[f]ructose . . . is vestigial and unnecessary for any biochemical reaction in eukaryotic cells," *id.* ¶ 18. Similar to alcohol, an "overwhelming majority" of fructose must be processed by the liver, *id.* ¶ 19, which "gives rise to all of the processes of metabolic syndrome; and these processes are unrelated to total calories or weight," *id.* ¶ 20; *see also id.* ¶ 28; Greger Decl. at 13-14, 19-21. As a result, "[a]dded sugar is a primary driver of chronic metabolic disease, such as Type 2 diabetes, heart disease, fatty liver disease, and tooth decay. This is not based on correlation; the scientific literature supports causation for each of these disease entities." Lustig Decl. ¶ 4; *see also id.* ¶¶ 19-30. Indeed, "consensus on causality is now strong," Greger Decl. at 15 (quotation omitted). This has led authoritative bodies like the American Heart Association (AHA), World Health Organization, and USDA to recommend limiting added sugar consumption to below 10% or even 5% of daily calories. *See* Lustig Decl. ¶¶ 33-34, 47; Greger Decl. at 23-25, 37-40. The challenged products here, by contrast, contain ▮g to ▮g of added sugar per serving,

contributing between ███% and ███% of their calories. Ex. 23; *see also* Lustig Decl. ¶ 42. Thus, they are not healthy. *See id.* ¶¶ 43-48; Greger Decl. at 40-46. The claims are especially misleading considering that consumers regularly eat multiple servings in a sitting. *See* Greger Decl. at 28-29; *compare* Ex. 40 at KP14698 (consumer stating, "████████████████████████████████████████████!"); Bernstein Tr. at 67:12-23 ("I have heard from consumers that they eat both less and more than a suggested serving," though those who eat less "are utilizing it as a snack or topping yogurt with it").

Post agrees that, to the extent the consumption of the added sugar in its cereals is linked with increased disease risk, their consumption is fairly characterized as unhealthy. *See* Bernstein Tr. 85:11-86:19.[3] And "██████ ████████" in focus groups concerning snacking, "'███████████████████████████████████ █████████████████████████████." Ex. 53 at KP4938. Due to their high added sugar content, the Post cereals challenged in this lawsuit do not meet this consumer expectation.

### 2. Great Grains is Not "Less Processed" or "Gently Steamed, Rolled, and Baked"

Great Grains' "less processed" messaging was not just misleading in its suggestion of healthfulness, but literally false. As described by Post's Director of Research and Development, in the "████████████" process for manufacturing ████████████ and ████████████ Great Grains:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

Mehren Tr. 52:22-53:18. This is the same process used to create ████████, ████████, and some ██████ cereals. *See* Ex 39 at KP1437 (███████); Ex. 54 at KP16551 (███████████████████); Ex. 35 at KP16812.

For the remaining Great Grains varieties, the "████████" process is used as follows:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[3] Notably, after ████████████████████████████████████████████████, Post left the formula with some "████████████████████████████████" Ex. 51 at KP9653. Yet, this was one reason Post ████████████████████████████. *See* Ex. 52 at KP5294.

11

Mehren Tr. 53:19-54:10. The process involves "███████████████████████," *id.* 54:17-20, and is the same process used to make ██████████████████████████████. *See* Ex. 35 at KP16812 ("███████████████████████████████"); Ex. 55 at KP27885; Ex. 56 at KP27892, 27900.

### G.   The Class was Injured by Post's Misrepresentations and Deceptive Omissions

Plaintiffs allege they "would not have purchased Post cereals and granola if [they] knew that their labeling claims were false and misleading," SAC ¶¶ 335, 364, and that "[i]f Post were enjoined from making the misleading claims," including through the disclosure of material information, *see id.* ¶¶ 247, 264, 289-90, "the market demand and price for its cereals and granola would drop, as it has been artificially and fraudulently inflated due to Post's use of deceptive health and wellness labeling," *id.* ¶¶ 336, 365.

### 1.   The Class Paid Premiums for the Products

"████████████████████████████████████████████████████████████████ ████████████████," Ex. 57 at KP2723; *see also* Ex. 1, Winters Tr. 100:5-13. Nevertheless, "█ ███████████████████████████████████████████████████," Ex. 24 at KP13850. In addition, ███████████████████████████████████████████████████████████ ████████████████████████████████████████" Ex. 27 at KP16439. "███████ ███████████," Ex. 28 at KP15475. And consumers—especially the health-conscious consumers that Post often targets—are willing to pay a premium for foods they believe are healthy. Silverman Decl. ¶¶ 52, 66.

Post observed, for example, an "████████████████████████████" of ████████████████ ███████ compared to █████████████, *see* Ex. 58 at KP20117, and believed "████████████████" a "██████████" with respect to "████████████████████████████████████" Ex. 59 at KP20114. In 2014, Culturati, which Post ████████████████████████████████████████████ ██████████████████████, found that "████████████████████████████████████████ ███████████████████████████████████████," and, as a result, HBO was "██████████ █████████████████████████████████████," Ex. 60 at KP3940. Post also characterized Great Grains' pricing as being within the "████████████████████████████" Ex. 61 at KP3801. And following its relaunched "less processed" messaging, "██████████████████████████████████████████ █████████████████████████████████." Ex. 62 at KP1630. As a result, in April 2011,

Post ███████████████████████, hoping to ███████████████████. *See id.* The

market, however, ████████████, with Post noting in June 2011 that "█████████

████████████████████████," Ex. 63 at KP1698.

Survey expert Steven P. Gaskin conducted a series of conjoint analyses, consistently finding that the

Class paid premiums based on the challenged claims. *See* Gaskin Decl. ¶¶ 10-50.

**2.    Post Realized a Significant Advantage at the Class's Expense by Advertising the Products as Healthy While Withholding Material Information**

"█████████████████████████████," Ex. 57

at KP2725, so "████████████████████████," Winters Tr. 103:4-

9; *see also* Ex. 57 at KP2726 (████████████████████). For example, Post

has determined that, "████████████████████████████

█████." Ex. 57 at KP2728. Thus, "███████████████████████

████████████████████," Winters Tr. 100:17-101:8. "████████████

████████████," including "████████████████████." Ex. 57 at

KP2723. For example, "████████████████," so "█████████████

█████████." Ex. 64 at KP1066. As a result, Post must compete, not just by generating premium

pricing, but also by increasing volume, either by increasing frequency of current customer purchases, or

increasing the number of new customers. *Cf.* Ex. 199 (Post's Responses to RFA Nos. 124-39).

Illustrating the effect of Post touting the products as healthy while withholding material information

about the detrimental health effects of their added sugar, Plaintiffs aver that, had Post disclosed to them the

material information, they would have curbed or perhaps ceased their consumption, reducing the number of

their purchases. Krommenhock Decl. ¶ 6; Krommenhock Tr. 224:18-225:10; 249:24-250:16; Hadley Decl.

¶ 16; Hadley Tr. 322:23-323:8. Surveys of actual Class Members are consistent: when a warning of the type

Plaintiffs allege was required was provided alongside Great Grains' and HBO's challenged health and

wellness claims, respondents indicated a significantly lower intent to consume the products in the future—

and thus to purchase them—than when just the challenged claims were provided. *See* Gaskin Decl. ¶¶ 51-72.

**H.    Post Acted with Fraud and Oppression, Subjecting it to Punitive Damages**

"To seek punitive damages under the CLRA, [Plaintiffs] must provide 'clear and convincing

13

evidence' that [Post] engaged in 'oppression, fraud, or malice.'" *See Bautista v. Valero Mktg. & Supply Co.*, 2018 WL 7142094, at *6 (N.D. Cal. Dec. 4, 2018) (quoting Cal. Civ. Code §§ 1780(a)(4), 3294(a)). "[I]f the plaintiff can make a showing that defendant's conduct . . . demonstrates a knowing and reckless disregard, punitive damages may be available." *In re Yahoo! Inc. Consumer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1149 (N.D. Cal. 2018) (quotation and internal emphasis omitted). This includes where misrepresentation was knowing. *See id.* ("Plaintiffs have alleged numerous fraudulent, malicious, and oppressive acts on the part of Defendants, including that Defendants 'did nothing to protect its user data' and 'made a conscious and deliberate decision not to alert any of Yahoo's customers that their PII had been stolen.'" (record citation omitted)); *In re Volkswagen 'Clean Diesel' Mktg., Sales Practices, & Prods. Liab. Litig.*, 2019 WL 693224, at *7 (N.D. Cal. Feb. 19, 2019) (representing that its "cars were environmentally friendly, when in fact VW knew that the cars utilized software to evade emissions testing and emitted nitrogen oxides at levels far exceeding the legal limits" would "amount[] to fraudulent conduct" meeting the standard for punitive damages). Here, Post has long known that excessive added sugar consumption is unhealthy, and the sugar in its cereals excessive, but has deliberately ignored the problem in pursuit of profit.

In 2009, Post joined the Children's Food and Beverage Advertising Initiative Pledge to "████████ ███████████████████████████████████████████," and "████████████ ██████" by ████████████████████████ products not meeting "██████████████," Ex. 65 at KP11306, including because they are not "████ "████████████████," Ex. 66 at KP11309. After reducing the sugar in Alpha-Bits from 10 to 6 grams per serving, Post identified as a "████████ ██████████" that it now had "████████████████████." Ex. 67. And an internal presentation called Kellogg's Special K "████████████," in part because it is "████████." Ex. 52 at KP5294; *see also id.* at KP5298 ("████████████████████████████████"). But, when ████████████████████████████████████████, it reformulated again, *doubling* the added sugar from 6g, to 12g per serving (from 20% to 34.29% of calories from added sugar).

In a "corporate topic statement[]" on "Sugar," Post dodged the issue, stating that it "offer[s] a variety of products to meet our consumer's dietary needs and preferences as well as offer a good value," and "rel[ies] on the scientific community and government regulators to provide guidance on food safety." Ex. 68 at KP11386. Similarly, in a "████████████████████████████████████████████"

14

1 providing ████████████████████████████, in response to █████████

2 ██████████████████ Post downplayed the issue again, telling consumers:

3
4
5

6 *See*, *e.g.*, Ex. 69 at KP27901.

7     At one point, Post noticed that "████████████████████████

8 ████████████████████████████████████████████████

9 ████████████," and that "████████████████████████

10 █████████████." Ex. 70 at KP10248. But Post was "████

11 ██," *id.* It "████████████████████████████

12 ████████████," and "████████████" "███

13 ████████████████████████████," so that it could "████

14 ████████████████." *Id.* Moreover, Post believed that "████

15 ████████████████████████████████████████████,"

16 so that "██████████████████████████." *Id.* at KP10249.

17     Post did this despite knowing that "████████████████

18 ███████." Bernstein 74:21-22; *see also id.* 77:11-15. The same is true for people

19 ████████████████████████. *Id.* 75:6-76:16. Post also knows that "████

20 ██████████████████," Ex. 71 at KP17166, and that "████

21 ██████████████████████," *id.* at KP17167. And in a slide titled

22 "████████████████████," a graphic shows that "██████," including "████

23 ████████," leads to "██████" and "██████," as well as "██████████" and "████,"

24 which in turn all lead to "████████████." *Id.* (citing Am J Clin Nutr (Mar. 2008)).

25     In 2013, Motivequest saw a chance for Post to "████████████

26 ████████████," and urged, "████████████████████████." Ex. 40 at

27 KP14711. "████████████████████████████████████."

28 *Id.* at KP14738. Then, in June 2014, ████████████████████, sent to █████

██████████████████████████, "██████████████████" regarding "████████████ ████████████," writing, "████████████████████████" Ex. 72 at KP27373-74.[4] ███████ responded that Post had "███████████████████████████████████████████," including by using ███████████. *Id.* at KP27373. A consultant then responded, "████████████ ███████████████████████████████████████████," so that "████████ ████████████████████████████████." *Id.*

That same month, a Post ████████████ attended some "████████████" of the █████████ ████████████ annual meeting, then provided her notes to ████████████████████, along with "██████ ████████████," which she "█████████████" they could access. Ex. 73 at KP27377. She described a presentation by ████████████████████, stating that "████████████████████████ ██████████████████," and "████████████████████████████████████████████." *Id.* at KP27382. She also noted a presenter who quoted the *New York Times* as pointing out that:



*Id.* at KP27385.

As a result of the foregoing, Post knows that the challenged cereals contain excessive added sugar. *See* Ex. 44 at KP1745 ("███████████████████████████████████████████ ████████████████████████████████████████████."); Ex. 40 at KP14727 ("███ ████████████████████████████████████████████."); Ex. 74 at KP5837 ("█ ████████████████████" a "██████" to ████████████). For litigation purposes, however, Post has claimed ignorance, testifying it "do[es] not do nutrition science." Mehren Tr. 15:22. It explained it "████ ████████████████████████████████████████████ ██████." *Id.* 126:8-11; *see also id.* 128:20-25 ("█████████████████████████ ████████████████████████████████████████████ ████████████████████████████."); 129:22-23 ("████████████

---

[4] The article is *available at* http://tinyurl.com/y2mvceck (includes detailed discussion of Dr. Lustig's work).

1    .”); 130:3-9, 133:2-22 (

2    ); 133:23-136:22 (

3    

4    ); 138:12-25 (

5    ). [5]

Given this supposed ignorance, Post claimed it is "

." *See id.* 141:3-142:2. Yet, it published a "Post Nutrition Pledge" claiming to have been "literally created to enhance health," and stating that "[p]eer-reviewed scientific studies show major health problems, from heart disease and obesity to diabetes and cancer, occur less frequently with a diet rich in whole grains," so that "today, we know the benefits . . . reach far beyond digestive health." Ex. 75.

Post also created press releases touting evidence that the whole grains in certain cereals were "Shown to be Naturally Protective for Your Heart," "reduce Hypertension," "Cut Stroke Risk," and "Help Prevent Cardiovascular Disease/Heart Failure," Ex. 76, are "A Natural Way to Fight Diabetes" and "Reduce the Risk of Atherosclerosis and Inflammation," Ex. 77, "MAY BOOST IMMUNITY AND SLOW AGING," Exs. 78-79, and "Reduces Chronic Inflammation in Diabetics," Ex. 80. But not one article mentions added sugar.

Thus, despite knowing the detrimental effects of the sugar in its cereals, Post deliberately leverages the products' purported healthfulness for profit, but has little genuine concern for consumer health, supporting punitive damages, especially since "lay consumers generally do not have a deep or sophisticated understanding of nutrition science." Silverman Decl. ¶ 343; *see also id.* ¶¶ 344-48 (noting Post's knowledge).

## II.    ARGUMENT

Under Rule 23, "'[a] class action may be maintained' if two conditions are met: The suit must satisfy the criteria set forth in subdivision (a) (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Moreover, "a class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5), in which case, "each

---

[5] To the extent some Post employees follow the science, it is only "                                  ," and "                        *id.* 126:14-17; but these people do *not* follow nutrition science "                                  ," *see id.* at 127:4-9.

subclass must separately and independently satisfy the requirements of Rule 23 for class certification," *Jones v. Goord*, 435 F. Supp. 2d 221, 232 (S.D.N.Y. 2006) (citations omitted).

### A.      The Requirements of Rule 23(a) Are Satisfied

#### 1.      Numerosity

Rule 23(a)(1) is satisfied if "the class is so numerous that joinder of all members is impracticable," Fed. R. Civ. P. 23(a)(1). Here, the unit and dollar sales suggest at least thousands of Class Members, *see* Weir Decl. at 21-22, Table 5, satisfying numerosity. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1093 (N.D. Cal. 2018) (finding numerosity in similar action against Kellogg).

#### 2.      Commonality

Rule 23(a)(2) is satisfied if "there are questions of law or fact common to the class," Fed. R. Civ. P. 23(a)(2), which means "class members have suffered the same injury," so that their claims "depend upon a common contention . . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (quotation omitted). "What matters" is "the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quotation omitted). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998). This exists "where a defendant has engaged in standardized conduct toward members of the class," *Hale v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 4992504, at *6 (S.D. Ill. Sept. 16, 2016) (citation omitted). Here, the product packaging within each Subclass was consistent throughout the Class Period, exposing every purchaser to at least one of the challenged claims. *See* Exs. 7-22. The amounts of added sugar in the products within each Subclass were also similar throughout the Class Period. *See* Ex. 23. Even across the Subclasses, the added sugar, comprising ███% to ██% of calories, falls well above the 5% and 10% daily limits endorsed by authoritative sources and supported in the scientific literature. Thus, within each Subclass—and even across the entire Class—there are numerous common questions, including whether the challenged claims were material and misleading. *See Hadley*, 324 F. Supp. 3d at 1093-94.

#### 3.      Typicality

Rule 23(a)(3) is satisfied if plaintiffs' claims "are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. "Typicality refers to the nature

of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and quotation marks omitted). "[T]he focus should be on the defendants' conduct and plaintiff's legal theory," *Simpson v. Fireman's Fund Ins.*, 231 F.R.D. 391, 396 (N.D. Cal. 2005) (citation and quotation marks omitted). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (quotation and citations omitted). "In instances wherein it is alleged that the defendant[] engaged in a common scheme relative to all members of the class, there is a strong assumption that the claims of the representative parties will be typical of the absent members." *Salvagne v. Fairfield Ford Inc.*, 264 F.R.D. 321, 328 (S.D. Ohio 2009) (quotation omitted).

Here, typicality exists both within each Subclass and across the entire Class. Plaintiffs allege they were injured when they paid more for the products due to the premium their misleading health and wellness claims demanded in the market, and when they were influenced to purchase and consume the products with greater frequency than they would have, had they known the true facts concerning the products' added sugar content. These are the same injuries each Class Member alleges based on the same Post conduct.

### 4. Adequacy

Rule 23(a)(4) is satisfied if "the representative parties will fairly and adequately protect the interests of the class," Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020 (citation omitted). Plaintiffs are adequate Class Representatives because they are *bona fide* purchasers with standing, have no conflicts, are aware of their obligations, and will continue to vigorously prosecute the case for the Class. *See Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001); *compare* Krommenhock Decl. ¶¶ 2-9; Krommenhock Tr. 47:10-48:10; 172:3-7; 180:25-181:16; 189:7-190:7; Hadley Decl. ¶¶ 2-20; Hadley Tr. 143:19-23; 156:4-15; 158:13-25; 161:7-163:4; 176:25-177:5; 199:8-199:13; *Hadley*, 324 F. Supp. 3d at 1119-21 (finding Mr. Hadley an adequate class representative). And Plaintiffs have retained adequate proposed Class Counsel. *See* Fitzgerald Decl. ¶¶ 202-206 & Ex. 200; *Hadley*, 324 F. Supp. 3d at 1121.

**B.      The Requirements of Rule 23(b)(3) Are Satisfied**

       **1.      Predominance**

           **a.      The Class's Claims will be Resolved through Objective Standards and Common Evidence that Apply Classwide**

                **i.      Consumer Fraud: Affirmative Misrepresentation**

California's FAL, CLRA, and UCL's "fraudulent" prong "prohibit 'not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public,'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quotation omitted). Advertising is "judged by the effect it would have on a reasonable consumer," *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496, 506-507 (2003). Thus, a product's packaging is misleading if it presents "a likelihood of confounding an appreciable number of reasonably prudent purchasers exercising ordinary care." *Brockey v. Moore*, 107 Cal. App. 4th 86, 99 (2003). If Post's labeling was likely to deceive under this objective "reasonable consumer" test, it will be liable to all Class Members because relief under the FAL and UCL "is available 'without individualized proof of deception, reliance and injury,' so long as the named plaintiff[] demonstrate[s] injury and causation." *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 482 (C.D. Cal. 2012) (quotation omitted). And while CLRA claims have a causation element, this "does not make plaintiffs' claims unsuitable for class treatment because causation as to each class member is commonly proved more likely than not by materiality." *Id.* at 482 (internal quotation marks and citation omitted). "As materiality is an objective inquiry [under the CLRA], no individualized examination of materiality is necessary." *Lanovaz v. Twinings N. Am., Inc.*, 2014 WL 1652338, at *4 (N.D. Cal. Apr. 24, 2014); *cf. Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2013) ("materiality is a 'common questio[n]' for purposes of Rule 23(b)(3)"). The objective tests for deception and materiality "render[] claims under the UCL, FAL, and CLRA ideal for class certification because they will not require the court to investigate class members' 'individual interaction with the product.'" *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 480 (C.D. Cal. 2012) (quotation omitted); *accord Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) ("Predominance is a test readily met in certain cases alleging consumer . . . fraud"). Here, "the predominating common issues include whether [Post] misrepresented" that the challenged products are healthy, "and whether the misrepresentations were likely to deceive a reasonable

consumer." *See Johns v. Bayer Corp.*, 280 F.R.D. 551, 557 (S.D. Cal. 2012); *In re Ferrero Litig.*, 278 F.R.D. 552, 560 (S.D. Cal. 2011). And the Class has substantial common evidence to support its fraud claims at trial, including of materiality in Post's documents, Plaintiffs' damages surveys, and the testimony of Post, Plaintiffs, and marketing expert, Mr. Silverman; and of deception in the testimony of Drs. Lustig and Greger.

### ii.    Consumer Fraud: Deceptive Omission

A duty to disclose material facts arises, *inter alia*, when the defendant "had exclusive knowledge of material facts not known to the plaintiff[] . . . actively conceal[ed] a material fact from the plaintiff[, or] . . . ma[de] partial representations but also suppresse[d] some material fact." *Falk v. Gen. Motors Corp.*, 496 F. Supp. 2d 1088, 1095 (N.D. Cal. 2007) (quotation omitted). Moreover, "[t]he UCL requires a duty to disclose when not disclosing would result in an 'unlawful, unfair or fraudulent business act or practice.'" *Cortina v. Goya Foods, Inc.*, 94 F. Supp. 3d 1174, 1192 (S.D. Cal. 2015). And under FDA regulations, "[o]nce Defendant emphasizes that a product is healthy, the fact that the product contains excess added sugar that is unhealthy becomes '[m]aterial in light of other representations' that have been made," *see Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1097 (N.D. Cal. 2017) (quoting 21 C.F.R. § 1.21); *compare Dachauer v. NBTY, Inc.*, 913 F.3d 844, 849 (9th Cir. 2019) (That recommended dosage increased risk of death was "a material fact 'with respect to consequences which may result from use of the article,'" which "the FDCA would deem it misleading not to reveal . . . on the label." (quoting 21 C.F.R. § 1.21(a)(2)).

"To prove reliance on an omission, a plaintiff must show that the defendant's nondisclosure was an immediate cause of the plaintiff's injury-producing conduct," which one may do "by simply proving 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quotation omitted). This "can be presumed, or at least inferred, when the omission is material." *Id.* Thus, "courts have found exposure and reliance suitable for class-wide resolution . . . where the class was defined as all purchasers . . . and the plaintiffs' . . . claims were based on information omitted from the product's packaging." *Butler v. Porsche Cars N. Am., Inc.*, 2017 WL 1398316, at *10 (N.D. Cal. Apr. 19, 2017). "In these cases, all class members were 'necessarily exposed' to the defendant's omissions on the package prior to purchase, and all class members would have been aware of a disclosure on the packaging had a disclosure been made." *Id.* (citing *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1105 (C.D. Cal. 2015) (collecting cases)).

Plaintiffs have substantial evidence on which to bring the Class's omission claims to trial, including evidence of Post's knowledge, especially relative to consumers, and evidence that the omitted information was material, including Plaintiffs' testimony that their behavior would have differed, and especially evidence from the Demand Surveys showing cereal purchasers' behavior *in fact* changed when warned in a plausible manner. *Compare Baranco v. Ford Motor Co.*, 294 F. Supp. 3d 950, 966-68 (N.D. Cal. Mar. 12, 2018).

### iii.      Breach of Warranty

Showing a breach of warranty requires that "(1) the seller's statements constitute an affirmation of fact or promise or a description of the goods; (2) the statement was part of the basis of the bargain; and (3) the warranty was breached." *In re ConAgra Foods*, 90 F. Supp. 3d 919, 984 (C.D. Cal. 2015) (quotation omitted); Cal. Com. Code §§ 2313(1)(a)-(b). Plaintiffs allege Post warranted its products as healthy. *See* SAC ¶ 399. "Whether such [] statement[s] constitute[] an express warranty, [and] whether that warranty was breached . . . are issues subject to common and generalized proof." *See Martin v. Monsanto Co.*, 2017 WL 1115167, at *7 (C.D. Cal. Mar. 24, 2017). And "[b]ecause reliance is not an element of express warranty claims under California law, common questions predominate and class action treatment is appropriate." *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 411 (S.D.N.Y. 2015) (citations omitted); *accord Karim v. Hewlett-Packard Co.*, 311 F.R.D. 568, 573 (N.D. Cal. 2015).

### b.      The Class's Damages Models are Consistent with its Theories of Liability, and Capable of Measuring Classwide Damages

For class certification, Plaintiffs must show "damages are capable of measurement on a classwide basis," in a manner "consistent with [their] liability case," *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013) (quotation omitted). "The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." *Id.* at 38 (citation and emphasis omitted). Here, "[f]or each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm" is that "the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 329 (2011). But consumers are also injured when they "would not have bought the product but for the misrepresentation," *see id.*, which may occur when, "[i]n a[] market with generally parallel pricing . . . competitors use representations about

features principally to increase market share rather than to charge a premium," *see id.* at 334 n.20.

The UCL, FAL, and CLRA all "authorize a trial court to grant restitution to private litigants asserting claims under those statutes." *Colgan v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 694 (2006) (citations omitted); *see also* Cal. Bus. & Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(3). "Class wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017) (quoting *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015)).

"The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received." *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014). "This calculation contemplates the production of evidence that attaches a dollar value to the 'consumer impact or advantage' caused by the unlawful business practices." *Id.* (citing *Colgan*, 135 Cal. App. 4th at 700). Because deception may both improperly increase market price and, separately, volume or market share, *i.e.*, demand, "restitution under California law may be calculated in terms of '*either* the dollar value of the consumer impact *or* the advantage realized by defendant,'" *Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 571 (S.D.N.Y. 2017) (quoting *Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *5 (C.D. Cal. Mar. 23, 2015)).

Here, Plaintiffs allege and present evidence that Post's misrepresentations and deceptive omissions both increased the products' market price, and caused a market distortion, or "advantage realized" by Post, in the increased consumer demand for its products attendant to its using the challenged health and wellness claims while omitting material information about the detriments of the products' added sugar. The Class's damages models are consistent with these theories and capable of measuring damages classwide.

### i.     The Consumer Impact Model

The consumer impact of a misrepresentation can be measured by determining the marketplace price premium attributable to a misleading claim or breached warranty. *See Stathakos v. Columbia Sportswear Co.*, 2017 WL 1957063, at *11 (N.D. Cal. May 11, 2017) (citation omitted). Because the Class challenges Post's labeling claims as misleading, thereby violating California's consumer protection laws and breaching Post's express and implied warranties, SAC ¶¶ 381-95, 397-410, the price premia associated with the

23

presence versus the absence of those claims on the products' packaging is a proper measure of restitution and damages tied to the conduct for which Post may be liable. *See Werdebaugh*, 2014 WL 2191901, at \*22.

To measure those premia, Mr. Gaskin employed conjoint analysis, which is "widely-accepted as a reliable economic tool for isolating price premia," *Hadley*, 324 F. Supp. 3d at 1110.[6] Several courts in this district have recently approved conjoint analysis in certifying consumer fraud claims (often performed by Mr. Gaskin). *See id.* at 1103-111; *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969 (N.D. Cal. 2018); *In re Arris Cable Modem Consumer Litig.*, 327 F.R.D. 334, 366-73 (N.D. Cal. 2018); *Bromfield v. Craft Brew Alliance, Inc.*, 2018 WL 4952519, at \*13-20 (N.D. Cal. Sept. 25, 2018); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 601, 603-606 (N.D. Cal. June 26, 2018); *In re Lenovo Adware Litig.*, 2016 WL 6277245, at \*21 (N.D. Cal. Oct. 27, 2016).

Here, Mr. Gaskin conducted a conjoint survey for each product line, then used a market simulator to determine the price premia attributable to various challenged labeling claims.[7] *See* Gaskin Decl. ¶¶ 10-50. As explained by economics expert Colin Weir, a factfinder can use Mr. Gaskin's premia to determine the amount of restitution and damages owed the Class. *See* Weir Decl. ¶¶ 61-65 & Table 3.

### ii.        The Advantage Realized Model

The Class alleges Post was under a duty to disclose material information about the negative health implications of the added sugar in its products, and that by failing to do so, it distorted the market demand for its products, causing Class Members to consume—and therefore purchase—more than they would have, had Post revealed all material facts. To test this allegation, Mr. Gaskin designed a Demand Study, using the test and control methodology, aimed at determining how consumer behavior differs once a disclosure is made of the type the Class alleges was required. The study was administered to Great Grains and HBO consumers.

---

[6] *See Martinelli v. Johnson & Johnson*, 2019 WL 1429653, at \*3-4 (E.D. Cal. Mar. 29, 2019) ("District courts have . . . certified classes where plaintiffs used conjoint analysis."); *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at \*9 (S.D. Cal. Sept. 14, 2017) (conjoint "a generally accepted method for valuing the individual characteristics of a product"); *Kurtz v. Kimberly-Clark Corp.*, 312 F.R.D. 482, 551 (E.D.N.Y. Mar. 27, 2017) (conjoint a "reliable method[] available for calculating the price premium attributable to a product characteristic"); *Miller v. Fuhu Inc.*, 2015 WL 7776794, at \*21 (C.D. Cal. Dec. 1, 2015) ("courts . . . have accepted" conjoint "as reliable . . . for calculating price premiums on a classwide basis")

[7] In some cases, only some challenged claims were tested. *See* Gaskin Decl. ¶ 9. This bolstered the reliability of the conjoint analysis and rendered damages calculations conservative. *See id.*; *see also* Gaskin Tr. 128:9-18, 134:14-135:6. As Plaintiffs have advised Post, they still intend to seek injunctive relief enjoining Post from using the challenged claims that were not tested for damages. Fitzgerald Decl. ¶ 201.

In each case, one group was given the challenged claims, and another, the challenged claims and a disclosure, and their future consumption behaviors compared. Gaskin Decl. ¶¶ 51-74. "Since the only difference between the Test and Control groups was this warning, any difference observed between the two groups is due to this warning." *Id.* ¶ 54. The aggregate difference in consumption (and ergo, purchases) can be applied to the aggregate sales to determine classwide damages. *See* Weir Decl. ¶¶ 66-73 & Table 4.

Post's conduct creating the legal liability was emphasizing the beneficial aspects of its cereals while failing to warn about their added sugar, and this method isolates and aggregates the economic impact of that advantageous conduct by determining how many fewer purchases the Class would have made. The model is thus properly tied to the Class's theory of liability and capable of measuring damages classwide.

## 2. Superiority

Whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," depends on:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Superiority is satisfied here. Class Members have no interest in controlling individual actions because the products cost less than $5, and superiority "is met '[w]here recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis.'" *Tait*, 289 F.R.D. at 486 (quotation omitted). This case also involves straightforward claims for consumer fraud and breach of warranty based on labeling statements that conveyed consistent health messages. Manageability concerns will be minimal and cannot, in any event, scuttle class certification "if no realistic alternative exists." *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996); *see also Culley v. Lincare Inc.*, 2016 WL 4208567, at *8 (E.D. Cal. Aug. 10, 2016) (class action the "only realistic method for recovery if there are multiple claims against the same defendant for relatively small sums" (citation omitted)); *cf. Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514-15 (9th Cir. 2013). Finally, Plaintiffs are not aware of any similar litigation pending elsewhere, and this is a desirable forum because the suit is on behalf of a California class.

## III. CONCLUSION

The Court should grant the motion.

Dated: April 24, 2019

Respectfully Submitted,

/s/ Jack Fitzgerald

**THE LAW OFFICE OF
JACK FITZGERALD, PC**
JACK FITZGERALD
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, CA 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

***Counsel for Plaintiffs***

*Krommenhock v. Post Foods, LLC*, No. 16-cv-4958-WHO
MOTION FOR CLASS CERTIFICATION