**THE LAW OFFICE OF JACK FITZGERALD, PC**
JACK FITZGERALD (SBN 257370)
*jack@jackfitzgeraldlaw.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@jackfitzgeraldlaw.com*
MELANIE PERSINGER (SBN 275423)
*melanie@jackfitzgeraldlaw.com*
Hillcrest Professional Building
3636 Fourth Avenue, Suite 202
San Diego, California 92103
Phone: (619) 692-3840
Fax: (619) 362-9555

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DEBBIE KROMMENHOCK and STEPHEN HADLEY, on behalf of themselves, all others similarly situated, and the general public,<br><br>        Plaintiffs,<br><br>                v.<br><br>POST FOODS LLC,<br><br>        Defendant. | Case No. 3:16-cv-04958-WHO (JSC)<br><br>**PLAINTIFFS' OPPOSITION TO POST'S MOTION TO EXCLUDE THE TESTIMONY OF STEVEN GASKIN AND COLIN WEIR (DKT. NO. 172)**<br><br>Judge:       Hon. William H. Orrick<br>Date:        October 9, 2019, 2:00 p.m.<br>Location:    Courtroom 2, 17th Floor |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................................ iii

RELEVANT LAW ...................................................................................................................... 2

    I.     CALIFORNIA'S CONSUMER PROTECTION STATUTES .............................................. 2

    II.    MEASURING DAMAGES ......................................................................................... 4

        A.    A Clear Statement of What Occurred ........................................................... 4

        B.    Defendant's Proper Actions in Place of its Unlawful Actions: the But-For World ..................................................................................................... 5

        C.    The Economic Situation Absent Defendant's Wrongdoing .......................... 6

PLAINTIFFS' DAMAGES MODELS ............................................................................................ 6

ARGUMENT ............................................................................................................................ 7

    I.     THE CLASS'S PRICE PREMIUM DAMAGES MODEL IS ADMISSIBLE ...................... 7

        A.    The Model Satisfies *Comcast* ...................................................................... 7

               1.    The Model Fits the Class's Theory of Liability ............................ 10

                    a.    Mr. Gaskin Properly Tested the Value of the Presence Versus the Absence of the Exact Statements Challenged ................. 11

                    b.    Mr. Gaskin Properly Controlled for Unchallenged Claims ............. 14

                    c.    Mr. Gaskin's Surveys Sufficiently Approximate the Real World ................................................................................................. 15

               2.    The Model Properly Calculated *Classwide* Damages ................... 17

               3.    The Model Deals with the Supply Side Appropriately ................... 18

        B.    The Model Satisfies *Daubert* ..................................................................... 21

i

II.   THE CLASS'S ADVANTAGE REALIZED DEMAND MODEL IS
      ADMISSIBLE.................................................................................................22

      A.    The Demand Surveys Properly Measure Restitution.................................22

      B.    The Survey Design is Reliable; Post's Criticisms go to Weight, not
            Admissibility...................................................................................................24

CONCLUSION....................................................................................................................25

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*Algarin v Maybelline, LLC*,
    300 F.R.D. 444 (S.D. Cal. 2014) ........................................................................... 17

*Allen v. ConAgra Foods, Inc.*,
    --- F.R.D. ----, 2019 WL 3302821 (N.D. Cal. July 22, 2019).................................. 2, 21

*Ass'n of Nat'l Advertisers, Inc. v. Lungren*,
    809 F. Supp. 747 (N.D. Cal. 1992) ...................................................................... 12

*Bradach v. Pharmavite, LLC*,
    735 Fed. Appx. 251 (9th Cir. 2018) .................................................................... 13

*Central Hudson Gas v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ........................................................................................... 12

*Classic Foods Int'l Corp. v. Kettle Foods, Inc.*,
    2006 WL 5187497 (C.D. Cal. Mar. 2, 2006) ....................................................... 15

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)............................................................................................... 4

*Cortez v. Purolator Air Filtration Prods. Co.*,
    23 Cal. 4th 163 (2000) ............................................................................. 3, 23, 24

*Day v. AT & T Corp.*,
    63 Cal. App. 4th 325 (1998) ................................................................................. 5

*Dean Witter Reynolds, Inc. v. Super. Ct.*,
    211 Cal. App. 3d 758 (1989) ................................................................................ 3

*Feitelberg v. Credit Suisse First Boston, LLC*,
    134 Cal. App. 4th 997 (2005) ....................................................................... 23, 24

*Fletcher v. Sec. Pac. Nat'l Bank*,
    23 Cal. 3d 442 (1979) ...................................................................................... 2, 6

*Gutierrez v. Carmax Auto Superstores California*,
    19 Cal. App. 5th 1234 (2018) ............................................................................... 5

*Hadley v. Kellogg Sales Co.*,
    324 F. Supp. 3d 1084 (N.D. Cal. 2018) .......................................................passim

*In re Arris Cable Modem Consumer Litig.*,
   327 F.RD. 334 (N.D. Cal. 2018) ................................................................................. 7

*In re Brazilian Blowout Litig.*,
   2011 WL 10962891 (C.D. Cal. Apr. 12, 2011) ...................................................... 14

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................... 7, 11, 13

*In re Dial Complete Mktg. & Sales Practices Litig.*,
   320 F.R.D. 326 (D. N.H. 2017) ............................................................................ 20

*In re Lenovo Adware Litig.*,
   2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ....................................................... 21

*In re Lipoderm Antitrust Litig.*,
   2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ......................................................... 17

*In re MyFord Touch Consumer Litig.*,
   291 F. Supp. 3d 936 (2018) ................................................................................... 25

*In re Tobacco Cases II*,
   240 Cal. App. 4th 779 (2015) ......................................................................... 22, 23

*In re Tobacco II Cases*,
   46 Cal. 4th 298 (2009) .................................................................................. passim

*In re: Lenovo Adware Litig.*,
   2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ......................................................... 7

*Kasky v. Nike, Inc.*,
   27 Cal. 4th 939 (2002) ..................................................................................... 5, 22

*Khoday v. Symantec Corp.*,
   2014 WL 1281600 (D. Minn. Mar. 13, 2014) ......................................................... 7

*Khoday v. Symantec Corp.*,
   93 F. Supp. 3d 1067 (D. Minn. 2015) ..................................................................... 7

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ....................................................................................... 23

*Kraus v. Trinity Mgmt. Servs., Inc.*,
   23 Cal. 4th 116 (2000) ..................................................................................... 22, 23

*Krommenhock v. Post Foods, LLC*,
   255 F. Supp. 3d 938 (N.D. Cal. 2017) ................................................................... 5

iv

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) ............................................................................... 5, 6

*Lambert v. Nutraceutical Corp.*,
   870 F.3d 1170 (9th Cir. 2017) .................................................................... 3, 21

*Leyva v. Medline Indus.*,
   716 F.3d 510 (9th Cir. 2013) .......................................................................... 24

*Marino v. Coach, Inc.*,
   264 F. Supp. 3d 558 (S.D.N.Y. Aug. 28, 2017) ............................................ 22

*Meister v. Mensinger*,
   230 Cal. App. 4th 381 (2014) ........................................................................ 23

*Park v. Cytodyne Techs, Inc.*,
   2003 WL 21283814 (Cal. Super. Ct. May 30, 2003) ...................................... 5

*Pelayo v. Nestle USA, Inc.*,
   989 F. Supp. 2d 973 (C.D. Cal. 2013) ........................................................... 12

*Pettit v. Proctor & Gamble Co.*,
   2017 WL 3310692 (N.D. Cal. Aug. 3, 2017) ................................................. 13

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ........................................................................... 3

*Sanchez-Knutson v. Ford Motor Co.*,
   181 F. Supp. 3d 988 (S.D. Fla. 2016) ............................................................. 7

*Sanchez-Knutson v. Ford Motor Co.*,
   310 F.R.D. 529 (S.D. Fla. 2015) ..................................................................... 7

*Spann v. J.C. Penney Corp.*,
   2015 WL 1526559 (C.D. Cal. Mar. 23, 2015) .............................................. 22

*Townsend v. Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018) ................................................ 5, 13, 14

*Troublé v. Wet Seal, Inc.*,
   179 F. Supp. 2d 291 (S.D.N.Y. 2001) ........................................................... 15

*Werdebaugh v. Blue Diamond Growers*,
   2014 WL 2191901 (N.D. Cal. May 23, 2014) ............................................... 22

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) ..................................................................... 5, 16

v

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

**Statutes**

Cal. Bus. & Prof. Code § 17200 ...........................................................................................2

Cal. Bus. & Prof. Code § 17203 .............................................................................2, 3, 6, 13

Cal. Bus. & Prof. Code § 17500 ...........................................................................................2

Cal. Bus. & Prof. Code § 17535 .......................................................................................2, 3

Cal. Civ. Code § 1770(a) .....................................................................................................2

Cal. Civ. Code § 1780(a)(3)..................................................................................................2

**Rules**

Federal Judicial Center, Reference Manual on Scientific Evidence at 432 (3d ed. 2011) .........................4, 6

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 32:178 (4th ed. 2005)............ 16

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

Like much of Post's June 28 briefing, its present motion mischaracterizes the Class's claims and California law. Properly construed, Plaintiffs' damages models satisfy *Comcast* and *Daubert*.

A damages analysis must proceed from the premise that the defendant committed the act the plaintiff alleges was harmful, and that the act was unlawful. It then measures economic loss by comparing the plaintiff's present position to her position in the "but-for world"—a hypothetical past world identical *in every way* except that the "harmful event" did not occur. Here, the harmful event was Post's making specific statements. Whether false on their face or in their implication, if making the statement was unlawful, as a damages analysis must assume, then in the but-for world, the defendant must not have made the statement.

Post posits the wrong but-for world because it mischaracterizes the harmful act as making a health implication *only*, rather than making a specific statement. Post is *factually* wrong with respect to the vast majority of the challenged statements Plaintiffs tested for damages. Moreover, under California law, a statement is actionable if it is likely to deceive *either* because it is false on its face, *or* because its implication is false. Regardless of the *reason*, defendants are prohibited from making misleading statements, which must therefore be gone from the but-for world. Post, by contrast, wants to divorce the misleading implication from the statement, deduct that implication from the but-for world, and continue to make the statement conveying only "truthful" implications. That is not possible. The challenged claim, "No High Fructose Corn Syrup," illustrates the point. If, as Post contends it is allowed to "truthfully" communicate "No High Fructose Corn Syrup" even if the statement is found to be misleading in its implication, the but-for world will not have changed at all. Thus, Post erroneously advocates a but-for world in which what changes is not its wrongful *behavior*, but only how consumers *interpreted* its behavior.

In criticizing the Class's conjoint analyses for supposedly failing to incorporate supply-side factors, Post's experts, Drs. Dominique M. Hanssens, and Bruce A. Strombom, also posit a wrong but-for world. Rather than changing *only* the harmful event, and holding everything else constant—*including quantity sold*—Drs. Hanssens and Strombom posit a world in which Post and others may *react* in an endless variety of ways to Post's being enjoined from using the challenged statement—replacing it with a different (even better!) claim, increasing advertising spend, discontinuing the product, introducing a line extension, etc. According to Drs. Hanssens and Strombom, these reactions mean the supply-side factors that were baked into the quantity *actually sold* would have been different in the but-for world, such that the removal of the

1

1  challenged claims would manifest, not just in *price* differences, but also *volume* differences.

2  This may be a proper measure of damages where the economic harm is the plaintiff patentholder's

3  *profits*, but consumer fraud claims call for a different analysis. Every court to consider this issue—including

4  this Court just two weeks ago, *see Allen v. ConAgra Foods, Inc.*, --- F.R.D. ----, 2019 WL 3302821, at *23-

5  24 (N.D. Cal. July 22, 2019) (Orrick, J.)—has found that conjoint analysis reliably measures the price

6  premium attributable to a challenged misrepresentation when holding fixed the quantity sold, which is a

7  matter of historical fact.

8  Post is also wrong about the propriety of the Class's Advantage Realized model. Because this focuses

9  on a difference in retail sales, it measures the amount of money once in possession of Class Members,

10  wrongfully obtained by Post through unfair competition, which must be returned, *i.e.*, restitution.

11  Post's remaining criticisms go to the weight of Plaintiffs' damages analyses, not the admissibility of

12  Messrs. Gaskin and Weir's opinions. Accordingly, the Court should deny Post's motion.

13  <u>**RELEVANT LAW**</u>

14  **I.   CALIFORNIA'S CONSUMER PROTECTION STATUTES**

15  The UCL's "fraudulent" prong prohibits "any . . . fraudulent business act or practice," Cal. Bus. &

16  Prof. Code § 17200. The FAL prohibits "untrue or misleading" statements in the course of business. *Id.* §

17  17500. The CLRA similarly prohibits certain "unfair methods of competition and unfair or deceptive acts or

18  practices undertaken by any person in a transaction intended to result or which results in the sale or lease of

19  goods or services to any consumer," Cal. Civ. Code § 1770(a), such as "[r]epresenting that goods or services

20  are of a particular standard[ ]. . . if they are of another," *id.* § 1770(a)(7).

21  "The substantive right extended to the public" by these statutes "is the right to protection from fraud,

22  deceit, and unlawful conduct," *see In re Tobacco II Cases*, 46 Cal. 4th 298, 324 (2009) (internal quotation

23  marks and citation omitted). They accordingly "focus on the defendant's conduct, rather than the plaintiff's

24  damages, in service of the[ir] larger purpose of protecting the general public against unscrupulous business

25  practices," *see id.* at 312 (citing *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal. 3d 442, 453 (1979)). Each

26  "authorize[s] a trial court to grant restitution to private litigants asserting claims under those statutes." *Colgan*

27  *v. Leatherman Tool Group, Inc.*, 135 Cal. App. 4th 663, 694 (2006) (citations omitted); *see also* Cal. Bus. &

28  Prof. Code §§ 17203, 17535; Cal. Civ. Code § 1780(a)(3).

2

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

The "overarching legislative concern" underlying these laws is "to provide a *streamlined* procedure for the prevention of ongoing or threatened acts of unfair competition." *See Cortez v. Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 173-74 (2000) (quoting *Dean Witter Reynolds, Inc. v. Super. Ct.*, 211 Cal. App. 3d 758, 774 (1989)). "To achieve its goal of deterring unfair business practices in an *expeditious* manner, the Legislature limited the scope of remedies available under the UCL" to injunctive relief and restitution. *Tobacco II Cases*, 46 Cal. 4th at 312 (emphasis added).

"The amount of restitution awarded . . . must be supported by substantial evidence" that "attempt[s] to quantify either the dollar value of the consumer impact *or* the advantage realized by" the defendant. *Colgan*, 135 Cal. App. 4th at 700 (emphasis added). Nevertheless, "a trial court has broad discretion under those statutes to grant equitable relief," *id.*, and "[c]lass wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving. California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017) (quoting *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015)), *rev'd on other grounds*, 139 S. Ct. 710 (2019); *accord Colgan*, 135 Cal. App. 4th at 695 ("'discretion is very broad' as to [ ] remedy" (quotation omitted).

Accordingly, it is not just these statutes' *liability* elements that are defendant-focused, and consumer-protective—so too are their remedial provisions. The UCL empowers a court to "make such orders or judgments . . . as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition . . . or as may be necessary to restore to any person in interest any money or property . . . which *may have been acquired* by means of such unfair competition." Cal. Bus. & Prof. Code § 17203 (emphasis added). The FAL is similar. *See id.* § 17535 ("The court may make such orders or judgments . . . which may be necessary to restore to any person in interest any money or property . . . which *may have been acquired* by means of any practice . . . declared to be unlawful." (emphasis added)). This "may have been acquired" language is "patently less stringent than the standing requirement for the class representative," and authorizes "broad[] relief," *see Tobacco II Cases*, 46 Cal. 4th at 320. For example, where "*some* of the purchasers in question may have purchased contaminated [products] . . . the 'money or property' *of the entire class* of purchasers 'may have [been] acquired by means' of an unfair practice, thus entitling them to restitution for their loss." *Id.* at 323 (emphasis added) (quoting Cal. Bus. & Prof. Code § 17203).

## II.    MEASURING DAMAGES

In *Comcast Corp. v. Behrend*, the U.S. Supreme Court quoted the Reference Manual on Scientific Evidence in explaining that "a damages study" starts with "the translation of the legal theory of the harmful event into an analysis of the economic impact of that event." 569 U.S. 27, 38 (2013) (emphasis omitted) (quoting Federal Judicial Center, Reference Manual on Scientific Evidence at 432 (3d ed. 2011) ["Reference Manual"]). A longer excerpt of the manual appears below—the bolded sentence will later be noteworthy.

> The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position.
>
> ***In almost all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and that the act was unlawful.*** The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement of the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved.

Ex. 12, Reference Manual at 432 (emphasis added); *see also id.* at 429 ("Damages quantification operates on the premise that the defendant is liable for the defendant's harmful act."); Ex. 5, Hanssens Tr. at 310:25-311:15.

The parties' dispute concerning damages in this case regards the legally-proper construction of the "but-for scenario." Accordingly, undertaking the exercise the Reference Manual suggests is instructive.

### A.    A Clear Statement of What Occurred

On behalf of the Class, Plaintiffs allege two "harmful events" occurred: Post made affirmative misrepresentations, and Post made deceptive omissions. *See generally* Dkt. No. 92, Second Am. Compl. ("SAC"). As for its *affirmative misrepresentations*, Plaintiffs allege this comprised *three* harmful practices:

(1)    Post directly or expressly representing that its cereals are "healthy," "nutritious," or "wholesome";

(2)    Post representing that consuming its cereals promotes bodily healthy, disease prevention, and weight loss; and

(3)    Post suggesting that its cereals are healthy, including by:

(a)    Emphasizing their supposedly beneficial aspects, and particularly their whole grain, fiber, or "real" ingredient content;

4

(b)   Using the Whole Grains Council Stamp to suggest some authoritative sanctioning of its cereals;

(c)   Emphasizing its cereals' lack of high fructose corn syrup;

(d)   Representing its cereals are "simple," "less processed" "whole foods"; and

(e)   Suggesting its cereals' sugar content is low.

*See* Pls.' Opp. to Post's Mot. for Sum. J. at 1-4 (detailing claims); SAC ¶¶ 234-63; *see also id.* ¶¶ 247, 264 (deceptive omission allegations); *compare Krommenhock v. Post Foods, LLC*, 255 F. Supp. 3d 938, 946-48 (N.D. Cal. 2017) (Orrick, J.) (noting that certain challenged labeling statements "use . . . language that while not expressly claiming to be healthy, nutritious, or wholesome, imply the same thing through suggestion.").

### B.   Defendant's Proper Actions in Place of its Unlawful Actions: the But-For World

Plaintiffs allege these "harmful events"—Post's affirmative misrepresentations and deceptive omissions—violate the FAL, CLRA, and all three UCL prongs, and breach Post's express and implied warranties. *See* SAC ¶¶ 381-410. A statement is actionable under these statutes if it is "false"; if "although true, [it] is actually misleading"; or if it "has a capacity . . . to deceive or confuse," *see Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (quoting *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 950 (2002)).

"[S]tatements can have an implied *meaning*, but this simply refers to the fact that the meaning of some statements must be ascertained through a chain of inferences." *Gutierrez v. Carmax Auto Superstores Cal.*, 19 Cal. App. 5th 1234, 1267 (2018) (Poochigian, J., concurring in part and dissenting in part). A "statement" that is "[i]dentif[ied] as misleading" through "inferential steps" is still a "misrepresentation[] under the CLRA." *See id.* Thus, when "couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information," a "perfectly true statement" is actionable. *Day v. AT & T Corp.*, 63 Cal. App. 4th 325, 332-33 (1998).

"Liability for UCL, FAL, and CLRA violations require a factfinder to determine that a defendant's *particular representations* are false or likely to mislead a reasonable consumer," and "[t]he exact wording of each statement is thus critical to Plaintiffs' claims," *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1021 (C.D. Cal. 2018) (emphasis added) (citing *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 326-29 (2011) ["*Kwikset*"]). Further, "reasonable consumers are not deceived by immaterial claims." *Park v. Cytodyne Techs, Inc.*, 2003 WL 21283814, at *2 (Cal. Super. Ct. May 30, 2003). The proper damages model thus assumes Post made the statements and omissions alleged, and that they were materially misleading.

5

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

The non-monetary remedies available under California's consumer protection statutes are informative as to "defendant's proper actions in place of its unlawful actions," *see* Reference Manual at 432. Courts have "'broad authority' . . . to fashion a remedy to deter defendant from engaging in future unfair trade practices." *Colgan*, 135 Cal. App. 4th at 696 (quoting *Fletcher*, 23 Cal. 3d at 450). Here, Plaintiffs seek on behalf of the Class, *inter alia*, "[a]n Order enjoining Post from labeling, advertising, or packaging the Post high-sugar cereals . . . with the challenged health and wellness statements," SAC ¶ 411(b).

In order to isolate "the plaintiff's economic position if the harmful event had not occurred," Reference Manual at 432, *everything* in the but-for world must be held constant *except* the unlawful act. Thus, the but-for world in this case is one in which *everything* is held constant *other than* Post's making the challenged statements, and those *statements* are absent in the but-for world.

## C.    The Economic Situation Absent Defendant's Wrongdoing

Plaintiffs allege Post's harmful acts distorted the market by increasing *both* the "demand and price for its cereals[.]" *See* SAC ¶¶ 336, 365; Dkt. No. 141, Pls.' Class Cert. Mot. at 12-13. Post and its experts concede this is possible. *See* Hanssens Tr. 147:3-8; Ex. 9, Strombom Tr. 14:16-15:3.[1] California law recognizes consumers are injured by losing "money or property," *see* Cal. Bus. & Prof. Code § 17203, when unfair competition distorts the market in either manner. "For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm" is that "the consumer has purchased a product that he or she *paid more for* than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset*, 51 Cal. 4th at 329. But consumers are also injured when they "would not have bought the product but for the misrepresentation," *see id.*, which may occur when, "[i]n a[] market with generally parallel pricing . . . competitors use representations about features principally to increase market share rather than to charge a premium," *see id.* at 334 n.20.

## PLAINTIFFS' DAMAGES MODELS

Although it might be possible to measure either a price or volume effect due to either an affirmative misrepresentation or deceptive omission, in consultation with survey and economic experts, Plaintiffs, on

---

[1] Their supply-side criticism, at bottom, is that the Class's conjoint analyses assume the entire market effect of the challenged statements would materialize in price, rather than volume, when in reality, the removal of the label statements would likely manifest in terms of *both* price and volume. *See* Mot. at 17-18.

6

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

behalf of the Class, have elected in this case to test (A) the price premia associated with challenged labeling claims (dubbed the "Consumer Impact Model" in Plaintiffs' certification motion, *see* Dkt. No. 141 ("Cert. Mot.") at 23), and (B) the change in demand associated with Post's omission of material information (dubbed the "Advantage Realized Model," *see id.* at 24). To measure price premia, survey expert Steven P. Gaskin conducted a series of conjoint analyses. *See id.* at 23-24; Dkt. No. 146, Gaskin Report ¶¶ 10-50.[2] To measure the increased sales volume caused by Post's omissions, Mr. Gaskin conducted two "Demand Surveys," Cert. Mot. at 22, using the test-and-control method to measure the effect of a disclosure on consumption, and thereby purchase frequency. *See id.* at 24-25; Gaskin Report ¶¶ 51-72. Economist Colin B. Weir then used Mr. Gaskin's price premia and change-in-volume results to calculate the Class's damages by applying them to the challenged products' retail sales. *See* Dkt. No. 147, Weir Report ¶¶ 55-78 & Tables 1-4. He recently updated his calculations. *See* Ex. 11, Suppl. Weir Decl.

## ARGUMENT

## I.   THE CLASS'S PRICE PREMIUM DAMAGES MODEL IS ADMISSIBLE

### A.   The Model Satisfies *Comcast*

"[I]ntroduced to the field of market research in 1971," conjoint analysis "is a tool that enjoys wide use and acceptance in the field of market research," and one that "is generally recognized by marketing science academics and industry practitioners to be the most widely studied and applied form of quantitative value measurement." Gaskin Report ¶ 11; *see also* Weir Report ¶¶ 28-29, 102; *compare In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1026 (C.D. Cal. 2015) ["*ConAgra*"] ("Marketers and marketing researchers have used conjoint analysis since the early 1970's to determine the values consumers ascribe to specific attributes of multi-attribute products and to understand the features driving product preferences." (record citation omitted)). "Conjoint analysis is founded on rigorous statistical and economic principles." Weir

---

[2] Mr. Gaskin is a Principal of Applied Marketing Science, Inc. *Id.* ¶ 2. He holds Bachelor's of Science and Master's of Science degrees from the Massachusetts Institute of Technology and its Sloan School of Management. *Id.* Mr. Gaskin has been admitted as a survey expert by numerous courts throughout the country. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1103-110 (N.D. Cal. 2018); *In re Arris Cable Modem Consumer Litig.*, 327 F.RD. 334, 367-73 (N.D. Cal. 2018); *Sanchez-Knutson v. Ford Motor Co.*, 181 F. Supp. 3d 988, 994-96 (S.D. Fla. 2016); *Sanchez-Knutson v. Ford Motor Co.*, 310 F.R.D. 529, 538-39 (S.D. Fla. 2015); *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1082-83 (D. Minn. 2015); *Khoday v. Symantec Corp.*, 2014 WL 1281600, at *10-11, *32-33 (D. Minn. Mar. 13, 2014).

Report ¶ 29 (citation omitted). For this reason, "conjoint analysis has been successfully used in litigation contexts to calculate damages for years." *See id.* (collecting cases).

"In a typical conjoint analysis, survey panelists are confronted with various choices of product attributes and prices, and asked either to rank their preferences, or to choose the most preferred attribute or combination thereof." Weir Report ¶ 30; *see also* Gaskin Report ¶ 13.

> The general idea behind conjoint analysis is that the market value for a particular product is driven by features or descriptions of features embodied in that product. Customers are shown product profiles made up of varying features and asked, as part of a series of "choice tasks," to indicate their preferred product profile. At no point are respondents asked to indicate directly how much they would pay; rather, the analysis is based on choices respondents make among alternatives . . . shown in the choice task presented . . . .

Gaskin Report ¶ 12. "By systematically varying the attributes of the product and observing how respondents react to the resulting product profiles, one can statistically measure information about the individual attributes." Weir Report ¶ 31. "Statistical methods (including regression analysis) are then applied to the survey responses to calculate attribute value." *Id.* ¶ 32 (citation omitted); *see also* Gaskin Report ¶¶ 13, 15-16 (describing use of Hierarchical Bayes regression to calculate partworths from the survey data).

"When price is one of the measured features in the conjoint analysis, the value (negative or positive) that the market places on the changes in features can be expressed in price and/or percentage terms. That is, it is possible to calculate the price premium, or the additional price (measured in dollars and/or percentage terms) customers would pay, for the class, for the inclusion of a feature or better level of a feature. Gaskin Decl. ¶ 19. "In particular, [Mr. Gaskin] can determine the price premia (measured in dollars and/or percentage terms) between these cereals or granola with the affirmative misrepresentations compared to the value of these cereals or granola without the affirmative misrepresentations." *Id.*

"Partworths" generated as part of a conjoint analysis represent for the respondents the "partial contributions of the [survey's] feature levels . . . to overall product utility," which is "an economic term referring to the total satisfaction received from consuming a good or service." *Id.* ¶ 14 & n.11. Calculating respondents' partworths "allows for the prediction of the probability that customers will choose any product profile that is described by the partworths and can do so for any competitive set of products." *Id.* Using this data will also allow Mr. Gaskin to "simulate how choice shares would change in a market based on a change in one or more products' prices." *Id.* Thus, "[b]y making use of these capabilities, [choice-based conjoint]

8

allows us to determine the market price premia (measured in dollars and/or percentage terms) for these cereals or granola *with* the affirmative misrepresentations compared to the value of these cereals or granola *without* the affirmative misrepresentations." *Id.*; *see also id.* ¶ 19.

Here, Mr. Gaskin designed and carried out conjoint surveys and analyses for nine products. In each survey, he showed respondents three product profiles in each choice set, comprised of features including brand, flavor, labels, and price. *See id.*; *see also id.* ¶ 18; Weir Report ¶ 42. Mr. Gaskin chose these attributes and their levels "us[ing] the [SAC], . . . Post's website, . . . cereal and granola packaging, . . . exploratory research among cereal purchasers, . . . market research presentations produced by Defendant, and . . . sales data produced by Defendant and IRI," Gaskin Report ¶¶ 21-22.

Within the "labels" attribute are levels for both the challenged health and wellness claims, and "distractor labels," which "have been included to obscure which labels are of primary interest in the surveys," and to thereby "reduce[] demand artifacts." *Id.* ¶ 22. In addition, his survey "includes actual market-based price points derived, in part, from market research presentations produced by Defendant, and sales data produced by Defendant and IRI," Weir Report ¶ 42; *see also* Gaskin Report ¶ 21 (Mr. Gaskin chose "prices that would be recognizable to a common audience and would simulate a cereal or granola comparison experience," and "mirror" market prices "based on actual sales data"). Otherwise, "[i]n the survey, all features other than the features and levels shown were held constant." Gaskin Decl. ¶ 21; *see also id.* ¶ 35 (noting respondents may be instructed, for example, that the product "will be described by the set of features you were just shown," and "[a]ny other features beyond those shown in the exercise are assumed to be the same for all the [product] options presented"). After making a selection in a given choice task, respondents were asked, "Given your knowledge of the market, would you actually be willing to buy the [cereal/granola] that you chose above?" *Id.* ¶ 38. This "dual response none option" technique is "the state-of-the-art way to provide respondents with a none choice." *See* Omnibus Gaskin Decl. ¶ 2.

Importantly, Mr. Gaskin's use of Hierarchical Bayes to estimate partworths from the raw survey data "enables [him] to appropriately balance the number of choice tasks in the survey with the number of partworths that need to be estimated," which he "ha[s] observed . . . limit[s] respondent wear-out." Gaskin Report ¶ 15; *see also* Weir Report ¶ 44. Because the surveys were programmed and implemented online, they were also effectively double-blinded. *See* Gaskin Report ¶ 25.

9

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

Mr. Gaskin pretested his designs. He "tested that respondents understand the written description of each feature; that they do not have difficulty with the questions and instructions; that they understood the choice exercise they were asked to perform; that they looked at all or almost all of the features in making their choices; and that they did not think the survey was trying to get them to answer in a certain way." *Id* ¶ 26. He also "explicitly tested for demand artifacts, asking [ ] about [ ] beliefs about the sponsor and purpose of the surveys." *Id.* This "ensured that respondents understood and would continue to understand questions, instructions, and descriptions presented in the questionnaire, and that the interview flows smoothly." *Id.*

In implementing his surveys, Mr. Gaskin used sample sizes of 300-350 respondents, which "greatly exceed the minimum requirements laid out by Sawtooth Software for sample size in a conjoint analysis study," and is thus "more than sufficient for making scientifically valid conclusions on the basis of th[e] surveys." *Id.* ¶ 32. After he collected individual utilities data from the survey and converted it into partworths estimates using Hierarchical Bayes regression, he fed those estimates into a market simulation designed to help him identify the marginal consumer, and thereby the price premia. *See id.* ¶¶ 45-48. Before doing so, however, "[i]n order to establish the appropriateness of using the partworths to forecast the market," Mr. Gaskin "tested the fit and predictive ability of the conjoint analyses estimates by running a holdout analysis for each survey," which "uses hit rates to measure accuracy." *Id.* ¶ 43.

Mr. Gaskin's proposed conjoint surveys mirror those published in peer-reviewed literature. For example, one published conjoint analysis was designed to determine "whether health claims (claims of health-promoting effects) of food products positively influence product price and consumer choices." Weir Report ¶ 34 (quotation omitted). Mr. Weir notes that the study "uses choice-based conjoint analysis to measure the effects of various product attributes on the price of a single product, green tea." *Id.* "The study examines only four product attributes: health claim, country of origin, the size of the product, and price." *Id.* (noting that the study found an approximately 20% premium associated with health claims on green tea).

### 1.    The Model Fits the Class's Theory of Liability

Post argues that the conjoint surveys Mr. Gaskin performed to support the Class's Price Premium damages model "do[ ] not fit Plaintiffs' theory of liability," so that certification is improper under *Comcast*, 569 U.S. 27, *see* Mot. at 5, for four reasons: "[t]he survey[s] erroneously" (1) "measured the value of removing *truthful* aspects of the challenged statements, not just the allegedly misleading implication," (2)

"measured the value of the cereals' *actual ingredients*, not just the allegedly misleading implication," (3) "failed to correct for the [ ] unchallenged statements . . . that address healthy ingredients and nutrition," and (4) "failed to assess the meaning of the challenged statements in their overall context," *id.* at 7, 8, 10, 13.

### a.   Mr. Gaskin Properly Tested the Value of the Presence Versus the Absence of the Exact Statements Challenged

Post's first two "fit" arguments proceed from the same erroneous premise. Citing *ConAgra*, 90 F. Supp. 3d at 1023-24, Post asserts that when a plaintiff "challenges only part of a label claim's meaning, a damages method fails if it does not isolate the corresponding portion of the claim's value." Mot. at 6; *see also id.* at 7 (discussing *ConAgra* further).

In *ConAgra*, the plaintiffs alleged a "100% Natural" representation on the label of Wesson Oil was misleading because the product was made from genetically-modified corn. Their damages expert initially proposed used hedonic regression to measure the price premium attributable to that claim, and the court denied certification, finding that the "hedonic regression analysis calculated only the price premium attributable to ConAgra's use of the term '100% Natural,' rather than the portion of that premium attributable to plaintiffs' theory of liability—i.e., that ConAgra's '100% Natural' label . . . caused putative class members to believe the products contained no genetically modified organisms or GMO ingredients." *See* 90 F. Supp. 3d at 1023 (quotation marks and record citation omitted). Important to the court's finding in that regard, was undisputed evidence that "100% Natural" had "many implications." *See id.* at 1024 (quotation omitted). When the plaintiffs later used conjoint analysis to apportion the price premium derived from the hedonic regression into those many different implications, the court certified the class based on this hybrid model. *See id.* at 1024-31.[3] *ConAgra* is distinguishable, and legally and logically erroneous.

First, Post grossly mischaracterizes and oversimplifies the Class's case, ignoring that there are multiple types of challenged claims, many stating expressly that the cereals are "healthy," "nutritious," "wholesome," or "good for you." Almost all of the statements tested for damages fit into this category. *See*

---

[3] In the sentence before citing *ConAgra*, Post cites *In re 5-Hour Energy Mktg. & Sales Practices Litig.*, 2017 WL 2559615, at \*10-11 (C.D. Cal. June 7, 2017), for the proposition that "[a] conjoint analysis may fail . . . [if] it d[oes] not account for consumer preferences and the relative value that consumers ascribe to different aspects of the product." *See* Mot. at 5-6. Post did not read the decision carefully; the court rejected an *underfill* theory precisely because it was not as robust as a model using conjoint analysis that was found in *ConAgra* to isolate the value of the challenged claims.

Gaskin Report at 4-5; Dkt. No. 166-1. Moreover the "natural" claim at issue in *ConAgra*, is a word of *sui generis* ambiguity. *See*, *e.g.*, *Pelayo v. Nestle USA, Inc.*, 989 F. Supp. 2d 973, 979-80 (C.D. Cal. 2013).

*ConAgra* is also wrong as a matter of law and logic. Statements either violate the UCL, FAL, and CLRA or they do not. "Perfectly true" statements violate these laws when they are "more likely to deceive the public than to inform it," *see Ass'n of Nat'l Advertisers, Inc. v. Lungren*, 809 F. Supp. 747, 754-55 (N.D. Cal. 1992) (quoting *Central Hudson Gas v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980) (citation omitted)). In the proper but-for world, this unlawful act—making the misleading statement—is absent. Thus, to the extent there are other potential, non-misleading *implications* to a statement, those are also absent.

The following hypothetical illustrates the logical error in *ConAgra*: A generic label symbol has developed in the marketplace, which beverage manufacturers use to convey one of three widely-divergent messages: that the product is either environmentally friendly, good for bodily health, or cures baldness. These attributes are important to sizable, though different, and sometimes overlapping consumers. That interest drives demand, allowing the marketplace to bear a higher price because the beverage is perceived by a substantial number of purchasers as a better value than an equivalent one without the symbol. Everyone who purchases the beverage will pay the same increased price: the tree-hugger, the health nut, the bald man; even the buyer who just loves the taste and never notices the symbol. Regardless of how each *understands* the symbol, or why the symbol *motivates* each, each pays the market price that the symbol drives.

Now imagine a class sues, conceding that a beverage bearing the symbol is good for the environment, but alleging it causes hair *loss* and brittle bones. While there is some truth to the symbol, on balance, it seems far more likely to deceive than to inform. The proper remedy is the removal of the symbol, in which case the market's perception of the beverage as a better value will go away, the demand will drop, and the price will drop for everyone—even the tree hugger. She may have received the benefit of her bargain, because she got what she perceived she was paying for—a beverage that was environmentally friendly—but her "substantive right . . . to protection from fraud, deceit, and unlawful conduct," *see Tobacco II Cases*, 46 Cal. 4th at 324, was violated, and that caused her bargain to be unnecessarily high: she would have gotten the benefit of a *better* bargain if the product were priced lower, even if she was willing to pay the higher price.

Moreover, identifying which consumers have some or none of these characteristics—that is, who purchased the beverage based on which understanding or motivation—is contrary to the liberal and *objective*

12

liability elements of the UCL, FAL, and CLRA. Under these statutes, where "*some* of the purchasers in question may have purchased contaminated [products] . . . the 'money or property' of *the entire class* of purchasers 'may have [been] acquired by means' of an unfair practice, thus entitling them to restitution for their loss." *Tobacco II Cases*, 46 Cal. 4th at 323 (quoting Cal. Bus. & Prof. Code § 17203). The reasonable consumer standard thus imposes "no burden to show the actual understanding of all consumers, or of any particular percentage of consumer, or that there was a uniform, class-wide understanding." *Pettit v. Proctor & Gamble Co.*, 2017 WL 3310692, at *1 (N.D. Cal. Aug. 3, 2017); *see also Hadley*, 324 F. Supp. 3d at 1116.

Rather, while a plaintiff's "claims will fail if she establishes no more than a 'mere possibility' that the [challenged] term 'might conceivably be misunderstood' by 'some few' unreasonable consumers, she can prevail through an objective showing of a probability that a 'significant portion' of the relevant consumers acting reasonably 'could be misled.'" *Pettit*, 2017 WL 3310692, at *3 (whether "all class members interpret 'flushable' in the same way" was "not the relevant inquiry"); *see also Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 254-55 (9th Cir. 2018) (a "district court's conclusion that it would need to inquire into the motives of each individual class member was premised on an error of law"); *Fitzhenry-Russell v. Dr Pepper Snapple Group, Inc.*, 326 F.R.D. 592, 613 (N.D. Cal. 2018) (the reasonable consumer standard "requires only that the Court find there is a probability that reasonable consumers could be misled, not that they all believed 'Made From Real Ginger' means the same thing"); *Suchanek v. Strum Foods, Inc.*, 764 F.3d 750, 758 (7th Cir. 2014) (Whether a representation is likely to mislead does "not . . . depend[ ] on each purchaser's subjective understanding of the package.").[4]

A damages analysis presupposes liability. That is what Mr. Gaskin did here. *See, e.g.*, Ex. 3, Gaskin Tr. 96:23-98:18,111:20-119:8, 154:11-155:5, 277:9-278:24, 324:20-325:3. Because liability for a misleading statement does not depend on whether the its deceptive message is express or implied, nor on whether there is a uniform understanding, Post is simply wrong that the Class has an "exceedingly difficult task" requiring

---

[4] In *Townsend*, *see* Mot. at 7, the court found that plaintiffs failed to justify their expert's choice of attributes, and that their "inability to establish a common meaning and show that the [challenged] statement is likely to deceive compound[ed] th[is] problem," 303 F. Supp. at 1050-51. Citing *ConAgra*, the court reasoned that, "[i]n order to tie a damages model for a misleading statement to a theory of liability, a plaintiff must show that the price premium paid was for the attribute consumers *believed* the product contained." *Id.* (citing 90 F. Supp. 3d at 1023-24). Thus, it committed the same error as in *ConAgra*, and which caused the Ninth Circuit to reverse in *Bradach*: improperly focusing on individual class members' subjective beliefs.

13

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

Mr. Gaskin to "thread [an] exceptionally small eye of the needle," by "distinguishing between a label statement's literal truth and its allegedly-false implications[.]" Mot. at 6, 9.

### b.   Mr. Gaskin Properly Controlled for Unchallenged Claims

Post argues Mr. Gaskin "fail[ed] to isolate the value of any healthiness implication arising *just from the challenged statements*, because he failed to account for the healthiness implication arising from the many *unchallenged statements* about healthy ingredients or attributes that appeared on the same cereal boxes." Mot. at 10. Post's premise is misguided because Mr. Gaskin's only task was to test the value of the presence versus absence of the challenged statements, proceeding from the assumption they are unlawful and should not have been made. But Post's argument depends on a second error of law, as well.

Post argues Plaintiffs must show some kind of incremental or relative materiality between challenged and unchallenged statements by discounting the materiality of unchallenged ones from the materiality of challenged ones. But California law does not treat materiality like a pie that must be apportioned among a limited set of attributes, such that the more material one is, the less material others are. Numerous statements can be simultaneously material, and "Plaintiff[s] [are] not required to prove that the challenged health statements were the sole or even the predominant or decisive factor influencing the class members' decisions to buy the [ ] products." *See Hadley*, 324 F. Supp. 3d at 1116-17 (internal quotation marks and quotation omitted); *see also In re Brazilian Blowout Litig.*, 2011 WL 10962891, at *4 (C.D. Cal. Apr. 12, 2011).

Here, Mr. Gaskin tested only the value of the presence versus the absence of the challenged claims. Everything else was held constant, including, necessarily, non-challenged claims. Thus, his study comports exactly with California law; Post's argument does not.

Finally, to the extent Post suggests the price premia Mr. Gaskin calculated include the value of unchallenged claims, it is wrong. The wording of the unchallenged claims is, of course, different than the challenged claims, even if both imply healthfulness. "[T]he exact words matter in false advertising claims." *Townsend*, 303 F. Supp. 3d at 1023-24. Thus, even accepting Post's dubious claim that unchallenged statements "address the cereal['s] nutritional characteristics in even clearer and more specific terms" than the claims Plaintiffs tested for damages, *see* Mot. at 10, this is inconsequential.[5] The unchallenged statements

---

[5] Post says Mr. Gaskin "testified that he never attempted to account for the[] unchallenged statements because he assumed that all statements addressing similar subjects would be challenged." Mot. at 10 (citing Van Oort

14

were not tested in his study, only the challenged ones. *Compare id.* at 12 (Mr. Gaskin explained that "additional statements with a healthy implication would have additional impact"); Gaskin Tr. 60:7-61:2, 64:8-65:17, 67:24-68:12, 84:17-85:7, 90:20-91:13, 306:5-25, 315:25-317:19, 320:19-322:11. If differently-worded unchallenged statements sent a general health message more forcefully, causing a greater distortion to price, Mr. Gaskin did not measure it (just as he did not measure the premia that might have been attributable to claims of great taste, social responsibility, brand, and everything else *but* the *exact* challenged statements).

### c.    Mr. Gaskin's Surveys Sufficiently Approximate the Real World

Post argues Mr. Gaskin's "survey[s] failed to fit Plaintiffs' liability" because they "did not assess the challenged statements in the context of the whole labels," despite that "context is integral to [Plaintiffs'] claims." Mot. at 13.[6] "Most prominently," Post complains, "[Mr.] Gaskin denied survey-takers basic information about the cereals' health and nutritional aspects," so that they could not compare the claims "against the cereal's actual contents" as set forth in the Nutritional Facts panels, for example. *See id.*

"[N]o survey can construct a perfect replica of 'real world' buying patterns," *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001). Rather, "[a]ny survey is of necessity an imperfect mirror of actual customer behavior under real life conditions." *Classic Foods Int'l Corp. v. Kettle Foods, Inc.*, 2006 WL 5187497, at *7 (C.D. Cal. Mar. 2, 2006) (quoting J. Thomas McCarthy, McCarthy on Trademarks and

---

Decl. Ex. 16, Gaskin Dep. 132:10-17, 133:5-8). Neither the question nor answer Post cites on page 132, however, concern unchallenged claims—only "statements on the same concept" (the question) or "sufficiently similar *challenged* statements" (Mr. Gaskin's answer). Clearly, Mr. Gaskin was testifying about the claims identified in footnote five of his report. *See* Gaskin Report ¶ 9 n.5. And in the testimony on page 133, Mr. Gaskin simply disclaimed understanding what would happened to those "health statements" that were not "ruled challenged." In any event, the Court should sustain Plaintiffs' counsel's objections to these questions because they are vague and ambiguous, as Post's attempt to misuse his answers demonstrates.

[6] Post says "Plaintiffs insisted that the entire context of the cereal box had to be considered in assessing the meaning of the challenged statements, and the Court denied dismissal on that basis." *Id.* (citing Dkt. No. 116 at 9-10, 18-20); *see also id.* at 14-15 (same). Post substantially overstates the record. Pages 9-10 of the Court's Order addresses only the "nutritious" or "wholesome" ingredient statements on Great Grains, and pages 18-20 do not address context at all. Plaintiffs' explained they allege that the "health and wellness labeling claims, *individually* and especially in their combined effect in the context of the packaging as a whole, mislead reasonable consumers," and argued that "[t]he clear message is that . . . *Great Grains* cereals are healthier than other options because they are less processed and include more 'nutritious ingredients. *In this context*, prominently emphasizing the 'nutritious[ness]' or 'wholesome[ness]' of its ingredients is part-and-parcel of Post's misleading health message." Dkt. No. 102 at 23 (emphasis added). This is all irrelevant, however, because Plaintiffs did not test the "nutritious" or "wholesome" ingredient statements for damages.

15

Unfair Competition, § 32:178 (4th ed. 2005)). Such criticisms thus go to weight rather than admissibility. *Id.* ("there is no such thing as a 'perfect' survey" and "[a]ny flaws in the survey may be elucidated on cross-examination, so that the finder of fact can appropriately adjust the weight it gives to the survey's results.").

Here, because Plaintiffs allege Post made statements to convince consumers its products were healthy *notwithstanding* their added sugar content, disclosing that content to consumers via the Facts Up Front or Nutrition Facts box is neither necessary nor appropriate. *Compare* Gaskin Tr. 322:25-324:19. Post's argument, moreover, runs afoul of *Williams*, in which the Ninth Circuit held that food manufacturers may not rely on "small print on the side of the box," like that in an ingredients list or Nutrition Facts box, to "provide a shield for liability for the deception." *See* 552 F.3d at 939; *compare* Mot. at 14 ("Gaskin . . . le[ft] survey-takers to infer how healthy the cereal is or is not based only on the slim textual clues he provided."). Mr. Gaskin's surveys thus need not, as Post contends, have attempted to effectively disclaim the truth of the challenged statements. In *Hadley*, Judge Koh rejected the same argument advanced by Kellogg, explaining:

> [T]he Ninth Circuit has held that criticisms about a survey's "fail[ure] to replicate real world conditions"—"valid as they may be"—"go to 'issues of methodology, design, reliability, . . . and critique of conclusions,' and therefore 'go to the weight of the survey rather than its admissibility.'" *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1037-38 (9th Cir. 2010) [(quotation omitted)]. Thus, while the Court understands Kellogg's point that Gaskin's failure to show Nutrition Facts to survey respondents may deprive respondents of real-life "context to the meaning of the challenged [health] statements," . . . Kellogg's criticisms . . . do not render Gaskin's conjoint analysis excludable. Instead, Kellogg will be free to attack Gaskin's conjoint analysis on these grounds at trial.

324 F. Supp. 3d at 1108 (internal record citation omitted).

Post also argues that "[b]ecause [Mr.] Gaskin's online survey[s] only presented limited information, he also did not allow survey-takers to consider factors that are important to actual consumers when choosing cereal to buy," in that he "selected a meager handful of cereal attributes to test[.]" Mot. at 14. Contrary to Post, Mr. Gaskin's selection of attributes was also proper.

Initially, Post's premise is wrong. While including important attributes is necessary, "[t]he attributes and levels included in the conjoint tasks do not need to include every possible feature of the cereals . . . ; in fact, it would be infeasible and contrary to best practices to do so." Gaskin Decl. ¶ 21. Rather, "[t]he main purpose" of using multiple attributes and levels "is to provide a reasonable and engaging task, and to help disguise the fact that our chief interest is in respondents' reactions to the affirmative misrepresentations."

16

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
Opposition to Post's Motion To Exclude Steven Gaskin and Colin Weir

1     *Id.*;[7] *see also* Gaskin Tr. 88:16-90:19, 91:16-95:8, 104:3-105:17, 107:10-108:17, 111:7-11, 164:1-166:1. Dr.

2     Hanssens admitted the choice of attributes "is a judgment question," *see* Hanssens Tr. 42:4-43:9.

3         Post's criticism is also wrong. For example, although taste is not included as an express attribute, it

4     is *not* excluded from the survey. As Mr. Gaskin explains, he "told respondents the brand of the cereal. If they

5     have eaten the cereal, or are familiar with the brand, this will give them some idea of the taste." Omnibus

6     Gaskin Decl. ¶ 3; *see also* Omnibus Weir Decl. ¶¶ 82-83. Taste was thus reflected the same way it is in real

7     life: those familiar with the product will be familiar with the taste and can incorporate that into their decision,

8     and those unfamiliar will have to decide without the benefit of taste, which people do at the store all the time.

9         Finally, after individual utilities are collected in the survey, "[a]s recommended by Sawtooth

10     Software, brand is held constant in the market simulation calculations, so the partworths resulting from

11     respondents' impressions of the taste of a product option based on its brand do not affect the final reduction

12     in market value calculations" in any event. Omnibus Gaskin Decl. ¶ 4.

13        **2.**      **The Model Properly Calculated *Classwide* Damages**

14         Post argues Mr. Gaskin should have calculated untold multiple different price premia to account for

15     the nearly infinite variation in sales over different "times, places, and retail channels," *see* Mot. at 15. Post

16     cites only *Algarin v Maybelline, LLC*, 300 F.R.D. 444, 461 (S.D. Cal. 2014), which it asserts stands for the

17     proposition that "failure to account for price variability renders a model legally insufficient to show classwide

18     damages." Mot. at 15. The court's concern in *Algarin* was that different consumers may have purchased the

19     products at different prices, so that the premium they paid might differ. But *Comcast* and its progeny require

20     an assessment of "classwide" damages. This argument, at bottom, asserts that the Court must examine every

21     class member's purchasing circumstances (time, geography, store) to determine their damages. That is simply

22     not the law. *See*, *e.g.*, *Hadley*, 324 F. Supp. 3d at 1113 (approving model that would calculate an "'aggregate

23     difference,'" which "can then be 'applied to the aggregate sales to determine classwide damages'" (record

24     citation omitted)); *cf. In re Lipoderm Antitrust Litig.*, 2017 WL 679367, at *1 (N.D. Cal. Feb. 21, 2017)

25     (Plaintiffs' experts "presented reliable, statistically-sound methods to determine not only classwide injury

26     but also proof of *aggregate* damages" (emphasis added)). *See also* Gaskin Tr. 208:1-210:6; Omnibus Weir

27

28     [7] Notably, Dr. Hanssens agreed "using prices that are reflective of market price," like Mr. Gaskin did "helps for th[e] purpose" of "link[ing] the survey to the real world[.]" Hanssens Tr. 317:17-20.

1    Decl. ¶¶ 58-61.

2             **3.      The Model Deals with the Supply Side Appropriately**

3            Post and Plaintiffs agree "the law required [Mr.] Gaskin to try to measure what the market price of

4    Post's cereals would have been in an alternative world that matched the real world *in every material respect*

5    *except*" for the unlawful conduct. *See* Mot. at 19 (*Post's* emphasis). As noted above, Post mischaracterizes

6    that conduct as "the . . . 'healthiness' *implication* arising from the challenged statements," *see id.* (emphasis

7    added), when the unlawful conduct is really just making the statement.

8            Post and its damages experts also misstate what it means to hold everything else constant in the but-

9    for world. They assert Plaintiffs must account for how the market would *react* differently if Post were not

10   allowed to engage in the unlawful conduct. *But that is, by definition, changing numerous, possibly infinite*

11   *things about the but-for world*. Plaintiffs' examination of Dr. Hanssens demonstrated this flaw.

12           First, Dr. Hanssens conceded that the conduct Plaintiffs allege is harmful is Post's "making a labeling

13   statement," and that Plaintiffs do *not* allege that "the mere sale of the challenged cereals" "separate and apart

14   from the labeling claims" "was unlawful[.]" *See* Hanssens Tr. 93:14-19, 94:3-18. He defined "the but-for

15   world [a]s the world that exists the way the plaintiff wants it," *id.* 92:12-13. Applied here, he defined the but-

16   for world as "a world in which there are no messages, labels as you call them, that create this health

17   perception." *Id.* 94:20-95:3; *see also id.* 96:20-23, 97:4-10, 316:20-317:3. Accordingly, by his own

18   definition, the but-for world must remove the labels while holding constant the sales, *i.e.*, quantity sold.

19           Post asserts that Mr. Gaskin should have considered that in the but-for world, "if Post removed the

20   challenged label statements, it might respond with other advertising or promotion," Mot. at 19. But, again,

21   Post is changing the rules, modifying far more about the but-for world than *only* the unlawful conduct.

22           It is telling that Dr. Hanssens omitted from his report the sentence of the Reference Manual bolded

23   on page 4 above. *See* Hanssens Report ¶ 31; Hanssens Tr. 308:25-311:21. Again, it admonishes: "In almost

24   all cases, the damages expert proceeds on the hypothesis that the defendant committed the harmful act and

25   that the act was unlawful." Reference Guide at 432. Dr. Hanssens claimed he omitted this "to be sparse," *see*

26   *id.* 311:20-21, but his and Post's error depends on their improperly rejecting this exact premise.

27           After agreeing that in the but-for world, "one difference" should be the absence of the unlawful

28   statement, Plaintiffs asked Dr. Hanssens whether there "[i]s anything else different in a but-for world in this

                                                           18

scenario?" Hanssens Tr. 97:12-13. At first, he responded, "another possibility to change the conduct is not to remove the entire statement, but to change the wording in some way that the plaintiff says, 'Well, that's okay.'" *Id.* 98:3-6. But he admitted, "if the wording of the statement is changed, then as a result of that change that particular [challenged] wording no longer appears on the list of complaints." *Id.* 98:18-21. Accordingly, he was really suggesting *two* changes to the but-for world: "when you say that [Post] . . . rather than removing a statement . . . could change the wording, what you're saying is two different things, right, they've removed statement A and they've replaced it with statement B, which says something different than statement A said." *See id.* 98:22-99:4. Dr. Hanssens then backtracked, asserting Post could modify the challenged statement to the same wording as an existing non-challenged statement. *See id.* at 99:5-18. The *only* other difference he could postulate that might be proper in the but-for world was a "disclosure[] that qualif[ies] the statement in a way that . . . plaintiff no longer considers . . . objectionable." *Id.* at 99:24-101:1.

Plaintiffs then engaged Dr. Hanssens in a "thought experiment . . . with one of the labeling claims in this case, 'No high fructose corn syrup.'" *Id.* 311:23-25. The colloquy further demonstrated Dr. Hanssens' erroneous assumptions and analytical errors, proceeding as follows.[8]

> Q.   So you agree that a damages analysis must assume that Post made that labeling claim and that making that labeling claim was unlawful; right?
>
> A.   Okay. Go on.
>
> Q.   Do you agree with that?
>
> A.   Okay. That claim in and of itself is not unlawful. If it is true that there is no [high fructose] corn syrup in there, then that claim is not unlawful. What is claimed to be unlawful in plaintiffs' theory is that that particular claim contributes to a perception that the overall product is healthy, and that, in turn, creates a price premium.
>
> Q.   What is the act that's alleged to be harmful?
>
> A.   Well, it is to use that claim and others . . . in as far as they create . . . the perception of the health -- product health.
>
> Q.   Okay. But the act is making a statement; correct?
>
> A.   Yes. . . . The act is making a statement that has certain implications. If that implication is not there and if it is indeed true that there is no high fructose corn syrup in there, then it's not unlawful.
>
> Q.   Okay. So you're rejecting the premise that Post's use of ['] no high fructose corn syrup['] was unlawful . . . correct?
>
> A.   Okay. All I'm really saying . . . . It is perfectly lawful to make a claim that is true.

---

[8] For brevity, some non-substantive portions and objections have been removed without indication.

19

The product has no syrup in it. . . . Wait a minute, however, if you think that claim -- using that claim, creates an impression that is false because of its context, then it becomes unlawful or so the plaintiff says.

Q.    Okay. So that's plaintiff's theory. Is that using that claim notwithstanding its literal truth, using that claim is misleading[; right]?

A.    That is my understanding of this case.

Q.    Okay. So to do a damages analysis under the [R]eference [G]uide, you have to proceed on the hypothesis that Post made the statement, [']no high fructose corn syrup['] and making the statement was unlawful; correct?

A.    Yes.

Q.    Okay. Given that[,] in relation to the [']no high fructose corn syrup['] [claim], please give your best description of defendant's proper actions in place of its unlawful action, which is what you quoted from the [R]eference [G]uide.

A.    [A]gain, this is the interpretation of a marketing professor, removing the statement, just simply not saying . . . or conveying the same information in a way that does not create the perception of product health . . . or keep the statement as it is and add a disclaimer.

*Id.* 311:23-315:7.[9]

Construing the proper but-for world in similar cases, numerous courts—including this one—have concluded that Messrs. Gaskin and Weir's approach is correct in this type of case; *none* have sanctioned Post's but-for world. *Compare id.* 165:8-17. One expressly found—as is true here—that the defendant's position "rest[ed] on a misunderstanding of what [the conjoint analysis damages model] purports to do," holding that plaintiffs' "proposed model asks a different question than the one [defendant's] experts seemingly would pose, and [plaintiffs'] question appears to be both more appropriate and better suited to determining full and complete damages tied to the actual number of offending products sold." *In re Dial Complete Mktg. & Sales Practices Litig.*, 320 F.R.D. 326, 336 (D. N.H. 2017). The court explained:

Dial's experts seem to argue that the market price of the product absent the allegedly false claims is best calculated by determining the demand curve, and then analyzing supply side forces to arrive at an intersection between demand and supply in a theoretical market. One apparent problem with that traditional approach (at least in this context) is that both supply and demand with respect to the product without the claimed feature can be expected to decline. Therefore, that approach can be expected to describe a price for the product at a point on the quantity sold axis below (perhaps significantly) the point that represents the actual number of offending products sold to class consumers in the actual market.

---

[9] For further instructive testimony on this proper but-for world and the analytical problems with Post's conceptualization, *see id.* 148:15-152:8, 153:4-154:22, 155:3-156:6, 157:7-12, 175:8-23, 178:2-9.

[Plaintiffs'] model is one in which quantity (the number of products with the offending claims actually sold) is held constant on the demand/supply graph in determining the likely market price of the product without the offending claim if sold in the actual market. His model seeks to calculate the highest price in the actual market at which Dial could have sold the same number of products without the challenged claim. The difference in price as calculated, then, would seem to capture the full measure of damages suffered by consumers who actually bought the allegedly misrepresented product.

*Id.*[10] Thus, "[a]s one court in this district recently summarized," "'conjoint analyses can adequately account for supply-side factors . . . when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period.'" *Allen*, --- F.R.D. at ----, 2019 WL 330821, at *23 (quoting *Hadley*, 324 F. Supp. 3d at 1105)).

Numerous other decisions, many in this district, are in accord. *See MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 971 (2018) ("modifying the supply curve," as would occur in "a traditional economic model" "could mean that a projection will assume that fewer vehicles were sold than were in fact sold, thereby failing to account for the fixed number of defective vehicles that *were* sold," which is problematic because "[a]ssuming that fewer consumers were injured in the hypothetical world than were injured in the real world runs the risk of undercompensating the real-world injured consumers."); *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (expert "addressed 'the supply side' of the market, determining that it was not at issue 'because all sales of the laptop models at issue have occurred in the past.'" (record citation omitted)); *Fitzhenry-Russell*, 326 F.R.D at 604-606.

**B.     The Model Satisfies *Daubert***

Post argues Mr. Weir's calculations are unreliable because he (*i.e.*, at the direction of Plaintiffs' counsel) used dates set forth on the product label proofs that Post produced to define the time periods for his analysis, and the dates on the documents do not reflect exact dates in the market due to things like the time it takes inventory to sell though. *See* Mot. at 16. However, exact precision of the sort Post demands is not required. *See Lambert*, 870 F.3d at 1182-83. Using the dates on each new proof to define the relevant period that design was in the market is a reasonable approximation in that it maintains the same overall timing, and

---

[10] Dr. Hanssens reviewed portions of the *Dial* decision and agreed this is what Mr. Gaskin did. *See* Hanssens Tr. 167-68, 170:18-173:225. Dr. Hanssens did assert that Mr. Gaskin did not use a marginal consumer analysis as in *Dial*, *see id.* 168:6-169:11, but he was mistaken. *See* Omnibus Gaskin Decl. ¶ 6.

merely shifts the period a little earlier, due to the time it takes to print and ship new labels, and sell through old inventory. The exact timing is inherently unknowable, but the goal here is a reasonable, classwide approximation, which Mr. Weir has given. *See* Omnibus Weir Decl. ¶ 51.

Moreover, in light of Post's criticism, Mr. Weir performed additional analysis whereby he "shifted" the time period forward by 45 days, and by 90 days to see if there was any material difference in the damages calculations. *Id.* There was not. *See* Ex. 4, Weir Tr. 321:17-324:20; *see also id.* 356:4-359:25.

## II.   THE CLASS'S ADVANTAGE REALIZED DEMAND MODEL IS ADMISSIBLE

### A.   The Demand Surveys Properly Measure Restitution

"An order for restitution is one 'compelling a UCL defendant to return money obtained through an unfair business practice to those persons in interest from whom the property was taken.'" *Kasky*, 27 Cal. 4th at 950 (quoting *Kraus v. Trinity Mgmt. Servs., Inc.*, 23 Cal. 4th 116, 126-27 (2000)). Because deception may both improperly increase market price and, separately, sales volume or market share, *i.e.*, demand, "restitution under California law may be calculated in terms of '*either* the dollar value of the consumer impact[11] *or* the advantage realized by defendant,'" *Marino v. Coach, Inc.*, 264 F. Supp. 3d 558, 571 (S.D.N.Y. 2017) (quoting *Spann v. J.C. Penney Corp.*, 2015 WL 1526559, at *5 (C.D. Cal. Mar. 23, 2015)).

In *Hadley*, the court explained that "[u]nder California law, there are two types of disgorgement remedies: 'restitutionary disgorgement, which *focuses on the plaintiff's loss*, and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment.'" 324 F. Supp. 3d at 1113 (quoting *In re Tobacco Cases II*, 240 Cal. App. 4th 779, 800 (2015) ["*Tobacco Cases II*") (internal quotation marks omitted)). It reasoned that because "Gaskin's proposed advantage realized model purports to measure how many fewer challenged products Kellogg would have sold," the model "appear to 'focus[ ]' solely on Kellogg's 'unjust enrichment'—i.e., **the additional sales** Kellogg gained from its allegedly deceptive omissions—and therefore seems to be capable of providing only a measure for *nonrestitutionary* disgorgement." *Id.* at 1114 (bolded emphasis added) (quoting *Tobacco II*, 240 Cal. App. 4th at 800).

The complete passage from *Tobacco Cases II*, however, demonstrates the error in this reasoning:

---

[11] *See*, *e.g.*, *Werdebaugh v. Blue Diamond Growers*, 2014 WL 2191901, at *22 (N.D. Cal. May 23, 2014) ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received.").

22

"There are two types of disgorgement: restitutionary disgorgement, which *focuses on the plaintiff's loss,* and nonrestitutionary disgorgement, which focuses on the defendant's unjust enrichment. [Citation.] **'Typically, the defendant's benefit and the plaintiff's loss are the same, and restitution requires the defendant to restore the plaintiff to his or her original position.'** [Citation.] However, '[m]any instances of "liability based on unjust enrichment . . . do not involve the restoration of anything the claimant previously possessed . . . includ[ing] cases involving the disgorgement of profits . . . wrongfully obtained[.]"'"

240 Cal. App. 4th at 800 (bolded emphasis added) (quoting *Meister v. Mensinger*, 230 Cal. App. 4th 381, 398 (2014)).

Here "the additional sales" Plaintiffs' demand model focuses on, *see Hadley*, 324 F. Supp. 3d at 1113, are *retail* sales, which represent the *Class's* purchases. The model reveals how many fewer units the *Class* would have purchased if Post had disclosed material information, as it was obligated. While this necessarily means Post made "additional sales"—its advantage—this is a situation where "the defendant's benefit and the [Class's] loss are the same," rather than one that "do[es] not involve the restoration of anything the claimant[s] previously possessed"; thus, "restitution requires the defendant to restore the [Class] to [its] original position." *See Tobacco Cases II*, 240 Cal. App. 4th at 800. In sum, Class Members "have an ownership interest in the money [they] seek[] to recover" and are "seeking the return of money . . . that was once in [their] possession." *See Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003).[12]

Post also argues the Class's demand model is an "attempt to circumvent" the rule against full refunds where a purchased product misleadingly labeled nevertheless provided some value, "by seeking a full refund for . . . the purchases that allegedly would not have happened." *See* Mot. at 20. This argument is misguided. The propriety of a full refund depends on a product's actual *value*. Plaintiffs used conjoint analysis to measure the value here, in the form of premia, not full refunds. *This* model measures the difference in *demand*.

---

[12] "By contrast, with non-restitutionary disgorgement, the focus is on the defendant's gain from the unfair practice; the plaintiff need not have suffered a loss." *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1013 (2005) (citation omitted). Comparing other cases in which proposed damages models have been held to be non-restitutionary is instructive. In *Cortez*, the California Supreme Court described "disgorgement to a fluid recovery fund of all profit defendant may have earned while withholding overtime wages," as non-restitutionary disgorgement. *See* 23 Cal. 4th at 168. Disgorgement has "been used to refer to surrender of all profits earned as a result of an unfair business practice regardless of whether those profits represent money taken directly from persons who were victims of the unfair practice." *See Kraus*, 23 Cal. 4th at 127. In *Korea Supply*, the plaintiff "never anticipated payment directly from" defendant, but instead "expected the Republic of Korea to pay [a third party], which would then pay a commission to" plaintiff. 29 Cal. 4th at 1149. Thus, "the monetary relief requested . . . d[id] not represent a quantifiable sum owed by defendants to plaintiff," but instead was "a contingent expectancy of payment from a third party." *Id.* at 1150.

23

Post says "Plaintiffs do not explain how this could measure classwide harm" if they "seek restitution only for sales to *some* class members," Mot. at 20. But Post misunderstands the model. "[T]he UCL class action is a procedural device that enforces substantive law by aggregating many individual claims into a single claim . . . to achieve the remedial goals" of the statute. *Tobacco II Cases*, 46 Cal. 4th at 313. *Comcast* requires damages to be calculated *classwide*, that is, in the *aggregate*, not on an individual basis. In this context, restitution is "the excess of what the [Class] gave the defendant over the value of what the [Class] received." *See Cortez*, 23 Cal. 4th at 174. How the judgment is apportioned among the class is an irrelevant claims administration issue. *See*, *e.g.*, *Leyva v. Medline Indus.*, 716 F.3d 510, 513-14 (9th Cir. 2013); *cf. Feitelberg*, 134 Cal. App. 4th at 1013 ("Restitutionary disgorgement also refers to situations where it is not possible to restore the money to the specific direct victims of the unfair practice." (citing *Kraus*, 23 Cal. 4th at 129)); *Tobacco II Cases*, 46 Cal. 4th at 323.

###    B.    The Survey Design is Reliable and Post's Criticisms go to Weight, not Admissibility

Test-and-control design is *the* standard experimental design. Mr. Gaskin designed and implemented a survey of 586 respondents for Great Grains and 550 respondents for Honey Bunches of Oats using the test and control method to measure the effect on consumption of a warning or disclosure of the type plaintiffs allege Post was under an obligation to make here. *See* Gaskin Decl. ¶¶ 53-72. "Respondents were randomly assigned to the Test Group or the Control Group." *Id.* ¶ 53. Use of a control group "is analogous to the use of a placebo in the test of . . . a new drug," and helps "account for guessing and other forms of noise," *id.* The Test Group viewed the challenged health and wellness claims, while the Control Group viewed those same statements, plus a warning that, due to its high added sugar content, Great Grains or Honey Bunches of Oats may lead the consumer to exceed the USDA's recommended daily added sugar maximum, which can cause type 2 diabetes, heart disease, fatty liver disease, and tooth decay. *Id.* ¶ 54. "Since the only difference between the Test and Control groups was this warning, any difference observed in responses between the groups is due to this warning." *Id.*

To measure each group's consumption, and thereby demand for the cereal, respondents were asked, after viewing the statements, "which bowl, if any [shown], most closely matches in size and depth the bowl they will use when they eat Great Grains or Honey Bunches of Oats in the near future." *Id.* ¶ 63. Respondents could pick from among three bowl sizes, whose dimensions were demonstrated with forensic rulers. *See id.*

24

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

& Figure 2. After selecting a bowl, respondents "saw photos of the bowl . .. filled with varying amounts of cereal," and "were asked to select the serving size which most closely matches the amount of cereal they plan to pour in their bowl." *Id.* ¶ 64 & Figure 3. Finally, respondents "were asked how often they plan to eat bowls of cereal, like the one they chose . . . in the near future." *Id.* ¶ 65; *see also id.* ¶ 69. After processing the data, *see id.* ¶¶ 68-71, the surveys showed "respondents indicated that they would consume significantly fewer servings of cereal per year had they been informed about the dangers of sugar consumption when purchasing Raisin Bran," *id.* ¶ 71. That is, "respondents indicated that they would consume 26.3% less Great Grains, and 28.1% less Honey Bunches of Oats had they been aware of the omitted information," *id.*

Post also criticizes the manner in which Mr. Gaskin showed the stimuli in his demand studies (like the font size), and professes to doubt the realism of pouring a cereal bowl virtually. These types of criticisms go to weight, not admissibility. *See Hadley*, 324 F. Supp. 3d at 1108. Post argues that the warning Mr. Gaskin used in his surveys "would flagrantly violate the First Amendment," meaning "his survey is invalid because the warning he tested could never be required." Mot. at 25. These are merits arguments on which there is competing evidence: as the warning was chosen for its scientific validity based on the opinion of Plaintiffs' expert, Dr. Lustig, and is on the conservative end of the spectrum, since it would be possible to place a lengthier warning on a cereal box. The point of the survey was to test how people reacted to the disclosure of material information Plaintiffs allege was omitted. If Post believes the warning failed to convey that information, or conveyed it too forcefully, it may argue to the jury as to the surveys' weight. *Compare In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 943 (2018) (Approving damages model that "infer[red] how consumers valued the MFT system in four scenarios where they were exposed to varying levels of information about the MFT defect, its safety implications, and Ford's knowledge of and failure to disclose information about the defect," and demonstrated "the more information consumers were provided about the defect, the less valuable the MFT system became to them."); *Fitzhenry-Russell*, 326 F.R.D. at 604 ("Yet just because the conjoint survey may result in overestimating the value consumers placed on the 'Made From Real Ginger' claim . . . does not necessarily render the survey excludable. Dr. Pepper will be free to attack Dr. Dennis's conjoint study as inflating the price premium at trial.").

## CONCLUSION

The Court should deny Post's motion.

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR

Dated: August 9, 2019                    Respectfully Submitted,

                                         /s/ Jack Fitzgerald

                                         **THE LAW OFFICE OF JACK FITZGERALD, PC**
                                         JACK FITZGERALD
                                         *jack@jackfitzgeraldlaw.com*
                                         TREVOR M. FLYNN
                                         *trevor@jackfitzgeraldlaw.com*
                                         MELANIE PERSINGER
                                         *melanie@jackfitzgeraldlaw.com*
                                         Hillcrest Professional Building
                                         3636 Fourth Avenue, Suite 202
                                         San Diego, California 92103
                                         Phone: (619) 692-3840
                                         Fax: (619) 362-9555

                                         ***Counsel for Plaintiffs***

*Krommenhock et al. v. Post Foods LLC*, No. 16-cv-4958-WHO (JSC)
OPPOSITION TO POST'S MOTION TO EXCLUDE STEVEN GASKIN AND COLIN WEIR