Pages 1 - 50

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

DEBBIE KROMMENHOCK and STEPHEN )
HADLEY, on behalf of          )
themselves, all others        )
similarly situated, and the   )
general public,               )
                              )
            Plaintiffs,       )
                              )
  VS.                         )      NO. C 16-04958 WHO
                              )
POST FOODS, LLC,              )
                              )
            Defendant.        )
_____)
                              San Francisco, California
                              Wednesday, October 9, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    LAW OFFICE OF JACK FITZGERALD, PC
                    Hillcrest Professional Building
                    3636 Fourth Avenue - Suite 202
                    San Diego, California  92103
              BY:   **JACK FITZGERALD, ATTORNEY AT LAW**
                    **MELANIE PERSINGER, ATTORNEY AT LAW**
                    **TREVOR FLYNN, ATTORNEY AT LAW**

For Defendant:
                    FAEGRE BAKER DANIELS LLP
                    2200 Wells Fargo Center
                    90 S. Seventh Street
                    Minneapolis, Minnesota  55402
              BY:   **AARON D. VAN OORT, ATTORNEY AT LAW**
                    **EMILY R. ZAMBRANA, ATTORNEY AT LAW**

Reported By:  Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
              Official Reporter

| | |
|---|---|
| 1 | **Wednesday - October 9, 2019**                              **2:12 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---oOo---** |
| 4 | **THE CLERK:**  Calling civil matter 16-4958, Krommenhock, |
| 5 | et al., versus Post Foods, LLC. |
| 6 | Counsel, please come forward and state your appearance. |
| 7 | **MR. FITZGERALD:**  Good afternoon, Your Honor.  Jack |
| 8 | Fitzgerald for plaintiffs.  With me are Melanie Persinger and |
| 9 | Trevor Flynn. |
| 10 | **THE COURT:**  Welcome. |
| 11 | **MR. VAN OORT:**  Good afternoon, Your Honor.  I'm Aaron |
| 12 | Van Oort representing Post, and with me is Emily Zambrana. |
| 13 | **THE COURT:**  Great. |
| 14 | So I saw your filing about splitting up issues and arguing |
| 15 | things.  I'm very happy to have anybody argue who you'd like to |
| 16 | argue at any point.  So that is great with me; and as I've told |
| 17 | many people, I prefer it when the people who have done the work |
| 18 | argue.  Those are usually the younger people as opposed to |
| 19 | the -- or the less senior as opposed to the more senior people. |
| 20 | So I'm particularly happy when that happens, but however you |
| 21 | cut it up is fine by me. |
| 22 | **MR. FITZGERALD:**  Thank you. |
| 23 | **THE COURT:**  Speaking of cutting it up, I'm going to |
| 24 | give each of you -- there are so many motions and issues, I'm |
| 25 | going to give each of you a total of 30 minutes each to argue |

1  whatever you want.  I'm going to lay out what my tentative is

2  so that you know where to go.

3      I'm going to start with the plaintiffs' motion, but you

4  can address it any way that you want to.

5      So I'm inclined to follow Judge Koh's analysis in the

6  *Kellogg* case.  So you should focus on why you disagree with her

7  or agree with her.

8      I'm inclined to grant class certification for the most

9  part, deny the motion for summary judgment for the most part,

10 and deny the *Dauberts* for the most part.

11     With respect to -- and I'll make just a couple of comments

12 about the motion so that you can see how I'm thinking.

13     With respect to class certification, with respect to

14 prominence, I'm not convinced that I need to look at the

15 challenged statements now in the way that Judge Koh did.

16     The fact that there are so many challenged statements

17 across so many product lines is going to definitely make this

18 litigation and the trial complex.  That's not a reason not to

19 grant certification, but the plaintiffs are going to need to

20 prove that reasonable consumers would be misled by each

21 particular label used for each product; and if Post argues that

22 the differences are so great that they're going to require

23 subclasses, maybe what's the best way to proceed is to have a

24 separate motion for decertification that would identify those

25 subclasses on the ground, that that's necessary; or the parties

1   could stipulate to a smaller number of claims that would be

2   presented at trial.

3        So that's what I'm thinking about with respect to

4   prominence and class certification, but I do think that the

5   elements have been met.

6        With respect to the motion for summary judgment, with

7   respect to the First Amendment argument, the plaintiffs have

8   enough evidence that sugar is bad and health claims were

9   material to the consumer's purchase.  There's a scientific

10  dispute here that I think goes to the jury.

11       The implied nutrient claims, though, given the emissions

12  in the six challenged statements, I'm leaning to find

13  preemption.  So I'm interested in that argument; and also with

14  the health claim, given Post's submission in 2006.

15       With respect to punitive damages, I am inclined to follow

16  Judge Koh's ruling on that given the scientific dispute in

17  which plaintiffs' expert himself says that they're in the

18  minority.

19       With respect to the experts, in general, at least at this

20  stage, I think the arguments go to the weight and not the

21  admissibility.  Portions of the testimony that may be outside

22  their expertise or have 403 implications could be handled in

23  *motions in limine* or at the time of trial.

24       The, I guess, special comments would include if Clemens

25  intends to testify regarding the Lustig studies at trial and

1  there is some prejudice as a result of his not knowing -- his

2  not remembering the studies during his deposition, the

3  plaintiffs could reopen his deposition for up to two hours, ask

4  him questions, if Clemens is going to testify on that subject.

5      The Gaskins conjoint study is okay.  I'm still looking at

6  the Advantage Realized Model, and I'm interested in argument on

7  that.

8      I'm also interested in argument over Strombom's expertise

9  in conjoint analyses and reliance on the before-and-after data.

10  Otherwise it seems okay.

11      I'm interested in argument over Hansen's opinions

12  regarding the conjoint analysis, which seems to attack the

13  concept of conjoint analysis that's been found to be valid in

14  this district.

15      So those are my comments.  And, Mr. Fitzgerald, if you

16  want to start on the motion for class certification.

17      **MR. FITZGERALD:**  Very good, Your Honor.  Ms. Persinger

18  is going to address that, if that's okay.

19      **THE COURT:**  Okay.  Excellent.

20      You can stay there.  Wherever you want to be,

21  Mr. Van Oort.

22      **MR. VAN OORT:**  I'm comfortable here.  I've got a good

23  view.

24      **THE COURT:**  Okay.

25      **MS. PERSINGER:**  Good afternoon, Your Honor.

1          **THE COURT:**  Good afternoon.

2          **MS. PERSINGER:**  Okay.  So Your Honor had mentioned

3     that you were inclined to follow Judge Koh's ruling on the

4     punitive damages issue --

5          **THE COURT:**  Yes.

6          **MS. PERSINGER:**  -- and so I just wanted to address

7     that fairly quickly.  But I think we've submitted lots of

8     evidence regarding Post's knowledge about the negative health

9     effects of sugar and the fact that they had evidence in their

10    possession that they knew sugar was bad but on top of that,

11    they also held themselves out as sort of having nutrition

12    expertise.

13         I believe we filed with our class cert -- I'm sorry -- in

14    opposing the summary judgment brief, we filed some statements

15    and press releases that they had put online regarding the fact

16    that they're experts in nutrition and that they create food,

17    you know, for -- they create healthy foods because they care

18    about their consumers; but through deposition testimony, it

19    actually came out that they don't have an expert nutritionist

20    on their staff, and they sort of throughout the entire

21    discovery process have disclaimed the fact that they claim to

22    have nutrition expertise.

23         So I think the fact that they have held themselves out as

24    nutrition experts but in a time of litigation have sort of

25    stepped back from that and said, "Actually, we don't have that

1  expertise and we haven't held ourselves out as a company that

2  is an expert in nutrition," sort of shows that they knew what

3  they were doing all along and the evidence was there, and they

4  knew it and should have known that they were putting consumers

5  at risk with the amount of sugar that they were putting in

6  their products.

7       And against that background and even during the litigation

8  of this case, they doubled the amount of sugar in Alphabets so

9  I think that goes towards that as well.

10      Your Honor also mentioned being inclined to dismiss the

11  six specifically mentioned claims.

12          **THE COURT:**  Before you get there --

13          **MS. PERSINGER:**  Oh, I'm sorry.

14          **THE COURT:**  -- what do you do with your own expert's

15  statement that his view was in the minority?  Why wouldn't that

16  just take me right into this is going to be -- this is a

17  dispute, it's going to get decided, but it doesn't come close

18  to the level of punitive damages?

19          **MS. PERSINGER:**  The fact that it can be characterized

20  as a minority viewpoint isn't necessarily sort of demonstrative

21  of what is the reality of the science.  And what's mainstream

22  to consumers and the media isn't necessarily what's mainstream

23  in science.

24      And so while there is a significant body of scientific

25  evidence that favors our side and a lot of scientists also that

1  favor our position, the science is still developing as

2  nutrition science does, it evolves over time.  And, you know,

3  not everyone has sort of come around to the new point of

4  thinking, and that doesn't necessarily mean that it's wrong and

5  doesn't mean that it's not going to be borne out to be the

6  majority viewpoint in maybe just a year from now.  The science

7  is really collecting quickly.

8      And so I think that while sort of maybe an out-of-context

9  answer to a deposition question may have been categorized that

10 way, I don't think that's actually reflected in the actual data

11 and the science itself.

12     **THE COURT:**  Okay.

13     All right.  So go on to the implied nutrient claims.

14     **MS. PERSINGER:**  Okay.  And I'm sorry.  I just realized

15 that I was starting with the motion for summary judgment

16 instead of class cert.

17     **THE COURT:**  You're doing fine.

18     **MS. PERSINGER:**  Okay.  Sorry about that.

19     **THE COURT:**  Just go wherever you want to go.

20                 (Pause in proceedings.)

21     **MS. PERSINGER:**  Sorry.  Excuse me.

22     I'd like to start with the heart-healthy claim.  So I know

23 Post had pointed out in their reply -- we had made the argument

24 that in our opposition that the heart-healthy claim is not

25 authorized.  They argue that it's authorized under the FDAMA

1   because in 2006 the claim that we actually don't challenge, the

2   claim that talks about foods that have -- that are low in trans

3   fat and low in cholesterol may reduce the risk of heart

4   disease, that is the actual claim that was submitted to the

5   FDA -- I'm sorry -- that was submitted for approval.

6       But under 21 C.F.R., 101.14(d)(2), that regulation

7   explicitly provides that attendant material similar to the

8   approved health claims only applies to regulations -- or, I'm

9   sorry -- health claims approved under subpart (e), which is a

10  very specific list of claims.

11      And FDAMA claims are not part of that process because

12  under 21 U.S.C., Section 343, you have to submit the exact

13  wording of a claim for approval, otherwise it's not approved

14  under the FDAMA.

15      And the exact claim that was submitted and approved isn't

16  what we're challenging.  We're challenging the heart healthy,

17  the insignia in the heart healthy, which is separate.  And

18  because those aren't the exact words that were submitted to and

19  approved, those aren't covered by 101.14(d)(2), which is what

20  Judge Koh found.

21      And I know she did rely on *Quaker* and *Quaker* doesn't use

22  the words "FDAMA claim," but it was in fact an FDAMA claim in

23  *Quaker*, but that's distinguishable there only because -- or

24  because they didn't make the argument that it wasn't an FDAMA

25  claim.

1      So the argument was basically that it was an approved

2   health claim and that that was an attendant material, and so

3   the court found that it was.  But because it's FDAMA and that

4   argument wasn't made, the conclusion should have been

5   different.

6      And the later case of *Ogden v. Bumble Bee Foods*, which was

7   two years later in 2014, describes the FDAMA approval process

8   and came to a similar conclusion that we're advocating here

9   that Judge Koh also found in *Kellogg*, that when you don't use

10  the exact words of the approved claim, it falls outside of

11  101.14(d)(2) and it's not approved.

12          **THE COURT:**  Okay.

13          **MS. PERSINGER:**  Regarding the three claims that have

14  already been addressed in this case, they were on the

15  Raisin Bran and Bran Flakes, the Court already decided that at

16  the motion to dismiss stage; and so our position is that --

17          **THE COURT:**  Well, we don't --

18          **MS. PERSINGER:**  I'm sorry.  Go ahead.

19          **THE COURT:**  So since I told you I'm not going that

20  way, give me an argument as to why they shouldn't be

21  preempted --

22          **MS. PERSINGER:**  Okay.

23          **THE COURT:**  -- as opposed to what I said two years

24  ago.

25          **MS. PERSINGER:**  Uh-huh.  Okay.  So for the wholesome

1  nutrition on Honey Bunches of Oats and the "It's a perfect

2  combination of wholesome goodness of honey sweet crunch that

3  everyone in your entire family will love," for those claims,

4  the Court dismissed other claims that were in the same

5  proximity to those claims.  They dismissed -- the Court

6  dismissed those claims as puffery.  And Post had argued that

7  the context of those claims didn't give any information to

8  quantify those claims, and so the Court dismissed them as

9  puffery.

10      And so I believe that if the context isn't enough to

11  offer -- to render puffery claims nutrient-content claims,

12  then -- or, I'm sorry -- it's not enough to render puffery

13  claims actionable under the UCL as false or misleading, then I

14  don't think it would be -- similarly, I don't think it would be

15  enough to give context to change a marketing claim into a

16  nutrient-content claim.

17      So, basically, the context of the claim that is similar to

18  the one that was dismissed and if the context didn't provide

19  enough to push that over the line, we don't think it would

20  provide enough to push those claims over the line in this

21  instance.

22          THE COURT:  Okay.  And what about the other?

23          MS. PERSINGER:  For the Alphabets claim, "Alphabets is

24  a good source of nutrients that are building blocks for your

25  child's developing brain," our position there is that the claim

```
 1   is set apart from the statements that we're not challenging as
 2   Post points to as nutrient-content claims, and the statement
 3   itself doesn't mention a nutrient or an amount of nutrient.  It
 4   just mentions nutrients generally, and the building blocks for
 5   a child's developing brain isn't a nutrient-content claim in
 6   the sense that it states the nutrients in the products will be
 7   good for maintaining a healthy lifestyle because it's actually
 8   a structure-function claim, which Post's regulatory person
 9   testified to, and those claims need to not be false or
10   misleading just like any other marketing claims on the box per
11   FDA guidance documents.
12        And the other three claims, the ones on the Bran Flakes --
13   excuse me -- Bran Flakes and Raisin Bran, they are similar to
14   another claim that the Court -- I'm sorry.  Let's see...
15                    (Pause in proceedings.)
16        MS. PERSINGER:  I'm sorry.  Really the only thing I
17   had to address on those was that they were law of the case, but
18   then also Post initially argued that they were puffery and that
19   they were unable to be quantified, and so it's hard to see why
20   a claim that Post initially believed was unable to be
21   quantified is now so specific that it can be an implied
22   nutrient-content claim.
23        THE COURT:  All right.  Thank you.
24        Mr. Van Oort.
25        MR. VAN OORT:  Your Honor, I'll start with punitive
```

1  damages where we agree with the tentative --

2          **THE COURT:**  Okay.

3          **MR. VAN OORT:**  -- on that.

4      And as you're right, Dr. Lustig mentions he is in the

5  minority view and that is, these are not generally accepted and

6  the FDA says there's no evidence connecting added sugars to

7  disease.  So speaking consistent with the accepted majority

8  view can't be subject to punitive damages.  We, of course,

9  argue that it's protected, and I'll get there later; but at a

10  minimum, punitive damages there.

11      Respecting preemption, each of the six statements that

12  we've listed that are at page 20 of our brief are directly

13  analogous to statements that Your Honor found preempted in the

14  second motion to dismiss.  You know, line by line, I think it's

15  pages 12 through 14 of Your Honor's previous opinion, "contains

16  dietary fiber" is directly analogous to "excellent source of

17  dietary fiber," which you found preempted; "21 grams of whole

18  grain per serving, 44 percent of your day's whole grains" is

19  directly analogous to over two-thirds of your day's whole

20  grains, which Your Honor found preempted; "8 grams of fiber" is

21  analogous to "4 grams of fiber," which Your Honor found

22  preempted; "5 grams of protein" is analogous to "good source of

23  protein," which Your Honor found preempted.  And that covers

24  those.

25      As to the FDAMA claim, Judge Koh found it not preempted

1   because *Kellogg* didn't actually use the precise phrase.   It

2   edited it and paraphrased, and that was the basis for her

3   ruling.   Post used the exact phrase.   At the beginning of it it

4   said "heart healthy" and it had the image of a heart.   That's

5   exactly the words and the image that was approved in the

6   *Quaker Oats* case on that, and the statute that we cited here

7   allows the approved verbatim claim to be presented in a context

8   that makes it understandable so it's covered by that.   So we

9   agree with that on preemption.

10       I think those are the directly responsive issues now.

11           **THE COURT:**   Okay.   All right.   So you can go ahead and

12   take the rest of your time, or however much you want, to tell

13   us why you disagree with things.

14           **MR. VAN OORT:**   Okay.   Let me focus, Your Honor, on the

15   way, as you invited, this case is different from the *Kellogg*

16   case, and the one difference that we pointed out that cuts

17   across everything is the damages model on this.

18       And I want to get very specific here on one thing.   You

19   may recall that we made an argument about the Whole Grains

20   Council stamp, the one stamp.   Plaintiffs at the motion to

21   dismiss expressly said they weren't challenging the content,

22   the 21 grams of whole grains in there.   They said that and it

23   was the basis for Your Honor's rulings.

24       But Mr. Gaskin tested it anyway.   We flagged that specific

25   problem in our brief and they had literally no response to it

1  because it's indefensible.  They aren't challenging it.

2      The reason I flagged that is that 60 percent of their

3  total damages claims come from that; and since they admitted

4  they aren't challenging it and he measured it anyway, that has

5  to be excluded under that.  And that wasn't at issue in *Kellogg*

6  at all.  And so since it's such a big deal, I want to

7  specifically flag that.

8      But then a step further, Your Honor, I invite Your Honor

9  to interrupt me and ask questions anytime you want because --

10          **THE COURT:**  Oh, I would do that without your

11  invitation.

12          **MR. VAN OORT:**  -- it does no good for me to speechify.

13  Okay?

14      So the basis -- the reason the damages is important is

15  that it affects both class certification and summary judgment.

16  Class certification, it's undisputed, unless you have a

17  class-wide damages model, you don't get a class.  And on

18  summary judgment these plaintiffs are relying solely on the

19  damages.  So it's central to everything.

20      It's also undisputed, we think, in this district and the

21  Ninth Circuit that there has to be a fit between what you're

22  measuring damages for and what the theory of liability is here.

23      And here's the real problem.  What Mr. Gaskin measured

24  doesn't fit at all what the claim is here because this is this

25  unusual claim where most of what plaintiffs are challenging are

1   these very specific things like nutritious cranberries or four

2   wholesome grains and all of that, and it's undisputed that the

3   cereals had that.  I think it's undisputed under California law

4   that you can't claim damages for something you got.  The only

5   thing that you can claim damages for in a false labeling case

6   is the difference between what was represented and what you

7   got.

8       The usual case --

9           **THE COURT:**  Isn't --

10          **MR. VAN OORT:**  Go ahead, Your Honor.

11          **THE COURT:**  Isn't this case -- fundamentally this case

12  is about whether your client is providing a healthy product,

13  and each of the representations goes to that issue as opposed

14  to how many cranberries are in -- whether the sugar that your

15  client is putting into the cereals makes it a product that's

16  not healthy.  That's the guts of the case, isn't it?

17          **MR. VAN OORT:**  That's the claim.  That's absolutely

18  right.  So to prove that claim, you've got to do two things.

19  First, you've got to prove that consumers understood something

20  that said "nutritious cranberries" to actually make a

21  representation broader about the health of the cereal.

22      And in an ordinary case, you don't need an expert because

23  like in the *Parkay* case that you just have the 0 grams of fat,

24  you can look at 0 grams of fat and say, "You know what?

25  Consumer understood it's 0 grams of fat," and then you fight

1    about whether that was there.

2        This case is different because when you say "nutritious

3    cranberries," they got the nutritious cranberries.  You've got

4    it -- if you're saying that what that meant is actually

5    something else and here it's some kind of health claim, you've

6    got to prove that up, and they have zero empirical evidence

7    that consumers actually had that broader understanding.

8        And where this takes me, Your Honor, is that Your Honor

9    has written decisions in cases with these broad, vague terms,

10   whether it's 100 percent natural or whether it's healthy on

11   that saying.  If you have a vague term that's subject to a

12   number of meanings, you can't just *ipse dixit* declare what it

13   means because you need to know what you're testing.

14       Here we're a step removed from that.  They aren't even

15   challenging the vague term.  They're challenging something that

16   said something else entirely, and they're saying it implied the

17   vague term and then are matching it up against that.

18       So we cited a whole line of cases, your colleague down the

19   hall, you know, Judge Breyer in a natural case, Wesson Oil's

20   natural case.  We had an electrolytes case where you say if you

21   have these vague terms, you can't just say, you know, this is

22   the whole thing.  You've got to prove it.  If you can't prove

23   it, then you don't get to a class.  And here, like I said,

24   we're a step removed from that.

25       But then on the damages side, if you've got something that

1    covered a variety of meanings, the only thing you can claim

2    damages for is the part that's not true.  And so -- and this is

3    one of our big problems with Mr. Gaskin.  He tested the whole

4    statement.  Like when it said 22 grams of whole grains, he

5    tested how much value there is with that.

6        Well, most of the value of that comes from the whole

7    grains being there.  You can't claim damages from that because

8    they got it.  There's no dispute about that.

9        The only thing you can claim damages for, because this is

10   their theory, is this implication that the cereal is healthy so

11   you have to isolate that.  You know, in the same way where

12   there's the natural claim in the case where it was about GMO

13   products, you couldn't claim damages for natural in general.

14   You had to isolate GMO.  Until you did it, they threw the

15   damages experts out and denied class certification.

16       We've got that problem a hundred times over here because

17   the statements were true.

18           THE COURT:  So why didn't -- would you then also argue

19   that in the *Kellogg* case, they also had the same problem?

20           MR. VAN OORT:  No, because they had a very different

21   set of statements there.  It was super-narrow by the time they

22   got there.  They had a heart-healthy preemption and things like

23   that.  So, you know, we have this huge set of terms.  You know,

24   I've got, you know, the list here that we can go through, and

25   it may actually be useful to do one in context on this to show

 1   this.  I gave a copy to counsel beforehand.  If Your Honor --

 2          THE COURT:  Okay.  Sure, if you want to hand something

 3   up.

 4          MR. VAN OORT:  I think Mr. Fitzgerald will argue this,

 5   but I've got copies to go around, Your Honor.  So as many as

 6   you need.  Let me know.

 7          THE COURT:  Okay.  I don't need this many, but thank

 8   you.

 9      What did you want to -- which one --

10          MR. VAN OORT:  So here's what -- if you start with the

11   front that has the cereal label, Your Honor -- flip it over.

12          THE COURT:  Yeah.

13          MR. VAN OORT:  So it has that.

14          THE COURT:  Yeah.

15          MR. VAN OORT:  So here's the basic problem in this

16   case.  So we have these cereal labels and what you have is a

17   ton of representations on here about various things, only some

18   of which plaintiffs are challenging, some of which they aren't.

19   And the problem is isolating the damages just to the ones

20   they're challenging and not, and then isolating just the

21   problem we have.

22      So if you flip it over, you know, the reverse side of

23   this, Your Honor, so the cereal label -- there's two sheets.

24   Just flip it over.

25          THE COURT:  Yes.

1      **MR. VAN OORT:**  So I took Mr. Gaskin's deposition so,

2   you know, that's why we're going through this.

3      Here's the big problem with his survey design.  The only

4   information he gave people about what was in the cereal were

5   his label statements.  And so when he took the label statements

6   out, he measured the value of taking the ingredients out and,

7   of course, that's not what the damage is here because they got

8   the ingredients.

9      And in the yellow highlighting in the middle, I asked him:

10  "Well, how would you design a survey if you actually wanted to

11  isolate the value just taking the label statement off?"  Right?

12     Because the claim in this case is that you'd still get the

13  same cereal.  Everything's in it.  You'd still have all of

14  these other statements here, and all you would do is you would

15  take this statement off.  So how would you isolate the value,

16  the damages caused, just by taking the statement off but

17  leaving all the stuff in there?

18     He said:  "Well, here's what you'd do.  You'd have to set

19  up a survey where you have a separate disclosure of what the

20  ingredients are; and then you'd have the ingredients, you'd

21  test the value of the ingredients plus a representation about

22  it, and then you'd test it with the ingredients without a

23  representation, and that's how you isolate it."

24     I said, "Well, did you do that here?"  He said, "No."  And

25  you can see that he didn't because he had no independent

1    ingredient list.  That's a really big fit problem -- right? --

2    under the *Comcast* model, under the *Ellis* model, because taking

3    off a statement is one thing; taking out an ingredient is

4    another.

5        No wonder the damages are so high.  It's a totally wrong

6    fit; right?  And the big one that I pointed out to Your Honor

7    earlier, and this is on the back, we don't have to go through

8    it, but it's the Whole Grains Council where you're not

9    challenging the comment about all the whole grains; you're just

10   challenging the empty graphic and you test the content.  No

11   wonder you get 60 percent of your damages from that.  That's a

12   real problem.

13       And this problem, Your Honor, doesn't -- this isn't an

14   attack on conjoint generally.  This is a fit between this

15   conjoint and this case, and it didn't show up in *Kellogg*.

16   Judge Koh didn't say anything about it.

17       So that's the argument there.  As we've said, if those are

18   excluded or if they don't fit, then you deny class

19   certification, you don't have to get to the rest of it.  That's

20   the number one thing I want to talk to Your Honor about.

21           **THE COURT:**  Okay.  I've heard that argument.  So go

22   ahead.

23           **MR. VAN OORT:**  Okay.  I don't know if Ms. Persinger

24   wants --

25           **THE COURT:**  Why don't you just go ahead and run

1   through the rest of your arguments.

2        **MR. VAN OORT:**  Okay.  All right.  Yeah, so let me go

3   to class certification then, Your Honor.

4        And the damages was the core of that, but the other

5   argument we had, and this is what I pointed out, when the

6   premise of your claim is some vague term, you can't just

7   declare that everybody understood it.  Materiality is common.

8   Your Honor said this in the case just before us, *Allen vs.*

9   *ConAgra*, where you said (reading):

10        "If there's likely to be different understandings for

11        a word with no fixed meaning, the lack of cohesion

12        presents a class-wide inference."

13        That's this case but worse because here the things that

14   are being challenged are about 50 different very specific

15   things about wholesome grains or cranberries or fiber or all of

16   that, and you're trying to get from there to an inference.  You

17   don't even have the term, that level of fixed.  You have

18   another level of vagueness so you've got to have proof and they

19   didn't have it.  That's the problem we had there.  We cited the

20   other cases that go to that point.

21        On the "too many variations" part, Your Honor, the core

22   principle there is that if you're matching up a representation

23   to the contents of a product, and that's what's going on here,

24   if the content of the representations matters and the content

25   of the product matters, then you can't generalize on that.  And

1    Your Honor established this principle in the *Ang vs. Bimbo*

2    *Bakeries* and said, you know, if the claim requires

3    context-specific analysis of the representation and looking at

4    other information on the label, then you can't generalize

5    across labels.  And Your Honor also said if the actual

6    composition of the product is legally significant, then you

7    can't generalize across products.

8         Well, here we have both.  Plaintiffs insisted on our

9    motion to dismiss that you had to look at context.  That's why

10   we lost.  You can't insist that you need context and then when

11   you get to class certification, say, "No.  Context doesn't

12   matter.  We're going to lump it all together."  That's what's

13   going on here.

14        And then you can't say this is all about the health

15   effects of sugar on that and then generalize across a bunch of

16   different amounts of sugar, which is what's going on here.

17        And since we don't even know what claim they're making

18   what "healthy" means, we kind of need to pay attention to all

19   the other things in the cereal that would affect health; like

20   how much fiber, how much whole grains, how much iron, how much

21   folic acid.  It's legally significant here so you can't

22   generalize, and that's what we're being asked to do.

23        You know, and even in opposing our summary judgment

24   motion, plaintiffs are still insisting that context matters.

25   They're saying, "Post, you're generalizing on your arguments on

1    the merits.  You can't do that."  This is a quote from their

2    brief (reading):

3              "Context is not only relevant, it's crucial."

4        That's pages 11 and 12 in their summary judgment

5    opposition.  They pound it when it comes to the merits and then

6    ignore it when it comes to class certification.

7        So what we showed is there's 160 different labels here or

8    combinations of labels and cereals, 31 different cereals.  We

9    went through in our brief all the different changes in the

10   formulas.  We went through the difference in the changes in

11   sugar.  We went through the redesign.

12       And if you're going -- if your theory is going to be that

13   "nutritious cranberries" actually means you can eat the cereal

14   as part of your daily diet without having any adverse health

15   effects and the reason you can draw that is because of

16   everything else on the box, then you better look at the

17   specific box one at a time.

18       We think right now, Your Honor, the burden is on them to

19   establish common issues.  They haven't met it.  The right thing

20   to do -- and I know Your Honor talked about decertifying or

21   doing that.  The right thing to do isn't to certify the class

22   when they haven't met the burden and then deal with it.  The

23   right thing to do is to deny it now.  And then if they come

24   back and say, "Well, actually, you know, Your Honor, we have a

25   fallback option, we're going to tailor this to something you

1    maybe could do," then we'll talk about whether they can meet

2    that burden.

3          **THE COURT:**  Well, you're talking about having them

4    tailor it to what you want them to do and the way that you want

5    them to define the class and it may be that that, at the end of

6    the day, might be necessary because they are trying to do

7    something that is very complex.  It's going to make it

8    difficult to try this case, and I totally recognize it.

9          But the theory that they have is a different theory than

10   the one that you've been arguing about, I think, and I'll be

11   happy to hear from the plaintiffs when you're done --

12         **MR. VAN OORT:**  Okay.

13         **THE COURT:**  -- on that.

14         **MR. VAN OORT:**  I think that's it on those issues,

15   Your Honor.  I'm mindful of my time and don't want to rob my

16   colleague.

17         **THE COURT:**  Great.  Okay.

18         **MS. PERSINGER:**  Okay.  So just to start with the label

19   and formulation differences --

20         **THE COURT:**  Okay.

21         **MS. PERSINGER:**  -- the plaintiffs' theory is actually

22   relatively straightforward notwithstanding that Post wants it

23   to be really complicated.

24         We allege that the claims we challenge individually and in

25   combination with the other challenged claims convey a message

1    that the cereals are healthy.  So when one claim comes off a

2    box and then maybe later can go back on and there's still these

3    other claims conveying the same health message, the overall

4    message of the box hasn't changed.  So the context I think is

5    still the same.

6        The context is always that this is a healthy cereal, and

7    the individual claims in combination with the other claims or

8    by themselves convey that message to consumers; and I think we

9    have, through the testimony -- through Post documents and

10   through the testimony of Bruce Silverman, have shown that those

11   convey a health message individually and in a combination.

12       And with the formulation differences, we allege that every

13   single product in this case has excessive added sugar over the

14   threshold amount that would be in a healthy product.  The

15   amount of excessive added sugar renders them unhealthy.

16       And that doesn't matter.  Every cereal in the class has

17   over that threshold amount.  So whether it varies between

18   10 percent and 40 percent, we allege that those are all

19   unhealthy for the same reason.  And so while there may be small

20   differences, they aren't material in this case and it's only

21   material differences that can defeat class certification.

22       And not only are they not material, Post hasn't attempted

23   to show that they are material.  They're just showing that

24   there are differences.

25       And while Post argues that the vitamins or the whole grain

content of the cereals must be taken into account and varies from cereal to cereal, within each subclass it's pretty uniform.  And then even within that, the variation that there is, none of those ingredients counteract the negative health effects of the sugar.

The sugar is still there.  It's still there in an amount we allege is unhealthy and renders the claims false and misleading.  And adding vitamin A doesn't change that analysis. It may make it, you know -- help you with rickets if you have that or these other diseases that their experts mention, but it's not going to undo the negative effects to your heart. It's not going to magically make the cereal heart healthy when the sugar is still in there.

Also, the way to properly deal with the material differences, if the Court is to find that some are material, is to create subclasses.  Really when you look at the changes that they point out, the 160 versions of the labels is drastically -- it's made to be a bigger deal than it really is because a lot of that is just changing the employee that's on the back of the box.

They had a series where they had Post employees pictured on the back of the box, and they count that.  Every time that face changes is a label variation according to Post.  That's clearly not material to the claims in this case.  So that 160 number is drastically overcounting any potential differences.

1        And the few differences that they do point out, we think,

2   you know, are not material; and if they are, it can be easily

3   dealt with in subclasses.

4        Let's see, for example, the Whole Grain Council stamp and

5   the no high fructose corn syrup claim are across a lot of the

6   products.

7            THE COURT:  Slow down just a little bit,

8   Ms. Persinger.

9            MS. PERSINGER:  Sorry?

10           THE COURT:  Slow down just a little bit so that the

11  court reporter can get everything.

12           MS. PERSINGER:  I'm sorry.

13           THE COURT:  That's all right.

14           MS. PERSINGER:  So, for example, the Whole Grain

15  Council stamp and the no high fructose corn syrup claim are

16  across a lot of the products, so even across subclasses there's

17  some uniformity there.

18       The -- let's see, and they brought up that one of the

19  Raisin Bran boxes, there's -- one of the versions of the labels

20  only has the Whole Grain Council stamp.  That's the most recent

21  version of the label.

22       And I just want to point out to Your Honor that we

23  submitted evidence, paragraphs 132 through 138 of the Silverman

24  report, as well as a *Decision Insights* document that shows --

25  which is in Post's possession, that shows that consumers do

```
 1   view the Whole Grain Council stamp standing alone as showing

 2   that the product is healthy for them and they choose it based

 3   on that.

 4       So even for that box where it's only the one claim, which

 5   is only one version of the label, the recent version, I still

 6   think it still conveys a health message according to Post's own

 7   documents.

 8           THE COURT:  Okay.  Hang on just a second.  We've got

 9   Mr. Fitzgerald.

10       Come on up, Mr. Fitzgerald.  Give us your wisdom.

11           MR. FITZGERALD:  I was just going to address the

12   damages issues if we're ready.

13           THE COURT:  Go ahead, please.

14           MR. FITZGERALD:  So I think what defendants are doing

15   here is they're conflating liability and damages when talking

16   about the sort of statements and the ingredients and so forth.

17       So, you know, we briefed this a lot and one of the

18   statements Mr. Van Oort says is you can only claim damages for

19   what's not true.  Well, that's not California law.  California

20   law says that a perfectly true statement can be misleading and

21   if it's misleading, the remedy is to get rid of the statement.

22   Even if it's true, if it's misleading, you get rid of it.  And

23   so a damages analysis starts from the premise that liability

24   has been established, that the challenged conduct was done by

25   the defendant, and that it was unlawful.
```

1          So here we have to assume, we have to start -- in damages

2     we start from the premise that Post made the statements and

3     that those statements were unlawful.  They were unlawful

4     whether they were literally true, whether they were misleading,

5     whether there's sort of this gray area like with four wholesome

6     grains where it might have some sort of element of literal

7     truth in an abstract context but in the context of the cereal,

8     it's not.

9          So, anyway, once liability is established, the question

10    is:  How do people value the presence versus the absence of the

11    challenged claim?  And that's what Mr. Gaskin tested, the

12    presence versus the absence of the challenged claim.

13         This idea that he got rid of ingredients because he had

14    statements, it's not true and it doesn't make sense.  There's

15    all sorts of ingredients in Post cereals that it's not making

16    statements about.  That doesn't mean the ingredients are not in

17    the cereals.

18         Moreover, the respondents in these surveys are prior

19    purchasers.  They're familiar with the cereals.  They know what

20    they are.  They're also given an instruction that for any

21    attribute or level that's not in the survey, they're to hold

22    everything else constant.

23         So they're familiar with the cereals.  They know they have

24    whole grain.  They know they've got other ingredients.  And if

25    those elements aren't addressed in the survey, they've been

1    told to hold them constant.

2          I think, you know, at best, really at best these

3    criticisms go to weight.

4          Regarding the materiality issue, I think we submitted a

5    lot of evidence on materiality.  You know, Silverman's report,

6    he cites lots of Post documents.  Remember under *Hinojos*,

7    materiality can be established by showing that Post thought it

8    was likely to be material to people, and we've got probably

9    hundreds or more documents on that.

10          I think I'll go to the Advantage Realized Model now.

11                **THE COURT:**  Okay.

12                **MR. FITZGERALD:**  So Judge Koh denied this model, and

13    we decided to press it here and at great expense because we

14    think it's ripe and we briefed the reason we think it's ripe,

15    and we think it's clearly ripe because, first of all, both

16    sides clearly agree that the difference in the labels can

17    manifest in price per volume.  We agree with that all over the

18    place.  So we did a price analysis under the conjoint and we

19    did a volume analysis under the demand model.

20          Judge Koh ruled that it was nonrestituionary disgorgement

21    because it only focused on Kellogg's sales.  Well, of course,

22    every sale Kellogg makes is a purchase a class member made, and

23    so really we're focused on class member purchases.

24          Post mentioned that if this was a proper model, it would

25    be Post profits, not retail sales, but that's not true.  We're

1  looking at the damage to class members.  It's the retail sales

2  that they experience.

3       And what our model did is it said on a class-wide basis,

4  aggregating the behavior of all the individuals in the class,

5  how would volume change on an aggregate basis if a warning was

6  made along with the statements as we allege was necessary.

7       And that's what we tested.  We see a change.  And the fact

8  that -- it's true that we can't identify which people and which

9  purchases would not have been made.  And even individual

10 people, you know, if they say, "Well, maybe I'm eating three

11 quarters of a bowl instead of a bowl," it's not like every

12 fourth time they go into the grocery store, they're making a

13 decision not to buy that one.  It's just that they're only

14 going into the grocery store, say, every eight days instead of

15 every six days, or something like that, because they're eating

16 less.  So this is about the change in volume due to the

17 lowering of consumption and demand that would happen due to the

18 warning.

19      Their other argument is a First Amendment argument.  I

20 think they're welcome to dispute the validity of the warning at

21 trial.  I think that goes to weight, not admissibility.  The

22 First Amendment issue is beside the point because we're not

23 asking the Court to actually impose that disclosure.

24      What we're saying is our theory of liability is if they

25 were going to make partial claims about the health of the

1  statements, they needed to make a disclosure about the

2  unhealthy aspects too, and that's what we're testing.  It's not

3  injunctive relief that we're actually seeking.  We're saying if

4  they had met our case theory of what's required, how would the

5  behavior of consumers change.

6      Last --

7          **THE COURT:**  One other thing you might mention while

8  you're up here -- you were the lawyer in the *Kellogg* case;

9  right?

10         **MR. FITZGERALD:**  That's correct, yes.

11         **THE COURT:**  So I just heard that there's a major

12  distinction between the two cases that you brought.  How would

13  you -- how do you compare the two cases that you brought?

14         **MR. FITZGERALD:**  There were more claims than just

15  heart healthy in *Kellogg*.  Two of the claims, the ones that we

16  won on summary judgment as unlawful, were long sentences just

17  like some of the long sentences here.

18      There was also a phrase "lightly sweetened" on Frosted

19  Mini-Wheats and Kellogg vehemently argued that "lightly

20  sweetened" was a taste representation and not an amount

21  representation.

22      But basically there were these series of cases in the

23  all-natural area where defendants had presented evidence that

24  the word "natural" had lots of different meanings, and that

25  evidence was undisputed by plaintiffs.

 1          Here we don't have that.  We don't have them showing that

 2     there's lots of different meanings to these things.  It's just

 3     sort of supposition.

 4          Not only that, but at least this district, in *Pettit* and

 5     *Hadley*, et cetera, have held that, you know, variation in

 6     interpretation goes to the merits of the issue.  It's not a

 7     class cert issue.

 8          So if it turns out that Post is right, that these -- and

 9     they can present that to a jury, that these things are so

10     ambiguous that they could mean different things for different

11     people, then we'll lose on the merits.

12          But let's take no high fructose corn syrup, for instance.

13     What they would argue is no high fructose corn syrup sends the

14     message both that it has no high fructose corn syrup and that

15     it's healthy.

16          That's not really true because the first message that it

17     has no high fructose corn syrup is only relevant to people,

18     it's only being stated because it implies that it's healthy.

19     They're not saying, you know, "Not a lot of protein in there"

20     or something like that.

21          **THE COURT:**  No, I understand what your point is.

22          **MR. FITZGERALD:**  Yeah.  So I think I've had my

23     argument on that.

24          **THE COURT:**  Okay.

25          **MR. FITZGERALD:**  Let me just go to the Hansen's thing.

```
 1        So Hansen's basically --

 2            MR. VAN OORT:  I don't want to interrupt there.  If

 3    you want me to respond to these points before you go to the

 4    next, I can do it now, or I can wait all the way at the end.

 5            THE COURT:  Why don't you just wait and let

 6    Mr. Fitzgerald finish.

 7            MR. VAN OORT:  Okay.

 8            MR. FITZGERALD:  Okay.

 9            THE COURT:  Thank you.

10            MR. FITZGERALD:  So we've got two differing ideas of

11    the but-for world, and I think a good way to think about this

12    is we're doing a historical analysis.  All the sales that we

13    allege were unlawful have already taken place, and that's true.

14    That can't be changed.

15        What they want to do is a forward-looking analysis.  If

16    you were to remove the label today, how would the market react?

17    How would competitors react, et cetera?  And certainly that

18    would change the supply curve.

19        But we can't change how competitors reacted in the past.

20    We can't change how much advertising there was in TV in the

21    past.  And we can't change the quantity sold.  And it's also

22    conservative not to do that for this reason.

23        Imagine there was a million units sold but doing the

24    supply curve in the back, you know, forward-looking supply

25    curve historically, it would be 800,000 units.  Well, the
```

remedy would be for those 200,000 units that would have never

been purchased to give a full refund and then to give the

premium on the 800,000 units.

But we're only asking for the premium on the full million

units so our estimate is actually conservative because we're

not allowing class members to undo their transactions even

though some of them would undo their transactions if that claim

wasn't on the label.

**THE COURT:** Okay.

**MR. FITZGERALD:** Okay.

**THE COURT:** Mr. Van Oort.

**MR. VAN OORT:** Yeah.  I'll run through this quickly.

The aggregate demand model, it seeks to award a full

refund, and Your Honor and all sorts of other courts have held

that a full refund isn't appropriate when you've got the cereal

and it was worth something.  That's the first reason it fails.

The second reason is the methodology has never been

accepted in any court.  It's not approved by any academic.

It's completely unreliable and it's shown that by it overstated

the estimated California sales by an order of magnitude.  Like,

it was 10 times off.

And then on top of that, the warning that they tested

wouldn't pass First Amendment because it has to be strictly

factual and it has to meet the *Central Hudson* factors.  And

when you say things like "high sugar amounts" instead of

1  sticking to facts and doing that -- you know, if a regulator

2  tried to do it, it would be struck down in a heartbeat.  So you

3  don't need to get all three, any one of the three is enough,

4  but that model is out.

5       Mr. Fitzgerald, regarding Mr. Hansen's and the critique

6  there, what I understand is they're saying he shouldn't be

7  allowed because one of the things he says is that conjoint

8  isn't ever capable of doing a market price.  A lot of what he

9  says is the way they did conjoint here is wrong to get a market

10 price, and all of those critiques on there are undeniably valid

11 regardless of the point.

12      The other thing Mr. Fitzgerald said right now to defend

13 the way they did it is he said historical quantity is fixed so

14 you can't change it.  As I said in the brief, that's complete

15 baloney because they actually ran a damages model changing

16 quantity.  That's the aggregate demand model.

17      And he just explained and in their briefs we quoted them

18 saying when you look back, you can measure changes in both

19 price and quantity.  You can do it.  And the whole point in the

20 but-for world is to say:  What would have happened had these

21 labels not been on there?  What would have happened is the

22 market would have sorted itself out into an equillibrium.

23      Their own experts admitted in this case on the record that

24 if demand changed for cereal, both price and quantity would

25 change.  So if you want to figure out what the actual change in

market price was, you'd have to model both.  That's their own

factual admission here.  That's not a big-picture theoretical

objection.  That's this case.

Really what Mr. Gaskin did is -- and the newest opinion on

this is the General Motors ignition switch that came out just a

couple of months ago.  It's really thoughtful on this.  It's

worth Your Honor's time.  It explains basically what

Mr. Gaskins did here by assuming you're going to have to sell

the same thing even if nobody wants it anymore.  It's a forced

sale and nobody in a real market sells everything, you know,

and tries to make up in volume what you lose in price.

So what he measured is how the price would change if the

market changed, not how the price would change if the label

changed.

But let me get to First Amendment, Your Honor, on this --

**THE COURT:**  Go ahead.

**MR. VAN OORT:**  -- because this is the heart of this.

And the arguments here are really fundamentally inconsistent

with the First Amendment in two ways because the

First Amendment is designed to make it easier to speak than the

suppressed speech, and that's upside down here.

So the rule, and we cited all of these cases in the

food-labeling context, says the Government can't suppress a

statement about a health effect if there's credible evidence

supporting it.  The only way you get to suppress it is if

there's no credible evidence on that, and we cited the cases

going through specifically in this, you know, it's the *Alliance*

case -- they're all out of the D.C. Court of Appeals and going

up because that's where the agency is -- there's the *Whitaker*

case, and there's one other in the Sixth Circuit.

And this is completely upside down.  Plaintiffs' argument

to Your Honor is if a jury could agree with plaintiffs, then

the speech can be banned, even if the jury could also agree

with Post.  They're saying if there's a fact issue.

The constitutional standard is really different.  It said

as long as there is evidence supporting Post, even if somebody

could go the other way, you can't ban it because that means the

debate's open.

And what's going on here is really strange.  Where speech

is consistent with the accepted majority prevailing scientific

view, the one endorsed by the FDA right now it says there's no

evidence, the one that the American Academy of Pediatrics said

it's a good thing to use sugar in cereal because it improves

diet quality, the one the American Health Association said no

cereal actually improves overall nutrition, if speaking

consistent with that can be censored because they're asking for

an injunction and it can be punished with damages, in the

majority view, just because he can get a jury to agree with a

minority view, that's really upside down under the

First Amendment.  The pendulum has swung way the wrong

1   direction here.  It's usually the other way.

2            **THE COURT:**  You're not arguing, are you, that the

3   First Amendment gives you a right to make false

4   advertisement -- let's assume that that was proven -- that

5   would mislead consumers into thinking that your product was

6   healthy when it wasn't?  That's not your argument?

7            **MR. VAN OORT:**  No.  No.  I mean, let me make it really

8   clear.  No, I'm not arguing that.

9        Here's the difference, though.  The state law standard

10  right now is a standard of potentially misleading.  It doesn't

11  require that you prove actual misleading, and the plaintiffs

12  rightly thump that in their briefs on there.

13       The constitutional standard for banning speech is actual

14  deception.  You have to prove it actually happened.  If the

15  only thing you can prove is potentially misleading, that

16  somebody might misunderstand it, then you're under the *Central*

17  *Hudson* analysis and all you can -- you can require disclosures,

18  you can do all that prophylactic stuff.  You can't ban it.

19  They aren't arguing that and there wasn't anything

20  prophylactically done.  We're in ban world here, and you have

21  to prove actual deception.

22       The case that we cited on this point is dead on on this

23  because it involved the FTC, you know, which is a deceptive

24  trade practices.  It's in our brief.  It's *FTC vs. Direct*

25  *Marketing Concepts*.  It's from the District of Massachusetts.

1   We cite it at page 5 of our summary judgment reply, and it

2   directly says potentially deceiving is different from actual

3   deception.

4        So our argument here is it's not enough for them to

5   speculate that people might think "four wholesome grains" meant

6   something else.  They actually had to prove it.  Because when

7   it actually happened, they thought it meant something healthy,

8   then you crossed step one.

9        And then step two is:  How do you prove that it's false or

10  not?  What's the standard?  When there's an open scientific

11  debate, which is what this is, this is a health context, we're

12  not talking about other things, open scientific debate on

13  health, the standard from the regulatory world on health says

14  you can't ban it if there's credible evidence supporting it.

15       And, you know, and it goes on and on because the premise

16  of the First Amendment is more speech is better than less.  And

17  here's what we actually think is going on here, Your Honor.

18  You know, you've heard plaintiffs' framing.  Here's what we

19  think is going on.

20       You can speak about some things without being forced to

21  speak about other things.  We're speaking about the dietary

22  benefits of fiber.  We aren't wading into the sugar wars.

23  We're speaking about wholesome almonds.  We're speaking about

24  cranberries.  And it's okay to address smaller things

25  truthfully without being forced to do other things.  That's the

1    basic thing.

2         You know, here's the most recent Supreme Court case we

3    cited, *Sorrell*.  It says courts are supposed to be skeptical of

4    the argument, that people should be kept in the dark for their

5    own good.  You should be skeptical.  The fear that people will

6    make bad decisions if given partial truth for information can't

7    justify supporting speech, and that's what this argument is.

8         Like, they're saying "If Post is allowed just to talk

9    about fiber and whole grains and cranberries, we think people

10   are going to buy more cereal than we, the plaintiffs, think

11   they should, and so because we're afraid of that, you should

12   stop their speaking."  That's not what you do.  You allow the

13   partial truthful speech and then counteract it in the other

14   ways.

15        So we cited the Eleventh Circuit case on skim milk where

16   the same argument was you can't call it skim unless you say all

17   the vitamin A is removed.  They're like, "No.  Partial truthful

18   information is protected."

19        We cited the alcohol case, the liquor case out of the

20   Fifth Circuit, it's *Duagin*, where they said, "You can't talk

21   about the good parts of alcohol, how it's going to make you

22   feel in price unless you also talk about how it's going to ruin

23   your life."  The Court said, "No.  Just because it's incomplete

24   does not mean it's misleading."

25        And here, Your Honor is the decision-maker on the

1    First Amendment.  This doesn't go to a jury.  It's here.  As a

2    matter of law, what's going on here is truthful partial

3    information about smaller pieces.  If they wanted to prove

4    actual deception, they had to do it, they had to go out to the

5    consumers, show what actually happened.  Sitting here and

6    speculating about it isn't enough.

7             THE COURT:  Okay.  I understand your argument.

8             MR. VAN OORT:  Thanks, Your Honor.

9             THE COURT:  Okay.

10            MR. FITZGERALD:  So I'm going to briefly touch on two

11   damages issues and then turn it back over.

12       So Mr. Van Oort said the methodology on the Advantage

13   Realized Model is unreliable.  The methodology is test and

14   control.  It's the gold standard experimental design basically.

15       So on the *General Motors* case, at the very end of the

16   decision it specifically distinguishes *Hadley* and says that the

17   conjoint, the way we view the supply side, makes sense in a

18   typical labeling case like *Hadley*.  So I'll just point those

19   two things out.

20       And then I'd like to turn it over to Ms. Persinger to

21   address the actually misleading argument, which is completely

22   wrong --

23            THE COURT:  Okay.

24            MR. FITZGERALD:  -- and then Mr. Flynn on the Strombom

25   if you still want to hear that.

1              **THE COURT:**  Well, in the three and a half minutes that

2      you have left, I'm happy to hear whatever you're going to say.

3              **MR. VAN OORT:**  Your Honor --

4              **THE COURT:**  And you've got four.

5              **MR. VAN OORT:**  I've got four?  All right.

6      Ms. Zambrana is going to --

7              **THE COURT:**  I'd like to hear from Ms. Persinger now,

8      but you do what you do.

9              **MS. PERSINGER:**  Thank you, Your Honor.

10         Regarding the First Amendment issue, he was discussing

11     this distinction with inherently misleading speech and actually

12     misleading speech and what standard is applied, and that

13     inquiry only ever arises in the first instance when speech has

14     already been restricted.

15         All of the cases that they cite are previous bans on

16     speech and even the two cases they cite in their footnote on

17     their reply saying they are UCL or FAL cases, what those cases

18     actually said was the challenged conduct was -- the challenged

19     speech -- or, I'm sorry -- the speech that they were being

20     challenged as false or misleading under the UCL was, in fact,

21     not commercial in the first instance.  One was educational.

22     One was editorial.

23         And it fell completely outside of the UCL, and so that's

24     not an instance where it's analogous to this case where the

25     claim -- the statement is being challenged as false or

1  misleading and then someone, you know, defended on

2  First Amendment grounds.

3       Essentially because speech has not been chilled at all yet

4  and it won't be if and until a jury has already decided that

5  the speech is false or misleading, there can't be this inquiry

6  of, you know, the speech being actually misleading or

7  inherently misleading and then, therefore, which standard do we

8  apply because that question doesn't arise in the first instance

9  because nothing has been chilled so far.

10      Mr. Van Oort in his argument, he kept referring to the

11  arguments here are inconsistent with the First Amendment or our

12  statements.  It seems to me what he's saying is that our case

13  theory is somehow contrary to the First Amendment, but we're

14  not chilling speech.  We haven't -- there's been no regulation

15  of Post's speech as of yet, and so that inquiry and that

16  analysis is not ripe yet.

17           **THE COURT:**  Okay.  Thank you.

18           **MR. FLYNN:**  Your Honor, I just wanted to address the

19  two issues with Dr. Strombom that you indicated at the

20  beginning.  I'll be brief.

21      One was the question of his expertise in conjoint surveys

22  and conjoint design.  I think he sort of spoke for himself when

23  he said he's not an expert in conjoint design.  He testified

24  the same in the *FCA* case, that while he's not an expert in

25  conjoint, he is an expert in economics and he can talk about

1    some of the economic theories that maybe surround conjoints.

2        But, you know, the important questions, the design, the

3    choice of attributes, the levels, the method of aggregation,

4    those are all really specific to the science of conjoint, and

5    he's admittedly not an expert in that so I think that was the

6    reason the Court wanted me to address that, and I think that's

7    pretty clear.

8        With respect to his sort of before-and-after analysis, I

9    think the Court just needs to look at the *Fitzhenry-Russell*

10   decision where that judge called it bunk science, and really

11   that's all it is.

12       You know, in that case it was a side-by-side comparison,

13   so you even had the same market conditions.  In this case the

14   before-and-after analysis is worse because you have sort of

15   ever-changing market conditions.  So looking simply at price

16   and time and it tells you nothing.

17       I mean, the only thing you're going to do is confuse a

18   jury if you try to present that kind of evidence because a

19   layperson might hear that and say, "Well, yeah, if this label

20   claim is worth 5 percent, you take it off, the price should

21   drop by 5 percent; right?"

22       That's just really not how it works in the real world in

23   economics.  You know, you have to look at all of those other

24   confounding factors; and if that's what Post wanted to do,

25   there's a methodology to do that.  You incorporate all of those

confounding factors and you maybe come up with an alternative

model, maybe you don't.  But that's not what they did, and it's

just -- it's a really simplistic thing that has really no

measurable effect.

         **THE COURT:**  All right.  Thank you.

         **MS. ZAMBRANA:**  So I just want to address those two

points briefly, Your Honor.

    So the first is that it's undisputed that Dr. Strombom has

expertise in economics, and basically plaintiffs' only argument

is this *In Re FCA* case, which is very distinguishable on a

couple of bases.

    The first is that that case was a totally different case

theory about a nondisclosed defect in vehicles, but the main

thing to know is that the scope of retention in that case was

very different from here.  In that case the main reason that

Dr. Strombom was excluded based on the court's opinion is that

he wasn't even retained to opine on the plaintiffs' claim of

class-wide damages at the point of sale, which is what we are

doing.  The point of sale would be similar to the price premium

theory in this case.  But in *FCA*, Dr. Strombom was retained to

talk about their increased depreciation theory and there's

nothing like that in this case.

    And the other big distinction is that the opinions that

Dr. Strombom was giving in that case, he's not giving any of

those opinions here.  Some of them were about whether the

1    members knew there was a defect or not and if you could then do

2    a conjoint analysis.  There's just nothing like that here.

3       And just one other point to make about this is that there

4    is a distinction between conjoint surveys and conjoint

5    analysis.  And Dr. Strombom has said he's not a survey

6    practitioner.  He's not even offering any opinions about the

7    survey itself, about were the questions appropriate, did they

8    use the right attributes.  He's not talking about any of that.

9    He's really talking about the conjoint analysis overall, what

10   is it measuring as a matter of economics, and he's clearly

11   qualified to give that based on his extensive qualifications in

12   economics and statistics.

13      And then just on the second point on the analysis of the

14   actual market data, what Dr. Strombom did here is actually

15   pretty narrow.  He's not opining that there is no price

16   premium.  All that he did was he took the price premium that

17   Mr. Gaskin got from his conjoint survey, some of which are very

18   large.

19      Just for one example, Mr. Gaskin measured a 12 percent

20   price premium from the Whole Grains Council stamp on Honeycomb;

21   and what Dr. Strombom did is looked at the actual data and just

22   to see if, number one, did the price move in the same direction

23   around the time that that came off; and, number two, did it

24   move in the same degree.  And when he looked at several

25   examples, he found that for the majority of the time, they did

1   not.

2        Plaintiffs' main complaint here is that he didn't control

3   for everything else, and we don't dispute that.  All he did was

4   track what happened to the prices when the challenged claims

5   came on and off.  But because he's not here to testify, "Oh,

6   there is no price premium," he's just criticizing Gaskin

7   saying, "You're saying there are these huge premiums but you

8   didn't even look at the actual market data," it's really just a

9   critique.  And the concerns that the plaintiffs have about jury

10  confusion can be addressed through cross-examination.

11       And that's all I have on that, Your Honor.

12       **THE COURT:**  Okay.  Great.  Thank you.

13       Thank you, everybody, for your argument.

14       **MR. FLYNN:**  Thank you, Your Honor.

15       **THE COURT:**  This was very helpful, helpful enough to

16  make me need to do more work.

17       So I'm in trial now.  It's going to take me awhile to get

18  my opinion out.  When I get the opinion out, I will set a case

19  management conference so that we can track the rest of the

20  case.

21       **MR. FITZGERALD:**  Thank you, Your Honor.

22       **MR. VAN OORT:**  Thank you, Your Honor.

23       **MR. FLYNN:**  Thank you, Your Honor.

24       **THE COURT:**  Are there some law students here?  Would

25  you stay?  I'll come to you.  I'd like to just say hello to

1    you.

2         So everybody else can leave.  Thank you.

3              (Proceedings adjourned at 3:18 p.m.)

4                        ---oOo---

5

6

7                  CERTIFICATE OF REPORTER

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10

11   DATE:   Tuesday, October 29, 2019

12

13

14

15   _____

16        Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
                U.S. Court Reporter

17

18

19

20

21

22

23

24

25