UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DEBBIE KROMMENHOCK, et al.,

Plaintiffs,

v.

POST FOODS, LLC,

Defendant.

Case No. 16-cv-04958-WHO

**ORDER ON PENDING MOTIONS**

Re: Dkt. Nos. 141, 151, 152, 153, 154, 155, 163, 164, 172, 173, 174, 175, 178, 184, 190, 191, 192, 207, 220, 224, 225

Plaintiffs Debbie Krommenhock and Stephen Hadley bring this class action case on behalf of a putative class of California consumers who purchased 31 varieties of Post Food, LLC's cereal (Products) whose boxes contained a mix of 45 statements that plaintiffs assert are rendered false and misleading given the amount of added sugar included in Post's Products. The essence of plaintiffs' claims under three California consumer protection statutes (the Unfair Competition Law (UCL), False Advertising Law (FAL), and Consumers Legal Remedies Act (CLRA)) is that it is false or misleading for Post to make health and wellness claims on their cereals (the 45 "Challenged Statements") given the high level of added sugar in each of those cereals.[1]

Currently before me is plaintiffs' motion for class certification, seeking to certify sub-classes of consumers who purchased the 31 identified varieties of cereals whose boxes contained one or more of the 45 Challenged Statements. Post opposes class certification and moves for summary judgment, arguing that plaintiffs' theory of liability is blocked by the First Amendment, that some of the Challenged Statements are preempted nutrient content or protected health claims, and that plaintiffs have no evidence supporting their claims for injunctive or monetary relief.

[1] UCL, Cal. Bus. & Prof. Code § 17200 *et seq.*; FAL, Cal. Bus. & Prof. Code § 17500 *et seq.*; and CLRA, Cal. Civ. Code § 1750 *et seq.*

1    Finally, both sides raise motions to exclude some or all of the opinions of experts offered by the

2    other side.

3         As explained below, plaintiffs have met the requirements of Rule 23(a) and (b) and their

4    motion to class certification is GRANTED.  Post's motion for summary judgment is DENIED,

5    except to the extent that certain of the Challenged Statements identified below are preempted and

6    are not actionable in this case.  The motions to exclude experts are DENIED, except to the limited

7    extent that plaintiffs' Advantage Realized Model, as developed by Gaskin and Weir, cannot be

8    used as a basis for damages under the California consumer protection statutes at issue.

9         A further Case Management Conference is set for April 28, 2020 at 2:00 p.m.  At that

10   Conference, the Court will resolve any disputes over the form or manner of class notice and set

11   this matter for trial.

12                                  **DISCUSSION**

13   **I.     PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

14          **A.     Legal Standard**

15          "Before certifying a class, the trial court must conduct a rigorous analysis to determine

16   whether the party seeking certification has met the prerequisites of Rule 23."  *Mazza v. Am. Honda*

17   *Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).  The party

18   seeking certification has the burden to show, by a preponderance of the evidence, that certain

19   prerequisites have been met.  *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-50 (2011);

20   *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

21          Certification under Rule 23 is a two-step process.  The party seeking certification must first

22   satisfy the four threshold requirements of Rule 23(a).  Specifically, Rule 23(a) requires a showing

23   that:  (1) the class is so numerous that joinder of all members is impracticable; (2) there are

24   questions of law or fact common to the class; (3) the claims or defenses of the representative

25   parties are typical of the claims or defenses of the class; and (4) the representative parties will

26   fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a).

27          Next the party seeking certification must establish that one of the three grounds for

28   certification applies.  *See* Fed. R. Civ. P. 23(b).  Plaintiffs seek certification under Rule (b)(3),

which requires them to establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). They also seek certification under Rule 23(b)(2) for injunctive relief.

In the process of class-certification analysis, there "may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465 - 66 (2013) (internal quotation marks omitted). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

### B. Proposed Classes

Plaintiffs seek to certify the following subclasses:

> All persons who, on or after August 29, 2012 (the "Class Period"), purchased in California, for household use and not for resale or distribution, one or more of the following Post cereal varieties:
>
> **Great Grains Subclass**: Raisins, Dates, and Pecans (16 or 40.5 oz. package); Crunchy Pecan (16 oz.); Cranberry Almond Crunch (14 oz.); Blueberry Pomegranate (15.9 oz.); Banana Nut Crunch (15.5 oz.); Protein Blend: Honey, Oats, and Seeds (14.75 or 13.5 oz.); and Protein Blend: Cinnamon Hazelnut (14.75 or 13.5 oz.).
>
> **Honey Bunches of Oats Subclass**: Honey Roasted (14.5, 18, 23, 24.5, 27, 28, 36, or 48 oz.); Almonds (14.5, 18, 23, 24.5, 27, 28, 36, or 48 oz.); Raisin Medley (17 oz.); Pecan Bunches (14.5 oz.); Cinnamon Bunches (14.5 or 18 oz.); Vanilla Bunches (18 oz.) Apple & Cinnamon Bunches (14.5 oz.); Real Strawberries (13, 16.5, or 20 oz.); Fruit Blends: Banana Blueberry (14.5 or 18 oz.); Fruit Blends: Peach Raspberry (14.5 or 18 oz.); Tropical Blends: Mango Coconut (14.5 or 18 oz.); Greek Honey Crunch (12.5 or 15.5 oz.); and Greek Mixed Berry (12.5 or 15.5 oz.).
>
> **Honey Bunches of Oats Whole Grain Subclass**: Vanilla Bunches (18 oz.); Honey Crunch (18 oz).
>
> **Honey Bunches of Oats Granola Subclass**: Honey Roasted (11 or 20 oz.); Cinnamon (11 oz.); Raspberry (11 oz.).
>
> **Raisin Bran Subclass**: Raisin Bran (20 or 25 oz.).
>
> **Bran Flakes Subclass**: Bran Flakes (16 oz.).
>
> **Alpha-Bits Subclass**: Alpha-Bits (11.5 or 12 oz.).

3

**Honeycomb Subclass**: Honeycomb (12.5, 16, 33, or 35 oz.).

**Waffle Crisp Subclass**: Waffle Crisp (11.5 oz.).

Class Cert. Mot. at 1.

### C.     Rule 23(a) Requirements

Plaintiffs have made a showing satisfying Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy.

#### 1.     Numerosity

Plaintiffs submit evidence of unit and dollar sales demonstrating that each of the proposed subclasses contain thousands of putative Class Members.[2]  Declaration of Colin B. Weir [Dkt. No. 155-12] at 21-22, Table 1.[3]  The proposed subclasses are numerous.

#### 2.     Typicality

Plaintiffs contend typicality exists across each subclass based on plaintiffs' alleged common injury; each class member paid a premium for the Products due to their "misleading health and wellness claims demanded in the market," and that they were "influenced to purchase and consume the products with greater frequency than they would have, had they known the true facts concerning the Products' added sugar content."  Class Cert. Mot. at 19.[4]  Post does not challenge that the named plaintiffs have claims that are typical of the class claims.  Instead, as discussed below, Post challenges whether plaintiffs have admissible, classwide proof of their injury.  Plaintiffs claims are typical of the class claims.

#### 3.     Adequacy

Plaintiffs argue they are adequate class representatives because they are purchasers with

---

[2] Courts generally find numerosity satisfied if the class includes forty or more members.  *See Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605–06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

[3] Post seeks to exclude various opinions of Weir, *see* below, but does not contest Weir's testimony regarding sales and does not contest that plaintiffs have satisfied numerosity.

[4] The test for typicality is "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted).

4

standing, have no conflicts, are aware of their obligations, will continue to vigorously prosecute the case for the Class, and have retained adequate counsel (The Law Office of Jack Fitzgerald, PC).  Class Cert. Mot. at 19.[5]  Post does not contest adequacy and I find Krommenhock and Hadley satisfy the adequacy requirement.[6]

### 4.    Commonality

Plaintiffs identify the following facts supporting commonality: (i) the Product packaging within each subclass was consistent throughout the Class Period, exposing every purchaser to at least one of the Challenged Statements; (ii) the amounts of added sugar in the Products within each subclass were also similar throughout the Class Period; and (iii) across the subclasses, "the added sugar, comprising 13.33% to 40% of calories, falls well above the 5% and 10% daily limits endorsed by authoritative sources and supported in the scientific literature." Class Cert. Mot. at 18. Following from these common facts, plaintiffs identify common legal questions subject to common proof, including whether the Challenged Statements were material and misleading.[7]  *Id*.

Post does not challenge the common facts or legal issues identified by plaintiffs.  Instead, Post argues that because there are 45 Challenged Statements that were made in varying combinations for 31 varieties of cereal, the *impact* of the Challenged Statements is highly

---

[5] Named plaintiffs will adequately represent a class where: (1) neither named plaintiffs nor their counsel have any conflicts of interest with other class members; and (2) the named plaintiffs and their counsel will prosecute the action vigorously on behalf of the class.  *Ellis*, 657 F.3d at 985.

[6] After the close of briefing, plaintiffs filed a motion to support appointment of additional class counsel, Sidney W. Jackson, III, of Jackson & Foster, LLC.  Dkt. No. 220.  Post opposes that motion.  Dkt. No. 221.  The motion is DENIED without prejudice.  If plaintiffs want to have counsel in addition to The Law Office of Jack Fitzgerald, PC formally appointed as class counsel they should refile their request as a motion for administrative relief and defendant may respond if it chooses to within four days.  *See* Civ. L.R. 7-11.  The matter will then be taken under submission.

[7]  To satisfy the commonality element, plaintiffs must show that the class members have suffered "the same injury" – which means that the class members' claims must "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (internal quotation marks and citation omitted).  The plaintiff must demonstrate not merely the existence of a common question, but rather "the capacity of classwide proceedings to generate common answers apt to drive the resolution of the litigation."  *Id*. (internal quotation marks and emphasis omitted).  For purposes of Rule 23(a)(2), "even a single common question will do."  *Id*. at 359 (internal quotation marks and modifications omitted).

individualized.  Post's actual contention, therefore, is that the common issues identified by plaintiffs will not predominate over individualized issues.  That predominance argument will be addressed below with respect to Rule 23(b)(3).  Plaintiffs have satisfied the commonality requirement.

In sum, plaintiffs have shown that each of the Rule 23(a) factors is satisfied.

### D.    Rule 23(b)(3) Requirements

#### 1.    Predominance

Plaintiffs rely on the following evidence, adduced through their experts, to show that common issues predominate.[8]  First, they provide the opinions of their advertising expert Bruce G. Silverman (contested on its merits and countered by Post and its experts) of how Post used the Challenged Statements to drive sales and market shares and that consumer interest in "better-for-you" foods is extremely relevant in the cold cereal category.  *See generally* Expert Report of Bruce G. Silverman [Dkt. No. 155-4].  Second, they submit evidence regarding the significant health impacts of sugar consumption through experts Dr. Robert Lustig and Dr. Michael Greger (similarly contested and countered by Post and its experts).  *See generally* Expert Report & Declaration of Robert Lustig [Dkt. No. 155-6]; Expert Report & Declaration of Dr. Michael Greger [Dkt. No. 155-8].

Third, plaintiffs submit damages evidence through two economic models created and applied by Steven P. Gaskin and Colin B. Weir (also contested and countered by Post) meant to assess two things.  They offer a "Consumer Impact/Price Premia Model" to establish the price premia class members paid as a result of the Challenged Statements based on conjoint studies designed by Gaskin with assistance from Weir and an "Advantage Realized/Consumer Demand Model" meant to measure the change in demand associated with Post's omission of material information about sugar.  *See generally* Expert Report of Steven P. Gaskin [Dkt. No. 155-10]; Declaration of Colin G. Weir [Dkt. No. 155-12].  These models are Post's primary target in

---

[8] In numerous, separate motions, Post objects and moves to exclude many of plaintiffs' experts' opinions and plaintiffs object and move to exclude many of Post's experts' opinions.  Dkt. Nos. 164, 175-1, 175-3, 184, 190, 191, 192.  These motions will be discussed below.

opposition to certification.  Post contends that the models are faulty in numerous respects and do not sufficiently "fit" plaintiffs' liability theories.  Absent those models, which Post asserts should be excluded from the case, Post claims that individualized causation and damage issues predominate over common ones and certification should be denied.

### a.    Objective Standards and Common Evidence

Post argues that plaintiffs have failed to show that any misleading representations were communicated classwide and that any particular Challenged Statement can be considered material for all class members.  Accordingly, it contends that there are predominant individualized issues regarding class member injury and causation.  It also asserts that consideration of each combination of labels and recipes with respect to each Challenged Statement likewise makes individual issues of liability predominate.

Post mischaracterizes the pertinent, predominant questions that arise under the California consumer protection statutes.  The relevant analysis under California law does not consider whether each class member saw and relied on each of the Challenged Statements and in what combination, but instead whether the Challenged Statements were used consistently through the Class Period, supporting an inference of classwide exposure, and whether the Challenged Statements would be material to a reasonable consumer.  *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1095 (N.D. Cal. 2018) (*Hadley I*) (the question is how an objective "reasonable consumer" would react to a statement, and not whether individual class members saw or were deceived by statements).  Those are common questions, supported at this juncture by plaintiffs' experts and subject to attack at trial by defendant's experts.

As a fallback position, Post argues that I should consider whether certain of the Challenged Statements are prominent enough on the Products' packages to support classwide inferences as a matter of law.  Oppo. to Class Cert. Mot. at 9-12.  It points out that in the *Kellogg* class certification order, the Hon. Lucy Koh concluded that "an inference of class-wide exposure to an alleged misrepresentation affixed to a product's packaging might not be warranted if the alleged misrepresentation is not sufficiently prominently displayed on the packaging." *Hadley I*, 324 F. Supp. 3d at 1099.  Judge Koh then determined as a matter of law that one statement ("wholesome

goodness") was not prominent enough to be certified because it "only appeared (1) on the back panel of the Nutri-Grain packaging; (2) 'in small font'; and (3) in the middle of a block of text." *Id*. at 1100.

In reaching this issue on class certification, Judge Koh relied on *Zakaria v. Gerber Products Co*., LACV1500200JAKEX, 2016 WL 6662723 (C.D. Cal. Mar. 23, 2016). There, the challenged representations on the products were "accompanied by other information, in small font, and sometimes located on the back or inside cover" of the product. *Id*. at *8. Based on that record, the court concluded as a matter of law that the "alleged misrepresentations were not prominently displayed. For this reason, it cannot be inferred that there is a 'high likelihood that in the process of buying the product, the consumer would have seen the misleading statement on the product and thus been exposed to it.'" *Id*. at *8 (quoting *Ehret v. Uber Techs., Inc*., 148 F. Supp. 3d 884, 895 (N.D. Cal. 2015)). The issue in *Ehret*, which was also relied on by Judge Koh and is not a labelling case, was "whether class-wide exposure can be inferred where Uber's alleged misrepresentations regarding the 20% gratuity were primarily on its website, blog, and e-mail messages, rather than on the Uber app itself." *Id*. at 895–96. In that case, the court denied class certification where "although there may have been a consistent misrepresentation, there is insufficient evidence that all customers during the class period were likely exposed to the misrepresentation" given that many customers only interacted with the app. *Id*. at 900.

In support of its argument that I should follow Judge Koh and determine prominence now (and conclude there can be no classwide inference of exposure for the Challenged Statements that are not prominent), Post also relies on *In re Clorox Consumer Litig*., 301 F.R.D. 436 (N.D. Cal. 2014). In that case, the challenged statements were prominent in television advertisements, but only on a small subset of the products' labels. Accordingly, in light of "powerful evidence that most members of the proposed classes probably never saw the allegedly misleading statements" as the "television commercials ran for only a small part of the class period, and the superiority claims appeared in small print on the back of a minority of Fresh Step packages," there was no demonstration "that the proposed classes were uniformly exposed to the allegedly misleading messages." *Id*., 301 F.R.D. at 445.

The evidence and Post's defense in this case are starkly different than in *Clorox* and *Ehret*. Here, there is no dispute that the majority of Challenged Statements were made consistently (or consistently enough) throughout the relevant timeframes on the Products' packages.[9] As to the prominence of statements on the Products' packages, plaintiffs argue that Judge Koh's approach – deciding the issue as a matter of law on class certification – was unnecessary because under California law prominence goes only to the inapposite question of whether significant numbers of prospective class members saw or interacted with the statement. According to plaintiffs, California law does not ask whether class members actually saw or relied on representations, but simply whether the representations were consistently made and were material to a reasonable consumer.

I agree with plaintiffs. Where, as here, there is evidence that the representation was consistently made on a product's label, the only question is whether it was objectively material to a reasonable consumer. *Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 254 (9th Cir. 2018) (unpublished), *cert. denied*, 139 S. Ct. 491 (2018) ("Under California law, class members in CLRA and UCL actions are not required to prove their individual reliance on the allegedly misleading statements. Instead, the standard in actions under both the CLRA and UCL is whether 'members of the public are likely to be deceived.'"); *see also Kumar v. Salov N.A. Corp.*, 14-CV-2411-YGR, 2016 WL 3844334, at *4 (N.D. Cal. July 15, 2016) ("The statement appeared on the front of the bottle. Salov's arguments—that the font size and color were too small to make the statement stand out; that consumers would not misunderstand the language the way Kumar alleges; and the presence of a hang-tag on the bottle neck or a statement on the back of the bottle would have blocked consumers' view of the statement—all go to the proof of whether a reasonable consumer would have been misled, not to determining who meets the class definition."); *see id.* at *7 ("To state a claim based on false labeling, "it is necessary only to show

---

[9] Post argues – without citation to any evidence – that one Statement only appeared on a few packages for a brief time and that another Statement moved from the front to the side of the box during the relevant period. Oppo. to Class Cert. Mot. at 11 fns. 13, 14. Absent evidence, I will not follow the *Clorox* or *Ehret* courts in determining that an inference of classwide exposure to a particular Challenged Statement is unreasonable as a matter of law.

United States District Court
Northern District of California

that 'members of the public are likely to be deceived.'" [] Thus the answer to the reasonable

consumer question based on common facts, that is, identical statements on the labels of the

products at issue."); *Martin v. Monsanto Co.*, EDCV 162168-JFWSPX, 2017 WL 1115167, at *7

(C.D. Cal. Mar. 24, 2017) ("Monsanto has 'failed to present any evidence that class members were

able to purchase [the] products without being exposed to the alleged misrepresentations,' so

predominance is satisfied."). When relevant, prominence goes to the materiality and misleading

questions to be resolved by the jury.

Post's related arguments regarding materiality are also unpersuasive. First, Post faults

plaintiffs for failing to conduct consumer surveys showing that each discrete Challenged

Statement (*e.g.*, nutritious blueberries) conveyed that the Product was healthy as a whole. Oppo.

Class Cert. Mot. at 13. Similarly, it complains that plaintiffs' evidentiary showing is fatally

deficient because they have no stand-alone survey or expert evidence to show that the truthful and

*unchallenged statements* (the ones I have found are preempted and not-actionable or otherwise

unchallenged) are seen by class members as less material than the Challenged Statements.

Post's arguments rest on a mischaracterization of the operative questions at issue. As

Judge Koh explained in *Hadley I*, "California courts have explicitly 'reject[ed] [the] view that a

plaintiff must produce' extrinsic evidence 'such as expert testimony or consumer surveys' in order

'to prevail on a claim that the public is likely to be misled by a representation' under the FAL,

CLRA, or UCL." *Hadley I*, 324 F. Supp. 3d at 1115 (internal citations omitted). Instead,

testimony from plaintiffs' marketing expert Bruce G. Silverman – relying on his extensive

experience in the industry, including marketing of cereal products, and Post's own documents – as

well as the models developed by Gaskin and Weir, support that the Challenged Statements could

have been material to the reasonable consumer. *See* Expert Report of Bruce G. Silverman [Dkt.

No. 155-4] pgs. 45-124; *see also* Expert Report of Steven P. Gaskin [Dkt. No. 155-10];

Declaration of Colin G. Weir [Dkt. No. 155-12]. Post's experts Hanssens and Van Liere dispute

Silverman's materiality conclusions, but those are issues to be ultimately resolved by the jury.

As to the unchallenged statements (preempted statements or otherwise unchallenged

statements), their truthfulness and potential impact on the materiality of the Challenged Statements

are questions to be resolved by the jury under the reasonable consumer standard. The jury will weigh the context of the Challenged Statements on the Products' labels, as well evidence of why Post decided to use the statements and how to place them on the Products, in order to determine whether "a reasonable consumer would attach importance to it or if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'" *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (*quoting Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 333 (2011)). Despite Post's repeated arguments to the contrary, that a truthful or unchallenged statement might be material to a reasonable consumer (an issue which Post repeatedly chides plaintiffs and their experts for allegedly "ignoring") does not mean that a Challenged Statement cannot *also* be material and, therefore, actionable. A statement need not be the "'the sole or even the predominant or decisive factor influencing'" the class members' decisions to buy the challenged products. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997)).

Post's contention that some of the Challenged Statements may not actually be material to some putative class members because some of them may have healthier lifestyles and can afford to eat higher levels of sugar is not relevant under plaintiffs' theory and claims. *See Hadley I*, 324 F. Supp. 3d at 1101 ("Kellogg's unpersuasive argument appears to stem from a mistaken assumption that the injury that Plaintiff is seeking to redress in the instant case is physical in nature.").

Finally, plaintiffs' challenge to so many Challenged Statements across so many Product lines *does* make litigation of this case – and plaintiffs' burden of proof at trial – complex. But that complexity does not mean predominance is undermined. The materiality of each set of claims, divided as necessary for each label used for each Product, can be determined on a classwide basis. Post points out that some of the labels for Products at issue were redesigned during the class period and that raises additional predominance issues. These arguments, however, show only that plaintiffs have a complex case to prove given its breadth and scope. They will need to prove that reasonable consumers would be misled by each particular label used for each Product during the

11

class period (unless the parties can stipulate to a smaller subset of challenges to present to the jury). This reality, however, does not mean that individualized issues predominate over the complex but common ones.[10]

### b. Damages Models and Consistency with Liability Theories

Post next contends that plaintiffs' damages models do not match their liability theory and, therefore, must be excluded. Without those models, Post notes, individualized damages issues would predominate. As discussed in depth below in connection with Post's motion to exclude the expert opinions (and damages models) proffered by Gaskin and Weir, plaintiffs' Consumer Impact/Price Premia Model "fits" plaintiffs' theory of liability and is reliable and admissible for purposes of proving classwide damages. Plaintiffs' second model, the Advantage Realized Model does not fit (as it does not accurately measure the restitution available to class members under the California consumer protection statutes at issue), but that does not undermine predominance because the first model is admissible.

Plaintiffs have satisfied the predominance requirement.

### 2. Superiority

Post contends that a class action is not superior to resolve the claims at issue here because of the impossibility of identifying class members. However, "plaintiffs' class definitions provide objective criteria that allow class members to determine whether they are included in the proposed class," and that is sufficient. *Farar v. Bayer AG*, 14-CV-04601-WHO, 2017 WL 5952876, at *14

---

[10] In support of this argument, Post relies on *Reitman v. Champion Petfoods USA, Inc.*, CV181736DOCJPRX, 2019 WL 7169792, at *9 (C.D. Cal. Oct. 30, 2019). There, the court determined that individualized issues predominated where plaintiffs sought certification of one class of purchasers of 23 different formulas of dog food whose packaging contained some of four sets of challenged statements. Specifically, the court found individualized issues predominated because whether the challenged phrases ("biologically appropriate," "fresh," "regional" or "local") were false or misleading would require individualized analysis of the ingredients and production location of each different variety of dog food sold with those statements. *Reitman* is not persuasive for a number of reasons. First, plaintiffs here propose subclasses for purchasers of each Product, as opposed to seeking one broadly defined class as in *Reitman*. Second, in this case plaintiffs have produced sufficient evidence of materiality each of the Challenged Statements. That plaintiffs will have to prove that materiality for each Challenged Statement on each different Product for each subclass means this case is complex. But those issues are common and predominate across each subclass. There are no truly "individualized" issues given the way these claims are assessed under California's consumer protection statutes. Defendant's motion and stipulation to address the *Reitman* case (Dkt. Nos. 224, 225) are GRANTED.

(N.D. Cal. Nov. 15, 2017). Moreover, as affirmed by the Ninth Circuit in *Briseno v. ConAgra Foods, Inc*., 844 F.3d 1121, 1129 (9th Cir. 2017), *cert. denied sub nom. ConAgra Brands, Inc. v. Briseno*, 138 S. Ct. 313 (2017), it is not a barrier to class certification that consumers may be required to self-identify to attest to purchasing the Products at issue. *Id*. at 1132; *see also id*. at 1129 ("The notion that an inability to identify all class members precludes class certification cannot be reconciled with our court's longstanding *cy pres* jurisprudence."). Plaintiffs have satisfied the superiority requirement.

For the foregoing reasons, plaintiffs' motion for class certification is GRANTED. The following subclasses are hereby certified:

> All persons who, on or after August 29, 2012 (the "Class Period"), purchased in California, for household use and not for resale or distribution, one or more of the following Post cereal varieties:
>
> **Great Grains Subclass**: Raisins, Dates, and Pecans (16 or 40.5 oz. package); Crunchy Pecan (16 oz.); Cranberry Almond Crunch (14 oz.); Blueberry Pomegranate (15.9 oz.); Banana Nut Crunch (15.5 oz.); Protein Blend: Honey, Oats, and Seeds (14.75 or 13.5 oz.); and Protein Blend: Cinnamon Hazelnut (14.75 or 13.5 oz.).
>
> **Honey Bunches of Oats Subclass**: Honey Roasted (14.5, 18, 23, 24.5, 27, 28, 36, or 48 oz.); Almonds (14.5, 18, 23, 24.5, 27, 28, 36, or 48 oz.); Raisin Medley (17 oz.); Pecan Bunches (14.5 oz.); Cinnamon Bunches (14.5 or 18 oz.); Vanilla Bunches (18 oz.) Apple & Cinnamon Bunches (14.5 oz.); Real Strawberries (13, 16.5, or 20 oz.); Fruit Blends: Banana Blueberry (14.5 or 18 oz.); Fruit Blends: Peach Raspberry (14.5 or 18 oz.); Tropical Blends: Mango Coconut (14.5 or 18 oz.); Greek Honey Crunch (12.5 or 15.5 oz.); and Greek Mixed Berry (12.5 or 15.5 oz.).
>
> **Honey Bunches of Oats Whole Grain Subclass**: Vanilla Bunches (18 oz.); Honey Crunch (18 oz).
>
> **Honey Bunches of Oats Granola Subclass**: Honey Roasted (11 or 20 oz.); Cinnamon (11 oz.); Raspberry (11 oz.).
>
> **Raisin Bran Subclass**: Raisin Bran (20 or 25 oz.).
>
> **Bran Flakes Subclass**: Bran Flakes (16 oz.).
>
> **Alpha-Bits Subclass**: Alpha-Bits (11.5 or 12 oz.).
>
> **Honeycomb Subclass**: Honeycomb (12.5, 16, 33, or 35 oz.).

**Waffle Crisp Subclass**: Waffle Crisp (11.5 oz.). [11]

Plaintiffs Krommenhock and Hadley are appointed as Class Representatives and the Law Office of Jack Fitzgerald, PC is appointed as Class Counsel. Counsel shall meet and confer promptly with respect to the form and dissemination of Class Notice. Any disputes regarding the same shall be raised so that they can be addressed at the next Case Management Conference.

## II.     POST'S MOTION FOR SUMMARY JUDGMENT

Post moves for summary judgment against all of plaintiffs' claims. Its main argument is that because plaintiffs admit the Challenged Statements – standing alone – are true and because the health impacts of added sugar are subject to ongoing disputes in the scientific and public health communities, the Statements are immune from attack under the First Amendment. It also asserts that seven of the Challenged Statements are implied nutrient or health claims that are protected under the federal Nutrition Labeling and Education Act (NELA), which preempts the state law claims. Finally, it contends that plaintiffs' request for injunctive relief and punitive damages should be rejected because they have not shown disputes of material fact potentially entitling them to any remedy.

### A.     Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that

---

[11] To the extent the scope or definition of the certified Subclasses needs to be amended in light of my rulings below with respect to preemption, the parties shall meet and confer and submit an agreed-to revised definition of the certified Subclasses.

party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding the motion, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

### B. Truthful, Non-Misleading Speech

Post argues that it is undisputed that the majority of the Challenged Statements – standing alone and not considering the level of added sugar in the Products – are true because they disclose that "healthy ingredients" that are in the Products. Post next argues that the Challenged Statements "are not even arguably misleading because they cannot be read to convey any message about the healthiness of added sugar," but even "if the statements could be found to speak indirectly about the healthiness of added sugar by speaking indirectly about the healthiness of Post's cereals, they communicated a constitutionally protected viewpoint based on mainstream science—namely, that nutrient-dense cereal containing some added sugar can be part of a healthy diet." Post MSJ [Dkt. No. 163] at 11. Acknowledging both that the First Amendment does not protect misleading advertisements and that whether speech is misleading is generally a question of fact, Post nevertheless contends that whether the Challenged Statements "fall[] beyond the protection of the First Amendment" is a legal question I should address at this juncture. *Id.* at 12.

At base, Post contends that the Challenged Statements cannot be considered misleading and are constitutionally protected because they conveyed "important, truthful information about specific ingredients and nutritional attributes that consumers had a compelling interest in receiving and did not," standing alone, "make a claim about the healthiness of the cereal as a whole." *Id.* at 13. It argues that such truthful statements are protected even if they could be considered misleading by a jury when considered with other information disclosed or not disclosed about the Products. But its position rests only on inapposite, out-of-circuit authority addressing government

restrictions on speech, *not* generally applicable consumer protection statutes.[12]  In the Ninth

Circuit, and as recognized by the California Supreme Court, California's consumer protection

statutes "prohibit 'not only advertising which is false, but also advertising which [,] although true,

is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse

the public.'" *Williams v. Gerber Products Co*., 552 F.3d 934, 938 (9th Cir. 2008) (quoting *Kasky

v. Nike, Inc*., 27 Cal.4th 939, 951 (2002)).

Post also argues that its truthful statements cannot be challenged on the basis that the

added sugar in the Products makes those statements misleading because "mainstream science

supports" its view that Post's cereals are "healthy" despite the added sugar.  Post MSJ at 17-18.

However, plaintiffs have ample, albeit disputed, evidence that the Products are not "healthy" given

the amounts of added sugar in them and considering consumer habits regarding serving size and

frequency of consumption.[13]

Post's position that to survive summary judgment plaintiffs need to establish that Post's

---

[12] The focus of each of the cases is the application of the Supreme Court's *Central Hudson* test for regulations on commercial speech.  In *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228 (11th Cir. 2017), the court addressed whether the state could prohibit a dairy from advertising its "skim milk products" because they did not contain vitamin A.  Applying the *Central Hudson* test, the Eleventh Circuit rejected the idea that misleading speech, subject to regulation under *Central Hudson*, could be defined as anything "inconsistent with the state's preferred definition."  *Id*. at 1238.  The case here does not address any state action other than the general application of California's consumer protection statutes to allegedly misleading speech. Similarly, in *Dunagin v. City of Oxford, Miss*., 718 F.2d 738 (5th Cir. 1983), the Fifth Circuit rejected the idea that a state can outright ban commercial speech that may not "tell the whole truth" about a product in light of the "policy" to generally "leave it to the public to cope for themselves with Madison Avenue panache and hard sells." *Id*. at 750.  The Fifth Circuit, nonetheless, concluded that the state's ban on billboard's advertising alcohol satisfied the *Central Hudson* test and passed constitutional muster.  *Id*.; *see also Intl. Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 637 (6th Cir. 2010) (where science was unsettled, a proposed label statement could not be considered "inherently misleading" as a matter of law and, therefore, application of remaining *Central Hudson* factors was necessary). Post implicitly concedes that these cases are inapposite by never discussing the *Central Hudson* factors, so central to the cases discussed above, in the case at bar.

[13] Post's reliance on cases challenging FDA attempts to ban or rewrite labels is similarly unhelpful.  Those cases apply the *Central Hudson* test and District of Columbia circuit authority balancing restrictions on commercial speech with compelled speech concerns.  The analyses in those cases are not helpful to my resolution of the questions before me.  *See, e.g*., *All. for Nat. Health U.S. v. Sebelius*, 786 F. Supp. 2d 1, 24 (D.D.C. 2011) (applying *Central Hudson* and rejecting FDA's attempted rewrite of a label disclaimer, because "[w]here the evidence supporting a claim is inconclusive, the First Amendment permits the claim to be made; the FDA cannot require a disclaimer that simply swallows the claim."); *Whitaker v. Thompson*, 248 F. Supp. 2d 1, 11 (D.D.C. 2002) (addressing FDA prohibitions on label claims).

cereals are unhealthy due to their sugar content based on "undisputed and settled science" is without support. The Ninth Circuit has been quite clear that plaintiffs need not do more than what they have here in opposing summary judgment, creating a material issue of fact that the Products are unhealthy given the amount of added sugar. *Sonner v. Schwabe N.A., Inc*., 911 F.3d 989, 992–93 (9th Cir. 2018). It reversed a district court that had required "not only producing affirmative expert evidence" but also evidence "foreclos[ing] any possibility" that defendant's products "provided the labeled benefits." *Id*. at 992. By doing so, the district court "elevated [plaintiffs'] burden well beyond what is usually required to defeat summary judgment." *Id*. The Ninth Circuit emphasized:

> [a]gain, a plaintiff need only show a triable issue of material fact to proceed to trial, [] not foreclose any possibility of the defendant's success on the claims. At trial, undoubtedly each party will seek to undermine the scientific bases underlying the opinion of the opposing party's expert. Those arguments, however, go to the weight that the fact-finder should give to the evidence, an inquiry that is not proper at the summary judgment stage.

*Id*. at 992-93. Neither the First Amendment nor Article I of the California Constitution require plaintiffs to do more at this juncture to survive summary judgment on their consumer protection claims. *See also Korolshteyn v. Costco Wholesale Corp*., 755 Fed. Appx. 725, 726 (9th Cir. 2019) (unpublished) (rejecting district court's "tougher, conclusive standard, holding that the existence of scientific studies supporting the alleged benefits of the product precluded the appellants from conclusively proving falsity in the appellees' product labeling").

### C.    Preemption

As both parties know, on extensive and highly contested briefing over two rounds of motions to dismiss, I accepted some of Post's preemption arguments agreeing that *some* of plaintiffs' claims as to specific Challenged Statements were preempted under the Nutrition Labeling and Education Act (NLEA), 21 U.S.C. § 343-1(a)(4)-(5). Dkt. 88 at 12-22; Dkt. 116 at 10-16. Re-raising a defense Post asserted and argued in both of its motions to dismiss, Post argues on summary judgment that seven of the Challenged Statements are preempted by federal law.

Plaintiffs note that I considered and rejected a preemption defense with respect to three of the re-challenged statements at the motion to dismiss stage and contend that holding should be

17

considered law of the case. They also argue, with respect to each of the seven statements identified in Post's motion for summary judgment, that Post should not be able to re-raise the preemption defense because it has not shown that reconsideration is appropriate under Civil Local Rule 7-9. Oppo. MSJ at 16-17. Given plaintiffs' broad attack on 45 different Challenged Statements on 31 different varieties of Products, and recognizing that Post had limited space to raise and discuss every meritorious preemption challenge at the motion to dismiss stage, I will consider each of the preemption challenges raised in its motion for summary judgment.

### 1. Implied Nutrient Claims

Post argues that the following Challenged Statements are preempted, FDA-authorized implied nutrient content claims:

- **Bran Flakes**: "<u>CONTAINS</u> DIETARY FIBER to Help Maintain Digestive Health."
- **Bran Flakes**: "Whole grains provide fiber and other important ingredients to help keep you healthy. <u>Diets rich in whole grain foods and other plant foods, and low in total fat, saturated fat and cholesterol, may help reduce the risk of heart disease and some cancers. Post Bran Flakes provides 21g whole grain per serving, that's 44% of your day's whole grains</u>!"
- **Raisin Bran**: "<u>Post Raisin Bran has 8g of natural fiber, making it an Excellent Source</u>. Fiber is good for digestive health."
- **Honey Bunches of Oats Greek**: "WHOLESOME NUTRITION: <u>5g of protein and 33g of whole grain per serving, that's over 2/3 of your day's whole grain</u>"
- **Honey Bunches of Oats Granola** (Honey Roasted, Cinnamon, and Raspberry varieties): "<u>With 3g of fiber and 34g of whole grain per serving</u>, it's the perfect combination of wholesome goodness and honey-sweet crunch that everyone in your entire family will love."
- **Alpha-Bits**: "ALPHA-BITS IS A GOOD SOURCE OF NUTRIENTS THAT ARE BUILDING BLOCKS FOR YOUR CHILD'S DEVELOPING BRAIN: -<u>IRON helps deliver oxygen to the brain & body -ZINC helps brain & body cells grow and develop -B VITAMINS B1, B2, B6, & B12 help support a healthy nervous system</u>"

18

MSJ at 19-20. Post points out that for each Challenged Statement, plaintiffs omitted the underlined language that demonstrates these statements are protected implied nutrient claims.

As explained in my June 2017 Order on the first motion to dismiss, an implied nutrient content claim "[d]escribes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (*e.g.*, 'high in oat bran')" and might also suggest that the food is compatible with a healthy or nutritional diet because of its nutrient content. Dkt. No. at 88 at 14-15; *see also* March 2018 Order [Dkt. No. 116] at 8; 21 C.F.R. § 101.13(b)(2)(i)-(ii). In my March 15, 2018 Order on the second motion to dismiss, I noted in determining whether an implied nutrient claim has been made, the court must consider the context of where the challenged claim is made; while the "magic words" that might create an implied nutrient claims do not "need to be directly adjacent to the discussion of a nutrient to create an implied nutrient content claim, [] there must be connection given the words, their placement, and their context," analyzing whether the nutrient statement is "connected by context to the other representations." March 2018 Order [Dkt. 116] at 12. For example, I rejected plaintiffs' attempt to excise "excellent source of fiber" from a paragraph that was wholly "focused on 'fiber' and that the product is an 'excellent source' of that fiber. Plaintiffs cannot excise the 'excellent source' of fiber, which is integral to the whole paragraph about fiber, to avoid preemption as an implied nutrient content statement." *Id.*

I rejected Post's argument that the two Bran Flakes statements above, as well as the Raisin Bran statement, were implied nutrient content claims because those statements did not (upon my initial review) appear to be connected to "statements about the contents of the products at issue, much less an implication that the products at issue contain specific levels (or healthful levels of specific nutrients)." *Id.* at 16. I was wrong because I failed to consider the underlined text excised by plaintiffs. Viewing the language above, including the underlined language that plaintiffs do not dispute appears as part of the same phrase or in the same clause as the Challenged Statements, each of the three statements implies something specific about the levels or healthfulness of the nutrients identified (fiber and whole grains). They are, therefore, protected implied nutrient claims and subject to preemption under NELA.

Turning to the phrases that I have not already considered on the Honey Bunches of Oats (HBO) and Alpha-Bits Products, plaintiffs do not dispute that the underlined language establishes implied nutrient claims because each of them discloses the actual content of nutrients in the Products. Instead, plaintiffs complain that Post originally challenged these statements as mere puffery and asked me not to consider the surrounding, factual context. Perhaps. But looking to the question before me now, "Wholesome Nutrition" on the HBO Products is clearly followed by relevant and connected text identifying the amounts of protein and whole grains per serving. Oppo. to MSJ at 19. Wholesome Nutrition, as used in this context, is an implied nutrient content claim.

Similarly, the phrase "[w]ith 3g of fiber and 34g of whole grain per serving, it's the perfect combination of wholesome goodness and honey-sweet crunch that everyone in your entire family will love" on the HBO Products is the explicit disclosure of specific amounts of nutrients that turns "wholesome goodness" into part of the implied nutrient content claim. The Alpha-Bits Challenged Statement, when read in full and in context, discloses the basis for the "good source" of nutrients claims because the iron, zinc, and B vitamins are identified immediately following the good source claim. *Id.*[14]

These six Challenged Statements are implied nutrient claims that are protected by NELA and its regulations and are not actionable as part of plaintiffs' false or misleading claims.

### 2. Health Claim

Post also argues that the claim on a number of Honey Bunches of Oats products is a preempted health claim: "Heart Healthy - Diets low in saturated fat and cholesterol, and as low as possible in trans fat, may reduce the risk of heart disease." Plaintiffs admit that the underlined language is a health claim, that was considered and approved by the FDA under the FDA Modernization Act (FDAMA), 21 U.S.C. § 343(r)(3)(C). Oppo. at MSJ at 20. But they omitted

---

[14] Plaintiffs' attempt to characterize this Challenged Statement as a structure function claim – a differently regulated claim that must be truthful and not misleading, Oppo. to MSJ at 19 – does not help them. Plaintiffs do not contest that "good source of nutrients that are building blocks for your child's developing brain," specifically identifying iron, zinc, and B vitamins, is itself or in conjunction with other unidentified statements false or misleading.

the underlined text from the Challenged Statement and want to challenge *only* the use of "Heart Healthy" and the heart image on the Product's package.

Post contends that the Heart Healthy statement must be considered along with the remaining language and should be considered part of the authorized health claim. Plaintiffs counter that because the words "Heart Healthy" were not approved by the FDA, those words cannot be considered an authorized claim under FDAMA but instead is an unauthorized health claim under 21 C.F.R. § 101.14(e).

I agree with Post that simply leading with "heart healthy" as a summary but then directing the reader to the express language approved by the FDA for a permissible health claim is a preempted health claim. The same conclusion was reached where a court considered packaging that combined "'heart healthy' statements and images of hearts with the claim that 'diets rich in whole grain foods and other plant foods and low in saturated fat and cholesterol may help reduce the risk of heart disease.'" *In re Quaker Oats Labeling Litig*., C 10-0502 RS, 2012 WL 1034532, at *3 (N.D. Cal. Mar. 28, 2012). In *Quaker Oats*, the Hon. Richard Seeborg considered FDA approved language with the use of "heart healthy" or a heart graphic. He explained that the FDA regulation (21 C.F.R. § 101.14(d)(2)(iv)) expressly provides for a reference statement directing the consumer to further information located elsewhere on the packaging. Accordingly, he found that while "heart healthy" was not shown directly next to the FDA approved health claim language, that was not a problem and claims using all of the relevant language were preempted. *Id*. at *3.[15]

The Challenged Statements identified by Post, when read in context with the language that directly surrounds them, are preempted and may not form the basis of plaintiffs' false and misleading claims in this case.

---

[15] In *Hadley v. Kellogg Sales Co*., 16-CV-04955-LHK, 2019 WL 3804661 (N.D. Cal. Aug. 13, 2019), the court declined to find health claims preempted as approved FDAMA claims where the language on the packing was missing significant, materials words from the exact language approved by the FDA. *Id*. at *21. Plaintiffs do not argue that is the case here and admit the underlined language is an approved FDAMA claim.

### D.     Lack of Evidence Supporting Any Remedy

Separately, Post argues that plaintiffs "lack evidence" that would entitle them to injunctive or monetary relief and, therefore, summary judgment should be granted in its favor.

#### 1.     Injunctive Relief

Post argues, first, that plaintiffs lack standing to seek injunctive relief because there is no likelihood that either plaintiff will be in danger of buying Post's Products in the future as a result of false or misleading statements that these plaintiffs now realize are allegedly false or misleading. The Ninth Circuit has identified two circumstances where plaintiffs in false or misleading labeling cases may seek injunctive relief: (i) where plaintiffs "would like to" buy the product again but "will not" because they "will be unable to rely on the product's advertising or labeling" without an injunction; or (ii) where the consumer "might purchase the product in the future" because they "may reasonably, but incorrectly, assume the product was improved."  See *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 970 (9th Cir. 2018).

Post characterizes the deposition testimony from plaintiffs Krommenhock and Hadley as falling outside *Davidson*, because both admitted that they would never buy Post cereal again given the Products' high added sugar content.  MSJ at 22-23.  Plaintiffs respond that while Hadley testified in his deposition in this case that he "didn't know" if he would purchase the cereals again given their high sugar content (MSJ Ex., 18 at 344), in the case he filed against Kellogg Hadley indicated it was "possible" he'd purchase high sugar content cereals again.  Oppo. to MSJ, Ex. 17 at 217.[16]  Plaintiffs also rely on the assertion in their Second Amended Complaint that if they could be assured the cereals were properly labelled, plaintiffs would consider purchasing Post cereals again.  SAC ¶ 120.  Given these two sources, plaintiffs argue that Hadley's intent to purchase Post's products in the future creates a question of fact and provides the minimal showing to demonstrate standing under *Davidson*.

Considering Hadley's ambiguous testimony, his future intent can be explored at trial. Post-trial, on a full record, I can determine what injunctive relief might be appropriate and whether

---

[16] Plaintiffs do not rebut or otherwise address Post's characterizations regarding Krommenhock's deposition testimony that she does not intend to purchase Post cereals in the future.

Hadley has standing to seek that relief.[17]

## 2. Monetary Relief

Post also argues that plaintiffs "lack evidence to support money relief" and summary judgment should, therefore, be granted in their favor. This argument, however, hinges entirely on Post's challenges to plaintiffs' proposed classwide damages models and application of those models by plaintiffs' experts Steven Gaskin and Colin Weir. Dkt. No. 175-1. For the reasons discussed below, plaintiffs' Consumer Impact Model adequately fits their theory of the case and is an acceptable method of proving classwide damages or restitution. Therefore, Post's argument fails.

## E. Punitive Damages

Finally, Post argues it is entitled to judgment on plaintiffs' claim for punitive damages under plaintiffs' CLRA claim. California allows punitive damages only for wrongdoing that is shown by clear and convincing evidence to be fraudulent or "despicable." Cal. Civ. Code § 3294(a), (c). Post contends that because of the debate in the scientific community concerning whether nutrient-rich but sugar-heavy products like Post's are nonetheless "healthy," plaintiffs will not be able to make their heightened showing that Post's conduct in marketing its Products was intentionally wrong or despicable. Post notes that in the case against Kellogg, Judge Koh reached this issue on summary judgment and concluded that plaintiffs in her case did not raise an issue of material fact on punitive damages under the CLRA where their expert (Dr. Robert Lustig, one of plaintiffs' experts here) admitted that: (1) he could not identify one study finding that cereal consumption increases the risk of coronary heart disease, diabetes, or obesity; (2) his view on the dangers of consuming added sugar to heart health (referring to heart disease) is a minority view; and (3) his opinion about the dangers of consuming added sugar to heart health "is not the majority view of researchers." *Hadley v. Kellogg Sales Co.*, 16-CV-04955-LHK, 2019 WL

---

[17] Post's argument that injunctive relief is unnecessary because it adequately discloses its added sugar content (or will disclose it adequately in the future) will not be considered at this juncture. Whether past or current disclosures suffice to negate what may otherwise be false or misleading statements regarding the healthiness of Post's cereals should be determined, if necessary, following the jury's verdict.

3804661, at *16 (N.D. Cal. Aug. 13, 2019) (*Hadley II*).

I will not reach this issue now. Given the dispute between the experts about the state of the science, the question of Post's own knowledge of and reaction to the science at different points in time, and Post's reasons for using the amounts of sugar it does in its Products, I conclude that whether plaintiffs can satisfy the heightened fraud or malice standard for punitive damages under the CLRA should be determined by the jury.

Post's motion for summary judgment is GRANTED to the limited extent that the seven preempted implied nutrient and health claims identified above are not independently actionable as Challenged Statements. The motion is DENIED in all other respects.

## III.    POST'S MOTION TO EXCLUDE GASKIN AND WEIR

As noted above, a significant argument in support of Post's opposition to class certification as well as its motion for summary judgment is that the economic models proposed by two of plaintiffs' experts, Stephen P. Gaskin and Colin B. Weir, are inherently faulty, do not "fit" plaintiffs' theory of the case, and do not capture on a classwide basis plaintiffs' potentially recoverable damages or restitution. Post does not challenge the qualifications of either expert but attacks the design of the conjoint and demand surveys they utilized and argues that the results either are unreliable or measure unrecoverable damages/restitution.

### A.    Gaskin

Steven P. Gaskin is a principal with Applied Marketing Science, Inc. ("AMS"), a market research and consulting firm. Gaskin Expert Report (Dkt. No. 155-10) ¶ 1. He developed two survey-based models to assess classwide impact and damages/restitution.

Consumer Impact Model/Price Premia – Conjoint Analyses. Gaskin was asked by counsel for plaintiffs to design, conduct, and analyze market research surveys and analyses that would enable him to assess the price premia resulting from the Challenged Statements on specific boxes of Post cereals and granola. *Id*. ¶ 8. To do that, Gaskin conducted nine conjoint surveys to estimate "the price premia (measured in dollars and/or percentage terms) caused by the presence of the affirmative misrepresentations on boxes of Post Great Grains, Honey Bunches of Oats Regular, Whole Grain, and Granola, Raisin Bran, Bran Flakes, Honeycomb, Alpha-Bits, and

United States District Court
Northern District of California

Waffle Crisp, meaning the difference in the value of these cereals or granola with the affirmative misrepresentations compared to the value of these cereals or granola without the affirmative misrepresentations." *Id.* ¶ 50. The resulting price premia, for each alleged misrepresentation, on each of the Products tested by Gaskin, ranged from $0.00 to $0.51. *Id.* ¶ 48.

Advantage Realized Model/Change in Demand – Demand Modeling Surveys. Gaskin also designed, conducted, and analyzed two market research surveys to enable him to test the effect of omission of information regarding the dangers of added sugar consumption on the Great Grains and Honey Bunches of Oats Products, and, thereby, on consumers' purchases during the relevant period. He concludes, as to the Demand Modeling Surveys and omitted information, that:

> The survey results indicated that Great Grains customers would have consumed, on average, 26.3% less Great Grains and Honey Bunches of Oats customers would have consumed, on average, 28.1% less Honey Bunches of Oats had they been aware of the omitted information. The percentage I calculated is applicable across all varieties of Great Grains and Honey Bunches of Oats cereal at issue in the class. Moreover, given the similarity of the results, and their high statistical significance, I believe it is reasonable to assume that a similar change in demand would apply to the remaining Class products. To be conservative, I would estimate the demand change for the remaining products as the lower of the two survey results, i.e., the 26.3% observed with respect to Great Grains.

Gaskin Report ¶72.

## B. Weir

Colin B. Weir is Vice President at Economics and Technology, Inc. ("ETI"), a research and consulting firm specializing in economics, statistics, regulation and public policy. Weir Expert Report (Dkt. No. 155-12) at 1. Weir was retained to "ascertain whether it would be possible to determine damages on a class-wide basis using evidence common to Class members, and, if so, to provide a framework for the calculation of damages suffered by the class as a result of the allegedly false and misleading Claims." *Id.* ¶ 5.

Weir worked with Gaskin to develop both sets of Gaskin's surveys. Relying on the survey results, he then calculated total price premium damages. He concluded:

> If Plaintiffs successfully establish liability for all claims and all products during the time periods shown above in Table 2, total price premium damages would be $69,316,353.92.

Weir Report ¶ 65.

Weir also estimated the reduction in demand if certain alleged misrepresentations had not been made:

> The Gaskin Declaration sets forth the results of the demand model performed by Gaskin. Gaskin has identified that consumers would have consumed at least 26.3% less Great Grains and 28.1% less Honey Bunches of Oats had a disclaimer been made.54,55 Gaskin has affirmed that these factors "appl[y] across all varieties of Great Grains and Honey Bunches of Oats cereal at issue in the class. Moreover, given the similarity of the results, and their high statistical significance, I believe it is reasonable to assume that a similar change in demand would apply to the remaining Class products. To be conservative, I would estimate the demand change for the remaining products as the lower of the two survey results, i.e., the 26.3% observed with respect to Great Grains."

*Id.*, ¶ 69. Using the most conservative percentage figure, and Post's sales data, Weir determined that the Change in Demand Damages if plaintiffs are successful on their claims is $140,417,315.41. *Id.* ¶ 73.

### C. Gaskin's Conjoint Survey and Weir's Calculations to Establish Price Premia and Classwide Damages/Restitution

Post moves to exclude the Gaskin conjoint study, price premia determinations, and Weir's resulting calculations because: (i) the conjoint surveys and model do not "fit" plaintiffs' theory of liability; (ii) the surveys make no attempt to prove classwide impact, they just assume it; (iii) Weir's damages calculations are unreliable; and (iv) the surveys measure consumers' willingness to pay, not market price which are distinct concepts.

#### 1. Fit

Both sides recognize that, as part of the predominance inquiry under Rule 23, plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013).[18] Plaintiffs must present a damages model consistent

---

[18] The questions of whether there is the required fit under *Comcast* and whether an expert's opinion should be excluded under *Daubert* are distinct. *See Hadley I*, 324 F. Supp. 3d at 1106 ("whether Gaskin's proposed conjoint analysis is sufficiently reliable from a methodological standpoint—and therefore admissible under *Daubert*—is a different issue from whether the conjoint analysis satisfies *Comcast*."). Post challenges the fit of Gaskin's model and Weir's calculations as part of its opposition to Class Certification and as a separate ground in support of its motion for summary judgment; I will consider both the *Comcast* challenge and the more typical *Daubert*/reliability challenges on Post's motion to exclude.

United States District Court
Northern District of California

with their theory of liability – that is, a damages model measuring "only those damages attributable to that theory." *Id.* at 35. "Calculations, need not be exact," but "at the class-certification stage (as at trial), any model supporting a 'plaintiff's damages case must be consistent with its liability case.'" *Id.* (quoting ABA Section of Antitrust Law, Proving Antitrust Damages: Legal and Economic Issues 57, 62 (2d ed. 2010)). Significant to the claims asserted here, "[r]estitution under the UCL and FAL 'must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015).

Post argues that there is no *Comcast* fit here. It contends that because plaintiffs challenge only the implication of healthiness from the Challenged Statements, plaintiffs cannot challenge the many other truthful or non-actionable statements on the Products. It also asserts that the model fails because plaintiffs' experts did not try and isolate and test the Challenged Statements separate and apart from the value of the unchallenged or truthful statements. But its argument overreaches. The question under California law is whether the Challenged Statements are false or misleading to an objective reasonable consumer. *See, e.g., Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Plaintiffs' Consumer Impact Model assumes that is true, which is an appropriate starting point for a damages model (especially one in support of class certification). *See, e.g., Hadley I.*, 324 F. Supp. 3d at 1106 (accepting Gaskin's similarly-designed conjoint analyses model as sufficiently fitting plaintiffs' theory).

### 2. Methodology Challenges

The design, structure, and methodology Gaskin used to conduct the analysis in support of the Consumer Impact Model also fits plaintiffs' theory of damages. Similar conjoint surveys and analyses have been accepted against *Comcast* and *Daubert* challenges by numerous courts in consumer protection cases challenging false or misleading labels. *See, e.g., Hadley I*, 324 F. Supp. 3d at 1107 (collecting cases).[19]

---

[19] Despite relying heavily on Judge Koh's opinion in *Hadley I* excluding Gaskin's "demand realized model," Post never addresses why Gaskin's consumer impact model/conjoint survey

Post's many arguments regarding Gaskin's methodology go to weight and not admissibility. For example, it alleges that Gaskin failed to account for the placement of the Challenged Statements surveyed on the actual labels and failed to account for or otherwise test unchallenged or truthful statements. It argues that the reasonable consumer would not have been misled by Challenged Statement X because the reasonable consumer would have relied on Unchallenged Statement Y instead and that the reasonable consumer would not have been influenced by the fact the Product contains a significant amount of sugar because the reasonable consumer values "whole grains". Its challenges go to the weight, not admissibility, of the Consumer Impact Model. Post can argue these points at trial as a method of defeating an award or reducing the amount of damages/restitution awarded. *See, e.g., Hadley I*, 324 F. Supp. 3d at 1108 (rejecting challenge that conjoint analysis failed to use actual labels or adequately identify actual ingredients, as in the Ninth Circuit, such criticisms about methodology, including a survey's "fail[ure] to replicate real world conditions," "go to the weight of the survey rather than its admissibility."). Its arguments that Gaskin's conjoint surveys and Weir's analysis fail to prove classwide impact because they did not take into account changes in pricing or consumers' willingness to pay price premia over time or location similarly go to the weight not admissibility of the Consumer Impact Model.

Post separately challenges Weir's calculations as unreliable because Weir did not match "sales to labels," as he did not independently verify which labels were on which Products at which

_____

analysis here differs from the one accepted by Judge Koh in *Hadley I*. Instead, it relies on inapposite cases. *See, e.g., Townsend v. Monster Bev. Corp.*, 303 F. Supp. 3d 1010, 1049 (C.D. Cal. 2018) (rejecting survey that did not suggest materiality for challenged statements and suffered from focalism bias among other defects); *In re 5-Hour Energy Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *10 (C.D. Cal. June 7, 2017) (rejecting damages model that used improper proxy for consumer value or restitution with respect to misrepresented feature and failed to account for value of other features); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1031 (C.D. Cal. 2015) (questioning design of conjoint analysis where survey did not adequately connect "100% Natural" claim to no-GMO theory, but nonetheless accepting the damages model that utilized the conjoint surveys plus a hedonic regression analysis); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1122 (C.D. Cal. 2015) (rejecting analysis that failed to account for market pricing); *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 11-CV-01846-LHK, 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014) (inadequate showing of price premia to support injunction in patent infringement case).

times.[20]  That may provide a basis for Post to argue to the trier of fact that damages or restitution should be reduced or rejected, but it does not undermine the fit or admissibility of the damages model.

Finally, Post argues that Gaskin's analysis and Weir's dependent conclusions suffer from two significant defects related to market pricing.  First, Gaskin's methodology was incapable of measuring a change in market price because he failed to account for how a drop in demand, once Challenged Statements were removed, would result in a drop in price and/or quantity of Product sold.  Second, Gaskin and Weir made no attempt to account for competitors' actions in the market, which also impacts Product pricing.  *But see Hadley I*, 324 F. Supp. 3d at 1106 (concluding Gaskin's "conjoint analysis adequately accounts for supply-side factors and does not merely measure demand-side willingness-to-pay," because the model utilized prices that "mirror" those actually observed in the market and based on actual sales data, and also holds quantity constant).  Post cites no cases rejecting conjoint analyses for failures to account for these particular issues.  While these attacks might be fodder for cross-examination, they are not grounds for exclusion.

Post's motion to exclude Gaskin and Weir's price premia damages model is DENIED.

### D.    Gaskin's Demand Surveys and Weir's Calculations to Establish Advantage Realized

Plaintiffs propose a second damages model, the "Advantage Realized Model," to capture the impacts that flow from Post's failure to disclose the sugar levels and related unhealthiness of its Products.  This omissions-based model rests on two "demand surveys" designed by Gaskin to measure the effect of a "disclosure" to consumers of the Products' high sugar content and, according to plaintiffs, unhealthiness, using a testing group and a control group.  Gaskin Report ¶¶ 52-53 ("This analysis was designed to determine the effect of the omitted information regarding the dangers of sugar consumption on the demand for Post Great Grains and Honey Bunches of Oats.").

Post moves to exclude this second model, arguing that Gaskin's demand surveys and

---

[20] Nor could he, according to Post, given the complex distribution chain and the number of different label variants over time.

Weir's calculations based on the theoretical change in demand: (i) measure only impermissible non-restitutionary disgorgement; (ii) rely on a survey design that is unscientific and unreliable; and (iii) propose a "warning" that flagrantly violates the First Amendment (Gaskin attempted to measure how much less cereal Post would have sold if the cereal boxes had included a warning about added sugar's unhealthiness). My analysis of the first argument is dispositive.

Judge Koh rejected a similar survey designed by Gaskin in the *Kellogg's* case. She determined that it measured only non-restitutionary disgorgement, which is not recoverable under California's Unfair Competition Law (UCL) or False Advertising Law (FAL). She explained that the demand surveys attempted to calculate how much money defendant made from products that Gaskin determined class members would not have otherwise purchased if the healthiness representations had not been made or the unhealthiness of sugar had been affirmatively disclosed. The surveys, therefore, did not measure "restitution," meaning funds secured by Post from class members, but non-restitutionary and not-recoverable disgorgement, meaning profits of defendant that did not flow from plaintiffs' purchases. *Hadley I*, 324 F. Supp. 3d at 1114 ("the advantage realized model appears to 'focus[ ]' solely on Kellogg's 'unjust enrichment'—*i.e.*, the additional sales Kellogg gained from its allegedly deceptive omissions— and therefore seems to be capable of providing only a measure for nonrestitutionary disgorgement.").

Plaintiffs argue that Judge Koh's reasoning about the Advantage Realized Model in *Hadley I* was erroneous. They claim that she neglected to consider that the model is connected to actual retail sales of products purchased by class members, even though it focuses on Post's sales. According to plaintiffs, because those sales would not have otherwise occurred if the omitted information had been disclosed, this model accurately captures money that is owed *back* to plaintiffs.

Plaintiffs miss the point. As recognized by Judge Koh in *Hadley I*, plaintiffs do "not argue that Gaskin's proposed advantage realized model can be used to measure the loss incurred by the class—as opposed to the benefit gained by Kellogg—due to Kellogg's allegedly deceptive omissions." *Id*. at 1114. Without some connection to the amount of *actual* loss to actual class members (*e.g.*, what Post gained from the class members that it would not have but for the

omissions), the appropriate amount of restitution cannot be determined. *See Colgan v. Leatherman Tool Group, Inc*., 135 Cal. App. 4th 663, 697 (Cal. App. 2d Dist. 2006), *as modified on denial of reh'g* (Jan. 31, 2006) ("the 'object of restitution is to restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest.'" (quoting *Korea Supply Co. v. Lockheed Martin Corp*., 29 Cal.4th 1134, 1149 (2003)).

By focusing on sales Post made to consumers who would not have otherwise purchased the Products (had they known the omitted information tested by Gaskin), the Advantage Realized Model ignores that the Products provided some value to the consumers despite the omitted information. It, therefore, is a full refund model of damages; it seeks a refund of the full price of the Products for those misled and injured purchasers. That model has been rejected by numerous courts when proffered in consumer product cases where the product provided some value. *See, e.g., Allen v. Conagra Foods, Inc*., 331 F.R.D. 641, 673 (N.D. Cal. 2019); *see also Chowning v. Kohl's Department Stores, Inc*., 735 Fed. Appx. 924, 925, 2018 WL 3016908, at *1 (9th Cir. June 18, 2018) ("The proper calculation of restitution in this case is price paid versus value received. Under California law, where a plaintiff obtains value from the product, the proper measure of restitution is 'the difference between what the plaintiff paid and the value of what the plaintiff received.'" (citation omitted)). By failing to account for the value actually realized by the class members from their purchase of the product, the Advantage Realized Model overstates the amount of restitution that might be owed to class members if plaintiffs prevail. It cannot be relied on to support the motion for class certification or to oppose defendant's motion for summary judgment.

Post's motion to exclude is DENIED, except to the limited extent that the Advantage Realized Model is not appropriate for and does not capture damages/restitution available to plaintiffs if they prevail. Plaintiffs cannot rely on the Advantage Realized Model for purposes of class certification or to oppose summary judgment. That said, the Consumer Impact Model does fit and is otherwise admissible. That model supports plaintiffs' motion for class certification and their opposition to Post's motion for summary judgment on monetary damages.

## IV.    PLAINTIFFS' MOTION TO EXCLUDE STROMBOM

Turning to an expert Post relies on to dispute the work of Gaskin and Weir, plaintiffs move

31

to exclude Bruce Strombom's opinions. Strombom is an economist who opines that Gaskin and Weir's Consumer Impact/Price Premia Model: (i) is based on the flawed assumption that supply is perfectly inelastic, causing Gaskin/Weir to overstate price premia; (ii) improperly fails to account for the addition or deletion of the Challenged Statements on the Products; and (iii) did not, but should have, accounted for price variation over time. He adds that Weir's damages calculations are based on errors and are inaccurate.[21]

Plaintiffs move to exclude these opinions, arguing that: (i) Strombom is unqualified to render opinions on conjoint surveys; (ii) his opinions are based on a "legally-erroneous understanding of the proper measure of damages in this case" and therefore his "supply-side opinion" is wrong as a matter of law and irrelevant; (iii) his opinion depends on unreliable "before and after sales data." In addition, plaintiffs move to strike Strombom's opinions on Weir's "calculation error" and on "ascertainability" generally. MTE Strombom (Dkt. No. 190).

I need not resolve at this juncture whether Strombom is qualified to opine on conjoint surveys generally and whether he is qualified to criticize Gaskin and Weir conclusions in particular. I similarly do not need to address whether Strombom made errors in his own analyses (which go to weight and not admissibility, as with the majority of Post's attacks against Gaskin and Weir). I have concluded that the Consumer Impact Model and damages calculations proposed by Gaskin and Weir are sufficient to support class certification and oppose the motion for summary judgment. Strombom was only mentioned twice in connection with Post's motion to exclude Gaskin and Weir's Consumer Impact Model (where Post decided to fully argue its challenge to that model) in connection with the rejected arguments about Gaskin's failure to consider price across time and geographic location. MTE Gaskin & Weir at 15, 16 n.11. These and the other opinions Strombom provides in his Report, if considered, do not change my opinions about the admissibility of Gaskin and Weir's Consumer Impact Model and are not otherwise relevant to my determinations of the class certification or summary judgment motions.

---

[21] Plaintiffs also move to exclude Strombom's opinions regarding deficiencies in the Advantage Realized Model and Weir's calculations based on that model. However, as that model is not admissible, I need not reach these arguments.

With respect to plaintiffs' objections to Strombom's criticism that neither Gaskin nor Weir address how class members would be ascertained or damages determined for individual class members, these issues were not argued by Post in opposing class certification. Strombom Report ¶¶ 79-83. They are irrelevant for purposes of resolving the pending substantive motions, as I have determined the class is ascertainable and recognize that there are numerous ways aggregate damages can be fairly apportioned among injured class members if plaintiffs are successful at trial.

Plaintiffs' motion to exclude is DENIED without prejudice. Plaintiffs may, if Strombom intends to testify at trial, make more targeted attacks on Strombom's qualifications or on the irrelevance of his opinions *in limine* or at trial.

## V. POST'S MOTION TO EXCLUDE SILVERMAN

Bruce G. Silverman is an advertising expert retained by plaintiffs to opine on: (i) the impact that advertising has on consumer perceptions regarding the health and wellness benefits of consumer products generally; (ii) consumer behavior and decision-making as it relates to labeling claims on cereal packaging; (iii) whether the challenged claims convey a material health message; and (iv) the materiality of information plaintiffs allege was deceptively omitted. Expert Report of Bruce G. Silverman (Dkt. No. 155-4), ¶¶ 1,4.

Silverman opines:

> 28. Consumers are interested in healthy eating and make food purchasing decisions based on health and wellness claims made on food packaging.

> 29. The challenged claims conveyed a health message, which is frequently bolstered by the context in which it is presented.

> 30. Consumers receive the health message in advertising, at the store, and over time, at their breakfast tables as they are exposed to the details on the box itself.

> 31. The health message is material to consumers.

> 32. Consumers rely on health messages when deciding which cereal to purchase. This is true specifically of the accused products and challenged claims.

> 33. Disclosure of material information Plaintiffs allege Post omitted, i.e., warning consumers of the potential dangers of consuming the accused products, would change consumer behavior.

He concludes:

> 352. . . It is evident to me that Post's advertising and packaging for these products focuses heavily on the alleged health benefits embodied in the claims listed in Plaintiffs' complaint, and it is equally evident from the Post and other marketing studies I reviewed that consumers respond positively to them. Thus, the claims have a material effect on consumer purchasing behavior.

> 353. Moreover, it is evident to me that Post's disclosure of information about the potential health risks and effects of consuming the added sugar in the cereals at issue in this matter would change consumer eating and purchasing behavior. It is likely that sales of these products would decline as consumers who currently hold to the belief that the products are healthy would cut back or eliminate the products altogether from their diets. In addition to adding a warning label, in my opinion it might also be appropriate for Post to fund a corrective advertising or public relations campaign to inform the public that the products at issue in this matter contain unhealthy levels of sugar.

Silverman Report.

Post moves to exclude Silverman's opinions on the meaning and materiality of the Challenged Statements, arguing that he failed to address the specific Challenged Statements at issue in the "particular combinations" that they were used on Post cereal boxes and has no methodology to achieve that specificity. It also complains that Silverman conducted no consumer surveys or other tests, and instead relied on his own experience in the industry and its own documents to support his opinions on meaning and materiality.[22]

Post's argument that Silverman's opinions must be excluded because he did not conduct any focus group or other consumer testing is misplaced. As Judge Koh explained in *Hadley I*, "California courts have explicitly 'reject[ed] [the] view that a plaintiff must produce' extrinsic evidence 'such as expert testimony or consumer surveys' in order 'to prevail on a claim that the public is likely to be misled by a representation' under the FAL, CLRA, or UCL." *Hadley I*., 324 F. Supp. 3d at 1115 (internal citations omitted).

Also without merit is Post's assertion that Silverman needed to have but had no methodology to support his analysis of meaning and materiality. As Judge Koh explained in

---

[22] Defendant also move to exclude Silverman's opinions regarding the Advantage Realized Model, which has been excluded from this case.

*Hadley II*, because "Silverman's opinions are based on his many years of marketing experience and his review of Kellogg's own internal consumer research and other documents," the motion to exclude was denied. *Hadley II*, 2019 WL 3804661, at *24 (N.D. Cal. Aug. 13, 2019).[23] Silverman's in-depth experience in this field, including attending numerous focus groups centered on marketing cereal and developing marketing plans for cereal products, qualify him to opine on the matters addressed in his Report. Post's challenges to Silverman's methodology and failure to consider specific issues go to weight, not admissibility.

Finally, Post's objections that Silverman did not consider other phrases on the packaging, other "possible influences" on consumer behavior, or Post documents not provided to him by plaintiffs' counsel, similarly go to the weight and not the admissibility of Silverman's testimony. The jury will consider the context of the Challenged Statements on the Products' labels, as well as relevant Post documents that impacted Post's decisions to use certain statements or how to place them, in order to determine whether "a reasonable consumer would attach importance to it or if 'the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action.'" *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (*quoting Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 333 (2011)). Post repeatedly chides plaintiffs and their experts for allegedly ignoring that a truthful statement might have been material to a reasonable consumer. But that does not mean that a Challenged Statement cannot *also* be material and, therefore, actionable. Further, a statement need not be "'the sole or even the predominant or decisive factor influencing'" the class members' decisions to buy the challenged products. *In re Tobacco II Cases*, 46 Cal. 4th 298, 326 (2009) (quoting *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977, 64 Cal.Rptr.2d 843, 938 P.2d 903 (1997)).

---

[23] Post's cases rejecting advertising experts' opinions based on experience are inapposite and not persuasive given plaintiffs' theory of liability in this case and Silverman's particular experience. *See, e.g., Jones v. ConAgra Foods, Inc.*, C 12-01633 CRB, 2014 WL 2702726, at *15 (N.D. Cal. June 13, 2014) (noting expert multiple admissions of potential insignificance of "100% natural label" and noting that expert's "rather startling admission might have something to do with the fact that there is no single, controlling definition of the word 'natural.'"); *GPNE Corp. v. Apple, Inc.*, 12-CV-02885-LHK, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (rejecting expert's proposed royalty rate based only on "30 years of experience" as "classic ipse dixit" reasoning).

Post's motion to exclude Silverman's opinions is DENIED.

## VI.    PLAINTIFFS' MOTION TO EXCLUDE HANSSENS

Dr. Domonique M. Hanssens is a marketing professor who was retained by Post to review and respond to Silverman (advertising and marketing), Gaskin (survey), and Weir (survey and damages models). Hanssens opined that Gaskin's failed to account for all supply factors. Plaintiffs move to strike that opinion because Hanssens makes only a general criticism of conjoint analyses that have been repeatedly accepted as valid to set price premia by courts in this District. They argue that Hanssens' supply-side opinion is entirely theoretical and unworkable. And they move to strike Hanssens' opinion that Gaskin's price premia are not validated by real-world market data because Hanssens uses Strombom's report and data that plaintiffs have also moved to exclude as unreliable.

I need not resolve plaintiffs' challenges to Hanssens' qualifications or analysis because I have already accepted – for purposes of granting class certification and denying Post's motion for summary judgment – the validity and admissibility of the Gaskin/Weir Consumer Impact Model. Hanssens' challenges, considered on their merits, do not alter those conclusions. As with Strombom, if Hanssens intends to testify at trial, plaintiffs may make more limited and specific requests to exclude identified parts of Hanssens testimony *in limine* or at trial.

Plaintiffs also move to strike four of Hanssens' opinions that attempt to undermine Silverman regarding messaging and materiality. Some of Hanssens' opinions are not relevant under the California consumer protection statutes at issue, while others raise questions to be resolved by the jury.[24] Hanssens opines that Silverman's opinions "lack evidence" that all or most consumers were exposed to the Challenged Statements, that all or most consumers relied on them,

---

[24] Whether "all or most consumers" were actually exposed to and relied on Challenged Statements are not relevant questions under the California consumer protection statutes at issue. Some of Hanssens' opinions might support Post's arguments that given the context and placement of the Challenged Statements on the labels, and in light of other unchallenged statements, some or all of the Challenged Statements would not be material to a reasonable consumer. That, however, is a merits question that does not defeat class certification or require summary judgment to Post. *See supra* at 9, discussing *Bradach v. Pharmavite, LLC*, 735 Fed. Appx. 251, 254 (9th Cir. 2018) (unpublished), cert. denied, 139 S. Ct. 491 (2018) & *Kumar v. Salov N.A. Corp.*, 14-CV-2411-YGR, 2016 WL 3844334, at *4 (N.D. Cal. July 15, 2016).

United States District Court
Northern District of California

that all or most consumers perceived statements to communicate healthiness, and that healthiness is material or that consumers would be impacted by plaintiffs' tested disclosure statement. The "lack of evidence" arguments do not undermine my conclusions discussed above that Silverman's opinions are reliable and admissible at this juncture to support class certification on materiality. The disclosure statement is not relevant as I have excluded the Advantage Realized Model. If Hanssens intends to testify at trial, plaintiffs may raise specific arguments to exclude identified portions of that testimony *in limine* or at trial. For purposes of ruling on the class certification and summary judgment motions, the motion to exclude is DENIED without prejudice.

## VII.  PLAINTIFFS' MOTION TO EXCLUDE VAN LIERE

Dr. Van Liere is an expert in conducting research surveys, market analysis, and sampling analysis retained by Post to conduct a consumer survey on its behalf to test the impact of some of the Challenged Statements and consumers' perceptions of sugar as healthy or unhealthy. Plaintiffs move to exclude the survey results, arguing that the results are biased and not based on a reliable methodology because: (i) only shoppers in malls were surveyed and numerous courts have criticized attempted extrapolation of the results of similar "mall intercept" surveys to broader populations; (ii) Van Liere failed to measure impact of Challenged Statements on Great Grains and Honeycomb cereals; and (iii) his opinion about consumers' healthy perception of cereals prior to 2012 is speculative and irrelevant.

I have concluded that plaintiffs satisfy the basic materiality showing (with the limited assistance of Silverman) to support predominance on class certification and survive Post's motion for summary judgment. As with Strombom and Hanssens, none of Van Liere's opinions undermine those determinations. Moreover, plaintiffs' challenges go primarily to the methodology and, therefore, the weight of Van Liere's survey and its results, not its admissibility.[25] If Van Liere intends to testify at trial, plaintiffs may raise specific arguments to

---

[25] Citing no cases where mall intercept surveys were excluded, and not relying on any expert opinion but only on a citation to the National Academy of Sciences 2011 Survey Reference Guide, plaintiffs complain that Van Liere's mall intercept study's problems are so severe they do not simply undermine its weight but make it inadmissible. MTE Van Liere [Dkt. No. 191] at 5-6. I will not exclude Van Liere's study on the basis of that very limited and unsupported argument.

exclude identified portions of that testimony *in limine* or at trial.  For purposes of ruling on the class certification and summary judgment motions, the motion to exclude is DENIED without prejudice.

## VIII.   POST'S MOTION TO EXCLUDE LUSTIG AND GREGER

### A.   Lustig

Robert Lustig is an Emeritus Professor of Pediatrics in the Division of Endocrinology and was the Director of the Weight Assessment for Teen and Child Health (WATCH) Program at the University of California, San Francisco for 14 years.  Lustig Expert Report (Dkt. No. 155-6), ¶ 7. He was asked by plaintiffs "to summarize relevant scientific and medical literature regarding the physiological metabolism and effects of added sugar consumption on the human body, both generally and specifically in relation to the types and amounts in the challenged cereals" and to "opine on the veracity of Post's labeling statements challenged in this lawsuit in light of the scientific evidence" and "on the scientific validity of a disclosure statement used in a 'demand study' that plaintiffs propose for this litigation."  *Id*. ¶ 2.

As particularly relevant to these motions, Lustig opines:

> 4.     Added sugar is a primary driver of chronic metabolic disease, such as Type 2 diabetes, heart disease, fatty liver disease, and tooth decay. This is not based on correlation; the scientific literature supports causation for each of these disease entities.

> 5.     Accordingly, it is my opinion that:

>> a.  regularly and/or excessively consuming Post cereals that have been challenged by plaintiffs—namely Great Grains, Honey Bunches of Oats, Honey Bunches of Oats Whole Grain, Honey Bunches of Oats Granola, Raisin Bran, Bran Flakes, Alpha Bits, Honey Comb, and Waffle Crisp—is not healthy, and the excess added sugar is more detrimental to health than the fiber and/or vitamins can be considered beneficial; and

>> b.  the disclosure statement used Plaintiffs' Demand Study propose is scientifically valid

*Id*. ¶¶ 4-5.

### B.   Greger

Dr. Michael Greger, M.D. FACLM is a graduate of Cornell University School of

Agriculture, and Tufts University School of Medicine, a physician (licensed as a general practitioner specializing in clinical nutrition), and a founding member and a Fellow of the American College of Lifestyle Medicine. Greger Expert Report (Dkt. No. 155-8) at 5. Greger has been asked to: (i) opine on the  health effects of added sugar consumption generally; (ii) identify, analyze, and summarize relevant scientific and medical literature regarding the health effects of cereal consumption, including concerning the consumption behaviors of cereal eaters; (iii) analyze and summarize any additional sources Post indicates it relied on to substantiate any challenged claim; and (iv) opine on whether, in light of the scientific evidence and their added sugar content, the Post cereals challenged by plaintiffs are generally healthy. *Id*. at 4.

Greger concludes that the Products are not generally healthy because: (i) the Products have high energy densities; (ii) the Products have sub-optimal carbohydrate-to-fiber ratios; (iii) the Products have high glycemic and insulinemic loads; and (iv) the trans fats in waffle crisp render the product particularly unhealthy.  He also states that the "Mary Poppins" argument (the argument that the sugar content is necessary for "taste appeal" to "encourage children to consume needed nutrients at breakfast time," implying children just will not eat cereals that are less sugary) is fallacious and the "better choice" argument (the argument that sugary cereal is better than a donut) presents a false dichotomy. *Id*. at 40-46.

### C.    Motion to Exclude or Strike

#### 1.    Analytical Gaps

Post moves to exclude Lustig and Greger's opinions as not based on reliable methods because "they depend on unsupported leaps across two analytical gaps."  Dkt. No. 164 at 5-15. Post claims that these experts: (i) espouse "theories about the health effects of added sugar in the overall diet [that] are not generally accepted"; (ii) make an unsupported leap from their claim about the health effects of added sugar to contend that the healthiness of particular foods can be judged solely on the basis of added sugar; (iii) make a further unsupported leap to claim that added sugar in breakfast cereals causes health issues, and this leap directly contradicts the existing science on breakfast cereals; and (iv) cannot "bridge their analytical gaps" with an unsupported conclusion that consumers eat too much cereal on a regular basis.

39

Post's arguments go to the weight of the testimony, not its admissibility. Lustig's and Greger's opinions are generally based on their own medical training, experience in practice, and research. If Post believes their opinions are in the minority or ignored contrary evidence or opinions, those are matters for cross-examination, not exclusion. *See, e.g., Hadley II*, 2019 WL 3804661 at *24 (denying motion to exclude Lustig despite recognition that some of his opinions were in the "minority," because his "opinions are based on his medical training, his experience treating obese children, his academic research, and his review of the scientific record. Kellogg's arguments as to why Dr. Lustig should be excluded go to weight and not admissibility."). The science and research around the impacts of high sugar consumption is continuing to develop. Even if Post is correct that these experts' opinions are currently in the minority, there *is* evidence supporting them. Simply being in minority does not mean that their opinions are excludable as unreliable.[26]

Finally, that Lustig and Gregor cannot identify any studies on sugar in "a particular food" (much less particularly in cereals) to support their opinions does not preclude their testimony. The "analytical gaps" Post complains of are nothing more than applying general research to the specific issues in this case. Those gaps can be explored on cross-examination.

## 2. Flawed Methodologies

Next, Post argues that the methodologies used by these two experts to review scientific literature were "fundamentally flawed" because they were biased in their article selection (Lustig allegedly rejected "industry funded" articles and Greger failed to conduct a "meta-analysis" or "systematic review" of literature) and drew "incorrect" conclusions from that literature. But Lustig's testimony is based on his own research and analysis of others' research and is not simply

---

[26] Where experts point to "an objective source demonstrating that his method and premises were generally accepted by or espoused by a recognized minority" of those in the fields, the opinions may be admissible. *Lust By and Through Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 597 (9th Cir. 1996). The developing evidence around the effects of sugar in the diet, and the different views of practitioners in the field that are based on accepted sources and methodologies, make inapposite the concerns acknowledged by the Supreme Court in *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579 (1993) with respect to "conjecture" and "known techniques" with minimal support. *Id*. at 594 (recognizing that in ruling particular evidence admissible or inadmissible "'a known technique which has been able to attract only minimal support within the community' . . . "may properly be viewed with skepticism." (internal citations omitted)).

a "literature review." That he did not rely on or was dismissive of certain studies does not make his opinions excludable; Post may test them on cross-examination.

As to Greger's literature review, Post contends that it was too haphazard – literature was collected from Boolean searches, as opposed to a more systematic method of collection – and this lack of methodology combined with his lack of expertise in studying sugar led him to a number of demonstrable errors in his opinions. Post identifies only one study that was not included in Greger's search results and review. Other than that one study, Post does not actually challenge the *results* of Greger's searches themselves, other than to argue Greger failed to identify his selection criteria.[27] On that point, Greger offered to provide those criteria, but Post did not follow up. While Post asserts that Greger "did not follow any recognized method" for his literature review, Post provides no caselaw or other citations in support of that specific point.[28] Nor does Post show that Greger utilized a rejected or discredited methodology of identifying literature. Post's complaints about Greger's conclusions from his literature study go to the weight, not the admissibility, of his opinions.

### 3. Opinions Outside their Expertise

Finally, Post moves to exclude opinions expressed by Lustig and Greger that are alleged to be outside their areas of expertise.

### a. Dr. Lustig's Opinions

In paragraph 26 of his report, Dr. Lustig opines about the healthcare costs of "chronic metabolic disease, such as diabetes and heart disease" and that, based in part on research paper he co-authored, there would be "savings in healthcare of $31 billion per year if we could reduce our

---

[27] In Reply, Post argues – without citation – that Greger missed "numerous studies" cited by its expert, Clemens. Reply on MTE Lustig & Greger at 12-13. I will not address unsupported arguments raised in Reply.

[28] Post, instead, relies on "pick and choose" cases where courts have criticized experts who picked and chose sources when conducting literature reviews and otherwise did not explain the conclusions and bases of their selected sources. *See, e.g.*, *Lust By and Through Lust v. Merrell Dow Pharm., Inc*., 89 F.3d 594, 596 (9th Cir. 1996) (excluding expert who selectively picked the literature reviewed); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices and Products Liab. Litig*., 174 F. Supp. 3d 911, 929 (D.S.C. 2016) (rejecting expert's literature review resulting from "cherry-picking articles based on the authors' biases").

added sugar consumption by 50%." Post moves to exclude those opinions as irrelevant, potentially misleading, and outside of Lustig's area of expertise. The objections are OVERRULED, as these comments are tied to Lustig's own publication and research.

Post also moves to exclude Lustig's comments in paragraph 31, that added sugar causes disease and that "if this were not true, then sugar taxation in Mexico, the U.K., 26 other countries around the world, and six cities in the United States, would not have been enacted." Post argues that Lustig is not an expert on public choice theory or political science, so he has no basis for opining about why laws were passed. The objection is OVERRULED because Lustig's background in law and public policy and his writing on policies (including taxation) to achieve sugar reduction provide necessary background for these opinions.

Post objects to Lustig's claims, in paragraphs 32 and 34, about the alleged "obfuscation of science" and "pressure" applied by the food "industry." Post objects to these opinions as gratuitous swipes outside his purported medical expertise, inflammatory, and irrelevant as not tied to Post. The objections are OVERRULED because the opinions are based on his review of industry-sponsored studies, but the objections may be renewed *in limine* or at trial.

Finally, Post objects to Lustig's characterization of the purpose, intent, and clarity of Challenged Statements in paragraph 44, on the grounds that Lustig is not an expert in marketing, consumer decision-making or how consumers interpret label statements, and because he did no independent investigation into how consumers interpret the labels. These objections are OVERRULED because they are based on his research experience, but the objections may be renewed *in limine* or at trial.

### b. Dr. Greger's Improper Opinions

Post objects to Greger's frequent "gratuitous statements" throughout his Report that characterized the industry as "sugar pushers" and conspiracists like the tobacco companies as inflammatory and irrelevant as unconnected to any conduct of Post. The objections are OVERRULED, as based on Greger's review of literature of studies regarding cereals and the history of food-industry sponsored studies and his background as a nutritionist, but may be renewed *in limine* or at trial.

For the foregoing reasons, Post's motion to exclude the testimony in whole or in part of Lustig and Greger is DENIED.

## IX.    PLAINTIFFS' MOTION TO EXCLUDE CLEMENS

For their part, plaintiffs move to exclude Post's expert, Roger Clemens, who seeks to challenge the opinions of Lustig and Greger. Dkt. No. 170. Clemens opines that: (i) added sugar is not a primary driver of metabolic disease; (ii) consumption of cereal that contains sugar is safe; (iii) consumption of nutrient fortified cereals is an important source of good nutrition; (iv) global guidelines on dietary sugar are not consistent or based on similar quality scientific evidence; and (v) consumption of the Post cereals at issue provides health benefits to consumers. Dkt. No. 170 at 3-5.

Plaintiffs' move to exclude Clemens' opinions in full, arguing that Clemens: (i) is not qualified, as he is only a nutritional expert and not a medical doctor; (ii) failed to consider numerous "ground breaking" studies conducted by Lustig; (iii) was evasive and did not answer questions directly in his deposition; and (iv) gave irrelevant testimony because he never directly disputed the points made by Lustig and Greger, but instead attempted to reformulate the critical issue in this case as not whether one item was "unhealthy" but instead whether a person's diet as a whole was healthy.

The problem with plaintiffs' "qualifications" challenge is that plaintiffs do not dispute that Clemens is qualified to opine on pharmacology, pharmaceutical science, and biological chemistry or that he was a member of the 2010 Dietary Guideline Advisory Committee ("2010 DGAC"), albeit to address nutrients other than sugar. That Clemens has only limited experience directly addressing "sugar" does not automatically undermine his ability to opine on areas that are within his expertise; it does provide a ground on which to attack his opinions on cross-examination.[29] *In*

---

[29] In a particularly unhelpful manner, plaintiffs argue Clemens is broadly unqualified and then point to numerous instances in his deposition where he, arguably, walked back assertions made either in his Report or in his deposition. But plaintiffs do not identify with any specificity the paragraphs, pages, or subject matters from Clemens' Report that they want excluded because he is unqualified. MTE Clemens [Dkt. No. 184] at 6-8. This broad-brush approach is not helpful. Identifying the parts and specific opinions in a report that a party wants to exclude tied to the evidence supporting that specific exclusion request is required, especially in this sort of case where many of the experts are opining on very broad ranges of topics resulting in numerous

*limine* or at trial plaintiffs may make more targeted attacks on Clemens' qualifications with respect to specifically identified opinions or testimony.

Plaintiffs next challenge the reliability of Clemens' opinions, arguing they are based on insufficient facts and data. These challenges go to weight, not admissibility. Plaintiffs' primary insufficiency challenge is based on Clemens' admissions in his deposition that he could not recall or failed to review key studies that were authored by or heavily relied on by Lustig as a basis for Lustig's opinions. In opposition, Post and Clemens address that charge by "clarifying" through a declaration and Clemens' deposition errata sheet (Dkt. Nos. 196-13, 200) that Clemens had, in fact, reviewed the majority of those studies when writing his Report and prior to his deposition.[30]

Plaintiffs' move to strike this argument and declaration, arguing that it is a "sham" made to contradict Clemens' deposition testimony and argue that Clemens should not be allowed to opine on the now-remembered and not-seen-before studies outside of his prior deposition. Dkt. No. 210. Reading the deposition testimony and his new declaration (as well as in the errata sheet), I conclude that Clemens' refreshed testimony is not a sham but a clarification that is not directly contradictory to his deposition statements. However, in order to avoid any prejudice to plaintiffs, Post shall produce Clemens for a subsequent deposition for up to two hours so that plaintiffs may ask Clemens about his newly-remembered consideration of the Lustig studies and references, as well as Clemens' opinions expressed in his declaration regarding the articles that were introduced at his deposition.[31]

Relatedly, plaintiffs challenge Clemens' testimony as unreliable because Clemens is not

_____

opinions.

[30] Clemens declares: "I did not recall a number of these articles at the time and so said that I had not seen them previously. Following my deposition, and as part of preparing my errata sheet, I reviewed my files to confirm whether I had in fact previously reviewed those documents. I identified several articles that I had previously reviewed in preparation of my report in this matter, but that I did not specifically recall during my deposition." Dkt. No. 200 ¶ 2. In his Declaration, Clemens also addresses other articles – one by Lustig and others that were introduced as his deposition that he admits he had not considered at that time – and explains his view of them now. *Id.* ¶¶ 4-6.

[31] Plaintiffs' remaining insufficiency challenges – that Clemens failed to consider industry funding a source of bias and that he relied on "outdated" sources – likewise go to the weight not the admissibility of Clemens' testimony.

1    credible, given what plaintiffs characterize as Clemens' evasive, non-responsive, and

2    contradictory answers in his deposition. These challenges, however, go to weight and not

3    admissibility. Finally, plaintiffs move to exclude Clemens' opinions as irrelevant and unhelpful.

4    Again, these challenges go to weight, not admissibility.

5        Plaintiffs' motion to exclude is DENIED. Plaintiffs may, however, raise narrowly tailored

6    and precisely supported challenges to specific portions of Clemens' opinions or expected

7    testimony *in limine* or at trial.

8    **X.    MOTIONS TO SEAL**

9        In support of both sides' motions, each side seeks to file information designated as

10   confidential by Post under seal. Dkt. Nos. 151, 152, 153, 154, 155, 174, 175, 178, 207. The

11   information sought to be sealed is characterized by Post as its own confidential and proprietary

12   information, discussing Post's sales and pricing data; distribution, sales and marketing strategies;

13   product performance and development information; and Post's internal and third-party-conducted

14   consumer research. It also includes information produced by third-parties, including Decision

15   Insight which conducted marketing on behalf of Post as well as marketing studies produced by

16   other third-parties hired by Post, and "highly confidential" sales figures produced by a third-party,

17   IRI pursuant to a subpoena issued by plaintiffs.

18       Parties seeking to seal judicial records relating to motions that are "more than tangentially

19   related to the underlying cause of action," *Ctr. for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092,

20   1099 (9th Cir. 2016), bear the burden of overcoming the presumption of public access to court

21   records with "compelling reasons supported by specific factual findings" that outweigh the general

22   history of access and the public policies favoring disclosure. *Kamakana v. City & Cnty. of*

23   *Honolulu*, 447 F.3d 1172, 1178-79 (9th Cir. 2006). Here, as the motions for class certification,

24   summary judgment, and to exclude experts are all central to the merits of this case Post must meet

25   the compelling justifications standard in order to seal information at issue.

26       Compelling reasons justifying the sealing of court records may exist "when such 'court

27   files might have become a vehicle for improper purposes,' such as the use of records to gratify

28   private spite, promote public scandal, circulate libelous statements, or release trade secrets."

45

*Kamakana* at 1179. However, "[t]he mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id*.

Post supports its broad requests to seal with the declarations of Ananta Engineer, who is a Senior Director of Insights and Planning at Post Consumer Brands, LLC. Dkt. No. 207-1, 174-1, 158. Engineer declares, generally, that given the "market for ready-to-eat breakfast cereal is highly competitive" and the "three large cereal makers (General Mills, Kellogg's, and Post) are closely monitoring the dockets in the cases brought by Plaintiffs' counsel against their competitors, including this case," and that if "the exhibits filed under seal are unsealed, they will almost certainly be reviewed by Post's competitors. And if Post's competitors see the information that Post has gathered and Post's thought processes in analyzing that information, they can use it to engage in more effective branding, advertising, product development, sales, and pricing for their own products, to Post's competitive disadvantage." Engineer Decl. [Dkt. No. 174-1] ¶ 3.

I agree that sealing is merited for some of the very specific, detailed financial figures and undisclosed marketing plans included in the record as disclosure of that information would likely cause Post competitive harm. However, even a cursory review of the expansive amounts of material Post seeks to seal show the requested sealing is overbroad. Examples of information Post seeks to seal from plaintiffs' motion for class certification includes: (i) very general statements regarding consumption of cereal products (noting that it is the "Top Food[] Consumed at Breakfast"); (ii) general statements regarding consumers' interests in convenient and healthy food options (consumers eat cereal is because of its "convenience and nutritional benefits"); (iii) and the fact that "Cereal boxes are read with interest and in detail," and represent a quality "opportunity to engage with target consumers." Dkt. No. 155-2 at 2-5. It is likely that much of this information (and similar information repeated throughout the motion papers, expert reports, and exhibits) is well known in the industry, if not by the public at large. The simple fact that something is cited from a report produced by a third-party marketing consultant or by members of Post's in-house marketing team does not make it sealable. Information may be sealed from the public *only* if it is truly confidential, not generally known, *and* its disclosure would likely cause

46

Post competitive harm.

One example from the Expert Reports concerns information produced for Post by Decision Insight. Post seeks to seal the following highlighted information regarding studies discussed in the Hanssens Report: those "studies include some analyses evaluating different cereal packaging options based on test and control study designs. However, these analyses are still inadequate for the purpose of evaluating the challenged claims in this case because they do not isolate the challenged claims separately, independent of other changes to the cereal packaging. *See* Decision Insight Report for Post, "Post Great Grains Cereal ShopperIQ Packaging Study," July 7, 2016, DI_0000047–87." Hanssens Report, Dkt. No. 174-10, at 5 n.13. It is hard to see how disclosure of this very general description of studies conducted by Decision Insight would not be generally known by Post's competitors and how disclosure could cause any harm whatsoever to Post.

Similar examples abound throughout the administrative motions to seal. These sorts of overbroad requests to seal will not be granted. *See, e.g., Hadley v. Kellogg Sales Co*., 16-CV-04955-LHK, 2018 WL 7814785, at *3 (N.D. Cal. Sept. 5, 2018) (rejecting overbroad sealing request of general consumer preference information). The very generalized declarations from Engineer explain why certain categories or types of information might be sealable, but those declarations do not (with some limited exceptions) address the filings on a line-by-line basis.

Therefore, the motions to seal are DENIED without prejudice. Within **twenty (20) days of the date of this Order** Post shall, after meeting and conferring with plaintiffs, file a chart identifying by document name, sealed Docket number, and page and line/paragraph number the precise information it maintains should remain under seal. That chart shall include citations to a declaration from Engineer (or another representative of Post with personal knowledge) attesting that the precise information at issue is confidential and not publicly known, and identifying the competitive harm that would likely flow from public disclosure of that precise information.

The filings currently conditionally under seal will remain conditionally under seal until I make a final ruling on sealing after reviewing the chart and declaration(s). At that juncture, the parties will be directed to e-file redacted documents that redact only the information I have determined may remain under seal.

United States District Court
Northern District of California

**CONCLUSION**

Plaintiffs' motion for class certification is GRANTED. Post's motion for summary judgment is GRANTED in limited part with respect to identified preempted Statements and DENIED in all other respects. The motions to exclude are DENIED, except that the Advantage Realized Model cannot be used as a measure of classwide damages/restitution. The administrative motions to seal are DENIED without prejudice. Post shall submit the required sealing chart and supporting declarations within twenty days of the date of this Order.

A further Case Management Conference is set for April 28, 2020 at 2:00 p.m. If there are disagreements about the content or delivery of Class Notice, the parties shall identify them in the Joint Case Management Conference Statement, to be filed by April 21, 2020. The parties shall also propose a trial schedule. At that Conference, the Court will resolve any disputes and set this matter expeditiously for trial.

**IT IS SO ORDERED.**

Dated: March 9, 2020

William H. Orrick
United States District Judge