# EXHIBIT 11

*Highly Confidential - Attorneys' Eyes Only*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

DEBBIE KROMMENHOCK, *et al.*

v.

POST FOODS LLC

Case No.: 16-cv-10958 (WHO)

**EXPERT REPORT OF BRUCE A. STROMBOM, PH.D.**

**MAY 24, 2019**

Contains Information Designated "Confidential" or
"Highly Confidential – Attorneys' Eyes Only" Under Protective Order

*Highly Confidential - Attorneys' Eyes Only*

## TABLE OF CONTENTS

I.    **Qualifications and Assignment** .................................................................1

    A.   Qualifications ...............................................................................1

    B.   Assignment ...................................................................................2

    C.   Documents Considered .................................................................3

II.   **Summary of Opinions** ...........................................................................3

III.  **Background** .............................................................................................7

    A.   Post...............................................................................................7

    B.   Challenged Products and Challenged Statements........................8

IV.   **Overview of Plaintiffs' Experts' Merits Reports** ...............................9

    A.   Price Premium Approach ..............................................................9

    B.   Change in Demand Restitution Approach ...................................12

V.    **Plaintiffs' Experts' Methodology Does not Estimate a Change in Market Price Caused By the Challenged Statements** ........................14

    A.   The "supply side considerations" in Mr. Weir's Price Premium analysis do not properly address supply-side factors and consequently his methodology does not measure the change in the market price of the Challenged Products, if any, caused by the Challenged Statements......14

         1.   The proper measure of any change in market price is the difference between actual prices and but-for prices ..........14

         2.   Holding quantity supplied fixed does not account for supply-side factors in the but-for world and overstates any change in market price...............................................................15

         3.   Relying on historical prices in the survey design and simulation analysis does not account for supply-side factors or market responses in the but-for world...................................21

    B.   Mr. Gaskin's and Mr. Weir's price premium estimates are inconsistent with price changes observed in actual sales transactions involving the Challenged Products .......................................................23

    C.   Mr. Weir does not accurately measure sales of Challenged Products with the Challenged Statements, and his sales forecast is flawed, resulting in nonsensical values...........................................27

         1.   Mr. Weir does not accurately measure sales of Challenged Products with the Challenged Statements......................27

         2.   Mr. Weir's sales forecast is flawed, resulting in nonsensical values ................................................................29

*Highly Confidential - Attorneys' Eyes Only*

D.   Mr. Weir disregards Mr. Gaskin's adjustment for bias attributable to the graphic form of the Whole Grains Council Stamp ...................................................31

E.   Mr. Gaskin's own analyses show that his Challenged Statement price premia are likely not additive .......................................................................32

F.   Mr. Gaskin and Mr. Weir calculate a single price premium percentage for each Challenged Product/Challenged Statement combination but have not tested whether any such price premium percentage is uniform across all transactions ...................................................................34

**VI.   Mr. Weir's Damages Calculation Based on the "Demand Modeling Survey" Fails to Measure Harm to Proposed Class Members, and the Calculation is Baseless and Flawed .......................................................37**

A.   Mr. Weir's Damages calculation based on the "Demand Modeling Survey" fails to measure harm to Proposed Class Members ......................................37

B.   Mr. Gaskin's Demand Survey implies annual sales that are significantly greater than actual sales ..........................................................40

C.   Mr. Weir's Change in Demand Damages Calculation is baseless and flawed...............................................................................................41

D.   Including only California respondents to Mr. Gaskin's Demand Survey reduces Mr. Weir's Change in Demand Damages to zero.............................................43

**VII.   Plaintiffs' Experts Did Not Address How Class Members Would Be Identified or How Damages Would be Determined for Individual Proposed Class Members .......................................................44**

**VIII. Conclusion ...............................................................................................47**

*Highly Confidential - Attorneys' Eyes Only*

## I.     QUALIFICATIONS AND ASSIGNMENT

### A.     Qualifications

1.     My name is Bruce A. Strombom. I am a Managing Principal in the Los Angeles office of Analysis Group, Inc., an international economic, financial, and strategy consulting firm with ten offices throughout North America, three in Europe, and one in Asia. Analysis Group employs over 900 staff, many with advanced degrees in economics, management, or statistics. I hold a Ph.D. in economics from the University of California, Irvine and a B.A. in economics from San Jose State University. My areas of specialization include applied microeconomics, industrial organization, and finance.

2.     For the past 25 years I have been employed as an economist and have served as a consulting and testifying expert in public policy matters and commercial litigation. Previously, I was Executive Vice President of Business Valuation for a middle market merger and acquisition firm and Manager in the Financial Advisory Services group of the public accounting firm Price Waterhouse. I have testified on topics involving economics, statistics and econometrics, among others, in numerous federal and state courts and in arbitrations. In that testimony, I have addressed issues related to class certification, liability, loss causation, and damages. I have conducted economic analyses related to the appropriateness of class treatment in approximately three dozen cases involving a range of products and markets including consumer packaged goods. A resume detailing *inter alia* my experience, testimony within the past four years, and publications within the past ten years is attached to this report as **Appendix A**.

3.     Analysis Group is compensated at a rate of $775 per hour for the time I spend on this matter; the rates for other Analysis Group staff members assigned to this case range from

*Highly Confidential - Attorneys' Eyes Only*

$310 to $600 per hour. Analysis Group's compensation is not dependent on the nature of my conclusions or the outcome of this matter.

### B.    Assignment

4.      Plaintiffs Debbie Krommenhock and Stephen Hadley ("Named Plaintiffs" or "Plaintiffs") brought the present case against Post Foods, LLC ("Post" or "Defendant"). I have been retained by counsel for Defendant to provide expert analysis and testimony in this matter. On March 12, 2019, I submitted the Expert Rebuttal Declaration of Bruce A. Strombom, Ph.D. (the "Strombom Rebuttal Declaration"), wherein I reviewed and responded to the opinions presented in the declarations of Colin B. Weir and Steven P. Gaskin, submitted on behalf of the Plaintiffs in this matter on January 11, 2019. In the Strombom Rebuttal Declaration, I assessed whether the methodologies proposed by Mr. Gaskin and Mr. Weir could be used to calculate damages on a class-wide basis using evidence common to Proposed Class Members. In this report, I have been asked to review and, where appropriate, respond to the opinions presented in the merit reports of Colin B. Weir and Steven P. Gaskin, submitted on April 24, 2019 (the "Weir Merits Report" and the "Gaskin Merits Report").[1] Specifically, as part of my assignment, I have been asked to review and comment on Mr. Weir's and Mr. Gaskin's methodologies and estimates of damages. I have not been asked to, nor do I, opine on the details of Mr. Gaskin's survey designs and conjoint analyses *per se*, except to the extent that they relate to the Plaintiffs' method of calculating damages.

---

[1] Declaration of Colin B. Weir, April 24, 2019; Report of Steven P. Gaskin, April 24, 2019.

*Highly Confidential - Attorneys' Eyes Only*

### C.      Documents Considered

5.      For this report, I and staff under my supervision have reviewed documents including: the
Second Amended Complaint; the Weir Merits Report; the Gaskin Merits Report;
transcripts of the depositions of Mr. Weir, Mr. Gaskin,[2] the Named Plaintiffs, and Post's
30(b)(6) witnesses; IRI data; as well as other materials provided through discovery in this
case or obtained from public sources. The documents, materials, and other information I
relied on in conducting my analysis and in forming my opinions are listed in this report,
its attached exhibits, and/or in **Appendix B**.

6.      My analysis and conclusions are based on the information available to me at present. If
additional information or materials become available or Plaintiffs present further expert
testimony, I reserve the right to update my opinions and analysis as appropriate.

## II.      SUMMARY OF OPINIONS

7.      Based on my expertise, review of the opinions presented by Plaintiffs' experts, and
review of the materials in this case, I have reached the following opinions:

- Mr. Weir's Price Premium approach is based on a fatally flawed
assumption that supply is perfectly inelastic—that the quantity supplied in
the but-for world would not have changed in response to a change in
consumers' demand for the Challenged Products.[3] This assumption is
inconsistent with the evidence in this case and contradicts both Mr. Weir's

---

[2] Deposition of Colin Weir, *Debbie Krommenhock, et al. v. Post Foods LLC,* March 1, 2019 ("Weir March Deposition"), Deposition of Colin Weir, *Debbie Krommenhock, et al. v. Post Foods LLC,* May 14, 2019 ("Weir May Deposition"), Deposition of Steven P. Gaskin, *Debbie Krommenhock, et al. v. Post Foods LLC*, February 28, 2019 ("Gaskin February Deposition"), and Deposition of Steven P. Gaskin, *Debbie Krommenhock, et al. v. Post Foods LLC*, May 15, 2019 ("Gaskin May Deposition").

[3] I refer to the list of products presented in Table 1 of the Weir Merits Report as "Challenged Products," and the list of health and wellness claims presented in that same table as the relevant "Challenged Statements."

*Highly Confidential - Attorneys' Eyes Only*

own observation that the Challenged Products sell in markets that follow the ordinary rules of supply and demand and the Plaintiffs' claim that the Challenged Statements were included with the purpose of increasing prices, sales, and market share of the Challenged Products.

- Mr. Gaskin's use of historical prices in his survey design and simulation analysis does not account for supply-side response by Post or the market reactions of competitors in the but-for world. As a result, Mr. Gaskin's price premium only measures theoretical changes in willingness-to-pay (*i.e.*, demand), and fails to account for competitive responses by suppliers, including Post, and other market participants.

- The erroneous assumption that supply is perfectly inelastic causes Mr. Gaskin's and Mr. Weir's methodology to overstate the price premium, if any, associated with the Challenged Statements. This renders their Price Premium approach biased and unreliable for the purpose of estimating damages to Proposed Class Members.

- Given the strikingly large magnitude of many of Mr. Gaskin's price premium estimates, one would expect observed market prices to change in response to the addition or deletion of Challenged Statements from the packages of the Challenged Products. However, contrary to Mr. Gaskin's and Mr. Weir's findings, there is no systematic relationship between the addition or deletion of the Challenged Statements and the prices that consumers paid for the Challenged Products.

- Mr. Weir does not accurately measure sales of the Challenged Products with the Challenged Statements. Also, his sales forecast is flawed, resulting in nonsensical values that cannot be relied on for the calculation of damages.

- Mr. Weir disregards Mr. Gaskin's adjustment for bias attributable to his use of the graphic form of the Whole Grains Council Stamp. While I do not endorse Mr. Gaskin's nor Mr. Weir's methodology, if Mr. Weir had

*Highly Confidential - Attorneys' Eyes Only*

used the adjusted price premia presented by Mr. Gaskin, his calculation of price premium damages would have been reduced by $24.5 million, or 35.3 percent.

- For some Challenged Statements, Mr. Gaskin's Conjoint Survey tested each of the Statements separately, as well as pairs of the Challenged Statements jointly. The price premium Mr. Gaskin calculates for the concurrent Statements are typically, and in aggregate, lower than the sum of the price premia of two separate Statements, suggesting that the price premia of the Challenged Statements are likely *not* additive as Mr. Gaskin assumes.

  o Using Mr. Gaskin's own price premium estimates of the concurrent Statements would reduce Mr. Weir's price premium damages by $7.1 million, or 17.9 percent of damages derived from products and sales periods with concurrent Statements.

  o Adjusting for both concurrent Statements tested by Mr. Gaskin and the Council Stamp bias would reduce Mr. Weir's damages calculation by $21.0 million, or 53.3 percent of damages derived from products and sales periods with concurrent Statements.

- Mr. Gaskin and Mr. Weir assume a single price premium factor for each Challenged Product/Challenged Statement combination during the Class Period. They have not tested whether this assumption is valid or reasonable. There is clear evidence that the Challenged Products exhibit considerable price variation across time, promotional activity, distribution channel, and package size. This variation, and more fundamentally, the underlying factors that cause this variation suggest that, like prices themselves, any price premium, or changes in market price, could also vary across these dimensions.

- Mr. Weir's Demand Restitution approach fails to measure harm to Proposed Class Members (*i.e.*, restitutionary disgorgement).

*Highly Confidential - Attorneys' Eyes Only*

- Mr. Gaskin's Demand Survey implies an annual level of sales that is significantly greater than actual sales of the Challenged Products. This material difference between the implied level of consumption and the actual level of consumption of the Challenged Products raises serious concerns about the reliability of Mr. Gaskin's Demand Survey and the use of his results by Mr. Weir to calculate damages.

- Mr. Gaskin conducts his Demand Survey for only two of the nine Challenged Products. Nevertheless, Mr. Weir calculates Change in Demand Damages for all of the Challenged Products. Neither Mr. Weir nor Mr. Gaskin provide any valid justification for applying the change in demand percentages calculated for the two tested products to the seven untested products.

- Mr. Weir does not incorporate Mr. Gaskin's adjusted change in demand percentage for consumers younger than age 18 in his damages calculation. While I do not endorse Mr. Gaskin's nor Mr. Weir's methodology, if Mr. Weir had followed Mr. Gaskin's adjustment method, the Change in Demand Damages he calculates would have been reduced by $22.9 million, or 16.3 percent.

- Even though the Proposed Class is limited to California consumers, Mr. Gaskin did not limit respondents to his Change in Demand Survey to those in California, but rather used a nationwide sample without testing whether that sample was representative of Proposed Class Members. Including only California respondents to Mr. Gaskin's Demand Survey reduces Mr. Weir's Change in Demand Damages to zero.

- Neither Mr. Weir nor Mr. Gaskin addressed how class members would be ascertained or how damages would be determined for individual Proposed Class Members.

*Highly Confidential - Attorneys' Eyes Only*

## III.    BACKGROUND

### A.    Post

8.    Post is the third-largest cereal company in the U.S., and has been in existence since the late nineteenth century.[4] Post Foods, LLC is a part of Post Consumer Brands, which is one of five segments of Post Holdings, Inc.[5] Post Consumer Brands produces ready-to-eat ("RTE") cereal brands such as Honey Bunches of Oats, Pebbles, Oreo O's, Great Grains, Grape-Nuts, Post Shredded Wheat, Oh's, Honeycomb, Golden Crisp, Post Raisin Bran, Alpha-Bits, Shreddies, Malt-O-Meal branded bagged cereal, and Mom's Best.[6]

9.    In the RTE cereal category, an $8.4 billion market as of 2017, Post is the third largest participant accounting for a 19.1 percent share of retail dollar sales and a 21.9 percent share of retail pound sales.[7] Post Consumer Brands' products are sold primarily to grocery, mass merchandise, supercenters, club stores, natural/specialty and drug store customers. Post also sells to military, e-commerce and food service channels. The largest customer of the Post Consumer Brands segment is Walmart, which accounted for approximately 29 percent of Post Consumer Brands' net sales in 2017.[8]

---

[4] "Post Consumer Brands U.S.," available at https://www.postholdings.com/businesses/post-consumer-brands-us/; "Post History," available at https://www.postholdings.com/about/post-history/.

[5] Post Holdings, Inc. 2017 Annual Report, p. 3.

[6] Post Holdings, Inc. 2017 Annual Report, p. 4.

[7] Post Holdings, Inc. 2017 Annual Report, pp. 3-4.

[8] Post Holdings, Inc. 2017 Annual Report, p. 6.

*Highly Confidential - Attorneys' Eyes Only*

**B.      Challenged Products and Challenged Statements**

10.     Plaintiffs filed the Second Amended Complaint on September 14, 2017.[9] In their

complaint, they allege that, "Post leverages a policy and practice of marketing high-sugar

cereals with health and wellness claims."[10] Plaintiffs assert that Post's practices were

"undertaken . . . with the purpose of increasing the prices, sales, and market share of its

cereals."[11]  Plaintiffs have put forward the following definition of the Proposed Class:

> "[A]ll persons in California who, at any time from August 29, 2012 to the
> time a class is notified, purchased high-sugar Post cereals bearing health and
> wellness claims for their own personal, family, or household use and not for
> resale."[12]

11.     I understand that since the filing of the Second Amended Complaint, the list of "high-

sugar Post cereals bearing health and wellness claims" has been reduced in number. For

purposes of this rebuttal declaration, I refer to the list of products presented in the Weir

Merits Report Table 1 as "Challenged Products," and the list of health and wellness

claims presented in that same table as the relevant "Challenged Statements."[13]

---

[9] Second Amended Complaint, *Debbie Krommenhock, et al. v. Post Foods LLC*, September 14, 2017 (herein after "SAC").

[10] SAC, ¶ 2.

[11] SAC, ¶ 314.

[12] SAC, ¶ 372.

[13] Mr. Weir referred to the Challenged Statements as "the Claims" or "Health Claims" (Weir Merits Report, ¶ 5).

*Highly Confidential - Attorneys' Eyes Only*

## IV.     OVERVIEW OF PLAINTIFFS' EXPERTS' MERITS REPORTS

12.     In the Weir Merits Report, Mr. Weir uses two approaches to estimating damages to the

class: the Price Premium approach and the Change in Demand Restitution approach. He

describes these approaches as follows.

> …the correct measure of damages in this situation is either Price Premium
> damages, wherein consumers would receive the difference in market value
> between what they were promised (a Product labeled as being healthy) and
> what they received (a Product that is not healthy as promised); or Change in
> Demand Restitution, wherein the class would receive the amount of additional
> purchases (increased demand) they were induced to make by Post's use of the
> Health Claims without a disclosure, representing the advantage Post realized
> at the hands of the class through that practice.[14]

13.     In the Weir March Deposition, Mr. Weir testified that he is attempting to measure the

change in market value by the difference between the market price actually paid and the

market price that would have been paid without the Challenged Statements.[15]

### A.     Price Premium Approach

14.     Under Mr. Weir's Price Premium approach, class-wide damages are calculated by

multiplying a Price Premium Factor percentage by total dollar sales for each Challenged

Product/Challenged Statement combination.[16] Mr. Weir opines that "[t]hese calculations

can be performed on a class-wide basis, across different geographies, and for any defined

time period, including the proposed Class Period(s) in this litigation."[17]

---

[14] Weir Merits Report, ¶ 9.

[15] Weir March Deposition, 18:4–18:15.

[16] Weir Merits Report, ¶¶ 63–64.

[17] Weir Merits Report, ¶ 64.

*Highly Confidential - Attorneys' Eyes Only*

15.     The Price Premium Factor that Mr. Weir uses comes from the Conjoint Analysis conducted by Mr. Gaskin.[18] Mr. Gaskin estimates the Price Premium Factor percentage for the Challenged Products using a conjoint analysis he describes in the Gaskin Merits Report.[19] Mr. Gaskin's Conjoint Survey presents respondents with "product profiles made up of varying features" and respondents are asked, "as part of a series of 'choice tasks,' to indicate their preferred product profile."[20] These product profiles contain Challenged Statements, among other features such as brand, flavor, and price (presented in his Conjoint Survey as one of a limited number of values).[21] Using responses from the survey, Mr. Gaskin estimates partworths for each Challenged Statement and for each Challenged Product using a hierarchical Bayesian regression. Then, Mr. Gaskin estimates the market price premium percentage using a "market simulation" involving only two products: one with a Challenged Statement, and the other without a Challenged Statement.[22]

16.     In each of the market simulations, Mr. Gaskin first sets the price of the two products equal to one of the five price levels he specifies for the conjoint analysis, and uses the estimated partworths to predict consumers' choices between these two products. Mr. Gaskin lowers the price of the product without the Challenged Statement until the simulated share of consumers who choose the product with a Challenged Statement equals the share of consumers who choose the product without a Challenged Statement.

---

[18] Weir Merits Report, ¶¶ 39–45; Gaskin Merits Report, ¶ 8.

[19] Weir Merits Report, ¶ 45.

[20] Gaskin Merits Report, ¶ 12.

[21] Gaskin Merits Report, ¶ 36.

[22] Gaskin Merits Report, ¶¶ 40, 44–47.

*Highly Confidential - Attorneys' Eyes Only*

At that point, Mr. Gaskin obtains the difference between two prices—that of the product with a Challenged Statement and the simulated price of the product without a Challenged Statement.[23] Using a similar process, Mr. Gaskin estimates another price difference for the same Challenged Statement for the same product by raising the price of the product with the Challenged Statement. Mr. Gaskin then repeats the process at the other price levels. Among all the price differences obtained at different price levels, Mr. Gaskin chose the smallest price difference as the dollar value price premium of the product with the Challenged Statement.[24] Mr. Gaskin then calculates the Price Premium Factor percentage as the dollar value price premium divided by the highest price level of the Challenged Product presented to respondents.[25]

17.     Mr. Weir measures total dollar sales as the dollar sales at retail.[26] Mr. Weir applies each Price Premium Factor percentage to the total sales of the product during the period when Mr. Weir assumes the Challenged Statement appeared on the product package.[27] Mr.

---

[23] Gaskin Merits Report, ¶ 47.

[24] Gaskin Merits Report, ¶ 47.

[25] Gaskin Merits Report, ¶ 48. Mr. Gaskin wrote that dividing the smallest dollar value price premium by the highest price level yields the most conservative estimate of the price premium percentage. However, typically in Mr. Gaskin's conjoint analyses, the smallest dollar value price premium is not derived from the market simulation conducted at the highest price level. In other words, typically, Mr. Gaskin's calculation of the price premium percentage is based on dollar amounts from two different market simulations. Mr. Gaskin does not explain why his "conservative price premium" is reliable or correct. In fact, dividing Mr. Gaskin's own estimated dollar value price premium by the price level at which the market simulation was conducted, one would obtain a large range of price premium percentages for the same Challenged Statement. For example, Honey Bunches of Oats Whole Grain Cereal's price premium percentage for the "Whole Grain" statement ranges between 5.1 percent and 42.6 percent when the price premium percentage is calculated by dividing the estimated dollar value price premium by the price level at which the market simulation was conducted. The large variation in price premium percentage raises serious concerns about the reliability of Mr. Gaskin's methodology and, by extension, Mr. Weir's estimate of Price Premium damages. If their methodology was robust, we would not expect to see such wide variation across price premium percentages for the same combination of Challenged Product and Challenged Statement.

[26] Weir Merits Report, ¶¶ 59–60.

[27] Weir Merits Report, Table 3.

*Highly Confidential - Attorneys' Eyes Only*

Weir stated that he "considered supply side factors in [his] determination of price premium damages" and that the quantity supplied for his purposes should be the actual number of units sold by the Defendant.[28]

### B.   Change in Demand Restitution Approach

18.   In Mr. Weir's Change in Demand Restitution approach, he calculates damages by multiplying a Change in Demand percentage by dollar sales.[29] The Change in Demand percentage comes from the Demand Modeling survey conducted by Mr. Gaskin (described below).[30] According to Mr. Weir, dollar sales "is the total purchases made at retail by consumers" and the change in sales at retail "would measure the total increase in purchases that Post induced consumers to make in the absence of a disclosure."[31]

19.   Mr. Gaskin's Demand Modeling Survey placed respondents into one of two groups: a test group, and a control group.[32] Respondents in the test group viewed statements about a particular Challenged Product; respondents in the control group viewed the same statements plus a warning about added sugar in the Challenged Product.[33] Each respondent was then presented with images of three different-sized bowls, asked which image matches the bowl he or she will use when eating the Challenged Product in the near future, and then asked how much cereal they plan to pour into the bowl. Each

---

[28] Weir Merits Report, ¶ 47.

[29] Weir Merits Report, ¶ 70.

[30] Weir Merits Report, ¶ 66; Gaskin Merits Report, ¶ 8.

[31] Weir Merits Report, ¶ 72.

[32] Gaskin Merits Report, ¶ 53.

[33] Gaskin Merits Report, ¶ 54.

*Highly Confidential - Attorneys' Eyes Only*

respondent was then asked about how often he or she plans to eat bowls of the cereal in the near future, and how many bowls he or she plans to eat in the near future.[34] The survey measures differences in responses between the test and control groups.[35]

20.     Mr. Gaskin conducted the Demand Modeling Survey only for Honey Bunches of Oats and Great Grains. Based on these two surveys, Mr. Gaskin calculates what he claims is the percentage change in consumption of Honey Bunches of Oats and Great Grains "had [consumers] been aware of the omitted information."[36]

21.     Mr. Weir applies the Change in Demand percentage of Honey Bunches of Oats to the total sales of Honey Bunches of Oats, Honey Bunches of Oats Granola, and Honey Bunches of Oats Whole Grain. For all the rest of the Challenged Products, he applies the Change in Demand percentage of Great Grains. Mr. Weir reports that he "believe[s] it is reasonable to assume that a similar change in demand would apply to the remaining Class products."[37]

---

[34] Gaskin Merits Report, ¶¶ 63–66.

[35] Gaskin Merits Report, ¶¶ 68–71.

[36] Gaskin Merits Report, ¶ 71.

[37] Weir Merits Report, ¶ 69, Table 4.

*Highly Confidential - Attorneys' Eyes Only*

V.   **PLAINTIFFS' EXPERTS' METHODOLOGY DOES NOT ESTIMATE A CHANGE IN MARKET PRICE CAUSED BY THE CHALLENGED STATEMENTS**

A.   **The "supply side considerations" in Mr. Weir's Price Premium analysis do not properly address supply-side factors and consequently his methodology does not measure the change in the market price of the Challenged Products, if any, caused by the Challenged Statements**

1.   *The proper measure of any change in market price is the difference between actual prices and but-for prices*

22.   To reliably estimate class-wide damages using the Price Premium approach employed by Mr. Weir, the price premium must be based on a proper measurement of a change in market price. The price premium, if any, for a particular Challenged Product is the difference between the prices Proposed Class Members actually paid for the product and the prices they would have paid in the marketplace, had the alleged misconduct not occurred (the "but-for" world). In this matter, but-for market prices are prices that members of the Proposed Class would have paid for the Challenged Products had the Challenged Statements not been displayed on the packaging.

23.   As in the actual marketplace, the interaction between supply and demand would determine prices, and quantities sold, in the but-for world. Thus, a proper analysis of but-for market prices must consider the effects of the changes to the Challenged Statements not only on consumers' demand for the Challenged Products, but also on producers' supply of those products.

24.   One method for estimating but-for prices can involve, in part, the use of a conjoint survey. A well-designed conjoint survey can be used to estimate changes in consumers'

*Highly Confidential - Attorneys' Eyes Only*

willingness-to-pay, or demand, caused by changes in the characteristics of a product.[38]

However, Mr. Gaskin's conjoint analysis—the conjoint survey, the partworths

estimation, and the "market simulation"—alone cannot determine but-for market prices

because it does not account for supply-side factors such as the responses of

manufacturers, retailers, and competitors to any change in consumer demand.

> 2. *Holding quantity supplied fixed does not account for supply-side factors in the but-for world and overstates any change in market price*

25. In the Gaskin Merits Report, Mr. Gaskin asserts that he believes, based on conversations

with Mr. Weir, that his conjoint survey "accounts for appropriate supply side factors"

since "the quantity of products used (or assumed) in the damages calculations reflects the

actual quantity of products sold during the Class Period."[39] Similarly, in the Weir Merits

Report, Mr. Weir asserts that "the historic number of units sold is a fact, and for purposes

of analyzing price premium damages, it would be illogical that the quantity supplied be

anything other than the actual number of units sold by Defendant."[40, 41]

26. The implication of Mr. Weir's argument is that, for the purpose of calculating a price

premium, the quantity supplied in the but-for world should be the same fixed amount as it

was in the actual world. In other words, despite having conducted a survey to measure

---

[38] Bryan K. Orme (2014), Getting Started with Conjoint Analysis, 3rd Edition, Research Publishers LLC, p. 88.

[39] Gaskin Merits Report, ¶ 19.

[40] Weir Merits Report, ¶ 47.

[41] Contrary to Mr. Weir's assertion, there is nothing illogical about recognizing that both price and quantity can change in response to a shift in demand. This does not mean however, as Mr. Weir suggests, that the quantity actually sold cannot be used to calculate damages. It typically is, and should be used, in the calculation of damages. Mr. Weir multiplies total actual sales (which reflects both actual prices and the *actual quantity sold*) by the price premium that Mr. Gaskin claims is attributable to the Challenged Statements. In calculating the price premium, however, it is incorrect to assume that the quantity sold in the hypothetical but-for world would necessarily be the same as the quantity sold in the actual world. In general, when demand is assumed to be different in the but-for world than it is in the actual world, the quantity sold will also be different, as discussed later in this section.

*Highly Confidential - Attorneys' Eyes Only*

consumers' responses to packaging changes, he is asserting that any measured difference in consumer behavior in the but-for world would have no effect on the quantity of Challenged Products supplied by Post and sold by retailers. This critical assumption is untested by Mr. Weir. As I describe below, it is unreasonable for Mr. Weir to assume that the quantity supplied would not change in response to a change in demand and the amount consumers are willing to pay for a product.

27.    Mr. Gaskin's and Mr. Weir's assertions that the quantity supplied in the but-for world would have been the same as the quantity sold in the actual world is nonsensical because they are based on the assumption that the quantity supplied of each Challenged Product is fixed and could not have changed in respond to changes in demand. In the field of economics, this concept of a fixed, nonresponsive quantity supplied is described as a perfectly inelastic supply curve.[42] Land is an example of a good with a perfectly inelastic supply—as demand for land changes, the price of land may change, but the amount of land available within a particular area cannot change.

28.    However, the supply curve of the Challenged Products is unlikely to be perfectly inelastic. As a product's price rises, all else equal, a typical supplier is willing to supply more of its product. When the price falls, the opposite occurs. As a result, the supply curve of a typical product is upward-sloping, which Mr. Weir acknowledged in his testimony.[43] In fact, Mr. Weir testified that the market for the Challenged Products is an "ordinary" market, where prices are set by the ordinary rules of supply and demand.[44]

---

[42] R. Glenn Hubbard and Anthony Patrick O'Brien (2017), Economics, 6th Edition, Pearson Education, Inc., p. 204.

[43] Weir March Deposition, 30:3–30:9.

[44] Weir March Deposition, 28:7–28:12.

*Highly Confidential - Attorneys' Eyes Only*

This is different from a market with inelastic supply because the quantity supplied of Challenged Products responds to changes in price.[45] Indeed, Plaintiffs themselves assert that the Challenged Statements were designed to increase both prices and quantity sold. The Second Amended Complaint states: "This strategy [including Health Claims on product packaging] is based on sophisticated consumer marketing research, and has been undertaken by Post with the purpose of increasing the *prices, sales, and market share* of its cereals."[46] This is inconsistent with Mr. Weir's assumption of a perfectly inelastic supply curve.

29.     In addition to being affected by supply, equilibrium prices in the but-for world are affected by the level of consumers' demand. A change in a product's features could change consumers' willingness-to-pay for the product, which would change the overall level of demand for the product. Based on his conjoint survey Mr. Gaskin finds that, generally, consumers are willing to pay less for a Challenged Product that does not include the Challenged Statements. Mr. Gaskin uses his estimate of that lower willingness-to-pay to calculate a "price premium" that is reflected in actual prices. In economic terms, this means the but-for price for any given quantity demanded would be lower than the actual price. That is, there is a decrease in demand (a downward shift in the demand curve) in the but-for world.

30.     If the supply curve for a Challenged Product is not perfectly inelastic, then a decrease in demand in the but-for world will cause both the equilibrium quantity supplied and the equilibrium price, which are determined jointly by the interaction of supply and demand,

---

[45] R. Glenn Hubbard and Anthony Patrick O'Brien (2017), Economics, 6th Edition, Pearson Education, Inc., p. 82.

[46] SAC, ¶ 314 (parenthetical and emphasis added).

to decline. Without properly accounting for the supply response to the change in demand in the but-for market, Mr. Gaskin's and Mr. Weir's methodology does not measure the correct but-for market price, and thus cannot be used to determine the correct price premium, if any.[47]

31.     In fact, Mr. Weir's and Mr. Gaskin's assumption of fixed supply overstates the price effect of a shift in demand. In other words, without accounting for the supply-side response, Mr. Weir and Mr. Gaskin overestimate the price premium, if any. To illustrate, in the figure below, demand curve D represents the demand for a Challenged Product *with* a particular Challenged Statement, and demand curve D' represents the assumed lower demand for the same Challenged Product *without* the particular Challenged Statement.[48] Supply curve S represents the amount of the Challenged Product that would be supplied at different prices. The equilibrium price ($P^*$) and quantity ($Q^*$)—determined by the intersection of supply curve S and demand curve D—represent the actual market price and quantity sold of the Challenged Product with the particular Challenged Statement.

---

[47] Mr. Gaskin testified that he does not attempt to predict what would actually happen in the real world. Gaskin February Deposition, 191:8–14.

[48] Note that the diagram is illustrative. It does not necessarily reflect the precise slopes and shapes of the supply and demand curves that apply in this case.

*Highly Confidential - Attorneys' Eyes Only*



32.    If demand falls and the demand curve shifts from D to D', the new equilibrium price and quantity—which is the but-for price and quantity—would be $P^1$ and $Q^1$, respectively. In other words, in the but-for world, where supply is not perfectly inelastic, the amount of the Challenged Product sold would decline from $Q^*$ to $Q^1$ and price would decline from $P^*$ to $P^1$. Thus, the appropriate price premium associated with the Challenged Statement should be measured as the difference between the actual price $P^*$ and the but-for price $P^1$.

33.    However, Mr. Weir and Mr. Gaskin assume that the supply of the Challenged Product is perfectly inelastic, or fixed at $Q^*$, and would not change with a drop in demand. In the example, this means that as demand shifts downward from D to D', the new equilibrium price would be $P^2$, where D' intersects the vertical line at $Q^*$. As a result of their

*Highly Confidential - Attorneys' Eyes Only*

implausible assumption of perfectly inelastic supply, Mr. Weir and Mr. Gaskin's price premium is overstated by the difference between $P^1$ and $P^2$.[49]

34.  The validity of Mr. Weir's and Mr. Gaskin's claim of perfectly inelastic supply can be evaluated through analysis of real-world data. As suggested by the discussion of the effect on price of a demand shift along a perfectly inelastic supply curve, the magnitude of the change in market price depends on the elasticity of supply. Specifically, when supply is inelastic, a shift in demand leads to relatively large changes in price; when supply is elastic, it leads to relatively small price changes.[50] Real-world data produced in this case are consistent with elastic, rather than inelastic, supply of the Challenged Products. (See discussion in **Section V.B** below.)

35.  As demonstrated in this section, Mr. Weir's Price Premium approach is based on a fatally flawed assumption that supply is perfectly inelastic—that the quantity supplied in the but-for world would not change from the actual quantity supplied in response to a change in consumers' willingness-to-pay. Without properly accounting for the supply response in the but-for world, Mr. Gaskin's and Mr. Weir's methodology does not correctly measure the but-for market price, and thus cannot be used to determine the correct price premium, if any, caused by the Challenged Statements.[51] Holding quantity supplied fixed at the historical level does not account for supply-side factors in the but-for world, and would

---

[49] Mr. Weir is incorrect when he states that "the price premium developed by Mr. Gaskin will be an inherently conservative measure." Mr. Weir's reasoning is that had the price not fallen for the Challenged Products in the but-for world, "many or all of the purchases would not have taken place at all" (Weir Merits Report, ¶ 49). Mr. Weir presents no evidence or analysis to support this conjecture. The actual impact on quantity sold would depend on the slopes and shapes of the supply and demand functions which Mr. Weir has not investigated.

[50] R. Glenn Hubbard and Anthony Patrick O'Brien (2017), Economics, 6th Edition, Pearson Education, Inc., p. 206.

[51] In **Section V.B** below, I discuss inconsistencies between Mr. Gaskin's and Mr. Weir's findings and price changes observed in actual sales transactions involving the Challenged Products.

*Highly Confidential - Attorneys' Eyes Only*

tend to overstate any price premium.[52] This renders Mr. Weir's Price Premium approach unreliable for the purpose of estimating damages to Proposed Class Members.

> 3. *Relying on historical prices in the survey design and simulation analysis does not account for supply-side factors or market responses in the but-for world*

36.     In the Gaskin Merits Report, Mr. Gaskin asserts that he believes, based on conversations with Mr. Weir, that his conjoint survey "accounts for appropriate supply side factors" by using a price range that "reflects the actual market prices that prevailed during the Class Period."[53] In the Weir Merits Report, Mr. Weir wrote that the prices used in Mr. Gaskin's conjoint survey "already reflect the supply side factors then extant in the marketplace."[54] However, this logic is faulty and says nothing of the role of supply-side factors in the but-for world. Although relying on historical prices in the survey design may improve the realism of the choice sets presented to survey respondents, doing so does not account for supply-side factors in the but-for world. Similarly, using historical prices in Mr. Gaskin's simulation analysis does not account for supply-side factors in the but-for world. This is because the simulation analysis is based solely on the conjoint survey results by simply transforming partworth estimates—which reflect only demand side factors—into predicted utility values and choices.

---

[52] The perfectly inelastic supply assumption is not the only reason why Mr. Gaskin's and Mr. Weir's price premium estimates are overstated. Flaws in Mr. Gaskin's Conjoint Analyses, which I do not opine on, but which I understand are addressed in Professor Hansen's expert report to be issued concurrently with this report, could also contribute to the overstatements.

[53] Gaskin Merits Report, ¶ 19.

[54] Weir Merits Report, ¶ 52.

*Highly Confidential - Attorneys' Eyes Only*

37.     Relying on historical prices also does not account for other market forces—namely the responses of competing suppliers—in the but-for world. In fact, Mr. Weir considers the market for Challenged Products "subject to competitive pressures,"[55] and Mr. Weir wrote and discussed with Mr. Gaskin that the prices of Challenged Products are "responsive to changing market forces."[56] Therefore, if the removal of the Challenged Statements reduced the relative value of the Challenged Products, it is economically reasonable to expect competitors to respond by various means including changing their prices as well. None of these potential competitive responses is considered in Mr. Gaskin's "price premium" analysis. Mr. Weir testified that the simulation analysis as Mr. Gaskin performed it does not allow for a new competitor to enter the market.[57]

38.     Further, Mr. Weir's assertion that "it is the retailers and not Defendant that set the price for the Products, and do so in a competitive environment" is irrelevant to whether Mr. Gaskin's conjoint survey accounts for supply-side factors.[58] As the most fundamental economic principles suggest, regardless of who put a price tag on the product, the market price is determined by the interaction of demand and supply.[59] Mr. Weir also acknowledged in his deposition that the market price for a product without the Challenged Statements would be set by market forces that exist in the RTE cereal

---

[55] Weir Merits Report, ¶ 53.

[56] Weir Merits Report, ¶ 52.

[57] Weir March Deposition, 172:1–11.

[58] Weir Merits Report, ¶ 48.

[59] R. Glenn Hubbard and Anthony Patrick O'Brien (2017), *Economics*, 6th Edition, Pearson Education, Inc., p. 72.

*Highly Confidential - Attorneys' Eyes Only*

market.[60] He testified that "competition and the pricing of other retailers and/or other products can have an impact on market price."[61]

39.     Thus, despite acknowledging the need to account for supply-side factors and the competitive dynamics of the market for RTE cereal, neither Mr. Gaskin nor Mr. Weir properly accounts for these factors.[62] As a result, the Plaintiffs' Price Premium damages method is untethered to the realities of the marketplace in which the Challenged Products are sold and, consequently, does not provide a reliable measure of damages.

**B.     Mr. Gaskin's and Mr. Weir's price premium estimates are inconsistent with price changes observed in actual sales transactions involving the Challenged Products**

40.     According to the reference cited by Mr. Gaskin, conjoint analysis is designed to "predict what consumers will buy when faced with the variety of brands available and changing product characteristics,"[63] and a conjoint survey cannot simulate real market results since "real market results are influenced by many factors . . . such as the effects of advertising, channel distribution, retailer assortment, shelf space, and so forth."[64] Therefore, the author interprets conjoint results "as being about consumer preference, assuming all other factors are equal," and states that "[c]onjoint results are not expected to deliver exact market forecasts."[65] Thus, when market data relevant to the issue at hand *do* exist, it is

---

[60] Weir March Deposition, 38:11–18.

[61] Weir March Deposition, 53:9–12.

[62] Both Mr. Gaskin and Mr. Weir admitted that they were not calculating any actual changes to market prices based on the inclusion of the Challenged Statements. Weir May Deposition, 252:15-253:3; Gaskin May Deposition 300:5-301:3.

[63] Bryan K. Orme (2014), Getting Started with Conjoint Analysis, 3rd Edition, Research Publishers LLC, p. 1.

[64] Bryan K. Orme (2014), Getting Started with Conjoint Analysis, 3rd Edition, Research Publishers LLC, p. 154.

[65] Bryan K. Orme (2014), Getting Started with Conjoint Analysis, 3rd Edition, Research Publishers LLC, p. 154.

*Highly Confidential - Attorneys' Eyes Only*

important to consider and analyze those data rather than relying solely on data derived from hypothetical choice experiments generated as part of a consumer survey.

41. In this matter, market data concerning actual consumers' purchases of the Challenged Products in actual retail settings do exist. In fact, Mr. Gaskin relied on such market data to choose characteristics and prices for his conjoint analysis,[66] and Mr. Weir relied on such market data to obtain sales information.[67] Furthermore, these data, which include information on both transaction prices and quantities sold, are available for many of the Challenged Products during periods when, according to Mr. Weir, the Challenged Statements appeared on the product packages and periods when they did not.[68] However, neither Mr. Weir nor Mr. Gaskin analyzes these data on actual market transactions either to validate whether the conjoint analysis generates realistic results, or to independently evaluate whether market prices differ systematically between periods when particular Challenged Statements were displayed on packaging and when they were not.

42. **Exhibits 1A** through **1F** present indexed actual prices of particular Challenged Products over time, along with indications of the time periods during which Challenged Statements were on packages according to Mr. Weir. These price charts also present implied prices using Mr. Gaskin's estimated price premium percentages.[69] Since the magnitude of Mr.

---

[66] Gaskin Merits Report, ¶ 21.

[67] Weir Merits Report, ¶ 59.

[68] This creates conditions that allow what economists call a "natural experiment." A natural experiment is an empirical study in which the individuals who are exposed to the control conditions (*e.g.,* no Challenged Statements on packages) and those who are exposed to treatment conditions (*e.g.,* Challenged Statements on packages) are determined by factors outside the control of the investigators. Economists have addressed many important questions in economics through the use of natural experiments. See, for example, Bruce D. Meyer, "Natural and Quasi-Experiments in Economics," 1994, NBER Technical Working Paper No. 170.

[69] The prices are indexed to the first available price in the data for each Challenged Product. The implied prices change based on Mr. Gaskin's price premium percentages so that an implied price rises when a Challenged Statement is added and declines when a Challenged Statement is removed. As a result, if Mr. Gaskin estimates a

*Highly Confidential - Attorneys' Eyes Only*

Weir's and Mr. Gaskin's price premium estimates are strikingly large, one would expect observed market prices to react to the addition or deletion of the Challenged Statements.[70] However, contrary to Mr. Gaskin's and Mr. Weir's findings, I do not observe any systematic relationship between the addition or deletion of the Challenged Statements and observed market prices of the Challenged Products.

43.   Take Alpha Bits for example (**Exhibit 1A**). Mr. Gaskin estimates a price premium of 10.7 percent for "Fructose," 15.0 percent for "Nutritious," and 29.7 percent for "Council Stamp." For an Alpha Bits package with all three Challenged Statements displayed at the same time, Mr. Weir's and Mr. Gaskin's analyses imply that 55.4 percent of the price is attributable to the three Challenged Statements alone.[71] The magnitude of the sum of the three price premia for the Challenged Statements implies that all of the other characteristics of the product combined (*e.g.*, the Post brand, the ingredients and nutritional value of the cereal, the flavor and texture of the cereal itself, product packaging including all other label statements, product placement on store shelves, distribution channel, and other advertising) account for less than 45 percent of the price of Alpha Bits. Given this large magnitude, if Mr. Gaskin and Mr. Weir are correct, I would expect to see a dramatic change in actual prices when the Statements were added or removed from the package. However, as shown in **Exhibit 1A**, after removal of the

---

price premium of 10 percent for a Challenged Statement on a particular Challenged Product, the implied price index would go up by 10 percentage points when the Challenged Statement was added to the Challenged Product, and the implied price index would go down by 10 percentage points when the Challenged Statement was removed from the Challenged Product.

[70] Overall, depending on the product, Mr. Weir's and Mr. Gaskin's analyses imply that between 13.0 percent and 55.4 percent of the price of the Challenged Products is attributable to the Challenged Statements displayed on packages. That is, if the Challenged Statements were added (or removed) from the packages, the price of the Challenged Products would increase (or fall) by 13.0 percent to 55.4 Percent. See Gaskin Merits Report, ¶ 48.

[71] Mr. Weir and Mr. Gaskin assume that price premia are additive. See **Section V.E** for further discussion.

*Highly Confidential - Attorneys' Eyes Only*

three Statements on March 28, 2013 (according to Mr. Weir),  as opposed to decreasing sharply as Mr. Gaskin's price premium estimate would imply. The lack of such dramatic changes in prices is consistent with elastic supply.[73]

44.    As another example, **Exhibit 1E** shows that after January 8, 2017, when, according to Mr. Weir, the "Council Stamp" and "Nutritious" Challenged Statements were removed from packages of Honeycomb Honey Oat and Corn Sweetened (12.5 ounce),[74] ███████ ████████████████████████████████████████████████ as Mr. Gaskin's price premium estimate would imply.

45.    The lack of relationship between the addition or deletion of the Challenged Statements and prices consumers actually paid for the Challenged Products—evident in **Exhibits 1A** through **1E**—holds in general for the Challenged Products and Challenged Statements. (See **Exhibit 2**.) I calculated the percentage difference in average price between periods when Mr. Weir assumed the Challenged Statements were displayed on the labels of the Challenged Products and when they were not.[75] Positive (green) values indicate that prices were higher during periods when the Challenged Statements were present, while negative (red) values indicate that prices were lower during periods when the Challenged Statements were present. If Mr. Gaskin's and Mr. Weir's conclusions are valid, we would

---

[72] Specifically, this exhibit presents the actual price of Post Alpha Bits Regular Whole Grain Oat Corn Sweetened (11.5 ounce), UPC 0884912025098. The name of this product is taken from Mr. Weir's data "Post IRI cereals - filled.xlsx."

[73] The lack of changes in prices could also be observed if, contrary to Mr. Gaskin's and Mr. Weir's expectations, willingness-to-pay and demand are unaffected by the presence or absence of the Challenged Statements.

[74] UPC for this product is 0884912111715. The name of this product is taken from Mr. Weir's data "Post IRI cereals - filled.xlsx."

[75] The analysis only for the Challenged Product and Challenged Statement combinations for which there are periods with and without the Challenged Statement on the product packaging.

expect all, or a preponderance, of the values I calculate to be positive, that is that prices would tend to be higher when the Challenged Statements were present than when they were not. As shown in **Exhibit 2** however, the evidence is inconsistent with the key conclusion of Mr. Gaskin and fundamental assumption underlying Mr. Weir's Price Premium damages calculation that, but-for the Challenged Statements, the prices that consumers would have paid for the Challenged Products would have been lower than the prices they actually paid. In fact, for approximately 47.5 percent of Challenged Product and Challenged Statement combinations, prices were actually lower during periods when the Challenged Statements were displayed on the product packaging than when they were not.[76] Again, this is inconsistent with Mr. Gaskin's and Mr. Weir's conclusions concerning Price Premium damages.

C.   **Mr. Weir does not accurately measure sales of Challenged Products with the Challenged Statements, and his sales forecast is flawed, resulting in nonsensical values**

1.   *Mr. Weir does not accurately measure sales of Challenged Products with the Challenged Statements*

46.   Mr. Weir measures sales of a Challenged Product with a particular Challenged Statement by calculating the sales of that product during the time period when the Challenged Statement is assumed to have been displayed "on the products."[77] Mr. Weir does not

---

[76] A binomial test shows that one cannot reject the null hypothesis that the share of positive percentage differences is statistically different from 50 percent. In other words, it is just as likely that the average price is lower during periods when Challenged Statements were displayed on the product packaging as it is that average price is higher during those periods.

[77] Mr Weir testified "I understand at the high level, that (the date ranges) are meant to reflect time periods when claims either were or were not made on the products. But how counsel made the determination of those ranges, I am not sure" (Weir March Deposition, 66:5–:9).

*Highly Confidential - Attorneys' Eyes Only*

explain precisely what this means. Even if one assumes the date ranges provided to Mr. Weir and shown in his Table 2 accurately identify the periods during which Challenged Products were packaged in boxes that included the Challenged Statements, some portion of sales during those periods would have been of product that was in inventory and thus would not have included the Challenged Statements.[78]

47.   For example, according to Mr. Weir, a "Whole Grains Council Stamp" statement was displayed on the packaging of Honeycomb (12.5 ounce) sold between December 1, 2012 and July 31, 2013, and again between October 1, 2014 and June 30, 2016. Mr. Weir measures sales of Honeycomb (12.5 ounce) with the "Whole Grains Council Stamp" statement as the sum of retail sales during these two periods.[79]

48.   However, this measure of sales of products with the Challenged Statements is not accurate because it does not account for the fact that packaged product can remain in inventory at various points in the supply chain for unknown periods of time before being sold to consumers. In order to illustrate, **Exhibits 3A** through **3C** present sales figures overlaid with periods during which Challenged Statements were on packages according to Mr. Weir. Consider the Honeycomb Honey Oat and Corn Sweetened (12.5 ounce) product,[80] for example. **Exhibit 3C-2** plots the monthly sales of this product between August 2012 and December 2018. Some of the sales that occurred between August 29,

---

[78] Further, I understand that it is possible that some of the packages that Mr. Weir assumed to have Challenged Statements displayed on them were never distributed to the market. "As we said when we produced labels, there's a possibility that some of the labels we produced were never in the market. Right. We produced what we had in terms of labels. So with that caveat if this is taken just looking at labels we produced and looking at dates, this is a summary of that, but it's not really a summary that this label went out in the marketplace at this time" (Deposition of Roxanne Bernstein, *Debbie Krommenhock, et al. v. Post Foods LLC*, February 14, 2019, 201:16-203:1).

[79] Weir Merits Report, ¶ 60, Table 2.

[80] UPC for this product is 0884912111715. The name of this product is taken from Mr. Weir's data "Post IRI cereals - filled.xlsx."

*Highly Confidential - Attorneys' Eyes Only*

2012 and January 8, 2017, when Mr. Weir assumes the "Whole Grains Council Stamp"

statement was displayed on the package, might be sales from inventory of the product

produced before August 29, 2012 (without the "Whole Grains Council Stamp" on the

package). As **Exhibit 3C-2** shows, ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████ Without accounting for the time products spend in inventory, Mr. Weir cannot

accurately measure the relevant sales of the Challenged Products.

### 2. *Mr. Weir's sales forecast is flawed, resulting in nonsensical values*

49.    The IRI data that Mr. Weir uses to calculate total unit sales and dollar sales contains

monthly data from 4 weeks ending August 12, 2012 through 4 weeks ending August 12,

2018,[81] and weekly data from the week ending October 7, 2018 through the week ending

December 30, 2018. Thus, the IRI data are missing for the approximately seven-week

period between August 12, 2012 and October 7, 2018, as well as for January to March of

2019. For these missing periods, Mr. Weir estimates a time series regression to forecast

sales.[82]

50.    There are at least two problems with Mr. Weir's forecast. First, Mr. Weir mixes monthly

and weekly data in his sales forecast. Specifically, he estimates a monthly forecasting

model using monthly and weekly sales data. The use of inconsistent time intervals in

such a forecasting model is not an appropriate statistical technique. Second, for January

---

[81] Instead of reporting data in each calendar month, IRI uses four weeks periods to define "months."

[82] "A seven week period from August into October 2018 was omitted from the Production. I have forecasted sales
for this period" (Weir Merits Report, footnote 41). "I conducted a Newey-West time series regression forecast with
seasonal controls to project sales for the period January-March 2019" (Weir Merits Report, ¶ 59).

*Highly Confidential - Attorneys' Eyes Only*

to March 2019, he attempts to forecast weekly values, using a model that was estimated (mostly) using monthly data—another inappropriate statistical technique.

51.     To illustrate the problem, **Exhibit 4A** plots Mr. Weir's output data for Great Grains Regular Multi Grain Box (14 ounce).[83] The blue solid line represents actual values; while red dots represent Mr. Weir's forecasted values. ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████ Mr. Weir uses these data in estimating his forecasting model. The forecasted sales in 2019 are on a weekly basis, and show a strong upward trend. This is because Mr. Weir forecasts weekly values using, in part, monthly averages. Converting the forecasted weekly sales to monthly equivalent, the forecasted sales in the four weeks of March 2019 is well over $300,000—a value more than ████████████████████████████████████████████ ████████████

52.     Overstatement of sales is not the only problem with Mr. Weir's method. For some products, Mr. Weir's regression model produces negative dollar sales. (See **Exhibits 4B** and **4C**.) These negative dollar sales are not the result of a deliberate effort by Mr. Weir to provide conservative estimates, but rather the result of his use of an incorrectly specified forecasting model.

---

[83] The UPC for this product is 0884912002371. The name of this product is taken from Mr. Weir's data "Post IRI cereals - filled.xlsx."

*Highly Confidential - Attorneys' Eyes Only*

53.    By not accounting for the difference in reporting frequency in the underlying data, Mr.
Weir's forecasted sales values are nonsensical and cannot be relied on for a damages
calculation. Removing these unreliable forecasted sales values would reduce the total
dollar sales reported in Table 1 of the Weir Merits Report by $111.7 million, or 8.3
percent.

### D.    Mr. Weir disregards Mr. Gaskin's adjustment for bias attributable to the graphic form of the Whole Grains Council Stamp

54.    Mr. Gaskin "note[s] that the Whole Grains Council Stamp consistently showed the
largest premium among the affirmative misrepresentations for each cereal, where it was
present."[84] According to Mr. Gaskin, the large price premium is likely due to "the use of
a graphic of the [Whole Grains Council Stamp] in the initial description of the attributes
and levels."[85] Recognizing the possible bias introduced by the graphic presentation of the
Whole Grains Council Stamp,[86] Mr. Gaskin provided an adjusted price premium for the
Whole Grains Council Stamp, reducing the price premium estimates by a factor of
between 1.6 and 3.[87] However, Mr. Weir does not incorporate these adjusted price premia
in his damages calculation. Instead, he uses the higher value without Mr. Gaskin's
adjustment. Without endorsing Mr. Gaskin's and Mr. Weir's methodology, if Mr. Weir
had used the adjusted price premium presented by Mr. Gaskin, his calculation of price

---

[84] Gaskin Merits Report, ¶ 49.

[85] Gaskin Merits Report, ¶ 48, Exhibit C-7.

[86] Gaskin Merits Report, footnote 49.

[87] Gaskin Merits Report, pp. 33–35, footnote 49.

premium damages would have been reduced by $24.5 million, or 35.3 percent. See **Exhibit 5**.[88]

### E.    Mr. Gaskin's own analyses show that his Challenged Statement price premia are likely not additive

55.    Mr. Gaskin's and Mr. Weir's damages methodology is based on the assumption that the price premia of the Challenged Statements are additive. That is, if two Challenged Statements are displayed on the package at the same time, the price premium associated with the two Challenged Statements would be the sum of the price premia of each Challenged Statement. However, Mr. Gaskin's own analyses show that the price premia of the Challenged Statements are likely *not* additive.

56.    For some Challenged Statements, Mr. Gaskin's Conjoint Survey tested each of the Challenged Statements separately, as well as pairs of the Challenged Statements jointly (*i.e.*, two Challenged Statements are presented to survey respondents at the same time).[89] For example, for Great Grains, Mr. Gaskin tested "Field to Bowl," "Council Stamp," and "Field to Bowl AND Council Stamp."[90] Using responses from the survey, Mr. Gaskin estimated a price premium for each of the individual Statements, as well as the price premia of the concurrent Statements.[91] **Exhibit 6A** summarizes these price premia estimates. It shows that for Great Grains, the price premium estimated by Mr. Gaskin is

---

[88] Mr. Weir's calculation of price premium damages would be further reduced if unreliable forecasted sales were removed (see **Section V.C.2**).

[89] Gaskin Merits Report, Exhibit X.

[90] Gaskin Merits Report, Exhibit X-18.

[91] Gaskin Merits Report, Exhibit K.

*Highly Confidential - Attorneys' Eyes Only*

5.79 percent for "Field to Bowl" and 6.9 percent for "Council Stamp" when these two Statements were analyzed separately.

57.     When analyzed concurrently, the price premium estimated by Mr. Gaskin for "Field to Bowl AND Council Stamp" is 10.24 percent—2.45 percentage points lower than the sum of the two individual price premia. In fact, the price premia of the concurrent Statements tested by Mr. Gaskin are typically lower than the sum of the price premia of two separate Statements, suggesting that the price premia of the Challenged Statements are likely *not* additive.[92] Mr. Gaskin himself testified that his analyses demonstrate a diminishing returns effect from having multiple statements communicating a similar topic.[93] Mr. Weir's damages calculation does not account for this diminishing returns effect.

58.     For the damages calculation, it is reasonable to assume that for Challenged Products with both Challenged Statements displayed on the package, the relevant price premium should be the price premium of the concurrent Statements. Using Mr. Gaskin's own price premium estimates of the concurrent Statements would reduce Mr. Weir's damages calculation by $7.1 million, or 17.9 percent of damages derived from products and sales periods with concurrent Statements tested by Mr. Gaskin.[94] See **Exhibit 6A**.

59.     Further, one would expect the bias attributable to the graphic presentation of the Whole Grains Council Stamp would also affect the price premium estimates of the concurrent

---

[92] Mr. Gaskin did not evaluate concurrent Statements for all of the Challenged Statements. Had Mr. Gaskin tested all the Challenged Statements concurrently, and the same pattern held, the price premia for the Challenged Statements would likely be smaller than those presented in the Gaskin Merits Report.

[93] Gaskin May Deposition, 309:22–310:25, 312:15–24, 316:12–20.

[94] Mr. Gaskin only tested 11 pairs of Challenged Statements. However, in his damages calculation Mr. Weir adds price premia for many more combinations of statements (*i.e.*, another 24 percent of sales used in the damages calculation have 2 or more statements and not one of the 11 tested combinations of statements).

*Highly Confidential - Attorneys' Eyes Only*

Statements. I estimate that adjusting for both concurrent Statements tested by Mr. Gaskin and the Council Stamp bias would reduce Mr. Weir's damages calculation by $21.0 million, or 53.3 percent of damages derived from products and sales periods with concurrent Statements tested by Mr. Gaskin.[95] See **Exhibit 6B**.

> ### F.   Mr. Gaskin and Mr. Weir calculate a single price premium percentage for each Challenged Product/Challenged Statement combination but have not tested whether any such price premium percentage is uniform across all transactions

60.   Mr. Weir calculates Price Premium damages to class members by multiplying a *single* Price Premium Factor percentage for each Challenged Product/Challenged Statement combination—provided by Mr. Gaskin—by total dollar sales for each Challenged Product/Challenged Statement combination during the Class Period.[96] Mr. Weir's and Mr. Gaskin's method assumes that this *single* Price Premium Factor can be applied equally to all purchases of the Challenged Products despite wide variation in prices paid by members of the Proposed Class.[97]

61.   However, Mr. Weir has not tested whether this assumption is valid. Mr. Weir testified that "I have not endeavored to see how the price premium would have fluctuated across [time, geography and sales channel]."[98] There is clear evidence that the Challenged Products exhibit considerable price variation across time, promotional activity,

---

[95] Mr. Weir's calculation of price premium damages would be further reduced if unreliable forecasted sales were removed (see **Section V.C.2**).

[96] "So I'm very comfortable using probably a multiple numbers . . . for different claims but a single premium to cover time or geography" (Weir March Deposition, 159:8–10). See also Weir May Deposition, 289:16–292:17.

[97] Mr. Weir acknowledges that prices may vary across retailers based on many different factors, such as a retailer's customer base, their particular market, past pricing history, the condition of the product at point of sale, the retailer's relationship with its suppliers, promotions, and the prices set by competitors (Weir May Deposition, 244:6-247:11).

[98] Weir March Deposition, 160:15-17.

distribution channel, and package size. This variation, and more fundamentally, the underlying factors that cause this variation, suggest that, like prices themselves, any price premium, or changes in market price, could also vary across these dimensions.

62.     **Exhibits 7A** through **7C** show the overall average unit price for three of the Challenged Products—Honey Bunches of Oats Honey Roasted (18 ounce), Great Grains Raisins Dates & Pecans (16 ounce), and Honeycomb (12.5 ounce).[99] ███████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

Plaintiffs' experts provide no reason to believe that the same Price Premium Factor, if any, would apply for the varying price over time.

63.     **Exhibits 8A** through **8C** show—for Honey Bunches of Oats Honey Roasted, Great Grains Raisins, Dates & Pecans, and Honeycomb—███████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████ As shown in **Exhibits 9A** through **9C,** ███████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████ Plaintiffs' experts provide no reason to believe that the

---

[99] In **Exhibits 7** through **11**, I present data on three products.  These three products are the Challenged Products with the most sales as measured by total unit sales in California for the "Multi Outlet" retailer grouping in the IRI Data: Honey Bunches of Oats Honey Roasted (18 ounce) (UPC: 0884912014261), Great Grains Raisins, Dates & Pecans (16 ounce) (UPC: 0884912126111), and Honeycomb (12.5 ounce) (UPC: 0884912111711).  I have used data on sales in California when available, and otherwise have used data on nationwide sales.

same Price Premium Factor, if any, would apply for both base prices and promotional prices.

64. **Exhibits 10A** through **10C** present, for the same three products, average base prices of products sold through different distribution channels. Distribution channels are represented by different types of stores at which consumers purchased the Challenged Products. Post sells cereals, and the Challenged Products in particular, through a wide range of distribution channels including grocery stores, mass merchandisers, supercenters, club stores, natural/specialty stores, and drug stores. **Exhibit 10A** shows that, for example, the average base prices of Honey Bunches of Oats Honey Roasted (18 ounce) sold in drug stores (U.S. Drug Stores in the IRI data) can exceed average base prices at Walmart by as much as 97 percent. Plaintiffs' experts provide no reason to believe that the same Price Premium Factor, if any, would apply across these different channels.

65. Lastly, **Exhibits 11A** and **11B** present average base prices of Honey Bunches of Oats Honey Roasted and Honeycomb across different package sizes.[100] There is considerable variation across this dimension, too. Of course, some of the differences in prices are due to paying for more of the product, but the simple point is that different package sizes lead to different prices. Plaintiffs' experts provide no reason to believe that the same Price Premium Factor, if any, would apply for the varying price across package sizes.

66. All of this variation in prices—across time, whether sold on promotion or not, across distribution channel, and across package size—shows that there are many different prices that consumers pay for the same product. To the extent that time, promotion, distribution

---

[100] There is only one package size for Great Grains Raisins, Dates & Pecans (16 ounce) in the IRI data.

*Highly Confidential - Attorneys' Eyes Only*

channel, or package size affects the Price Premium Factor percentage calculated by Mr.

Mr. Gaskin and used by Mr. Weir, the calculated damages under Plaintiffs' Price

Premium approach will not accurately reflect actual harm to Proposed Class Members.

This introduces another potential source of error in Mr. Weir's Price Premium damages

calculation. Some Proposed Class Members may be over-compensated, while other

Proposed Class Members may be under-compensated.

## VI.   MR. WEIR'S DAMAGES CALCULATION BASED ON THE "DEMAND MODELING SURVEY" FAILS TO MEASURE HARM TO PROPOSED CLASS MEMBERS, AND THE CALCULATION IS BASELESS AND FLAWED

### A.   Mr. Weir's Damages calculation based on the "Demand Modeling Survey" fails to measure harm to Proposed Class Members

67.   Plaintiffs assert a deceptive omission theory of liability, namely that, "Post necessarily

and intentionally . . . de-emphasizes, hides, obscures, and otherwise omits material

information regarding the products' detrimental nutrient content, and specifically their

high added sugar content."[101] Plaintiffs assert that Post's practices were "undertaken . . .

with the purpose of increasing the prices, sales, and market share of its cereals."[102]

68.   Mr. Weir's Change in Demand approach purports to measure damages under this theory

of liability. Specifically, the Change in Demand approach attempts to measure the

"amount of additional purchases—increased demand—the Class made as a result of

Post's use of the Health Claims without a disclosure."[103] Mr. Weir's Change in Demand

approach relies on Mr. Gaskin's Demand Modeling Survey, which attempts to measure

---

[101] SAC, ¶ 247.

[102] SAC, ¶ 314.

[103] Weir Merits Report, ¶ 25.

*Highly Confidential - Attorneys' Eyes Only*

the impact of not displaying a warning message on the Challenged Product packaging. It appears that the Change in Demand approach, as implemented by Mr. Weir, is intended to measure restitutionary disgorgement (*i.e.*, Plaintiffs' loss).

69. While apparently intended to measure restitutionary disgorgement, neither Mr. Weir nor Mr. Weir explain how the approach relates to Plaintiffs' losses. According to Mr. Gaskin, the demand survey yields estimates of the amount of Challenged Products that consumers actually purchased, but would have *not* purchased, had they been sufficiently warned. Mr. Weir calculates damages from the change in demand using the following formula:

"%Change in Demand X $Units Sold = Damages."[104]

However, this calculation assumes without basis that the incremental quantity, if any, of the Challenged Products consumed by Proposed Class Members due to the failure to include Mr. Gaskin's warning label provided no value to consumers. A proper measure of economic harm would need to offset the measure of damages calculated by Mr. Weir by the value of the products to those who consumed them. Failing to do so would provide a windfall to the Plaintiffs.

70. Furthermore, to the extent the approach is intended to measure Plaintiffs' loss, individual inquiry is required. For example, different consumers would have different values (*i.e.*, derive different levels of utility) from consuming the same product.

71. Also, different consumers would be affected differently by the warning label, and therefore the change in demand would vary by individual. This can be demonstrated by

---

[104] Weir Merits Report, ¶ 70.

*Highly Confidential - Attorneys' Eyes Only*

Mr. Gaskin's own demand survey. Using Mr. Gaskin's demand survey responses, I calculate the change in demand percentage across gender, and across different age groups. **Exhibit 12A** shows that the percent decline in Great Grains consumption—as defined by Mr. Gaskin—is larger for female respondents than for male respondents, while the percent decline in Honey Bunches of Oats is smaller for female respondents than for male respondents. **Exhibit 12B** shows large variation in the percentage decline in consumption across age groups, both for Great Grains and for Honey Bunches of Oats. Especially for older respondents of the Honey Bunches of Oats survey (*i.e.*, age 50 and above), those exposed to the warning message (the control group) chose to consume a similar amount or more of Honey Bunches of Oats than those not exposed to the warning message (the test group). Neither Mr. Gaskin nor Mr. Weir explain how the Demand Restitution approach could calculate damages for particular members, or particular groups of members, of the Proposed Class or on a class-wide basis.[105] To the extent that gender and age affects the change in demand percentage calculated by Mr. Gaskin and used by Mr. Weir, the calculated damages under Plaintiffs' Change in Demand approach will not accurately reflect actual harm to Proposed Class Members. Some Proposed Class Members may be over-compensated, while other Proposed Class Members may be under-compensated.

---

[105] Mr. Gaskin admitted that he was not attempting to make predictions about change in demand on an individual person level (Gaskin May Deposition, 388:1-7).

*Highly Confidential - Attorneys' Eyes Only*

**B.    Mr. Gaskin's Demand Survey implies annual sales that are significantly greater than actual sales**

72.    Mr. Gaskin's Demand Survey asked respondents about their cereal consumption in the "near future."[106] However, Mr. Gaskin did not clearly define what "near future" meant, nor did he provide any justification for extrapolating the indicated level of consumption within the "near future" to the entire Class Period.[107] There are many reasons why such extrapolation may be inappropriate. For example, respondents to Mr. Gaskin's Demand Surveys on average report purchasing 5.7 different cereals, among the 12 tested cereals.[108] Thus, consumers might alternate between different Challenged Products, or purchase other products from other manufacturers over time. Consequently, the consumption of a Challenged Product in the "near future" does not necessarily reflect a consumer's actual or expected consumption of that product throughout the Class Period.

73.    Whatever the cause, Mr. Gaskin's demand survey implies annual sales that are significantly greater than actual annual sales of the Challenged Products. Take Great Grains for example. Mr. Gaskin estimates that on average consumers not exposed to the warning label (the test group) would consume 6.99 cups per week, or 363.51 cups per year. Based on the nutrition label of Great Grains Raisins, Dates, & Pecans, one cup corresponds to about 2.7 ounces of the product.[109] Thus, Mr. Gaskin's analyses would

---

[106] Gaskin Merits Report, ¶ 60; Gaskin May Deposition, 374:1–25.

[107] Mr. Gaskin testified that the extrapolated level of consumption is not "a perfect measure" (Gaskin May Deposition, 375:9–16).

[108] S7 of Mr. Gaskin's Demand Surveys asked respondents "Which, if any, types of cereal have you purchased in the past 3 months?" Respondents can choose all the applicable options among 12 different cereals, or "None of the above." (Gaskin Merits Report, Exhibit D-13).

[109] A serving of Great Grains is equal to 3/4 cup, and there are 8 servings per 16-ounce (weight) package. 2.7 ounces per cup = 2 ounces per serving / ¾ cups per serving ("Great Grains Cereal," available at https://www.postconsumerbrands.com/great-grains/).

imply annual spending of approximately $223.07 per consumer on Great Grains in 2017.[110] With 2.84 million U.S. consumers of Great Grains in the same year,[111] Mr. Gaskin's analyses implies $633.5 million in sales of Great Grains in 2017, or an estimated $61.0 million in California.[112] ███████████████████████████

████████████████████████████████████████████████

████████████████████████

74.     This material difference between the implied level of consumption and the actual level of consumption of the Challenged Product raises serious concerns about the reliability of Mr. Gaskin's Demand Survey and the use of his results to calculate damages.[113]

###     C.     Mr. Weir's Change in Demand Damages Calculation is baseless and flawed

75.     As described in **Section IV.B**, Mr. Gaskin conducts his Demand Survey for only two of the nine Challenged Products. Nevertheless, Mr. Weir calculates Change in Demand Damages for all of the Challenged Products. Neither Mr. Weir nor Mr. Gaskin provide

---

[110] $223.07 = 363.51 cups per year × 2.7 ounces (weight) per cup × approximately $0.23 average price per ounce (weight). Average price per ounce equals total dollar sales of all Great Grains divided by total ounces sold of all Great Grains in California during periods ending in 2017. Total ounces sold is calculated by multiplying ounces per unit and units sold for each UPC and then summing across all UPCs of Great Grains.

[111] 2.84 million is conservative compared to the prior three years. Statista; "U.S. population: Most eaten brands of breakfast cereal (cold) within 7 days from 2014 to 2018," September 2018, available at https://www.statista.com/statistics/282000/us-households-brands-of-breakfast-cereal-cold-eaten-within-7-days-trend/.

[112] $633.5 million = $223.07 × 2.84 million. The calculation follows Mr. Gaskin's assumption that estimates from any point of time observation can be extrapolated to a year.

$61.0 million = $633.5 million × 9.63%. According to IRI, RTE cereal sales was $8.66 billion in 2017 for the U.S., and $0.83 billion for California, implying a 9.63 percent California share. Statista, "Ready-to-eat cereal sales in the United States in 2014 to 2017 (in billion U.S. dollars)," available at https://www.statista.com/statistics/407906/us-ready-to-eat-cereal-sales/; IRI data, using sales periods ending in 2017. This calculation is conservative since California represents 12 percent of the U.S. population, and 14 percent of U.S. GDP.

[113] Mr. Gaskin testified that he was not aware of any other literature that used the method he used in the Demand Surveys (Gaskin May Deposition, 371:16–372:7).

*Highly Confidential - Attorneys' Eyes Only*

any valid justification for applying the change in demand percentages calculated for the two tested products to the seven untested products. As discussed above (**Section VI.A**), the change in demand percentages calculated by Mr. Gaskin for the tested products are not uniform across all respondents, but rather are correlated with factors such as respondents' age and gender. To the extent that consumers of the untested products differ along these, and potentially other, dimensions from consumers of the tested products, there is no basis to assume that the percentages calculated by Mr. Gaskin would apply to the untested products. For example, it is my understanding that Waffle Crisp, Honey Comb, and Alpha Bits—three of the untested products—are considered children's cereals and that consumers of these products are younger than consumers of the tested products.[114] Without conducting Demand Surveys and properly accounting for the factors affecting the change in demand percentages, Mr. Weir's Change in Demand Damages calculation for the untested Challenged Products is baseless. Excluding damages on untested products from Mr. Weir's calculations reduces his estimate of Change in Demand Damages by $12.9 million, or 9.2 percent.

76.     In fact, Mr. Gaskin recognizes that the warning message might have a different effect on the consumption behavior of children under age 18 than on consumption of those who are older.[115] To account for the different impact, Mr. Gaskin presents an adjusted estimate of the change in demand percentage for Honey Bunches of Oats. To calculate the adjustment, Mr. Gaskin multiplies the change in demand percentage by the percentage of

---

[114] For example, only 52 percent of Honeycomb consumers are age 18 or older. See Age Profile (Krom_POST00058304-334 at 327).

[115] Gaskin Merits Report, ¶ 71.

*Highly Confidential - Attorneys' Eyes Only*

consumers of the product ages 18 or older.[116] However, Mr. Weir does not incorporate this adjusted change in demand percentage in his damages calculation. Without endorsing Mr. Gaskin's nor Mr. Weir's methodology, if Mr. Weir had followed Mr. Gaskin's adjustment method, his calculation of damages would have been reduced by $22.9 million, or 16.3 percent. (See **Exhibit 13**.[117]) Adjusting Mr. Weir's Change in Demand Damages by both excluding untested products and accounting for those under 18 years of age reduces Mr. Weir's damages by $32.4 million or 23.0 percent.

### D. Including only California respondents to Mr. Gaskin's Demand Survey reduces Mr. Weir's Change in Demand Damages to zero

77.     As described above, the Proposed Class in this matter is comprised of persons in California who purchased the Challenged Products bearing the Challenged Statements during the proposed Class Period. However, in conducting his Demand Survey, Mr. Gaskin did not limit respondents to those in California, but rather used a nationwide sample.[118] Mr. Gaskin does not provide any justification as to why the consumption behavior of the proposed class of California consumers can be appropriately approximated using a nationwide sample, nor does he report the results of any tests that he undertook to confirm that his sample was representative of members of the Proposed Class.

---

[116] Gaskin Merits Report, ¶ 71.

[117] I did not make adjustment for Challenged Products for which I was not provided with percentages of consumers under age 18 (*i.e.*, Great Grains, Waffle Crisp, and Alpha Bits). Thus, the reduction of Mr. Weir's damages would have been larger if these products were included.

[118] Gaskin Merits Report, ¶ 57.

*Highly Confidential - Attorneys' Eyes Only*

78.   **Exhibit 14** presents estimates of the percent decline in Honey Bunches of Oats and in Great Grains using only California respondents to Mr. Gaskin's Demand Survey. I find that, in both the Honey Bunches of Oats survey and the Great Grains survey, there are no statistically significant differences in responses between those exposed to the warning message (the control group) and those not exposed to the warning message (the test group). This means that, based upon responses of California consumers to Mr. Gaskin's Demand Survey, it is not reasonable to conclude that consumption of the Challenged Products would have been reduced due to exposure to the warning message, indicating that Demand Damages are zero.

## VII.   PLAINTIFFS' EXPERTS DID NOT ADDRESS HOW CLASS MEMBERS WOULD BE IDENTIFIED OR HOW DAMAGES WOULD BE DETERMINED FOR INDIVIDUAL PROPOSED CLASS MEMBERS

79.   Neither Mr. Gaskin nor Mr. Weir has presented a method to ascertain who is a member of the Proposed Class, that is, a method for identifying who purchased the Challenged Products with the Challenged Statements. This is a particularly important issue in this case, in part, because particular Challenged Statements were allegedly included on packages during only parts of the proposed Class Period. Further, because products remain in inventory for some unknown period of time before being sold at retail stores to consumers, even if it were known when a Challenged Statement was included on packages and when a particular consumer made a purchase, it is not, in general, possible to say whether the package they purchased contained the Challenged Statement. Plaintiffs' failure to propose a method of ascertaining who is a member of the Proposed Class will be compounded if the Defendant is found to be not liable for some of the Challenged Statements.

*Highly Confidential - Attorneys' Eyes Only*

80.     For example, neither Mr. Gaskin nor Mr. Weir has presented a method to ascertain which Proposed Class Members bought Honeycomb before its Challenged Statements were discontinued on January 8, 2017.[119] As another example, according to the information provided in Table 2 of the Weir Merits Report, three different packages of Honey Bunches of Oats Granola are Challenged Products, each of which has a "Whole Grains Council Stamp" displayed on the package during different time periods.[120] Assuming that Post is found liable for inclusion of the "Whole Grains Council Stamp" on packaging, among consumers who purchased Honey Bunches of Oats Granola between February and May of 2013, those who purchased Honey Bunches of Oats Honey Cinnamon Granola (UPC 0884912002020) would be damaged, while those who purchased Honey Bunches of Oats Honey Roasted Granola (UPC 0884912003416) would *not* be damaged. Neither Mr. Gaskin nor Mr. Weir has presented a method to ascertain class members who purchased the Challenged Product with a particular UPC during a specific time period.

81.     Neither Mr. Weir nor Mr. Gaskin presented a method to identify damages particular to each Proposed Class Member. Even if Mr. Weir is able to calculate an aggregate damages number applicable to the entire Proposed Class, he has provided no method by which those damages will be allocated to individual purchasers in a way that compensates for alleged harm to each individual. Such a method would need to identify the particular price that each consumer paid for each purchase of a Challenged Product with the

---

[119] Weir Merits Report, Table 2.

[120] UPC 0884912002020 has "Whole Grains Council Stamp" displayed between February 3, 2013 and March 31, 2019. UPC 0884912003416 has "Whole Grains Council Stamp" displayed between May 4, 2013 and March 31, 2019. UPC 0884912003423 has "Whole Grains Council Stamp" displayed between March 28, 2013 and March 31, 2019.

*Highly Confidential - Attorneys' Eyes Only*

Challenged Statements. The prices that individuals pay is not uniform—members of the Proposed Class paid a variety of prices depending on factors such as promotional pricing, time, geographic location, distribution channel, and package size. Identifying which price an individual paid will require individualized inquiry.[121]

82.  Lastly, even with individualized inquiry, it is difficult to identify relevant information to determine damages for the two Named Plaintiffs, let alone on a class-wide basis for other Proposed Class Members. For example, when asked about the purchase of Great Grains, Plaintiff Hadley testified that he could not remember which varieties of Great Grains he purchased, or from which stores he purchased.[122] Even though Mr. Hadley provided answers to interrogatories stating that he purchased Challenged Products from Safeway, the receipts he submitted from Safeway did not contain any record of such purchases.[123]

83.  Similarly, Plaintiff Krommenhock testified that she purchased the Challenged Products from a combination of stores, including Walmart, Safeway, Lucky's California, and Grocery Outlet.[124] She could not remember how much she paid for each Challenged Product, and testified that prices varied between $2 and $4, depending on the store from which she purchased.[125] Neither Mr. Weir nor Mr. Gaskin has presented any method to determine damages specific to the two Named Plaintiffs.[126] Proving purchases and

---

[121] See **Exhibit 7** through **Exhibit 11**.

[122] Deposition of Stephen Hadley, *Debbie Krommenhock, et al. v. Post Foods LLC*, January 4, 2019 ("Hadley Deposition"), 161:21–163:23.

[123] Hadley Deposition, 180:16–185:19.

[124] Deposition of Debbie Krommenhock, *Debbie Krommenhock, et al. v. Post Foods LLC*, December 20, 2018 ("Krommenhock Deposition"), 169:15–170:5.

[125] Krommenhock Deposition, 178:25–179:11.

[126] Mr. Weir testified that he has not been asked to calculate individual damages (Weir March Deposition, 153:4–:7).

substantiating prices at which purchases were made will likely be very difficult, if not impossible, for Proposed Class Members, as it is for the Named Plaintiffs.

## VIII.   CONCLUSION

84.   Mr. Weir and Mr. Gaskin failed to use an appropriate method to calculate damages on a class-wide basis. The Price Premium approach fails to account for the supply response in the but-for world, and overstates any price premium associated with the Challenged Statements. Contrary to Mr. Gaskin's and Mr. Weir's findings, there is no systematic relationship between the addition or deletion of the Challenged Statements and the prices that consumers paid for the Challenged Products. Mr. Weir does not accurately measure sales of the Challenged Products with the Challenged Statements. Also, his sales forecast is flawed, resulting in nonsensical values and cannot be relied on for damages calculation. Mr. Weir disregards Mr. Gaskin's adjustment for bias attributable to his use of the graphic form of the Whole Grains Council Stamp. Mr. Gaskin's own analyses suggest that the price premia of the Challenged Statements are likely *not* additive as Mr. Gaskin assumes. Mr. Gaskin and Mr. Weir did not test whether the price premium, if any, would be uniform across all transactions.

85.   The Demand Restitution approach failed to measure unjust enrichment to defendants. Mr. Gaskin's Demand Survey implies an annual level of sales that is significantly greater than actual sales. Mr. Gaskin conducts his Demand Survey for only two of the nine Challenged Products. Nevertheless, Mr. Weir purports to calculate Change in Demand Damages for all of the Challenged Products. Mr. Weir does not incorporate Mr. Gaskin's adjusted price premium for consumers younger than age 18 in his damages calculation. When respondents to Mr. Gaskin's Demand Survey are limited to California residents,

*Highly Confidential - Attorneys' Eyes Only*

Demand Damages are reduced to zero. Finally, neither Mr. Weir nor Mr. Gaskin addressed how class members would be ascertained or how damages would be determined for individual Proposed Class Members.

* * *

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Signed on the 24th day of May, 2019 in Los Angeles, California.

_____

Bruce A. Strombom, Ph.D

48

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 1A**
**Indexed Actual Prices Compared to Implied Prices Based on Mr. Gaskin's Estimated Price Premia**
**Alpha Bits**
*July 2012 – April 2014*



Notes:
[1] Mr. Weir assumes the Challenged Statements were displayed during the following period: 08/01/2012–03/31/2013 (Council Stamp, Fructose, Nutritious) for "Post Alpha Bits Regular Whole Grain Ot Crn Box Sweetened 11 5 Oz" (UPC: 0884912025098).
[2] Actual Price is the average non–promotional price indexed to the earliest price in the data for this product (08/19/2012).
[3] Mr. Gaskin estimates price premia of 29.7% for Council Stamp, 15.0% for Nutritious, and 10.7% for Fructose. The Implied Price Index equals 1, until a Challenged Statement is added or removed. When a Challenged Statement is removed, the Implied Price decreases by the price premium percentage of that Challenged Statement. When a Challenged Statement is added, the Implied Price increases by the price premium percentage of that Challenged Statement. If the Challenged Statement was on the package at the beginning of the Class Period (August 29, 2012), I assume no change in the Implied Price on August 29, 2012.
Sources:
Gaskin Merits Report; Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 1B**
**Indexed Actual Prices Compared to Implied Prices Based on Mr. Gaskin's Estimated Price Premia**
**Bran Flakes**
*July 2012 – December 2018*



Actual Price — Implied Price

Notes:
[1] Mr. Weir assumes the Challenged Statements were displayed during the following periods: 10/01/2012–03/31/2019 (Council Stamp, Fiber/Digestive), 01/01/2013–03/31/2019 (Fiber/Weight, No Fructose, Whole Grain) for "Post Bran Flakes Toasted Whl Grn Wht Wht Brn Box 16 Oz" (UPC: 0884912113139).
[2] Actual Price is the average non–promotional price indexed to the earliest price in the data for this product (08/19/2012).
[3] Mr. Gaskin estimates price premia of 12.5% for Council Stamp, 9.2% for Fiber/Digestive, 8.1% for Fiber/Weight, 7.7% for No Fructose, and 7.7% for Whole Grain. The Implied Price Index equals 1, until a Challenged Statement is added or removed. When a Challenged Statement is removed, the Implied Price decreases by the price premium percentage of that Challenged Statement. When a Challenged Statement is added, the Implied Price increases by the price premium percentage of that Challenged Statement. If the Challenged Statement was on the package at the beginning of the Class Period (August 29, 2012), I assume no change in the Implied Price on August 29, 2012.
[4] Gaps in Actual Price indicate that IRI data is missing for that month.
Sources:
Gaskin Merits Report; Production of Weir Merits Report.

## Exhibit 1C
## Indexed Actual Prices Compared to Implied Prices Based on Mr. Gaskin's Estimated Price Premia
## Great Grains
*July 2012 – December 2018*



Notes:
[1] Mr. Weir assumes the Challenged Statements were displayed during the following periods: 08/01/2012–03/31/2017 (Field to Bowl, Less Processed, Why Less Processed),
08/01/2012–03/31/2019 (Council Stamp) for "Post Great Grains Regular Multi Grain Box 14 Oz" (UPC: 0884912002372).
[2] Actual Price is the average non–promotional price indexed to the earliest price in the data for this product (08/19/2012).
[3] Mr. Gaskin estimates price premia of 6.9% for Council Stamp, 5.8% for Field to Bowl, 1.8% for Why Less Processed, and 0.0% for Less Processed. The Implied Price Index
equals 1, until a Challenged Statement is added or removed. When a Challenged Statement is removed, the Implied Price decreases by the price premium percentage of that
Challenged Statement. When a Challenged Statement is added, the Implied Price increases by the price premium percentage of that Challenged Statement. If the Challenged
Statement was on the package at the beginning of the Class Period (August 29, 2012), I assume no change in the Implied Price on August 29, 2012.
[4] Gaps in Actual Price indicate that IRI data is missing for that month.
Sources:
Gaskin Merits Report; Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 1D**
**Indexed Actual Prices Compared to Implied Prices Based on Mr. Gaskin's Estimated Price Premia**
**HBO Granola**
*May 2013 – December 2018*



Notes:
[1] Mr. Weir assumes the Challenged Statements were displayed during the following periods: 05/01/2013–03/31/2019 (Council Stamp), 03/01/2014–03/31/2019 (Wholesome) for "Post Honey Bunches Of Oats Honey Roasted Granola Resealable Plastc Bg 11 Oz" (UPC: 0884912003416).
[2] Actual Price is the average non–promotional price indexed to the earliest price in the data for this product (06/23/2013).
[3] Mr. Gaskin estimates price premia of 9.3% for Council Stamp, and 4.5% for Wholesome. The Implied Price Index equals 1, until a Challenged Statement is added or removed. When a Challenged Statement is removed, the Implied Price decreases by the price premium percentage of that Challenged Statement. When a Challenged Statement is added, the Implied Price increases by the price premium percentage of that Challenged Statement. If the Challenged Statement was on the package at the beginning of the Class Period (August 29, 2012), I assume no change in the Implied Price on August 29, 2012.
[4] Gaps in Actual Price indicate that IRI data is missing for that month.
Sources:
Gaskin Merits Report; Production of Weir Merits Report.

*Highly Confidential − Attorneys' Eyes Only*

**Exhibit 1E**
**Indexed Actual Prices Compared to Implied Prices Based on Mr. Gaskin's Estimated Price Premia**
**Honeycomb**
*July 2012 − December 2018*



Notes:
[1] Mr. Weir assumes the Challenged Statements were displayed during the following period: 08/01/2012−01/31/2017 (Council Stamp, Nutritious) for "Post Honeycomb Honey Oat And Corn Box Sweetened 12 5 Oz" (UPC: 0884912111715).
[2] Actual Price is the average non−promotional price indexed to the earliest price in the data for this product (08/19/2012).
[3] Mr. Gaskin estimates price premia of 12.2% for Council Stamp, and 0.8% for Nutritious. The Implied Price Index equals 1, until a Challenged Statement is added or removed. When a Challenged Statement is removed, the Implied Price decreases by the price premium percentage of that Challenged Statement. When a Challenged Statement is added, the Implied Price increases by the price premium percentage of that Challenged Statement. If the Challenged Statement was on the package at the beginning of the Class Period (August 29, 2012), I assume no change in the Implied Price on August 29, 2012.
[4] Gaps in Actual Price indicate that IRI data is missing for that month.
Sources:
Gaskin Merits Report; Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 1F**
**Indexed Actual Prices Compared to Implied Prices Based on Mr. Gaskin's Estimated Price Premia**
**Raisin Bran**
*July 2012 – December 2018*



Notes:
[1] Mr. Weir assumes the Challenged Statements were displayed during the following periods: 08/01/2012–03/31/2015 (No Fructose), 01/01/2013–01/31/2017 (Fiber, Healthy, Nutritious), 08/01/2012–03/31/2019 (Council Stamp) for "Post Raisin Bran Regular Whole Gran Wht Brn Box 25 Oz" (UPC: 0884912114709).
[2] Actual Price is the average non–promotional price indexed to the earliest price in the data for this product (08/19/2012).
[3] Mr. Gaskin estimates price premia of 8.1% for Council Stamp, 7.0% for No Fructose, 2.5% for Fiber, 2.3% for Healthy, and 2.1% for Nutritious. The Implied Price Index equals 1, until a Challenged Statement is added or removed. When a Challenged Statement is removed, the Implied Price decreases by the price premium percentage of that Challenged Statement. When a Challenged Statement is added, the Implied Price increases by the price premium percentage of that Challenged Statement. If the Challenged Statement was on the package at the beginning of the Class Period (August 29, 2012), I assume no change in the Implied Price on August 29, 2012.
[4] Gaps in Actual Price indicate that IRI data is missing for that month.
Sources:
Gaskin Merits Report; Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 2**
**Percentage Difference in Real Prices**
**Between Periods when Challenged Statements Were Present and Periods when They Were Not**
*August 29, 2012 – December 31, 2018*



Notes:
[1] Each bar represents a combination of one Challenged Product (one UPC) and one Challenged Statement.
[2] This graph shows only the Challenged Product and Challenged Statement combinations for which there are periods with and without the Challenged Statement on the product packaging. For example, the UPC 0884912001832 with "Four Grains" (03/13/2013 – 03/31/2019) is included, while the same UPC with "No Fructose" (08/29/2012 – 03/31/2019) is not included because there were no periods when "No Fructose" was not on the product package, according to Mr. Weir.
[3] Difference in Real Price is calculated in five steps. First, I calculate the market price per ounce, including both Post and RTE cereal competitors. I calculate this in each month as total dollar sales divided by total ounces sold. Second, I convert the monthly market price into a daily market price index as the cumulative percent change since August 2012. I assume the same index value for each day in a calendar month. Third, for each Challenged Product, I create a daily price series, assuming the same price for each day in the sales period (28 or 7 days). Price is calculated as total sales divided by total units. Fourth, I calculate the daily real price as the Challenged Product daily price divided by the market price index. Fifth, I calculate the percentage difference between the average real daily price for days when the Challenged Statement was present and the average daily real price for days when the Challenged Statement was not present.
Sources:
Production of Weir Merits Report; Gaskin Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 3A−1**
**Retail Sales in Periods with and without "Council Stamp" Statement**
**HBO**
*August 2012 – December 2018*



Note:
[1] The shaded region shows the period: 8/29/2012–3/31/2019 during which Mr. Weir assumes the "Council Stamp" label was displayed on the product package of "Post Honey Bunches Of Oats Honey Roasted Whole Grain Oat Box 18 Oz" (UPC: 0884912014269).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 3A−2**
**Retail Sales in Periods with and without "Four Grains" Statement**
**HBO**
*August 2012 − December 2018*



Note:
[1] The shaded regions show the periods: 11/29/2012−4/28/2016 and 10/12/2016−3/31/2019 during which Mr. Weir assumes the "Four Grains" label was displayed on the product package of "Post Honey Bunches Of Oats Honey Roasted Whole Grain Oat Box 18 Oz" (UPC: 0884912014269).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 3A−3**
**Retail Sales in Periods with and without "No Fructose" Statement**
**HBO**
*August 2012 − December 2018*



Note:
[1] The shaded region shows the period: 8/29/2012−3/31/2019 during which Mr. Weir assumes the "No Fructose" label was displayed on the product package of "Post Honey Bunches Of Oats Honey Roasted Whole Grain Oat Box 18 Oz" (UPC: 0884912014269).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 3B−1**
**Retail Sales in Periods with and without "Council Stamp" Statement**
**Great Grains**
*August 2012 − December 2018*



Note:
[1] The shaded region shows the period: 8/29/2012–3/31/2019 during which Mr. Weir assumes the "Council Stamp" label was displayed on the product package of "Post Great Grains Regular Whole Grain Box 16 Oz" (UPC: 0884912126115).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 3B−2**
**Retail Sales in Periods with and without "Field to Bowl" Statement**
**Great Grains**
*August 2012 − December 2018*



Note:
[1] The shaded regions show the periods: 8/29/2012−10/16/2013 and 11/6/2014−10/17/2016 during which Mr. Weir assumes the "Field to Bowl" label was displayed on the product package of "Post Great Grains Regular Whole Grain Box 16 Oz" (UPC: 0884912126115).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 3B−3**
**Retail Sales in Periods with and without "Less Processed" Statement**
**Great Grains**
*August 2012 − December 2018*



Note:
[1] The shaded region shows the period: 8/29/2012–10/17/2016 during which Mr. Weir assumes the "Less Processed" label was displayed on the product package of "Post Great Grains Regular Whole Grain Box 16 Oz" (UPC: 0884912126115).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 3B−4**
**Retail Sales in Periods with and without "Why Less Processed" Statement**
**Great Grains**
*August 2012 − December 2018*



Note:
[1] The shaded regions show the periods: 8/29/2012−10/16/2013 and 11/6/2014−10/17/2016 during which Mr. Weir assumes the "Why Less Processed" label was displayed on the product package of "Post Great Grains Regular Whole Grain Box 16 Oz" (UPC: 0884912126115).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 3C−1**
**Retail Sales in Periods with and without "Council Stamp" Statement**
**Honeycomb**
*August 2012 − December 2018*



Note:
[1] The shaded region shows the period: 8/29/2012–1/8/2017 during which Mr. Weir assumes the "Council Stamp" label was displayed on the product package of "Post Honeycomb Honey Oat And Corn Box Sweetened 12 5 Oz" (UPC: 0884912111715).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 3C−2**
**Retail Sales in Periods with and without "Nutritious" Statement**
**Honeycomb**
*August 2012 − December 2018*



Note:
[1] The shaded region shows the period: 8/29/2012–1/8/2017 during which Mr. Weir assumes the "Nutritious" label was displayed on the product package of "Post Honeycomb Honey Oat And Corn Box Sweetened 12 5 Oz" (UPC: 0884912111715).
[2] The sales data are only available through 12/30/2018.
Sources:
Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 4A**
**Actual Sales vs. Mr. Weir's Forecasted Sales**
**Great Grains**
*August 2012 – March 2019*



Notes:
[1] Mr. Weir forecasts dollar sales for "Post Great Grains Regular Multi Grain Box 14 Oz" (UPC: 0884912002372) in monthly increments during 08/12/18 – 10/07/18 and in weekly increments during 12/30/19 – 03/31/19.
[2] The data for this chart was taken directly from the file "forecast.dta", which is generated using Mr. Weir's Stata script "3 Forecast.do."
Source:
Production of Weir Merits Report.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 4B**
**Actual Sales vs. Mr. Weir's Forecasted Sales**
**HBO**
*August 2012 – March 2019*



Notes:
[1] Mr. Weir forecasts dollar sales for "Post Honey Bunches Of Oats Apple Whole Grain Oat Box 14 5 Oz" (UPC: 0884912005649) in monthly increments during 08/12/18 – 10/07/18 and in weekly increments during 12/30/19 – 03/31/19.
[2] The data for this chart was taken directly from the file "forecast.dta", which is generated using Mr. Weir's Stata script "3 Forecast.do."
Source:
Production of Weir Merits Report.

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 4C**
**Actual Sales vs. Mr. Weir's Forecasted Sales**
**HBO**
*August 2012 − March 2019*



Notes:
[1] Mr. Weir forecasts dollar sales for "Post Honey Bunches Of Oats Honey And Vanilla Multi Grain Box 18 Oz" (UPC: 0884912017864) in monthly increments during 08/12/18 − 10/07/18 and in weekly increments during 12/30/19 − 03/31/19.
[2] The data for this chart was taken directly from the file "forecast.dta", which is generated using Mr. Weir's Stata script "3 Forecast.do."
Source:
Production of Weir Merits Report.

*Highly Confidential - Attorneys' Eyes Only*

**Exhibit 5**
**Adjusting for Bias Attributable to Graphical Form of "Whole Grains Council Stamp"**
**Would Reduce Mr. Weir's Price Premium Damages by 35.3%**

| Product | Statement | Dollar Sales | Mr. Weir's Price Premium Damages | | Adjusting for Bias Attributable to Graphical Form of "Whole Grains Council Stamp" [1] | |
|---|---|---|---|---|---|---|
| | | | Price Premium | Damages | Price Premium [2] | Damages |
| | | [A] | [B] | [C]=[A]*[B] | [D] | [E]=[A]*[D] |
| Alpha Bits | Council Stamp | ■ | 29.7% | ■ | **9.69%** | ■ |
| Alpha Bits | Fructose | ■ | 10.7% | ■ | 10.7% | ■ |
| Alpha Bits | Nutritious | ■ | 15.0% | ■ | 15.0% | ■ |
| Bran Flakes | Council Stamp | ■ | 12.5% | ■ | **7.67%** | ■ |
| Bran Flakes | Fiber/Digestive | ■ | 9.16% | ■ | 9.16% | ■ |
| Bran Flakes | Fiber/Weight | ■ | 8.10% | ■ | 8.10% | ■ |
| Bran Flakes | No Fructose | ■ | 7.67% | ■ | 7.67% | ■ |
| Bran Flakes | Whole Grain | ■ | 7.67% | ■ | 7.67% | ■ |
| Great Grains | Council Stamp | ■ | 6.90% | ■ | **5.79%** | ■ |
| Great Grains | Field to Bowl | ■ | 5.79% | ■ | 5.79% | ■ |
| Great Grains | Less Processed | ■ | 0.00% | ■ | 0.00% | ■ |
| Great Grains | Metabolism | ■ | 1.33% | ■ | 1.33% | ■ |
| Great Grains | Why Less Processed | ■ | 1.78% | ■ | 1.78% | ■ |
| HBO | Council Stamp | ■ | 7.67% | ■ | **2.55%** | ■ |
| HBO | Four Grains | ■ | 2.55% | ■ | 2.55% | ■ |
| HBO | No Fructose | ■ | 4.26% | ■ | 4.26% | ■ |
| HBO | Wholesome | ■ | 2.34% | ■ | 2.34% | ■ |
| HBO Granola | Council Stamp | ■ | 9.30% | ■ | **3.10%** | ■ |
| HBO Granola | Wholesome | ■ | 4.53% | ■ | 4.53% | ■ |
| HBO Whole Grain | Balanced Diet | ■ | 3.27% | ■ | 3.27% | ■ |
| HBO Whole Grain | Council Stamp | ■ | 10.4% | ■ | **4.29%** | ■ |
| HBO Whole Grain | No Fructose | ■ | 3.47% | ■ | 3.47% | ■ |
| HBO Whole Grain | Nutritious | ■ | 3.68% | ■ | 3.68% | ■ |
| HBO Whole Grain | Whole Grain | ■ | 4.29% | ■ | 4.29% | ■ |

*Highly Confidential - Attorneys' Eyes Only*

**Exhibit 5**
**Adjusting for Bias Attributable to Graphical Form of "Whole Grains Council Stamp"**
**Would Reduce Mr. Weir's Price Premium Damages by 35.3%**

| Product | Statement | Dollar Sales | Mr. Weir's Price Premium Damages | | Adjusting for Bias Attributable to Graphical Form of "Whole Grains Council Stamp" [1] | |
|---|---|---|---|---|---|---|
| | | | Price Premium | Damages | Price Premium [2] | Damages |
| | | [A] | [B] | [C]=[A]*[B] | [D] | [E]=[A]*[D] |
| Honeycomb | Council Stamp | ■ | 12.2% | ■ | **4.01%** | ■ |
| Honeycomb | Nutritious | ■ | 0.75% | ■ | 0.75% | ■ |
| Raisin Bran | Council Stamp | ■ | 8.10% | ■ | **2.55%** | ■ |
| Raisin Bran | Fiber | ■ | 2.55% | ■ | 2.55% | ■ |
| Raisin Bran | Healthy | ■ | 2.34% | ■ | 2.34% | ■ |
| Raisin Bran | No Fructose | ■ | 7.03% | ■ | 7.03% | ■ |
| Raisin Bran | Nutritious | ■ | 2.13% | ■ | 2.13% | ■ |
| Waffle Crisp | Iron & Zinc | ■ | 6.31% | ■ | 6.31% | ■ |
| Waffle Crisp | No Fructose | ■ | 7.40% | ■ | 7.40% | ■ |
| **Total** | | ■ | | ■ | | ■ |

Reduction in Mr. Weir's Damages Calculation  ■
*Percent Difference*   **35.3%**

Notes:
[1] Mr. Gaskin describes possible bias attributable to introducing the "Whole Grains Council Stamp" to survey respondents in graphical form. He proposes that the price premium for the "Whole Grains Council Stamp" can be reduced to the value of any other whole grain statement for the cereal being tested. When there is no other whole grain statement for that cereal (i.e. Alpha Bits, HBO Granola, Honeycomb, Raisin Bran), Mr. Gaskin reduces the "Whole Grains Council Stamp" price premium by a factor of about 3.
[2] In the Price Premium column, bold typeface indicates that the price premium is adjusted for bias associated with the graphical form of the "Whole Grains Council Stamp," as described in the Gaskin Merits Report, pp. 33-35.
Sources:
Gaskin Merits Report; Weir Merits Report.

**Exhibit 6A**
**Mr. Weir Inappropriately Adds Price Premia for Concurrent Statements that were Jointly Tested**

| Product | Jointly Tested Statements | Price Premium | | | Reduction in Price Premium | Sales | Reduction in Damages |
|---|---|---|---|---|---|---|---|
| | | Statement 1 | Statement 2 | Concurrent Statements | | | |
| | | [A] | [B] | [C] | [D]=[A]+[B]-[C] | [E] | [F]=[D]*[E] |
| Bran Flakes | Fiber/Digestive AND Fiber/Weight | 9.17% | 8.10% | 13.01% | 4.26% | | |
| Bran Flakes | Whole Grain AND Council Stamp | 7.68% | 12.58% | 20.26% | 0.00% | | |
| Great Grains | Field to Bowl AND Council Stamp | 5.79% | 6.90% | 10.24% | 2.45% | | |
| Great Grains | Less Processed AND Why Less Processed | 0.00% | 1.78% | 2.45% | -0.67% | | |
| HBO | Four Grains AND Council Stamp | 2.56% | 7.68% | 8.10% | 2.13% | | |
| HBO Granola | Wholesome AND Council Stamp | 4.53% | 9.31% | 19.09% | -5.25% | | |
| HBO Whole Grain | Balanced Diet AND Nutritious | 3.27% | 3.68% | 7.16% | -0.20% | | |
| HBO Whole Grain | Whole Grain AND Council Stamp | 4.29% | 10.43% | 11.25% | 3.48% | | |
| Raisin Bran | Fiber AND Council Stamp | 2.56% | 8.10% | 10.45% | 0.21% | | |
| Raisin Bran | Healthy AND Nutritious | 2.35% | 2.13% | 3.41% | 1.07% | | |
| Waffle Crisp | No Fructose AND Iron & Zinc | 7.41% | 6.32% | 12.85% | 0.87% | | |



|  |  |
|---|---|
| **Mr. Weir's Damages Calculation** | |
| **Reduction in Mr. Weir's Damages Calculation** | |
| *Percent Difference* | **17.9%** |

Notes:

[A, B, C] *See* Gaskin Merits Report, Appendix K. The Concurrent Statements column shows the estimated price premium when Statement 1 and Statement 2 are combined as a single attribute level. Mr. Weir adds the price premia from Statement 1 and from Statement 2 rather than using the single price premium when both statements are present.

[E] Sales include dollar sales for UPCs in periods in which both Statement 1 and Statement 2 were present on packaging.

[F] The total shown for Mr. Weir's Damages Calculation includes only damages derived from sales periods with concurrent statements. It is calculated as the sum of ([A]+[B])*[E].

Sources:

Gaskin Merits Report; Weir Merits Report and Production.

*Highly Confidential - Attorneys' Eyes Only*

**Exhibit 6B**

**Mr. Weir Inappropriately Adds Price Premia for Concurrent Statements that were Jointly Tested**

**Adjusting for Bias Attributable to Graphical Form of "Whole Grains Council Stamp"**

| Product | Jointly Tested Statements | Statement 1 | Statement 2 | Adjusted Statement 2 | Concurrent Statements | Adjusted Concurrent Statements | Cumulative Reduction in Price Premium | Sales | Reduction in Damages |
|---|---|---|---|---|---|---|---|---|---|
| | | [A] | [B] | [C] | [D] | $[E]=[D] * \frac{[A]+[C]}{[A]+[B]}$ | [F]=[A]+[B]-[E] | [G] | [H]=[F]*[G] |
| Bran Flakes | Fiber/Digestive AND Fiber/Weight | 9.17% | 8.10% | 8.10% | 13.01% | 13.01% | 4.26% | | |
| Bran Flakes | Whole Grain AND Council Stamp | 7.68% | 12.58% | **7.67%** | 20.26% | **15.35%** | 4.91% | | |
| Great Grains | Field to Bowl AND Council Stamp | 5.79% | 6.90% | **5.79%** | 10.24% | **9.35%** | 3.35% | | |
| Great Grains | Less Processed AND Why Less Processed | 0.00% | 1.78% | 1.78% | 2.45% | 2.45% | -0.67% | | |
| HBO | Four Grains AND Council Stamp | 2.56% | 7.68% | **2.55%** | 8.10% | **4.04%** | 6.19% | | |
| HBO Granola | Wholesome AND Council Stamp | 4.53% | 9.31% | **3.10%** | 19.09% | **10.53%** | 3.31% | | |
| HBO Whole Grain | Balanced Diet AND Nutritious | 3.27% | 3.68% | 3.68% | 7.16% | 7.16% | -0.20% | | |
| HBO Whole Grain | Whole Grain AND Council Stamp | 4.29% | 10.43% | **4.29%** | 11.25% | **6.56%** | 8.17% | | |
| Raisin Bran | Fiber AND Council Stamp | 2.56% | 8.10% | **2.55%** | 10.45% | **5.01%** | 5.65% | | |
| Raisin Bran | Healthy AND Nutritious | 2.35% | 2.13% | 2.13% | 3.41% | 3.41% | 1.07% | | |
| Waffle Crisp | No Fructose AND Iron & Zinc | 7.41% | 6.32% | 6.32% | 12.85% | 12.85% | 0.87% | | |



|  |  |
|---|---|
| **Mr. Weir's Damages Calculation** | |
| **Reduction in Mr. Weir's Damages Calculation** | |
| *Percent Difference* | **53.3%** |

Notes:

[A, B, D] *See* Gaskin Merits Report, Appendix K. The Concurrent Statements column shows the estimated price premium when Statement 1 and Statement 2 are combined as a single attribute level. Mr. Weir adds the price premia from Statement 1 and from Statement 2 rather than using the single price premium when both statements are present.

[B] The total shown for Mr. Weir's Damages Calculation includes only damages derived from sales periods with concurrent statements. It is calculated as the sum of ([A]+[B]) * [G].

[C] Mr. Gaskin describes possible bias attributable to introducing the "Whole Grains Council Stamp" to survey respondents in graphical form. He proposes that the price premium for the "Whole Grains Council Stamp" can be reduced to the value of any other whole grain claim for the cereal being tested, or reduced by a factor of between 1.6 to 3 if there is no other whole grain statement for that cereal. Adjusted Statement 2 is the Council Stamp Statement price premium adjusted for graphical form bias. Adjusted numbers are shown in bold typeface.

[E] Assuming that the reduction in the Concurrent Statements' premia due to bias correction is the same as the reduction in the summed premia due to bias correction, I adjust the single combined premia by the ratio of Statement 1 plus Adjusted Statement 2 to Statement 1 plus Statement 2. Adjusted numbers are shown in bold typeface.

[F] Cumulative Reduction in Price Premium is the sum of the Concurrent Statements price premium adjusted for the Council Stamp bias minus unadjusted Statement 1 and Statement 2.

[G] Sales include dollar sales for UPCs in periods in which both Statement 1 and Statement 2 were present on packaging.

Sources:

Gaskin Merits Report; Weir Merits Report and Production.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 7A**
**Average Unit Price – California Multi Outlet**
**HBO**
*October 2012 – December 2017*



Notes:
[1] The graph plots data for "Post Honey Bunches Of Oats Honey Roasted Whole Grain Oat Box 18 Oz" (UPC: 0884912014261).
[2] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[3] Average Unit Price is the "Price per Unit" in the data. Price data is only available until 12/31/2017.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 7B**
**Average Unit Price – California Multi Outlet**
**Great Grains**
*October 2012 – December 2017*



Notes:
[1] The graph plots data for "Post Great Grains Regular Whole Grain Box 16 Oz" (UPC: 0884912126111).
[2] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[3] Average Unit Price is the "Price per Unit" in the data. Price data is only available until 12/31/2017.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

Highly Confidential – Attorneys' Eyes Only

**Exhibit 7C**
**Average Unit Price – California Multi Outlet**
**Honeycomb**
*October 2012 – December 2017*



Notes:
[1] The graph plots data for "Post Honeycomb Honey Oat And Corn Box Sweetened 12 5 Oz" (UPC: 0884912111711).
[2] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[3] Average Unit Price is the "Price per Unit" in the data. Price data is only available until 12/31/2017.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

Highly Confidential – Attorneys' Eyes Only

**Exhibit 8A**
**Percentage of Units Sold on Promotion – California Multi Outlet**
**HBO**
*December 2012 – October 2017*



Notes:
[1] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[2] Percentage of units sold on promotion data is only available until 10/28/2017.
Sources:
60 Months xAOC % on Promo.xlsx (Krom_POST00000359); 60 Months Food % on Promo.xlsx (Krom_POST00000364);
60 Months Walmart % on Promo.xlsx (Krom_POST00000369); 60 Months California % on Promo.xlsx (Krom_POST00000373).

Highly Confidential – Attorneys' Eyes Only

**Exhibit 8B**
**Percentage of Units Sold on Promotion – California Multi Outlet**
**Great Grains**
*December 2012 – October 2017*



Notes:
[1] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[2] Percentage of units sold on promotion data is only available until 10/28/2017.
Sources:
60 Months xAOC % on Promo.xlsx (Krom_POST00000359); 60 Months Food % on Promo.xlsx (Krom_POST00000364);
60 Months Walmart % on Promo.xlsx (Krom_POST00000369); 60 Months California % on Promo.xlsx (Krom_POST00000373).

Highly Confidential – Attorneys' Eyes Only

**Exhibit 8C**
**Percentage of Units Sold on Promotion – California Multi Outlet Honeycomb**
*December 2012 – October 2017*



Notes:
[1] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[2] Percentage of units sold on promotion data is only available until 10/28/2017.
Sources:
60 Months xAOC % on Promo.xlsx (Krom_POST00000359); 60 Months Food % on Promo.xlsx (Krom_POST00000364);
60 Months Walmart % on Promo.xlsx (Krom_POST00000369); 60 Months California % on Promo.xlsx (Krom_POST00000373).

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 9A**
**Average Prices – California Multi Outlet**
**HBO**
*October 2012 – August 2018*



Notes:
[1] This chart presents the prices of "Post Honey Bunches Of Oats Honey Roasted Whole Grain Oat Box 18 Oz" (UPC: 0884912014261).
[2] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[3] Average Base Price is the "Average Non Promoted Price per Unit" in the data. Average Promotional Price is the "Average Promoted Price per Unit" in the data. Average Unit Price is the "Price per Unit" in the data.
[4] Average Base Price and Average Promotional data is only available until 08/12/2018, and Average Unit Price is only available until 12/31/2017.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

Highly Confidential – Attorneys' Eyes Only

**Exhibit 9B**
**Average Prices – California Multi Outlet**
**Great Grains**
*October 2012 – August 2018*



Notes:
[1] This chart presents the prices of "Post Great Grains Regular Whole Grain Box 16 Oz" (UPC: 0884912126111).
[2] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[3] Average Base Price is the "Average Non Promoted Price per Unit" in the data. Average Promotional Price is the "Average Promoted Price per Unit" in the data. Average Unit Price is the "Price per Unit" in the data.
[4] Average Base Price and Average Promotional data is only available until 08/12/2018, and Average Unit Price is only available until 12/31/2017.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 9C**
**Average Prices – California Multi Outlet**
**Honeycomb**
*October 2012 – August 2018*



Notes:
[1] This chart presents the prices of "Post Honeycomb Honey Oat And Corn Box Sweetened 12 5 Oz" (UPC: 0884912111711).
[2] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[3] Average Base Price is the "Average Non Promoted Price per Unit" in the data. Average Promotional Price is the "Average Promoted Price per Unit" in the data. Average Unit Price is the "Price per Unit" in the data.
[4] Average Base Price and Average Promotional data is only available until 08/12/2018, and Average Unit Price is only available until 12/31/2017.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

Highly Confidential – Attorneys' Eyes Only

**Exhibit 10A**
**Average Base Price by Retail Channel – Nationwide**
**HBO**
*October 2012 – August 2017*



Notes:
[1] The graph plots data for "Post Hbo Plain Hny Rstd Bx 18 Oz." UPC information is not available for this data.
[2] U.S. Drug Stores include chain and independent drug retailers (e.g., Walgreens, RiteAid).
[3] U.S. Food Stores include any U.S. grocery or food retailers with sales above $2 million annually (e.g., Vons, Safeway).
[4] U.S. Extended All Outlet Combined includes Food/Grocery, Drug, Mass Merchandisers, Walmart, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[5] Average Base Price is "Base Unit Price" in the data. Price data is only available until 08/26/2017.
Sources:
Post Sales Data (Krom_POST00011188–92, tab "5 year monthly–Price"); 60 Months California Avg Unit Price (Krom_POST00000396); 60 Months Food Avg Unit Price (Krom_POST00000394); 60 Months Walmart Avg Unit Price (Krom_POST00000395); 60 Months xAOC Avg Unit Price (Krom_POST00000393).

*Highly Confidential – Attorneys' Eyes Only*

**Exhibit 10B**
**Average Base Price by Retail Channel – Nationwide**
**Great Grains**
*October 2012 – August 2017*



Notes:
[1] The graph plots data for "Post Grt Grn Dt Rsn Rte Ms Bx 16 Oz." UPC information is not available for this data.
[2] U.S. Drug Stores include chain and independent drug retailers (e.g., Walgreens, RiteAid).
[3] U.S. Food Stores include any U.S. grocery or food retailers with sales above $2 million annually (e.g., Vons, Safeway).
[4] U.S. Extended All Outlet Combined includes Food/Grocery, Drug, Mass Merchandisers, Walmart, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[5] Average Base Price is "Base Unit Price" in the data. Price data is only available until 08/26/2017.
Sources:
Post Sales Data (Krom_POST00011188–92, tab "5 year monthly–Price"); 60 Months California Avg Unit Price (Krom_POST00000396); 60 Months Food Avg Unit Price (Krom_POST00000394); 60 Months Walmart Avg Unit Price (Krom_POST00000395); 60 Months xAOC Avg Unit Price (Krom_POST00000393).

Highly Confidential – Attorneys' Eyes Only

**Exhibit 10C**
**Average Base Price by Retail Channel – Nationwide**
**Honeycomb**
*October 2012 – August 2017*



Notes:
[1] The graph plots data for "Post Honey Comb Rte Ms Bx 12 5 Oz." UPC information is not available for this data.
[2] U.S. Drug Stores include chain and independent drug retailers (e.g., Walgreens, RiteAid).
[3] U.S. Food Stores include any U.S. grocery or food retailers with sales above $2 million annually (e.g., Vons, Safeway).
[4] U.S. Extended All Outlet Combined includes Food/Grocery, Drug, Mass Merchandisers, Walmart, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[5] Average Base Price is "Base Unit Price" in the data. Price data is only available until 08/26/2017.
Sources:
Post Sales Data (Krom_POST00011188–92, tab "5 year monthly–Price"); 60 Months California Avg Unit Price (Krom_POST00000396); 60 Months Food Avg Unit Price (Krom_POST00000394); 60 Months Walmart Avg Unit Price (Krom_POST00000395); 60 Months xAOC Avg Unit Price (Krom_POST00000393).

Highly Confidential – Attorneys' Eyes Only

**Exhibit 11A**
**Average Base Price By Package Size – California Multi Outlet**
**HBO**
*August 2012 – August 2018*



Notes:
[1] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[2] Prices of products with fewer than 10 units sold in a month are excluded from this chart in that month.
[3] Average Base Price is the "Average Non Promoted Price per Unit" reported in the data. Price data is only available until 08/12/2018.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

Highly Confidential – Attorneys' Eyes Only

**Exhibit 11B**
**Average Base Price By Package Size – California Multi Outlet**
**Honeycomb**
*August 2012 – August 2018*



● 12.5 ounce (UPC: 0884912111711)   ● 16 ounce (UPC: 0884912111811)

Notes:
[1] California Multi Outlet includes Food/Grocery, Drug, Mass Merchandisers, Club Stores (e.g., BJ's and Sam's), Dollar Stores (e.g., Dollar General, Family Dollar, Fred's Dollar), Military DECA (e.g., commissaries).
[2] Prices of products with fewer than 10 units sold in a month are excluded from this chart in that month.
[3] Average Base Price is the "Average Non Promoted Price per Unit" reported in the data. Price data is only available until 08/12/2018.
Sources:
IRI Data ("IRI Data – Cold Cereals – CONFIDENTIAL – COUNSEL ONLY.XLSX, tab 'California – Multi Outlet'"; "Jack Fitzgerald – Kellogg (RTE Cereal) – HIGHLY CONFIDENTIAL AEO.XLSX, tab 'California – MULO'").

Highly Confidential – Attorneys' Eyes Only

**Exhibit 12A**
**Percent Decline in Consumption by Gender**



Notes:
[1] According to Mr. Gaskin's Demand Survey, the Control group observed a warning about excessive sugar consumption, which was omitted for the Test group.
[2] The percent decline is calculated as 1 − (Average Cups per Week of the Control group)/(Average Cups per Week of the Test group).
Sources:
Gaskin Merits Report; Weir Merits Report and Production.

Highly Confidential – Attorneys' Eyes Only

**Exhibit 12B**
**Percent Decline in Consumption  by Age Group**



Notes:
[1] According to Mr. Gaskin's Demand Survey, the Control group observed a warning about excessive sugar consumption, which was omitted for the Test group.
[2] The percent decline is calculated as 1 − (Average Cups per Week of the Control group)/(Average Cups per Week of the Test group).
Sources:
Gaskin Merits Report; Weir Merits Report and Production.

*Highly Confidential − Attorneys' Eyes Only*

**Exhibit 13**
**Adjusting for Consumers Under Age 18 Would Reduce Mr. Weir's Change in Demand Damages by 16.3%**

| Product | Dollar Sales | Mr. Weir's Change in Demand Damages | | Adjusting for Consumers Under Age 18 | | |
|---|---|---|---|---|---|---|
| | | Change in Demand | Damages | Percentage of Consumers Age 18 or Older | Change in Demand | Damages |
| | [A] | [B] | [C] = [A]*[B] | [D] | [E] = [B]*[D] | [F] = [A]*[E] |
| HBO Granola | ■ | 28.1% | | | **23.3%** | |
| HBO Whole Grain | ■ | 28.1% | ■ | ■ | **20.7%** | ■ |
| HBO | ■ | 28.1% | ■ | ■ | **23.3%** | ■ |
| Great Grains | ■ | 26.3% | ■ | ■ | 26.3% | ■ |
| Waffle Crisp | ■ | 26.3% | | ■ | 26.3% | |
| Honeycomb | ■ | 26.3% | ■ | ■ | **13.7%** | ■ |
| Alpha Bits | ■ | 26.3% | ■ | ■ | 26.3% | ■ |
| Bran Flakes | ■ | 26.3% | ■ | ■ | **23.1%** | ■ |
| Raisin Bran | ■ | 26.3% | ■ | ■ | **21.8%** | ■ |
| **Total** | ■ | | ■ | | | ■ |

Reduction in Mr. Weir's Damages Calculation ■
*Percent Difference* **16.3%**

Notes:
[1] Mr. Gaskin proposes the assumption that the presentation of the omitted warning would not affect the cereal consumption of children under age 18. Using this assumption, the change in overall consumption would be the percentage of consumers age 18 or older multiplied by the estimated percentage change in consumption.
[2] In the Change in Demand column, bold typeface indicates that the Change in Demand percentage was adjusted for the percentage of consumers age 18 or older. For products without documentation supporting the percentage of consumers age 18 or older (i.e. Great Grains, Waffle Crisp, Alpha Bits), I do not apply any adjustments.
Sources:
Gaskin Merits Report; Post Foods, LLC's Reply to MOM Brands Company's Response Concerning Cereal Advertising Claims for Mom Brands' Cereals, Dated July 10, 2014 (Krom_POST00058304-334 at -327, -328); NPD Age Profile Post Raisin Bran Bran Flakes Whole Grain HBO  5-19.xlsx; Weir Merits Report.

*Highly Confidential − Attorneys' Eyes Only*

**Exhibit 14**
**Including Only California Residents Would Reduce Mr. Weir's Change in Demand Damages by 100.0%**

| Product | Dollar Sales | Mr. Weir's Change in Demand Damages | | Including Only California Residents | | | | |
| | | | | Average Cups per Year | | | | |
| | | Change in Demand | Damages | Control Group | Test Group | Change in Demand | P-Value | Statistically Significant? |
| | [A] | [B] | [C] = [A]*[B] | [D] | [E] | [F] = 1 - [D] / [E] | [F] | [G] |
| HBO Granola | ▮ | 28.1% | ▮ | 261.60 | 253.28 | 0.2% | 0.497 | No |
| HBO Whole Grain | ▮ | 28.1% | ▮ | 261.60 | 253.28 | 0.2% | 0.497 | No |
| HBO | ▮ | 28.1% | ▮ | 261.60 | 253.28 | 0.2% | 0.497 | No |
| Great Grains | ▮ | 26.3% | ▮ | 240.63 | 241.14 | -3.3% | 0.546 | No |
| Waffle Crisp | ▮ | 26.3% | ▮ | 240.63 | 241.14 | -3.3% | 0.546 | No |
| Honeycomb | ▮ | 26.3% | ▮ | 240.63 | 241.14 | -3.3% | 0.546 | No |
| Alpha Bits | ▮ | 26.3% | ▮ | 240.63 | 241.14 | -3.3% | 0.546 | No |
| Bran Flakes | ▮ | 26.3% | ▮ | 240.63 | 241.14 | -3.3% | 0.546 | No |
| Raisin Bran | ▮ | 26.3% | ▮ | 240.63 | 241.14 | -3.3% | 0.546 | No |
| **Total** | ▮ | | ▮ | | | | | |

▮ in Mr. Weir's Damages Calculation       ▮

*Percent Difference*       **100.0%**

Notes:

[1] Mr. Gaskin includes a national sample in the demand suveys. For both surveys, 95 California residents are identified by QS2 of "CA," and 9 of these are excluded because Q1 equals 4 or 5, or because answers to questions 2-4 are missing.

[2] Damages are assumed to be $0 if the Control Group has higher average cups per year than the Test Group, or if the difference is not statistically significant.

[3] P-Value comes from a T-Test with the alternative hypothesis that the Control Group average cups per year is less than the Test Group average cups per year.

Sources:

Gaskin Merits Report; Weir Merits Report.

**Appendix A**            *Highly Confidential − Attorneys' Eyes Only*

# BRUCE A. STROMBOM, Ph.D.
## Managing Principal

| | |
|---|---|
| Phone: (213) 896-4520 | 333 S. Hope Street |
| Fax: (213) 623-4112 | Suite 2700 |
| bruce.strombom@analysisgroup.com | Los Angeles, CA  90071 |

Bruce Strombom is an expert in applied microeconomics, finance, and quantitative and statistical analysis.  He provides assistance to attorneys in all phases of pretrial and trial practice, prepares economic and financial models, and provides expert testimony in litigation and public policy matters.  Dr. Strombom has conducted assessments of class certification, liability, and damages issues in cases involving antitrust, breach of contract, ERISA, false advertising, intellectual property, labor and employment, product liability, securities, and general commercial disputes.

Prior to joining Analysis Group, Dr. Strombom was Executive Vice President of a middle-market merger and acquisition firm, where he managed a financial and market research organization that provided valuation and consulting services to over 500 privately held companies annually.  Previously, he was Consulting Manager at Price Waterhouse, where he provided litigation support and value enhancement consulting services, and Senior Financial Analyst at the Tribune Company, where he evaluated capital projects and acquisition candidates.  Dr. Strombom holds a Ph.D. in economics from the University of California, Irvine, and a B.A. in economics from San Jose State University.

## EDUCATION

| | |
|---|---|
| Ph.D. | Economics, University of California, Irvine |
| | Fields: Finance and Industrial Organization |
| | Thesis: Switching Cost, Price Sensitivity and Health Plan Choice |
| | |
| B.A. | Economics, San Jose State University, San Jose, CA |

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 2004 – Present | Managing Principal, Analysis Group, Inc., Los Angeles, CA |
| 1993 – 2004 | Senior Associate and Vice President, Analysis Group, Inc., Los Angeles, CA |
| 1992 | Regional General Manager, Prodata, Inc., Sacramento, CA |
| 1985 – 1991 | Executive Vice President, Geneva Business Research Corp., Irvine, CA |
| 1983 – 1985 | Manager of Consulting Services, Price Waterhouse, Newport Beach, CA |
| 1981 – 1983 | Senior Financial Analyst, Tribune Newspapers West, Woodland Hills, CA |

**Appendix A**

**SELECT CASE ASSIGNMENTS**

**General Commercial Litigation**

- **Debbie Krommenhock, et al. v. Post Foods LLC**
  *United States District Court, Northern District of California*
  Assess whether plaintiffs' proposed use of conjoint analysis provides a reliable method of calculating class-wide damages in this matter involving alleged misleading health claims on boxes of Post cereal (expert report).

- **Joesph Lack, et al v. Mizuho Bank and Mark Karpeles**
  *United States District Court, Central District of California, Southern Division*
  Evaluate economic issues related to class certification in this matter involving the bankruptcy of the bitcoin exchange Mt. Gox (expert report).

- **Denis Marc Audet, et al. v. Stuart A. Fraser, et al.**
  *United States District Court, District of Connecticut*
  Review economic evidence related to class certification in this matter involving the sale of virtual currency mining equipment and cloud-hosted mining and the inital coin offering of the cryptocurrency Paycoin (expert report and deposition).

- **Iconlab Inc., et al. v. Valeant Pharmaceuticals International, Inc., et al.**
  *United States District Court, Central District of California, Southern Division*
  Evaluate lost profits and unjust enrichment in this matter involving alleged misappropriation of trade secrets related to the sale of intraocular lenses in Turkey and India (expert report and deposition).

- **Gregory Greene, et al. v. Mizuho Bank and Mark Karpeles**
  *United States District Court, Northern District of Illinois, Eastern Division*
  Evaluate economic issues related to class certification in this matter involving the bankruptcy of the bitcoin exchange Mt. Gox (expert report and deposition).

- **New World TMT Limited v. Wang Wei, et al.**
  *High Court of the Republic of Singapore*
  Project defendant's net cash balance as of June 30, 2017 that is traceable to funds misappropriated from plaintiff from April 2000 to December 2006 (expert report).

- **United States of America, ex rel. Bruce Jacobs v. Bank of America, et al.**
  *United States District Court, Southern District of Florida*
  Assess whether calculations performed by plaintiff's expert provide a reliable estimate of damages from allegedly false claims for FHA insurance recoveries (expert report).

- **Strategic Partners, Inc. v. Vestagen Protective Technologies, Inc.**
  *United States District Court, Central District of California - Western Division*
  Evaluate damages from alleged false advertising under the Lanham Act and unfair business practices in the market for protective medical garments (expert report, deposition and testimony at trial).

**Appendix A**

- **Benjamin Michael Merryman, et al. v. Citigroup, Inc., et al.**
  *United States District Court, Southern District of New York*
  Evaluate the feasibility of calculating damages on a class-wide basis and rebut plaintiffs' damages calculation in this case involving foreign exchange transactions associated with American Depository Receipts (ADRs) (expert declaration and deposition).

- **Carlos McClatchy v. Gary B. Pruitt, et al.**
  *Superior Court of the State of California, City and County of San Francisco*
  Calculate damages to a trust beneficiary from the alleged failure to properly diversify the trust's holdings (deposition and testimony at trial).

- **Ronald McAllister, et al. v. The St. Louis Rams, LLC**
  *United States District Court, Eastern District of Missouri, Eastern Division*
  Identify data related to personal seat licenses available to the Rams and evaluate whether those data are suitable for identifying members of the proposed classes, establishing liability and calculating damages on a class-wide basis without individualized inquiry (expert report and deposition).

- **James J. Cotter, et al. v. Margaret Cotter, et al. and Reading International, Inc.**
  *District Court, Clark County, Nevada*
  Evaluate plaintiffs' damages analysis in this shareholder derivative action and address issues of loss causation (expert report and deposition).

- **CoreLogic, Inc. v. First American Financial Corp.**
  *JAMS Arbitration*
  Rebut Plaintiff's damages analysis in this matter involving alleged breach of contract and misappropriation of trade secrets (deposition and testimony at arbitration).

- **Maricopa County v. Office Depot, Inc.**
  *United States District Court, District of Arizona*
  Calculate damages from the alleged failure to comply with the terms of a contract that guaranteed the plaintiff the lowest prices offered by the defendant (expert report).

- **Alex Ang, et al. v. Bimbo Bakeries USA, Inc.**
  *United States District Court, Northern District of California*
  Evaluate proposed regression-based methods of determining harm to consumers and calculating damages resulting from allegedly false and misleading claims appearing on the labels of bread and other baked goods (declaration).

- **Patrick Hendricks, et al. v. Starkist Co.**
  *United States District Court, Northern District of California*
  Assess whether members of a putative class can be ascertained and whether the proposed method for calculating harm to consumers from underweight products can be applied on a common, class-wide basis (declaration and deposition).

- **David Helmer, et al. v. The Goodyear Tire & Rubber Co.**
  *United States District Court, District of Colorado*
  Assess the typicality of class representatives and numerosity of potential class members in this matter related to the manufacturing and distribution of allegedly defect hose used in hydronic heating systems (expert report and testimony at hearing).

**Appendix A**

- **Big 5 Sporting Goods Song-Beverly Cases**
  *Superior Court of California, County of Los Angeles*
  Estimate the value of certain ZIP code information collected from customers who made credit card purchases (expert report).

- **UMG Recordings, Inc. v. NBC Universal, Inc., et al.**
  *Superior Court of California, County of Los Angeles*
  Evaluate the reliability and adequacy of data provided by plaintiffs to calculate damages from the destruction of over 100,000 original master audio recordings in a warehouse fire (deposition).

- **Hansen Beverage Company v. Vital Pharmaceuticals, Inc.**
  *United States District Court, Southern District of California*
  Evaluate damages under the Lanham Act from alleged false advertising in the energy drink and energy shot markets (expert report and deposition).

- **Emily Diaz v. First American Home Buyers Protection Corporation**
  *United States District Court, Southern District of California*
  Evaluate class certification issues including plaintiff's proposed method of calculating economic damages suffered by members of the putative class using a common method of proof (expert report and deposition).

- **State Pipe and Supply, Inc. v. Coutinho & Ferrostal Inc.**
  *United States District Court, Central District of California*
  Calculate damages (a) to the plaintiff from the failure of a steel pipe supplier to deliver products as contracted and (b) to the defendant under a counter-claim assuming proper mitigation (expert report).

- **Classic Concepts v. Linen Source, Inc.**
  *United States District Court, Central District of California*
  Estimate damages related to a claim of copyright infringement (expert report and testimony at trial).

- **City of Los Angeles**
  *Consent Decree with U.S. Department of Justice*
  Evaluate claims of racial profiling by LAPD officers using advanced statistical techniques and data on motor vehicle and pedestrian stops (expert report).

- **In re: FedEx Ground Package System, Inc., Employment Practices Litigation**
  *United States District Court, Northern District of Indiana*
  In this case involving the alleged misclassification of drivers as independent contractors, led case team supporting two Academic Affiliates who analyzed the functions performed by FedEx drivers, the economic relationships between FedEx, the drivers and customers of FedEx, and transactions involving the sale of routes by drivers.

- **Memory Card International v. Fry's Electronics, Inc., et al.**
  *California Superior Court, County of Orange*
  Estimate damages caused by alleged misappropriation of trade secrets related to computer memory devices (expert report).

**Appendix A**

- **New World TMT, Ltd. v. PrediWave Corp., et al.**
  *Superior Court of California, County of Santa Clara*
  Evaluate prices of SDRAM chips and calculate damages from investments, purchases and advances made by New World when a cable television venture in China failed (expert report and deposition).

- **Rajashree Karwa v. Madison Tyler Holdings, LLC**
  *Arbitration before JAMS*
  Rebut damages claimed by plaintiff related to her termination and removal as a management member of Madison Tyler Holdings without sufficient cause (expert report and deposition).

- **Mark Ford, et al. v. Bimbo Bakeries USA, Inc., et al.**
  *Superior Court of California, County of Los Angeles*
  Estimate damages suffered by independent distributors in a contract dispute with a large commercial bakery (deposition).

- **Fredrick W. Penney, et al. v. CLC, Inc.**
  *Arbitration before JAMS*
  Estimate damages suffered by law firms from failure of a prepaid legal services plan to refer members to contracted legal network (deposition and testimony at arbitration).

- **Independent Association of Mailbox Center Owners, Inc., et al. v. Mail Boxes Etc. USA, Inc.**
  *Superior Court of California, County of San Diego*
- **O'Cubed Technology, Inc., et al. v. Mail Boxes Etc., Inc.**
  *Arbitration Before JAMS*
- **Anything Goes, LLC, et al. v. Mail Boxes Etc. USA, Inc.**
  *Superior Court of California, County of Los Angeles*
- **Catherine Thomas, et al. v. Mail Boxes Etc. USA, Inc.**
  *Arbitration before the American Arbitration Association*
- **Morgate LLC, et al. v. Mail Boxes Etc., Inc.**
  *Superior Court of California, County of Los Angeles*
  Case team leader supporting multiple experts in this series of cases brought by franchisees related to the acquisition of franchisor Mail Boxes Etc. USA, Inc. by United Parcel Service, Inc. and conversion of Mail Boxes Etc. stores to The UPS Stores.

- **Jason Brett, et al. v. The Walt Disney Company, et al.**
  *Superior Court of California, County of Los Angeles*
  Led a case team that gathered information from both electronic and paper sources, interviewed staff members, and created a comprehensive database covering over 8,300 television writers and analyzed the data for evidence of age discrimination.

- **In re Quanex Corporation and Affiliated Subsidiaries**
  *United States Tax Court*
  Assess the economic substance and business purpose of a transaction establishing a special purpose subsidiary (expert report and testimony at trial).

- **Impact Management Consulting v. National Scrip Center**
  *Arbitration before JAMS*
  Estimate lost profits from the breach of an exclusive marketing agreement (expert report).

**Appendix A**

- **Larry Plancich v. United Parcel Service, Inc.**
  *Superior Court of California, County of San Bernardino (testimony at trial)*
- **Ben Lopez v. United Parcel Service, Inc.**
  *United States District Court, Northern District of California (declaration)*
- **Daniel Kline v. United Parcel Service, Inc.**
  *United States District Court, Northern District of California (declaration)*
- **Gerald Shoemaker v. United Parcel Service, Inc.**
  *United States District Court, District of Idaho (declaration)*
  Analyze time records to determine whether the FLSA Motor Carrier Exemption applied in these wage and hour matters.

- **Microsoft Corp. – Private Antitrust Litigations**
  Consulting support to counsel related to potential overcharges from anticompetitive conduct in markets for PC operating system and application software. Estimated damages exposure in an antitrust action brought by Netscape for alleged anticompetitive conduct in the market for internet browsers.

- **Robert Kahn v. Financial Management Advisors, Inc.**
  *Arbitration before JAMS*
  Evaluate the equivalence of shares in an S-corporation with membership units in a majority owned subsidiary limited liability corporation (expert report and testimony at arbitration).

- **Janice Millius, et al. v. Los Angeles Unified School District**
  *Superior Court of California, County of Los Angeles*
  In this case seeking recovery of unpaid wages and benefits, calculated the difference in cost between bus service provided by district employees and service provided by independent third party vendors (expert report).

- **Kan Di Ki, Inc. v. Timothy B. Ferrigan, et al.**
  *Superior Court of California, County of Fresno*
  Estimate damages from breach of a non-solicitation agreement associated with the sale of a mobile radiology company (expert report and deposition).

- **Gary M. Kawesch, M.D. Inc. v. Antione L. Garabet, M.D., Inc., et al.**
  *United States District Court, Northern District of California*
  Estimate damages resulting from trademark/trade dress infringement by a laser eye surgery provider (expert reports).

- **Consumer Justice Center, et al. v. Brother Industries, Inc., et al.**
  *Superior Court of California, County of Orange*
  Develop, implement and analyze a consumer survey to determine whether product advertising misled consumers about product features.

- **Western Filter Corporation v. Vickers Inc.**
  *United States District Court, Central District of California*
  Assess damages resulting from the breach of an alliance agreement involving the sales and marketing of industrial hydraulic equipment (expert report and testimony at arbitration).

- **Edison Electric Institute**
  Prepare a white paper on the use of derivative securities to hedge risk in the electric utility industry.

**Appendix A**          *Highly Confidential − Attorneys' Eyes Only*
*Bruce A. Strombom, page 7*

- **SEC v. Henry Yuen, et al.**
  *United States District Court, Central District of California, Western Division*
  Provide consulting support on liability issues related to revenue recognition and market acceptance of a new interactive programming guide offered by Gemstar-T.V. Guide International.

- **Ticketmaster LLC v. StubHub, Inc.**
  *Superior Court of California, County of Los Angeles*
  Retained by defendant to evaluate damages from the sale of blocks of "artist hold tickets" on StubHub's internet-based marketplace.

## ERISA

- **Theresa Brown, et al. v. Nationwide Life Insurance Company, et al.**
  *United States District Court, Southern District of Ohio Eastern Division at Columbus*
  Assess, from an economic perspective, whether claims that Nationwide charged unreasonable asset-based fees for the provision of recordkeeping and other administrative service can be evaluated on a classwide basis (expert report).

- **Steve Wildman, et al. v. American Century Services, LLC, et al.**
  *United States District Court, Western District of Missouri*
  In this ERISA class action involving claims that a 401(k) plan sponsor breached fiduciary duties, plan fees were excessive and investment options were imprudent, evaluate whether liability and damages can be determined on a class-wide basis without individualized inquiry and evaluate plaintiffs' damages estimate (expert reports, deposition and testimony at trial).

- **Jaclyn Santomenno, et al. v. Transamerica Life Insurance Company, et al.**
  *United States District Court, Central District of California*
  In this case involving claims that fees charged by an ERISA retirement plan service provider were excessive, evaluate whether questions related to liability and damages can be addressed on a class-wide basis without individualized inquiry and calculate damages (expert reports and deposition).

- **Beverly Kanawi, et al. v. Bechtel Corporation**
  *United States District Court, Central District of California*
  Case team leader in rebutting analyses of seven opposing experts in ERISA case involving claims that 401(k) plan sponsor breached fiduciary duties, plan fees were excessive and investment options were imprudent.

- **Joan Ned-Sthran v. Methodist Hospitals of Dallas, et al.**
  *United States District Court, Northern District of Texas*
  Evaluate claims of breach of fiduciary duty and damages in ERISA case involving alleged excessive charges for employees' share of health insurance premiums (expert report).

- **Penske Logistics, LLC, et al. v. Freight Drivers and Helpers Local No. 557 Pension Fund**
  *Before Arbitrator Ira F. Jaffe*
  Evaluate economic issues related to the alleged evasion and avoidance of an unfunded pension liability under ERISA (expert report, deposition and testimony at arbitration).

**Appendix A**

## Health Care and Health Insurance

- **In re Loestrin 24 FE Antitrust Litigation**
  *United States District Court, District of Rhode Island*
  Evaluate availability of an administratively feasible method for ascertaining the members of a proposed end-payor class and the economic role of PBMs in retail prescription drug transactions (expert report, deposition and testimony at hearing).

- **In re Asacol Antitrust Litigation**
  *United States District Court, District of Massachusetts*
  Evaluate economic issues related to the ascertainability of the class and evidence that defendant's actions caused class-wide harm and evaluate plaintiffs' damages claims (expert report and deposition).

- **Francis Fenwick, et al. v. Ranbaxy Pharmaceuticals, et al.**
  *United States District Court, District of New Jersey*
  Evaluate plaintiffs' proposed methodology for identifying class members and calculating damages on a class-wide basis to consumers who purchased generic atorvastatin that may have contained a foreign material (expert report and deposition).

- **In re Wellbutrin XL Antitrust Litigation**
  *United States District Court, Eastern District of Pennsylvania*
  Evaluate the ascertainability of members of a class of indirect purchasers given risk-sharing arrangements in the distribution of pharmaceuticals and the "pass-on" of health care costs by health plans in the form of higher premiums (expert reports and deposition).

- **New Mexico Oncology and Hematology Consultants v. Presbyterian Healthcare Services, et al.**
  *United States District Court, District of New Mexico*
  Evaluate damages to a medical specialty group from alleged unlawful maintenance of monopoly power in the markets for private health insurance and inpatient services and attempted monopolization of the market for a speciality medical service by an integrated health insurer and provider organization (expert reports and depositions).

- **Lake Travis Transitional LTCH, LLC v. Lakeway Regional Medical Center, LLC, et al.**
  *The District Court of Travis County, Texas, 345th Judicial District*
  Review and evaluate cash flow projections for a start-up long-term care hospital and assess the reasonableness of estimated lost profit damages (deposition and testimony at trial).

- **Mylan Pharmaceuticals, Inc., et al. v. Warner Chilcott Public Limited Company, et al.**
  *United States District Court, Eastern District of Pennsylvania*
  Evaluate the relevance of "pass-on" issues to the damages claimed by indirect purchasers of an oral antibacterial drug (expert reports and deposition).

- **WellSpan Health, et al. v. Quantum Imaging and Therapeutic Associates, Inc.**
  *Court of Common Pleas of York County, Pennsylvania*
  Calculate damages from the alleged breach of noncompete provisions of employment contracts and unfair competiton related to provision of radiology and radiation oncology services (expert report).

**Appendix A**

- **Allegheny General Hospital v. UPMC Health Plan, Inc.**
  *Court of Common Pleas of Allegheny County, Pennsylvania*
  Evaluate methods of calculating "actual costs" incurred by a hospital in providing emergency and other medical services to health plan enrollees (declaration, expert report and deposition).

- **Beverly Clark, et al. v. The Prudential Insurance Company of America**
  *United States District Court, District of New Jersey*
  Evaluate whether the existence and extent of damages to members of the proposed class due to the closure of a block of health insurance business can be determined using a common method of proof without individual inquiry (declaration, expert report and deposition).

- **Capital Funding Group, Inc. v. Credit Suisse Securities LLC, et al.**
  *Circuit Court for Montgomery County, Maryland (expert report, deposition and testimony at trial)*

- **Leonard Grunstein et al. v. Ronald E. Silva, et al.**
  *Court of Chancery of the State of Delaware (expert report and deposition)*
  Evaluate whether defendants used plaintiffs' proprietary information related to HUD-insured refinancing of commercial mortgage backed securities (CMBS) issued in the acquisition of assisted living facilities throughout the U.S.

- **Neurosurgical Specialties of Nepa, Inc., et al. v. Wyoming Valley Health Care System, Inc.**
  *Court of Common Pleas of Luzerne County, Pennsylvania*
  Calculate damages from the alleged breach of contract for neurosurgery services between a medical practice and a hospital (expert report).

- **California State Auditor**
  Several assignments including review of the financial status and future prospects of the Los Angeles County Department of Health Services and review of a decision by CalPERS to limit the hospital network available to health plan enrollees.

- **Nevada Attorney General - Health Plan Merger**
  Retained by Nevada State Attorney General to prepare an expert report and testify concerning market definition and the impact of a proposed health plan merger on competition in health insurance markets. Evaluate possible monopsony power in the market for physician services.

- **In re Managed Care**
  *United States District Court, Southern District of Florida*
  Provide expert support to a large commercial health plan in a dispute involving claims adjudication practices, including the use of automated claims review and editing software, and prepare detailed analyses of over 100 million fee-for-service claims.

- **Oncure Medical Corporation v. Mission Hospital Regional Medical Center**
  *Superior Court of California, County of Orange*
  Estimate damages suffered by a radiation therapy provider from the breach of a non-compete agreement and provide assistance in mediation.

- **Unilab Corporation v. Westcliff Medical Laboratories**
  *California Superior Court, County of Los Angeles*
  Estimate damages associated with the acquisition of a medical testing laboratory.

**Appendix A**          *Highly Confidential − Attorneys' Eyes Only*
*Bruce A. Strombom, page 10*

- **Health Net, Inc. v. State Department of Health Services, et al.**
  *Superior Court of California, County of Sacramento*
  Estimate damages suffered by Health Net from the State's failure to properly allocate MediCal managed care enrollees to the health plan (deposition).

- **John Muir Medical Center v. Health Net, Inc.**
  *Arbitration before JAMS*
  Evaluate whether inflation in hospital charges exceeded the amount allowed in a provider services contract (deposition).

- **Sutter Health v. Health Net, Inc.**
  *American Arbitration Association*
  Assess the reasonableness of a hospital's billed charges during contract negotiations with a health plan (expert report and testimony at arbitration).

- **Cost Shifting in Hospital Services**
  For a consortium of community hospitals, compare hospital reimbursement rates paid by government payers (Medicare, Medicaid and County Indigent Programs) with those paid by commercial health plans and estimate the impact of "cost shifting" on health plan premiums and enrollment.

- **Wichita Clinic, P.A., v. Columbia/HCA Healthcare Corporation**
  *United States District Court, District of Kansas*
  Support Academic Affiliate in economic analysis and evaluation of the alleged monopolization of hospital services market.

- **Vitascan Partners v. G.E. Healthcare Financial Services**
  *Superior Court of California, County of Santa Barbara*
  Evaluate claims that poor performance of EBT scanners caused the failure of plaintiffs' business and estimate damages (deposition and testimony at trial).

- **The Commissioner of Corporations of the State of California v. Western Dental Services, Inc.**
  *California Superior Court, County of Orange*
  Support Academic Affiliate in evaluating the statistical sampling methodology used by the Department of Corporations to assess the quality of dental services.

- **MedImmune, Inc., v. Centocor, Inc., et al.**
  *United States District Court, District of Maryland*
  Support an Academic Affiliate in evaluating whether the monoclonal antibody product, Synagis, was commercially successful and whether the patented technology at issue contributed to that success.

**<u>Valuation</u>**

- **In re September 11 Litigation**
  *United States District Court, Southern District of New York*
  Led a case team that supported Academic Affiliate in estimating the value of the 99-year master leasehold interests held by Silverstein Properties and calculate damages from destruction of World Trade Center Towers One, Two, Four, Five and Seven on 9/11.

**Appendix A**

- **Center Partners, Ltd., et al. v. Urban Shopping Centers, L.P, et al.**
  *Circuit Court Cook County, Illinois*
  Value a minority interest with complex allocation and option provisions in a multi-billion dollar limited partnership with investments in regional shopping malls.

- **Gary Pudles v. William Robertshaw, et al.**
  *California Superior Court, County of Orange*
  Value a controlling interest in a software company providing communications, business process automation and performance management applications to businesses (deposition).

- **Sunset Drive Corporation v. City of Redlands**
  *United States District Court, Central District of California*
  Prepare financial projections, value a low- to moderate-income residential development and estimate damages suffered by a developer when defendant blocked construction (expert report and deposition).

- **MVU Investors LLC v. General Electric Corporation**
  *United States District Court, Central District of California*
  Estimate value and calculate damages from the alleged breach of an agreement to purchase a patent portfolio involving MRI technology (expert report).

- **Equipoint Financial Network, Inc. v. Bruce Barnes, et al.**
  *California Superior Court, County of San Diego*
  Review and critique defendants' valuation report and estimate the fair market value of a minority interest in an originator of FHA Home Equity Conversion (reverse) Mortgages (expert report).

- **SOC-SMG Inc. v. Day & Zimmermann, Inc.**
  *Arbitration before JAMS*
  Value two merging businesses and calculate the amount of overpayment in a joint venture transaction caused by misrepresentations and non-disclosure of material adverse events related to procurement of military contracts (expert report and testimony at arbitration).

- **Denise P. Edwards, et al., v. The First American Corporation, et al.**
  *United States District Court, Central District of California*
  Estimate the values of various interests in title insurance agencies acquired by First American to determine if purchase prices exceeded fair market value and constituted kickbacks for referrals of title insurance business under RESPA (expert reports and deposition).

- **Conrad P. Lee Company, et al. v. EPS Solutions Corp., et al.**
  *Arbitration before JAMS*
  Estimate the fair market value of five privately held companies, evaluate factors leading to the failure of a professional services firm and estimate damages resulting from non-disclosures in a roll-up transaction (expert reports, deposition and testimony at arbitration).

- **David Salomon v. Michael Gould, et al.**
  *Arbitration before JAMS*
  Review two competing valuations of a securities trading firm engaged in arbitrage in exchange-listed equities, fixed-income products and derivatives using proprietary algorithms and electronic trade execution software (deposition and testimony at arbitration).

**Appendix A**

- **Horowitz Limited Partnership I v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert report and testimony at arbitration);*
- **James Holden and Christine Holden v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert reports, deposition and testimony at arbitration); and*
- **Victor Arias, et al. v. Deloitte and Touche, et al.**
  *American Arbitration Association (expert reports, deposition and testimony at arbitration)*
  Value eight privately held companies, assess loss causation issues and estimate damages resulting from non-disclosures in a roll-up transaction involving over thirty professional service companies.

- **Peter Vagenas, et al. v. Demetrios Kefallinos, et al.**
  *Arbitration before ADR Services, Inc.*
  Value a fast-food restaurant chain, rebut plaintiffs' damages analysis and estimate damages from alleged infringement of trademark/trade dress (deposition and testimony at arbitration).

- **Marshall Hospital v. Eliot R. Drell, M.D., et al.**
  *Arbitration before JAMS*
  Estimate the fair market value of an Ambulatory Surgery Center and calculate lost profits from termination of a joint venture between a hospital and medical group (deposition and testimony at arbitration).

- **Chinyun Kim v. The Grover Coors Trust, et al.**
  *District Court, Jefferson County, Colorado*
  Provide analytic support to an Academic Affiliate in the valuation of convertible preferred stock in a financial distressed packaging materials manufacturer.

- **California State Auditor**
  At the request of the State Legislature, evaluate the merger of UCSF Medical Center and Stanford Health Services to determine the benefits of integration and assess the relative value of assets contributed by the two organizations.

- **Pacific Coin Management v. BR Telephony Partners, et al.**
  *California Superior Court, County of Los Angeles*
  Estimate damages suffered by the buyer of a pay telephone company from the seller's failure to disclose information allegedly pertinent to the value of the company (expert report, deposition and testimony at trial).

- **Bell and Associates, Inc. v. Fidelity National Information Solutions, Inc., et al.**
  *Superior Court of California, County of Orange*
  Value a start-up internet-based business enterprise and estimate damages caused by the alleged breach of a joint venture agreement (expert report and deposition).

- **Gray v. ODS Technology, LP, et al.**
  *United States District Court, Southern District of Florida*
  Value an option to acquire an equity interest in an internet gaming enterprise.

- **In re the Marriage of Downey**
  *California Superior Court, County of Orange*
  Value a manufacturer of commercial and general aviation aircraft cabin interior products (expert report and deposition).

**Appendix A**

- **California Food Plan, Inc. v. Robert Size, et al.**
  *California Superior Court, County of Orange*
  Value a direct marketing food retailer and analyze alleged excess compensation under a consulting agreement (expert report and deposition).

## Real Estate and Mortgage Lending

- **AMBAC Assurance Corporation, et al v. Nomura Credit & Capital, Inc., et al**
  *Supreme Court of the State of New York, County of New York*
  Evaluate damages caused by alleged defective loans originated by the defendant and include in two residential mortgage backed securitizations insured by the plaintiff (expert report).

- **Nancy L. Manchester, et al. v. U.S. Bank National Association, et al.**
  *Circuit Court of the First Circuit, State of Hawaii*
  Evaluate the nature and extent of class-wide injuries arising from foreclosure sales of residential real estate (expert report).

- **Evelyn Jane Gibo, et al. v. U.S. Bank National Association, et al.**
  *United States District Court, District of Hawaii*
  Evaluate the nature and extent of class-wide injuries arising from foreclosure sales of residential real estate (expert report and declaration).

- **Lionel Lima, Jr., et al. v. Deutsche Bank National Trust Company, et al.**
  *United States District Court, District of Hawaii*
  Evaluate the nature and extent of class-wide injuries arising from foreclosure sales of residential real estate (expert report and declaration).

- **Panagiotis Mallios v. Bank of America, NA, et al.**
  *District Court, Clark County, Nevada*
  Estimate damages to borrower when defendant declined to modify residential mortgages and foreclosed (expert report and testimony at trial).

- **In Re: RFC and ResCap Liquidating Trust Litigation**
  *United States District Court, District of Minnesota*
  Case team leader supporting multiple academic and mortgage industry experts in addressing issues including statistical sampling methods, mortgage origination standards and practices, loss causation and damages arising from the settlement of RMBS trust and monoline claims in the bankruptcy of RFC.

- **Old Republic Insurance Company v. The Bank of New York Mellon, et al.**
  *Circuit Court of Cook County, Illinois, County Department, Chancery Division*
  Case team leader supporting multiple academic and mortgage industry experts in addressing residential real estate and mortgage industry conditions, underwriting standards and practices and whether alleged misrepresentations had a statistically significant impact on loan performance.

**Appendix A**

- **Confidential Assignment – Residential Mortgage Portfolio Valuation**
  Value a multi-billion dollar portfolio of first and second lien residential mortgages for tax purposes.

- **Carmel Development Company v. Monterra Ranch Properties, LLC, et al.**
  *Superior Court of California, County of Monterey*
  Analyze financial and other records related to a failed residential real estate development and evaluate the amounts properly claimed under mechanics' liens (expert report, deposition and testimony at trial).

- **Bank of America, N.A. v. Old Republic Insurance Company**
  *United States District Court, Western District of North Carolina*
  Case team leader supporting academic affiliate in evaluating developments in the residential real estate and mortgage markets prior to, and during, the Great Recession and the impact of those developments on loan performance and mortgage market participants including mortgage insurers.

- **Conley D. Wolfswinkel, et al. v. Joseph Arpaio, et al.**
  *United States District Court, District of Arizona*
  Estimate damages resulting from inability to restructure real estate loans as a result of disruption to plaintiffs' business caused by illegal execution of a search warrant and seizure of company property (expert report and deposition).

- **Eagle Real Estate Group, LLC, et al. v. Kenneth R. Melton, et al.**
  *Superior Court of California, County of Orange*
  Support Academic Affiliate in the valuation of multifamily residential properties and estimation of damages resulting from breach of a partnership agreement.

- **Countrywide Financial Corporation, et al. v. Republic Mortgage Insurance Company, et al.**
  *American Arbitration Association*
  Case team leader supporting academic affiliate in addressing statistical sampling and inferences concerning mortgage underwriting practices and quality control procedures.

- **Confidential Assignment – Residential Mortgage Underwriting Standards**
  Evaluate the impact on minority borrowers of changes to underwriting standards of a large residential mortgage lender that were motivated by falling residential real estate values and present findings to HUD.

- **Bank of America, N.A. v Republic Mortgage Insurance Company, et al.**
  *American Arbitration Association*
  Case team leader supporting Academic Affiliate in evaluating risk management practices in mortgage lending and securitization and describing of factors that contributed to home price appreciation in the early to mid-2000s and the collapse that followed.

- **EMC Mortgage Corporation v. Ameriquest Mortgage Corporation**
  *District Court of Denton County, Texas 16th Judicial District*
  Support Academic Affiliate in preparing expert report analyzing how trends in residential real estate prices, loan repurchase obligations and developments in the securities markets interacted to force the closure of many subprime lenders.

**Appendix A**

- **First American Corporation**
  Prepare expert reports and provide testimony before various state regulators concerning competition in markets for title insurance and real estate closing services, variation in real estate conveyance practices across markets and proposed changes in title insurance regulation.

- **Cecil Barret, Jr., et al. v. Option One Mortgage Corp., et al.**
  *United States Distric Court, District of Massachusetts*
  Led a case team supporting an Academic Affiliate in evaluating whether plaintiffs' statistical analyses showed a common mode of exercising discretion in loan pricing across brokers and a common disparate impact on minority borrowers.

**<u>Title Insurance</u>**

- **In The Matter of First American Title Insurance Company Market Conduct Examination**
  *Before the Indiana Commissioner of Insurance*
  Review and evaluate the methods of statistical sampling, extrapolation and calculation of alleged overcharges and premium tax underpayments used in the Department of Insurance's Market Conduct Examination (expert report, deposition and testimony at hearing).

- **Cynthia A. Patterson, et al. v. Fidelity National Title Insurance Company, et al.**
  *Court of Common Pleas of Allegheny County, Commonwealth of Pennsylvania, Civil Division*
  Assess the accuracy of certian data stored in Fidelity's database systems related to real estate transactions (expert report and deposition).

- **Sjobring v. First American Title Co.**
  *Superior Court of the State of California, County of Los Angeles*
  Assess the feasibility of using defendant's electronic data to prove, on a class-wide basis, whether charges exceeded rates filed with the California Department of Insurance (declaration and deposition).

- **Bruce Levine, et al. v. First American Title Insurance Co.,**
  *United States District Court, Eastern District of Pennsylvania*
  Review and evaluate plaintiffs' proposed method of identifying class members and calculating damages on a class-wide basis (expert report).

- **Miriam Haskins, et al. v. First American Title Insurance Company**
  *United States District Court, District of New Jersey*
  Evaluate the feasibility of identifying members of a proposed class using electronic data and calculating damages on a class-wide basis (expert report, deposition and testimony at hearing).

- **Patrick Kirk, et al. v. First American Title Insurance Company, et al.**
  *Superior Court of California, County of Los Angeles*
  Evaluate the level of filed rates and estimate the fair market value of various real estate settlement services (declaration, deposition and testimony at trial).

- **Anthony L. Slapikas, et al. v. First American Title Insurance Company**
  *United States District Court, Western District of Pennsylvania*
  Evaluate the feasibility of identifying on a class-wide basis individuals that were entitled to, but did not receive, either the Reissue Rate or the Refinance Rate based on electronic data maintained in defendant's data processing systems (declaration).

**Appendix A**

- **Campbell v. First American Title Insurance Company, Inc.**
  *United States District Court, District of Maine*
  Evaluate class certification issues and review the statistical sampling method used by plaintiffs' expert to estimate the frequency of overcharges for title insurance policies issued in refinance transactions (expert report).

- **Daniel Perez, et al. v. First American Title Insurance Company, Inc.**
  *United States District Court, District of Arizona*
  Draw and evaluate a sample of title insurance policy files to determine the frequency of mispricing and assess whether damages can be calculated on a class-wide basis without individual inquiry (expert report and deposition).

- **Raffone, et al. v. First American Title Insurance Company, Inc.**
  *Circuit Court, Nassau County, Florida*
  Assess the feasibility of using the company's electronic data to determine whether consumers were entitled to, but did not receive, discounted prices on a class-wide basis (expert reports).

<u>**Automotive**</u>

- **In re: FCA US LLC Monostable Electronic Gearshift Litigation**
  *United States District Court, Eastern District of Michigan, Southern Division*
  Review and rebut plaintiffs' proposed survey-based method of calculating class-wide damages and analyze used car prices for evidence of diminution of value resulting from alleged defects in electronic gearshifts (expert report and deposition).

- **Tom Kondash, et al. v. Kia Motors America and Kia Motors Corp.**
  *United States District Court, Southern District of Ohio*
  Evaluate the plaintiffs' proposed method of calculating class-wide damages resulting from alleged defects in panoramic sunroofs (expert report and deposition).

- **Billy Glenn, et al. v. Hyundai Motor America, et al.**
  *United States District Court, Central District of California*
  Evaluate the plaintiffs' proposed method of calculating class-wide damages and conduct a statistical analysis of the fracture rates of conventional and panoramic sunroofs (expert report and deposition).

- **Paul Butler, et al. v. Porsche Cars North America, Inc.**
  *United States District Court, Northern Cistrict of California*
  Assess whether a common methodology exists to measure the alleged diminution in the value of class vehicles had an allegedly defect been disclosed at the time of purchase (expert report).

- **Alfred Salas and Gloria Ortega v. Toyota Motor Sales, U.S.A. Inc.**
  *United States District Court, Central District of California*
  Evaluate plaintiffs' proposed Benefit of the Bargain Damages Methodology and determine if it provides a reliable method of calculating class-wide damages without individualized inquiry (expert report and deposition).

**Appendix A**

- **Galo Coba, et al. v. Ford Motor Company**
  *United States District Court, District of New Jersey*
  Assess whether used vehicle prices support the claim of diminution in the value of class vehicles as a result of allegedly defective fuel tanks (expert report and deposition).

- **In re General Motors OnStar Litigation**
  *United States District Court, Eastern District of Michigan*
  Assess whether common proof exists of injury to all members of the putative class and whether damages can be calculated on a class-wide basis without individual inquiry (expert report and deposition).

- **Margie Daniel, et al. v. Ford Motor Company**
  *United States District Court, Eastern District of California*
  Evaluate repair costs for fleet vehicles for evidence of excess tire wear and review prices of used car transactions for evidence of excess depreciation in the Ford Focus (expert report, deposition and testimony at trial).

- **Peter Diamond, et al. v. Porsche Cars North America, Inc.**
  *Circuit Court of the 11th Judicial Circuit, Miami-Dade County, Florida*
  Evaluate whether quantitative and statistical methods could be used to establish liability and loss causation in this case involving allegedly defective headlights in Porsche vehicles (deposition and testimony at hearing).

- **Johnette C. Alexander, et al. v. Kia Motors America, Inc., et al.**
  *Superior Court of California, County of Orange*
  Assess damages suffered by class members caused by alleged defective rear seat belt systems in the Kia Sephia (deposition and testimony at trial).

- **Regina Little, et al. v. Kia Motors America, Inc., et al.**
  *Superior Court of New Jersey – Law Division Union County (expert report and testimony at trial);*
- **Maria Santiago, et al. v. Kia Motors America, Inc., et al.**
  *Superior Court of California, County of Orange (deposition); and*
- **Shamell Samuel-Bassett, et al. v. Kia Motors America, Inc., et al.**
  *Court of Common Pleas of Philadelphia County, Pennsylvania (expert report and testimony at trial)*
  Estimate excess depreciation of vehicle and other damages suffered by class members as the result of an allegedly defective braking system in the Kia Sephia in this series of cases in state courts.

## SELECTED PAPERS AND PRESENTATIONS

"Product Liability Litigation Involving Pharmaceuticals and Medical Devices: How Has It Changed in the Big Data/Social Media Era?" Law and Economics Symposium, MIT Sloan, Samberg Center, May 6 2019, Cambridge, MA.

"Using Cash Flows Versus Accrual Net Income," (co-author), *Calculation of Lost Profits Damages – Theory and Practice*, 1st ed., Everett and Kinrich, eds., Valuation Products and Services LLC, 2017.

"Competition in Title Insurance Markets Since the Great Recession," presented at the National Conference of Insurance Legislators, Summer Meeting, July 11, 2013, Philadelphia, PA.

**Appendix A**

"Class Certification and Damages Theories: Consumers' Valuation of Un-priced Product Attributes," presented at a Webinar continuing legal education forum sponsored by Ballard Spahr, May 16, 2012.

"Statistical Analyses in Proactive Audits and Employment Litigation," presented at a Webinar continuing legal education forum for attorneys sponsored by Analysis Group, Inc. May 20, 2009.

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a Webinar continuing legal education forum for attorneys sponsored by Analysis Group, Inc., July 29, 2008

"The Subprime Mortgage Crisis and Disclosures: What Went Wrong?" presented at a continuing education forum for attorneys sponsored by Analysis Group, Inc., June 24, 2008, San Francisco, CA.

"Subprime Litigation: A Survival Guide," presented at Institutional Investor Legal Forum Summer Roundtable, June 18, 2008, Santa Monica, CA.

"Subprime Lending Litigation," Program Co-chair at a continuing education forum for attorneys sponsored by CLE International, May 8 and 9, 2008, Los Angeles, CA.

"Reductions in Force: Strategies to Minimize Litigation Risk in Downsizing," presented at a continuing education forum for attorneys sponsored by K&L Gates, January 17, 2008, New York, NY.

"Investigation of Racial Profiling by the LAPD – Pedestrian and Motor Vehicle Post-Stop Data Analysis Report," City of Los Angeles, July 2006.

"An Assessment of Competition in California Title Insurance and Escrow Markets," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Evaluation of Proposed Regulations for the California Title Insurance and Escrow Industry," with Bruce Stangle, report prepared for First American Title Insurance Company, August 30, 2006.

"Competition and Title Insurance Rates in California," with Bruce Stangle, report prepared for First American Title Insurance Company, January 23, 2006.

"Competition and Title Insurance Prices in California," report and presentation to the National Association of Insurance Commissioners (NAIC), Title Insurance Working Group, June 2006, Washington DC.

"Switching Cost, Price Sensitivity and Health Plan Choice," *Journal of Health Economics* 21, January 2002, p. 89-116.

"Risk Selection Caused by the Correlation of Health Status and Sensitivity to Price," Research in Health Care Financial Management Symposium, August 2001, Best Research Paper Award.

"Health Status and Consumers' Willingness to Switch Health Plans," American Public Health Association, Annual Meeting, October 1999, Chicago, IL.

"Risk Selection in a Setting of Managed Competition," Western Economics Association, Annual Conference, July 1999, San Diego, CA.

**Appendix A**

*Highly Confidential − Attorneys' Eyes Only*
*Bruce A. Strombom, page 19*

"Policy Options for Reducing Growth in Medicaid Spending for Long-term Care Services," Pfizer, Inc., Health Care Legislation Conference, May 1997, Irvine, CA.

"Regulation of Provider Networks that Bear Insurance Risk," Health Care in Louisiana: Issues and Answers, January 1997.

*Highly Confidential - Attorneys' Eyes Only*

**Appendix B**
**Documents Considered**

*Legal Filings and Expert Reports*

| |
|---|
| Declaration of Colin B. Weir, April 24, 2019, and materials relied upon |
| Declaration of Colin B. Weir, January 11, 2019, and backup data and materials relied upon |
| Declaration of Steven P. Gaskin, January 11, 2019, and materials relied upon |
| Expert Rebuttal Declaration of Bruce A. Strombom, March 12, 2019, and materials relied upon |
| Expert Report and Declaration of Dr. Kent D. Van Liere, March 12, 2019 |
| Expert Report and Declaration of Professor Dominique M. Hanssens, March 12, 2019 |
| Expert Report of Bruce G. Silverman, April 24, 2019 |
| Report of Steven P. Gaskin, April 24, 2019, and materials relied upon |
| Second Amended Complaint, *Debbie Krommenhock, et al. v. Post Foods LLC*, September 14, 2017 |

*Depositions and Exhibits*

| |
|---|
| Deposition of Colin Weir, *Debbie Krommenhock, et al. v. Post Foods LLC*, March 1, 2019 |
| Deposition of Colin Weir, *Debbie Krommenhock, et al. v. Post Foods LLC*, May 14, 2019 |
| Deposition of Debbie Krommenhock, *Debbie Krommenhock, et al. v. Post Foods LLC*, December 20, 2018 |
| Deposition of Garrett Winters, Debbie Krommenhock, et al. v. Post Foods LLC, February 12, 2019 |
| Deposition of Krista Mehren, Debbie Krommenhock, et al. v. Post Foods LLC, February 13, 2019 |
| Deposition of Roxanne Bernstein, *Debbie Krommenhock, et al. v. Post Foods LLC*, February 14, 2019 |
| Deposition of Stephen Hadley, *Debbie Krommenhock, et al. v. Post Foods LLC*, January 4, 2019 |
| Deposition of Steven P. Gaskin, *Debbie Krommenhock, et al. v. Post Foods LLC*, February 28, 2019 |
| Deposition of Steven P. Gaskin, *Debbie Krommenhock, et al. v. Post Foods LLC*, May 15, 2019 |

*Other Documents from Counsel*

| |
|---|
| 60 Months California % on Promo.xlsx (Krom_POST00000373) |
| 60 Months California Avg Unit Price.xlsx (Krom_POST00000396) |
| 60 Months California Dollar Volume.xlsx (Krom_POST00000370) |
| 60 Months California lb Volume.xlsx (Krom_POST00000372) |
| 60 Months California Unit Volume.xlsx (Krom_POST00000371) |
| 60 Months Food % on Promo.xlsx (Krom_POST00000364) |
| 60 Months Food %ACV.xlsx (Krom_POST00000363) |
| 60 Months Food Avg Unit Price.xlsx (Krom_POST00000394) |
| 60 Months Food Dollar Volume.xlsx (Krom_POST00000360) |
| 60 Months Food Lb Volume.xlsx (Krom_POST00000362) |
| 60 Months Food Unit Volume.xlsx (Krom_POST00000361) |
| 60 Months Share-Post Legacy.xlsx (Krom_POST00000401) |
| 60 Months Walmart % on Promo.xlsx (Krom_POST00000369) |
| 60 Months Walmart %ACV.xlsx (Krom_POST00000368) |
| 60 Months Walmart Avg Unit Price.xlsx (Krom_POST00000395) |
| 60 Months Walmart Dollar Volume.xlsx (Krom_POST00000365) |
| 60 Months Walmart Lb Volume.xlsx (Krom_POST00000367) |
| 60 Months Walmart Unit Volume.xlsx (Krom_POST00000366) |
| 60 Months xAOC % on Promo.xlsx (Krom_POST00000359) |
| 60 Months xAOC %ACV.xlsx (Krom_POST00000358) |
| 60 Months xAOC Avg Unit Price.xlsx (Krom_POST00000393) |
| 60 Months xAOC Dollar Volume.xlsx (Krom_POST00000355) |
| 60 Months xAOC Lb Volume.xlsx (Krom_POST00000357) |
| 60 Months xAOC Unit Volume.xlsx (Krom_POST00000356) |
| Age Profile (Krom_POST00058304-334) |
| Annual California % on Promo.xlsx (Krom_POST00000392) |
| Annual California Avg Unit Price.xlsx (Krom_POST00000397) |
| Annual California Dollar Volume.xlsx (Krom_POST00000389) |
| Annual California Lb Volume.xlsx (Krom_POST00000391) |
| Annual California Unit Volume.xlsx (Krom_POST00000390) |
| Annual Food % on Promo.xlsx (Krom_POST00000383) |
| Annual Food %ACV.xlsx (Krom_POST00000382) |
| Annual Food Avg Unit Price.xlsx (Krom_POST00000399) |

*Highly Confidential - Attorneys' Eyes Only*

# Appendix B
## Documents Considered

| |
|---|
| Annual Food Dollar Volume.xlsx (Krom_POST00000379) |
| Annual Food Lb Volume.xlsx (Krom_POST00000381) |
| Annual Food Unit Volume.xlsx (Krom_POST00000380) |
| Annual Share-Post Legacy.xlsx (Krom_POST00000402) |
| Annual Walmart % on Promo.xlsx (Krom_POST00000388) |
| Annual Walmart %ACV.xlsx (Krom_POST00000387) |
| Annual Walmart Avg Unit Price.xlsx (Krom_POST00000398) |
| Annual Walmart Dollar Volume.xlsx (Krom_POST00000384) |
| Annual Walmart Lb Volume.xlsx (Krom_POST00000386) |
| Annual Walmart Unit Volume.xlsx (Krom_POST00000385) |
| Annual xAOC % on Promo.xlsx (Krom_POST00000378) |
| Annual xAOC %ACV.xlsx (Krom_POST00000377) |
| Annual xAOC Avg Unit Price.xlsx (Krom_POST00000400) |
| Annual xAOC Dollar Volume.xlsx (Krom_POST00000374) |
| Annual xAOC Lb Volume.xlsx (Krom_POST00000376) |
| Annual xAOC Unit Volume.xlsx (Krom_POST00000375) |
| IRI Data (IRI Data - Cold Cereals - CONFIDENTIAL - COUNSEL ONLY.XLSX; Jack Fitzgerald - Kellogg (RTE Cereal) - HIGHLY CONFIDENTIAL AEO. XLSX) |
| NPD Age Profile Post Raisin Bran Bran Flakes Whole Grain HBO 5-19.xlsx |
| Post IRI cereals - filled.xlsx |
| Post Package Labels (Krom_POST00000001-350) |
| Post Sales Data (Krom_POST00011188-95) |
| Production of Weir Declaration, January 11, 2019 |
| Production of Weir Merits Report, May 4, 2019 |

### Academic Articles and Books

| |
|---|
| Bruce D. Meyer, "Natural and Quasi- Experiments in Economics," 1994, NBER Technical Working Paper No. 170 |
| Bryan K. Orme (2014), Getting Started with Conjoint Analysis, 3rd Edition, Research Publishers LLC |
| R. Glenn Hubbard and Anthony Patrick O'Brien (2017), Economics, 6th Edition, Pearson Education, Inc. |

### Publicly Available Documents

| |
|---|
| "Great Grains Cereal," available at https://www.postconsumerbrands.com/great-grains/ |
| "Post Consumer Brands U.S.," available at https://www.postholdings.com/businesses/post-consumer-brands-us/ |
| "Post History," available at https://www.postholdings.com/about/post-history/ |
| "Post Holdings EBITDA Margin 2010-2019," available at https://www.macrotrends.net/stocks/charts/POST/post-holdings/ebitda-margin |
| Post Holdings, Inc. 2017 Annual Report |
| Statista, "Ready-to-eat cereal sales in the United States in 2014 to 2017 (in billion U.S. dollars)," available at https://www.statista.com/statistics/407906/us-ready-to-eat-cereal-sales/ |
| Statista, "U.S. population: Most eaten brands of breakfast cereal (cold) within 7 days from 2014 to 2018," September 2018, available at https://www.statista.com/statistics/282000/us-households-brands-of-breakfast-cereal-cold-eaten-within-7-days-trend/ |